UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

MAURICE RICHARDSON,

                        Plaintiff,

v.

ENFORCEMENT AGENCY (DEA); SPECIAL
RESPONSE TEAM (SRT); OFFICERS JOHN             1:25-CV-0774
DOES 1-8, Members of Special Response Team,     (AJB/ML)
in their individual and official capacities;
KENNETH SANDERS, Member of Special
Response Team; COHOES POLICE DEP'T;
OFFICER JOHN DOE 9, Cohoes Police Dep't,
their individual and official capacities; and
OFFICER JANE DOE 10, Cohoes Police
Dep't, in their individual and official capacities,

                        Defendants.
_____

APPEARANCES:                             OF COUNSEL:

MAURICE RICHARDSON
  Plaintiff, *Pro Se*
Allenwood Low Federal Correctional Institution
Post Office Box 1000
White Deer, Pennsylvania 17887

MIROSLAV LOVRIC, United States Magistrate Judge

## <u>ORDER and REPORT-RECOMMENDATION</u>

      The Clerk has sent a complaint in the above captioned action together with an amended

application to proceed *in forma pauperis* and inmate authorization form, filed by Maurice

Richardson ("Plaintiff") to the Court for review. (Dkt. Nos. 4, 7, 15.) For the reasons discussed

below, I (1) grant Plaintiff's amended *in forma pauperis* application (Dkt. No. 15), and (2)

recommend that Plaintiff's Complaint (Dkt. No. 7) be dismissed in part without prejudice and with leave to amend, and in part without leave to amend.

## I.    INTRODUCTION

Construed as liberally[1] as possible, Plaintiff's Complaint alleges that his constitutional rights were violated by defendants Drug Enforcement Agency ("DEA"), Special Response Team ("SRT"), Cohoes Police Department, Kenneth Sanders, John Does 1-8, John Doe 9, and Jane Doe 10 (collectively "Defendants"). (*See generally* Dkt. No. 7.)

More specifically, the Complaint alleges that on November 16, 2023, at approximately 6:20 a.m., Defendants DEA, SRT, and the Cohoes Police Department executed a search warrant at Plaintiff's residence. (Dkt. No. 7 at 2.) Plaintiff alleges that while assisting his mother, officers aggressively seized him, punched him in the face, and continued to assault him. (*Id.*) Plaintiff alleges that he was subjected to multiple punches to his head and body, slammed into a wall, kicked in the stomach, and forcibly restrained with zip ties while officers hit and pushed him. (*Id.*) The Complaint alleges that Plaintiff suffered multiple bruises, scratches, pain, and was not offered any medical attention despite his clear injuries. (*Id.*)

Based on these factual allegations, Plaintiff asserts the following two claims: (1) a claim of excessive force pursuant to the Fourth Amendment and 42 U.S.C. § 1983; and (2) a claim of failure to intervene pursuant to the Fourth Amendment and 42 U.S.C. § 1983. (Dkt. No. 7 at 2.) As relief, Plaintiff seeks compensatory damages of $5,000,000 and punitive damages of $2,000,000. (*Id.* at 3.)

Plaintiff also seeks leave to proceed *in forma pauperis*. (Dkt. No. 15.)

---

[1]    The court must interpret *pro se* complaints to raise the strongest arguments they suggest. *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)).

## II.   PLAINTIFF'S AMENDED APPLICATION TO PROCEED *IN FORMA PAUPERIS*

"28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged." *Cash v. Bernstein*, 09-CV-1922, 2010 WL 5185047, at *1 (S.D.N.Y. Oct. 26, 2010).[2] "Although an indigent, incarcerated individual need not prepay the filing fee at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts." *Cash*, 2010 WL 5185047, at *1 (citing 28 U.S.C. § 1915(b); *Harris v. City of New York*, 607 F.3d 18, 21 (2d Cir. 2010)).

Upon review, the Court finds that Plaintiff has submitted a completed IFP application which has been certified by an appropriate official at his facility (Dkt. No. 15 at 2), and which demonstrates economic need. *See* 28 U.S.C. § 1915(a)(2). Plaintiff has also filed the inmate authorization required in the Northern District. (Dkt. No. 4.)

Accordingly, Plaintiff's amended application to proceed with this action IFP is granted. (Dkt. No. 15.)

---

[2]     Section § 1915(g) prohibits a prisoner from proceeding *in forma pauperis* where, absent a showing of "imminent danger of serious physical injury," a prisoner has filed three or more actions that were subsequently dismissed as frivolous, malicious, or failing to state a claim upon which relief may be granted. *See* 28 U.S.C. § 1915(g). The Court has reviewed Plaintiff's litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service. *See* http://pacer.uspci.uscourts.gov. It does not appear from that review that Plaintiff had accumulated three strikes for purposes of 28 U.S.C. § 1915(g) as of the date this action was commenced.

III.    **LEGAL STANDARD FOR INITIAL REVIEW OF THE COMPLAINT**

"Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that . . . the action . . . (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief."  28 U.S.C. § 1915(e)(2); *see also* 28 U.S.C. § 1915A(a) ("The court shall review . . . as soon as practicable . . . a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.").

Likewise, under 28 U.S.C. § 1915A, a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint . . . is frivolous, malicious, or fails to state a claim upon which relief may be granted; or . . . seeks monetary relief from a defendant who is immune from such relief."  28 U.S.C. § 1915A; *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d Cir. 1999) (per curiam) (Section 1915A applies to all actions brought by prisoners against government officials even when plaintiff paid the filing fee); *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (stating that both sections 1915 and 1915A are available to evaluate prisoner pro se complaints).

"In reviewing a complaint . . . the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor."  *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal

conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

Courts are "obligated to construe a pro se complaint liberally." *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009); *see also Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam) (reading the plaintiff's *pro se* complaint "broadly, as we must" and holding that the complaint sufficiently raised a cognizable claim). "[E]xtreme caution should be exercised in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and [the] parties . . . have had an opportunity to respond." *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983).

## IV.    ANALYSIS

In addressing the sufficiency of a plaintiff's complaint, the court must construe his pleadings liberally. *Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008). Having reviewed Plaintiff's Complaint with this principle in mind, I recommend that it be dismissed in part (1) without prejudice and with leave to amend, and (2) without leave to amend.

### A.    Claims Against Defendants DEA and SRT[3]

The Fourth Amendment and 42 U.S.C. § 1983 are inapplicable to the federal government, therefore Plaintiff's causes of action against Defendants DEA and SRT must be dismissed on this ground. *Ricca v. United States*, 488 F. Supp. 1317, 1325 (E.D.N.Y. 1980) (citing *District of Columbia v. Carter*, 409 U.S. 418, 93 S. Ct. 602, 34 L.Ed.2d 613 (1973)). Suits against the United States and federal agencies require "a cause of action, subject matter jurisdiction, and a

---

[3]    It is unclear whether Defendant Special Response Team is a federal agency or part of a federal agency. However, Plaintiff alleges that Defendant Special Response Team has the same address as Defendant DEA and thus, it appears to be a part of Defendant DEA. (Dkt. No. 7 at 1.) Moreover, state and local officers who have been deputized to a federal task force act "under the color of federal, not state, law for the purposes of the activities carried out by the task force." *Escobar v. Correa*, 22-CV-08434, 2024 WL 4042122, at *7 (S.D.N.Y. Sept. 4, 2024).

waiver of sovereign immunity," which Plaintiff has not asserted here. *Presidential Gardens Assoc. v. Sec'y of Hous. and Urban Dev.*, 175 F.3d 132, 139 (2d Cir. 1999) (citing *United States v. Mitchell*, 463 U.S. 206, 212 (1983)); *see also Adeleke v. United States*, 355 F.3d 144, 150 (2d Cir. 2004). Unless Congress has specifically authorized an agency of the federal government to be sued in its own name, an action may not be maintained against that agency. *Blackmar v. Guerre*, 342 U.S. 512, 515 (1952). Since Congress has not chosen to authorize suits against the DEA, except in limited circumstances, which Plaintiff does not assert here, I recommend that the claims against Defendants DEA and SRT be dismissed. *Ricca*, 488 F. Supp. at 1325.

**B.    Claims Against Defendants Kenneth Sanders and John Does 1-8[4]**

While there is no statutory basis for a remedy for damages against federal officials who violate certain constitutional rights, "*Bivens* permits suits against federal officials for certain constitutional violations in their individual capacities for money damages." *Silva v. Canarozzi*, 18-CV-1771, 2019 WL 1596346, at *2 (D. Conn. Apr. 15, 2019) (citing *FDIC v. Meyer*, 510 U.S. 471, 485-86 (1994)).

**1.    Official Capacity Claims**

A *Bivens* action does not permit suits against federal officials in their official capacity or for injunctive or declaratory relief. *See Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007) ("The only remedy available in a *Bivens* action is an award for monetary damages from defendants in their individual capacities."); *Yorinski v. Imbert*, 39 F. Supp. 3d 218, 229 (D. Conn. 2014) (citing *Polanco v. US DEA*, 158 F.3d 647, 652 (2d Cir. 1998)).

---

[4]    It appears that Defendants Sanders and John Does 1-8 are employed by Defendant SRT, which, as set forth above in note 3, appears to be a part of Defendant DEA.

As a result, I recommend that Plaintiff's claims against Defendants Sanders and John Does 1-8 in their official capacities be dismissed.

## 2.     Individual Capacity Claims

42 U.S.C. § 1983 provides for an action to redress "the deprivation of any rights, privileges or immunities secured by the Constitution and laws" committed by a person acting under color of state law.  "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'"  *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)).

"An action brought pursuant to 42 U.S.C. § 1983 cannot lie against federal officers." *Kingsley v. Bureau of Prisons*, 937 F.2d 26, 30 n. 4 (2d Cir. 1991); *accord United States v. Acosta*, 502 F.3d 54, 60 (2d Cir. 2007) ("Section 1983, of course, does not apply to allegedly unlawful acts of federal officers . . . . ").  "A federal actor may be subject to section 1983 liability where there is evidence that the federal actor was engaged in a 'conspiracy' with state defendants." *Beechwood Restorative Care Ctr. v. Leeds*, 436 F.3d 147, 154 (2d Cir. 2006). However, "even specific allegations of conspiracy, if conclusory, would not be sufficient to state a claim for conspiratorial violation of [a plaintiff's] rights."  *Morales v. City of New York*, 752 F.3d 234, 237 (2d Cir. 2014).

The Complaint does not allege facts plausibly suggesting that Defendants Sanders and John Does 1-8 acted pursuant to a conspiracy.  *See Madera v. United States*, 24-CV-2903, 2025 WL 1019139, at *3-4 (S.D.N.Y. Apr. 4, 2025) (citing *Escobar v. Correa*, 22-CV-8434, 2024 WL 4042122, at *6 (S.D.N.Y. Sept. 4, 2024) ("[c]ooperation between state and federal bureaucracies is insufficient; federal actors must have acted with an improper motive rather than just in a spirit

of cooperation with the state defendants.")) ("mere cooperation between state and federal officers is insufficient, and a plaintiff must identify an improper motive of the federal actors."). As a result, I recommend that any claims pursuant to 42 U.S.C. § 1983 be dismissed.

In the alternative, to the extent that Plaintiff's claims are construed as pursuant to *Bivens*, I recommend that they be dismissed.

To state a valid *Bivens* claim against a federal official in his or her individual capacity, a plaintiff must allege that he or she "has been deprived of a constitutional right by a federal agent acting under color of federal authority." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006). Not all such wrongs, however, give rise to a *Bivens* action. The Supreme Court historically recognized three categories of *Bivens* claims and since emphasized that "expanding the . . . remedy is now a 'disfavored' judicial activity." *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017) (quoting *Iqbal*, 556 U.S. at 675). The approved claims arose in: (i) *Bivens* itself, a Fourth Amendment search-and-seizure suit against federal narcotics officers; (ii) *Davis v. Passman*, 442 U.S. 228 (1979), a Fifth Amendment due process suit against a congressman-employer on the grounds of gender discrimination; and (iii) *Carlson v. Green*, 446 U.S. 14 (1980), an Eighth Amendment cruel and unusual punishment suit against federal prison authorities for failure to provide adequate medical treatment. *See Ziglar*, 582 U.S. at 130-31. "After those decisions, however, the Court changed course," and has "consistently rebuffed requests to add to the claims allowed under *Bivens*." *Hernandez v. Mesa*, 589 U.S. 93, 99, 102 (2020). This is because "creating a cause of action is a legislative endeavor . . . [a]nd the Judiciary's authority to do so at all is, at best, uncertain." *Egbert v. Boule*, 596 U.S. 482, 491, 142 S. Ct. 1793 (2022).

In analyzing a proposed claim under *Bivens*, courts generally consider (1) "whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningfully' different from the three cases in

which the [Supreme] Court has implied a damages action," *Egbert*, 596 U.S. at 492, 142 S. Ct.

1793 (alteration adopted) (quoting *Abbasi*, 582 U.S. at 139, 137 S. Ct. 1843), and (2) "if a claim

arises in a new context," the court then considers whether there are " 'special factors' indicating

that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and

benefits of allowing a damages action to proceed.'" *Id.* (quoting *Abbasi*, 582 U.S. at 136, 137

S.Ct. 1843). "[T]h[e]se steps often"—but not necessarily always—"resolve to a single question:

whether there is any reason to think that Congress might be better equipped to create a damages

remedy." *Id.*

"Courts in this Circuit . . . are split as to whether excessive force claims [pursuant to the

Fourth Amendment] present a new context under *Bivens*, and the Second Circuit has yet to weigh

in on the question."[5] *Carattini v. Behun*, 21-CV-9373, 2024 WL 3274663, at *3 (S.D.N.Y. July

2, 2024).

Notwithstanding the lack of clear guidance, the undersigned is guided by other recent,

non-precedential Second Circuit decisions "affirming the district courts' findings that the

plaintiffs' Fourth Amendment *Bivens* claims presented a 'new context.'" *Carattini v. Behun*, 21-

CV-9373, 2024 WL 3274663, at *3 n.3 (S.D.N.Y. July 2, 2024) (citing *Cohen v. Trump*, No. 23-

35, 2024 WL 20558, at *2-3 (2d Cir. Jan. 2, 2024) (summary order) (affirming dismissal of

*Bivens* claims alleging unlawful seizure, based on "new context" presented by lawsuit against

federal officials); *Lewis v. Bartosh*, No. 22-3060, 2023 WL 8613873, at *2 (2d Cir. Dec. 13,

---

[5]     In *Edwards v. Gizzi*, the Second Circuit affirmed the district court's dismissal of a *Bivens*
claim "seeking damages from court-security officers and deputy U.S. Marshals for using
excessive force while restraining [the plaintiff] in a courtroom." 107 F.4th 81, 82 (2d Cir. 2024).
However, the action in *Edwards* concerned an excessive force claim pursuant to the Eighth
Amendment and thus, did not resolve the question of whether a Fourth Amendment excessive
force claim "is different in a meaningful way from the three *Bivens* claims the Supreme Court
has recognized." *Edwards*, 107 F.4th at 82 (Park, J., concurring).

2023) (summary order) (affirming dismissal of *Bivens* claim alleging excessive force, based on "new context" presented by suit against Deputy U.S. Marshals)).  "While not explaining their application of the two-part test from *Egbert* with precision, the panels in *Cohen* and *Lewis* both relied on the different agencies and federal officers involved, as well as the existence of an alternative remedy, in declining to infer a *Bivens* cause of action in those cases."  *Gray v. Gomez*, 728 F. Supp. 3d 264, 271-72 (E.D.N.Y. 2024) (footnote omitted) (citing *Cohen*, 2024 WL 20558 at *2-3; *Lewis*, 2023 WL 8613873 at *1).

Moreover, recent district court decisions within the Second Circuit addressing Fourth Amendment *Bivens* claims are in accord with the Second Circuit's decisions in *Cohen* and *Lewis*. *See*, *e.g.*, *Escobar v. Correa*, 22-CV-8434, 2024 WL 4042122, at **4-5 (S.D.N.Y. Sept. 4, 2024) (dismissing *Bivens* claim against U.S. Marshals who allegedly "used 'brutal, retaliatory excessive force' against Plaintiff" when arresting him in a home because claim involved new category of defendant and plaintiff could bring claim under the FTCA); *Shaw v. United States Marshall*, 24-CV-5644, 2024 WL 4574146, at *2 (E.D.N.Y. Oct. 24, 2024) (dismissing *Bivens* claim against U.S. Marshal who allegedly breached the door of plaintiff's home and destroyed her property while searching home, because claim involved new category of defendant and plaintiff could bring claim under the FTCA); *German-Andujar v. U.S. Customs & Border Prot.*, 24-CV-6190, 2025 WL 1101514, at *3 (W.D.N.Y. Apr. 14, 2025) (dismissing *Bivens* claim against border patrol agent who allegedly tackled and beat plaintiff fleeing from an "unwarranted" search because claim involved new category of defendant and plaintiff could bring claim under the FTCA).

This case is partially distinguishable from *Cohen*, *Lewis*, and the other district court cases cited above because this case does not "involve[ ] a 'new category of defendants.'"  *Egbert*, 596

U.S. at 492.  Indeed, like the plaintiff in *Bivens*, Plaintiff sues federal narcotics officers.  *See*

*Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 708 (S.D.N.Y. 2020) (holding that the plaintiff's

case against the defendant DEA agents "concern[ed] the same type of federal officers: narcotics

officers" as those in *Bivens*, which were FBI agents).  "Nevertheless, even if a claim does not

involve a 'new category of defendants,' a *Bivens* remedy may still be 'unavailable' if there is an

'alternative remedial structure.'""  *Salaman v. Carney*, 25-CV-0482, 2025 WL 2432674, at *5

(D. Conn. Aug. 22, 2025) (citing *Lewis*, 2023 WL 8613873, at *1 (noting that "'if a claim arises

in a new context'—such as if it involves 'a new category of defendants'—*or* if there is an

'alternative remedial structure,' a *Bivens* remedy is generally 'unavailable.'" (alteration omitted;

emphasis added)); *Escobar*, 2024 WL 4042122 at *4 (quoting *Egbert*, 596 U.S. at 493) (noting

that "a *Bivens* remedy is unavailable 'if Congress already has provided, or has authorized the

Executive to provide, an alternative remedial structure,' even if existing or alternative remedies

do not provide complete relief.")).  Such an "alternative remedial structure" is available here.

"Indeed, as with the plaintiffs in *Escobar, Shaw*, and *German-Andujar*, [Plaintiff] could

bring a claim under the Federal Torts Claims Act ("FTCA") related to the . . . alleged use of

excessive force" by Defendants Sanders and John Does 1-8.  *Salaman*, 2025 WL 2432674, at *5

(citing *Oliveras v. Basile*, 440 F. Supp. 3d 365, 374-76 (S.D.N.Y. 2020) (concluding that the

FTCA provided alternative remedial structure precluding *Bivens* remedy for false arrest and

excessive force claims in connection with injurious detonation of explosive devices during

raid)).[6]

---

[6]    Neither the Supreme Court nor the Second Circuit has explicitly "decided whether, in the
wake of *Abbasi*, the availability of an FTCA action precludes the *Bivens* remedy."  *Scott v. Quay*,
19-CV-1075, 2020 WL 8611292, at *8 (E.D.N.Y. Nov. 16, 2020).  Thus, "absent clear
guidance," some courts have been "unwilling to determine that the FTCA alone is a sufficient
alternate remedy."  *See Mirvis v. Quay*, 19-CV-2573, 2023 WL 5671935, at *10 (E.D.N.Y. Sept.

Hence, the undersigned concludes that the availability of this "alternative remedial structure" forecloses a *Bivens* action against DEA agents for excessive force under the Fourth Amendment. *See Egbert*, 596 U.S. at 497 (that "Congress has provided alternative remedies for aggrieved parties in [plaintiff's] position . . . independently foreclose a *Bivens* action here."). As a result, I recommend that Plaintiff's Fourth Amendment excessive force claims be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

Moreover, to the extent that Plaintiff asserts claims of failure to intervene pursuant to *Bivens* and the Fourth Amendment, I recommend that those claims be dismissed.

A failure to intervene claim pursuant to the Fourth Amendment is a new context for purposes of *Bivens*. *See, e.g.*, *Johnson v. Santiago*, 624 F. Supp. 3d 295, 300 (E.D.N.Y. 2022) ("[A] claim for failure to protect based on the allegation that [Defendant] was present during the attack on Plaintiff but did not help Plaintiff or intervene presents a new *Bivens* context."); *Cannenier v. Skipper-Scott*, 18-CV-2383, 2019 WL 764795, at *5 (S.D.N.Y. Feb. 20, 2019) ("The Supreme Court has recognized only three *Bivens* contexts, none of which include failure to protect . . . ."); *Martinez v. D'Agata*, 16-CV-0044, 2019 WL 6895436, at *7 (S.D.N.Y. Dec. 18, 2019) (declining to find *Bivens* remedy for claim against federal defendants for "failure to intervene").

---

1, 2023). But while the Supreme Court and Second Circuit may not have explicitly stated that the FTCA in particular precludes a *Bivens* remedy, it need not do so because "'*any* alternative, existing process for protecting the [injured party's] interest' . . . itself may 'amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" *Abbasi*, 582 U.S. at 137 (emphasis added; alteration in original) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 73-74 (2001) (recognizing that state tort law provided alternative means for relief); *Minneci v. Pollard*, 565 U.S. 118, 127-130 (2012) (same); *but see Arias v. Herzon*, 150 F.4th 27 (1st Cir. 2025).

In addition, special factors counsel against extending *Bivens* to Plaintiff's failure to intervene claim. More specifically, the alternative remedial structure, as set forth above, result in the same conclusion as Plaintiff's excessive force claims. *Arias v. Herzon*, 680 F. Supp. 3d 61, 70 (D.N.H. 2023) (dismissing the plaintiff's *Bivens* failure to intervene claims because they are a new context and an alternative remedial structure exists), *reversed on other grounds*, 150 F.4th 27 (1st Cir. 2025).

Moreover, a failure to intervene claim "does not constitute a cognizable *Bivens* claim." *Smith v. Arrowood*, 21-CV-6318, 2023 WL 6065027, at *5 (W.D.N.Y. Sept. 18, 2023) (citing, *inter alia*, *Arias v. Herzon*, 680 F. Supp. 3d at 70 ("Regardless of whether a failure-to-intervene claim is an alternative theory of liability or separate constitutional violation, *Bivens* did not involve any theory that the defendant officers' failure to intervene should subject them to bystander liability under *Bivens*.")).

As a result, I recommend that Plaintiff's failure to intervene claims asserted against Defendants Sanders and John Does 1-8 in their individual capacities be dismissed. *See Oehler v. Nietzel*, 23-CV-0956, 2024 WL 4989300, at *10 (W.D.N.Y. Aug. 6, 2024) (citing *Sigalovskaya v. Braden*, 15-CV-0034, 2023 WL 6385761, at *4 (E.D.N.Y. Sept. 29, 2023) ("[p]laintiff's malicious prosecution and failure to intervene claims are new contexts because Bivens did not involve a malicious prosecution or failure to intervene claim.") (holding that the plaintiff's "failure to intervene claims . . . which were [not] at issue in *Bivens*, . . . present[s a] new context[].")

### C.     Claims Against Defendants John Doe 9 and Jane Doe 10

Plaintiff brings this action pursuant to 42 U.S.C. § 1983, which establishes a cause of action for "the deprivation of any rights, privileges, or immunities secured by the Constitution and laws of the United States." *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 508 (1990).

"Section 1983 itself creates no substantive rights, [but] . . . only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citation omitted).

To state a viable claim under Section 1983, a plaintiff must allege that the defendant, while acting under color of state law, deprived him of a right, privilege or immunity secured by the Constitution or by the laws of the United States. *See* 42 U.S.C. § 1983. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.'" *Austin v. Pappas*, 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

Separate from the substantive personal involvement requirement, is a pleading requirement that, to adequately state a claim, a plaintiff's complaint must "differentiate which defendant[s] w[ere] involved in [what] unlawful conduct." *Ying Li v. City of New York*, 15-CV-1599, 2017 WL 1208422, at *6 (E.D.N.Y. Mar. 31, 2017); *see also Wright v. Orleans Cnty.*, 14-CV-0622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a § 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2), which requires a short and plain statement of the claim showing that the pleader is entitled to relief" (citation and quotation marks omitted)); *Holmes v. Allstate Corp.*, 11-CV-1543, 2012 WL 627238, at *7, *22 (S.D.N.Y. Jan. 27, 2012) ("Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it.").

To satisfy the personal involvement requirement and the rule against group pleading, it is not necessary for a plaintiff to know the name of the defendant. Where a plaintiff does not know the name of a defendant, the plaintiff may identify the defendant in the pleading as John or Jane Doe. However, the pleading must still satisfy the rules governing personal involvement and group pleading as to the John or Jane Doe defendant. *See Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 493-94 (S.D.N.Y. 2014) (dismissing without prejudice excessive force claim asserted against "members of the 'Special Search Team' and 'ESU Officers' " and noting that, "[t]o the extent that [plaintiff] does not know the names of the members of the Special Search Team or ESU Officers involved, he may name 'John Doe' defendants and include as much identifying information as he has knowledge of, for the purpose of filing an amended complaint, should [he] chose to do so"); *Williams v. 120 PCT Undercover*, 11-CV-4690, 2011 WL 13128209, at *1 (E.D.N.Y. Oct. 18, 2011) (dismissing complaint without prejudice where plaintiff's claims provided information about the alleged constitutional deprivations, but were brought against "the 120 Precinct and District 9, a police precinct and district of the New York City Police Department").

Here, Plaintiff simply lists different groups of unidentified law enforcement officers—"members of the DEA, Special Response Team, and Cohoes Police Department" (Dkt. No. 7 at 2)—and generally alleges that on November 16, 2023, "officers aggressively seized him, punched him in the face, and continued to assault him." (*Id.*) "The use of the terms 'they,' or 'the police' or 'officer' as a name for alleged defendants is not adequate to state a claim against a 'person' as required in § 1983 actions." *LaPietra v. City of Albany Police Dep't*, 19-CV-1527, 2020 WL 5891888, at *8-9 (N.D.N.Y. Oct. 5, 2020) (Dancks, M.J.) (citing *Williams*, 2011 WL 13128209, at *1 (dismissing complaint with leave to amend where the "[p]laintiff alleges that

unnamed undercover police officers used excessive force against him and caused him to sustain injuries on August 26, 2008 but does not identify any particular defendants.")), *report and recommendation adopted*, 2020 WL 7021589 (N.D.N.Y. Nov. 30, 2020) (McAvoy, J.).[7]

Hence, the undersigned finds that Plaintiff failed to adequately plead that any individual defendant was personally involved in any alleged wrongdoing on November 16, 2023, and has contravened the rule against group pleading.  As a result, I recommend dismissing Plaintiff's claims against these Defendants John Doe 9 and Jane Doe 10 without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.  *See LaPietra*, 2020 WL 5891888, at *8-9 (N.D.N.Y. Oct. 5, 2020) (recommending dismissal of the plaintiffs' claims where they "simply list[ed] different groups of unidentified defendants in the caption of the Complaint and generally allege[d] that on December 16, 2014, their Fourth Amendment constitutional rights were violated.").

### D.    Claims Against Defendant Cohoes Police Department

"Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal . . . department does not have the capacity to be sued as an entity separate from the municipality in which it is located."  *White v. Syracuse Police Dep't*, 18-CV-1471, 2019 WL 981850, at *3 (N.D.N.Y. Jan. 7, 2019) (Peebles, M.J.) (citing *Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (McAvoy, J.); *Turczyn ex rel. McGregor v. City of Utica*, 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y.

---

[7]    *See Williams*, 2011 WL 13128209, at *1 (giving the plaintiff leave to file an amended complaint to name the individuals responsible for the alleged deprivation of his rights and noting "if plaintiff cannot identify the individual defendant(s) within the time allowed in this order or because they were undercover, he may designate the individual as John (or Jane) Doe #1, and so on.").

Nov. 26, 2014) (Sharpe, J.); *Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence.  Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department.")), *report and recommendation adopted by* 2019 WL 974824 (N.D.N.Y. Feb. 28, 2019) (Suddaby, C.J.).

As a result, I recommend that Plaintiff's claims against Defendant Cohoes Police Department be dismissed because it is not an entity that is amenable to suit.  To the extent that the Complaint is liberally construed as asserting claims against the City of Cohoes, I recommend that they be dismissed for two reasons.

First, because I recommend that the Court dismiss Plaintiff's claims against the individual defendants, "Plaintiff[] may not prevail on [his] municipal-liability claims under *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658 (1978)."  *Stollman v. Williams*, 23-7610, 2025 WL 2784215, at *5 n.2 (2d Cir. Sept. 30, 2025).

Second, Plaintiff fails to state a claim upon which relief may be granted for municipal liability.  "[T]o hold a municipality liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *Adams v. City of Syracuse*, 21-CV-0650, 2025 WL 2772081, at *28 (N.D.N.Y. Sept. 29, 2025) (Nardacci, J.) (internal brackets omitted) (quoting *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020)).  A plaintiff can establish the existence of an official policy or custom through "(1) a formal policy endorsed by the municipality; (2) actions directed by the government's authorized decisionmakers or those who establish governmental policy; (3) a persistent and

17

widespread practice that amounts to a custom of which policymakers must have been aware; or (4) a constitutional violation resulting from policymakers' failure to train municipal employees." *Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (internal quotations, citations, and brackets omitted).

Here, Plaintiff essentially complains of one discrete incident during which Defendants—some of whom are employed by the City of Cohoes as police officers—did not act properly. (Dkt. No. 1 at 1-3.)  There is no indication that Plaintiff can assert a policy or custom, which would support municipal liability based on these facts.  *See Flagg v. NYS Division of Parole*, 19-CV-0886, 2019 WL 5002215, at *5 (N.D.N.Y. Aug. 15, 2019) (Baxter, M.J.) (citing *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998)) ("A single incident, particularly if it involved individuals below the policy-making level is insufficient to state a *Monell* claim."), *report and recommendation adopted*, 2019 WL 4963112 (N.D.N.Y. Oct. 8, 2019) (McAvoy, J.); *Wright v. City of Syracuse*, 10-CV-0661, 2014 WL 1293527, at *15 (N.D.N.Y. Mar. 31, 2014) (Suddaby, J.) ("Isolated acts of municipal employees are typically not sufficient to establish municipal liability.").  In addition, Plaintiff's conclusory allegation that "[t]he Cohoes Police Department failed to properly train and supervise officers, contributing to the violations of Plaintiff's rights" is insufficient to plausibly suggest a failure to train or "deliberate indifference" to the rights of persons who would come into contact with employees of City of Cohoes.

As a result, I recommend that Plaintiff's claims against the City of Cohoes be dismissed.

## V.    OPPORTUNITY TO AMEND

Generally, a court should not dismiss claims contained in a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated."  *Branum v. Clark*, 927 F.2d 698, 704-05

(2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave when justice so requires."). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, . . . it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).[8]

The issues identified in Plaintiff's Complaint asserting claims against Defendants DEA, SRT, Sanders, John Does 1-8, and Cohoes Police Department are substantive, such that a better pleading could not cure them. As a result, I recommend that Plaintiff's claims against Defendants DEA, SRT, Sanders, John Does 1-8, and Cohoes Police Department be dismissed without leave to replead.

However, out of deference to Plaintiff's pro se status, and because a more detailed pleading could potentially cure the defects identified against Defendants John Doe 9 and Jane

---

[8]    *See also Carris v. First Student, Inc.*, 132 F. Supp. 3d 321, 340-41 n.1 (N.D.N.Y. 2015) (Suddaby, C.J.) (explaining that the standard set forth in *Gomez v. USAA Fed. Sav. Bank*, 171 F.3d 794, 796 (2d Cir. 1999)—that the Court should grant leave to amend "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would be successful in stating a claim"—is likely not an accurate recitation of the governing law after *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)), *rev'd on other grounds*, 682 F. App'x 30.

Doe 10,[9] the undersigned recommends dismissing Plaintiff's claims without prejudice and with leave to amend.

If Plaintiff chooses to file an amended complaint, he should note that in any amended complaint, Plaintiff must clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Finally, Plaintiff is informed that any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

**ACCORDINGLY**, it is

**ORDERED** that Plaintiff's amended application to proceed *in forma pauperis* (Dkt. No. 15) is **GRANTED**; and it is further

**ORDERED** that the Clerk of the Court (1) provide the Superintendent of the facility that Plaintiff has designated as his current location with a copy of Plaintiff's inmate authorization form (Dkt. No. 4) and notify that official that Plaintiff has filed this action and is required to pay the Northern District of New York the entire statutory filing fee of $350.00 in installments, over

---

[9]    In addition, if Plaintiff desires, claims against the City of Cohoes would be ripe for re-pleading.

time, pursuant to 28 U.S.C. § 1915; and (2) provide a copy of Plaintiff's inmate authorization form (Dkt. No. 4) to the Financial Deputy of the Clerk's office; and it is further respectfully

**RECOMMENDED** that Plaintiff's Complaint (Dkt. No. 7) be **DISMISSED** (1) **without prejudice** and **with leave to amend** with respect to Plaintiff's claims against Defendants John Doe 9 and Jane Doe 10, and (2) **without leave to amend** with respect to Plaintiff's claims against Defendant DEA, SRT, Sanders, John Does 1-8, and Cohoes Police Department, pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b); and it is further

**ORDERED** that the Clerk of the Court shall file a copy of this order, report, and recommendation on the docket of this case and serve a copy upon the parties in accordance with the local rules.[10]

**NOTICE:** Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[11]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**.  28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)).

Dated: December 30, 2025
      Binghamton, New York

Miroslav Lovric
U.S. Magistrate Judge

---

[10]    The Clerk shall also provide Plaintiff with copies of all unreported decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

[11]    If you are proceeding *pro se* and served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date that the report, recommendation, and order was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

KeyCite Blue-Striped Flag

Appeal Filed by  Adams v. City of Syracuse,  2nd Cir.,  October 17, 2025

2025 WL 2772081
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Robert ADAMS, Jr., Plaintiff,
v.
CITY OF SYRACUSE et al., Defendants.

5:21-cv-00650 (AMN/MJK)
|
Signed September 29, 2025

**Attorneys and Law Firms**

A. CABRAL BONNER, ESQ., CHARLES A. BONNER, ESQ., LAW OFFICES OF BONNER & BONNER, 3060 Kerner Boulevard – Suite A, San Rafael, California 94901, Attorneys for Plaintiff.

JESSE P. RYDER, ESQ., RYDER LAW FIRM, 6739 Myers Road, East Syracuse, New York 13257, Attorneys for Plaintiff.

DANIELLE R. SMITH, ESQ., TODD M. LONG, ESQ., CITY OF SYRACUSE, CORPORATION COUNSEL, 233 East Washington Street, Room 300 City Hall, Syracuse, New York 13202, Attorneys for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Anne M. Nardacci, United States District Judge:

**I. INTRODUCTION**

 **\*1**  On June 3, 2021, Robert Adams, Jr. ("Plaintiff"), commenced this civil rights action against Police Officers Joseph Tolone,[1] Aaron Cecile, and Lashonda Russell (the "Responding Officers"); Detectives Ryan Brimmer and Jeffrey Beauchine (the "Detectives" and together with the Responding Officers, the "Individual Defendants"); the City of Syracuse ("Defendant City," and, together with the Individual Defendants, "Defendants"); Does 1-100 (the "Doe Defendants"); and others, alleging violations of federal and state law arising from his arrest and subsequent monthslong detention during a since-dismissed criminal prosecution. Dkt. No. 1 ("Complaint").

Presently before the Court[2] is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, Dkt. No. 77 ("Motion"), Plaintiff's opposition, Dkt. No. 85, and Defendants' reply in further support, Dkt. No. 90. For the reasons set forth below, the Motion is granted in part and denied in part.

**II. BACKGROUND**[3]

 **A. The Parties**

Plaintiff is a black man who has lived in Syracuse for most of his life. *See, e.g.,* Dkt. No. 77-44 at 16:5-17:4. In May 2019, he was 55 years old, approximately 5'7" in height and 160 pounds in weight, and lived in an apartment building located at 941 James Street. Dkt. No. 90-1 at ¶ 515; Dkt. No. 77-23. At that time, Plaintiff's medical diagnoses included, *inter alia*, alcoholism, depression, and schizophrenia. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454.

Defendant City is a large municipality in New York State with a police department that employs the Individual Defendants. As of May 2019, Officer Cecile had been a patrol officer for approximately two years, Dkt. No. 77-47 at 21:24-22:15; Officer Russell had been a patrol officer for approximately three years, Dkt. No. 77-46 at 9:17-25; Officer Tolone had been a patrol officer for approximately three years, Dkt. No. 77-48 at 9:24-10:2; Detective Brimmer had been a detective for less than three years, Dkt. No. 77-49 at 12:11-13:8; and Detective Beauchine had been a detective for approximately nine years, Dkt. No. 77-51 at 16:21-17:17.

 **B. Relevant Events**

 **1. May 1, 2016**

Shortly after 7:30 p.m. on May 1, 2019, police (apparently including Officer Russell) and emergency medical services found Plaintiff intoxicated and lying on the side of a road in Syracuse. Dkt. No. 77-42 at 2, 50-51; Dkt. No. 77-46 at 104:15-25. Plaintiff was covered in feces and urine and reported drinking six to seven "Na[tt]y Daddy beverages," a brand of malt liquor. Dkt. No. 77-42 at 2, 51; Dkt. No. 77-43 at 49:11-13. Plaintiff was transported to a local hospital emergency room for treatment, where his blood alcohol level ("BAC") was measured at 0.422 percent later that night.[4] Dkt. No. 77-55 at ¶ 311; Dkt. No. 77-42 at 25.

**2. May 6, 2016**

**a. 941 James Street**

 **\*2**  At around 3:00 p.m. on May 6, 2019, Plaintiff began drinking in and in front of his apartment building at 941 James Street. Dkt. No. 77-55 at ¶¶ 407, 410. By 4:00 or 5:00 p.m., he had consumed three or four 24-ounce cans of Natty Daddy. *Id.* at ¶ 411. Around that time, a younger man, Charles Jones, came over to socialize with Plaintiff. *Id.* The two had known each for several years and, while they were not actually related, Plaintiff referred to Mr. Jones as his nephew and Mr. Jones called Plaintiff uncle. Dkt. No. 77-43 at 71:8-15; Dkt. No. 77-44 at 59:1-7, 98:16-23. Plaintiff and Mr. Jones walked to a store to purchase four of five more 24-ounce cans of Natty Daddy that they could share. Dkt. No. 77-55 at ¶¶ 414, 416. Plaintiff paid for the alcohol because Mr. Jones had no money. *Id.* at ¶ 415. The two returned to 941 James Street, where a woman (Vanessa Goldych) and an unnamed man were outside the building. *Id.* at ¶¶ 417, 419, 421-22, 424. Plaintiff continued drinking Natty Daddy and joined Mr. Jones, Ms. Goldych, and the unnamed man in front of 941 James Street. *Id.* at ¶¶ 419-20. At some point, Mr. Jones and the unnamed man got into a verbal altercation, which then turned physical. *Id.* at ¶¶ 421, 424.

**i. 911 call**

Shortly before 7:30 p.m., a young woman (Arianna Jordan Bailey) was walking down James Street with her siblings. *Id.* at ¶¶ 1, 339. At that time, Ms. Bailey observed the physical altercation between Mr. Jones and the unnamed man. *Id.* at ¶ 340. Mr. Jones swung a stick at the unnamed man; that man grabbed the stick and proceeded to knock Mr. Jones to the ground. *Id.* The unnamed man then discarded the stick, smashed Mr. Jones' cell phone on the ground, and took off running down the sidewalk. Dkt. No. 85-10 at 4. Mr. Jones was not moving and did not get up, and Plaintiff went to check on him. *Id.* at 5. Plaintiff asked Ms. Bailey to call 911. *Id.* At approximately 7:25 p.m., Ms. Bailey did so. Dkt. No. 77-55 at ¶ 1.

The roughly three and a half minute recording of that 911 call reflects that Ms. Bailey informed the dispatcher that two people had been fighting; one was unconscious on the ground; and "a big type log looking thing" had been involved as a weapon. *Id.* at ¶¶ 2-4; *see also* Dkt. No. 77-5. When the dispatcher asked whether the assailant was still there, Ms. Bailey said "no" and explained that "he got up out of here." Dkt. No. 77-55 at ¶ 5.

When the dispatcher asked for a description of the assailant, Ms. Bailey said "he was African-American" and she had "just seen him running off." *Id.* at ¶¶ 6-7. Ms. Bailey then switched to providing a description of Mr. Jones, whom she described as approximately 25 years old and 5'7". *Id.* at ¶¶ 8-9. When the dispatcher clarified that he needed the description of the assailant, Ms. Bailey stated that he was "kind of bigger, he's gotta be like 6'3", like medium build[.]" *Id.* at ¶ 10.

When the dispatcher asked what the assailant was wearing, Ms. Bailey said "a green lookin' sweatsuit thing" and then explained that "officers [a]re right here on site and I'm just gonna tell them what happened." *Id.* at ¶¶ 10-11. Ms. Bailey can then be heard saying "he got in a fight with somebody, the other dude ran off but he got knocked out... he was, he was hit too in the whole altercation, you see that stick he was hit with that ... he was." *Id.* at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

**ii. Police response**

Officers Russell, Cecile, and Tolone were the officers who initially responded to 941 James Street between approximately 7:27 and 7:28 p.m. *Id.* at ¶¶ 14-15. The 911 call notes indicated "2 PEOPLE FIGHTING – ONE PERSON NOW UNC[ONSCIOUS] ON THE GROUND – COMPL[AINANT] SAW A VERY LG STICK." Dkt. No. 77-4 at 3; Dkt. No. 77-55 at ¶¶ 16-17. The 911 call notes also reported that the assailant was " 'a black male,' 25-35 years old, six feet 3 inches, last seen wearing a green sweat[suit]." Dkt. No. 90-1 at ¶ 18. Soon after 7:30 p.m., four other officers arrived at the scene. *See, e.g.,* Dkt. No. 77-4 at 1-2.

After arriving, each of the Responding Officers activated and de-activated their body worn cameras ("BWC") at different times. *See* Dkt. Nos. 77-15, 77-16, 77-17. Officer Russell's BWC footage initially shows her standing over Mr. Jones, next to Plaintiff (who is also on the ground) and Ms. Bailey, as Officer Cecile exits his police vehicle and walks over. Dkt. No. 77-16 at 0:00. Ms. Bailey, who was still on the phone with 911 at this time, is visible pointing down at Mr. Jones and saying "he got into a fight with somebody" and "the other dude run off." *Id.*; Dkt. No. 77-55 at ¶ 21. Plaintiff says words to the same effect. Dkt. No. 77-16 at 0:00.

 **\*3**  Officer Russell proceeded to ask Plaintiff, who had some blood on his lip, "what happened to you, why you bleeding?" Dkt. No. 77-55 at ¶ 29. Ms. Bailey explained "he was hit too" and "you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; Dkt. No. 77-16 at 0:05. Ms. Bailey subsequently slowly

walked down the sidewalk, as Officer Tolone walked past her to join Officers Russell and Cecile by Mr. Jones. Dkt. No. 77-16 at 0:15; Dkt. No. 77-55 at ¶ 32. Officer Tolone tended to Mr. Jones, who remained unconscious, with labored, gasping breaths and blood coming from the left side of his head. Dkt. No. 77-55 at ¶¶ 40-42.

Plaintiff remained near the Responding Officers during this time. *See generally* Dkt. Nos. 77-16, 77-17. In response to Officer Cecile's question about who had hit Mr. Jones, Plaintiff said "some motherfucker." Dkt. No. 77-16 at 1:10. In response to Officer Russell's question about what that person looked like, Plaintiff pointed down James Street and said it was a "black guy" whom he did not know. Dkt. No. 77-16 at 1:15. Following further questions, Plaintiff stated words to the effect of "y'all acting like we did something wrong." *Id.* at 1:58. Officer Russell responded "no, no, we just trying to get that information, so that way we can put out a point of information regarding the guy who did it." *Id.* at 2:03. Officer Russell again asked about Plaintiff's lip; Plaintiff responded that it was "a long story" and unrelated to Mr. Jones. *Id.* at 2:28. In response to Officer Russell's question, Plaintiff confirmed that he, Mr. Jones, and Ms. Goldych had been drinking with a fourth person. *Id.* at 2:54. Plaintiff also stated that the fourth person hit Mr. Jones, and that this person's name was "Pete." *Id.* Officer Russell then confirmed this version of events with Ms. Goldych. *Id.* at 3:00. In response to further questioning from Officer Russell, Plaintiff provided his name, address, and birthdate. *Id.* at 3:47, 4:10. Plaintiff again stated words to the effect "y'all acting like we done something," to which Officer Russell responded "no, we just need your info so that way you can help us, that's all." *Id.* Soon after, Officer Russell again asked "were you two fighting each other," to which Plaintiff responded "no." *Id.* at 5:45.

Approximately thirty seconds later, at 7:34 p.m., Officer Tolone directed Plaintiff to stand up and turn around, quickly patted him down, and informed Ms. Goldych "you're gonna get detained too dear." Dkt. No. 77-17 at 4:34. Officer Tolone then told Plaintiff "you're being detained right now" and placed Plaintiff in handcuffs. *Id.* at 4:53. Officer Tolone walked Plaintiff over to a police vehicle and said "stand right here; don't move," before unlocking the vehicle and directing Plaintiff into the backseat. *Id.* at 5:10.

The Responding Officers proceeded to put up police tape around the scene. *See, e.g.,* Dkt. No. 77-16 at 7:43. At approximately 7:38 p.m., Officer Russell remarked to Officers Tolone and Cecile that "we don't have anything to

put out a point for, except for it was a black man." *Id.* at 9:54. Officer Tolone responded, "it's the guy we have in the car, I can almost guarantee it," Dkt. No. 77-17 at 8:27, and Officer Cecile agreed, saying "it's definitely him."[5] Dkt. No. 77-15 at 1:41.

At approximately 7:39 p.m., Officer Tolone asked various officers "have we started a canvas yet guys?" Dkt. No. 77-17 at 9:54. Officer Russell responded "yeah, we'll do that right now. I wish we would have got those people that were ..." and gestured down the sidewalk in the direction Ms. Bailey and her siblings had walked. Dkt. No. 77-16 at 11:27. At approximately 7:40 p.m., the Responding Officers spoke with two non-party officers who arrived after they did. *See, e.g.,* Dkt. No. 77-17 at 10:14. One of the non-party officers asked "what's up with the guy with the busted lip," to which Officer Tolone responded "yeah, I'm thinking that's gonna, like you said, that's gonna be our guy." *Id.*

**\*4** At approximately 7:41 p.m., Officer Cecile called the Criminal Investigations Division of the Syracuse Police Department ("CID"). Dkt. No. 77-15 at 4:55. Officer Cecile reported that "we've got possible suspects, I don't know, they're totally drunk, I don't know if someone wants to show up down here or not." *Id.* at 5:35. During the course of this call, Officer Cecile asked Officer Russell for the name of "the guy, the suspect ... the guy that we got detained right now," and then provided Plaintiff's name as "the possible suspect." *Id.* at 8:19.

At approximately 7:45 p.m., Officer Russell asked Officer Tolone, "did anyone contact those people back," Dkt. No. 77-16 at 17:21, presumably again in reference to Ms. Bailey and her siblings, to which Officer Tolone responded that he tried but they did not want to meet, Dkt. No. 77-17 at 15:51. Officers Tolone and Russell then canvased the area for additional eyewitnesses, without success. *See, e.g.,* Dkt. No. 77-55 at ¶ 76; Dkt. No. 77-17 at 18:30.

At approximately 7:47 p.m., seemingly while on hold with CID, Officer Cecile stated to other officers on the scene that "I'm just going to call back the [911] caller, because they obviously saw it, and see if they want to talk and give us the, uh, a statement of what happened, once I'm done with CID." Dkt. No. 77-15 at 10:57. After the call with CID resumed, Officer Cecile reiterated to the person with whom he was speaking that "he's totally, he's totally wasted, so how much that would do, I don't know" before saying words to the effect that he would "try and give the [911 caller] a call" and "see

if she witnessed who did it ... and maybe she'll give us a statement." *Id.* at 12:39.

At approximately 7:50 p.m., Officer Cecile again informed one of the other officers at the scene that he was going to contact the 911 caller "to see if they could give us a statement since they're all wasted, and then, you know, to [see] who hit him with it, because obviously they saw the whole thing." *Id.* at 14:16. Officer Cecile then spoke with Ms. Bailey and asked if she could provide "an ID of who the suspect is, because right now all we've got is three people that are intoxicated, nobody's owning up to hit, hitting this, uh, gentlemen with a stick." *Id.* at 14:50. Officer Cecile went on to ask "do you remember what the, uh, what the guy that hit him with a stick was wearing," before repeating "a green shirt." *Id.* at 16:01. Officer Cecile then clarified "the guy that got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?" *Id.* at 16:43. After the call ended, Officer Cecile shared with other officers on the scene that he had spoken with Ms. Bailey, and said that Mr. Bailey had said the assailant "was wearing a green shirt, he's got a green vest on," to which another officer responded "yeah, it's this guy," presumably in reference to Plaintiff. *Id.* at 17:20. Officer Cecile then tried to call Ms. Bailey again, and asked if she would come back to identify the person she had seen fighting with Mr. Jones. *Id.* at 18:30. Ms. Bailey did not agree to do so, in part because she had just "seen a fight, I don't want nobody looking for me or anything." *Id.* at 18:45.

While officers identified numerous video cameras that could contain footage of the incident, no such footage was retrieved. *See, e.g.,* Dkt. No. 77-16 at 24:15; Dkt. No. 77-55 at ¶¶ 86, 134, 316, 383-84.

Shortly before 8:00 p.m., Plaintiff was removed from the police vehicle to be photographed by a non-party officer. Dkt. No. 77-16 at 31:11; Dkt. No. 77-55 at ¶ 113. During this process, Officer Russell walked over and asked Plaintiff "you being good Robert" and "how'd that thing go the other day when you shit your pants?"[6] *Id.* at 31:22. Plaintiff appears to have mumbled that he "got drunk." *Id.* at 31:29. The non-party officer photographing Plaintiff directed him to ball his hands up behind his back. *Id.* at 31:38. After leaning down to examine Plaintiff's hands and knuckles—presumably for blood or injuries—this officer did not photograph them. *Id.*

**\*5**  Plaintiff then exclaimed "I want to know what I did," to which Officer Russell responded "we're trying to figure that out too." *Id.* at 31:50. As the non-party officer placed

Plaintiff back in the vehicle, Officer Russell asked Plaintiff "you nervous," to which he responded "yeah." *Id.* at 32:00.

### 3. Criminal Investigations Division

Officers Tolone and Cecile transported Plaintiff and Ms. Goldych from 941 James Street to CID. Dkt. No. 77-6 at 5. Officer Tolone placed Plaintiff in a holding room, where he remained detained for several hours. Dkt. No. 77-8 at 3.

At some point during the hours that Plaintiff was detained at CID, Detective Brimmer and a non-party detective appear to have traveled to 941 James Street to investigate the scene. *See* Dkt. Nos. 77-13, 77-19. Detective Brimmer's police report indicates that he also reviewed the 911 call notes at this time. Dkt. No. 77-19 at 2. The non-party detective assisting Detective Brimmer in canvassing the apartment building documented that one of the witnesses "stated that he did not know the men who drank in the parking lot, but stated that he observed three men and one woman drinking beer in the lot this afternoon." Dkt. No. 77-13 at 2. Once back at CID, Detective Brimmer tried to speak with Ms. Goldych, but determined that she "appeared extremely intoxicated" and "was unable to speak due to apparent intoxication."[7] Dkt. No. 77-19 at 2. Detective Brimmer's police report states that "[b]ased on the 911 caller[']s description of the incident" and Plaintiff's presence at the crime scene, "he was being considered a likely suspect." *Id.* at 3.

Once Detective Brimmer returned to CID, he and Detective Beauchine moved Plaintiff into a small interrogation room at approximately 10:30 p.m. Dkt. No. 77-55 at ¶ 141; Dkt. No. 77-21 at 0:00. Plaintiff remained in this room until he was placed back in handcuffs at approximately 1:00 a.m. *See generally* Dkt. No. 77-21. Shortly after 10:30 p.m., Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Plaintiff proceeded to speak with the Detectives. In response to Detective Brimmer's initial question about "[w]hat happened over there, man," Plaintiff stated "[w]ell, what happened -- my nephew got into it with some guy. You know, and - - you know, they was fighting and stuff, you know. And I'm drunk. You know what, hey, here I am. That's what happened." Dkt. No. 77-22 at 6:18-23.

**\*6**  The parties dispute the extent of Plaintiff's intoxication during the approximately two and half hours that he remained in the interrogation room. Sometime after approximately 1:00 a.m. on May 7, 2019, when Plaintiff's booking process began, his BAC was measured at 0.15 percent, or nearly twice the

legal limit to operate a motor vehicle. Dkt. No. 77-24; *see also supra* n.4. According to one of Defendants' retained experts (Robert L. Weisman, D.O.), the physiological effects of such a BAC are that "[m]otor function, speech, and judgment are all severely affected at this height of blood alcohol. Staggering, and slurred speech, may be observed." [8] Dkt. No. 77-52 at 10.

Based on Dr. Weisman's review of numerous record materials and his examination of Plaintiff in June 2024, his expert psychiatric report contains several other findings that are relevant for purposes of summary judgment. *See generally id.* First, Dr. Weisman determined that—when sober—"Mr. Adams has deficits in his *Miranda* understanding, particularly regarding legally acceptable deceptive police practices as well as other specific aspects of remaining silent versus talking to the police." *Id.* at 7, 9. Based on certain of Mr. Adams' test scores—again, when sober—Dr. Weisman also concluded that Plaintiff's "basic understanding of *Miranda*" ranked in the eighteenth percentile of pretrial defendants. *Id.* at 8-9. Defendants take the position in the Motion that "Dr. Weisman's opinions are unrebutted." Dkt. No. 77-56 at 20.

Beyond the extent of Plaintiff's intoxication, the parties also dispute the voluntariness and significance of various statements Plaintiff made during his interrogation by the Detectives. In sum, the Detectives refused to accept Plaintiff's version of events, and instead told Plaintiff that video evidence, forensic evidence, and numerous witnesses all established that he had fought Mr. Jones; Plaintiff just needed to provide the details. *See generally* Dkt. No. 77-22. For example:

Det. Beauchine: Okay. Hit the reset button. All right, okay.

Det. Brimmer: Why don't we start at the beginning and tell the truth?

Plaintiff: That's the truth.

Det. Brimmer: No.

Det. Beauchine: No, it's not. Listen, listen. It's not. We can do this over --

Plaintiff: Okay. Then you tell the truth, then. Okay?

Det. Beauchine: I don't need to tell the truth. You're the one that needs to --

Plaintiff: Well, well, I'm telling you what I -- I'm telling you what as far as I know.

Det. Brimmer: You were there. You were part of this.

Det. Beauchine: Yes.

Det. Brimmer: So you should --

Plaintiff: That's what I'm saying.

Det. Brimmer: -- you should know, then.

Plaintiff: Okay. That's what I'm saying. Okay, I'm trying to tell y'all what happened. You telling me I'm lying.

Det. Beauchine: Well, let me put it to you like this. Okay?

Plaintiff: Oh, man. That --

Det. Beauchine: We got several people saying that you, all right, got into an argument with this guy, and that you hit him with a stick. All right? Just hear me out. Hear me out. Okay? And that you hit him with a stick, and that you hit him so hard that he got knocked out and went to the ground.

Plaintiff: No.

Det. Beauchine: And so we're trying to verify whether or not you intentionally hit him --

**\*7**  Plaintiff: No. No, no, no, no, no.

Det. Beauchine: -- because you're a predatory person who wants to go out there and hurt people and do bad things to people, or if this is just a family argument that went awry and --

Plaintiff: No.

Det. Beauchine: Okay.

Det. Brimmer: He ended up falling and hitting his head or something.

Det. Beauchine: Right. And that's exact --

Plaintiff: Oh, no.

Det. Beauchine: -- that's (indiscernible).

Plaintiff: No.

Det. Beauchine: Okay. That's what we're facing, so did -- was this something where you are a predator? You intentionally attack people with things --

Plaintiff: No.

Det. Beauchine: -- or whatever -- whatever you have available to you? Or is this just something that just --

Plaintiff: I don't hurt nobody.

Det. Beauchine: -- listen, listen. Or is this something where you, a couple guys are having a couple drinks and some shit is said, and it's a family matter and shit went south, and it was more of an accident than anything else, or are you intentionally going around doing stuff like this? This is --

Plaintiff: No.

Det. Beauchine: Okay. Which of the --

Plaintiff: No.

Det. Beauchine: -- which of the two is it?

Plaintiff: Nothing. Not one.

Det. Beauchine: No, no. Which -- no, no, no. I'm --

Plaintiff: I just happened to be there.

Det. Beauchine: You didn't just happen to be there. Okay?

Plaintiff: I didn't even hit the guy.

Det. Beauchine: Not with your hand.

Plaintiff: I hit nobody.

Det. Beauchine: You say not with your hands, because you're showing us your hands. We know that. All right? We know that.

Det. Brimmer: Listen, it was a mistake, and you didn't mean for him to get hurt like that, that's a big difference than if you go out there trying to hurt people.

Plaintiff: I ain't hit him.

Det. Brimmer: It's a huge difference.

Plaintiff: I didn't. Man, I swear to God I didn't. I didn't.

Det. Brimmer: It's a huge difference.

Plaintiff: I just happened to be there.

Det. Brimmer: No.

Plaintiff: I witnessed the thing.

Det. Brimmer: That story is not going to fly.

Det. Beauchine: Right. When people --

Det. Brimmer: It's not going to hold up.

Det. Beauchine: -- when people see the video and they talk to someone --

....

They're going to see you in a certain fashion. And that's without you saying anything, right? So if you give your side of the story, and give your thoughts, and what was going through your head at the time, listen, it puts people in your perspective and in your shoes. Now, it doesn't -- and here's what I would say. It --

Plaintiff: I didn't do nothing.

Det. Beauchine: Hold on, listen to me. It doesn't always make it right.

Plaintiff: I'm telling you. I didn't do this.

Det. Beauchine: People will understand if you put them in your shoes, and you can only do that by talking.

Plaintiff: I don't give a --

Det. Beauchine: By telling us.

Plaintiff: Well, I'm telling you.

Det. Beauchine: Yeah.

Plaintiff: I'm telling you how it happened. Okay? I didn't --

Det. Beauchine: Were you shooing him away with the stick, or did you mean to hurt him with the stick?

Plaintiff: No. No.

Det. Beauchine: What were you doing?

**\*8**  Plaintiff: Wait a minute. You put -- you put words --

Det. Beauchine: No, no, no. I'm asking you. It's a question.

Det. Brimmer: We're trying to get to the --

Plaintiff: -- you're putting words in my mouth.

Det. Brimmer: -- we're trying to get to the bottom of this.

Plaintiff: I'm telling you. Charles was fighting this guy. Okay? Next thing I know --

Det. Beauchine: We're past that. We're past that. Alright? We're past that. We know.

Plaintiff: And --

Det. Beauchine: We're past that. All right? Listen, relax.

Det. Brimmer: Just help us understand.

Det. Beauchine: Help us understand what happened. All right? Between you and Charles.

Det. Brimmer: I mean, you got a wound on your face. That could be a defensive wound, you know. It could --

Plaintiff: No. I ran into a tree being drunk.

Det. Beauchine: Okay. So is it safe -- how often do you drink?

Plaintiff: Hmm? Every day.

Det. Beauchine: Okay. Could this be --

Plaintiff: All day. (laughs)

Det. Beauchine: -- could this -- listen, could this be a mistake between you and Charles --

Plaintiff: No.

Det. Beauchine: -- because you were intoxicated and --

Plaintiff: No, no, no no.

Det. Beauchine: -- he was intoxicated?

Plaintiff: No, no, no, no, no, no, no, no. No, no, no, no. Really, me and Charles ain't got no problem at all.

Det. Beauchine: Well, you did tonight.

Plaintiff: No. Hmm-mm.

Det. Beauchine: You did.

Plaintiff: No. No. No. Huh-uh.

Det. Beauchine: You might not want to think that you might have had a problem, but --

Plaintiff: No, man.

Det. Beauchine: -- you get -- you had a problem with him tonight.

Plaintiff: No.

Det. Beauchine: Or he had a problem with you, and you were defending yourself, tell us.

Plaintiff: No, no, no, no.

Det. Brimmer: Did he start talking about Vanessa and upset you?

Plaintiff: No.

Det. Brimmer: No?

Det. Beauchine: You had a problem with him tonight.

Plaintiff: Me and Vanessa had walked up. They happen to over sitting -- sitting down, drinking. And still we was drinking. Okay, next thing I know, they fighting. Really. Really, man. Period.

Det. Beauchine: Was this an accident or did you mean to hurt him?

Plaintiff: Man -- I didn't hurt him.

Det. Beauchine: You meant to hurt him?

Plaintiff: I never hurt him at all.

Det. Beauchine: It was an accident?

Plaintiff: Why do you -- why are you trying to put words in my mouth? Okay? Huh?

Det. Brimmer: We're not trying to. We just want to get to the bottom of this.

Plaintiff: Man, where -- well, where the bottom -- we're at the bottom of [sic]. I was telling you.

Det. Brimmer: We're just going in circles.

Plaintiff: I didn't do nothing. I was a witness. That don't -- this they got --

Det. Brimmer We're just going in circles here....

*Id.* at 51:2-59:19.

During the interrogation, Plaintiff's cellular phone rang. The Detectives instructed Plaintiff not to answer the phone, to turn it off, and to place it on the table. *Id.* at 27:6-20. At approximately 11:14 p.m., just prior to the first break taken during the interrogation, Detective Brimmer said that he was going to take Plaintiff's phone outside the room. *Id.* at 60:24-25; *see also* Dkt. No. 77-21b at 13:50. Plaintiff responded, "[m]an, give me my phone," to which Detective Brimmer replied "[n]o, it's going to sit out here." Dkt. No. 77-22 at 61:1-3. During this break, Plaintiff is visible talking to himself and unsuccessfully trying to open the interrogation room's door, which appears to have been deadbolted from the outside. Dkt. No. 77-21b at 14:00-17:00. Plaintiff subsequently informed the Detectives that he was not currently working because he had a "dual diagnosis" and that his psychiatrist, counselor, and primary care doctor were all at the same local healthcare provider. *Id.* at 102:16-103:16; *see also United States v. Moran*, 778 F.3d 942, 951 (11th Cir. 2015) ("[D]ual diagnosis patients are those suffering from both substance abuse *and* acute mental disorders.").

**\*9** Plaintiff contends that he denied assaulting Mr. Jones nearly 200 times before the Detectives coerced him into providing a false confession around midnight. Dkt. No. 85-2 at ¶¶ 570-71. During the subsequent break, Plaintiff can be heard saying "I'm going to jail for something I didn't do,"[9] Dkt. No. 77-21c at 8:49, and further talking to himself, *see, e.g., id.* at 9:10, 11:23.

Defendants contend that Plaintiff's eventual confession was not coerced nor false. Dkt. No. 77-56 at 9, 25. Presumably to support this position, Defendants requested that Dr. Weisman opine on Plaintiff's capacity during the May 2019 interrogation. Dkt. No. 77-52 at 11, 12. As relevant here, Defendants requested that Dr. Weisman determine whether Plaintiff had the "proper requisite intellectual capacity and base intelligence level" and the "proper requisite psychological state and mental health capacity" to have:

> ....
>
> (c) understood the significance and context of the questions being asked regarding the assault of Charles Jones; ...
>
> ....
>
> (f) understood [the] significance and context of his answers to those questions with respect to the assault of Charles Jones; ....

(g) observed the events for which he was being questioned, illustrated the ability to recall those same observations, and provided answers based upon those observations and recollections (even if, under certain circumstances, Plaintiff was deceptive in his response); ....

(h) [had] the ability (or exhibited the ability) to communicate his answers truthfully, effectively, clearly and coherently; ..... and

(i) provided the answers of his own accord.

*Id.* at 11-12, 12-13. In response to every one of these items, Dr. Weisman concluded:

> Initially, yes, but towards the latter part of the ~1.5-hour interview, Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him.

*Id.* at 11-12, 12-13.

### 4. Police Reports

#### a. Detective Brimmer

According to the arrest report prepared by Detective Brimmer, he and Detective Beauchine arrested Plaintiff at 12:00 a.m. on May 7, 2019. Dkt. No. 77-23. The arrest report listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Appeared Normal." *Id.* The arrest report included criminal charges against Plaintiff. *Id.*

Detective Brimmer also prepared a police report regarding events on May 6 and 7, 2019, including his telephone conversation with Ms. Bailey. Dkt. No. 77-19. The parties dispute what was said during this conversation on May 7, 2019.

According to Detective Brimmer's report, Ms. Bailey corroborated certain key details of Plaintiff's confession during this conversation, including that the day before "she observed 2 unknown black males yelling at each other[;]"

"one male punched the other, and the one that got punched was hitting the other with a stick[;]" and "one of the subjects went down to the ground unresponsive and the other male was saying something about his nephew[.]" *Id.* at 3. Detective Brimmer also wrote that Ms. Bailey stated that "she called 911 but walked away prior to EMS and Police arrival." *Id.*

**\*10**  According to a sworn affidavit provided by Ms. Bailey, she never said many of the statements Detective Brimmer attributed to her, including that she "never used the word 'punch' because I did not see either of the two individuals punching[;]" "never told Detective Brimmer that the man helping the victim was the who hit the victim. The person who hit the victim ran away. The victim was unresponsive and the older man told me the victim was his nephew. The older man asked me to call 911[;]" "never told Detective Brimmer that the older man was involved in this fight[;]" and "[t]he police arrived while I was on the phone with 911 and I spoke to a lady officer. I did not tell Detective Brimmer that I left before the police arrived." Dkt. No. 85-10 at ¶¶ 6-9. Ms. Bailey further stated that Detective Brimmer's report "contains false statements. I never told him that I witnessed anyone punching. I never told him that the older man who called the victim his nephew was involved in the fight. I never told him that I left before the police arrived." *Id.* at ¶ 10.

### b. Officer Cecile

Officer Cecile's police report, dated May 6, 2019, listed Plaintiff as 55 years old, 5'7" tall, 160 pounds, and described his apparent condition as "Impaired Alcohol." Dkt. No. 77-6 at 2.

In the narrative portion of his report, Officer Cecile stated that "while in route, dispatch notes read that there was a fight in progress between two people with one person [ ] unconscious on the ground, the other person was wearing a green sweat suit and there is a very large stick involved." *Id.* at 5. With respect to Plaintiff's detention, Officer Cecile wrote "[b]ased on the notes from dispatch and lack of cooperation for Goldych and Adams, both were detained at this time." *Id.* As for his call with Ms. Bailey, Officer Cecile wrote:

> Bailey stated that she witnessed the fight between the victim and suspect ... Bailey stated that the suspect was an old black male wearing a green jump suit. Bailey stated that she saw the

> male in the jump suit dodge a punch from the victim and then swing the large stick at [t]he victim's head which connected and knocked him to the ground.

*Id.* As for Plaintiff's appearance, Officer Cecile described him as "an older black male in a grayish/teal puffy jacket and green pants[.]" *Id.*

### c. Officer Tolone

Officer Tolone's police report, dated May 6, 2019, listed Plaintiff as 55 years old, provided no height or weight, and described his apparent condition as "Normal." Dkt. No. 77-8 at 4.

In the narrative portion of his report, Officer Tolone wrote that "[p]rior to our arrival dispatch advised us that our caller, Jordan Bailey who refused to speak with us regarding this incident, stated to the call taker that she saw two males fighting, one wearing a green jump suit, and then saw someone get struck with a stick and then saw the man on the ground." *Id.* at 2. With respect to Plaintiff's detention, Officer Tolone wrote that "Adams was detained at this time for suspicion that he was in deed [sic] the suspect in this incident however, when we initially arrived on scene Adams stated there was another male that started a fight with Jones." *Id.* As for Plaintiff's appearance, Officer Tolone wrote that "Adams, at the time contact was made, was wearing green pants and a grey / green vest." *Id.*

### d. Other Police Reports

Officer Russell prepared a short report, also dated May 6, 2019, with a brief narrative that does not mention Ms. Bailey or Plaintiff, or Officer Russell's interactions with either of them. Dkt. No. 77-7 at 2.

Following Plaintiff's interrogation at CID, a non-party officer photographed Plaintiff in the interrogation room and collected his clothing early in the morning of May 7, 2019. Dkt. No. 77-10. This officer catalogued Plaintiff's clothing as consisting of a "Black winter coat[,]" "Grey pants with belt[,]" "Blue/green/white striped shirt[,]" "Blue Puma sneakers[,]" and a "Baseball Hat (Grey, green Bird Game logo)[.]" *Id.* at 3.

**5. Criminal Prosecution**

In the weeks after the events of May 6, 2019, Officer Cecile, Detective Brimmer, and Ms. Bailey testified before a grand jury in Onondaga County. Dkt. No. 77-25. The grand jury subsequently indicted Plaintiff [10] for (i) assault in the first degree in violation of N.Y. Penal Law § 120.10(1); (ii) assault in the second degree in violation of N.Y. Penal Law § 120.05(2); and (iii) criminal possession of a weapon in the third degree in violation of N.Y. Penal Law § 265.02(1). Dkt. No. 77-26 at 1. Plaintiff remained detained in jail pending trial. Dkt. No. 77-55 at ¶¶ 309, 382.

**\*11** Mr. Jones died in the hospital on August 18, 2019. Dkt. No. 85-15. A medical examiner ruled Mr. Jones' death a homicide as a result of complications from being struck in the head "with a large stick containing imbedded nails." *Id.* at 1, 2. After Mr. Jones' death, it appears that the criminal charges against Plaintiff could have been increased from assault to manslaughter. [11] Dkt. No. 77-55 at ¶¶ 372-74.

On August 19 and 20, 2019, ADA Michael Manfredi offered Plaintiff, through his court-appointed counsel, "a plea to Manslaughter in the first with a sentence of 12 years Determinate." Dkt. No. 77-28 at 2, 1. On October 8, 2019, ADA Manfredi reiterated to Plaintiff's court-appointed counsel that the "[o]ffer remains Man 1ˢᵗ with 12 years determinate." *Id.* at 1.

On January 9, 2020, Plaintiff's court-appointed counsel made a bail application on behalf on Plaintiff, in part on the basis that:

> We have had an opportunity to review much of the evidence against [Plaintiff] and the defense believes there is significant evidence that the People have the wrong man in jail. Despite what the People have presented as a "confession", the defense believes that the evidence will show that it is a psychologically coerced false confession. There is no indication there are any witnesses identifying him at the scene. In fact the opposite. The People's case is weak.

Dkt. No. 77-39 at ¶ 22.

Soon after, an investigator from the DA's Office contacted Ms. Bailey. Dkt. No. 77-34 at 1. On January 16, 2020, Ms. Bailey provided a voluntary affidavit that stated in relevant part:

> [Investigator Tim Galanaugh] asked if I would be willing to come down to his office and meet with Mr. Coolican, the prosecutor, and see if I would watch some video footage that they had. He also made me aware that the police had made an arrest of an individual the day of the [May 6, 2019] incident. I told him that I would be willing to come down and speak to them, and help in any way because I was unaware that the victim had died.
>
> Back in May, when everything had happened, I initially called 911 for a man that was trying to assist the victim. That man that I am speaking about was African American and told me that the victim was his nephew. I stayed on the scene with my siblings until the police officers arrived. I gave information to the 911 person telling them that the suspect that was responsible had run down James Street towards downtown. I told the dispatch person that the suspect was African American and over 6 foot tall and was wearing dark green. As the officers showed up they started talking to the older guy that was kneeling next to his nephew. They wanted him to step back from the victim. I told the female officer that he had nothing to do with it. There was a[ ]lot going on at the time and I didn't want to get more involved so I walked away with my siblings. At the time, I felt that I had cooperated enough by reporting it and I didn't want to involve myself or my siblings in what appeared to me at the time to be a fight between two guys that ended with one being knocked out with a stick. When the police officers contacted me 30 minutes or so later to see if I would come back to the scene to try to identify someone, I didn't want to get involved. I was scared that it would jeopardize my safety and my siblings['] safety so I told the police officers that I didn't want to do anymore than what I had done to help already.

**\*12** ....

This is what I remember about the incident today: That I had been leaving Bryant and Stratton on James Street and observed two African American men that appeared to be about to fight. Me and my siblings w[ ]ere almost walking right through where this was occurring. The victim had a long branch in his hand and starts to run up on the suspect.

As the victim tries to swing on the suspect, the suspect grabs the stick and snatches the stick from the victim. The suspect then swings the stick at the victim with one hand towards his upper body. I couldn't tell where it connected or if he followed up with an elbow. All I seen is the victim stumble and drop to the ground. Suspect then tosses the stick. The suspect then goes to the pa[ ]nts pocket of the victim, takes a cell phone out and smashes it onto the pavement. Then the suspect takes off running down the sidewalk on James Street towards downtown.

I didn't see where the suspect had run to because I then focused my attention on the victim on the ground. That's the same time when I noticed the older man get off the stones by the Chestnut Apartments sign and walk over to his nephew to check on him. I remember telling him that he should help get him up off the ground. The victim wasn't moving and looked like he had been knocked out, but after a few moments of looking at him more closely I told the older man that he, the victim, didn't look so good. That[']s when the uncle asked me to call 911, so I did. I stayed with the uncle until the police arrived, but like I said, I walked off shortly after with my siblings because we didn't want to get more involved.

Today, at around 1045 AM, I met Mr. Coolican and Investigator Galanaugh at the D.A.'s Office. They had me watch some video footage from one of the officer's body cameras when they showed up at the scene. In the video I saw the victim on the ground and the African American man, who told me the victim was his nephew, kneeling next to him wearing a gray baseball hat. You can hear me talking in the video telling the female officer that the victim was hit with the stick.

I showed Mr. Coolican w[here] the victim's cell phone can be seen in the video laying on the pavement, smashed. I was told by Mr. Coolican and Investigator Galanaugh that the person that was arrested in this incident, was the man that told me that the victim was his nephew. The person that the police arrested was not the suspect that I saw fighting with the victim, and causing the victim to be hurt with the stick. I saw that suspect run from the scene after smashing the victim's phone on the ground.

*Id.* at 1-2; *see also* Dkt. No. 77-55 at ¶¶ 380-81.

Plaintiff was not released from jail until February 12, 2020, more than nine months after his arrest on May 6, 2019. Dkt.

No. 77-55 at ¶ 382. The charges against Plaintiff were not dismissed until September 15, 2020. *Id.* at ¶ 404.

### a. Plaintiff's Capacity

On February 13, 2020, the judge presiding over Plaintiff's criminal prosecution ordered Plaintiff's capacity evaluated pursuant to New York Criminal Procedure Law § 730. Dkt. No. 77-35 at 1 (stating that "the Court being of the opinion that the defendant may be an incapacitated person" an examination is ordered "to determine whether said defendant, as a result of mental disease or defect, lacks capacity to understand the proceedings against him or to assist in his own defense").

**\*13** Two physicians subsequently examined Plaintiff and issued their reports on August 27, 2020. Dkt. No. 77-55 at ¶¶ 391-92, 395. As relevant here, the first physician concluded that "although suffering from Alcohol Use Disorder," Plaintiff "at the time of this evaluation, did not as a result of mental disease or defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 394. The second physician similarly concluded that Plaintiff "is not currently suffering from a mental illness which would cause him to lack the capacity to understand the proceedings against him or to assist his counsel in his own defense" and that Plaintiff, "at the time of this evaluation, did not as a result of mental disease o[r] defect lack the capacity to understand the proceedings against him or to assist in his own defense." *Id.* at ¶ 398.

### 6. Additional Investigation by CID

On January 29, 2020, prior to Plaintiff's release from jail, two non-party detectives returned to 941 James Street to obtain video footage of the incident that had occurred nearly nine months earlier. *Id.* at ¶ 383. Their investigation obtained no such footage, *id.* at ¶ 384, and determined that none of a dozen nearby businesses retained such footage for longer than three months, Dkt. No. 77-31 at 2. The two detectives also made efforts at this time to locate individuals previously mentioned by Plaintiff and Ms. Goldych, including "the 'Pete' mentioned in BWC [footage from the Responding Officers], but without success." Dkt. No. 77-55 at ¶¶ 385-86.

Forensic evidence recovered from items collected at 941 James Street—apparently including multiple drink containers as well as Mr. Jones' smashed phone—was linked to an individual whose first name is Pierre. Dkt. No. 85-1 at ¶ 56; Dkt. No. 85-4; Dkt. No. 85-14 at 9, 28; Dkt. No. 85-11 at 28. A

non-party detective testified during his deposition that "[w]e do have forensic evidence indicating that he may have been present at the time of the incident or in the hours preceding it." Dkt. No. 77-50 at 123:24-124:9.

A September 2020 internal memorandum from the Syracuse Police Department ("Memo") states that such evidence "strongly suggests, at a minimum, Pierre [ ] was onscene at some point that day [May 6, 2019], and drinking with the group" and notes that Pierre "is listed as much bigger than Adams ([ ] - 6'00", 220 lbs.), and closer resembles that of the suspect description initially provided to 911 by Jordan Bailey." Dkt. No. 85-11 at 28. When provided with the opportunity to speak with CID, Pierre apparently declined to do so. *Id.* Another internal document from the Syracuse Police Department indicates that while Pierre had been identified as "a person of interest," "there is no proof beyond a reasonable doubt suggesting [Pierre] is the primary suspect at this time." *Id.* at 7-8. The Memo notes that the investigation of Mr. Jones' death "will now be considered 'unsolved'." *Id.* at 30.

### C. Prior Proceedings

#### 1. Citizen Review Board

In April 2021, Plaintiff filed a complaint with Defendant City's Citizen Review Board in connection with his arrest and interrogation. Dkt. No. 85-11 at 14-21. The Syracuse Police Department's Internal Affairs Division assigned a sergeant to investigate Plaintiff's complaint and prepare a case report. *Id.* at 1-13 ("Report"). The sergeant's investigation included an interview with a deputy police chief. *Id.* at 8-9. The sergeant included the following information from that conversation in the Report:

> I addressed the complaints made by Mr. Adams of the false arrest as well as being interviewed while intoxicated. Deputy Chief [ ] was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being interviewed is intoxicated to the point of being in a manic state. Deputy Chief [ ] also informed me it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic

state.... Therefore, the actions by [the D]etectives during that interview were lawful and proper.

**\*14** *Id.* at 9. The Report ultimately concluded that:

> Mr. Adams['] claim that he was arrested and charge[d] for a crime he did not commit is true. However, after reviewing this case and based on the evidence shown, there is no evidence to show wrong doing on behalf of any of the Syracuse Police Officers involved. The interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer. The basis for Mr. Adams being charged with this crime was due to his own admission and the lack of cooperation from the original eye witness. Therefore, this complaint is unsubstantiated.

*Id.* at 12.

In the course of reaching these conclusions, the sergeant also briefly spoke with the Detectives. *Id.* at 11-12. According to Detective Brimmer, "Mr. Adams did not appear excessively intoxicated during the interview" that began on May 6, 2019. *Id.* at 11. Detective Beauchine similarly "stated [that] he did not feel Mr. Adams was excessively intoxicated" during the interview. *Id.* at 12. Detective Brimmer also shared that "Mr. Adams would not have been under arrest without the confession." *Id.* at 11.

The sergeant, the sergeant's supervisor, a bureau chief, the first deputy chief, and the chief of police are all listed as March 2022 signatories to the Report. *Id.* at 13.

#### 2. New York Court of Claims

Plaintiff previously filed a notice of claim in the New York Court of Claims. Dkt. No. 63-1. Defendants examined Plaintiff on January 22, 2021. Dkt. No. 77-43.

#### D. Procedural History

Plaintiff commenced this action in June 2021. Dkt. No. 1. Defendants moved to dismiss the Complaint in July 2021. Dkt. No. 7. Plaintiff voluntarily dismissed his claims against one individual defendant and otherwise opposed the motion. Dkt. Nos. 9, 16.

In March 2022, United States Senior District Judge Lawrence E. Kahn partially granted and partially denied Defendants' motion to dismiss. Dkt. No. 19. Judge Kahn observed that "[i]f the facts alleged by Plaintiff are true, Plaintiff's detainment amounts to a substantial miscarriage of justice." *Id.* at 1. Judge Kahn dismissed Plaintiff's second, sixth, seventh, and ninth claims, as well as another individual defendant, and denied the balance of Defendants' motion. *Id.* at 1-18. Discovery proceeded, with the parties requesting and receiving numerous extensions. *See generally* Docket Sheet.

In January 2024, United States Magistrate Judge Mitchell J. Katz denied Plaintiff's motion to amend the Complaint to add two individual defendants, but granted Plaintiff's request to dismiss his claims against three other individual defendants. Dkt. No. 64.

The Motion was fully submitted in April 2025. Dkt. Nos. 77, 85, 90.

#### E. Plaintiff's Claims

Plaintiff's remaining claims,[12] *see* Dkt. No. 19, are as follows: pursuant to Section 1983, (i) false arrest against the Individual Defendants, Dkt. No. 1 at ¶¶ 41-47; (ii) malicious prosecution against Defendants, *id.* at ¶¶ 63-71; (iii) fabricated evidence against Defendants, *id.* at ¶¶ 72-80; (iv) a *Monell* claim against Defendant City, *id.* at ¶¶ 52-62; and, pursuant to New York law, (v) false arrest against Defendants, *id.* at ¶¶ 91-93; and (vi) negligent supervision, etc., against Defendants, *id.* at ¶¶ 97-100.

### III. STANDARD OF REVIEW

**\*15** Summary judgment is properly granted only if, upon reviewing the evidence in the light most favorable to the nonmovant, there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir. 1993). A court first determines "whether the evidence

presents a sufficient disagreement to require submission to a [factfinder] or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986). "When analyzing a summary judgment motion, the court 'cannot try issues of fact; it can only determine whether there are issues to be tried.' " *Galeotti v. Cianbro Corp.,* No. 12-cv-00900, 2013 WL 3207312, at \*4 (N.D.N.Y. June 24, 2013) (quoting *Chambers v. TRM Copy Ctrs. Corp.,* 43 F.3d 29, 36-37 (2d Cir. 1994)).

Defendant, in seeking summary judgment, "bears the burden of establishing that no genuine issue of material fact exists and that the undisputed facts establish [its] right to judgment as a matter of law." *Rodriguez v. City of New York,* 72 F.3d 1051, 1060-61 (2d Cir. 1995) (citation omitted). To determine whether a genuine issue of material fact exists, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); *accord Gibbs-Alfano v. Burton,* 281 F.3d 12, 18 (2d Cir. 2002). A "material" fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable [factfinder] could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *accord R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 57 (2d Cir. 1997). The Court should "grant summary judgment where the nonmovant's evidence is merely colorable, conclusory, speculative or not significantly probative." *Schwimmer v. Kaladjian,* 988 F. Supp. 631, 638 (S.D.N.Y. 1997) (citing, *inter alia, Anderson,* 477 U.S. at 249-50).

### IV. DISCUSSION

The Court addresses the parties' specific arguments with respect to the remaining claims below. Given the disputed factual record as to many aspects of Plaintiff's claims, the Court finds it appropriate to reiterate the Second Circuit's guidance in another case involving Section 1983 claims for false arrest, malicious prosecution, fabricated evidence, and related *Monell* liability:

> We write because the district court improperly granted summary judgment to defendants. The record before us reveals evidence from which a jury could find that certain of the individual police officers

prepared a false report and initiated a prosecution of plaintiff[ ] predicated on this manufactured evidence. We also write to emphasize a larger issue raised by this case. Plaintiff[ ] allege[s] that the defendant police officers lied and fabricated evidence. While we do not know whether the accusations can be sustained, we do know that such accusations must be carefully reviewed. Lying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust. Courts must ensure that such serious accusations receive appropriate scrutiny lest our Court appears to endorse such official misconduct, which would weaken the public's respect for the administration of justice. In making these remarks, we emphasize that we have reached no conclusions about whether the plaintiff['s] accusations can be substantiated. It will be for a jury to determine at trial whether plaintiff[ ] ha[s] proved [his] very serious charges.

**\*16** *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 125 (2d Cir. 1997). While the Court addresses the parties' significant factual disputes in detail below, it similarly reaches no conclusions at this stage regarding whether Plaintiff will ultimately be able to prove his surviving claims.

### A. False Arrest under Section 1983 and New York law

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures[,] is substantially the same as a claim for false arrest under New York law." *Alexander v. City of Syracuse*, 132 F.4th 129, 156 (2d Cir. 2025) (alteration in original) (quoting *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021)). And "[u]nder New York law, to prevail on a claim for false arrest, a plaintiff must show that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* (quoting *Ashley v. City of New York*,

992 F.3d 128, 136 (2d Cir. 2021)). "Under both federal and New York state law, probable cause is a complete defense to a false arrest claim." *Carruthers v. Colton*, ––– F.4th ––––, 2025 WL 2405451, at \*6 (2d Cir. Aug. 20, 2025) (quoting *Triolo v. Nassau Cnty.*, 24 F.4th 98, 106 (2d Cir. 2022)); *see also Grice v. McVeigh*, 873 F.3d 162, 166 (2d Cir. 2017) ("[Plaintiff]'s unlawful arrest claim fails because his handcuffing was an 'investigatory detention' (otherwise known as a '*Terry* stop') that never ripened into an arrest and was supported by reasonable suspicion."). "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested." *United States v. Hawkins*, 37 F.4th 854, 858 (2d Cir. 2022) (quoting *United States v. Patrick*, 899 F.2d 169, 171 (2d Cir. 1990)).

As detailed earlier, after several minutes of questioning by numerous officers, Plaintiff was handcuffed and put into the back of a police vehicle in front of 941 James Street at approximately 7:34 p.m. on May 6, 2019. *See supra* Section II.B.2. Plaintiff was eventually transported to CID shortly after 8:00 p.m., where he remained detained until his custodial interrogation began at approximately 10:30 p.m. *See supra* Section II.B.3. Plaintiff was held in the interrogation room until approximately 1:00 a.m. on May 7, 2019, when he was placed back in handcuffs and his booking process began. *Id.* Plaintiff was then detained for more than nine months, until his eventual release on February 12, 2020. *See supra* Section II.B.5.

Plaintiff's opposition to the Motion does not challenge his detention and questioning by officers prior to being handcuffed at approximately 7:34 p.m.[13] *See, e.g.,* Dkt. No. 85 at 10; *see also* Dkt. No. 77-56 at 12-13. And Defendants only seek summary judgment on the portions of Plaintiff's false arrest claims that relate to his "pre-confession detainment" and "post-confession arrest," not his subsequent months-long detention. *Compare* Dkt. No. 77-56 at 12, *with* Dkt. No. 1 at ¶¶ 43, 92-93; *see also* Dkt. No. 7-2 at 13-14; Dkt. No. 19 at 9-10. The Court thus focuses its analysis on Plaintiff's detention at 941 James Street on May 6, 2019, his formal arrest at CID on May 7, 2019, and the five or so hours that he remained detained in between.

### 1. Plaintiff's Detention at 941 James Street

**\*17** Defendants first contend that Plaintiff's false arrest claims should fail because—although Plaintiff was handcuffed, placed in the back of a police vehicle, transported from his home to a police station approximately 30 minutes later, and detained for hours—he was not actually under arrest during this time. Instead, Defendants argue, the approximately five-hour seizure of Plaintiff prior to his formal arrest merely constituted an investigative stop and only required reasonable suspicion. Dkt. No. 77-56 at 13, 16 (stating that "only reasonable suspicion was required" to detain Plaintiff at 941 Adams Street and Defendants "had ample reasonable suspicion to detain Plaintiff"); *id.* at 17, 18 (stating that "Plaintiff's pre-confession detainment at CID was merely a continuation of his on-scene detainment" and "the detainment was supported by reasonable suspicion"); Dkt. No. 90 at 6 (stating that, as to Plaintiff's interrogation, "Defendants maintain that Plaintiff was being *detained* requiring only reasonable suspicion").

This is a particularly weak argument given applicable law and the facts of this case. [14] *See, e.g., United States v. Lefebvre,* 117 F.4th 471, 475 (2d Cir. 2024) ("There were several factors present during th[is] seizure that, in many situations, this Court would consider to be evidence that a seizure had indeed become a de facto arrest. [Plaintiff]'s 'freedom of movement was restrained' and 'handcuffs were used.' ... [T]he encounter lasted roughly 20 minutes.... [Plaintiff]'s transportation to a police station, instead of some of other reasonable third location, would in many situations clearly establish that the seizure had ripened into a de facto arrest.") (citations omitted) (collecting cases). The Court agrees with Plaintiff, Dkt. No. 85 at 8-9, that Defendants' maximalist position regarding their multi-hour detention of Plaintiff is unsupported by Fourth Amendment jurisprudence, *see, e.g., United States v. Candelario,* 486 F. App'x 907, 908 (2d Cir. 2012) ("It is well established that 'a police officer may *briefly detain* an individual for questioning if the officer has a reasonable suspicion that the individual is, has been, or is about to be engaged in criminal activity.' ") (emphasis added) (quoting *United States v. Padilla,* 548 F.3d 179, 186 (2d Cir. 2008)). *See also Grice,* 873 F.3d at 167 ("In general, to determine whether a *Terry* stop is so intrusive as to become an arrest, we look to: [']the amount of force used by police, the need for such force, and the extent to which the individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or

not handcuffs were used.[']") (quoting *United States v. Perea,* 986 F.2d 633, 645 (2d Cir. 1993)).

By approximately 7:34 p.m., Plaintiff had already been questioned for several minutes by multiple officers at the scene. *See supra* Section II.B.2.a.ii. Plaintiff had informed officers that he did not assault Mr. Jones (which Ms. Bailey had also said); that the person who assaulted Mr. Jones had run down James Street (which Ms. Bailey had said as well); that the assailant was a black man named "Pete" (which Ms. Goldych had also said); and that Plaintiff lived in one of the apartments at 941 James Street. *Id.* Defendants acknowledge that "the entire interaction was peaceful" prior to Plaintiff's handcuffing, Dkt. No. 77-56 at 15, and Officer Tolone testified that he did not feel his safety was at issue, Dkt. No. 90-1 at ¶ 510. Throughout this time, Plaintiff did not interfere with the investigation, continued answering questions from officers, and made no effort to leave the scene. *See supra* Section II.B.2.a.ii. Indeed, BWC footage shows Plaintiff sitting down and speaking with Officer Russell seconds before Officer Tolone directed him to stand up and turn around. Dkt. No. 77-17 at 4:34. Officer Tolone then handcuffed Plaintiff and informed Plaintiff that he was being detained. *Id.* Officer Tolone proceeded to place Plaintiff into the back of one of the multiple police vehicles parked in front of Plaintiff's home. *Id.* at 5:08.

**\*18** Given this factual record, a reasonable juror could conclude that Plaintiff was arrested at this time. *Grice,* 873 F.3d at 167. As the authority upon which Defendants rely, Dkt. No. 77-56 at 15, makes clear, "[h]andcuffing is ordinarily not incident to a *Terry* stop, and tends to show that a stop has ripened into an arrest," *Grice,* 873 F.3d at 167. *See also United States v. Newton,* 369 F.3d 659, 676 (2d Cir. 2004) ("Handcuffs are generally recognized as a hallmark of a formal arrest.") (collecting cases). Moreover, Defendants have failed to demonstrate the applicability of any of the "certain unusual circumstances" when "handcuffing a suspect to investigate a reasonable suspicion does not transform a *Terry* stop into an arrest." *Grice,* 873 F.3d at 168 (collecting cases); *see also* Dkt. No. 77-56 at 15-16. As just discussed, nothing in the record indicates concern about officer safety. The balance of Defendants' cursory arguments about why Plaintiff purportedly needed to be handcuffed and placed in the back of a police vehicle are unpersuasive. *United States v. Fiseku,* 915 F.3d 863, 870 (2d Cir. 2018) ("[T]o satisfy the reasonableness standard, officers conducting stops on less than probable cause must employ the least intrusive means

reasonably available to effect their legitimate investigative purposes.") (quoting *Newton*, 369 F.3d at 674).

### 2. Probable Cause

Defendants next argue that, regardless of when Plaintiff was arrested, they had probable cause to arrest him for assault [15] within moments of arriving at 941 James Street. Dkt. No. 77-56 at 12-18.

This argument is also unconvincing, again given applicable law and the facts of this case. "To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' " *Ashley*, 992 F.3d at 136 (quoting *Stansbury v. Wertman*, 721 F.3d 84, 89 (2d Cir. 2013)). The parties largely agree on the basic information known to the Responding Officers at the time Plaintiff was handcuffed: [16] the 911 call notes, Plaintiff's presence at the scene, and some blood on Plaintiff's lip. Dkt. No. 77-56 at 13-14; Dkt. No. 85 at 14-15. The parties dispute the factual contours of much of that information, however, as well as its legal significance.

Defendants' arguments regarding probable cause miss the forest for the trees. When evaluating probable cause, the Second Circuit has "consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' " *Washington v. Napolitano*, 29 F.4th 93, 107 (2d Cir. 2022) (quoting *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006)). Defendants were repeatedly informed that the black man who assaulted Mr. Jones was no longer present at the scene. *See supra* Section II.B.2.a. Ms. Bailey told the 911 dispatcher that this third man had assaulted the victim and had run off, but that the victim and his uncle were still there. *Id.* The 911 call notes indicated that the suspect was "last seen wearing" a green sweatsuit. Dkt. No. 90-1 at ¶ 18. Ms. Bailey again told Officer Russell—as Officer Russell stood next to Plaintiff, possibly within earshot of Officer Cecile as he approached—that the assailant who hit Mr. Jones was someone other than Plaintiff and had run off. *See supra* Section II.B.2.a. Plaintiff separately told Responding Officers that the assailant had run off, that his name was Pete, and that he was a black man. *Id.* Ms. Goldych also indicated that the man's name was Pete. *Id.* Defendants simply ignore the existence of this third man, identified by multiple eyewitnesses at the scene (and subsequently confirmed by forensic evidence). *See* Dkt. No. 77-56 at 12-18; *see also* Dkt. No. 77-50 at 123:24-124:9; Dkt. No. 85-11 at 28.

**\*19** Instead, Defendants argue that Plaintiff "was the only individual on scene that matched Ms. Bailey's description." Dkt. No. 77-56 at 14. But a reasonable juror could readily conclude that Plaintiff did not match Ms. Bailey's description. As the parties agree, the 911 call notes described the assailant as 25 to 35 years old, 6'3" tall, with a "med[ium] build," and "black male." Dkt. No. 90-1 at ¶ 18; Dkt. No. 77-4 at 3. At the time, Plaintiff was 55 years old, 5'7" tall, and weighed approximately 160 pounds. *See, e.g.,* Dkt. No. 90-1 at ¶ 515. Defendants' own observations and descriptions of Plaintiff are consistent with these attributes. *See, e.g.,* Dkt. No. 77-6 at 2 (Officer Cecile's police report listing Plaintiff's age as 55, height as 5'7," and weight as 160); Dkt. No. 77-23 (Detective Brimmer's arrest report listing the same); Dkt. No. 77-8 at 4 (Officer Tolone's police report listing Plaintiff's age as 55); Dkt. No. 77-16 at 4:11 (Officer Russell's BWC footage showing her asking Plaintiff for his birthdate, prior to his arrest, and being told the date in 1964); 18:26 (Officer Russell's BWC footage showing her providing Plaintiff's birthdate to another officer); Dkt. No. 77-25 at 7:5-11 (Officer Cecile testifying that he thought Plaintiff was in his "[l]ate 50s or early 60s" "just going by looking at [him]").

The only portion of Plaintiff's physical attributes that "matched" Ms. Bailey's description of the suspect is that Plaintiff was also "a black male." Dkt. No. 90-1 at ¶ 18. A reasonable juror could conclude that this fails to provide reasonable suspicion to briefly detain Plaintiff, let alone probable cause to arrest him. *See, e.g., United States v. Walker*, 965 F.3d 180, 186 (2d Cir. 2020) ("As we have repeatedly said, 'race, when considered by itself and sometimes even in tandem with other factors, does not generate reasonable suspicion for a stop.' ") (quoting *United States v. Swindle*, 407 F.3d 562, 569-70 (2d Cir. 2005)); *Zuniga-Perez v. Sessions*, 897 F.3d 114, 124 (2d Cir. 2018) ("As the Supreme Court has made abundantly clear, stopping and interrogating people based solely on race or ethnicity violates the Fourth Amendment.") (citing *United States v. Brignoni-Ponce*, 422 U.S. 873, 885-86 (1975)); *Dancy v. McGinley*, 843 F.3d 93, 109 (2d Cir. 2016) ("[A] description of race and gender alone will rarely provide reasonable suspicion justifying a police search or seizure.") (quoting *Brown v. City of Oneonta*, 221 F.3d 329, 334 (2d Cir. 2000)); *Jenkins*, 478 F.3d at 90 ("It has long been established, however, that when that description could have applied to any number of persons and does not single out the person arrested, probable cause does not exist.") (collecting cases); *see also supra* n.13.

Defendants also claim that Plaintiff's clothing "matched" the description Ms. Bailey had provided, in that "his hat, shirt, and pants all appeared to be different shades of green." Dkt. No. 77-56 at 13-14. This characterization is unsupported by the BWC footage from the Responding Officers, which a reasonable juror could conclude shows Plaintiff wearing a grey hat, a white striped shirt, grey pants, and a puffy black patterned jacket, none matching. *See generally* Dkt. Nos. 77-15, 77-16, 77-17. Defendants' claim is also contradicted by the assessment from the non-party officer who cataloged Plaintiff's clothing as consisting of a "Baseball Hat (Grey, green Bird Game logo)[,]" "Blue/green/white striped shirt[,]" "Grey pants with belt[,]" and a "Black winter coat[.]" Dkt. No. 77-10 at 3. In any event, the varied articles of clothing Plaintiff wore on May 6, 2019 are not indisputably a "green sweatsuit," like Ms. Bailey had described. Dkt. No. 90-1 at ¶ 18. And Ms. Bailey never described the suspect wearing any hat at all, Dkt. No. 77-5, let alone a hat with prominent neon lettering, like the one Plaintiff had on his head when Officer Russell arrived, walked over to Plaintiff and Ms. Bailey, and began speaking with them, Dkt. No. 77-16 at 0:00. Given this factual record, Defendants have not established that Plaintiff's clothing "matched" the description of the suspect such that they are entitled to judgment as a matter of law.

**\*20** At best, Defendants' argument is that they had probable cause to arrest Plaintiff because some of his clothing may have had some green. The Court finds this argument unpersuasive given the Second Circuit's analysis in *Dancy v. McGinley*. In that Section 1983 case, police officers received a description of a robbery suspect as simply "[t]hin black male, brown jacket." *843 F.3d at 99*. Minutes later, officers stopped, and ultimately arrested, two teenagers near the crime scene, one of whom was wearing a "camouflage-patterned coat, with green, light green, and brown patches." *Id. at 100, 101.* As relevant here, the panel reasoned that there was not even reasonable suspicion to stop this teenager, who "was indeed thin, black, and male. But, unlike the description, he was wearing a camouflage-patterned coat." *Id. at 109.* The Circuit went on to explain that "[w]hile such a discrepancy does not necessarily defeat a finding of reasonable suspicion ... the remaining description—thin, black, and male—is too vague in the circumstances here to justify a stop of anyone meeting it[.]" *Id.* (citations omitted) (collecting cases).

A reasonable juror could reach a similar conclusion here. Plaintiff's age, height, and build were nothing like the physical description Defendants received for the suspect. Further, Plaintiff's clothes, in color and type, did not constitute a

"green sweatsuit," and thus did not provide Defendants reasonable suspicion to detain him, let alone probable cause to arrest him. *See Dufort v. City of New York, 874 F.3d 338, 350 (2d Cir. 2017)* ("Viewing the evidence in the light most favorable to the plaintiff, a reasonable jury could find that the police arrested [plaintiff] based on little more than a witness's statement that he wore a similar shirt to that of one of [the victims'] attackers. Although a jury could also interpret the evidence differently, the record presents genuine issues of material fact that preclude the conclusion that there was probable cause as a matter of law and that, instead, require a trial on the merits."); *see also supra* n.13.

Defendants' argument regarding Plaintiff's presence at the scene fares no better. *See, e.g., United States v. Delossantos, 536 F.3d 155, 160 n.4 (2d Cir. 2008)* ("[A] person's presence at a crime scene or association with criminal suspects do not, without more, amount to probable cause to arrest."); *Dufort, 874 F.3d at 350* ("Police do not have particularized probable cause to make an arrest simply because a suspect has suspicious acquaintances, or happens to be at the scene of a crime[.]") (citation omitted); *Curry v. City of Syracuse, 316 F.3d 324, 335 (2d Cir. 2003)* ("[A]n individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime.") (quoting *Illinois v. Wardlow, 528 U.S. 119, 124 (2000)*). Plaintiff was present in front of the apartment building where he lived and, as detailed earlier, Defendants were repeatedly informed that the assailant was another man who had already left the scene. *Mitchell v. City of New York, 841 F.3d 72, 78 (2d Cir. 2016)* ("[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause.") (quoting *Colon v. City of New York, 455 N.E.2d 1248, 1250 (1983)*).

As to the blood on Plaintiff's lip, in response to Officer Russell's question, Ms. Bailey can be heard explaining that "he was hit too in the whole altercation, you see that stick he was hit with that." Dkt. No. 77-55 at ¶ 12; *see also* Dkt. No. 77-16 at 0:05.

In sum, the totality of the circumstances proffered by Defendants fails to establish an undisputed factual record on which to grant summary judgment. *Delossantos, 536 F.3d at 161.* A reasonable juror could find that Defendants lacked probable cause to arrest Plaintiff at approximately 7:34 p.m. on May 6, 2019.

**3. Subsequent Information**

Defendants go on to argue that, between handcuffing Plaintiff and formally arresting him approximately five hours later, they obtained additional information that provided them probable cause to arrest Plaintiff. Dkt. No. 77-56 at 15-21. Because a reasonable juror could conclude that Plaintiff had been arrested at approximately 7:34 p.m., however, this subsequent information is not relevant to analyzing probable cause. *See, e.g., Carruthers,* ––– F.4th ––––, 2025 WL 2405451, at *6 ("To assess probable cause, a court considers only the facts 'available to the officer at the time of the arrest and immediately before it.' ") (quoting *Ashley,* 992 F.3d at 136); *Gonzalez v. City of Schenectady,* 728 F.3d 149, 155 (2d Cir. 2013) ("The inquiry is limited to 'whether the facts known by the arresting officer at the time of the arrest objectively provided probable cause to arrest.' ") (quoting *Jaegly v. Couch,* 439 F.3d 149, 153 (2d Cir. 2006)). Nonetheless, for the avoidance of doubt, a reasonable juror could conclude that none of the subsequent information identified by Defendants, in combination with the earlier information discussed above, provided probable cause to formally arrest Plaintiff at approximately 1:00 a.m. on May 7, 2019.

**a. Plaintiff's Continued Detention Prior to His Interrogation**

**\*21** Defendants first argue that the Responding Officers "performed many investigative tasks" after handcuffing Plaintiff at approximately 7:34 p.m., and that Detective Brimmer "performed several investigative tasks" prior to interrogating Plaintiff at approximately 10:30 p.m. Dkt. No. 77-56 at 15, 17.

With respect to the Responding Officers, however, the only additional information Defendants identify is Officer Cecile's subsequent call with Ms. Bailey. *Id.* at 15-16. During that call, Ms. Bailey appears to have again stated that the man who hit Mr. Jones was "wearing a green jump suit," Dkt. No. 77-55 at ¶ 100, and was "like 35 to 40" years old, Dkt. No. 77-15 at 16:43, not the "[l]ate 50s or early 60s" that Officer Cecile perceived Plaintiff to be, Dkt. No. 77-25 at 7:5-11. Such information is largely consistent with—and duplicative of—the information Responding Officers already had. *See supra* Section IV.A.2. Thus, a reasonable juror could conclude that Plaintiff still did not match the description that Ms. Bailey provided.

Defendants further contend that the Responding Officers undertook various investigative efforts at 941 James Street after handcuffing Plaintiff. Dkt. No. 77-56 at 15-16. But Defendants identify no relevant additional information from these efforts. *Id.* Instead, Defendants take the position that the Responding Officers had "ample" probable cause to arrest Plaintiff because "[a]t the conclusion of th[eir] investigation, nothing excluded Plaintiff as the assailant. In other words, no eye-witness exonerated Plaintiff ... and there was no available surveillance evidence." *Id.* at 16. Defendants cite no legal authority for the proposition that unless a person is "exonerated" by an eyewitness or video evidence at the scene of a crime, there is probable cause to arrest them. *Cf. Ricciuti,* 124 F.3d at 130 ("This argument—an ill-conceived attempt to erect a legal barricade to shield police officials from liability—is built on the most fragile of foundations; it is based on an incorrect analysis of the law and at the same time betrays a grave misunderstanding of those responsibilities which the police must have toward the citizenry in an open and free society."). Defendants identify nothing from these investigative efforts that even suggested that Plaintiff had committed a crime. *Hawkins,* 37 F.4th at 858.

With respect to Detective Brimmer's investigation prior to Plaintiff's interrogation, Defendants similarly contend that Detective "Brimmer did not discover any evidence that suggested Plaintiff *was not* the assailant." Dkt. No. 77-56 at 17. More importantly, Defendants again fail to identify any additional information developed by Detective Brimmer that indicated Plaintiff *was* the assailant. *Id.* Moreover, a reasonable juror could conclude that the factual record belies Defendants' claim. The results of the canvas conducted by Detective Brimmer and his colleague further indicated that there had been three men drinking at the scene of the assault, not just Plaintiff and Mr. Jones, and thus further supported the possibility that Plaintiff was not the assailant. Dkt. No. 77-13 at 2; *see also* Dkt. No. 77-56 at 12.

**b. Plaintiff's Interrogation**

Defendants next argue that Plaintiff's statements during his interrogation by the Detectives provided probable cause for his arrest, and that "Plaintiff voluntarily waived his rights and was not coerced into a confession." Dkt. No. 77-56 at 18-21. [17]

**\*22** "Challenges to the voluntariness of a confession are based on two overlapping constitutional provisions: (1) due process protections under the Fifth (or Fourteenth)

Amendment, and (2) the Fifth Amendment privilege against self-incrimination." *United States v. Mendonca*, 88 F.4th 144, 163 (2d Cir. 2023) (citing *Dickerson v. United States*, 530 U.S. 428, 433 (2000)). "As a general matter, courts' descriptions of statements as 'compelled' (invoking the text of the Self-Incrimination Clause) and/or 'involuntary' (invoking, arguably, the Due Process Clause) are often used interchangeably and the words often treated synonymously." *United States v. Allen*, 864 F.3d 63, 82 n.84 (2d Cir. 2017) (collecting cases). As a practical matter, courts "look at the totality of circumstances surrounding a *Miranda* waiver and any subsequent statements to determine knowledge and voluntariness." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014) (citation omitted). "To be effective, a waiver of a defendant's *Miranda* rights must be both knowing and voluntary." *United States v. LaPorte*, 779 F. App'x 63, 65 (2d Cir. 2019) (citing *United States v. Plugh*, 648 F.3d 118, 127 (2d Cir. 2011)). In the *Miranda* context, " 'knowing' means with full awareness of the nature of the right being abandoned and the consequences of abandoning it, and 'voluntary' means by deliberate choice free from intimidation, coercion, or deception." *Taylor*, 745 F.3d at 23 (quoting *Plugh*, 648 F.3d at 127). Even if a waiver is knowing and voluntary, courts "must nonetheless determine whether the [subsequent] inculpatory statements themselves were voluntary." *Id.* (citing *Dickerson*, 530 U.S. at 444).

Defendants make various factual arguments as to why "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary." Dkt. No. 77-56 at 19-20. Given the present factual record, however, Defendants are not entitled to summary judgment on this issue.

As an initial matter, Defendants' own expert contradicts Defendants' position. *Id.* at 20. Dr. Weisman has repeatedly opined that, over the course of the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13.

Further, the parties agree that Plaintiff consumed in excess of one hundred ounces of malt liquor in the hours before his interrogation. Dkt. No. 77-55 at ¶¶ 410-11, 414, 420. Plaintiff stated "I'm drunk" shortly after the interrogation began, Dkt. No. 77-22 at 6:22, and repeatedly referenced his drunkenness thereafter, Dkt. No. 90-1 at ¶ 522. Nearly

three hours after the interrogation began, Plaintiff's BAC, as measured by Defendants, was still almost twice the legal limit. Dkt. No. 77-24; *see also supra* n.4. Dr. Weisman opined that, even at this lower BAC, "[m]otor function, speech, and judgment are all severely affected" and that "[s]taggering, and slurred speech, may be observed." Dkt. No. 77-52 at 10. A reasonable juror could conclude that Plaintiff's body movements, speech, and demeanor during the videotaped interrogation demonstrate a significant level of intoxication, and also that they are consistent with Dr. Weisman's opinion. *See generally* Dkt. No. 77-21.

Defendants' suggestion that Plaintiff's mental health during the interrogation was not at issue because he did not share any hallucinations with the Detectives proves too much. Dkt. No. 77-56 at 20 ("[A]t no point during the interview did Plaintiff indicate that he was hearing voices.... Similarly, at no point during the interview did Plaintiff indicate that he could see things that the Defendant Detectives could not see."). Plaintiff's medical diagnoses at the time included schizophrenia, depression, and alcoholism. Dkt. No. 77-42 at 2-3; Dkt. No. 77-55 at ¶ 454. During the interrogation, Plaintiff explained that he was not currently working because he had a dual diagnosis and that his primary care doctor, psychiatrist, and counselor were at the same local healthcare provider. Dkt. No. 77-22 at 102:16-103:16. As for Defendants' argument that Plaintiff was determined not to be incapacitated more than a year after the interrogation, that does little to establish the voluntariness of Plaintiff's waiver on May 6, 2019. Dkt. No. 77-55 at ¶¶ 390-98.

**\*23** Given this record, a reasonable juror could determine that Plaintiff's *Miranda* waiver was not voluntary.

Even if Defendants had established that Plaintiff's waiver was voluntary, they have not demonstrated that it was also knowing. *LaPorte*, 779 F. App'x at 65. Defendants do not appear to make any express arguments on this second requirement for waiver. *See, e.g.*, Dkt. No. 77-56 at 18 ("[A]s discussed below, Plaintiff voluntarily waived his rights and was not coerced into a confession."); *id.* at 25 ("[F]or the reasons stated above, Plaintiff voluntarily waived his *Miranda* rights and his confession was freely given."). In any event, Dr. Weisman's opinions also include his assessment that—when sober—Plaintiff's "basic understanding of *Miranda*" ranks in the eighteenth percentile of pretrial defendants and that Plaintiff "has deficits in his *Miranda* understanding, particularly regarding legally acceptable deceptive police practices as well as other specific

aspects of remaining silent versus talking to the police." Dkt. No. 77-52 at 7, 8-9. Because "knowing" for purposes of *Miranda* means "made *with a full awareness of both the nature of the right being abandoned* and the consequences of the decision to abandon it," a reasonable juror could find that Plaintiff's waiver was not knowing. *United States v. O'Brien*, 926 F.3d 57, 73 (2d Cir. 2019) (quoting *Berghuis v. Thompkins*, 560 U.S. 370, 382-83 (2010)).

A reasonable juror could also find Plaintiff's subsequent confession, after extensive interrogation by the Detectives, involuntary for similar reasons. *See, e.g., Taylor*, 745 F.3d at 24 ("An individual's mental state should be considered in the voluntariness inquiry to the extent it allowed law enforcement to coerce the individual.... It is clear, however, that when 'a person is unconscious or drugged or otherwise lacks capacity for conscious choice,' a confession cannot be voluntary.") (first citing *Colorado v. Connelly*, 479 U.S. 157, 164-65 (1986); then citing *United States v. Salameh*, 152 F.3d 88, 117 (2d Cir. 1998) (*per curiam*); and then quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 224 (1973)). Again, Defendants' expert has repeatedly opined that, during the interrogation, "Mr. Adams being under the combination of duress, fatigue, limitations of his legal knowledge, and some level of alcohol intoxication, became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him." Dkt. No. 77-52 at 11-13. The Court also notes that, prior to Plaintiff's confession, the Detectives removed Plaintiff's phone from his person and then from the room. Dkt. No. 77-22 at 27:6-20, 60:24-61:3. During the subsequent break, and prior to Plaintiff's confession, Plaintiff is visible in the video talking to himself and trying to open the locked door keeping him in the interrogation room. Dkt. No. 77-21b at 14:00-17:00; *cf. Poventud v. City of New York*, 750 F.3d 121, 145 & n.6 (2d Cir. 2014) (Lynch, J., concurring) ("[W]e know that false confessions have been obtained by pressures much less imposing than those to which [plaintiff] was subjected.") (collecting authorities).

**\*24** Because a reasonable juror could determine that Plaintiff's confession was involuntary, based in part on his intoxication, capacity, and the length and nature of his detention and interrogation, the Court finds Defendants' argument that the Detectives permissibly used "falsehoods" during the interrogation to be somewhat beside the point. Dkt. No. 90 at 7 (citing *Frazier v. Cupp*, 394 U.S. 731, 739 (1969) ("The fact that the police misrepresented statements that [a witness] had made is, while relevant, insufficient in our view to make this otherwise voluntary confession inadmissible.");

*see also United States v. Caraballo*, 282 F. App'x 910, 914 (2d Cir. 2008) ("We have held that '[w]hether a confession is a product of coercion may only be determined after a careful evaluation of the totality of all the surrounding circumstances, including the accused's characteristics, the conditions of the interrogation, and the conduct of law enforcement officials.' ") (alteration in original) (quoting *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991)).

For all of these reasons, [18] the Motion is denied as to Plaintiff's federal and state claims for false arrest following his handcuffing at approximately 7:34 p.m. on May 6, 2019.

### B. Malicious Prosecution under Section 1983

"To prevail on a malicious prosecution claim under New York law, a plaintiff must show '(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding[,] and (4) actual malice.' " *Alexander*, 132 F.4th at 158 (alteration in original) (quoting *Kee*, 12 F.4th at 161-62). Section 1983 requires these same four elements, "but it also imposes an additional one: '(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights.' " *Id.* (first quoting *Rohman v. N.Y.C. Transit Auth.*, 215 F.3d 208, 215 (2d Cir. 2000); and then citing *Chiaverini v. City of Napoleon*, 602 U.S. 556, 562 (2024)).

Defendants challenge only the probable cause element of Plaintiff's Section 1983 claim for malicious prosecution. Defendants argue that this claim fails because (i) "the probable cause supporting Plaintiff's arrest was overwhelming;" (ii) "[t]hat probable cause only increased in the day following Plaintiff's arrest;" and (iii) the DA's Office sought and obtained Plaintiff's indictment. Dkt. No. 77-56 at 21-24.

Defendants' first argument is unpersuasive for the reasons detailed previously. *See supra* Section IV.A. Given the current record, a reasonable juror could find that Defendants did not have probable cause to either arrest or prosecute Plaintiff based on the events that transpired between approximately 7:30 p.m. on May 6, 2019, and 1:00 a.m. on May 7, 2019. *See, e.g., Walsh v. City of New York*, 742 F. App'x 557, 562 (2d Cir. 2018) (" 'Probable cause, in the context of a malicious prosecution, has ... been described as such facts and circumstances as would lead a reasonably prudent person

to believe the plaintiff guilty.' ... Because a reasonable juror could believe that probable cause did not exist for [plaintiff]'s arrest, as noted above, we conclude that it follows that a reasonable juror could also believe that probable cause did not exist for [plaintiff]'s prosecution.") (first alteration in original) (citing *Stansbury,* 721 F.3d at 95). Summary judgment is thus not appropriate on this ground.

**\*25**  Defendants' second argument relies on disputed facts that are also not appropriately resolved at summary judgment. Defendants contend that, later on May 7, 2019, Detective Brimmer received additional information from Ms. Bailey and Ms. Goldych. Dkt. No. 77-56 at 22-23. But, as detailed earlier, the parties dispute what Ms. Bailey actually said to Detective Brimmer. *See supra* Section II.B.4.a. Moreover, Ms. Bailey's sworn statement suggests that she provided significant exculpatory information to Detective Brimmer. *See, e.g.,* Dkt. No. 85-10 at ¶¶ 7-8, 10; *Napolitano,* 29 F.4th at 107 ("[W]e have also consistently held, as relevant here, that 'an officer may not disregard plainly exculpatory evidence.' ") (quoting *Panetta,* 460 F.3d at 395). Because there is a genuine dispute of material fact as to what information Ms. Bailey provided Detective Brimmer—including whether it was exculpatory—such information is not an appropriate basis on which to find the existence of probable cause as a matter of law. Nor is the information that Ms. Goldych apparently provided Detective Brimmer on May 7, 2019, during his third attempt to speak with her. Dkt. No. 77-19 at 2-3. Given Ms. Goldych's intoxication, memory, and the absence of a written statement from her, the information attributed to her does not establish probable cause entitling Defendants to judgment as a matter of law. *See supra* n.7.

Defendants' third argument rests on the presumption of probable cause created by a grand jury indictment. *See, e.g., Werkheiser v. Cnty. of Broome,* 655 F. Supp. 3d 88, 103 (N.D.N.Y. 2023) ("[I]ndictment by a grand jury creates a presumption of probable cause that may *only* be rebutted by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.") (quoting *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir. 2003)). The parties agree that such a presumption applies in this case, but dispute whether the factual record rebuts it. Dkt. No. 77-56 at 23; Dkt. No. 85 at 28-29.

A reasonable juror could conclude that the current factual record rebuts such a presumption. Not only was the prosecution against Plaintiff dismissed, senior prosecutors

in the DA's Office have indicated that the basis for the prosecution was deeply flawed. Dkt. No. 85-7 at 1; Dkt. No. 85-11 at 9. A reasonable juror could find, for example, that Plaintiff's prosecution was initiated by (i) the arrest report charging Plaintiff that Detective Brimmer prepared; (ii) the allegedly false confession obtained by Detectives Brimmer and Beauchine, *see, e.g., Ekukpe v. Santiago,* 823 F. App'x 25, 32 (2d Cir. 2020) ("A jury 'may permissibly find that a defendant initiated a prosecution where he filed the charges or prepared an alleged false confession and forwarded it to prosecutors.' ") (quoting *Manganiello v. City of New York,* 612 F.3d 149, 163 (2d Cir. 2010)); *Dufort,* 874 F.3d at 353 ("The 'initiation' requirement is met when the plaintiff can establish that police officers forwarded statements to a prosecutor without sharing that the statements were suspect.") (citing *Manganiello,* 612 F.3d at 163); and/or (iii) the purportedly false statements in the police reports prepared by Detective Brimmer, Officer Cecile, Officer Tolone, and Officer Russell,[19] *see, e.g., Cameron v. City of New York,* 598 F.3d 50, 63 (2d Cir. 2010) ("[G]enerally in malicious prosecution actions alleging that a police officer provided false information to a prosecutor, what prosecutors do subsequently has no effect whatsoever on the police officer's initial, potentially tortious behavior.") (collecting cases); *Werkheiser,* 655 F. Supp. 3d at 103 ("A defendant could have initiated a prosecution 'by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.' ") (first quoting *Ying Li v. City of New York,* 246 F. Supp. 3d 578, 605 (E.D.N.Y. 2017); additional citations omitted).

Moreover, Plaintiff is correct that a "jury examining Detective Brimmer's police report alongside Ms. Bailey's statements could conclude that Det. Brimmer fabricated what [Ms.] Bailey told him to support, rather than contradict, Mr. Adams' false confession." Dkt. No. 85 at 27; *see also Manganiello,* 612 F.3d at 162 ("Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.") (quoting *Ricciuti,* 124 F.3d at 130); N.Y. Crim. Proc. Law § 60.50 ("A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed."); N.Y. Crim. Proc. Law § 70.10(1) ("[E]vidence is not legally sufficient when corroboration required by law is absent.").

**\*26** The Court also agrees with Plaintiff that a reasonable juror could conclude that the police reports from the Responding Officers contained "false or misleading information that wrongfully inculpated Mr. Adams and failed to include key exculpatory information." Dkt. No. 85 at 28; *see also Manganiello*, 612 F.3d at 162 ("Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome.") (quoting *Boyd v. City of New York*, 336 F.3d 72, 77 (2d Cir. 2003)); *Werkhesier*, 655 F. Supp. 3d at 104 ("Alternatively, the presumption 'can be overcome by a showing by claimant that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures.' ") (quoting *Hill v. Melvin*, No. 05-cv-6645, 2006 WL 1749520, at \*13 (S.D.N.Y. June 27, 2006)).

For instance, Officer Cecile's report states that Ms. "Bailey stated that the suspect was an old black man." Dkt. No. 77-6 at 5. But this assertion is contrary to the actual description of the suspect contained in the 911 call notes, Dkt. No. 90-1 at ¶ 18 (indicating that Ms. Bailey stated the suspect was only 25 to 35 years old) and the similar description Ms. Bailey appears to have provided to Officer Cecile during their subsequent phone conversation, Dkt. No. 77-15 at 16:43 (Officer Cecile clarifying "the guy who got knocked out was, like, in his mid to late 20s, and it was, like, an older guy, like 35 to 40, that hit him?"). Officer Cecile also noted in his report that the suspect had been described as wearing "a green sweat suit," while Plaintiff was wearing "a grayish/teal puffy jacket and green pants[.]" Dkt. No. 77-6 at 5. As detailed earlier, while there is presently a factual dispute as to whether Plaintiff's pants were green, Defendants do not contend that Plaintiff's jacket was green. *See supra* Section IV.A.2 (Defendants arguing that Plaintiff's "hat, shirt and pants all appeared to be different shades of green") (quoting Dkt. No. 77-56 at 14); *see also* Dkt. No. 77-10 at 3 (report from non-party officer stating that Plaintiff had a "Black winter coat"). Similarly, Officer Tolone's report states that the suspect was wearing "a green jump suit," while Plaintiff "was wearing green pants and a grey / green vest." Dkt. No. 77-8 at 2. As also detailed earlier, Defendants do not contend that Plaintiff was wearing a vest at all. *See supra* Section IV.A.2; *see also* Dkt. No. 77-10 (report from non-party officer listing Plaintiff's items of clothing, none of which are a vest). Given all this, a reasonable juror

could find that Officers Cecile and Tolone fabricated portions of their reports to align their descriptions of Plaintiff with that of the suspect.

Additionally, Officers Cecile and Russell omitted any mention of the exculpatory facts that Ms. Bailey, [20] Ms. Goldych, and Plaintiff all indicated that a third man had assaulted Mr. Jones and left the scene. Dkt. Nos. 77-6, 77-7; *see also Werkheiser*, 655 F. Supp. 3d at 103; *Napolitano*, 29 F.4th at 107. For his part, Officer Tolone's report states only that "when we initially arrived on scene Adams stated there was another male that started a fight with Jones." Dkt. No. 77-8 at 2.

**\*27** With respect to each Individual Defendant, then, a reasonable juror could find that the indictment "was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith,' " or "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures," *Werkheiser*, 655 F. Supp. 3d at 104 (first quoting *Savino*, 331 F.3d at 72; and then quoting *Hill*, 2006 WL 1749520, at \*13). Given the current factual record, a reasonable juror could find that the presumption of probable cause is rebutted. *Hicks v. Marchman*, 719 F. App'x 61, 65 (2d Cir. 2018) ("[T]he presumption can be rebutted by showing 'that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith[.]' ") (second alteration in original) (quoting *Colon*, 455 N.E.2d at 1250-51). Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for malicious prosecution against the Individual Defendants. [21]

### C. Fabricated Evidence under Section 1983

In order to prevail on "a Section 1983 fabrication of evidence claim, a plaintiff must demonstrate that '(1) [an] investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forward[ed] that information to prosecutors, and (5) the plaintiff suffer[ed] a deprivation of life, liberty, or property as a result.' " *Ortiz v. Stambach*, 137 F.4th 48, 67 (2d Cir. 2025) (alterations in original) (quoting *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 279 (2d Cir. 2016)).

Defendants first argue that Plaintiff's fabricated evidence claim is limited to his allegedly false confession and should

thus be dismissed against the Responding Officers, "who were not present for Plaintiff's interview and were not involved in his confession." Dkt. No. 77-56 at 25, Dkt. No. 90 at 8. The Court agrees with Plaintiff that this claim is not so limited, and that "there are disputed issues of fact from which a reasonable juror could find that" each of the Responding Officers "fabricated inculpatory evidence [or] suppressed exculpatory evidence to implicate [Plaintiff] wrongly." Dkt. No. 85 at 30; *see also supra* Section IV.B.

As to the confession, Defendants' renewed argument that Plaintiff voluntarily waived his *Miranda* rights and voluntarily confessed remains unpersuasive for the reasons previously set forth. Dkt. No. 77-56 at 25; *see also supra* Section IV.A.3.b.

Defendants' final argument that the Detectives did not know Plaintiff's confession was false is similarly insufficient to grant summary judgment on this claim. Dkt. No. 77-56 at 25-26. A reasonable juror could view the videotaped interrogation of Plaintiff and conclude that the Detectives knew Plaintiff's eventual confession was false because, for example, Plaintiff was visibly intoxicated; Plaintiff denied assaulting Mr. Jones nearly 200 times, Dkt. No. 85-2 at ¶ 570; Plaintiff "became emotionally and cognitively distressed, resigned, and compelled to offer the narrative of the crime being demanded of him," as Defendants' expert opined after viewing the videotaped interrogation, Dkt. No. 77-52 at 11-13; or, as Detective Brimmer noted in his police report, because Plaintiff "provided several different versions about what occurred," Dkt. No. 77-19 at 2, some of which were implausible, *see, e.g.,* Dkt. No. 77-22 at 86:22-87:22 (Plaintiff stating that he was able to hit Mr. Jones in the head three of four times with a stick before Mr. Jones fell down); *id.* at 100:8-21 (Plaintiff stating that Mr. Jones punched him twice over the course of the day, both times on the "same place" on his lip and Detective Brimmer responding "[y]eah, he knows where to get you, man. He's got aim on that thing, huh"). *See also Ortiz*, 137 F.4th at 62, 67-68 ("[T]he law does not require a plaintiff to prove that police officers fabricated evidence or engaged in bad faith through any particular type of evidence and, thus, a plaintiff may do so entirely through circumstantial evidence.... 'The jury, of course, was not required to believe [the defendant's] testimony denying knowledge. Issues relating to state of mind, such as knowledge and intent, may be influenced by assessments of credibility and often must be established by circumstantial evidence.' ") (last alteration in original) (quoting *United States v. Ocampo-Guarin*, 968 F.2d 1406,

1410 (1st Cir. 1992)). Moreover, if a jury were to believe Ms. Bailey that Detective Brimmer fabricated various statements he attributed to her in his police report, they could also conclude that he did so knowingly.

**\*28** Accordingly, the Court denies the Motion as to Plaintiff's Section 1983 claim for fabricated evidence against the Individual Defendants. [22]

### D. *Monell* Claim

Section 1983 "does not impose vicarious liability on a municipality for the actions of its employees." *Alexander*, 132 F.4th at 160 (citing *Friend v. Gasparino*, 61 F.4th 77, 93 (2d Cir. 2023)). Instead, "[t]o hold a [municipality] liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Lucente v. Cnty. of Suffolk*, 980 F.3d 284, 297 (2d Cir. 2020) (second alteration in original) (first quoting *Wray v. City of New York*, 490 F.3d 189, 195 (2d Cir. 2007); and then citing *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658, 690-91 (1978)). As to the first element, a plaintiff can establish the existence of an official policy or custom in four ways:

> (1) a formal policy endorsed by the municipality, ...; (2) actions directed by the government's "authorized decisionmakers" or "those who establish governmental policy," ...; (3) a persistent and widespread practice that amounts to a custom of which policymakers must have been aware, ...; or (4) a "constitutional violation[ ] resulting from [policymakers'] failure to train municipal employees[.]"

*Deferio v. City of Syracuse*, 770 F. App'x 587, 589-90 (2d Cir. 2019) (final alteration added) (first citing *Turpin v. Mailet*, 619 F.2d 196, 199 (2d Cir. 1980); then quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986); then citing *Turpin*, 619 F.2d at 199; and then quoting *City of Canton v. Harris*, 489 U.S. 378, 380 (1989)).

Defendants first argue that Plaintiff's *Monell* claim should be dismissed because there is no underlying constitutional violation. Dkt. No. 77-56 at 26. Given that Plaintiff's constitutional claims survive summary judgment, this argument is unavailing. *See supra* Section IV.A-C.

Defendants next argue that the purportedly similar arrests referenced in one paragraph of the Complaint do not establish a *Monell* claim. Dkt. No. 77-56 at 27-28. Those alleged instances appear to relate to excessive force and racial profiling claims against non-party officers in the Syracuse Police Department over a span of some years. Dkt. No. 1 at ¶ 61. In part because Plaintiff has not brought an excessive force claim, the Court agrees with Defendants that these alleged instances are insufficiently similar to the constitutional deprivations Plaintiff allegedly suffered. *See Campo v. City of New York*, No. 19-cv-04364, 2022 WL 970730, at *12 (E.D.N.Y. Mar. 31, 2022) ("A plaintiff may also plead the existence of *de facto* customs or policies 'by citing to complaints in other cases that contain similar allegations.' ") (quoting *Gaston v. Ruiz*, No. 17-cv-1252, 2018 WL 3336448, at *6 (E.D.N.Y. July 6, 2018)). As Defendants correctly point out in reply, Plaintiff also has not opposed the Motion on this narrow issue. Dkt. No. 90 at 8-9; *see also Jackson*, 766 F.3d at 195. Accordingly, any *Monell* claim based on these dissimilar cases or racial profiling is dismissed.

**\*29** For whatever reason, Defendants do not squarely address the core of Plaintiff's *Monell* claim. *Compare* Dkt. Nos. 77-56, 90, *with* Dkt. No. 1 at ¶¶ 52-60 (alleging, *inter alia*, that Defendant City "has a policy, custom, practice and pattern of conduct in place that enables its agents and employee[ ] police officers to act with deliberate indifference to the constitutional rights of individuals[,]" including "inadequate guidelines for conducting interrogations, obtaining false confessions and corroborating false confessions with eye witness accounts"). Plaintiff's opposition to the Motion argues that Defendant City was deliberately indifferent to his constitutional rights by failing "to supervise and/or train its officers to undertake constitutionally lawful detentions, interrogations, and practices to forego the fabrication of evidence." Dkt. No. 85 at 31-33 (citing Dkt. No. 1 ¶¶ 53, 54, 58).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-23 (1985) (plurality opinion)). The Second Circuit has set forth the

following requirements before a municipality's failure to train or supervise constitutes deliberate indifference:

"First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation." ... "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." ... "Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights." ... "In addition, at the summary judgment stage, plaintiffs must 'identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation.' "

*Jenkins*, 478 F.3d at 94 (first quoting *Walker v. City of New York*, 974 F.2d 293, 297, 298 (2d Cir. 1992); and then quoting *Green v. City of New York*, 465 F.3d 65, 81 (2d Cir. 2006)).

Regardless of whether Plaintiff has satisfied the first three of these requirements, his assertions with respect to the Responding Officers' training lack the necessary factual detail and are too conclusory. Dkt. No. 85 at 31. He fails to identify any "specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury[,]" *Green*, 465 F.3d at 81. Accordingly, any *Monell* claim based on the training of the Responding Officers is dismissed. For similar reasons, any *Monell* claim based on training related to fabricated evidence generally is also dismissed.

Plaintiff's arguments as to the training the Detectives received warrant a different outcome however. Plaintiff contends that the Detectives received inadequate "training on how to avoid false confessions" and "improperly interrogated" Plaintiff, leading to his allegedly false confession. Dkt. No. 85 at 33. Unlike with the Responding Officers and fabricated evidence more generally, Plaintiff also sets forth various facts regarding the Detectives' interrogation training, facts which Defendants largely do not deny. Dkt. No. 90-1 at ¶¶ 523-28, 531-33, 587-88.

Additionally, the Report that Plaintiff includes in his opposition to the Motion states that a deputy police chief at the Syracuse Police Department "was able to explain there is case law which supports interviewing a person who is intoxicated. The only limitation to this is if the person being

interviewed is intoxicated to the point of being in a manic state." Dkt. No. 85-11 at 9. The Report further states that "it is a matter of training that detectives are trained on the fact that interviewing an intoxicated person is lawful, unless in this manic state." *Id.* The Report indicates that neither Detective thought Plaintiff was "excessively intoxicated" during the interview on May 6, 2019. *Id.* at 11, 12. Seemingly because of such training, the Report determined that "[t]herefore, the actions by [the D]etectives during that interview were lawful and proper." *Id.* 9.

**\*30** The Report went on to conclude that Plaintiff's "claim that he was arrested and charge[d] for a crime he did not commit true[,]" and that while Plaintiff was charged "due to his own admission[,]" "[t]he interview conducted by Det. Beauchine and then Det. Brimmer was lawful and proper. There was no violation of any rules and regulations by Det. Beauchine or Det. Sgt. Brimmer, or any officer." *Id.* at 12. [23] Following that conclusion were signatures for the chief of police, the first deputy chief, a bureau chief, a supervisor, and the investigating sergeant. *Id.* at 13. *Jones v. Town of East Haven*, 691 F.3d 72, 81 (2d Cir. 2012) ("To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights."); *Donovan v. Norwich City Sch. Dist.*, No. 19-cv-1638, 2022 WL 623904, at \*11 (N.D.N.Y. Mar. 3, 2022) ("An official's title, though not dispositive of his authority to make policy, is relevant for the interferences fairly to be drawn therefrom.") (quoting *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983)).

Drawing all reasonable inferences in Plaintiff's favor for purposes of summary judgment, a reasonable juror could find the requirements for deliberate indifference satisfied with respect to the Detectives' training for interrogating intoxicated individuals. First, the apparent existence of this very training reflects "a moral certainty" that detectives will need to interview such individuals. *Jenkins*, 478 F.3d at 94 (citation omitted). Second, Detective Brimmer's own testimony suggests that interviewing intoxicated individuals presents a "difficult choice." *Id.* (citation omitted); Dkt. No. 77-49 at 25:16-24 (Detective Brimmer testifying with respect to intoxication and mental capacity during custodial interviews that "I can't think of any exact incident where that has occurred but I do understand how, you know, severe intoxication or, you know, severe mental health where someone's having a schizophrenic outbreak, or something to

that effect, is certainly going to affect what they're telling us. *And it would be a judgment call and we likely would not interview that person if they're under extreme intoxication or having an emotional and/or mental health crisis.*") (emphasis added). Third, Defendants' own expert indicates that the "wrong choice" can result in a false confession, and thus a deprivation of constitutional rights. *Jenkins*, 478 F.3d at 94 (citation omitted); Dkt. No. 77-52 at 11-13; *see also* Dkt. No. 85-7 at 1 ("The district attorney said the case shows police and prosecutors need better training in identifying the dynamics of false confessions. 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [DA] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. [']"). Finally, the Report identifies a "specific deficiency in the city's training program," *Jenkins*, 478 F.3d at 94 (citation omitted), in that the only limitation on interrogating intoxicated individuals appears to be when they are "in a manic state," [24] Dkt. No. 85-11 at 9.

**\*31** At bottom, Plaintiff contends that the Detectives' training caused them to violate his constitutional rights, by interrogating him while he was intoxicated and coercing him into providing a false confession. Plaintiff may well ultimately fail to prove such a claim. *See, e.g., Outlaw v. City of Hartford*, 884 F.3d 351, 373 (2d Cir. 2018) ("[D]eliberate indifference is a stringent standard of fault.") (alteration in original) (quoting *Connick*, 563 U.S. at 61). But he has done enough to survive summary judgment—particularly in the absence of more specific argument from Defendants regarding deliberate indifference. According, the Motion is denied as to Plaintiff's *Monell* claim based on the Detectives' interrogation training.

### E. Negligent Supervision and Retention under New York law

In general, "[t]o state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show[, *inter alia*,] (1) that the tort-feasor and the defendant were in an employee-employer relationship ...; [and] (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury' prior to the injury's occurrence[.]" *Ehrens v. Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004) (first citing *D'Amico v. Christie*, 518 N.E.2d 896, 901-02 (1987); and then quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 793 (N.Y. App. Div. 1997)). Additionally, "[w]hen a

negligence claim is asserted against a municipality or its employees, the threshold inquiry is 'whether the municipal entity was engaged in a proprietary function or acted in a governmental capacity at the time the claim arose.' " *Velez v. City of New York*, 730 F.3d 128, 134 (2d Cir. 2013) (quoting *Applewhite v. Accuhealth, Inc.*, 995 N.E.2d 131, 134 (2013)). "Providing police protection has long been recognized as a quintessential governmental function" and when "a municipality undoubtedly acts in a governmental capacity, a plaintiff may not recover without proving that the municipality owed a 'special duty' to the injured party." *Id.* at 135 (citing *Valdez v. City of New York*, 960 N.E.2d 356, 592 (2011)).

Defendants argue, *inter alia*, that this negligence claim should be dismissed (i) against the Individual Defendants because they were all employees and cannot be held liable as an employer; and (ii) against Defendant City because its employees were acting in the scope of their employment as police officers. Dkt. No. 77-56 at 28-30. Plaintiff provides no persuasive response. Dkt. No. 85 at 33-34. The Court also notes that Plaintiff offers no evidence regarding any of the Individual Defendants' "propensity for the conduct which caused the injury," *Ehrens*, 385 F.3d at 235 (citation omitted), nor any evidence that Defendant City owed him "a special relationship beyond the duty that is owed to the public generally," *Velez*, 730 F.3d at 135. Accordingly, the Court grants the Motion as to Plaintiff's tenth claim.

### F. Qualified Immunity for the Individual Defendants

Defendants argue that (i) the Individual Defendants are entitled to qualified immunity on Plaintiff's false arrest and malicious prosecution claims because of the collective knowledge doctrine and because of "plausible instructions from a superior officer;" (ii) the Individuals Defendants are entitled to qualified immunity on Plaintiff's pre-interrogation detention because the multi-hour detention was "objectively reasonable;" (iii) the Individual Defendants are entitled to qualified immunity because they had arguable probable cause to arrest Plaintiff; and (iv) the Detectives are entitled to qualified immunity with respect to Plaintiff's confession because "there is no evidence that Plaintiff was not of sound mind or so intoxicated as to render his confession involuntary[.]" Dkt. No. 77-56 at 30-38. Defendants do not appear to contend that they are entitled to qualified immunity as to the balance of Plaintiff's fabricated evidence claim. *See id.*

**\*32**  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *White v. Pauly*, 580 U.S. 73, 78-79 (2017) (*per curiam*) (citation modified). The application of qualified immunity requires the Court to undertake a two-pronged inquiry: whether "(1) ... the official violated a statutory or constitutional right, and (2) ... the right was 'clearly established' at the time of the challenged conduct." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (alterations in original) (quoting *Ricciuti v. Gyzenis*, 834 F.3d 162, 167 (2d Cir. 2016)). Under the "clearly established" prong, the law does not require "a case directly on point," but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.* (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *see, e.g., Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right."); *Ricciuti*, 124 F.3d at 128, ("The right to be free from arrest or prosecution in the absence of probable cause is a long established constitutional right."); *Weaver v. Brenner*, 40 F.3d 527, 533-34 (2d Cir. 1994) ("It is clear that [in 1989] ... a criminal suspect could not lawfully be compelled to be a witness against himself.... It was also clearly established in 1989 that police could not lawfully coerce incriminating statements from an in-custody criminal suspect."); *Zahrey v. Coffey*, 221 F.3d 342, 345 (2d Cir. 2000) ("We hold that there is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity .... [and] that this right was clearly established in 1996[.]"); *Morse v. Fusto*, 804 F.3d 538, 541 (2d Cir. 2015) ("[T]he actions of the defendants upon which [plaintiff] bases his claims were the knowing creation of false or misleading evidence by a government officer acting in an investigative capacity. We have held that such activity by a government official qualifies as an unconstitutional deprivation of the victim's rights. This right was, moreover, clearly established at the time of the defendants' conduct."); *Horn v. Adger*, Nos. 24-1034, 24-1038, 2025 WL 1618761, at \*3 (2d Cir. June 9, 2025) (summary order) ("On appeal, the Detectives do not contest our clearly established caselaw holding that police officers are liable under § 1983 for 'creat[ing] false information likely to influence a jury's decision and forward[ing] that information to prosecutors.' ") (alterations in original) (citation omitted). "Courts have discretion to decide the order in which to engage these two prongs." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (citation omitted).

At this stage, the Court need only address the "constitutional violation" prong. As detailed above, whether any Defendant violated Plaintiff's constitutional rights depends on numerous disputed issues of material fact. The parties dispute, for example, when Plaintiff's detention ripened into an arrest, *see supra* Section IV.A.1; whether the Individual Defendants had probable cause to arrest Plaintiff prior to his interrogation, *see supra* Section IV.A.2-3.a; the extent of Plaintiff's intoxication during the interrogation, as well as the voluntariness and veracity of his statements, *see supra* Section IV.A.3.b; and whether the Individual Defendants improperly initiated Plaintiff's prosecution, *see supra* Section IV.B. Such factual disputes preclude a finding of qualified immunity at this stage. *See, e.g., Dufort*, 874 F.3d at 343 ("We conclude that the district court's grant of summary judgment as to [plaintiff]'s false arrest and malicious prosecution claims was premature, because disputed questions of material fact remain regarding key aspects of the criminal investigation and subsequent prosecution. We further conclude that those same questions of material fact preclude a grant of qualified immunity at the summary judgment stage.").

The Court reaches the same conclusion with respect to Defendants' arguments regarding reliance on "plausible instructions" from a superior officer and arguable probable cause. As to the former, the limited record evidence cited by Defendants is insufficient to establish, as a matter of law, that such instructions were given. Dkt. No. 77-55 at 34-35. In any event, as the authority on which Defendants rely makes clear, *id.* at 35, even if such instructions were given, that does not end the inquiry. *See Anthony v. City of New York*, 339 F.3d 129, 138 (2d Cir. 2003) ("Plausible instructions from a superior or fellow officer support qualified immunity where, viewed objectively in light of the surrounding circumstances, they could lead a reasonable officer to conclude that the necessary legal justification for his actions exists (*e.g.*[,] a warrant, probable cause, exigent circumstances).") (first quoting *Bilida v. McCleod*, 211 F.3d 166, 174-75 (1st Cir. 2000); additional citations omitted). And the disputed factual record precludes reaching a determination with respect to this inquiry.

As to arguable probable cause, the current factual record also precludes summary judgment. *See, e.g., Napolitano*, 29 F.4th at 105 ("A police officer has arguable probable cause 'if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test

was met.' ") (quoting *Figueroa v. Mazza*, 825 F.3d 89, 100 (2d Cir. 2016)); *Jenkins*, 478 F.3d at 88 ("[U]nder both New York and federal law, summary judgment dismissing a plaintiff's false arrest claim is appropriate if the undisputed facts indicate that the arresting officer's probable cause determination was objectively reasonable.... If, however, on the undisputed facts the officer would be unreasonable in concluding that probable cause existed, or if the officer's reasonableness depends on material issues of fact, then summary judgment is inappropriate for both New York and federal false arrest claims.") (first citing *Cerrone v. Brown*, 246 F.3d 194, 199 (2d Cir. 2001); and then citing *Dillard v. City of Syracuse*, 381 N.Y.S.2d 913, 915 (N.Y. App. Div. 1976)).

**\*33** In sum, the disputed factual record precludes summary judgment based on qualified immunity. *See, e.g., Eaton v. Estabrook*, 144 F.4th 80, 89 (2d Cir. 2025) ("In the qualified immunity context, '[p]re-trial resolution of the defense [of qualified immunity] ... may be thwarted by a factual dispute.' ... 'Any disputed questions of material fact —such as the acts of the defendant and their effects on the plaintiff—are to be determined by the factfinder.' ") (final alteration added) (first quoting *Warren v. Dwyer*, 906 F.2d 70, 74 (2d Cir. 1990); and then quoting *Walker v. Schult*, 45 F.4th 598, 617 (2d Cir. 2022)). Given the current factual record, Defendants have not carried their burden to demonstrate that no rational juror could conclude that they violated Plaintiff's constitutional rights. *Coollick v. Hughes*, 699 F.3d 211, 219 (2d Cir. 2012) ("Thus, a decision dismissing a claim based on qualified immunity at the summary judgment stage may only be granted when a court finds that an official has met his or her burden demonstrating that no rational jury could conclude '(1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct.' ") (quoting *al-Kidd*, 563 U.S. at 735). [25]

### G. John Does 1-100

Defendants also argue that because Plaintiff has not amended his Complaint, the Doe Defendants should be dismissed without prejudice. Dkt. No. 77-56 at 30. Plaintiff responds with a single sentence "reassert[ing] his request to amend the complaint to include additional defendants" and no authority in support of such a request. Dkt. No. 85 at 34.

Almost two years ago, Magistrate Judge Katz considered and denied Plaintiff's request to amend the Complaint to include two additional defendants. Dkt. No. 64. Since that time, Plaintiff has not sought a review of that decision and has

not undertaken any further efforts to amend the Complaint. Plaintiff now offers no authority and no new arguments in support of his cursory request. Plaintiff's renewed request is denied for the reasons set forth by Magistrate Judge Katz, Dkt. No. 64, and all claims against the Doe Defendants are dismissed, *see, e.g., Kaczmarek v. City of Schenectady*, No. 10-cv-1193, 2013 WL 5506276, at *2 (N.D.N.Y. Oct. 4, 2013) ("Because plaintiffs have failed to timely identify and serve the John Doe defendants, plaintiffs' claims against both John Doe defendants are dismissed.").

**V. CONCLUSION**

Accordingly, the Court hereby

**ORDERS** that Defendants' motion for summary judgment, Dkt. No. 77, is **GRANTED in part and DENIED in part**, as set forth in Section IV of this Memorandum-Decision and Order; and the Court further

**ORDERS** that the Clerk serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2025 WL 2772081

---

**Footnotes**

1    The Complaint incorrectly spells Officer Tolone's last name as "Toltone." Dkt. No. 77-55 at 1 n.1. Citations to docket entries utilize the pagination generated by CM/ECF, the Court's electronic filing system, and not the document's internal pagination.

2    This case was reassigned to the undersigned on January 19, 2023. Dkt. No. 34.

3    Unless otherwise indicated, the following facts have been asserted by the parties in their statements of material facts with accurate record citations, and expressly admitted or not denied with a supporting record citation in response. *See* N.D.N.Y. L.R. 56.1. The Court has also considered the parties' other submissions and attached exhibits. *See generally* Dkt. Nos. 77, 85-86, 90.

4    A person with a BAC of 0.08 percent is considered intoxicated *per se* under New York's Vehicle and Traffic Law ("VTL"). *See* N.Y. Veh. & Traf. Law § 1192(2); *see also Dalmasi v. City of Mount Vernon*, No. 13-cv-8672, 2014 WL 6645827, at *1 n.3 (S.D.N.Y. Nov. 24, 2014) (noting that a court may "take judicial notice of the VTL in deciding" summary judgment) (citations omitted).

5    During his deposition, Office Cecile characterized this statement as "police banter." Dkt. No. 77-47 at 74:13-17 ("Q. So, it's definitely him doesn't mean -- it doesn't mean that you were sure it was him? A. Right. That's police banter. I wasn't sure.").

6    Officer Russell testified during her deposition that she already knew Plaintiff from "[p]rior incidents," none involving violence. Dkt. No. 77-46 at 104:16-25.

7    Seemingly in the early morning of May 7, 2019, Detective Brimmer again tried to speak with Ms. Goldych, who "still seemed too intoxicated" and "could speak a little but was talking about outlandish things not related to this incident." Dkt. No. 77-19 at 3. When Detective Brimmer spoke with Ms. Goldych a third time, at some point later on May 7, 2019, she "seemed much less intoxicated." *Id.* While in that state, Ms. Goldych apparently told Detective Brimmer, *inter alia*, that she was "drunk[ ] at the time of the incident and does not remember all of the details" and that "she was unaware that Jones had been injured." *Id.* Detective Brimmer did not take a written statement from Ms. Goldych. *Id.*; *see also* Dkt. No. 77-30 at 2 (non-party detective's report stating that

when he subsequently spoke with Ms. Goldych "[i]t should be noted throughout our conversation V. Goldych referred to 'spiritual incidents' as well as being visited by 'higher powers' on several different occasions. She often had a difficult time organizing her thoughts and at times did not directly answer questions. Based upon her actions and statements her mental health status is unknown to me at this time.").

8    Dr. Weisman further opined that "[t]o help determine typical reductions in human BAC, clinical services often utilize a declination rate of 0.015% per hour." Dkt. No. 77-52 at 11. This suggests that Plaintiff had a higher BAC several hours prior, when Detective Brimmer read Plaintiff his *Miranda* rights. Dkt. No. 77-55 at ¶ 154. Presumably, the corresponding physiological effects identified by Dr. Weisman would have been more severe at that time and during the interrogation.

9    The transcript Defendants provided inaccurately characterizes Plaintiff's statement as "[m]umbles incoherently." Dkt. No. 77-22 at 105:7.

10   Members of the Onondaga County District Attorney's Office ("DA's Office") have since identified deficiencies with the process that led to this result. Dkt. No. 85-7 at 1 (" 'While it seems counterintuitive that someone would confess to something they did not do, it happens,' [Onondaga County District Attorney ("DA") William] Fitzpatrick said. 'And in this case, I hope all involved analyze the root causes of why this happened. We have done that in my office.' .... 'I have discussed the case with the prosecutor initially assigned and pointed out mistakes that were made,' Fitzpatrick said. 'The prosecutor who presented it to the grand jury and missed several red flags is no longer with the office.' "); Dkt. No. 85-11 at 9 (Syracuse Police Department report stating that, according to Onondaga County Assistant District Attorney ("ADA") Joe Coolican, "when the grand jury proceeding occurred, there was no identification process done by the Assistant District Attorney overseeing the case. Therefore, the witness [Ms. Bailey] was unaware Mr. Adams was the one who was in custody and accused of these crimes.").

11   From the record before the Court, it is not clear whether these charges were ever increased. *Compare* Dkt. No. 77-33, *with* Dkt. No. 77-38.

12   The Complaint also contains various requests for relief. *See, e.g.,* Dkt. No. 1 at ¶¶ 105-114; Dkt. No. 77-56 at 9 n.2.

13   To the extent that the Complaint states a claim for false arrest prior to this time, any such claim is dismissed as abandoned, as is any claim for declaratory judgment. *See Jackson v. Fed. Exp.,* 766 F.3d 189, 195 (2d Cir. 2014) ("[A] partial response arguing that summary judgment should be denied as to some claims while not mentioning others may be deemed an abandonment of the unmentioned claims."); *see also* Dkt. No. 1 at ¶¶ 101-04; Dkt. No. 77-56 at 9 n.2.

14   It also contradicts a position that Defendants took in support of their prior dispositive motion, wherein they argued that Plaintiff's "alleged drunken confession – insofar as it could possibly be construed as 'false' – did not result in Plaintiff's loss of liberty as he had already been arrested and confined." Dkt. No. 7-2 at 16.

15   Defendants do not contend that they had probable cause to arrest Plaintiff for any other offense. Dkt. No. 77-56 at 14.

16   The parties further agree that the "collective or imputed knowledge doctrine" applies. *See, e.g.,* Dkt. No. 77-56 at 12 ("[T]he relevant inquiry is whether the collective knowledge of the Syracuse Police Department ('SPD') constituted probable cause, not whether a specific arresting officer had probable cause."); Dkt. No. 85 at 14. Under that doctrine, an arrest "is permissible where the actual arresting ... officer lacks the specific information to form the basis for probable cause ... but sufficient information to justify the arrest ... was known by other law enforcement officials initiating ... the investigation" and "the other officers 'have communicated the information they possess individually, thereby pooling their collective knowledge to meet the probable

cause threshold.' " *Brown v. City of New York*, 798 F.3d 94, 99 (2d Cir. 2015) (alterations in original) (first quoting *Zellner v. Summerlin*, 494 F.3d 344, 369 (2d Cir. 2007); and then quoting *United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008)).

17    Defendants do not dispute that *Miranda* warnings were necessary. *See id.*; *Jackson v. Conway*, 763 F.3d 115, 136 (2d Cir. 2014) ("The *Miranda* safeguards apply only to 'custodial interrogations.' ").

18    Defendants' argument that no Individual Defendants was personally involved in all of the events resulting in Plaintiff's arrest and monthslong detention is unpersuasive. Dkt. No. 77-56 at 13, 21 n.6. As detailed above, Plaintiff has sufficiently established the personal involvement of every Individual Defendant in the events giving rise to his false arrest claims. *See, e.g., Legre v. City of Waterbury*, No. 22-cv-00659, 2024 WL 3964944, at *7 (D. Conn. Aug. 28, 2024) ("However, 'personal involvement' in an arrest is not limited to officers who were physically involved in taking someone into custody. Courts in this Circuit have upheld false arrest liability for non-arresting officers.") (collecting cases).

19    Each report was affirmed under penalty of perjury. *See, e.g.,* Dkt. No. 77-19 at 2-3; Dkt. No. 77-6 at 5; Dkt. No. 77-8 at 2; Dkt. No. 77-7 at 2.

20    Defendants contend that Officer Russell was "unaware of the fact" that Ms. Bailey was still on the scene when Officer Russell arrived. Dkt. No. 77-56 at 14. This assertion is contradicted by Officer Russell's BWC footage. *See* Dkt. No. 77-16 at 0:01 (Officer Russell responding to Ms. Bailey's statement that "he got into a fight with somebody, the other dude ran off, but he got knocked out" with "the other dude knocked out?"); *id.* at 11:27 (Officer Russell stating "I wish we would have got those people that were ..." and gesturing towards the sidewalk in the direction Ms. Bailey and her siblings had walked); *id.* at 17:21 (Officer Russell stating "did anyone contact those people back," presumably again in reference to Ms. Bailey and her siblings).

21    To the extent that the Complaint states a distinct claim for malicious prosecution against Defendant City individually, or pursuant to New York law, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 22 & n.7, 24, *with* Dkt. No. 85 at 23-30; *see also Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed further below. *See infra* Section IV.D.

22    To the extent that the Complaint states a distinct claim for fabricated evidence against Defendant City individually, any such clam is dismissed as abandoned. *Compare* Dkt. No. 77-56 at 26, *with* Dkt. No. 85 at 30; *see also Jackson*, 766 F.3d at 195. Plaintiff's separate *Monell* claim against Defendant City is addressed next. *See infra* Section IV.D.

23    This portion of the Report makes clear that Detective Brimmer was subsequently promoted to Detective Sergeant, a position in which he supervises other detectives. *See also* Dkt. No. 77-49 at 12:20-13:1.

24    It is unclear from the current record how this limitation operates in practice, given that alcohol is a depressant while "[m]ania is a condition in which you have a period of abnormally elevated, extreme changes in your mood or emotions, energy level or activity level. This highly energized level of physical and mental activity and behavior must be a change from your usual self and be noticeable by others." *Mania*, CLEVELAND CLINIC, https://my.clevelandclinic.org/health/diseases/21603-mania (last visited September 29, 2025). Neither the Report nor the Motion identify the referenced caselaw. *See generally* Dkt. Nos. 77, 85-11, 90.

25    Because factual disputes preclude summary judgment on the first prong of the qualified immunity inquiry, the Court makes no determination as to the second prong, as noted above. *Id.* at 219-220; *see also Linton v. Zorn*, 135 F.4th 19, 32 (2d Cir. 2025) ("But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment.") (quoting *Tolan*, 572 U.S. at 656). For similar reasons, the Court also does not address the parties' competing expert reports. Dkt. Nos. 77-53, 77-54, 85-14.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2008 WL 857528
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Richard AUSTIN, Plaintiff,
v.
Brian PAPPAS, John Does, Yonkers
Police Commissioner Charles C. Coles,
Westchester County, Defendants.

No. 04-CV-7263 (KMK)(LMS).
|
March 31, 2008.

**Attorneys and Law Firms**

Mr. Richard Austin, Stormville, NY, pro se.

Rory Carleton McCormick, Esq., Corporation Counsel, City of Yonkers, Yonkers, NY, for Defendants.

*ORDER ADOPTING REPORT & RECOMMENDATION*

KENNETH M. KARAS, District Judge.

**\*1** Richard Austin ("Plaintiff") filed this suit pursuant to 42 U.S.C. § 1983 ("Section 1983") against Yonkers Police Officer Brian Pappas ("Defendant Pappas"), several John Doe Yonkers Police Officers ("John Doe Defendants"), former Yonkers Police Commissioner Charles C. Cola ("Defendant Cola") (whose name is misspelled in Plaintiff's Complaint as Charles C. Coles), and Westchester County (collectively, "Defendants"), alleging violations of Plaintiff's civil rights under the First, Fourth, Fifth, Eighth, and Fourteenth Amendments of the United States Constitution, along with various supplemental state law claims.[1] (Compl.¶¶ 17, 19.) Plaintiff alleged that these violations occurred when Defendants failed to protect Plaintiff from Franklyn Kelley, a private individual who physically attacked Plaintiff during the course of Plaintiff's May 16, 2003 arrest. (*Id.* ¶ 10.) Plaintiff alleged that Defendant Pappas and the John Doe Defendants handcuffed him and pinned him to the ground while Franklyn Kelley repeatedly kicked and punched Plaintiff in the face. (*Id.* ("The officers did nothing to protect the plaintiff from this vicious assault, even though plaintiff was helpless and in their custody [.]").) Defendants moved for summary judgment, and this Motion was referred by Judge McMahon to Chief

Magistrate Judge Lisa M. Smith for review pursuant to 28 U.S.C. § 636(b)(1). On August 2, 2007, Magistrate Judge Smith issued a thorough Report and Recommendation ("R & R"), concluding that this Court should grant Defendants' Motion for Summary Judgment on the ground that Plaintiff has failed to demonstrate that there exists a genuine issue of material fact as to whether his constitutional rights were violated. Plaintiff was advised of his right to file objections to the R & R, but he did not do so.

A district court reviewing a report and recommendation " 'may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge.' " *Donahue v. Global Home Loans & Fin., Inc.,* No. 05-CV-8362, 2007 WL 831816, at *1 (S.D.N.Y. Mar. 15, 2007) (quoting 28 U.S.C. § 636(b)(1)(C)). Under 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, parties may submit objections to a magistrate judge's report and recommendation. The objections must be "specific" and "written," and must be made "within 10 days after being served with a copy of the recommended disposition." Fed.R.Civ.P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1).

Where a party does not submit an objection, " 'a district court need only satisfy itself that there is no clear error on the face of the record.' " *Donahue,* 2007 WL 831816, at *1 (quoting *Nelson v. Smith,* 618 F.Supp. 1186, 1189 (S.D.N.Y.1985)). In addition, a party's failure to object waives that party's right to challenge the report and recommendation on appeal. *See Fed. Deposit Ins. Corp. v. Hillcrest Assocs.,* 66 F.3d 566, 569 (2d Cir.1995) ("Our rule is that 'failure to object timely to a magistrate's report operates as a waiver of any further judicial review of the magistrate's decision.' " (quoting *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989))).

**\*2** Here, Plaintiff has not filed objections to the R & R. Accordingly, the Court has reviewed the R & R for clear error only. In so doing, the Court adopts the conclusion reached in the R & R that Defendants' Motion for Summary Judgment should be granted, but the Court does so in part on different grounds than those relied on in the R & R.

First, the Court agrees with Magistrate Judge Smith that Defendants' noncompliance with Local Civil Rule 56.2 should be overlooked because any prejudice resulting from noncompliance was cured by the following: (i) Magistrate Judge Smith advised Plaintiff of the nature of summary judgment during a March 23, 2007 conference; and (ii) Magistrate Judge Smith annexed a Rule 56.2 notice to the

R & R, a document to which Plaintiff was free to file objections. *See Narumanchi v. Foster,* No. 02-CV-6553, 2006 WL 2844184, at *2 (E.D.N.Y. Sept. 29, 2006) (refusing to deny defendant's motion for summary judgment based on failure of defendant to comply with Local Civil Rule 56.2 because "[a]ny prejudice to *pro se* plaintiffs [was] cured" by court's actions).

As expressed in the R & R, though Plaintiff did not file any opposition to Defendants' Motion for Summary Judgment, Defendants were still required to meet their burden of demonstrating to the Court that "no material issue of fact remains for trial." *See Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001). The Court finds no clear error in Magistrate Judge Smith's determination that Defendants satisfied this burden.

With respect to Defendants Pappas and Cola, the Court finds that Plaintiff has failed to offer any evidence demonstrating that they were personally involved in the alleged violation of Plaintiff's constitutional rights. The " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 122 (2d Cir.2004) (quoting *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). For purposes of Section 1983 liability, personal involvement can be established by evidence that:

> '(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring.'

*Id.* at 127 (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)); *accord Hayut v. State Univ. of N.Y.,* 352 F.3d 733, 753 (2d Cir.2003); *Schiller v. City of New York,* No. 04-CV-7922, 2008 WL 200021, at *4 (S.D.N.Y. Jan. 23, 2008); *Fair v. Weiburg,* No. 02-CV-9218, 2006 WL 2801999, at *4 (S.D.N.Y. Sept. 28, 2006). Further, a Section 1983 plaintiff must "allege a tangible connection between the acts of the defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986); *see also Fair,* 2006 WL 2801999, at *4 (citing *Bass* ).

**\*3** In support of their Motion for Summary Judgment, Defendants submitted evidence that Defendant Pappas did not directly participate in the arrest of Plaintiff, but he instead arrested Plaintiff's accomplice. For example, on April 8, 2004, at a hearing before the Honorable Richard A. Molea of the Westchester County Court, Defendant Pappas testified that he remained with Plaintiff's accomplice while other officers arrested Plaintiff. (Defs.' Affirmation in Supp., Ex. J, 50-51.) Further, in response to interrogatories served on him by Plaintiff, Defendant Pappas stated that he "did not observe what transpired during the course of plaintiff's arrest." (*Id.,* Ex. L.) Finally, Defendants offer a police report indicating that "Pappas was detaining [Plaintiff's accomplice] in the garage area, as additional units arrived and placed [Plaintiff] into custody." (*Id.,* Ex. C.)

Plaintiff has failed to offer any evidence refuting Defendant Pappas' version of events. In other words, Plaintiff has offered no evidence demonstrating that Defendant Pappas was actually one of the officers who arrested him and allegedly pinned him to the ground while Kelley assaulted him. In fact, during his deposition testimony, Plaintiff admitted that he was not sure whether Defendant Pappas was one of the police officers who arrested him, and that the reason Defendant Pappas was named as a defendant in the present suit was because Plaintiff had seen his name on Plaintiff's felony complaint. (*Id.,* Ex. G, 32-35.) As such, the unrefuted evidence before the Court demonstrates that Defendant Pappas was not one of the officers directly involved in Plaintiff's arrest. Plaintiff therefore has failed to satisfy a prerequisite to liability under Section 1983-namely that Defendant Pappas had personal involvement in the alleged violation of Plaintiff's constitutional rights. *See Back,* 365 F.3d at 122. Thus, Plaintiff's claim against Defendant Pappas must be dismissed.

Plaintiff alleged that Defendant Cola, Yonkers Police Commissioner at the time of Plaintiff's 2003 arrest, violated Plaintiff's constitutional rights by "authoriz[ing], tolerat[ing], as institutionalized practices, and ratif[ying] the misconduct

[of Defendant Pappas and John Doe Defendants]." (Compl.¶ 14.) More specifically, Plaintiff charges Defendant Cola with failure to properly: (1) discipline subordinate officers; (2) take adequate precautions in hiring subordinate officers; (3) report criminal acts by police personnel to the Westchester County District Attorney; and (4) establish a system for dealing with complaints about police misconduct. (*Id.*) Plaintiff does not assert that Defendant Cola directly participated in the violation of his constitutional rights; instead, Plaintiff urges the Court to find Defendant Cola liable under Section 1983 based on his role as supervisor of Defendant Pappas and the John Doe Defendants.

"It is well settled, however, that the doctrine of respondeat superior standing alone does not suffice to impose liability for damages under section 1983 on a defendant acting in a supervisory capacity." *See Hayut,* 352 F.3d at 753 (citing *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 691 (1978)). Instead, it is necessary to establish a supervisory official's personal involvement in the alleged constitutional violation. *See id.; Fair,* 2006 WL 2801999, at *4.

 **\*4**  Plaintiff has failed to provide the Court with any evidence from which a reasonable jury could conclude that Defendant Cola was personally involved in the alleged violation of Plaintiff's constitutional rights. Plaintiff has offered no evidence demonstrating that Defendant Cola was aware of and failed to remedy constitutional violations by subordinate officers, or that he acted in a grossly negligent or deliberately indifferent manner in supervising or training subordinate officers. There is also no evidence in the record to support a theory that Defendant Cola created a policy or custom that fostered and led to the alleged violation of Plaintiff's rights. *See Hayut,* 352 F.3d at 754 (finding as fatal to plaintiff's Section 1983 claim the fact that there existed "no evidence that, after becoming aware of the alleged harassment, any of the [supervisory officials] failed to respond or remedy the situation, that any of these [supervisory officials] created or allowed a policy to continue under which alleged harassment could occur, or that they were grossly negligent in monitoring [the alleged harasser's] conduct"); *Harris v. City of New York,* No. 01-CV-6927, 2003 WL 554745, at *6 (S.D.N.Y. Feb. 26, 2003) ("[P]laintiff has put forth no evidence pointing to defendant ['s] personal involvement in plaintiff's alleged deprivation of rights .... Plaintiff's conclusory allegations regarding defendant['s] alleged supervisory role, without more, cannot withstand summary judgment."). Further, nothing in the record, even

drawing all inferences in Plaintiff's favor, suggests any tangible connection between Defendant Cola's training or supervision of subordinate officers and the alleged violation of Plaintiff's rights. In fact, the record contains no evidence with regard to Defendant Cola whatsoever. Without such evidence, no reasonable jury could conclude that Defendant Cola had personal involvement in the alleged violation of Plaintiff's constitutional rights, which means that Plaintiff has failed to satisfy a prerequisite to Section 1983 liability, and therefore that Defendant Cola is entitled to summary judgment in his favor. *See Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir.1998) ("After an opportunity for discovery, undisputed allegations that [a] supervisor lacked personal involvement will ultimately suffice to dismiss that official from the case.").

In sum, the Court finds that Plaintiff has failed to establish the personal involvement of Defendants Pappas and Cola in the alleged violation of his rights. For reasons set forth more fully in the R & R, the Court also dismisses the Complaint as to the John Doe Defendants because Plaintiff's time limit to amend the Complaint in order to substitute in named defendants has lapsed. Therefore, the Court finds it unnecessary to reach the question of whether Plaintiff has adequately established an underlying violation of his constitutional rights. Finally, having determined that no cognizable federal claims exist, the Court will follow Magistrate Judge Smith's recommendation in declining to exercise jurisdiction over the state law claims.

 **\*5**  Accordingly, it is hereby:

ORDERED that the Report and Recommendation dated August 2, 2007, is ADOPTED on the grounds set forth in this Order; and it is further

ORDERED that Defendants' Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 is GRANTED.

The Clerk of Court is respectfully directed to enter judgment in favor of Defendants, to terminate Defendant's Motion (Dkt. No. 28), and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2008 WL 857528

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

## Footnotes

1    On August 8, 2005, Plaintiff's claim against Westchester County was dismissed by the Honorable Gerald E. Lynch, to whom this case was initially assigned. On February 28, 2006, the case was transferred to White Plains and reassigned to Judge Colleen McMahon. The case was reassigned to the undersigned on August 6, 2007.

**End of Document**                                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 57 of 340

1997 WL 599355
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Kenneth BROWN, Plaintiff,

v.

Andrew PETERS, Warden, Watertown Correctional
Facility; Joseph Williams, Warden, Lincoln Work–
Release Center; Francis J. Herman, Senior Parole
Officer Interstate Bureau; T. Stanford, Senior Parole
Officer; Deborah Stewart, Parole Officer; John Doe #
1, Parole Agent, Watertown Correctional Facility; John
Doe # 2, Parole Agent, Lincoln Work Release Center;
Susan Bishop, Director of Interstate Compact, South
Carolina; Cecil Magee, Parole Officer, South Carolina;
Frank Barton, Parole Officer, South Carolina; John
McMahan, Parole Officer, South Carolina, Defendants.

No. Civ.A. 95CV1641RSPDS.
|
Sept. 22, 1997.

### Attorneys and Law Firms

Kenneth Brown, State Court Institute–Greene, Waynesburg,
PA, plaintiff, pro se.

Dennis C. Vacco, New York State Attorney General, The
Capitol Albany, NY, for defendants Peters, Herman Stewart,
Doe # 1, Doe # 2, and Williams, Jeffrey M. Dvorin, Assistant
Attorney General, Carl N. Lundberg, Chief Legal Counsel,
South Carolina Department of Probation, Columbia, SC, for
defendants Bishop, Magee, Barton, McMahan, and Stanford,
Carl N. Lundberg, of Counsel.

### DECISION AND ORDER

POOLER, J.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Daniel Scanlon, Jr.,
duly filed on April 17, 1997. Following ten days from the
service thereof, the Clerk has sent me the entire file, including
any and all objections filed by the parties herein.

Plaintiff Kenneth Brown commenced this Section 1983 civil
rights action on November 17, 1995. On February 12,

1996, Magistrate Judge Scanlon ordered Brown to submit an
amended complaint alleging the specific acts committed by
the individuals named as defendants which Brown claimed
violated his constitutional rights. Brown filed an amended
complaint on March 21, 1996. In his amended complaint,
Brown alleged that defendants violated his rights under the
Eighth and Fourteenth Amendments by failing to process
properly his interstate compact paperwork, resulting in Brown
being imprisoned pursuant to a parole hold when in fact
he had never violated the conditions of his parole. For a
more complete statement of Brown's claims, see his amended
complaint. Dkt. No. 5.

On August 5, 1996, defendants Peters and Williams made
a motion to dismiss for failure to state a claim pursuant to
Fed.R.Civ.P. 12(b)(6). Dkt. No. 13; Dkt. No. 14, at 2. On
August 19, 1996, defendants Bishop, Magee, Barton, and
McMahan made a motion to dismiss the complaint against
them or, in the alternative, for summary judgment. Dkt. No.
20. On October 17, 1996, defendants Herman, Stewart, and
Stanford made a motion to dismiss for failure to state a
claim. Dkt. No 34. On April 17, 1996, Magistrate Judge
Scanlon recommended that all defendants' motions to dismiss
be granted and that the complaint be dismissed. Dkt. No. 50.

On June 9, 1997, Brown filed objections to the
magistrate judge's report-recommendation, having been
granted additional time in which to do so. Dkt. No. 52. In
addition, Brown filed on June 9, 1997, a motion for leave to
file a second amended complaint and a copy of his proposed
amended complaint. Dkt. No. 53. I turn first to the last motion
filed, Brown's motion for leave to amend his complaint a
second time.

Brown seeks to file a second amended complaint "setting
forth in detail the personal involvement of each defendant
and how their acts of commission and omission served to
deprive plaintiff of Constitutionally secured rights." Dkt. No.
53. The district court has discretion whether to grant leave
to amend. *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129,
131 (2d Cir.1993). In exercising that discretion, the court
should freely grant leave to amend when justice so requires.
Fed.R.Civ.P. 15(a). However, the court need not grant leave
to amend where it appears that amendment would prove to be
unproductive or futile. *Ruffolo,* 987 F.2d at 131.

Here, Brown moved to amend his complaint to add additional
allegations against the named defendants. However, the
additional allegations fail to cure the deficiency which

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 58 of 340

Brown v. Peters, Not Reported in F.Supp. (1997)

forms the basis of defendants' motion to dismiss—the absence of defendants' personal involvement in a constitutional deprivation. Section 1983 imposes liability upon an individual only when personal involvement of that individual subjects a person to deprivation of a federal right. *See Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). A complaint is fatally defective if it fails to allege personal involvement sufficient to establish that a supervisor was "directly and personally responsible for the purported unlawful conduct." *Alfaro Motors, Inc. v. Ward,* 814 F.2d 883, 886 (2d Cir.1987).

**\*2** Brown's proposed amended complaint alleges in conclusory fashion that defendants acted "in a grossly negligent and concerted manner which breached their duties owed to Plaintiff and is the proximate cause of [the violation of plaintiff's constitutional rights]." Proposed Am. Compl., at 3. Brown continues in the same vein, stating that defendants owed duties to plaintiff to carry out their jobs in a professional manner and they failed to carry out those duties appropriately. The complaint states that defendants held specific responsibilities, such as checking for outstanding warrants, which if performed properly should have alerted them to a problem. However, nowhere does the complaint set forth allegations that these defendants either participated directly in any constitutional infraction or that they were even aware of such an infraction. The proposed amended complaint merely alleges that these defendants failed in performing their supervisory and ministerial functions. "These bare assertions do not state a claim under 42 U.S.C. § 1983." *Smiley v. Davis,* 1988 WL 78306, \*2 (S.D.N.Y.).

This plaintiff previously has had the opportunity to amend his complaint for the same reason asserted here, to allege personal involvement on the part of defendants. Brown's first amended complaint failed to accomplish that task, and it appears that even if allowed to amend again Brown would be unable to make the requisite allegations with sufficient specificity to sustain his complaint. Consequently, I find that amendment would be futile, and I deny Brown's motion for leave to amend his complaint.

I turn now to the magistrate judge's report-recommendation and defendants' motions. The magistrate judge recommends that I grant defendants' motions and dismiss the complaint as to all defendants. The report-recommendation clearly describes the grounds on which the magistrate judge recommends dismissal as to each defendant. Fed.R.Civ.P. 72(b) requires the district judge to make a *de novo*

determination on "any portion of the magistrate's disposition to which specific, written objection has been made." Brown's objections fail to address directly any of the analysis. Brown's objections state (1) that he has been deprived of his constitutional rights; (2) that he has stated a cause of action; (3) that the court wrongly refused to appoint an attorney for him and wrongly stayed discovery pending the outcome of these motions; (4) that he seeks to file an amended complaint; (5) the standard of review for a Fed.R.Civ.P 12(b)(6) motion; (6) that he disagrees with the magistrate judge's recommendation to grant defendants' motions because the allegations in his complaint, which he repeats, show that his rights were violated; and (7) the text of the Fourteenth and Eighth Amendments.

Even affording the objections the liberal reading required for *pro se* pleadings, I find that these objections fail to state any basis whatsoever, much less a specific one, for the court not to adopt the magistrate judge's rulings. They simply re-state the relief sought and the facts on which Brown grounds his complaint and conclude that the magistrate judge's conclusions are wrong. When the parties make only frivolous, conclusive, or general objections, the court reviews the report-recommendation for clear error. *See Camardo v. General Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (court need not consider objections which are frivolous, conclusive, or general and constitute a rehashing of the same arguments and positions taken in original pleadings); *Chambrer v. Leonardo,* 1991 WL 44838, \*1 (S.D.N.Y.) (restatement of allegations already before the court and assertion that valid constitutional claim exists insufficient to form specific objections); *Schoolfield v. Dep't of Correction,* 1994 WL 119740, \*2 (S.D.N.Y.) (objections stating that magistrate judge's decisions are wrong and unjust, and restating relief sought and facts upon which complaint grounded, are conclusory and do not form specific basis for not adopting report-recommendation); *Vargas v. Keane,* 1994 WL 693885, \*1 (S.D.N.Y.) (general objection that report does not address violation of petitioner's constitutional rights is a general plea that report not be adopted and cannot be treated as objection within the meaning of 28 U.S.C. § 636), *aff'd,* 86 F.3d 1273 (2d Cir.), *cert. denied,* 519 U.S. 895, 117 S.Ct. 240, 136 L.Ed.2d 169 (U.S.1996). *See also Scipio v. Keane,* 1997 WL 375601, \*1 (1997) (when objections fail to address analysis directly, court reviews report-recommendation for clear error); Fed.R.Civ.P. 72(b), Advisory Comm. Note (when no specific, written objections filed, "court need only satisfy itself that there is

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 59 of 340

Brown v. Peters, Not Reported in F.Supp. (1997)

no clear error on the face of the record in order to accept the recommendation").

**\*3** Because Brown fails to make specific objections or provide any basis for his general objections, I review the report-recommendation for clear error. After careful review, I conclude that the magistrate judge's report-recommendation is well-reasoned and is not clearly erroneous. [1] The magistrate judge employed the proper standard, accurately recited the facts, and reasonably applied the law to those facts. Consequently, I adopt the report-recommendation.

CONCLUSION

Because plaintiff's proposed amendment demonstrates that amendment would be futile, I deny plaintiff's motion for leave to amend his complaint. I approve the magistrate judge's recommendation and grant defendants' motions to dismiss. Plaintiff's complaint is dismissed in its entirety.

IT IS SO ORDERED.

**ORDER and REPORT–RECOMMENDATION**

This matter was referred to the undersigned for report and recommendation by the Hon. Rosemary S. Pooler, United States District Judge, by Standing Order dated November 12, 1986. Currently before this Court are a number of motions. Defendants Peters and Williams have filed a motion to dismiss (dkt.13); defendants Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative to dismiss (dkt.20); and defendants Herman, Stewart and Stanford also have filed a motion to dismiss (dkt.34). Plaintiff opposes these three motions (dkts.27, 29, 33, 38). Defendants Bishop, Magee and McMahan have filed a motion to stay discovery (dkt.41) and plaintiff has filed a motion to extend time (dkt.44) in which to file opposition to the latter motion for a stay of discovery.

The Court addresses these issues *seriatim.*

**BACKGROUND**

Plaintiff's amended complaint, which he has brought pursuant to 42 U.S.C. § 1983, alleges the following facts. In October, 1991, plaintiff was incarcerated in the Watertown Correctional Facility in Watertown, New York. He applied for an interstate compact because he wanted to return to South Carolina to live with his common law wife, Pamela Reid. During the application process, he was interviewed by the facility's parole officer, identified only as defendant John Doe # 1. After signing the necessary papers, his application was forwarded to defendant Andrew Peters, the facility's superintendent, who reviewed, signed and forwarded the papers to the Interstate Bureau. Amend. Compl. at ¶¶ 1–2; Exs. A, B.

On or about January 15, 1992, while his compact was waiting for review at the Interstate Bureau, plaintiff was approved for work release and sent to the Lincoln Work Release Center in New York City. While at the center, plaintiff spoke to a parole officer, defendant John Doe # 2, and told him that he was seeking a compact that would return him to South Carolina upon his conditional release. Plaintiff claims the parole officer told him that he would handle the necessary paperwork, although the officer had had no experience with an interstate compact. Amend. Compl. at ¶¶ 3, 4.

**\*4** Plaintiff, meanwhile, asked Reid whether any officials had contacted her in South Carolina regarding his prospective residence in that state. Upon discovering no one had contacted her, plaintiff asked a lawyer he knew, Navron Ponds, to inquire as to his compact status. In March, 1992, the lawyer spoke with defendant Susan Bishop, who is the director of the interstate compact program in South Carolina. Bishop allegedly told Ponds that plaintiff "was disapproved because there was a discrepancy about approving plaintiff['s] compact." The "discrepancy" was the fact that plaintiff owed the state of South Carolina eighty-six days of confinement from a previous sentence. Plaintiff claims Bishop told Ponds to contact defendants Cecil Magee and Frank Barton, who worked for the South Carolina Parole Department. Sometime in March, 1992, Ponds made some calls to Barton and Magee. A verbal agreement was reached, and plaintiff, upon speaking with Barton and Magee was told that his compact had been approved. He also was told that he should report to the South Carolina Department of Parole upon being released. Amend. Compl. at ¶¶ 5–7.

Prior to leaving the Lincoln Work Release Center, plaintiff processed paperwork related to his interstate compact. His paperwork was sent by Doe # 2 to defendant Joseph Williams, the superintendent of the center. Williams reviewed, signed and returned the paperwork to plaintiff. On May 1, 1992,

upon his release from the center, plaintiff traveled to South Carolina. Three days later, he entered a South Carolina parole office and promptly was arrested because of the eighty-six days of confinement that he owed the state. Plaintiff's paperwork was given to defendant John McMahan, a parole officer. Plaintiff claims that McMahan never returned this paperwork to him. On May 20, 1992, the state of South Carolina revoked plaintiff's parole and plaintiff was returned to prison to serve the eighty-six days that he owed. When he asked McMahan what would happen to his one year of parole from New York, the officer allegedly told him that his New York parole would run concurrently with his South Carolina parole, and that when he finished his South Carolina parole, he would not owe any parole whatsoever. Plaintiff served the eighty-six days he owed and was released on July 31, 1992. Amend. Compl. at ¶¶ 8–10.

In February, 1993, plaintiff was arrested on robbery charges in South Carolina. The charges ultimately were dropped, but he apparently encountered some difficulties regarding this arrest as a result of a parole hold that New York state had placed upon him. Bishop's office told him that it had nothing to do with his parole hold and that any problem that he had was between him and the state of New York. He talked to authorities in Albany, New York regarding the parole hold, but was not successful in his efforts to have the hold removed. On September 30, 1993, after had been extradited to New York as a fugitive from justice, plaintiff was given a preliminary hearing at Riker's Island, New York. The hearing officer found no probable cause that plaintiff had violated any condition of parole. He was released. Amend. Compl. at ¶¶ 11–14; Exs. C–J.

**\*5** Plaintiff claims that he would not have suffered hardships if his interstate compact had been handled correctly. He alleges that defendant Deborah Stewart failed to follow up and see whether plaintiff had arrived in South Carolina. If she had, he argues, she would have discovered that he had been arrested upon his arrival. He alleges that defendant Francis Herman, a parole officer at the Interstate Bureau failed to do his job by not investigating plaintiff's violation reports. Amend. Compl. at ¶¶ 15–17; Exs. F–I.

Plaintiff asserts that the foregoing amounts violations of his Eighth and Fourteenth Amendment rights, wherefore he both compensatory and declaratory relief.

## DISCUSSION

A. Motion to Dismiss by Williams and Peters.

Williams and Peters have filed a motion to dismiss plaintiff's complaint pursuant to FED.R.CIV.P. 12(b)(6) on the grounds that it fails to state a claim upon which relief may be granted. In a Rule 12(b)(6) motion, all factual allegations in the complaint must be taken and construed in plaintiff's favor. *See LaBounty v. Adler,* 933 F.2d 121, 122 (2d Cir.1991) (citing *Ortiz v. Cornette,* 867 F.2d 146, 149 (1989)). The Court's role is not to assess whether plaintiffs have raised questions of fact or demonstrated an entitlement to a judgment as a matter of law, as in a motion made pursuant to FED.R.CIV.P. 56 for summary judgment, but rather to determine whether plaintiff's complaint sufficiently alleges all of the necessary legal elements to state a claim under the law. *See Christopher v. Laidlaw Transit, Inc.* 899 F.Supp. 1224, 1226 (S.D.N.Y.1995), (citing *Ricciuti v. New York City Transit Authority,* 941 F.2d 119, 124 (2d Cir.1991)). Factual allegations in brief or memoranda may not be considered. *Fonte v. Board of Managers of Continental Towers Condominium,* 848 F.2d 24, 25 (2d Cir.1988). The Court now turns to the issues presented.

Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). As superintendents at New York State Correctional facilities, Williams and Peter may be found personally involved in the alleged deprivation of plaintiff's constitutionally protected rights by a showing that they: (1) directly participated in the infraction; (2) knew of the infraction, but failed to remedy the wrong; (3) created or continued a policy or custom under which unconstitutional practices occurred; or (4) were grossly negligent in managing subordinates who caused unlawful conditions or events. *Id.,* (quoting *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986)). Supervisory liability also may be imposed against Williams or Peters with a showing of gross negligence or deliberate indifference to plaintiff's constitutional rights. *Id.* Absent some personal involvement by Williams or Peters in the allegedly constitutionally infirm conduct of their subordinates, neither can be held liable under § 1983. *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987).

**\*6** Plaintiff has not provided any evidence linking either Williams or Peters to his alleged constitutional deprivations. All that plaintiff has alleged is that Williams and Peters, as superintendents, have reviewed and signed paperwork

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 61 of 340

Brown v. Peters, Not Reported in F.Supp. (1997)

relating to plaintiff's compact. Though it has long been held that *pro se* complaints are held to "less stringent standards than formal pleadings drafted by lawyers" for the purpose of a motion to dismiss under Rule 12(b)(6), *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595–96, 30 L.Ed.2d 652 (1972), plaintiff has not explained how the ministerial conduct of these two defendants was violative of the Constitution. Their motion to dismiss should be granted.

B. Motion for Summary Judgment or to Dismiss by Bishop, Magee, Barton and McMahan.

Bishop, Magee, Barton and McMahan have filed a motion for summary judgment, or in the alternative a motion to dismiss. The Court will treat their motion as a motion to dismiss. "[C]omplaints relying on the civil rights statutes are insufficient unless they contain some specific allegations of fact indicating a deprivation of rights, instead of a litany of general conclusions that shock but have no meaning." *Barr v. Adams,* 810 F.2d 358, 363 (2d Cir.1987). Plaintiff has not alleged specifically how the conduct of these four defendants infringed upon his constitutional rights. In his amended complaint, he contends that defendants violated the Constitution by "continuously breaching [[[their] duty" to him. This language underscores the defect with the complaint: if it alleges anything at all, it alleges that defendants were negligent in handling plaintiff's interstate compact and parole. To state a cognizable § 1983 claim, the prisoner must allege actions or omissions sufficient to demonstrate deliberate indifference; mere negligence will not suffice. *Hayes v. New York City Dept. of Corrections,* 84 F.3d 614, 620 (2d Cir.1996); *Morales v. New York State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1988) (section 1983 does not encompass a cause of action sounding in negligence).

The Court finds that the claims against Bishop, Magee, Barton and McMahan should be dismissed.

C. Motion to Dismiss by Herman, Stewart and Stanford.

Plaintiff's claim against Stewart is that she failed to follow up and see whether plaintiff had arrived in South Carolina. Herman, he likewise asserts, failed to do his job because he did not investigate plaintiff's violation reports. Plaintiff has not alleged how these actions run afoul of the Constitution; and again, these claims seem to be grounded in negligence, which is not actionable under § 1983. *Hayes,* 84 F.3d at 620.

Plaintiff's claim against Stanford must fail because his complaint literally fails to state a claim against that

defendant. Aside from naming Stanford as a defendant, and alleging that he was the appointed Senior Parole Officer at plaintiff's September 30, 1993 revocation hearing at Riker's Island, plaintiff does not detail how Stanford violated his constitutional rights. Absent some personal involvement by Stanford in the allegedly constitutionally infirm conduct of his subordinates, he cannot be held liable under § 1983. *Gill,* 824 F.2d at 196.

**\*7** Accordingly, the Court finds that Stanford, Stewart and Herman's motion to dismiss should be granted.

D. Plaintiff's "John Doe" Claims.

In so far as neither John Doe # 1 nor John Doe # 2 have been identified and served in this matter, the Court does not have jurisdiction over these parties and does not reach the merits of plaintiff's claims against them.

E. Discovery Motions.

Defendants Bishop, Magee and McMahan have filed a motion to stay discovery until the Court has made a ruling on their motion to dismiss. Plaintiff has filed a motion to extend the time in which he may file opposition to defendants' motion. Plaintiff, however, has filed his opposing response (dkt.47), therefore his instant discovery motion is denied as moot. In that the Court recommends granting defendants' motion to dismiss, discovery in this matter would be fruitless. Accordingly, defendants' motion for a stay of discovery pending the resolution of their motion to dismiss is granted.

## CONCLUSION

WHEREFORE, based upon the foregoing analysis, it is hereby

ORDERED, that plaintiff's motion to extend the time to file an opposing reply (dkt.44) is denied as moot; and it is further

ORDERED, that defendants Bishop, Magee and McMahan's motion to stay discovery until their motion to dismiss is decided (dkt.41) is granted; and it is further

RECOMMENDED, that defendants Peters and Williams' motion to dismiss (dkt.13) be granted; and it is further

Brown v. Peters, Not Reported in F.Supp. (1997)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 62 of 340

RECOMMENDED, that defendants Bishop, Magee, Barton and McMahan's motion to dismiss (dkt.20) be granted; and it is further

RECOMMENDED, that defendants Herman, Stewart and Stanford's motion to dismiss (dkt.34) be granted.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten (10) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN TEN (10) DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); FED.R.CIV.P. 6(a), 6(e) and 72.

**All Citations**

Not Reported in F.Supp., 1997 WL 599355

---

## Footnotes

1    I note, however, that the report-recommendation would survive even *de novo* review.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 63 of 340

Cannenier v. Skipper-Scott, Not Reported in Fed. Supp. (2019)

2019 WL 764795
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Quaysean CANNENIER, Plaintiff,
v.
Warden SKIPPER-SCOTT, et al., Defendants.

18 Civ. 2383 (LGS)
|
Signed 02/20/2019

**Attorneys and Law Firms**

Quaysean Cannenier, Waymart, PA, pro se.

Brandon Herbert Cowart, U.S. Attorney's Office, New York, NY, for Defendants.

**OPINION AND ORDER**

Lorna G. Schofield, United States District Judge

**\*1** Pro se Plaintiff Quaysean Cannenier brings this action against Shirley Skipper-Scott, Jossam Georgy, Rosa Proto, Kiet Vuong, Leslie McPherson-Anderson and Krishna Ajarie ("Defendants") who are Federal Bureau of Prisons ("BOP") Officers, [1] stemming from a head wound Plaintiff sustained when stabbed by another inmate. The Complaint is construed to raise claims under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971), and the Federal Tort Claims Act ("FTCA"). Defendants move to dismiss for lack of subject matter jurisdiction and for failure to state a claim. Fed. R. Civ. P. 12(b)(1), 12(b)(6). For the reasons described herein, the motion is granted.

**I. BACKGROUND**

The facts are taken from the Complaint and Plaintiff's opposition to the motion to dismiss, and, as required on a motion to dismiss, these facts are accepted as true and construed in the light most favorable to Plaintiff. *Raymond Loubier Irrevocable Tr. v. Loubier*, 858 F.3d 719, 725 (2d Cir. 2017); *see also Coke v. Med., Dep't of Corr. & Cmty. Supervision*, No. 17 Civ. 0866, 2018 WL 2041388, at \*1 n. 2 (S.D.N.Y. Apr. 30, 2018) ("[W]hen *a pro se* plaintiff's opposition memoranda raises new allegations that are consistent with the allegations in the Complaint,

these allegations may be read as supplements to th[e] pleadings.") (some alteration in original) (internal quotation marks omitted).

**A. The Stabbing and Subsequent Medical Treatment**
In September 2016, Plaintiff was a pre-trial detainee at the Metropolitan Correctional Center ("MCC") in the Unit 11 North housing unit. On September 1, 2016, Defendants Vuong, McPherson-Anderson and Ajarie conducted a general search of Unit 11 North for weapons and contraband. Vuong, McPherson-Anderson and Ajarie failed to find a weapon kept by Joan Vasquez, an inmate. On September 2, 2016, Vasquez used the weapon to stab Plaintiff in the head. Ajarie was present for the attack but did not help Plaintiff or intervene. Plaintiff's wound caused heavy bleeding, and Plaintiff passed out as he tried to seek medical attention.

**\*2** When Plaintiff awoke, he was being taken to Brooklyn First Hospital. At the hospital, Plaintiff did not receive an MRI or X-ray.

Once Plaintiff returned to MCC, he was put in the "box" -- a special housing unit -- for 90 days even though no disciplinary charges were filed against him. Although Plaintiff requested medical attention for his terrible pain, he did not receive medical care for a week. At that time, he was given an MRI and X-ray.

**B. Grievance Attempt**
Plaintiff requested a BP-8 form (for an informal resolution) from Defendant Proto who has been a BOP Officer for at least ten years. However, Proto knowingly gave Plaintiff a BP-9 form (a formal written complaint). Plaintiff's completed BP-9 form includes allegations of improper medical care because no MRI or X-ray was performed, but does not contain information about the other claims raised in the Complaint. Plaintiff's BP-9 was received on October 27, 2016, and rejected on October 28, 2016. The rejection notice states that the BP-9 was rejected because Plaintiff did not attempt, or provide evidence of an attempt at, informal resolution (i.e. a BP-8 form). The notice, which is attached to the Complaint, explains that Plaintiff must first attempt informal resolution and that Plaintiff had five days to submit a proper form.

**II. LEGAL PRINCIPLES**

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 64 of 340

Cannenier v. Skipper-Scott, Not Reported in Fed. Supp. (2019)

### A. Motion to Dismiss for Lack of Subject Matter Jurisdiction

In order to survive a motion to dismiss under Rule 12(b)(1), "the plaintiff has the burden of proving by a preponderance of the evidence that subject matter jurisdiction exists." *Katz v. Donna Karan Co.*, 872 F.3d 114, 120 (2d Cir. 2017). All material allegations in the Complaint are accepted as true, however, "argumentative inferences favorable to the party asserting jurisdiction should not be drawn." *Atl. Mut. Ins. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992); *accord Lucas v. Fed. Bureau of Prisons*, No. 17 Civ. 1184, 2018 WL 3038496, at *2 (S.D.N.Y. June 19, 2018). In considering a Rule 12(b)(1) motion, a court may rely on evidence outside the pleadings. *Moser v. Pollin*, 294 F.3d 335, 339 (2d Cir. 2002); *accord Raymond Loubier Irrevocable Tr.*, 858 F.3d at 725.

### B. Motion to Dismiss for Failure to State a Claim

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party, *Montero v. City of Yonkers*, 890 F.3d 386, 391 (2d Cir. 2018), but gives "no effect to legal conclusions couched as factual allegations," *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 35 (2d Cir. 2017) (internal quotation marks omitted). To withstand a motion to dismiss, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007) ). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

### C. Pro se Pleadings and Briefs

Courts must "liberally construe pleadings and briefs submitted by pro se litigants, reading such submissions to raise the strongest arguments they suggest." *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 156 (2d Cir. 2017) (internal quotation marks omitted). "The policy of liberally construing pro se submissions is driven by the understanding that implicit in the right to self-representation is an obligation ... of the court to make reasonable allowances to protect pro se litigants from inadvertent forfeiture of important rights because of their lack of legal training." *Id.* at 156–57 (internal quotation marks omitted). "We afford a pro se litigant special solicitude by interpreting a complaint filed pro se to raise the strongest claims that it suggests." *Hardaway v. Hartford Pub. Works*

*Dep't*, 879 F.3d 486, 489 (2d Cir. 2018) (internal quotation marks omitted).

### III. DISCUSSION

**\*3** The Complaint is construed to raise an FTCA claim for negligence in failing to find the weapon and *Bivens* claims for denying access to the grievance process, failure to protect against an inmate's assault, improper placement in a special housing unit, and deliberate indifference to a serious medical need. For the following reasons, the motion to dismiss is granted.

### A. FTCA Claim

The Complaint raises a negligence claim against Defendants Vuong, McPherson-Anderson and Ajarie for failing to find the weapon used to stab him during their search of Plaintiff's housing unit. As explained below, the United States is substituted as the named Defendant for Plaintiff's FTCA negligence claim, and the claim is dismissed for lack of subject matter jurisdiction. *See Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005) ("The FTCA requires that a claimant exhaust all administrative remedies before filing a complaint in federal district court. This requirement is jurisdictional and cannot be waived."); *accord Shariff v. United States*, 689 F. App'x 18, 20 (2d Cir. 2017) (summary order); *Davila v. Gutierrez*, 330 F. Supp. 3d 925, 936 (S.D.N.Y. 2018).

### 1. Substituting the United States as the Named Defendant

The FTCA provides a limited waiver of sovereign immunity for claims "arising from the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment...." 28 U.S.C. § 2679(b)(1). "The only proper defendant to a tort claim under the FTCA is the United States." *Skyers v. Sommer*, No. 12 Civ. 3432, 2016 WL 4484241, at *7 (S.D.N.Y. Aug. 23, 2016) (citing *Rivera v. United States*, 928 F.2d 592, 609 (2d Cir. 1991) ).

"The FTCA provides that upon certification by the Attorney General that an employee was acting within the scope of his office or employment when he committed the allegedly negligent act, the United States shall be substituted as the defendant in place of the employee, and the FTCA shall be the exclusive remedy for any action or claim arising out of

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 65 of 340

Cannenier v. Skipper-Scott, Not Reported in Fed. Supp. (2019)

the negligent act." *Fountain v. Karim*, 838 F.3d 129, 133 n.3 (2d Cir. 2016). Because the United States has certified that Defendants Vuong, McPherson-Anderson and Ajarie were acting within the scope of their employment in conducting searches of Plaintiff's unit on September 1, 2016, the United States is substituted as the named Defendant for Plaintiff's FTCA claim for the negligent failure of Defendants Vuong, McPherson-Anderson and Ajarie to find the weapon that was used to stab Plaintiff.

### 2. Failure to Exhaust

Under the FTCA, a plaintiff must exhaust administrative remedies prior to bringing a tort claim against the United States. The FTCA states in relevant part:

> (a) An action shall not be instituted upon a claim against the United States for money damages for injury or loss of property or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, unless the claimant shall have first *presented the claim to the appropriate Federal agency and his claim shall have been finally denied by the agency in writing....*

28 U.S.C. § 2675(a) (emphasis added). The exhaustion requirement is "strictly construed." *See Johnson v. Smithsonian Inst.*, 189 F.3d 180, 189 (2d Cir. 1999); *accord Bright-Asante v. Wagner*, No 15 Civ. 9110, 2017 WL 6948359, at *9 (S.D.N.Y. Dec. 1, 2017). A plaintiff bears the burden to " 'plead and prove compliance with the [exhaustion] requirements' of the FTCA." *Bright-Asante*, 2017 WL 6948359, at *9 (quoting *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 210, 214 (2d Cir. 1987) ). Where a plaintiff fails to exhaust his administrative remedies, the district court lacks subject matter jurisdiction over the FTCA claims. *See Celestine*, 403 F.3d at 82; *accord Davila*, 330 F. Supp. 3d at 936.

**\*4** The FTCA claim for the negligent failure to find the weapon that was used to stab Plaintiff is dismissed because

the Court lacks subject matter jurisdiction. The Complaint alleges no facts to show that a sufficient administrative claim was filed with an appropriate federal agency as required under the FTCA. *See, e.g., Page v. Oath Inc.*, No. 17 Civ. 6990, 2018 WL 1406622, at *4 (S.D.N.Y. Mar. 20, 2018); *Bright-Asante*, 2017 WL 6948359, at *9 (dismissing FTCA claim where plaintiff "wholly fail[ed] to plead the filing of an administrative claim with the [relevant agency]").

### B. *Bivens* Claims

In *Bivens*, the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66 (2001).

A two-step process determines whether a *Bivens* remedy is available for an alleged constitutional injury. First, a court must determine if there is a recognized *Bivens* action encompassing that claim. *Ochoa v. Bratton*, No. 16 Civ. 2852, 2017 WL 5900552, at *6 (S.D.N.Y. Nov. 28, 2017) (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) ) ("Because 'the [Supreme] Court has made clear that expanding the *Bivens* remedy is now a "disfavored" judicial activity,' when confronted with claim under *Bivens*, a district court must first determine whether a *Bivens* action encompassing that claim has already been recognized, or whether the claim presents a potentially new context."). "The Supreme Court has recognized a *Bivens* action in only three contexts: (1) an unreasonable search and seizure in violation of the Fourth Amendment, (2) employment discrimination in violation of the Due Process Clause of the Fifth Amendment, and (3) failure to treat an inmate's medical condition in violation of the Eighth Amendment." *Modest Needs Found. v. Bianco*, No. 16 Civ. 3144, 2017 WL 3130416, at *9 (S.D.N.Y. July 21, 2017) (internal citations omitted). "The proper test for determining whether a case presents a new *Bivens* context is as follows. If the case is different in a meaningful way from previous *Bivens* cases decided by this Court, then the context is new." *Ziglar*, 137 S. Ct. at 1859. The Supreme Court has provided some examples of ways in which a case "might differ in a meaningful way" including:

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 66 of 340

Cannenier v. Skipper-Scott, Not Reported in Fed. Supp. (2019)

the problem confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860. Although "the new-context inquiry is easily satisfied," the Supreme Court has recognized that "[s]ome differences, of course, will be so trivial that they will not suffice to create a new *Bivens* context." *Id.* at 1865.

Second, if the claim arises in a new context, a court must consider whether there are special factors counseling hesitation in creating a *Bivens* remedy. *Id.* at 1857. The question of what special factors counsel hesitation "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action or proceed." *Id.* at 1857–58. "Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858. "[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Id.*

### 1. Denying Access to the Grievance Process

**\*5** The Complaint is construed to include a claim against Defendant Proto for denying access to the grievance system. The Complaint states that Defendant Proto intentionally gave Plaintiff a BP-9 instead of a BP-8 for informal resolution, so that Plaintiff's BP-9 form would be rejected, which the Court assumes to be true for purposes of this motion and does not condone. But this does not state a *Bivens* claim because there is no constitutional right to the grievance process. *See, e.g., Conquistador v. Adimitis*, No. 18 Civ. 1240, 2018 WL 6344187, at \*2 (D. Conn. Dec. 5, 2018) ("[P]risoners do not have a due process right to a thorough investigation of grievances.") (internal quotation marks omitted); *Young v. Tryon*, No. 12 Civ. 6251, 2015 WL 309431, at \*14 (W.D.N.Y. Jan. 23, 2015), *report and recommendation adopted*, 2015 WL 554807 (W.D.N.Y. Feb. 11, 2015) ("[T]he law is clear that [inmates] ha[ve] no constitutional right to have [their] grievances processed at all, or if processed, to have the

procedure done properly.") (alternation in original) (internal quotation marks omitted). The denial of access to the grievance process claim is dismissed.

### 2. Failure to Protect and Improper Placement in a Special Housing Unit

The Complaint is construed to include a claim for failure to protect based on the allegation that Ajarie was present during the attack on Plaintiff but did not help Plaintiff or intervene. *See Poulos v. City of New York*, No. 14 Civ. 3023, 2015 WL 5707496, at \*6 (S.D.N.Y. Sept. 29, 2015) (" 'Where a prison inmate has alleged that he was not protected by prison officials, this court has recognized that an inmate who is injured as a result of a prison official's deliberate indifference to his safety may maintain a damage action for the deprivation of his civil rights under the Eighth and Fourteenth Amendment.' ") (quoting *Snider v. Dylag*, 188 F.3d 51, 54 (2d Cir. 1999) ). The Complaint is also construed to include a claim for improper placement in a special housing unit based on the allegation that Plaintiff was placed in a special housing unit for 90 days even though no disciplinary charges were filed against him. *See Smith v. New York State Dep't of Corr. Servs.*, No. 15 Civ. 3455, 2018 WL 2305566, at \*4 (S.D.N.Y. May 21, 2018) ("A prisoner's liberty interest may be implicated by [special housing unit] confinement only if the discipline imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.") (some alteration in original) (internal quotation marks omitted).

These claims are dismissed. First, both claims present a new *Bivens* context. The Supreme Court has recognized only three *Bivens* contexts, none of which include failure to protect or improper placement in a special housing unit. Second, there are special factors that counsel against expanding a new *Bivens* remedy, including the availability of alternative relief (the BOP administrative grievance process and habeas corpus) and Congress's legislation in the area of prisoners' rights. *See Ziglar*, 137 S. Ct. at 1865 (noting that post-*Carlson*, "Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court [without providing for a standalone damages remedy against federal jailers]," therefore "Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs") (internal citation omitted). As a result, there is no *Bivens* remedy for failure

Cannenier v. Skipper-Scott, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 67 of 340

to protect or improper housing. *See Turkmen v. Ashcroft*, No. 02 Civ. 2307, 2018 WL 4026734, at \*13 (E.D.N.Y. Aug. 13, 2018) (collecting cases); *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 61 (E.D.N.Y. 2017), *aff'd*, No. 17 Civ. 3790, 2018 WL 5960773 (2d Cir. Nov. 14, 2018) (declining to extend a *Bivens* remedy for confinement in special housing unit). The failure to protect claim and improper placement claim are dismissed.

### 3. Deliberate Indifference to a Serious Medical Need [2]

**\*6** The Complaint is construed to include a claim for deliberate indifference to a serious medical need against Defendants Skipper-Scott and Georgy. [3]

To assert a viable constitutional claim for deliberate indifference to a serious medical need, a plaintiff must plead facts showing that (1) the deprivation of medical care is objectively "sufficiently serious" in light of a medical condition "that may produce death, degeneration, or extreme pain," *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011), and (2) "the defendant-official ... intentionally ... or recklessly failed to act with reasonable care ... even though the defendant-official knew, or should have known," that the alleged medical condition "posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *see also Hill*, 657 F.3d at 122–23.

A plaintiff must plead "that the alleged deprivation of medical treatment is, in objective terms, 'sufficiently serious' -- that is, ... that his medical need was a condition of urgency, one that may produce death, degeneration, or extreme pain." *Johnson v. Wright*, 412 F.3d 398, 403 (2d Cir. 2005) (internal quotation marks omitted). "Because '[t]he objective component ... is ... [necessarily] contextual' and fact-specific, the serious medical need inquiry must be tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003) (alterations in original) (internal citation omitted) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992) ).

Deliberate indifference may be "manifested by prison doctors in their response to the prisoner's needs." *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). Non-medical personnel may be deliberately indifferent by "intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." *Id.*; *Wright*, 412 F.3d at 404 (citing *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir. 1987) ) ("[A] deliberate indifference claim can lie where prison

officials deliberately ignore the medical recommendations of a prisoner's treating physicians."). Still, "a plaintiff must prove that [nonmedical] prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problems known to the attendant prison personnel or that the inmate suffered a complete denial of medical treatment." *Roundtree v. City of New York*, No. 15 Civ. 8198, 2018 WL 1586473, at \*6 (S.D.N.Y. Mar. 28, 2018) (alteration in original) (internal quotation marks omitted).

**\*7** For individual liability to attach, *Bivens* defendants -- even those in supervisory positions -- must be personally involved such that "through their own actions, they satisfy each element of the underlying constitutional tort." *Turkmen v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015), *rev'd on other grounds, Ziglar v. Abbasi*, 137 S. Ct. 1843, 1869 (2017); *see also Gonzalez v. Hasty*, No. 17 Civ. 3790, 2018 WL 5960773, at \*4 (2d Cir. Nov. 14, 2018) (summary order) ("A *Bivens* plaintiff cannot rely on *respondeat superior* to establish the liability of defendants; instead, he must prove that each Government-official defendant, through the official's own individual actions, has violated the Constitution.") (internal quotation marks omitted).

The Complaint does not plausibly allege a claim for deliberate indifference to a serious medical need against Defendants Skipper-Scott and Georgy because Skipper-Scott and Georgy appear only in the caption of the Complaint. The Complaint contains no allegations that Skipper-Scott or Georgy knew of -- or acted with deliberate indifference to -- Plaintiff's severe medical condition. The deliberate indifference to a serious medical need claim is accordingly dismissed. *See Calix v. Fed. Bureau of Prisons*, No. 18 Civ. 3980, 2018 WL 3518509, at \*2 (E.D.N.Y. July 20, 2018) (dismissing a *Bivens* claim against a defendant where the only mention of defendant was the caption of the complaint).

### C. Leave to Replead

Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a). "However, where the plaintiff is unable to demonstrate that he would be able to amend his complaint in a manner which would survive dismissal, opportunity to replead is rightfully denied." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 53 (2d Cir. 1999). Leave to amend also may be denied where the plaintiff "fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d

Cannenier v. Skipper-Scott, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 68 of 340

Cir. 2014). Any motion for leave to replead shall be filed as provided below.

If Plaintiff believes that he can sufficiently replead the FTCA claim against the United States or deliberate indifference to a serious medical need claim against Defendants Skipper-Scott and Georgy, he may file a letter (by filing it with the Pro Se Intake Office), not to exceed three, single-spaced pages, describing how he would amend the Complaint to cure the deficiencies described in this Opinion -- including (1) for an FTCA claim, how Plaintiff has exhausted all necessary administrative remedies prior to bringing such a tort claim against the United States; (2) for a deliberate indifference to a serious medical need claim against Skipper-Scott and Georgy, how Skipper-Scott and/or Georgy knew or should have known of Plaintiff's severe medical condition and what

they did to deprive Plaintiff of medical care. Any such application for leave to replead shall be filed as provided below.

## IV. CONCLUSION

For the foregoing reasons, the United States is substituted as the named Defendant for the FTCA claim, and Defendants' motion to dismiss the Complaint is GRANTED. If Plaintiff seeks leave to file an amended complaint, he shall file a letter application as described above on or before **March 22, 2019.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 764795

---

## Footnotes

1    The Complaint also names as a Defendant the "Director of Brooklyn First Hospital." In the April 13, 2018, Order the Court stated:

> The Court declines at this stage to issue a Valentin order as to the hospital director. Plaintiff fails to provide sufficient detail about who this individual is and what his role was in what occurred. When Plaintiff files an amended complaint to add the names of the correction officers, he may provide more information about the hospital director. The Court will reconsider the matter at that time.

Plaintiff did not provide more information, and thus the Director of Brooklyn First Hospital was not served. As this Defendant was not served within 90 days after the complaint was filed and Plaintiff was provided an opportunity to provide more information about the hospital director but failed to do so, the Director of Brooklyn First Hospital is dismissed from this action pursuant to Rule 4(m), Fed. R. Civ. P.

2    Defendants argue that it is clear from the face of the Complaint that Plaintiff failed to exhaust his administrative remedies for his *Bivens* claims for deliberate indifference to a serious medical need. This argument is unpersuasive. Since "failure to exhaust is an affirmative defense under the [Prison Litigation Reform Act], ... inmates are not required to specially plead or demonstrate exhaustion in their [*Bivens*] complaints." *Jones v. Bock*, 549 U.S. 199, 216 (2007). Nevertheless, "a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Williams v. Priatno*, 829 F.3d 118, 122 (2d Cir. 2016). Here, it is not clear on the face of the Complaint that Plaintiff failed to exhaust his administrative remedies. The Complaint attaches Plaintiff's BP-9 form and the response dated October 28, 2016, rejecting Plaintiff's BP-9 form because Plaintiff did not provide evidence that he attempted an informal resolution (i.e. a BP-8 form) before submitting his BP-9 form. The Complaint states that because of Proto's actions, Plaintiff could not exhaust his administrative remedies and his only recourse was to file this action over a year later. It is unclear what administrative remedy steps Plaintiff may have taken between receiving the notice and filing this action. Because Plaintiff is not required to plead exhaustion in the Complaint on a *Bivens* claim, the deliberate indifference to a serious medical need claim is not dismissed for failure to exhaust administrative remedies. *See, e.g., White*

**Cannenier v. Skipper-Scott, Not Reported in Fed. Supp. (2019)**

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 69 of 340

*v. Westchester Cty.*, No. 18 Civ. 730, 2018 WL 6726555, at *9 (S.D.N.Y. Dec. 21, 2018) (declining to dismiss a complaint for failure to exhaust administrative remedies where the plaintiff submitted evidence that he attempted to comply with two of four administrative remedy steps).

3    Defendants do not question whether a Fifth Amendment *Bivens* remedy for deliberate indifference to a serious medical need exists after *Ziglar*; for the purposes of this motion, its existence is assumed. *See Morgan v. Shivers*, No. 14 Civ. 7921, 2018 WL 618451, at *7 n.4 (S.D.N.Y. Jan. 29, 2018) ("The Court notes that, even in light of the proscription against creating new *Bivens* remedies, it would be counterintuitive if a convicted prisoner could remedy a federal officer's failure to provide medical care amounting to punishment, but a pre-trial detainee—who, 'unlike convicted prisoners[,] cannot be punished at all,' could not. *Kingsley v. Hendrickson*, 135 S.Ct. 2466, 2475 (2015).") (alteration in original).

---

**End of Document**                                     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 70 of 340

Carattini v. Behun, Not Reported in Fed. Supp. (2024)

2024 WL 3274663
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Eric CARATTINI, Plaintiff,

v.

Christopher BEHUN, Defendant.

No. 21 Civ. 9373 (NSR)
|
Signed July 2, 2024

**Attorneys and Law Firms**

Eric Carattini, Holyoke, MA, Pro Se.

Alyssa O'Gallagher, DOJ-USAO, New York, NY, for
Defendant.

**OPINION & ORDER**

NELSON S. ROMÁN, United States District Judge

**\*1** Plaintiff Eric Carattini ("Plaintiff"), proceeding *pro
se*, brings this action against Defendant Christopher Behun
("Defendant"). (*See* Second Amended Complaint, "SAC.,"
ECF No. 40.) As against Defendant, Plaintiff asserts claims
for excessive force under the Fourth Amendment and
deliberate indifference to medical needs under the Fifth
Amendment. (*See id.* at 11–12.)

Defendant moves to dismiss Plaintiff's SAC for failure to
state a claim under Federal Rule of Civil Procedure 12(b)(6).
(the "Motion," ECF No. 63.) For the following reasons, the
Motion is GRANTED in part and DENIED in part.

**BACKGROUND**

I. Factual Background
The following facts are taken from the SAC and assumed to
be true for the purposes of the Motion.

On April 19, 2021, following a brief car chase, Plaintiff was
arrested, handcuffed, and transported by Defendant, a Drug
Enforcement Administration ("DEA") Task Force Officer, to
the Hawthorne State Police Barracks in the front passenger
seat of an "unmarked and unequipped[ ] 'temporary' police

vehicle." (SAC at 3–4.) The vehicle lacked light bars, seat
belts, and a radio. (*Id.* at 4.) Defendant placed Plaintiff in the
front seat with no seat belt on and began to question him.
(*Id.*) Defendant then elbowed and "backhand[ed]" Plaintiff
repeatedly in the ribs, arm, shoulder, and face, as well as
slammed on the brakes so that Plaintiff "pitched forward"
onto the windshield, "cracking it and hurting his head." (*Id.*)
Defendant subsequently "fail[ed] to get [Plaintiff] medical
attention," *id.* at 12, though Plaintiff ultimately "was sent to
local hospital" after attempting to enter a jail facility, *id.* at 6.

II. Procedural History
On November 8, 2021, Plaintiff filed his Complaint. (ECF
No. 1.) On August 25, 2022, Defendant served Plaintiff with
a motion to dismiss the Complaint pursuant to Rule 12(b)(6)
of the Federal Rules of Civil Procedure (ECF Nos. 24–26.)
Plaintiff subsequently sought and was granted leave to file
an amended complaint on two separate occasions. (*See* ECF
Nos. 31, 36, 40–41.) On July 10, 2023, Plaintiff filed the SAC,
which is now the operative complaint. (*See* ECF No. 40.)

On October 31, 2023, Defendant filed the instant Motion, as
well as a memorandum of law ("Def.'s MoL", ECF No. 64)
and reply brief (ECF No. 65) in support thereof. Plaintiff filed
an opposition. (ECF No. 59.)

**LEGAL STANDARD**

To survive a motion to dismiss pursuant to Fed. R. Civ.
P. 12(b)(6), for "failure to state a claim upon which relief
can be granted," a complaint must "contain sufficient factual
matter, accepted as true, to 'state a claim to relief that is
plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678
(2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
570 (2007)). Detailed factual allegations are not necessary for
the purposes of surviving a motion to dismiss, however "a
plaintiff's obligation to provide the grounds of his entitlement
to relief requires more than labels and conclusions, and a
formulaic recitation of a cause of action's elements will not
do." *Twombly*, 550 U.S. at 555 (internal citations omitted).

**\*2** Courts use a "two-pronged" approach to analyze a motion
to dismiss. *Brandon v. City of New York*, 705 F. Supp. 2d
261, 276–77 (S.D.N.Y. 2010) (citing *Iqbal*, 556 U.S. at 678–
79). First, the Court accepts the factual allegations in a
complaint as true and draws all reasonable inferences in favor
of the plaintiff. *Twombly*, 550 U.S. at 678. At this point, the

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 71 of 340

Carattini v. Behuti, Not Reported in Fed. Supp. (2024)

court may identify and strip away pleadings which are legal conclusions "couched as [ ] factual allegations[s]," which are not entitled to the assumption of truth. *Id.* at 678–79. Second, the court is tasked with determining whether the factual allegations "plausibly give rise to an entitlement to relief." *Id.* A claim is facially plausible when the factual content pleaded allows the Court "to draw a reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678. Ultimately, determining whether a complaint states a facially plausible claim upon which relief may be granted is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

The Second Circuit has ordered courts that "*pro se* complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.' " *Sykes v. Bank of America*, 723 F.3d 399, m403 (2d Cir. 2013) (quoting *Triestman v. Federal Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)). These submissions are not held to the rigidities of federal practice. *Massie v. Metropolitan Museum of Art*, 651 F. Supp.2d 88, 93 (S.D.N.Y. 2009). However, they will not survive a motion to dismiss unless "their pleadings contain factual allegations sufficient to 'raise a right to relief above a speculative level.' " *McDaniel v. City of New York*, 585 F. Supp. 3d 503, 512 (S.D.N.Y. 2022) (quoting *Martinez v. Ravikumar*, 536 F.Supp.2d 369, 370 (S.D.N.Y. 2008)).

## DISCUSSION

Liberally construed, Plaintiff's SAC asserts a Fourth Amendment excessive force claim and a Fifth Amendment deliberate indifference claim [1] pursuant to the doctrine of *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). [2] (SAC at 11–12.) In *Bivens*, the Supreme Court recognized "an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." *McGowan v. United States*, 825 F.3d 118, 123 (2d Cir. 2016) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 66, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001)). The *Bivens* Court implied a private right of action under the Fourth Amendment for an unreasonable search and seizure claim against FBI agents for handcuffing a man in his own home without a warrant. *Bivens*, 403 U.S. at 389, 397, 91 S.Ct. 1999. Since then, the Supreme Court has recognized *Bivens* claims in only two other circumstances: (1) under the Fifth Amendment's Due Process Clause for gender discrimination against a congressman for firing his female secretary, *Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60

L.Ed.2d 846 (1979), and (2) under the Eighth Amendment's prohibition on cruel and unusual punishment against prison officials for failure to treat an inmate's asthma which led to his death, *Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980). Following *Bivens, Davis,* and *Carlson*, the Supreme Court has retreated from recognizing implied damages remedies under the Constitution, *see Ziglar v. Abbasi*, 582 U.S. 120, 131–33 (2017), and "made clear that expanding the *Bivens* remedy is now a disfavored judicial activity," *id.* 135 (internal quotation marks and citation omitted).

**\*3** In *Egbert v. Boule*, the Supreme Court crystallized a two-step inquiry for courts to determine whether to imply a *Bivens* cause of action in a new context or against a new category of defendants. 596 U.S. 482, 490–93 (2022) (citing *Abbasi*, 582 U.S. at 135–38). *First*, a court considers "whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]' different from the three cases in which the [Supreme] Court has implied a damages action." *Id.* at 492. The Supreme Court did not offer an "exhaustive list of differences that are meaningful enough to make a given context a new one," but it did offer in *Abbasi* examples that "might prove instructive." 582 U.S. 120 at 139. The Court explained that

> [a] case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 139–40. If the case does not present a "new context," an implied cause of action for damages is available. *See Egbert*, 596 U.S. 482 at 492. *Second*, if a "new context" is presented, a court considers whether " 'special factors' indicat[e] that the Judiciary is at least arguably less equipped than Congress to

Carattini v. Behun, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 72 of 340

'weigh the costs and benefits of allowing a damages action to proceed.' " *Id.* (quoting *Abbasi*, 582 U.S. at 136).

I. Fourth Amendment Excessive Force Claim

Plaintiff alleges Defendant used excessive force on him when he elbowed and "backhand[ed]" Plaintiff repeatedly in the ribs, arm, shoulder, and face, as well as slammed on the brakes so that Plaintiff would hit his head on the windshield. (SAC at 4.) In response, Defendant argues that, by nature of the constitutional rights at issue and other factual distinctions, recognizing such a claim would extend *Bivens* to a new context. (Def.'s MoL at 6-8.)

A. New Context Analysis

Courts in this Circuit—and indeed, in this District—are split as to whether excessive force claims present a new context under *Bivens*, and the Second Circuit has yet to weigh in on the question.[3] Some courts—like those in *Martinez,* 2019 WL 6895436 and *Rivera v. Samilo,* 370 F. Supp. 3d 362 (E.D.N.Y. 2019)—have found that the right at issue in *Bivens* was primarily a privacy right, not a right to be free of excessive force. As such, they have found that excessive force claims present a new *Bivens* context. Other courts, however, have held that *Bivens* also involved a claim "that unreasonable force was employed in making the arrest," and that the plaintiff was entitled to recover for "*any* injuries...suffered as a result of the agents' violation of the [Fourth] Amendment." *Bivens,* 403 U.S. at 389, 397 (emphasis added); *see also Walker,* No. 18CIV4090VECSLC, 2020 WL 7685100, at *16 (S.D.N.Y. Apr. 24, 2020), *report and recommendation adopted sub nom. Walker v. Kim,* No. 18-CV-4090 (VEC), 2020 WL 7079421 (S.D.N.Y. Dec. 3, 2020) (holding, without deciding, that Fourth Amendment unconstitutional arrest claims against federal defendants in New York City "arguably fall within one of the recognized *Bivens* categories"); *Bueno Diaz,* 2020 WL 1082482, at *2–5 (finding that claim based on unconstitutional arrest in New York City was a "run-of-the-mill challenge to a standard law enforcement operation" that was not "a context meaningfully different" from *Bivens*); *Lehal v. Cent. Falls Det. Facility Corp.,* 13 Civ. 3923 (DF), 2019 WL 1447261, at *10–12 (S.D.N.Y. Mar. 15, 2019). This Court joins the latter group in holding that excessive force claims under *Bivens* survive *Abbasi*, and therefore proceeds to analyzing whether the case at bar presents a new context under *Bivens*.

**\*4** *First,* both *Bivens* and this case concern the same type of federal officers: narcotics officers. (*See* SAC at 3; *Bivens,* 403 U.S. at 389.) *Second,* the "legal mandate under which the officer was operating" is not meaningfully different, *Abbasi,* 582 U.S. at 140, "because the officers in both cases carried out the same category of 'official action': an arrest of someone suspected of a narcotics offense," *see Bueno Diaz,* 442 F. Supp. 3d at 708. (*See* SAC at 3; *Bivens,* 403 U.S. at 389.) Defendant argues that the fact that Plaintiff was arrested pursuant to a warrant makes this case meaningfully different from *Bivens*, because in *Bivens*, "the officers lacked both a warrant and probable cause to arrest the plaintiff" in his home, whereas "[h]ere, ...Plaintiff 'makes absolutely no allegations that he was ultimately arrested without either a warrant or probable cause.' " (Def.'s MoL at 7 (quoting *Sosa v. Bustos,* No. 17 CIV. 417 (ER), 2020 WL 1940550, at *4 (S.D.N.Y. Apr. 22, 2020).) But Defendant's argument directly contradicts *Bivens*. The holding in *Bivens* entitled the arrestee to recover for "*any* injuries he has suffered as a result of the agents' violation of the [Fourth] Amendment," *Bivens,* 403 U.S. at 397 (emphasis added), and explicitly recognized that, among other injuries, the arrestee had alleged "that unreasonable force was employed in making the arrest," *id.* at 389. *Bivens* is not, therefore, meaningfully different on this basis. *See Bueno Diaz,* 442 F. Supp. 3d at 708 (holding that arrest pursuant to a warrant did not present a new *Bivens* context); *Lehal,* 2019 WL 1447261, at *12 ("the existence of a warrant...should not be characterized as 'potential special factors that previous *Bivens* cases did not consider.' ") (quoting *Abbasi,* 582 U.S. at 140). Rather, the fact that Plaintiff's Fourth Amendment claim asserts a constitutional right implicated in *Bivens* itself is a factor that, under *Abassi*, weighs heavily in *favor* of finding that Plaintiff's claim arises in the *Bivens* context, rather than in a "new" context.

Defendant contends that because the question of whether a particular use of force was excessive is fact-dependent, "judicial precedents provide a less meaningful guide for official conduct," Def.'s MoL at 7 (quoting *Abbasi,* 582 U.S. at 148), and therefore "this factor weigh[s] in favor of finding a new context with respect to a Fourth Amendment excessive force claim," *id.* at 8. The Court disagrees. "[A]t the time of Plaintiff's arrest, there existed substantial 'judicial guidance' as to the unconstitutionality of employing excessive force in the course of an arrest." *See Bueno Diaz,* 442 F. Supp. 3d at 707–09 (quoting *Abbasi,* 582 U.S. at 140); *see, e.g., Graham v. Connor,* 490 U.S. 386, 395–97 (1989) (setting forth judicial guidance on the prohibition of excessive force

Carattini v. Behun, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 73 of 340

by an arresting officer). Striking an arrestee repeatedly in the ribs, arm, shoulder, and face, as well as causing him to hit his head on a car windshield is hardly a close call in terms of evaluating official conduct. *See Bueno Diaz*, 442 F. Supp. 3d at 713 ("Here, [d]efendant's actions constitute excessive force. Spitting is not reasonably related to any goals of effectuating a lawful arrest.") Finally, Defendant does not suggest, nor is it apparent to the Court, that recognizing a *Bivens* remedy in this case would risk a "disruptive intrusion by the Judiciary into the functioning of other branches." *Abbasi*, 582 U.S. 120 at 140.

In sum, there is no meaningful difference between the context of *Bivens* and that of this case. "While this case does not align with *Bivens* on all fours, the cases are closely analogous to the extent they involve claims of federal agents using excessive force to effect arrests." *See Lehal*, 2019 WL 1447261, at *12. "[T]he facts here present a 'garden variety excessive force case,' " *Bueno Diaz*, 442 F. Supp. 3d at 709 (citation omitted), in "a context [not] meaningfully different from *Bivens*," *id.* at 708 (upholding Fourth Amendment excessive force claim under *Bivens* against a DEA agent who beat plaintiff after arresting him). Accordingly, the Court finds that Plaintiff's *Bivens* claim for excessive force does not arise in a "new context."

## B. Special Factors Analysis

In the alternative, the Court holds that, even if this case were considered to present a new *Bivens* context, special factors would not counsel against extending a *Bivens* remedy. The "special factors" analysis asks "whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Egbert*, 142 S. Ct. at 1803. In answering this question, a court may look to whether Congress has provided an "alternative remedial structure," the existence of which "itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Abbasi*, 582 U.S. at 137 (internal quotation marks, citation, and brackets omitted). Defendant argues that the existence of an alternative remedial scheme—the Federal Tort Claims Act ("FTCA")—"provides a reason to think Congress might be better equipped to create a damages remedy and, as such, alone 'foreclose[s] a *Bivens* action.' " (Def.'s MoL at 8 (quoting *Egbert*, 142 S. Ct. at 1806).) Defendant contends that Plaintiff's ability to obtain monetary relief under the FTCA, 28 U.S.C. §§ 2674, 2680(h), precludes him from bringing a *Bivens* action. *Id.* at 8–10. The

Court disagrees, and concludes that Defendant overreads the Supreme Court's guidance regarding alternative remedies.

**\*5** The Supreme Court has stated that it is "crystal clear" that "Congress views FTCA and *Bivens* as parallel, complementary causes of action." *Carlson*, 446 U.S. at 20, 100 S.Ct. 1468. In particular, "the FTCA facilitates only liability in tort against the United States itself, whereas the *Bivens* remedy vindicates violations of constitutional rights by federal employees." *See Powell v. United States*, No. 19-cv-11351, 2020 WL 5126392, at *10 (S.D.N.Y. Aug. 31, 2020) (internal citation omitted). It has been repeatedly emphasized that an FTCA claim is simply not "a substitute for a *Bivens* action," *Bush v. Lucas*, 462 U.S. 367, 378 (1983); *see also Wilkie v. Robbins*, 551 U.S. 537, 553 (2007) (noting that the "FTCA and *Bivens* remedies were 'parallel, complementary causes of action' and that the availability of the former did not preempt the latter" (quoting *Carlson*, 446 U.S. at 20, 100 S.Ct. 1468)). Neither the Supreme Court nor the Second Circuit has explicitly "decided whether, in the wake of *Abbasi*, the availability of an FTCA action precludes the *Bivens* remedy." *Scott v. Quay*, No. 19-cv-1075, 2020 WL 8611292, at *8 (E.D.N.Y. Nov. 16, 2020). "[A]bsent clear guidance, this Court joins others unwilling to determine that the FTCA alone is a sufficient alternate remedy." *See Mirvis v. Quay*, No. 19CV2573LDHVMS, 2023 WL 5671935, at *10 (E.D.N.Y. Sept. 1, 2023); *see also Powell*, 2020 WL 5126392, at *10 ("The Supreme Court has not been bashful in signaling its skepticism of the *Bivens* remedy—if the Court intended to overrule *Carlson*, I am quite sure it would simply do so."); *Bueno Diaz*, 442 F. Supp. 3d at 711 ("The Supreme Court's prior rulings in [*Carlson*] and [*Robbins*], remain good law ... [t]he Court will follow that precedent.").

"Certainly, the Court is mindful of the Supreme Court's recent decision in *Egbert v. Boule*, which has been interpreted to significantly constrict the pathway for redress under *Bivens*." *Mirvis*, 2023 WL 5671935, at *6. However, "although [the *Egbert*] opinion will make it harder for plaintiffs to bring a successful *Bivens* claim....the lower courts should not read it to render *Bivens* a dead letter." *Egbert*, 142 S. Ct. at 1823 (Sotomayor, J., concurring in part and dissenting in part). Though in recent Supreme Court decisions, "the ground has shifted under *Bivens*, shaking its doctrinal foundations...shaky or no, *Bivens* remains the law, and we are not free to ignore it." *See Powell*, 2020 WL 5126392, at *10 (quoting *Engel v. Buchan*, 710 F.3d 698, 708 (7th Cir. 2013)).

Carattini v. Behun, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 74 of 340

Accordingly, the Court is unwilling to restrict the availability to Plaintiff of a *Bivens* remedy based on the existence of the FTCA alone.

### C. Sufficiency of Pleading

Having found that a *Bivens* remedy is available for the Fourth Amendment violation Plaintiff alleges, the Court also concludes that Plaintiff has adequately stated a claim of excessive force against Defendant. Although "not every push or shove" violates the Fourth Amendment, *Graham*, 490 U.S. at 396, 109 S.Ct. 1865, Plaintiff claims that Defendant elbowed him repeatedly in the ribs, arm, shoulder, and face, as well as slammed on the brakes so that Plaintiff would hit his head on the windshield. (SAC at 4.) "These actions, assumed true for the purposes of deciding the motion to dismiss, exceed reasonable force." *See Bueno Diaz*, 442 F. Supp. 3d at 713; *see also O'Hara v. City of New York*, 570 F. App'x. 21, 23–24 (2d Cir. 2014) (concluding that, "no reasonable officer ... could have thought that the law authorized him repeatedly to punch an unarmed, non-menacing 17-year-old in effecting an arrest"); *Konovalchuk v. Cerminaro*, No. 11 Civ. 1344, 2014 WL 272428, at *17 (N.D.N.Y. Jan. 24, 2014) ("Crediting the *pro se* plaintiff's account of the events, as required by the governing law, the alleged kicking, punching, and stomping carried out by [the officers] would be objectively unreasonable and disproportional to the circumstances confronting those officers."). As a result, the Court denies Defendant's motion to dismiss Plaintiff's Fourth Amendment excessive force claim.

### II. Fifth Amendment Deliberate Indifference Claim

Plaintiff alleges that Defendant "fail[ed] to get [him] medical attention after sadistically and maliciously assaulting [him]" during their car ride following Plaintiff's arrest. (SAC at 12.) In response, Defendant argues that, by nature of Plaintiff's pre-trial status and other factual distinctions, recognizing such a claim would extend *Bivens* to a new context. (Def.'s MoL at 11-14.)

### A. New Context Analysis

**\*6** In *Carlson v. Greene*, the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment gave an inmate a damages remedy for failure to provide adequate medical treatment. *See* 446 U.S. at 17–

18. Plaintiff's status as a pretrial detainee, however, requires his claims be considered under the Fifth Amendment, as the Fifth, not Eighth, Amendment protects federal pretrial detainees from deliberate indifference to their serious medical needs. *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)); *Darnell v. Pineiro*, 849 F.3d 17, 21 n.3 (2d Cir. 2017). The Supreme Court has not explicitly recognized a *Bivens* remedy for deliberate indifference to serious medical needs under the Fifth Amendment. Therefore, as Defendant's argument goes, Plaintiff's claim arises under a new *Bivens* context. (Def.'s MoL at 11-12.)

"However, contrary to Defendant['s] contention, that Plaintiff's claim[ ] arise[s] under a different constitutional provision is not necessarily dispositive as to whether Plaintiff's claim[ ] implicate[s] a new *Bivens* context." *See Mirvis*, 2023 WL 5671935, at *4 (concluding that the difference between the Fifth and Eighth Amendments did not suffice to create a new *Bivens* context with respect to pretrial detainee's deliberate indifference claims). In this case, Plaintiff seeks to hold a federal officer liable for damages he sustained as a result of the officer's indifference to his medical claims as a pretrial detainee. If the claim proceeds, in assessing its sufficiency, the Court would employ the same analysis that it would have had Plaintiff's claim arose under the Eighth Amendment. Indeed, the Second Circuit has noted that "[w]e have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment ... [w]e see no reason why the analysis should be different under the Due Process Clause of the Fifth Amendment." *Cuoco*, 222 F.3d at 106. *Compare Cannenier v. Skipper-Scott*, 18-cv-2383, 2019 WL 764795, at *4 (S.D.N.Y. Feb. 20, 2019) (considering a deliberate indifference to serious medical need claim under the Eighth Amendment), *with Laurent v. Borecky*, No. 17-cv-3300, 2018 WL 2973386, at *5 (E.D.N.Y. June 12, 2018) (considering a deliberate indifference claim brought under the Fifth Amendment and finding that while "this case...presents a different constitutional right at issue...it bears an extremely strong resemblance to [one of] the three *Bivens* claims the [Supreme] Court has approved in the past[ ]") (alternations in original) (internal quotation marks omitted). Plaintiff's medical indifference claim is indistinguishable from *Carlson* in form aside from the Plaintiff's pretrial status, which forces him to pursue his claim under the Fifth Amendment as opposed to the Eighth Amendment. *Cf. Ojo v. United States*, 364 F. Supp. 3d 163, 173 (E.D.N.Y. 2019) (finding Fifth

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 75 of 340

Carattini v. Behuri, Not Reported in Fed. Supp. (2024)

Amendment equal protection claim presented new context because it was "distinct from the deliberate indifference claim recognized in *Carlson*.").

Accordingly, the fact that Plaintiff's *Bivens* claim for deliberate indifference to serious medical needs is brought under the Fifth Amendment as opposed to the Eighth Amendment claim recognized in *Carlson* does not mean that the claim arises in a new context. In so finding, the Court joins several other district courts within this Circuit to reach a similar conclusion. *See, e.g., Mirvis*, 2023 WL 5671935, at *4; *Mendoza v. Edge*, 615 F. Supp. 3d 163, 171 (E.D.N.Y. 2022) (finding that Fifth Amendment deliberate indifference claim bore "an 'extremely strong resemblance' to the Eighth Amendment deliberate indifference claim at issue in *Carlson*.") (citation omitted); *Geritano v. AUSA Office for E.D.N.Y.*, No. 20-cv-0781, 2020 WL 2192559, at *4 (S.D.N.Y. May 5, 2020) ("Courts in this district have held that a federal pretrial detainee may bring a medical claim under the Fifth Amendment because such a claim is the same context as an Eighth Amendment claim already recognized in *Carlson*."); *Torres v. Licon Vitale*, No. 20-CV-3787 (LLS), 2020 WL 3872151, at *3 (S.D.N.Y. July 9, 2020) ("Federal pretrial detainees may bring a Fifth Amendment claim for failure to provide medical treatment as a *Bivens* action because such a claim bears a strong resemblance to the claim in *Carlson*.").

**\*7** The Court agrees with Defendant, however, that other distinctions make it such that Plaintiff's deliberate indifference claim arises in a new context. *First*, unlike Plaintiff's Fourth Amendment claim, Plaintiff's Fifth Amendment claim is brought against a "new category of defendants" as compared to *Carlson*. *See Abbasi*, 582 U.S. at 135 (observing that the Supreme Court has "consistently refused to extend *Bivens* to any ... new category of defendants" (citation omitted)). While *Carlson* involved allegations of deliberate indifference by prison officials, *see Carlson*, 446 U.S. at 16, this case involves allegations of deliberate indifference by an alleged "investigator for the New York State Police" "working in conjunction with the [DEA]," (SAC at 1, 3); *see Martinez*, 2019 WL 6895436, at *7 (finding different "type of officers involved" to be a meaningful difference).

*Second*, the severity of Plaintiff's alleged injury differs significantly from that in *Carlson*., Liberally construed, the SAC alleges unspecified injuries to Plaintiff's ribs, arm, shoulder, face, and head from the Defendant's alleged

elbowing, backhanding, and stopping his vehicle short. (*See* SAC at 4.) By contrast, *Carlson* involved allegations of grossly inadequate medical care provided to an inmate with a severe and chronic asthma condition that ultimately resulted in the inmate's death. *See Carlson*, 446 U.S. at 16 & n.1. "Courts have routinely found variances in circumstances and severity render deliberate indifference claims different from *Carlson* and thus arise in a 'new context.' " *Bettis v. Grijalva*, No. 21 CIV. 7505 (GWG), 2023 WL 4141869, at *6 (S.D.N.Y. June 23, 2023) (collecting cases); *see also Caraballo v. Pliler*, No. 21-CV-10476 (PMH), 2023 WL 3467185, at *8 (S.D.N.Y. May 15, 2023) ("Because the [d]efendants' alleged deliberate indifference to the [p]laintiff's COVID-19 symptoms did not result in any serious injury or harm, the [p]laintiff's allegations would present a new *Bivens* context that is much different from the life-threatening asthma attack that the plaintiff suffered in *Carlson*.") (citations and quotation marks omitted). For example, in *Rivera v. Fed. Bureau of Prisons*, the plaintiff brought a *Bivens* claim alleging "deliberate indifference to the medical needs of a person in federal custody[.]" No. 17-CV-05103 (GBD/DF), 2018 WL 11312146, at *8 (S.D.N.Y. Dec. 14, 2018), *report and recommendation adopted*, 368 F. Supp. 3d 741 (S.D.N.Y. 2019). The Court recognized the plaintiff's claim as similar to *Carlson*, but determined:

> there [was] a key distinction between the two [cases]: unlike in *Carlson*, where medical personnel failed to provide any medical treatment for a life-threatening condition, [the p]laintiff's *Bivens* claims centers on whether he was constitutionally entitled to a certain dosage of a drug as part of a drug treatment program, in which he admits he was placed.

Defendant's alleged deliberate indifference – namely, his "failing to get [P]laintiff medical attention (SAC at 12) – in this case did not result in any serious injury or harm to Plaintiff. Because Plaintiff has failed to allege sufficiently similar serious medical needs as the plaintiff in *Carlson*, the Court finds that his Fifth Amendment claim presents a new *Bivens* context. *Cf. Mendoza*, 615 F. Supp. 3d at 171 (concluding that the plaintiff's "claim that the defendants were deliberately indifferent to his health bears an 'extremely strong resemblance' to the Eighth Amendment deliberate

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 76 of 340

Carattini v. Behun, Not Reported in Fed. Supp. (2024)

indifference claim at issue in *Carlson*," given that the plaintiff was denied medical care after he "suffered lacerations and bruises to his face, head, chest, back, wrists and legs ... [and t]wo of his teeth, his jaw and his nose were broken, and he urinated blood for two or three days") (quoting *Laurent*, 2018 WL 2973386, at *5). The non-life-threatening nature of Plaintiff's injuries presents a context different from *Carlson*.

### B. Special Factors Analysis

**\*8** Having found that his Fifth Amendment claim arises in a new context, the Court must now determine whether there are special factors counselling hesitation against providing Plaintiff with a *Bivens* remedy. As with Plaintiff's Fourth Amendment claim, Defendant contends that "the existence of an alternative remedial scheme—the FTCA—provides a reason to think Congress might be better equipped to create a damages remedy for Plaintiff's Fifth Amendment deliberate indifference claim and, as such, alone 'foreclose[s] a *Bivens* action.' " (Def.'s MoL at 13-14 (quoting *Egbert*, 142 S. Ct. at 1806).) As the Court explained earlier, it is unwilling to determine that the FTCA alone is a sufficient alternate remedy. *See Powell*, 2020 WL 5126392, at *10.

The Court does, however, find that, the existence of the Prison Litigation Reform Act of 1995 (the "PLRA"), 42 U.S.C. § 1997e, counsels against recognizing Plaintiff's new *Bivens* claim for deliberate indifference.[4] As the Supreme Court has observed, after *Carlson*, "Congress passed the Prison Litigation Reform Act of 1995, which made comprehensive changes to the way prisoner abuse claims must be brought in federal court" and evidenced "that Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs." *Id.* (citing 42 U.S.C. § 1997e). That the PLRA "does not provide for a standalone damages remedy against federal jailers" constitutes "legislative action suggesting that Congress does not want a damages remedy," and is thus a "factor counseling hesitation" against recognizing a new *Bivens* claim. *Bravo*, 684 F. Supp. 3d at 125–26 (finding that absence of damages remedy against federal prison officials in PLRA was a factor counseling against recognizing a new *Bivens* claim for inadequate medical treatment) (quoting *Abbasi*, 582 U.S. at 148–49). Moreover, the PLRA's scope squarely covers the complaints Plaintiff raises here: "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some

other wrong," including deliberate indifference to medical needs. *See Porter v. Nussle*, 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). The PLRA's requirements counsels against expansion of the *Bivens* remedy in this case. Accordingly, Plaintiff's Fifth Amendment deliberate indifference claim is dismissed.

**\*9** "Absent a Supreme Court decision creating a new *Bivens* remedy on all fours with Plaintiff's alleged [Fifth Amendment] *Bivens* Claim[ ], Plaintiff's *Bivens* Claim[ ] cannot survive a motion to dismiss." *See Negron v. United States*, No. 19-CV-05442 (PMH), 2020 WL 5634304, at *10 (S.D.N.Y. Sept. 21, 2020). There is no Supreme Court decision that has created a new *Bivens* remedy which would allow Plaintiff's claim to survive a motion to dismiss. As a result, the Court dismisses his Fifth Amendment claim with prejudice.

### CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss the Second Amended Complaint is GRANTED in part and DENIED in part.

Plaintiff's Fifth Amendment claim is dismissed with prejudice. Defendant is directed to answer Plaintiff's Second Amended Complaint by July 23, 2024. The parties are then directed to complete and file a Case Management Plan and Scheduling Order (blank form attached) by August 6, 2024.

Attachment

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Rev. May 2014

-------------------------------------------------------------------x

Plaintiff(s),

- against -

CIVIL CASE DISCOVERY PLAN
AND SCHEDULING ORDER

Defendant(s).          _____ CV _____ (NSR)

-------------------------------------------------------------------x

This Civil Case Discovery Plan and Scheduling Order is adopted, after consultation with
counsel, pursuant to Fed. R. Civ. P. 16 and 26(f):

1.   All parties [consent] [do not consent] to conducting all further proceedings before
     a Magistrate Judge, including motions and trial, pursuant to 28 U.S.C. § 636(c).
     The parties are free to withhold consent without adverse substantive consequences.
     (If all parties consent, the remaining paragraphs of this form need not be
     completed.)

2.   This case [is] [is not] to be tried to a jury.

3.   Joinder of additional parties must be accomplished by _____.

4.   Amended pleadings may be filed until _____. Any party
     seeking to amend its pleadings after that date must seek leave of court via motion.

5.   Interrogatories shall be served no later than _____, and responses
     thereto shall be served within thirty (30) days thereafter. The provisions of Local
     Civil Rule 33.3 [shall] [shall not] apply to this case.

6.   First request for production of documents, if any, shall be served no later than
     _____.

7.   Non-expert depositions shall be completed by _____.

     a.   Unless counsel agree otherwise or the Court so orders, depositions shall not
          be held until all parties have responded to any first requests for production
          of documents.

     b.   Depositions shall proceed concurrently.

     c.   Whenever possible, unless counsel agree otherwise or the Court so orders,

non-party depositions shall follow party depositions.

8.   Any further interrogatories, including expert interrogatories, shall be served no
     later than _____.

9.   Requests to Admit, if any, shall be served no later than _____.

10.  Expert reports shall be served no later than _____.

11.  Rebuttal expert reports shall be served no later than _____.

12.  Expert depositions shall be completed by _____.

13.  Additional provisions agreed upon by counsel are attached hereto and made a part
     hereof.

14.  **ALL DISCOVERY SHALL BE COMPLETED BY** _____.

15.  Any motions shall be filed in accordance with the Court's Individual Practices.

16.  This Civil Case Discovery Plan and Scheduling Order may not be changed without
     leave of Court (or the assigned Magistrate Judge acting under a specific order of
     reference).

17.  The Magistrate Judge assigned to this case is the Hon. _____.

18.  If, after entry of this Order, the parties consent to trial before a Magistrate Judge,
     the Magistrate Judge will schedule a date certain for trial and will, if necessary,
     amend this Order consistent therewith.

19.  The next case management conference is scheduled for _____
     at _____. (The Court will set this date at the initial conference.)

SO ORDERED.
Dated:
White Plains, New York

_____
Nelson S. Román, U.S. District Judge

**All Citations**

Not Reported in Fed. Supp., 2024 WL 3274663

---

## Footnotes

1   The Court construes Plaintiff's deliberate indifference claim as arising under the Fifth Amendment, which
    applies to pretrial detainees, rather than the Eighth Amendment, which applies to those being "punished,"
    because Plaintiff was, at most, a pretrial detainee at the time of the allegations in the SAC. See *Cuoco v.
    Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) ("Because as a pretrial detainee [plaintiff] was not being 'punished,'
    the 'cruel and unusual punishment' proscription of the Eighth Amendment to the Constitution does not apply.
    The district court correctly concluded that [plaintiff's] claims arise under the Due Process Clause of the Fifth
    Amendment instead.) In addition, the Fifth Amendment is implicated in deliberate indifference claims brought
    by pretrial detainees against federal actors. See *Martinez v. D'Agata*, No. 16 Civ. 44 (VB), 2019 WL 6895436,
    at *7 (S.D.N.Y. Dec. 18, 2019).

2   Plaintiff brings his claims pursuant to 42 U.S.C. § 1983, but a Section 1983 cause of action applies to state, not
    federal officers. *Davis v. United States*, No. 03 Civ. 1800, 2004 WL 324880, at *10 (S.D.N.Y. Feb. 19, 2004)
    ("[A]n action brought pursuant to 42 U.S.C. § 1983 cannot lie against federal officers.") (internal quotation
    marks, citation, and alterations omitted). Here, Defendant is alleged to be a federal officer—specifically, a
    DEA agent. (See SAC at 3.) "Where a plaintiff brings a Section 1983 claim against federal defendants in
    error, the proper course of action is to construe the complaint as stating a cause of action under *Bivens*."
    *Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 706 (S.D.N.Y. 2020) (quoting *Spinale v. U.S. Dep't of Agric.*,
    621 F. Supp. 2d 112, 119 (S.D.N.Y. 2009)); *see also Tavarez v. Reno*, 54 F.3d 109, 109–10 (2d Cir. 1995)

**Carattini v. Behun**, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 78 of 340

(noting that the district court properly considered an action brought under § 1983 as an action under *Bivens*). Accordingly, the Court construes the SAC as raising *Biven* claims.

3    The Second Circuit recently issued two non-precedential, summary orders affirming the district courts' findings that the plaintiffs' Fourth Amendment *Bivens* claims presented a "new context." *See Cohen v. Trump*, No. 23-35, 2024 WL 20558, at *2–3 (2d Cir. Jan. 2, 2024) (affirming dismissal of *Bivens* claims alleging unlawful seizure, based on "new context" presented by lawsuit against, among others, "officers and agents of the [Bureau of Prisons] and the [Probation and Pretrial Services Office]"); *Lewis v. Bartosh*, No. 22-3060-PR, 2023 WL 8613873, at *2 (2d Cir. Dec. 13, 2023) (affirming dismissal of *Bivens* claim alleging excessive force, based on "new context" presented by suit against Deputy U.S. Marshals). "While not explaining their application of the two-part test from *Egbert* with precision, the panels in *Cohen* and *Lewis* both relied on the different agencies and federal officers involved, as well as the existence of an alternative remedy, in declining to infer a *Bivens* cause of action in those cases." *See Gray v. Gomez*, No. 19CV4746PKCLB, 2024 WL 1345656, at *5 (E.D.N.Y. Mar. 30, 2024); *see also Cohen*, 2024 WL 20558, at *2–3; *Lewis*, 2023 WL 8613873, at *1 (explaining that, " '[i]f a claim arises in a new context'—such as if it involves a 'a new category of defendants'—or if there is an 'alternative remedial structure,' a *Bivens* remedy is generally 'unavailable' " (quoting *Egbert*, 596 U.S. at 492–93, 142 S.Ct. 1793)). By contrast, here, the Plaintiff's claims proceed against the same agency and type of officer originally involved in *Bivens*. (*See* SAC at 3; *Bivens*, 403 U.S. at 389.)

4    The PLRA defines a "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." *Id.* § 1915(h). " 'Read broadly, this language could arguably be interpreted to include' all individuals 'who are currently detained and who have in the past been accused of, convicted of, or sentenced for a criminal offense.' " *Jones v. Cuomo*, 2 F.4th 22, 25–26 (2d Cir. 2021) (quoting *Page v. Torrey*, 201 F.3d 1136, 1139 (9th Cir. 2000)). In other words, "to fall within the definition of 'prisoner,' the individual in question must be *currently detained as a result of* an accusation, conviction, or sentence for a criminal offense." *Id.* (quoting *Gibson v. City Municipality of New York*, 692 F.3d 198, 202 (2d Cir. 2012)) (emphasis in original). At the time of his alleged denial of medical treatment by Defendant, Plaintiff was detained and in the custody of a Defendant as a result of being accused of a crime. As a result, the PLRA is applicable to his claims. *See Bravo v. U.S. Marshals Serv.*, 684 F. Supp. 3d 112, 126 (S.D.N.Y. 2023) (declining to extend *Bivens* to give pretrial detainee remedy for injuries he sustained during detention in federal custody in part because of the existence of the PLRA).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    9

2010 WL 5185047
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

David J. CASH, Plaintiff,

v.

BERNSTEIN, MD, Defendant.

No. 09 Civ.1922(BSJ)(HBP).
|
Oct. 26, 2010.

*REPORT AND RECOMMENDATION* [1]

PITMAN, United States Magistrate Judge.

**\*1** TO THE HONORABLE BARBARA S. JONES, United States District Judge,

I. *Introduction*

By notice of motion dated March 4, 2010 (Docket Item 11), defendant moves pursuant to 28 U.S.C. § 1915(g) to revoke plaintiff's *in forma pauperis* ("IFP") status on the ground that plaintiff has previously had at least three Section 1983 actions dismissed as frivolous, malicious or failing to state a claim upon which relief could be granted, and has not shown that he is in imminent danger of serious physical injury. Defendant further seeks an order directing that the action be dismissed unless plaintiff pays the full filing fee within thirty (30) days. For the reasons set forth below, I respectfully recommend that defendant's motion be granted.

II. *Facts*

Plaintiff, a sentenced inmate in the custody of the New York State Department of Correctional Services, commenced this action on or about January 12, 2009 by submitting his complaint to the Court's Pro Se office. Plaintiff alleges, in pertinent part, that he has "a non-healing ulcer that is gane green [*sic* ]" and that defendant Bernstein "did not want to treat the ulcer right" (Complaint, dated March 3, 3009 (Docket Item 2) "Compl."), at 3).

The action was originally commenced against two defendants —Dr. Bernstein and Dr. Finkelstein. The action was dismissed as to Dr. Finkelstein because the complaint contained no allegations whatsoever concerning Dr. Finkelstein (Order dated February 18, 2010 (Docket Item 9)).

On March 4, 2010, the sole remaining defendant—Dr. Bernstein—filed the current motion. Plaintiff failed to submit a response. Accordingly, on August 20, 2010, I issued an Order advising plaintiff that if he wished to oppose the motion, he must submit his opposition by September 15, 2010 and that after that date I would consider the motion fully submitted and ripe for decision (Order dated August 20, 2010 (Docket Item 15)). The only submission plaintiff has made in response to my Order is a multi-part form issued by the New York State Department of Correctional Services entitled "Disbursement or Refund Request." [2] By this form, plaintiff appears to request that the New York State Department of Correctional Services pay the filing fee for this action. The form is marked "Denied."

III. *Analysis*

28 U.S.C. § 1915 permits an indigent litigant to commence an action in a federal court without prepayment of the filing fee that would ordinarily be charged. Although an indigent, incarcerated individual need not prepay the filing fee at the time at the time of filing, he must subsequently pay the fee, to the extent he is able to do so, through periodic withdrawals from his inmate accounts. 28 U.S.C. § 1915(b); *Harris v. City of New York,* 607 F.3d 18, 21 (2d Cir.2010). To prevent abuse of the judicial system by inmates, paragraph (g) of this provision denies incarcerated individuals the right to proceed without prepayment of the filing fee if they have repeatedly filed meritless actions, unless such an individual shows that he or she is in imminent danger of serious physical injury. *See Ortiz v. McBride,* 380 F.3d 649, 658 (2d Cir.2004) ("[T]he purpose of the PLRA ... was plainly to curtail what Congress perceived to be inmate abuses of the judicial process."); *Nicholas v. Tucker,* 114 F.3d 17, 19 (2d Cir.1997). Specifically, paragraph (g) provides:

> **\*2** In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous,

malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).

If an inmate plaintiff seeks to avoid prepayment of the filing fee by alleging imminent danger of serious physical injury, there must be a nexus between the serious physical injury asserted and the claims alleged. *Pettus v. Morgenthau,* 554 F.3d 293, 298 (2d Cir.2009).

Section 1915(g) clearly prevents plaintiff from proceeding in this action without prepayment of the filing fee. The memorandum submitted by defendant establishes that plaintiff has had his IFP status revoked on at least four prior occasions as a result of his repeatedly filing meritless actions.

- In 2005, plaintiff commenced an action in the United States District Court for the Northern District of New York seeking to have his infected leg amputated. *Nelson[3] v. Lee,* No. 9:05–CV–1096 (NAM)(DEP), 2007 WL 4333776 (N.D.N.Y. Dec. 5, 2007). In that matter, the Honorable Norman A. Mordue, Chief United States District Judge, accepted and adopted the Report and Recommendation of the Honorable David E. Peebles, United States Magistrate Judge, that plaintiff had brought three or more prior actions that had been dismissed for failure to state a claim and that plaintiff's IFP status should, therefore, be revoked. 2007 WL 4333776 at *1–*2.

- In *Nelson v. Nesmith,* No. 9:06–CV–1177 (TJM)(DEP), 2008 WL 3836387 (N.D.N.Y. Aug. 13, 2008), plaintiff again filed an action concerning the medical care he was receiving for his left leg. The Honorable Thomas J. McAvoy, United States District Judge, accepted the Report and Recommendation of Magistrate Judge Peebles, and revoked plaintiff's IFP status and dismissed the action on the ground that plaintiff had previously commenced at least three actions that had been dismissed on the merits. 2008 WL 3836387 at *1, *7.

  - In *Nelson v. Spitzer,* No. 9:07–CV–1241 (TJM) (RFT), 2008 WL 268215 (N.D.N.Y. Jan. 29, 2008), Judge McAvoy again revoked plaintiff's IFP status

on the ground that plaintiff had commenced three or more actions that constituted "strikes" under Section 1915(g) and had not shown an imminent threat of serious physical injury. 2008 WL 268215 at *1–*2.

- Finally, in *Nelson v. Chang,* No. 08–CV–1261 (KAM)(LB), 2009 WL 367576 (E.D.N.Y. Feb. 10, 2009), the Honorable Kiyo A. Matsumoto, United States District Judge, also found, based on the cases discussed above, that plaintiff had exhausted the three strikes permitted by Section 1915(g) and could not proceed IFP in the absence of a demonstration of an imminent threat of serious physical injury. 2009 WL 367576 at *2–*3.

**\*3** As defendant candidly admits, there is one case in which plaintiff's leg infection was found to support a finding of an imminent threat of serious physical injury sufficient to come within the exception to Section 1915(g). *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2008 WL 4401874 at *2 (N.D.N.Y. Sept. 24, 2008). Nevertheless, summary judgment was subsequently granted for defendants in that case, and the complaint was dismissed. Judge Mordue concluded that there was no genuine issue of fact that plaintiff had received adequate medical care for his leg wound and that the failure of the leg to heal was the result of plaintiff's own acts of self-mutilation and interference with the treatment provided. *Nelson v. Scoggy,* No. 9:06–CV–1146 (NAM)(DRH), 2009 WL 5216955 at *3–*4 (N.D.N.Y. Dec. 30, 2009).[4]

In light of the foregoing, there can be no reasonable dispute that plaintiff has exceeded the three "strikes" allowed by Section 1915(g) and that he cannot, therefore, proceed here without prepaying the filing fee unless he demonstrates an imminent threat of serious physical injury. Plaintiff has declined to attempt to make this showing in response to defendant's motion, and the only suggestion in the record of serious physical injury is the bare statement in the complaint that plaintiff "'need[s] to go back to a wound speci [a]list before the gane green [*sic* ] kills [him]" (Compl. at 5). "However, unsupported, vague, self-serving, conclusory speculation is not sufficient to show that Plaintiff is, in fact, in imminent danger of serious physical harm." *Merriweather v. Reynolds,* 586 F.Supp.2d 548, 552 (D.S.C.2008), *citing Ciarpaglini v. Saini,* 352 F.3d 328, 330 (7th Cir.2003) and *White v. Colorado,* 157 F.3d 1226, 1231–32 (10th Cir.1998); *see also Martin v. Shelton,* 319 F.3d 1048, 1050 (8th Cir.2003) (imminent danger exception to Section 1915(g) requires "specific fact allegations of ongoing serious physical injury,

or of a pattern of misconduct evidencing the likelihood of imminent serious physical injury"). Given the plaintiff's history, as set forth in the cases described above, I conclude that this vague statement is insufficient to support a finding that plaintiff is in imminent danger of serious physical injury. [5]

IV. *Conclusion*

Accordingly, for all the foregoing reasons, I find that plaintiff has had three or more prior actions dismissed as being frivolous, malicious or failing to state a claim and that plaintiff's *in forma pauperis* status should, therfore, be revoked. If your Honor accepts this recommendation, I further recommend that the action be dismissed unless plaintiff pays the filing fee in full within thirty (30) days of your Honor's final resolution of this motion.

V. *OBJECTIONS*

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections. *See also* Fed.R.Civ.P. 6(a). Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Barbara S. Jones, United States District Judge, 500 Pearl Street, Room 1920, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007. Any requests for an extension of time for filing objections must be directed to Judge Jones. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS *WILL* RESULT IN A WAIVER OF OBJECTIONS AND *WILL* PRECLUDE APPELLATE REVIEW. *Thomas v. Arn,* 474 U.S. 140, 155 (1985); *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 57–59 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 5185047

---

## Footnotes

1    At the time the action was originally filed, the Honorable Leonard B. Sand, United States District Judge, granted plaintiff's application for *in forma pauperis* status based on plaintiff's *ex parte* submission (Docket Item 1). Although the present application seeking to revoke plaintiff's *in forma pauperis* status is non-dispositive, I address it by way of a report and recommendation to eliminate any appearance of a conflict between the decision of a district judge and that of a magistrate judge.

2    Plaintiff sent this form directly to my chambers, and it has not been docketed by the Clerk of the Court. The form will be docketed at the time this Report and Recommendation is issued.

3    It appears that plaintiff uses the names David J. Cash and Dennis Nelson interchangeably. In his complaint in this matter, plaintiff states that the Departmental Identification Number, or DIN, assigned to him by the New York State Department of Correctional Services ("DOCS") is 94–B–0694 (Compl. at 7). DOCS inmate account records submitted by plaintiff in connection with his application for IFP status indicate that DIN 94–B–0694 is assigned to Dennis Nelson. In addition, the DOCS form described in footnote two bears the docket number of this action, but is signed in the name of Dennis Nelson and was sent in an envelope identifying the sender as Dennis Nelson. A subsequent action has been filed in this Court in which the plaintiff identifies himself as Dennis Nelson but lists his DIN as 94–B–0694, the same DIN used by plaintiff here. Finally, plaintiff has submitted nothing to controvert the assertion in defendant's papers that David Cash and Dennis Nelson are the same person. In light of all these facts, I conclude that David Cash and Dennis Nelson are both names used by plaintiff.

4    Although the form complaint utilized by plaintiff expressly asks about prior actions involving the same facts, plaintiff disclosed only the *Scoggy* action and expressly denied the existence of any other actions relating to his imprisonment (Compl. at 6).

5    Plaintiff has sent me several letters describing his wound and its symptoms in detail, and I have no doubt that the wound is serious. However, in granting summary judgment dismissing an action last year based on the same allegations, Judge Mordue of the Northern District found that there was no genuine issue of fact that plaintiff's own conduct was responsible for the ineffectiveness of the treatment he was provided:

> Furthermore, to the extent that Nelson's medical treatment was delayed, much of the delay was due to his own refusal to cooperate with medical staff and his self-mutilations. Nelson's actions to thwart the medical treatment of his wound cannot be construed as interference or indifference by anyone else.... [T]he medical treatment Nelson received complied with constitutional guarantees as it was appropriate, timely, and delayed only by Nelson's own actions.

> *Nelson v. Scoggy, supra,* 2009 WL 5216955 at *4.

> Given plaintiff's total failure to respond to the pending motion and his failure to even deny that he is actively thwarting treatment of his wound, it would be sheer speculation for me to conclude that he is in imminent danger of a serious injury as a result of defendant's conduct.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

October 21, 2024

145 S.Ct. 415
Supreme Court of the United States.

Michael D. COHEN, Petitioner,
v.
Donald J. TRUMP, former
President of the United States, et al.

No. 24-41
|

Case below, 2024 WL 20558.

**Opinion**

Petition for writ of certiorari to the United States Court of Appeals for the Second Circuit denied.

**All Citations**

145 S.Ct. 415 (Mem), 220 L.Ed.2d 170

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 84 of 340

Escobar v. Correa, Not Reported in Fed. Supp. (2024)

KeyCite Yellow Flag

Distinguished by Salaman v. Carney, D.Conn., August 22, 2025

2024 WL 4042122
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Tyrel ESCOBAR, Plaintiff,
v.
Det. Luis CORREA, et al., Defendants.

22-CV-08434 (MMG)
|
Signed September 4, 2024

**Attorneys and Law Firms**

Stephanie Panousieris, Robert Howard Rickner, Rickner PLLC, New York, NY, for Plaintiff.

Seema Kassab, New York, NY, for Defendants Declan Ludington, Ryan Sheehan.

**OPINION & ORDER**

MARGARET M. GARNETT, United States District Judge:

\*1  Plaintiff brings this action against various law enforcement officers for their alleged use of excessive force during his arrest on a fugitive warrant in October 2019. Before the Court are two motions to dismiss the Third Amended Complaint as against defendants Deputy U.S. Marshal Kevin Kamrowski, Deputy U.S. Marshal Eric Kushi, Detective Jaime Rosado,[1] and Detective Luis Correa. Dkt. Nos. 61 and 63. For the reasons that follow, the motions to dismiss are GRANTED.

**BACKGROUND**

Plaintiff Tyrel Escobar (the "Plaintiff") filed a complaint on October 3, 2022, against John Does 1-10. Dkt. No. 1. He subsequently amended the complaint three times and named various defendants, filing a Third Amended Complaint on June 23, 2023. Dkt. No. 39 ("Third Amended Complaint" or "TAC").

Plaintiff, through his Third Amended Complaint, alleges the use of excessive force in violation of 42 U.S.C. § 1983 and Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971) ("Bivens"). In the Third Amended Complaint, Plaintiff named the following individuals as defendants in their individual capacities: Detective Luis Correa, Detective Jaime Rosado, Deputy U.S. Marshal Kevin Kamrowski, Deputy U.S. Marshal Eric Kushi, Sergeant Declan Ludington, Detective Ryan Sheehan, and unnamed John Does 1-5 (U.S. Marshals and/or officers or agents of the New York Police Department ("NYPD")) (collectively, "Defendants"). TAC ¶¶ 6, 9, 12, 13, 14, 17, 20. Dets. Correa, Rosado, and Sheehan, and Sgt. Ludington were, "at all times relevant," NYPD officers employed by the City of New York who were "deputized by the United States Marshals Service Fugitive Task Force."[2] Id. ¶¶ 6, 9, 14, 17.

The facts, as alleged by Plaintiff and assumed to be true for purposes of the motions, are as follows:

On October 2, 2019, Plaintiff absconded from court[3] after discovering that his bail had been revoked and went to a family member's house in the Bronx. Id. ¶ 25.

Later the same day, five to six of the Defendants arrived at the house to arrest Plaintiff. Id. ¶ 26. Plaintiff alleges that he did not resist Defendants, but they nonetheless used "brutal, retaliatory excessive force" against Plaintiff. Id. ¶¶ 26–27. Defendants allegedly hit, kicked, tased, and punched Plaintiff; verbally harassed and taunted Plaintiff; encouraged one another to hit and tase Plaintiff; and boasted and laughed about "how many blows or tasers they were able to deploy during the attack." Id. ¶¶ 26–29. Defendants also allegedly dragged Plaintiff down multiple flights of stairs while Plaintiff's hands were cuffed behind his back. Id. ¶ 31. Some of this alleged conduct was purportedly caught on cell phone video footage, and when Plaintiff was escorted from the apartment, he had visible injuries, including a busted lip, obvious redness, and bruising to his eye and cheek. Id. ¶¶ 29–30. Additionally, after Defendants had dragged Plaintiff down the stairs, he could "barely stand, ... appeared dizzy and disoriented, and ... was bleeding out of at least one of his ears." Id. ¶ 31.

\*2  Plaintiff was transported to a Bronx precinct and then to Queens Central Booking, where additional officers placed a bag over Plaintiff's head while Plaintiff remained cuffed; those officers, including Det. Rosado, allegedly "assault[ed]

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 85 of 340

Escobar v. Correa, Not Reported in Fed. Supp. (2024)

and batter[ed]" Plaintiff again while Plaintiff remained restrained. *Id.* ¶¶ 32–33.

Det. Correa, Det. Rosado, Deputy U.S. Marshal Kamrowski, and Deputy U.S. Marshal Kushi (the "Moving Defendants") have moved to dismiss the Third Amended Complaint. [4] In their initial briefing on the motions, the Moving Defendants largely argued that Plaintiff failed to state a claim upon which relief can be granted because Plaintiff has no *Bivens* remedy as a matter of law and because any *Bivens* claim would be time-barred. [5] Joint Mem. at 4–18; Correa Mem. at 3–11.

In his opposition briefing, Plaintiff argued, *inter alia*, that, even if no *Bivens* remedy were available, the Moving Defendants are liable under 42 U.S.C. § 1983 ("§ 1983") because, despite their status as either Deputy U.S. Marshals or deputized members of a federal task force, they acted under the color of state law. Pl.'s Mem. Opp. Mots. Dismiss by Defs. Correa, Kamrowski, Kushi, and Rosado, Dkt. No. 68, at 4–10 ("Opp."). The Moving Defendants' reply briefs then addressed the Plaintiff's arguments that they could be liable under § 1983 despite their status as federal law enforcement agents. Def. Correa's Reply Mem., Dkt. No. 70, at 2–8 ("Correa Reply"); Defs. Kamrowski, Kushi, and Rosado's Reply Mem., Dkt. No. 72, at 2–6 ("Joint Reply"). The Court issued an Order explaining that it was inclined to consider the Moving Defendants' arguments regarding dismissal of Plaintiff's § 1983 claims and invited Plaintiff to file a sur-reply further addressing the Moving Defendants' arguments. Dkt. No. 73. Plaintiff subsequently filed a sur-reply. Dkt. No. 74.

### LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim only has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint is properly dismissed where, as a matter of law, "the allegations in a complaint, however true, could not raise a claim of entitlement to relief." *Bell Atl. Corp.*, 550 U.S. at 558.

When ruling on a motion to dismiss, the district court must accept all factual allegations contained in the complaint as true and draw all reasonable inferences in favor of the

plaintiff. *See, e.g.*, *Koch v. Christie's Int'l, PLC*, 699 F.3d 141, 145 (2d Cir. 2012).

### DISCUSSION

#### I. The *Bivens* Claims Must Be Dismissed

**\*3** The Court begins where all parties appear to agree: Plaintiff has failed to state a claim under *Bivens*. [6]

In his opposition briefing, Plaintiff acknowledges that his *Bivens* claims as against the Moving Defendants are "likely preclude[d]" under a recent Second Circuit decision. Opp. at 10.

In *Bivens*, the Supreme Court held that "even absent statutory authorization, it would enforce [an implied] damages remedy [under the Constitution] to compensate persons injured by federal officers who violated the [Fourth Amendment's] prohibition against unreasonable search and seizures." *Ziglar v. Abbasi*, 582 U.S. 120, 130–31 (2017). In the decades following *Bivens*, the Supreme Court has strictly cabined *Bivens'* reach. "[E]xpanding the *Bivens* remedy is now a disfavored judicial activity," *id.* at 135 (internal references omitted), and "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts." *Egbert v. Boule*, 596 U.S. 482, 486 (2022).

When a court is asked to infer a *Bivens* remedy, it must first determine whether the case presents a context that is "different in a meaningful way" from the three cases in which the Supreme Court has implied a damages action under the Constitution. *See Ziglar*, 582 U.S. at 139. Those three cases involved claims against: "[federal narcotics] agents for handcuffing a man in his own home without a warrant;" "a Congressman for firing his female secretary;" and "prison officials for failure to treat an inmate's asthma." *Id.* at 140 (citing *Bivens*; *Davis v. Passman*, 442 U.S. 228 (1979); and *Carlson v. Green*, 446 U.S. 14 (1980)).

While some differences are so trivial that they will not create a new *Bivens* context, the Supreme Court has made it clear that "even a modest extension is still an extension." *Ziglar*, 582 U.S. at 147, 149; *see also Egbert*, 596 U.S. at 491 ("When asked to imply a *Bivens* action, our watchword is caution.") (internal references omitted). A context may be "new" even though the right at issue and the mechanism of injury are the same. *Ziglar*, 582 U.S. at 139. For instance, a context may be different than the three cases in which the Supreme Court

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 86 of 340

Escobar v. Correa, Not Reported in Fed. Supp. (2024)

implied a constitutional damages action because of the rank of the officer involved or the federal agency employing the defendant. *See id.* at 135, 139–40; *see also Egbert,* 596 U.S. at 494–98 (foreclosing an implied Fourth Amendment damages action against a Customs and Border Patrol officer who had allegedly used excessive force against the plaintiff).

**\*4** Where a case presents a new *Bivens* context, a *Bivens* remedy is not available if "special factors indicat[e] that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." *Egbert,* 596 U.S. at 492 (internal references omitted). Moreover, a *Bivens* remedy is unavailable "if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure," even if existing or alternative remedies do not provide complete relief. *Id.* at 493 (internal references omitted).

The Second Circuit recently affirmed a district court's ruling that a *Bivens* remedy was not available in a post-*Egbert* case quite similar to this case. In *Lewis v. Westfield*, which involved claims against various Deputy U.S. Marshals and others, including for the use of excessive force against the plaintiff in his home, a district judge in the Eastern District of New York concluded that under *Egbert*, a *Bivens* remedy was not available because the case presented a new category of defendants from the three cases in which the Supreme Court previously approved a *Bivens* remedy. 640 F. Supp. 3d 249, 253–54 (E.D.N.Y. 2022), *aff'd sub nom. Lewis v. Bartosh*, No. 22-3060-pr, 2023 WL 8613873 (2d Cir. Dec. 13, 2023). The district court also observed that a *Bivens* remedy was precluded in light of the alternative remedial schemes created by federal statutes. *Westfield,* 640 F. Supp. 3d at 254–55. The Second Circuit affirmed, stating: "The district court concluded that several of the factors recognized in *Egbert* precluded a *Bivens* remedy here, including the professional identity of [d]efendants-[a]ppellees (Deputy Marshals, rather than federal narcotics agents) and the existence of an alternative remedial scheme through which the Directors of the Marshals Service must investigate reported misconduct." *Bartosh,* 2023 WL 8613873, at \*2; [7] *see also Cohen v. Trump,* No. 23-35, 2024 WL 20558, at \*2 (2d Cir. Jan. 2, 2024) (affirming, in a summary order, the district court's denial of a *Bivens* remedy where the defendants were a former President, former Attorney General, and multiple officers and agents of the Bureau of Prisons and Pre-trial Services); *Edwards v. Gizzi,* 107 F.4th 81 (2d Cir. 2024) (affirming district court's denial of *Bivens* remedy in excessive force case against

Deputy U.S. Marshals and others, albeit in two concurrences with different reasoning).

Similarly to *Westfield*, this case involves meaningful differences from the three cases in which the Supreme Court previously approved a *Bivens* remedy. Among the differences —which need not be detailed exhaustively here—Defendants were Deputy U.S. Marshals and deputized members of a U.S. Marshals Service ("USMS") Fugitive Task Force, thus presenting a new category of defendants. *See id.* Moreover, Defendants were acting pursuant to a different legal authority than the three Supreme Court cases; they were carrying out an arrest warrant at a third party's residence pursuant to the USMS's federal statutory authority, rather than, as in *Bivens*, carrying out an arrest without a warrant in the plaintiff-arrestee's own home. *See Westfield,* 640 F. Supp. 3d at 254.

**\*5** Because this case provides a new context for the application of *Bivens*, the operative question becomes whether special factors counsel hesitation in extending *Bivens*. As in *Westfield*, an implied constitutional damages remedy is precluded here because of the existence of an alternative remedial scheme. In addition to the availability of the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–80; *see also Edwards v. Gizzi,* No. 20-cv-07371 (KMK), 2022 WL 309393, at \*8–9 (S.D.N.Y. Feb. 2, 2022), *aff'd* 107 F.4th 81 (2d Cir. 2024), there is direct recourse within the Marshal Service: "by regulation, the Director [of USMS] 'shall' investigate 'alleged improper conduct on the part of U.S. Marshal Service personnel.' Anyone aggrieved by a Deputy Marshal's conduct may file a grievance alleging improper conduct." *Westfield,* 640 F. Supp. 3d at 254 (citing 28 C.F.R. § 0.111(n)). Moreover, the Attorney General must "ensure that 'any component' of the Department that receives a 'nonfrivolous allegation of criminal wrongdoing or administrative misconduct by an employee of the Department of Justice ... shall report that information to the Inspector General.' " *Id.* (citing 5 U.S.C. App. § 8E(d)) (current version at 5 U.S.C. § 413(d)). In turn, the Inspector General is authorized to " 'investigate allegations of criminal wrongdoing or administrative misconduct by an employee of the Department of Justice,' 'refer such allegations to the Office of Professional Responsibility,' or refer them to 'the internal affairs office of the appropriate component' of the Department, including the USMS." *Id.* (citing 5 U.S.C. App. § 8E(b)(2)) (current version at 5 U.S.C. § 413(b)(2)). Public channels are available to make complaints under both remedies. *See id.*

Accordingly, no *Bivens* remedy is available in this case and the Moving Defendants' motions to dismiss the *Bivens* claims are granted.

## II. The Claims Under 42 U.S.C. § 1983 Must Be Dismissed

In addition to his *Bivens* claims, Plaintiff alleges that Defendants are liable under § 1983 for their use of excessive force. *See* TAC ¶ 40.

### A. The Section 1983 Arguments Are Not Waived

As a preliminary matter, Plaintiff appears to argue in his opposition brief to the motions to dismiss that the Moving Defendants did not brief or address the availability of claims under § 1983 in their opening briefs and thus have waived arguments regarding those claims. Opp. at 9–10.

In his opening brief, Det. Correa noted in a footnote that to the extent Plaintiff was alleging a § 1983 claim, the claim should be dismissed because such actions are not properly brought against federal employees. Correa Mem. at 2 n.2 (citing cases). Det. Rosado, Deputy U.S. Marshal Kamrowski, and Deputy U.S. Marshal Kushi did not directly address the § 1983 claim in their opening brief. *See* Joint Mem. However, in his opposition brief, Plaintiff argued at length that the case against the Moving Defendants should not be dismissed because even if there was no legal remedy under *Bivens*, they could be held liable under § 1983. *See* Opp. at 4–10. In their reply briefs, all of the Moving Defendants responded fully to the § 1983 claims. *See* Correa Reply at 2–8; Joint Reply at 2–6.

District courts need not consider arguments or requests for relief raised for the first time in reply briefs. *In re Various Grand Jury Subpoenas*, 235 F. Supp. 3d 472, 485 (S.D.N.Y. 2017). Arguments newly raised in reply briefs generally are not considered because the opposing party may not have an adequate opportunity to respond. *Id.* However, the Second Circuit has made clear that district courts have discretion to consider a belatedly raised argument, and a judge's decision to countenance such an argument is reviewed only for abuse of discretion. *See Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 252 (2d Cir. 2005).

Here, as explained, Det. Correa raised the § 1983 claim in his opening brief, arguing that such a claim (if made) is not

properly brought against federal employees and that, because Det. Correa (an NYPD detective) was acting in the capacity of a federal task force agent, Plaintiff's claims must be analyzed under *Bivens*. Correa Mem. at 2 n.2. While the other Moving Defendants did not raise arguments about this issue until filing their joint reply brief, for reasons of judicial efficiency and fairness, this Court will consider their arguments as to dismissal of the § 1983 claims.

Where one defendant, Det. Correa, raised arguments regarding the inapplicability of the claims in his opening brief and Plaintiff had the opportunity to respond (and did, in fact, address the argument in detail), Plaintiff cannot claim that he was "blindsided" by the Moving Defendants' arguments as to Plaintiff's failure to state a claim under § 1983. *See Ruggiero*, 424 F.3d at 252; *see also Bayway Refining Co. v. Oxygenated Mktg. and Trading A.G.*, 215 F.3d 219, 226–27 (2d Cir. 2000); *Kingstown Cap. Mgmt., L.P. v. Vitek*, No. 20-3406, 2022 WL 3970920, at *1 (2d Cir. 2022) (with respect to a motion to dismiss, plaintiffs were not prejudiced or taken by surprise when the district court considered foreign-law expert's affidavit attached to defendants' reply briefs because plaintiffs had filed a similar affidavit with their opposition papers).

**\*6** Moreover, Plaintiff was explicitly given notice that this Court was inclined to consider the Moving Defendants' arguments regarding the § 1983 claims, and Plaintiff was given leave to file a sur-reply addressing that issue. Dkt. No. 73. Plaintiff then filed a sur-reply and thus had a full opportunity to be heard on the issue and to respond to any additional arguments made in the Moving Defendants' reply briefs. Pl.'s Sur-Reply Mem., Dkt. No. 74 ("Sur-Reply"). *See Ruggiero*, 424 F.3d at 252 ("[I]t is hard for [the plaintiff] to claim unfair prejudice now, because she could have claimed surprise in the district court and sought to file a responsive sur-reply."); *A. Hotel Int'l Grp., Inc. v. OneBeacon Ins. Co.*, 611 F. Supp. 2d 373, 375 (S.D.N.Y. 2009) (district courts have discretion to consider arguments first raised in reply briefs, which discretion can be exercised by either ignoring the new arguments or granting permission for a sur-reply). As such, Plaintiff is not prejudiced by this Court's consideration of the Moving Defendants' arguments regarding the § 1983 claims, and considering all claims together is in the interests of judicial efficiency.

### B. Plaintiff Fails to State a Claim Under
### [§ 1983](#) Against the Moving Defendants

The Supreme Court has explained that "[t]he purpose of [§ 1983](#) is to deter *state actors* from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (emphasis added). In order to prevail on a claim under [§ 1983](#), a plaintiff must show the deprivation of any rights, privileges, or immunities secured by the Constitution and laws *by a person acting under the color of state law*. *Bryant v. Steele*, 25 F. Supp. 3d 233, 246 (E.D.N.Y. 2014).

Here, citing, *inter alia*, to *Baez v. JetBlue Airways*, 745 F. Supp. 2d 214 (E.D.N.Y. 2010) and *Kletschka v. Driver*, 411 F.2d 436 (2d Cir. 1969), Plaintiff argues that the Moving Defendants were acting under the color of state law because (1) the State of New York issued the arrest warrant for Plaintiff and thus the state "compelled" the conduct at issue; (2) the Moving Defendants acted in concert with the state by acting jointly with the NYPD; and (3) the Moving Defendants were policing and enforcing state laws, which are functions traditionally performed by the state. *See* Opp. at 6–10.

In order for conduct causing deprivation of a federal right to be attributable to the state: (1) the alleged deprivation must be "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible;" and (2) "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982). As to the second requirement, a party may fairly be said to be a state actor "because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Id.*; *see also Baez v. JetBlue Airways*, 745 F. Supp. 2d at 221.

Generally, a state employee acts under color of state law while acting in his or her official capacity or while exercising his or her responsibilities pursuant to state law. *See West v. Atkins*, 487 U.S. 42, 50 (1988). Federal actors can potentially be held liable under [§ 1983](#) under extremely limited circumstances where their conduct "is the joint product of the exercise of a State power and of a non-State power" and where "the state or its officials played a significant role in the result." *Kletschka*, 411 F.2d at 449 (internal references omitted). Cooperation

between state and federal bureaucracies is insufficient; federal actors must have "acted with an improper motive" rather than just in a "spirit of cooperation" with the state defendants. *See Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147, 154–55 (2d Cir. 2006). Moreover, federal officers who "conspire[ ] with a state officer may act under color of state law, but since federal officials typically act under color of *federal* law, they are rarely deemed to have acted under the color of state law." *Arar v. Ashcroft*, 585 F.3d 559, 568 (2d Cir. 2009) (internal references omitted) (emphasis in original).

**\*7** Here, the absence of action "under the color of state law," as opposed to federal law, is fatal to Plaintiff's claims under [§ 1983](#) as to the Moving Defendants, all of whom were either Deputy U.S. Marshals or deputized members of the federal Marshals Fugitive Task Force. Courts in this Circuit have consistently held that federal task forces act pursuant to federal, not state, law; as such, members of the federal task force act pursuant to *federal* law and a *federal* grant of authority. *See Guerrero v. Scarazzini*, 274 F. App'x 11, 11 n.1 (2d Cir. 2008); *Ochoa v. Bratton*, No. 16-cv-2852 (JGK), 2017 WL 5900552, at \*6 (S.D.N.Y. Nov. 28, 2017); *Aikman v. Cnty. of Westchester*, 691 F. Supp. 2d 496, 498–99 (S.D.N.Y. 2010). This is true even when the task force is acting to investigate or enforce state crimes. *See Pou v. U.S. Drug Enforcement Admin.*, 923 F. Supp. 573, 576, 579 (S.D.N.Y. 1996). Additionally, state officers who have been deputized by a federal task force and are acting in their capacity as federal officers on the task force are equally acting under the color of federal, not state, law for the purposes of the activities carried out by the task force. *See, e.g., id.* at 579; *Morales v. City of New York*, No. 11-cv-05407 (PAC), 2012 WL 13388990, at \*3 (S.D.N.Y. Dec. 5, 2012); *see also Boudette v. Sanders*, No. 18-cv-02420 (CMA) (MEH), 2019 WL 3935168, at \*17 (D. Colo. Aug. 19, 2019).[8]

Specifically as to USMS Fugitive Task Forces, every court to have considered the issue has held that these Task Forces and their members (including deputized local or state law enforcement) are acting pursuant to federal law and federal authority, and Plaintiff cites to no authority holding otherwise. As a general background, the USMS is authorized to deputize "federal, state, or local law enforcement officers whenever the law enforcement needs of the U.S. Marshals Service so require." 28 C.F.R. § 0.112(b). The USMS is further expressly authorized to "investigate such fugitive matters, both within and outside the United States, as directed by the Attorney General." 28 U.S.C. § 566(e)(1)(B). Indeed, in the Presidential Threat Protection Act of 2000, 34 U.S.C.

Escobar v. Correa, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 89 of 340

§ 41503(a), Congress specifically directed the Attorney General to establish "permanent Fugitive Apprehension Task Forces consisting of Federal, State, and local law enforcement authorities ... to be directed and coordinated by the United State Marshals Service, for the purpose of locating and apprehending fugitives." *See generally James v. City of Rochester*, 673 F. Supp. 3d 279, 285 (W.D.N.Y. 2023). As such, these task forces plainly derive their authority from federal, not state, law.

The fact that the USMS Task Force at issue in this case was executing a state warrant does not alter the analysis, nor does the presence of deputized state law enforcement officers on the task force change the federal nature of the conduct. *See, e.g., James*, 673 F. Supp. 3d at 287; *Martinez v. D'Agata*, No. 16-cv-00044 (VB), 2019 WL 6895436, at *5 n.5 (S.D.N.Y. Dec. 18, 2019) (members of the USMS's New York/New Jersey Regional Fugitive Task Force were acting under federal law, even where the warrant was issued by New York state in connection with violations of state law, and where the relevant task force members included deputized state law enforcement officers); *Hester-Bey v. Donaruma*, No. 14-cv-03903 (CBA) (LB), 2017 WL 1148613, at *3 n.1 (E.D.N.Y. Mar. 24, 2017) (plaintiff failed to state a claim under § 1983 because defendants, who had acted pursuant to a bench warrant issued by a state court, were U.S. Marshals or local law enforcement agents deputized as Special Deputy Marshals and were thus not acting under color of state law).

**\*8** Here, the Moving Defendants were "[a]t all times relevant [to the Third Amended Complaint] ... deputized by the United States Marshals Service Fugitive Task Force," *see* TAC ¶¶ 6, 9, or were "[a]t all times relevant [to the Third Amended Complaint] ... United States Marshal[s] employed by the United States Marshals Service," *see id.* ¶¶ 12, 13, and thus were acting under the color of federal law. Plaintiff does not otherwise allege an illegal conspiracy between state and federal actors; he only alleges that the federal task force included certain state employees and was acting as a result of the violation of state law. But this is plainly insufficient.

*See Boudette*, 2019 WL 3935168, at *17; *see also Beechwood Restorative Care Center*, 436 F.3d at 154–55.

Plaintiff argues that the framework here, well-established in the courts of the Second Circuit, would allow state law enforcement officers to "eschew liability under § 1983 based on their status as a federal officer." Opp. at 8. To the extent that Plaintiff's concern is specifically about liability under § 1983, he is correct—except under extremely limited circumstances not present here, persons who are federal officers under the law, including state law enforcement officers acting as deputized federal task force members, cannot be sued under § 1983. However, as discussed above, that does not mean no remedy exists at all for allegations of wrongdoing against federal officers, or those acting in their capacity as federal officers. *See, e.g. Westfield*, 640 F. Supp. 3d at 254 (discussing USMS internal grievance process and citing 28 C.F.R. § 0.111(n)); *Sosa v. Bustos*, No. 17-cv-00417 (ER), 2020 WL 1940550, at *4 (S.D.N.Y. Apr. 22, 2020) (discussing Federal Tort Claims Act); *Aikman*, 691 F. Supp. 2d at 498 (citing 5 U.S.C. § 3374(c) and 21 U.S.C. § 878(b) for principle that state and local law enforcement officers designated as federal task force members are treated as federal employees for the purposes of any federal tort liability statutes).

Accordingly, the motions to dismiss Plaintiff's claims under § 1983 as against the Moving Defendants are also granted.

## CONCLUSION

Because Plaintiff has failed to state a claim upon which relief can be granted against the Moving Defendants, the Court need not reach the issue of whether Plaintiff's claims against the Moving Defendants are time-barred. For the foregoing reasons, the Moving Defendants' motions to dismiss are GRANTED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4042122

---

**Footnotes**

Escobar v. Correa, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 90 of 340

1    Plaintiff's Third Amended Complaint refers to Det. Rosado as "Jamie Rosado." Det. Rosado has clarified through counsel that his first name is "Jaime" Rosado. Defs. Kamrowski, Kushi, and Rosado's Mem. Supp. Mot. Dismiss, Dkt. No. 62, at 1 n.1 ("Joint Mem.").

2    Det. Rosado and Deputy U.S. Marshals Kamrowski and Kushi note that in spite of Plaintiff's allegations, "upon information and belief, defendants Ludington and Sheehan are NYPD officers who were not deputized by the U.S. Marshals Service Fugitive Task Force." Joint Mem. at 2 n.2. This issue does not bear on the disposition of this Opinion, although the assertion is consistent with Det. Sheehan and Sgt. Ludington's answer to the Third Amended Complaint. Dkt. No. 43.

3    Although the Third Amended Complaint merely states that Plaintiff "absconded from court," TAC ¶ 25, it appears from the briefing on the motions to dismiss that the relevant court was the New York state court located in Queens County.

4    Det. Correa filed one motion to dismiss (Dkt. No. 63), and Det. Rosado, Deputy U.S. Marshal Kamrowski, and Deputy U.S. Marshal Kushi separately filed a joint motion to dismiss (Dkt. No. 62).

5    Det. Correa was the only Moving Defendant to specifically note in his briefing papers that, to the extent Plaintiff alleges a claim under 42 U.S.C. § 1983, the claim should be dismissed because the claim is not properly brought against federal employees, and Det. Correa's participation in Plaintiff's arrest was in his capacity as a federal task force agent (both as alleged in the TAC and as uncontested by Det. Correa). Def. Correa's Mem. Supp. Mot. Dismiss, Dkt. No. 64, at 2 n.2 ("Correa Mem.").

6    In his brief opposing the motions to dismiss, Plaintiff effectively concedes that *Lewis v. Bartosh*, No. 22-3060-pr, 2023 WL 8613873 (2d Cir. Dec. 13, 2023), bars his *Bivens* claim here, but wrote, "While a *Bivens* remedy may now be foreclosed by *Lewis*, it was not at the time of filing, and Plaintiff reserves his right to challenge the Circuit's holding as wrongly decided based on [district court] precedent permitting excessive force cases under *Bivens*, as well as allowing actions against federal law enforcement, including U.S. Marshals." Opp. at 10–11. The Court assumes that Plaintiff is asserting his right to raise this issue in the Court of Appeals at the appropriate time (and properly preserving his ability to do so), rather than before this Court, which is bound to apply the controlling law set forth in *Egbert* and *Bartosh*.

7    The Circuit's affirmance rested solely on the district court's "new category of defendants" finding, as the plaintiff did not challenge the district court's "alternative remedies" finding on appeal. However, the "alternative remedies" finding is well-supported in the governing caselaw. *See, e.g., Egbert*, 596 U.S. at 493; *Ziglar*, 582 U.S. at 137.

8    Plaintiff points to *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 399 (1979), for the proposition that "federal authorizing legislation does not preclude § 1983 liability against persons or entities who engage in state action." Sur-Reply at 1. In *Lake Country Ests., Inc.*, the Supreme Court found that conduct undertaken under an interstate Compact occurred under the color of state law, in part because the "Compact had its genesis in the actions of the compacting States" and the states implemented the agency contemplated by the Compact, notwithstanding that congressional consent to the Compact was required. 440 U.S. at 399. Here, in contrast, as explained *infra*, the Fugitive Task Force had its "genesis" entirely in federal action. Likewise, Plaintiff's references in his sur-reply to cases from other circuits involving dissimilar factual circumstances are inapposite. Sur-Reply at 2–4.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 91 of 340

2019 WL 5002215
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,

v.

NYS DIVISION OF PAROLE; Mark Saben,
Parole Officer; Syracuse Police Dept.; Detective
William Summers, ID#409; D.P. Proud, ID#
0140; Richard Curran, ID# 0066; William
J. Fitzpatrick, Onondaga County, District
Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886 (TJM/ATB)
|
Signed 08/15/2019

**Attorneys and Law Firms**

LAYTONIA FLAGG, Plaintiff pro se

**ORDER and REPORT-RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge

 *1 The Clerk has sent me an amended [1] civil rights complaint filed by pro se plaintiff Laytonia Flagg. (Dkt. No. 3). Plaintiff Flagg has also filed an application to proceed in forma pauperis ("IFP"). (Dkt. No. 4).

**I. IFP Application**
A review of plaintiff's IFP application shows that she declares she is unable to pay the filing fee. (Dkt. No. 4). The court finds that plaintiff meets the financial criteria for IFP status.

In addition to determining whether plaintiff meets the financial criteria to proceed IFP, the court must also consider the sufficiency of the allegations set forth in the complaint in light of 28 U.S.C. § 1915, which provides that the court shall dismiss the case at any time if the court determines that the action is (i) frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief. 28 U.S.C. § 1915(e)(2)(B)(i)-(iii).

In determining whether an action is frivolous, the court must consider whether the complaint lacks an arguable basis in

law or in fact. Neitzke v. Williams, 490 U.S. 319, 325 (1989). Dismissal of frivolous actions is appropriate to prevent abuses of court process as well as to discourage the waste of judicial resources. Neitzke, 490 U.S. at 327; Harkins v. Eldridge, 505 F.2d 802, 804 (8th Cir. 1974). Although the court has a duty to show liberality toward pro se litigants, and must use extreme caution in ordering sua sponte dismissal of a pro se complaint before the adverse party has been served and has had an opportunity to respond, the court still has a responsibility to determine that a claim is not frivolous before permitting a plaintiff to proceed. Fitzgerald v. First East Seventh St. Tenants Corp., 221 F.3d 362, 363 (2d Cir. 2000) (finding that a district court may dismiss a frivolous complaint sua sponte even when plaintiff has paid the filing fee).

To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. (citing Bell Atl. Corp., 550 U.S. at 555). The court will now turn to a consideration of the plaintiff's complaint under the above standards.

**II. Complaint**
Plaintiff states that she is the mother of Mario Leslie, who at the time of the incidents described in the complaint, was on parole. (Amended Complaint ("AC") at 1). [2] On August 8, 2016, defendant New York State Parole Officer ("PO") Mark Saben went to Mr. Leslie's home at 514 Marcellus Street in Syracuse, New York, to conduct a "standard home visit." [3] (Id.) Mr. Leslie lived at the Marcellus Street address with his girlfriend, Tamacha Rodriguez. (Id.) Plaintiff claims that Ms. Rodriguez answered the door for PO Saben, and that Mr. Leslie was "summoned" from his bedroom to speak with defendant Saben. (Id.) After some discussion, PO Saben was walking toward the front door, when he spotted some glassine packets "known to contain heroin." (Id.) Upon discovering the glassine packets, defendant Saben informed Mr. Leslie that he was going to conduct a search of the entire residence according to the conditions of his parole release. (Id.)

 *2 Plaintiff states that, as a result of the subsequent search, the officer discovered a safe, containing a loaded firearm and $31,925 in United States currency. Defendant Saben also discovered a key chain on which were a set

of keys that were identified as keys to plaintiff's residence. Plaintiff claims that "[a]t this point Sr. P.O. Rigby called the Syracuse Police Department."[4] (AC at 2). Plaintiff claims that defendant Rigby spoke to Sergeant A. Llukaci, a detective with the Syracuse Police Department, and Sergeant Llukaci told defendants Detectives William Summers and D.P. Proud to go to the Marcellus Street address. Plaintiff states that upon his arrival, defendant Proud stated that he spoke to Ms. Rodriguez, who told defendant Proud that Mr. Leslie kept his money at his mother's apartment "although there is no affidavit on file to attest to that assertion by the [sic] Det. Proud."

Defendant Summers obtained a warrant for the search of plaintiff's home at 112 Fordham Rd. in Syracuse, New York. (AC Ex. CM/ECF p.16-17). Plaintiff claims that she was not home when the "Syracuse Police" and defendant Saben arrived at her home to execute the search warrant.[5] (AC at 2). The officers entered with the key that was found at Mr. Leslie's Marcellus Street home.[6] (Id.) Plaintiff arrived shortly thereafter, but was denied entrance to her home while the search was being executed. (Id.) Plaintiff states that the officers searched plaintiff's apartment and recovered $40,000.00 in cash from a safe that was located in plaintiff's bedroom closet. Plaintiff alleges that the officers confiscated the money.

Plaintiff claims that the officers did not have probable cause to obtain the warrant to search her home because there was no proof that Ms. Rodriguez ever made the statement that Mr. Leslie kept his money at his mother's house, and thus, the warrant was obtained improperly. Plaintiff claims that her Fourth Amendment rights were violated as the result of the search of her apartment. Plaintiff then claims that after the seizure of her $40,000.00, she informed defendant Assistant District Attorney ("ADA") Sean Chase that the money did not belong to Mr. Leslie, and that the money was plaintiff's savings which she would be using to purchase a new home. (AC at 5). Plaintiff claims that ADA Chase told her that his "office would return the illegally seized money." (Id.)

Plaintiff states that, shortly after the incident, she also filed a "complaint" form to complain about the police "conduct in Plaintiff's home," and to request the "immediate return of the Plaintiff's money." (Id.) Plaintiff states that the District Attorney's Office responded to the "property release" request only after plaintiff obtained the intervention of "a 3[rd] party (Feldman, Kramer & Monaco, P.C.)" (Id.) Plaintiff claims that

the property release form showed that the plaintiff's "legally possessed currency was improperly forfeited along with the monies ($31,925.00) seized at 514 Marcellus St." (AC at 6).

Plaintiff claims that ADA Chase told plaintiff on three separate occasions that her money was going to be returned, but that this was a "stalling tactic" by the District Attorney's Office. ADA Chase told plaintiff that he was waiting to hear from Mr. Leslie's attorney "in hopes of persuading [Mr. Leslie] to sign a forfeiture document that later became clear to the Plaintiff that the forfeiture included what was seized at both residences...." (AC at 6). The forfeiture document states that Mr. Leslie stipulated to the forfeiture of $67,269.00, and that he was not aware of any other person who claimed to be the owner of the property.[7] (AC at 6). Plaintiff alleges that the $40,000.00 was not Mr. Leslie's to forfeit. Plaintiff also alleges that the amount on the stipulation of forfeiture that Mr. Leslie signed does not account for the entire amount seized, even though plaintiff was not given any of her money back. Plaintiff claims that the actual amount seized, including her $40,000.00 was $71,925.00, and that there is $4,656.00 missing from the total. (Id.) Plaintiff also claims that the individuals who seized her money did not have the "warrant in hand" and never gave her a receipt for the money that they took. (AC at 7). Plaintiff states that the money taken from her home was not specifically mentioned in any of the paperwork that was subsequently provided to plaintiff as the result of her inquiries. (AC at 8).

**\*3** Plaintiff states that she spoke to then-Chief of the Syracuse Police, Frank Fowler, who told plaintiff that her concerns would be "thoroughly investigated," but then did not provide plaintiff a report of the investigation and told plaintiff to file a Freedom of Information request if she wished to see the report. (Id.) Plaintiff has attached correspondence that she received from former Chief Fowler, stating that the report had been forwarded to him and that plaintiff could "be assured that [Fowler would] take the proper administrative action in this case." (AC Ex. CM/ECF p.19).

Although the AC contains a "Second Cause of Action," plaintiff essentially repeats that her Fourth Amendment rights were violated by the defendants' actions in conjunction with the search of her home and the seizure of her money. (AC at 8-9). Plaintiff states that she has not been afforded any documentation that would establish probable cause to search her home. (AC at 9). Plaintiff states that there is no connection between her and Mr. Leslie's "illegal activities," and there was nothing "illegal" found in plaintiff's apartment. (Id.) In

applying a very liberal reading of the AC,[8] the court could interpret plaintiff's second cause of action as a Fourteenth Amendment Due Process claim, asserting that the defendants deprived her of her money without due process of law when they did not return the money after she made various inquiries and did not allow her to challenge the ownership of the money after her son signed the waiver and stipulation.

As stated above, the plaintiff has attached various documents as exhibits to the AC, including (1) the search warrant issued by City Court Judge Kate Rosenthal for plaintiff's apartment at 112 Fordham Rd. (AC Ex. CM/ECF pp.16-17); (2) Plaintiff's Civilian Complaint Report (AC Ex. CM/ECF p.18); a letter to plaintiff from former Chief Fowler (AC Ex. CM/ECF p.19); a letter to plaintiff from David L. Chaplin, II, Esq. on behalf of the Citizen Review Board dated December 2, 2016 (AC Ex. CM/ECF p. 20); a letter to plaintiff from Kimberly M. Osbeck, a paralegal for the Onondaga County District Attorney's Office, dated March 6, 2018 (AC Ex. CM/ECF p. 21); a letter to plaintiff from the Public Integrity Bureau of the New York State Attorney General's Office (AC Ex. CM/ECF p. 22); an "Application for Release of Property," signed by plaintiff on November 2, 2017, together with the unsigned refusal to release the property because the "money [was] forfeited during [a] criminal prosecution." (AC Ex. CM/ECF pp.23-24); the "Waiver and Stipulation," signed by Mr. Leslie on February 28, 2017, relinquishing any rights to the seized money (AC Ex. CM/ECF pp.25-26); "CNYLEADS Narrative Supplement[s]" numbers 1-3, including an "offense page" and a "property supplement," detailing all the property taken from the Marcellus St. address. (AC Ex. CM/ECF pp.27-32).

Plaintiff seeks the return of the $40,000.00 that she claims was taken from her in August of 2016, compensatory damages for the "Syracuse Police Department trashing Plaintiff's two bedrooms at 112 Fordham Rd.," damages for "five hours" worth of lost income[9] on the day of the search, unspecified lost income for the day that she had to appear in court,[10] and "punitive" damages for emotional pain and suffering, including the damages for the delay in purchasing her dream home. (*Id.*)

### III. Eleventh Amendment/New York State Division of Parole

#### A. Legal Standards

**\*4** The Eleventh Amendment provides that states have immunity against suits in federal court. *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 106 (1984). An action against state officers in their official capacities, or an action against an agency of the state, is tantamount to an action against the state. *Yorktown Medical Laboratory v. Perales*, 948 F.2d 84, 87 (2d Cir. 1991) (official capacity actions); *Santiago v. New York State Dep't of Correctional Services*, 945 F.2d 25, 28 n.1 (2d Cir. 1991) (agencies of the state).

#### B. Application

In this case, in addition to the individual parole officers who were allegedly responsible for obtaining the warrant to search her apartment, plaintiff has named the "N.Y.S. Division of Parole." (AC at 1). The Eleventh Amendment prevents plaintiff from suing the N.Y.S. Division of Parole. Thus, to the extent that plaintiff seeks to sue the agency separately from the individual officers, the AC may be dismissed with prejudice, but as further discussed below, plaintiff may sue Mark Saben, one of the individuals who allegedly participated in obtaining the warrant for her home.[11]

### IV. Syracuse Police Department/Municipal Liability

#### A. Legal Standards

Under New York law, departments, like the Syracuse Police Department that are merely administrative arms of a municipality, do not have a legal identity separate from the municipality, and may not sue or be sued. *Hayes v. County of Sullivan*, Nos. 07-CV-667; 09-CV-2071, 2012 WL 1129373, at *24 (S.D.N.Y. March 30, 2012) (citing inter alia *Hall v. City of White Plains*, 185 F. Supp. 2d 293, 303 (S.D.N.Y. 2002)).

#### B. Application

To the extent that plaintiff is suing the Syracuse Police Department as an entity separate from the individual police officers who were allegedly involved in obtaining the warrant for her apartment, plaintiff may not do so. Unlike the State of New York itself, against which a suit for damages would be barred by the Eleventh Amendment, the City of Syracuse could be named instead of the Syracuse Police Department. However, the municipality itself may only be named as a defendant in certain circumstances. In *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), the Supreme Court outlined the limited circumstances under which a municipality may be liable under Section 1983. Only when the municipality, through the execution of its policies, actually deprives an

individual of his constitutional rights, is it liable for the injury. *Id.* at 694. To establish municipal liability, the policy must actually cause the violation of constitutional rights; it must be the moving force behind the violation. *Id.*; *Dominguez v. Beame*, 603 F.2d 337, 341 (2d Cir. 1979).

**\*5** As it is written, the AC makes no claims that would allow the plaintiff to name the City of Syracuse as a defendant in this action. Plaintiff essentially complains of a single incident, during which the officers did not act properly in obtaining a warrant for her home and did not act properly in executing the warrant in her case. There is no indication that plaintiff can assert a policy or custom which would support municipal liability based on these facts. While plaintiff may not sue the Syracuse Police Department in any event, and while the court will not sua sponte replace the Syracuse Police Department with the City of Syracuse, the court does not rule out that, upon proper pleading, plaintiff could amend her AC to assert such a claim against the City of Syracuse.

However, plaintiff is warned that any such facts must plausibly suggest her claim, and that simply making a conclusory allegation of a "policy or custom" is insufficient to assert municipal liability. *Sulaymu Bey v. City of New York*, No. 17-CV-3563. 2019 WL 1434597, at \*10 (E.D.N.Y. Mar. 29, 2019); *Nielsen v. City of Rochester*, 58 F. Supp. 3d 268, 277 (W.D.N.Y. 2014) (conclusory allegations which merely recite the elements for stating a *Monell* claim are insufficient to state a claim for municipal liability) (citing inter alia *Genovese v. Town of Southhampton*, 92 F. Supp. 2d 8, 25 (E.D.N.Y. 2013)). A single incident, particularly if it involved individuals below the policy-making, level is insufficient to state a *Monell* claim. *DeCarlo v. Fry*, 141 F.3d 56, 61 (2d Cir. 1998). As discussed below, plaintiff may proceed against the individual officers who she claims violated her constitutional rights: Detective Summers, D.P. Proud; and Richard Curran.

## V. Prosecutorial Immunity/Personal Involvement

### A. Legal Standards

#### 1. Prosecutorial Immunity

Prosecutors enjoy absolute immunity from suit under section 1983 in matters associated with their prosecutorial functions, regardless of motivation. *Dory v. Ryan*, 25 F.3d 81, 83 (2d Cir. 1994) (prosecutorial immunity covers virtually all acts associated with the prosecutor's function, including conspiracies to present false evidence); *Bernard v. County*

*of Suffolk*, 356 F.3d 495 (2d Cir. 2004) (absolute immunity shields prosecutors from suit pursuant to section 1983 for their alleged malicious or selective prosecution as well as for any misconduct in the presentation of evidence to the grand jury).

Absolute immunity is defeated only when the prosecutor is engaging in investigative functions. *Bernard v. County of Suffolk*, 356 F.3d at 502-503 (citation omitted). The initiation and pursuit of prosecution, regardless of any alleged illegality, is protected by absolute prosecutorial immunity. *Peay v. Ajello*, 470 F.3d 65, 67-68 (2d Cir. 2006). It has also been held that a prosecutor is entitled to absolute immunity for his or her decision not to prosecute, regardless of the motivation for that decision. *Scloss v. Bouse*, 876 F.2d 287, 292 (2d Cir. 1989).

### 2. Personal Involvement

Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith*, 781 F.2d 319, 323-24 (2d Cir. 1986), the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id.* See also *Iqbal v. Hasty*, 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin*, 58 F.3d 865, 873) (2d Cir. 1995), *rev'd on other grounds*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**\*6** Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft*. See *Conklin v. County of Suffolk*, 859 F. Supp. 2d 415, 439 (E.D.N.Y. 2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon*.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 95 of 340

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

*Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.*, 811 F. Supp. 2d 803, 815 (S.D.N.Y. 2011)). *See also Jones v. Smith*, No. 09-CV-1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit).

### B. Application

Plaintiff has named the Onondaga County District Attorney, William J. Fitzpatrick, together with one of his Assistant District Attorneys, Sean Chase. (AC ¶ 3(c)). Plaintiff claims that she spoke to ADA Chase "right after the seizure," she explained to him that the money did not belong to her son, the money was hers, and she "produced tax returns" for the last five consecutive years in an effort to show that she "legally possessed the money." (AC at 5). She claims that "[k]nowing this," ADA Chase told plaintiff that his office would return the illegally seized money. (*Id.*) Plaintiff claims that notwithstanding ADA Chase's statement, he did not return the money, and allegedly "stalled" plaintiff until her son signed the waiver of forfeiture document, which included the total amount of money that was seized from both residences. (AC at 6). The initiation of civil asset forfeiture proceedings is a prosecutorial function that has been afforded absolute immunity. *See Byrne v. City of New York*, 736 Fed. App'x 263, 266 (2d Cir. 2018) (Second Circuit precedent affords absolute immunity to government attorneys who initiate civil suits) (quoting *Spear v. Town of W. Hartford*, 954 F.2d 63, 66 (2d Cir. 1992); *Mangiafico v. Blumenthal*, 471 F.3d 391, 395 (2d Cir. 2006)).

ADA Chase was allegedly handling the forfeiture proceeding, and even though he did not have to initiate court proceedings because Mr. Leslie signed the stipulation and waiver, the document stated that "I have concluded that the District Attorney would likely establish that the above-mentioned property is subject to forfeiture pursuant to Article 13-A [of the NY Civil Practice Law and Rules] and the District Attorney would likely prevail in such a forfeiture action." [12] (AC Ex. CM/ECF p.25). This document took the place of an in-court forfeiture proceeding, which would have been held pursuant to N.Y. Civ. Prac. L. & R. § 1311 (Forfeiture Actions). Thus, ADA Chase is entitled to absolute immunity with respect to his conduct relative to the forfeiture of the

money seized, even if plaintiff claimed that some of the money belonged to her. [13] This is true whether ADA Chase's conduct was proper or improper, and whether or not he was mistaken in obtaining Mr. Leslie's waiver and stipulation of forfeiture. Thus, to the extent that plaintiff raises due process violations with respect to her interest in the funds, they must be dismissed as against ADA Chase.

**\*7** Plaintiff has not asserted any facts against defendant Fitzpatrick. [14] He does not appear to have been involved in any way in obtaining the search warrant for plaintiff's apartment, in executing the search warrant for plaintiff's apartment, or in the forfeiture proceedings with respect to the money seized. Thus, any claims against him individually would fail for lack of personal involvement. If he had been personally involved in the forfeiture, he, like ADA Chase, would be entitled to absolute prosecutorial immunity. [15] Thus, plaintiff's amended complaint may be dismissed with prejudice as against defendants ADA Chase and DA Fitzpatrick.

## VI. Search and Seizure

### A. Legal Standards

"It is well-settled that in cases raising claims under the Fourth Amendment of unauthorized execution of a search warrant '[t]he validity of the warrant must be assessed on the basis of the information that the officers disclosed, or had a duty to disclose, to the issuing Magistrate.' " *Arroyo v. City of Buffalo*, No. 15-CV-753, 2018 WL 4376798, at *3 (W.D.N.Y. Sept. 13, 2018) (quoting *Velardi v. Walsh*, 40 F.3d 569, 575 n. 2 (2d Cir. 1994) (internal quotation marks omitted)). A warrant is not invalid for section 1983 purposes if it is " 'based on seemingly reliable information which is later found to be erroneous.' " *Id.* (quoting *Lewis v. City of Mt. Vernon, N.Y.*, 984 F. Supp. 748, 756 (S.D.N.Y. 1997)).

### B. Application

Although the court has concerns about the merits of this action, at this stage of the proceedings, the court finds that any Fourth Amendment claims that plaintiff may have against defendants Saben, Summers, Proud, and Curran may survive initial review. [16] Plaintiff seems to claim that the warrant for her home was based on false information given the court, which plaintiff claims was the only basis for the warrant. While it may be that a close review of the documents provided with the amended complaint, together with any other evidence

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 96 of 340

or argument by defendants in a properly supported dispositive motion, may show otherwise, the court is not currently in a position to make factual or other determinations regarding the validity of the warrant or any other claims that plaintiff may have regarding the search of her home.

**\*8** The court also notes that because of the waiver and stipulation, signed by Mr. Leslie, there was no formal forfeiture proceeding in New York State Court as provided in N.Y. Civ. Prac. L. & R. § 1311. Thus, it is unclear how the plaintiff could have challenged the forfeiture.[17] The court also makes no findings regarding the validity of any defenses that the defendants may assert regarding the incident in question.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that plaintiff's motion to proceed IFP (Dkt. No. 4) is **GRANTED**, and it is

**RECOMMENDED**, that the amended complaint (Dkt. No. 3) be **DISMISSED IN ITS ENTIRETY** as against defendants **N.Y.S. DIVISION OF PAROLE; SYRACUSE POLICE DEPARTMENT; WILLIAM J. FITZPATRICK; AND SEAN CHASE**, and it is

**RECOMMENDED**, that to the extent that the AC may be read as naming **SGT. LLUKACI or PO RIGBY**, the AC may be dismissed **WITHOUT PREJUDICE** for failure to state a claim, and it is

**RECOMMENDED**, that if the District Court adopts this Recommendation, the case be returned to me for further proceedings, including an order serving the remaining defendants: **SABEN, SUMMERS, PROUD, and CURRAN**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

### All Citations

Not Reported in Fed. Supp., 2019 WL 5002215

---

### Footnotes

1    When plaintiff filed her original complaint, the case was administratively closed due to plaintiff's failure to comply with the filing fee requirement. (Dkt. No. 2). Prior to re-filing her motion to proceed IFP, (Dkt. No. 4), plaintiff also filed an amended complaint, which the court will review as the operative pleading. The case was re-opened on August 1, 2019. (Dkt. No. 6).

2    Plaintiff numbered the pages of the "Fact" section of the amended complaint at the bottom of the page. The court will cite to the page numbers contained on the actual document. Plaintiff has attached a series of documents as exhibits to the amended complaint which she did not number. The court will cite to the plaintiff's exhibits ("AC Ex.") with the page number as assigned by the court's electronic filing system ("CM/ECF").

3    Plaintiff was not present for any of the incidents that she describes in her complaint until she arrived at her house during the subsequent search of her property. Plaintiff appears to be taking her recitation of the background facts from the police reports and other documents that she has attached to her amended complaint. (AC Ex. CM/ECF pp. 16-32). The court is stating the facts as plaintiff has described them in the amended complaint.

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 97 of 340

4  This is the first time that another parole officer was mentioned in plaintiff's statement of facts. The court will assume that defendant Rigby was at the residence from the beginning, but it is not completely clear from the papers.

5  Plaintiff does not allege that PO Rigby participated in the search of her apartment.

6  Plaintiff states that the officers were in possession of the door key "prior to their actual possession of the warrant for 112 Fordham Rd." (AC at 2).

7  Plaintiff has attached a copy of Mr. Leslie's "Waiver and Stipulation." (AC Ex. CM/ECF p.25-26). Plaintiff claims that this document was obtained after she asked for the return of the money several times from the District Attorney's Office, the Citizen Review Board, and the Syracuse Police Department. (AC at 7). When she failed to get a "truthful" response, she contacted Feldman, Kramer & Monaco, P.C. (*Id.*) The document was sent to the attorneys' office after the firm wrote a letter of inquiry. (*Id.*)

8  Plaintiff is pro se, and the court must interpret plaintiff's complaint liberally. *Sealed Plaintiff v. Sealed Defendants*, 537 F.3d 185, 191 (2d Cir. 2008). The court considers all possible grounds for relief that plaintiff could be raising. *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994) (pro se papers are interpreted liberally to raise the strongest arguments suggested therein).

9  Plaintiff states that she works from home, and could not work for the time that the officers were searching her apartment. (AC at 10).

10  Apparently, on the day that the officers searched plaintiff's apartment, they found a "weed roach" and gave plaintiff an appearance ticket, which was later dismissed after plaintiff appeared in court. (AC at 10). Plaintiff seeks lost income for the time that it took to appear in court. (*Id.*)

11  It is unclear whether plaintiff meant to name PO Rigby as a defendant herein. He is mentioned briefly in the body of the complaint and was apparently present during the Marcellus St. search, but is not listed in the caption of the complaint, and plaintiff submitted no proposed summons for PO Rigby. In addition, it does not appear from the facts as stated by plaintiff that PO Rigby was involved in obtaining the search warrant for plaintiff's apartment, nor is it even apparent that he was present during the search of plaintiff's apartment. Thus, plaintiff does not state any claims against PO Rigby, and to the extent that she meant to name him as a defendant, the AC should be dismissed as against him.

12  Article 13-a is entitled "Proceeds of a Crime -Forfeiture." N.Y. Civ. Prac. L. & R. Art. 13-a

13  Although not relevant to the court's decision because it is based on absolute immunity of the prosecutor, regardless of whether Mr. Leslie's assertions in the document were correct, the court notes that plaintiff's statement herein is contrary to her son's **sworn** assertion in the document. Plaintiff states that ADA Chase told plaintiff that they were waiting to hear from Mr. Leslie's attorney regarding whether he was going to sign the forfeiture document. (AC at 6). Plaintiff claims that her son signed the document "under duress." Plaintiff cannot assert any claims regarding her son, and in any event, her son was, by her own statement, represented by counsel during the matter.

14  Plaintiff requests only damages, including a return of the $40,000.00 as relief in this action. She does not seem to be asking for any form of injunctive relief. Even though plaintiff asks for a "return" of money, the Eleventh Amendment does not "recognize a distinction 'between monetary damages and money in which plaintiff has a property interest.' " *Local 851 of Internat'l Broth. of Teamsters v. Thyssen Haniel Logistics, Inc.*, 90 F. Supp. 2d 237, 249-50 (E.D.N.Y. 2000) (quoting *Yorktown Medical Lab., Inc. v. Perales*, 949 F.2d 84, 87-88 (2d Cir. 1991)). The District Attorney could have been the proper party in a declaratory judgment under

**Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)**

Case 1:25-cv-00774-AJB-ML     Document 16     Filed 12/30/25     Page 98 of 340

New York State law under N.Y. Civ. Prac. L & R. 1327 (Proceedings to Determine Adverse Claims), which plaintiff could have filed within six months of the stipulation, signed by Mr. Leslie.

15    To the extent that the complaint could be interpreted as suing either ADA Chase or DA Fitzpatrick in their "official capacities," the Eleventh Amendment would bar any such suit. *See Blessinger v. City of New York,* No. 17-CV-108, 2017 WL 3841873, at *1-2 (S.D.N.Y. Sept. 1, 2017) (prosecutors are entitled to Eleventh Amendment immunity when they are acting in their prosecutorial capacity because they are acting as state officials rather than city or county employees) (citing *Peterson v. Tomaselli,* 469 F. Supp. 2d 146, 157 (S.D.N.Y. 2007) and *Baez v. Hennessy,* 853 F.2d 73, 77 (2d Cir. 1988) (when prosecuting a criminal matter, a district attorney in New York State represents the State not the County)).

16    Although plaintiff has included a proposed summons for Sgt. Llukaci, this individual is not listed in the caption of the AC, nor is he included in the section of the form-AC which lists the individual Syracuse Police Officers. (AC ¶ 3(c)) for whom she has included identification numbers. In any event, plaintiff's only allegations against Sgt. Llukaci are that he sent defendants Proud and Summers to Mr. Leslie's Marcellus St. home after the parole officers found contraband therein. Plaintiff does not allege that he was personally involved in any of the conduct that she claims violated her constitutional rights. He was not at either residence and was not involved in obtaining the allegedly invalid warrant. Thus, to the extent that plaintiff is trying to sue Sgt. Llukaci, the AC may be dismissed as against this defendant.

17    The court does note that section 1311(7) provides that an innocent owner may challenge the forfeiture and regain the forfeited property if the owner never received notice of the forfeiture. In addition, section 1327 provides for an "interested person" to bring a proceeding to determine adverse claims, even after the forfeiture action was settled by stipulation. *See Tupi Cambios, S.A. v. Morganthau,* 48 A.D.2d 278 (1st Dep't 2008). In *Tupi Cambios,* the District Attorney was the proper "defendant" in New York State Court.

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

Flagg v. NYS Division of Parole, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 99 of 340

2019 WL 4963112
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Laytonia FLAGG, Plaintiff,

v.

NYS DIVISION OF PAROLE; Mark Saben,
Parole Officer; Syracuse Police Dept.; Detective
William Summers, ID#409; D.P. Proud, ID#
0140; Richard Curran, ID# 0066; William
J. Fitzpatrick, Onondaga County, District
Attorney; and Sean Chase, D.A., Defendants.

5:19-CV-886
|
Signed 10/08/2019

**Attorneys and Law Firms**

Laytonia Flagg, Syracuse, NY, pro se.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

 **\*1**  This pro se action brought pursuant to 42 U.S.C. § 1983 was referred to the Hon. Andrew T. Baxter, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). In his Order and Report-Recommendation dated August 15, 2019 (Dkt. No. 7), Magistrate Judge Baxter grants Plaintiff's application to proceed in forma pauperis, and examines the sufficiency of the allegations set forth in the Amended Complaint ("AC") in light of 28 U.S.C. § 1915. He recommends that the AC (Dkt. No. 3) be dismissed in its entirety as against defendants N.Y.S. Division of Parole, Syracuse Police Department, William J. Fitzpatrick, and Sean Chase; that to the extent that the AC may be read as naming Sgt. Llukaci or PO Rigby, the AC be

dismissed without prejudice for failure to state a claim; and that if the Court adopts these recommendations that the case be returned to him for further proceedings, including an order serving the remaining defendants Saben, Summers, Proud, and Curran. No objections to the Report-Recommendation have been filed, and the time to do so has expired.

**II. DISCUSSION**

After examining the record, this Court has determined that the Order and Report-Recommendation is not subject to attack for plain error or manifest injustice.

**III. CONCLUSION**

Accordingly, the Court **ACCEPTS and ADOPTS** the recommendations in the Order and Report-Recommendation (Dkt. No. 7) for the reasons stated therein. Therefore, it is hereby

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 3) is **DISMISSED IN ITS ENTIRETY** as against defendants N.Y.S. DIVISION OF PAROLE, SYRACUSE POLICE DEPARTMENT, WILLIAM J. FITZPATRICK, and SEAN CHASE, and it is further

**ORDERED** that to the extent the Amended Complaint may be read as naming SGT. LLUKACI or PO RIGBY, it is **DISMISSED WITHOUT PREJUDICE** for failure to state a claim, and it is further

**ORDERED** that the case be returned to Magistrate Judge Baxter for further proceedings, including an order serving the remaining defendants: SABEN, SUMMERS, PROUD, and CURRAN.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2019 WL 4963112

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag
Distinguished by   Salaman v. Carney,   D.Conn.,   August 22, 2025

2025 WL 1101514
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Silvestre GERMAN-ANDUJAR, Plaintiff,

v.

U.S. CUSTOMS AND BORDER PROTECTION;
Unknown Border Patrol Agent, Defendants.

6:24-CV-06190 EAW
|
Signed April 14, 2025

**Attorneys and Law Firms**

Silvestre German-Andujar, Lockport, NY, Pro Se.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, Chief Judge

**INTRODUCTION**

**\*1**  *Pro se* plaintiff Silvestre German-Andujar ("Plaintiff"), filed a complaint and amended complaint seeking relief pursuant to *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). (Dkt. 1; Dkt. 4). His claims arise from the alleged use of excessive force by border patrol agents during the execution of a search on January 4, 2024. (Dkt. 4 at 5). He alleges violations of the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and he requests compensatory damages. (*Id.* at 4, 5). Plaintiff also has filed a motion for leave to proceed *in forma pauperis* and a motion to appoint counsel. (Dkt. 2; Dkt. 6).

For the reasons that follow, Plaintiff's application to proceed *in forma pauperis* (Dkt. 2) is granted, his motion to appoint counsel (Dkt. 6) is denied as moot, and the amended complaint (Dkt. 4) is dismissed under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim without leave to amend.

**DISCUSSION**

Because Plaintiff meets the statutory requirements of 28 U.S.C. § 1915(a), he is granted permission to proceed *in forma pauperis*, and the Court must screen the amended complaint pursuant to 28 U.S.C. §§ 1915(e)(2) and 1915A(a). [1]

**I. LEGAL STANDARDS**

Section 1915 "provide[s] an efficient means by which a court can screen for and dismiss legally insufficient claims." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (citing *Shakur v. Selsky*, 391 F.3d 106, 112 (2d Cir. 2004)). The Court shall dismiss a complaint filed by an individual proceeding *in forma pauperis* if the Court determines that the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).

In evaluating a complaint, a court must accept all factual allegations as true and must draw all inferences in a plaintiff's favor. *See Larkin v. Savage*, 318 F.3d 138, 139 (2d Cir. 2003) (per curiam); *King v. Simpson*, 189 F.3d 284, 287 (2d Cir. 1999). "Specific facts are not necessary," and a plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also Boykin v. KeyCorp*, 521 F.3d 202, 216 (2d Cir. 2008) ("[E]ven after *Twombly*, dismissal of a *pro se* claim as insufficiently pleaded is appropriate only in the most unsustainable of cases."). Although "a court is obliged to construe [*pro se*] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis*, 357 F.3d 197, 200 (2d Cir. 2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure, *Wynder v. McMahon*, 360 F.3d 73, 79 n.11 (2d Cir. 2004).

**\*2**  Generally, a court will afford a *pro se* plaintiff an opportunity to amend or to be heard prior to dismissal "unless the court can rule out any possibility, however unlikely it might be, that an amended complaint would succeed in stating a claim." *Abbas*, 480 F.3d at 639 (internal quotation marks omitted). But leave to amend pleadings may be denied when

any amendment would be futile. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000).

## II. PLAINTIFF'S ALLEGATIONS

On January 4, 2024, Plaintiff attempted to flee "during a search that was unwarranted" in Ransomville, New York. (Dkt. 4 at 5). [2] An unnamed border patrol officer "tackled [and] beat" Plaintiff, causing him to sustain a "dislocated broken shoulder." (*Id.*). The agents then "intentionally ignore[ed] [his] injury [and] pain and suffering to question [him] ... [without] a translator ... [or] a lawyer." (*Id.*). Plaintiff alleges that the officials were attempting "to force an 'admission' " and "knew about" his broken shoulder. (*Id.*). They "denied [and] delayed treatment for hours knowingly [and] deliberately." (*Id.*).

Read liberally, Plaintiff's amended complaint can be construed to assert claims against U.S. Customs and Border Patrol employees for unlawful arrest, search and seizure, denial of medical treatment, and excessive force as well as violations of the Fifth and Sixth Amendments to the United States Constitution. Because U.S. Customs and Border Patrol is a federal agency, the Court construes the complaint under *Bivens*. [3]

## III. *BIVENS* CLAIMS

A *Bivens* action affords "the victims of a constitutional violation by a federal agent ... a right to recover damages against the official in federal court despite the absence of any statute conferring such a right." *Hartman v. Moore*, 547 U.S. 250, 254 n.2 (2006) (quoting *Carlson v. Green*, 446 U.S. 14, 18 (1980)). Notwithstanding its creation of the remedy, "the Supreme Court has [repeatedly] warned that the *Bivens* remedy is an extraordinary thing that should rarely if ever be applied in 'new contexts.' " *Arar v. Ashcroft*, 585 F.3d 559, 571 (2d Cir. 2009) (quoting *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 69 (2001)). Consequently, district courts must engage in a *Bivens* analysis before permitting any *Bivens* claim to proceed to trial, *Ziglar v. Abbasi*, 582 U.S. 120, 139-40 (2017), and reject a *Bivens* claim when: (1) the claim presents a new *Bivens* context, and (2) special factors counseling hesitation are present, *Hernandez v. Mesa*, 589 U.S. 93, 102 (2020).

**\*3** A case "presents a new *Bivens* context" when it is "meaningfully different from the three cases in which the [Supreme] Court has implied a damages action." *Egbert v.*

*Boule*, 596 U.S. 482, 492 (2022) (internal quotation marks and bracket omitted) (quoting *Ziglar*, 582 U.S. at 139-40). "*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Ziglar*, 582 U.S. at 131. The plaintiff in *Bivens* asserted claims for unreasonable search and seizure under the Fourth Amendment. 403 U.S. at 389. The plaintiff in *Davis v. Passman* asserted a claim of employment discrimination under the Due Process Clause of the Fifth Amendment. 442 U.S. 228, 230-31 (1979). And *Carlson* asserted Eighth Amendment claims for inadequate medical treatment of a convicted prisoner. 446 U.S. at 16 n.1.

A "special factor ... cause[s] a court to hesitate before" finding that "the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Ziglar*, 582 U.S. at 136. If there are any such factors, the Court must "reject the request" to extend a *Bivens* remedy. *Hernandez*, 589 U.S. at 102.

Applying the two-part inquiry, it is apparent that the Court cannot extend the *Bivens* remedy to Plaintiff's claims. Plaintiff's Fourth Amendment claim arose during a traffic stop and a "search that was unwarranted." (Dkt. 1 at 5; Dkt. 4 at 5). The context of Plaintiff's claim and the category of putative defendants clearly are "different in a meaningful way" from the context of, and the category of defendants in, the three *Bivens* actions the Supreme Court previously has recognized.

Though *Bivens* also recognized a cause of action under the Fourth Amendment, that is not dispositive; "[a] claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernandez*, 589 U.S. at 103. Indeed, "[t]he Supreme Court has twice declined to extend *Bivens* to Fourth Amendment claims filed against border agents." *Morales v. United States*, No. 18-cv-4247(CBA)(RER), 2023 WL 2129580, at \*9 (E.D.N.Y. Feb. 17, 2023) (citing *Egbert*, 596 U.S. at 494-98 (declining to create a Fourth Amendment excessive force claim or a First Amendment retaliation claim against a border patrol agent, and noting that a court was "plainly" not "competent to authorize a damages action ... against Border Patrol agents generally")); *Hernandez*, 598 U.S. at 103-10 (declining to create a damages remedy for a Fourth Amendment excessive force claim against a border patrol agent).

In light of *Hernandez* and *Boule*, allowing a *Bivens* claim to proceed against the individual border patrol agent or agents who allegedly were involved in Plaintiff's Fourth Amendment violation would run counter to the Supreme Court's precedents. *See Lovell v. Parker*, 618 F. Supp. 3d 127, 139 (E.D.N.Y. 2022) (finding that "[u]nder binding Supreme Court precedent" in *Boule* and *Hernandez*, the plaintiff "may not maintain a cause of action against the individual Defendants [individual Customs and Border Patrol] officers on duty at a border checkpoint within an international airport" pursuant to *Bivens*).

The same conclusion is warranted concerning Plaintiff's Fifth and Sixth Amendment claims under *Bivens*. Neither the Supreme Court nor the Second Circuit has recognized a Fifth Amendment *Bivens* claim outside of the employment context. *See Davis*, 442 U.S. at 248-49. Nor has the Supreme Court recognized a Sixth Amendment right to counsel claim under *Bivens*. *See Egbert*, 596 U.S. at 498 (noting that, under *Bivens*, "a new context arises when there is a new constitutional right at issue") (internal citations and quotation marks omitted); *see also Morales v. United States*, 18-cv-4247 (CBA) (RER), 2023 WL 2129580, at *10 (E.D.N.Y. Feb 17, 2023) (determining that a Sixth Amendment right to counsel claim presented a new context under *Bivens*).

 **\*4** Plaintiff also asserts violations of the Eighth Amendment because he was denied medical care. He contends that the border patrol agents were deliberately indifferent to his medical needs. (Dkt. 4 at 5). Because Plaintiff was not a prisoner at the time of the events, analysis under the Eighth Amendment is inappropriate, and Plaintiff's claims should be analyzed through the Due Process Clause of the Fifth Amendment. *See Cuoco*, 222 F.3d at 106 (noting that a claim of deliberate indifference to a serious medical need by a federal pre-trial detainee arises under the Due Process Clause of the Fifth Amendment instead of the Eighth Amendment). The Supreme Court considered a Fifth Amendment due process claim for "deliberate indifference to prisoner abuse" in *Ziglar* but determined that the plaintiffs sought to expand *Bivens* to a new context, noting that "even a modest extension is still an extension." *Ziglar*, 582 U.S. at 146-47. Accordingly, Plaintiff's deliberate indifference claims sound in a new *Bivens* context and must be dismissed.

Plaintiff further asserts Fourteenth Amendment equal protection and due process claims. (Dkt. 4 at 4). Because he asserts his claims against federal employees, the Court construes them as arising under the Fifth Amendment.

*See San Francisco Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 542 n. 21 (1987) (whereas "[t]he Fourteenth Amendment applies to actions by a State", the Fifth Amendment applies "to the Federal Government and contains an equal protection component"); *Duncan v. I.N.S.*, No. 02 CIV. 300 (MBM), 2003 WL 255325, at *4 (S.D.N.Y. Feb. 5, 2003) ("Although the Fifth Amendment, unlike the Fourteenth, contains no language guaranteeing equal protection of the laws, 'there is a well-established equal protection component to the Fifth Amendment Due Process Clause applicable to the federal government.' " (quoting *Skelly v. INS*, 168 F.3d 88, 91 (2d Cir. 1999))). But Plaintiff's claims are "meaningfully different from the Fifth Amendment-based gender employment discrimination claims in *Davis*." *Grossman v. Von Blackensee*, No. 19-CV-9191 (NSR), 2025 WL 563931, at *1 (S.D.N.Y. Feb. 19, 2025).

Moreover, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-80, provides "just the sort of alternative remedial scheme that counsels against judicial expansion of *Bivens*." [4] *Edwards v. Gizzi*, 107 F.4th 81 (2d Cir. 2024) (summary order) (Park, J., concurring); *see also Dean v. Robinson*, 656 F. Supp. 3d 400, 412 (W.D.N.Y. 2023) ("the PLRA, the FTCA, and the difficulties of prison administration lead inexorably to the conclusion that it is Congress, and not this Court, that should determine whether a damages remedy is available under the circumstances presented here"); *Swinton v. Serdula*, No. 15-CV-47, 2022 WL 3701196, at *7 (W.D.N.Y. Aug. 26, 2022) (declining to extend *Bivens* to inadequate medical care claim in light of "the alternative means of relief, including a suit under the FTCA"); *Turkmen v. Ashcroft*, No. 02-CV-2307 (DLI) (SMG), 2018 WL 4026734, at *10 (E.D.N.Y. Aug. 13, 2018) (collecting cases that, since *Ziglar*, "have declined to permit *Bivens* claims to proceed because the FTCA provides an adequate alternative remedy"), *report and recommendation adopted*, No. 02-CV-02307 (DLI) (SMG), 2021 WL 4099495 (E.D.N.Y. Sept. 9, 2021).

 **\*5** In sum, there can be no *Bivens* remedy in the circumstances presented in this case. The context here is different from those limited circumstances where the Supreme Court has previously implied a cause of action under the Constitution. And, as "in most every case," there is at least one rational reason to defer to Congress as to the availability of a damages remedy. *Egbert*, 596 U.S. at 491-92 (" 'Even a single sound reason to defer to Congress' is enough to require a court to refrain from creating ... a [*Bivens*]

remedy." (quoting *Nestle USA, Inc. v. Doe*, 593 U.S. 628, 635 (2021))). Accordingly, Plaintiff's claims are not cognizable under *Bivens*, and this case must be dismissed for failure to state a claim. The dismissal is without leave to amend because these deficiencies in Plaintiff's claims cannot be cured with better pleading.

## IV. MOTION TO APPOINT COUNSEL

Although there is no constitutional right to appointed counsel in civil cases, under 28 U.S.C. § 1915(e), the Court in its discretion may appoint counsel to assist indigent litigants. *See, e.g., Sears, Roebuck & Co. v. Charles W. Sears Real Estate, Inc.*, 865 F.2d 22, 23 (2d Cir. 1988); *Hendricks v. Coughlin*, 114 F.3d 390, 392 (2d Cir. 1997) (identifying the factors to be considered in appointing counsel) (citing *Hodge v. Police Officers*, 802 F.2d 58, 61-62 (2d Cir. 1986)). Because Plaintiff's amended complaint is dismissed, his motion to appoint counsel is denied as moot.

### ORDER

IT IS HEREBY ORDERED that Plaintiff's motion to proceed *in forma pauperis* (Dkt. 2) is granted; and it is further

ORDERED that Plaintiff's motion to appoint counsel (Dkt. 6) is denied as moot; and it is further

ORDERED that Plaintiff's amended complaint (Dkt. 4) is dismissed without leave to amend under 28 U.S.C. § 1915(e)(2)(B) for failure to state a claim. The Clerk of Court is directed to close this case; and it is further

ORDERED that this Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Decision and Order would not be taken in good faith, and leave to appeal to the United States Court of Appeals for the Second Circuit as a poor person is denied. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the Second Circuit, in accordance with Federal Rule of Appellate Procedure 24.

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 1101514

---

## Footnotes

1    "The Court screens Plaintiff's Amended Complaint instead of his original Complaint because '[i]t is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.' " *Sathue v. Mir Vest Inc.*, No. 18-CV-548-FPG, 2018 WL 10741681, at *1 n.1 (W.D.N.Y. Nov. 13, 2018) (quoting *Int'l Controls Corp. v. Vesco*, 556 F.2d 665, 668 (2d Cir. 1977)).

2    Although the amended complaint (Dkt. 4) is vague as to what was being searched, the complaint alleges that these events occurred during a traffic stop (Dkt. 1 at 5).

3    *Bivens* claims may be brought against federal officers, not federal agencies. *See F.D.I.C. v. Meyer*, 510 U.S. 471, 486 (1994) (holding that the respondent "had no *Bivens* cause of action for damages against FSLIC," a federal agency); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 77 (2001) (Stevens, J., dissenting). Therefore, Plaintiff's claims against U.S. Customs and Border Protection are dismissed for lack of subject matter jurisdiction. *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) ("[T]o the extent that Robinson's claims constituted a *Bivens* action against AAFES[, a federal agency,] or the individual federal defendants in their official capacities, they were properly dismissed for want of subject matter jurisdiction." (citing *Meyer*, 510 U.S. at 485-86)).

4    While Plaintiff could potentially attempt to pursue a claim under the FTCA, the Court has not construed the complaint as making such a claim because Plaintiff does not name the United States as defendant as required

by 28 U.S.C. § 1346. There is also nothing in the record before the Court to suggest that Plaintiff exhausted his administrative remedies by presenting his claim to the appropriate federal agency as required by 28 U.S.C. § 2675(a). This requirement "is jurisdictional and cannot be waived." *Celestine v. Mount Vernon Neighborhood Health Ctr.*, 403 F.3d 76, 82 (2d Cir. 2005). In other words, Plaintiff would need to pursue any potential FTCA claim before the appropriate federal agency before it could be asserted in a federal district court.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Distinguished by *Kolbe & Kolbe Millwork, Co., Inc. v. Manson Ins. Agency, Inc.,* W.D.Wis., October 25, 2013

2012 WL 627238
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Tyrone HOLMES and Samuel's Temple
Church of God in Christ, Inc., Plaintiffs,

v.

The ALLSTATE CORPORATION, Bryan M. Harris,
a.k.a. Bryan Michael Harris, Bluebox Entertainment,
Inc., Harris Financial Inc., Harris Financial Insurance
Inc., Associate Management LLC, B.M. Harris Inc.,
First One Distributors, Inc., I Am Global Ent. LLC,
Harris Financial Insurance Services, Defendants.

No. 11 Civ. 1543(LTS)(DF).
|
Jan. 27, 2012.

**REPORT AND RECOMMENDATION**

DEBRA FREEMAN, United States Magistrate Judge.

**\*1 TO THE HONORABLE LAURA T. SWAIN,
U.S.D.J.:**

In this diversity action, plaintiffs Tyrone Holmes ("Holmes") and the church of which he has claimed to be the Executive Pastor, Samuel's Temple Church of God in Christ, Inc. (the "Church" or "Samuel's Temple") (collectively, "Plaintiffs") have asserted a variety of state-law claims against defendants the Allstate Corporation ("Allstate"), Bryan M. Harris ("Harris"), and a number of corporate entities of which Harris is purportedly the principal (the "Harris Entities"[1]) (collectively, "Defendants"), essentially alleging that Defendants mismanaged or stole more than half a million dollars that Plaintiffs had entrusted to Defendants for investment or other purposes.

Currently pending before the Court for a report and recommendation are five separate motions:

(1) a motion by Allstate to dismiss Plaintiffs' Amended Complaint, as against Allstate (Dkt.18);

(2) a cross-motion by Plaintiffs for leave to file a Second Amended Complaint (Dkt.33);

(3) a motion by Allstate against Plaintiffs for Rule 11 sanctions for bringing a frivolous lawsuit against Allstate (Dkt.27);

(4) a motion by Plaintiffs against Allstate for Rule 11 sanctions, for making purportedly false and unsupported statements to the Court in motion papers (Dkt.51); and

(5) a motion by Harris and the Harris Entities (collectively, the "Harris Defendants") to dismiss Plaintiffs' Amended Complaint as against them (*see* Dkt. 55).[2]

For the reasons set forth below, I respectfully recommend that Allstate's motion to dismiss (Dkt.18) be granted and that Plaintiffs' claims against Allstate be dismissed with prejudice. I further recommend that Plaintiffs' cross-motion to amend (Dkt.33) be denied, as nothing in Plaintiffs' proposed amended pleading would cure the defects in the Amended Complaint. As for the pending sanctions motions, I recommend that Allstate's motion against Plaintiffs (Dkt.27) be granted and that Plaintiffs' motion against Allstate (Dkt 51) be denied, as Plaintiffs' claims against Allstate are patently frivolous and Plaintiffs' sanctions motion against Allstate is procedurally defective and meritless. On these motions, I recommend that Plaintiffs' counsel be ordered to pay to Allstate certain costs it has incurred, as set forth below. Finally, I recommend that the motion by the Harris Defendants to dismiss Plaintiffs' claims against them (Dkt.55) be granted, without prejudice to Plaintiffs' filing a Second Amended Complaint that satisfies the requirements of Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure, with respect to Plaintiffs' claims against these defendants.

***BACKGROUND***

**A. *The Amended Complaint***

Initially proceeding *pro se,* Holmes filed the initial Complaint in this matter on his own behalf. (*See* Complaint, dated Mar. 7, 2011 (Dkt.1).) Holmes then retained as counsel Eric Suffin, Esq. ("Suffin"), of the Law Firm of Eric Andrew Suffin, and, on June 1, 2011, Suffin filed an Amended Complaint, on behalf of both Holmes and the Church. (*See* Amended Complaint, dated May 17, 2011 ("Am.Compl") (Dkt.17).)

### 1. Factual Allegations

**\*2** At its core, the Amended Complaint alleges that Holmes and the Church entrusted Harris with more than half a million dollars, that Harris promised to make certain investments and purchases with the funds and also promised certain benefits to Holmes and his family, and that Harris broke these various promises. The Amended Complaint alleges the following facts, which are accepted as true for purposes of the motions to dismiss:

Plaintiff Samuel's Temple is a non-profit religious organization that formerly owned a church in East Harlem, New York. (*Id.* at ¶¶ 6, 7.) According to the Amended Complaint, Holmes is the Executive Pastor and Music Director of Samuel's Temple. (*Id.* at ¶ 3.) Defendant Harris is an Allstate agent and franchisee (*id.* at ¶ 10), who also operates defendant HFIS (*id.* at ¶ 13). The Amended Complaint does not describe the nature of HFIS or the other Harris Entities, other than to allege that they are all "alter egos" of one another. (*Id.* at ¶¶ 15–22.)

In 2006, Plaintiffs received $1 million from a developer (*id.* at ¶ 27), and Defendants suggested that Plaintiffs' capital be invested with them (*id.* at ¶ 32).[3] Defendants promised Plaintiffs at least a 15–20% profit within two years of their investment. (*Id.* at ¶ 33.) Harris was to serve as Plaintiffs' investment advisor and business manager for their capital investments, and Defendants proposed investments in real estate, insurance, an entertainment company (defendant Bluebox), and various securities and derivatives. (*Id.* at ¶¶ 34, 37, 49.) In connection with their proposal, Defendants also allegedly promised many personal benefits for Holmes, including housing for him and his family in Georgia, insurance for him and his family, and appointments to several executive positions at Bluebox. (*Id.* at ¶¶ 38, 47, 49.)

On the basis of these representations, Plaintiffs allegedly invested approximately $513,000.[4] (*Id.* at ¶ 53.) More specifically, Plaintiffs made a series of wire transfers to Bluebox, from August 2006 through February 2007, in amounts that totaled approximately $500,000.[5] (*Id.* at ¶¶ 56–58, 60.) Plaintiffs also invested approximately $15,000 in cash with Defendants, and made a $28,000 down payment for a piece of real estate. (*Id.* at ¶¶ 55, 61.) Defendants sent Plaintiffs promissory notes regarding amounts of $320,000 and $50,000, promising repayment of these principal amounts, together with interest, at a rate of 8.5% per annum on the unpaid balance, and promising

balloon payments in the form of cashier's checks. (*Id.* at ¶ 59.) Despite demand, Plaintiffs allege that they have not received any money back from their investments with Defendants, nor have they received an accounting regarding their investments. (*Id.* at ¶¶ 69–72.) As described more specifically below, Plaintiffs also allege that Defendants did not follow through on their various alleged promises.

#### a. Blue Box

**\*3** Holmes alleges that, as part of the alleged investment deal, he was promised stock and a number of positions at the entertainment company Bluebox. (*Id.* at ¶ 47.) Holmes was allegedly to become the Chief Executive Officer of Bluebox, as well as its Director of Music Production and Video Production. (*Id.*) Holmes was also to be appointed as Musician, Webmaster, Digital Music Engineer, and Songwriter for Bluebox. (*Id.*) Holmes and Samuel's Temple, together, were to become 51% stockholders of Bluebox. (*Id.*) Harris agreed to reduce his own stock holdings in Bluebox to only 49%, although he promised to serve as Bluebox's Chief Financial Officer and Business Manager. (*Id.* at ¶ 48.) Finally, Defendants promised to file "any required annual tax documents relating to Bluebox, and plaintiff Holmes's personal income taxes as a salaried corporate officer and employee of Bluebox ." (*Id.* at ¶ 44.)

According to the Amended Complaint, Defendants have admitted to omitting Plaintiffs' names from documents regarding control of Bluebox. (*Id.* at ¶ 76.)

#### b. Real Estate

##### i. 921 Moreland Avenue

According to Plaintiffs, part of their money was supposed to be used to buy a house that, at the time, belonged to Harris, and Holmes and his family were to live in it. (*Id.* at ¶¶ 47, 55 .) Under the agreement, Samuel's Temple would become the titleholder of the property, which was located at 921 Moreland Avenue, in Atlanta, Georgia. (*Id.* at ¶¶ 47, 55.) Defendants allegedly represented that they would secure a purchase mortgage for Plaintiffs and make mortgage payments with Plaintiffs' capital investment. (*Id.* at ¶ 77.) Plaintiffs allege that on or around March 16, 2006, Plaintiffs gave Defendants $28,000 as a down payment on this house. (*Id.* at ¶ 55.)

On or around December 28, 2007, Harris sent Plaintiffs an email indicating that the Moreland Avenue property, which

Holmes and his family were by then occupying, was in danger of being foreclosed. (*Id.* at ¶ 79.)

Then, at some point in 2008, while Holmes was in New York, Harris allegedly entered the Moreland Avenue property, which Holmes was still using as a residence, and removed personal property belonging to Holmes, including a rifle, hard drives, two speakers, video footage, sound tools, documents, video masters, and music masters. (*Id.* at ¶ 80.) A person believed to be an agent of the City of Atlanta Police Department allegedly stood outside of the Moreland Avenue property while Harris entered the home and left with Holmes' personal property. (*Id.* at ¶ 80.)

At a later point in 2008, the house at 921 Moreland Avenue was foreclosed and Plaintiffs were evicted. (*Id.* at ¶ 81.) Plaintiffs allege that, despite the representations made by Defendants, Defendants never obtained a purchase mortgage for Plaintiffs for the Moreland Avenue property, and Defendants failed to use Plaintiffs' capital investment to make mortgage payments on that property. (*Id.* at ¶ 77.)

#### ii. *Other Allegations Regarding Real Estate*

**\*4** HFIS and Harris, as an agent of Allstate, had an office at 1133 Forest Parkway, in Forest Park, Georgia. (*Id.* at ¶ 14.) In April of 2007, Defendants told Plaintiffs that Defendants had sold the mall that contained this office. (*Id.* at ¶ 67.) The Court is unclear as to whether Plaintiffs are claiming any interest in this mall.

Plaintiffs also allege that "[i]n or about 2008, defendants represented to plaintiffs that defendants bought a parcel and properties for the benefit of plaintiffs and lost the parcel and properties." (*Id.* at ¶ 68.) It is not clear to the Court whether this allegation refers to the property at 921 Moreland Avenue, discussed above, or to another piece of property.

#### c. *Insurance*

Plaintiffs allege that Defendants said that they would purchase and maintain life insurance for Holmes and his family. (*Id.* at ¶¶ 49, 39.) Although Defendants later represented that they had purchased a $5,000 life insurance policy, this policy allegedly lapsed in November of 2010. (*Id.* at ¶¶ 62, 63, 82.) According to Plaintiffs, Defendants also represented that they had purchased "business insurance policies" for the benefit of Plaintiffs (*id.* at ¶ 62), but the Amended Complaint does not indicate whether Defendants actually made such purchases, or, if so, whether these insurance policies also lapsed.

#### d. *Loans to an Elected Representative*

Plaintiffs allege that Defendants loaned $20,000 to Ron Sailor Jr. (identified in the Amended Complaint as a Georgia Congressman) [6] from Plaintiffs' capital investment. (*Id.* at ¶ 64.) Plaintiffs do not indicate whether this loan was authorized by Plaintiffs or whether the loan was repaid.

#### e. *Documents*

At some point, Defendants allegedly sent Plaintiffs a large collection of Allstate documents containing personal information of thousands of Allstate policyholders and other policyholders. (*Id.* at ¶ 29.) Plaintiffs assert that they stored these documents for nine years, without compensation, incurring approximately $10,080 in storage costs. (*Id.* at ¶ 30.) [7]

### 2. *Legal Claims and Alleged Damages*

Plaintiffs assert nine claims against Defendants. One of these claims—for *prima facie* tort—is asserted solely against Harris. The eight remaining claims are brought against all Defendants. These claims include: (1) conversion; (2) fraud; (3) violation of New York Debtor and Creditor Law § 276; (4) negligent misrepresentation; (5) promissory estoppel; (6) unjust enrichment; (7) breach of contract; and (8) negligent infliction of emotional distress.

Plaintiffs demand $10 million in damages for the death of a Samuel's Temple member (whose death was allegedly "[d]irectly related to the conduct of defendants"), loss of business opportunities, loss of the ability to operate a school, harm to reputation, financial distress, harm to familial relations, and loss of employment at Bluebox. (Am. Compl. at ¶¶ 15, 86, 87, 88, 89, 94.)

### B. *Motions before the Court*

#### 1. *Allstate's Motions To Dismiss and for Sanctions*

**\*5** On June 28, 2011, Allstate moved to dismiss the Amended Complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. (*See* Notice of Motion To Dismiss Plaintiffs' Amended Complaint as Against Defendant the Allstate Corporation ("Allstate Mtn. To Dismiss"), dated June 28, 2011 (Dkt.18).) Allstate seeks dismissal on the grounds that the Amended Complaint consists of improper "group" allegations against "defendants," that it alleges no direct

action by Allstate and no conduct by Allstate that could make it liable for the actions of any of the other defendants, and that each individual claim fails for additional and independent reasons. (*See generally* Allstate Mtn. To Dismiss.)

Allstate has also filed a motion for sanctions against Plaintiffs, as well as their counsel, under Rule 11 of the Federal Rules of Civil Procedure and based on the Court's inherent authority. (*See* Notice of Motion For Sanctions Under Rule 11 ("Allstate's Sanctions Mtn."), dated July 29, 2011 (Dkt.27).) In its sanctions motion, Allstate contends that, as against Allstate, the Amended Complaint is frivolous and without any factual or legal basis. (*Id.*)

### 2. *Plaintiffs' Motions for Leave To Amend and for Sanctions*

On August 5, 2011, Plaintiffs opposed Allstate's motion to dismiss and filed a cross-motion for leave to file a Second Amended Complaint. (Notice of Cross–Motion, dated Aug. 5, 2011 (Dkt.33).) Plaintiffs argue that, because Harris was an agent and franchisee of Allstate, Allstate is liable for the acts alleged in the Amended Complaint. (Plaintiff's Memorandum of Law in Opposition to Defendant the Allstate Corporation's Motion To Dismiss Plaintiff's Amended Complaint and in Support of Plaintiff s Cross–Motion for Leave To File a Second Amended Complaint ("Pl. Opp. Mem. to Allstate Mtn."), dated Aug. 5 (Dkt.34 [8] ), at 4.) Primarily on this basis, Plaintiffs contend that each of their eight claims against Allstate is well-founded. (*Id.* at 6–11.) Nonetheless, Plaintiffs also request leave of Court to file the proposed Second Amended Complaint that they submit with their cross-motion. (*Id.* at 11.)

On September 30, 2011, Plaintiffs filed a motion for sanctions against Allstate. (Notice of Motion, dated Sept. 30, 2011 (Dkt.51) .) Plaintiffs allege that certain statements contained in Allstate's memoranda in support of its two motions, and in a Declaration supporting Allstate's motion to dismiss and opposing Plaintiffs' cross-motion for leave to amend, are without evidentiary support. (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011 ("Pl. Sanctions Mem.") (Dkt.53), at 2.)

### 3. *Motions of the Harris Defendants*

On October 11, 2011, the Harris Defendants filed their own motion to dismiss the Amended Complaint. (*See* Memorandum of Law in Support of the Motion of Defendants, Bryan M. Harris a/k/a Bryan Michael Harris,

Bluebox Entertainment, Inc., Harris Financial Insurance Services, Inc., Harris Financial, Inc., Harris Financial Insurance, In. Associate Management LLC, B.M. Harris Inc., First One Distributors, Inc., I Am Global Ent. LLC a/k/a Attracknaphobia, LLC To Dismiss The Amended Complaint ("Harris Mtn. To Dismiss"), dated Oct. 9, 2011 (Dkt.55).) The Harris Defendants contend that Plaintiffs have no standing to bring their claims; that, as a general matter, the Amended Complaint is inadequately pleaded; and that the nine claims also fail for independent reasons. (*See id.*)

**\*6** In opposition to the Harris Defendants' motion, Plaintiffs argue that each of their claims against these defendants is sufficient as pleaded, and Plaintiffs also submit additional documents related to the issue of standing and ask for leave to file an "Alternative Second Amended Complaint," which they submit with their opposition papers. (*See* Plaintiffs' Memorandum of Law in Opposition to Harris Defendants' Motion To Dismiss ("Pl. Opp. Mem. to Harris Mtn."), dated Nov. 10, 2011 (Dkt.64); *see also* Affidavit of Tyrone Holmes, dated Nov. 7, 2011 (Dkt.65); *see also* Declaration of Eric Andrew Suffin in Opposition to Harris Defendants' Motion To Dismiss, dated Nov. 10, 2011 ("11/10/11 Suffin Decl.") (Dkt.66).)

### DISCUSSION

### I. *ALLSTATE'S MOTION TO DISMISS AND PLAINTIFFS' CROSS–MOTION TO AMEND*

#### A. *Applicable Legal Standards*

#### 1. *Rule 12(b)(6)*

A case is subject to dismissal under Rule 12(b)(6) where the complaint is not legally sufficient to state a claim upon which relief can be granted. *See Kopec v. Coughlin,* 922 F.2d 152, 155 (2d Cir.1991). In deciding a Rule 12(b)(6) motion, the Court "accept[s] as true all factual statements alleged in the complaint and draw[s] all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 191 (2d Cir.2007) (citation omitted); *accord Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). A court should grant dismissal where, after considering the plaintiff's allegations in this generous light, "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Walker v. City of New York,* 974 F.2d 293, 298 (2d Cir.1992), *cert. denied,* 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). At the same time, "conclusory allegations or legal

conclusions masquerading as factual conclusions will not suffice to defeat a motion to dismiss." *Achtman v. Kirby, McInerney & Squire, LLP,* 464 F.3d 328, 337 (2d Cir.2006) (citation omitted). Rather, in order to withstand a motion to dismiss, a complaint must plead "enough facts to state a claim for relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) ("[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged").

### 2. *Rule 15(a)*

Rule 15(a) of the Federal Rules of Civil Procedure governs the amendment of complaints and provides that the court "should freely give leave when justice so requires." Fed.R.Civ.P. 15(a). A motion to amend should be denied, however, "if there is an 'apparent or declared reason—such as undue delay, bad faith or dilatory motive ... repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of the allowance of an amendment, [or] futility of amendment.' " *Dluhos v. Floating and Abandoned Vessel Known as "New York,"* 162 F.3d 63, 69 (2d Cir.1998) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

**\*7** An amendment is considered futile when the proposed new claim would not withstand a motion to dismiss, either for failure to state a cause of action, or on another ground. *See Milanese v. Rust-oleum Corp.,* 244 F.3d 104, 110 (2d Cir.2001). Thus, if a proposed amendment would be subject to "immediate dismissal" on some ground, the Court will not permit the amendment. *See Jones v. NY. State Div. of Military & Naval Affairs,* 166 F.3d 45, 55 (2d Cir.1999). If, on the other hand, the party seeking to amend "has at least colorable grounds for relief, justice ... require[s]" that its motion be granted. *Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.,* 748 F.2d 774, 783 (2d Cir.1984) (citation omitted).

### B. *Adequacy of Plaintiffs' Allegations Against Allstate*

Allstate makes a number of arguments for dismissing the claims against it. As an initial matter, Allstate argues that in order to state a claim against it, Plaintiffs would have to proceed under a theory that Harris had apparent authority to act on Allstate's behalf, but that Plaintiffs have not pleaded any facts sufficient to support the conclusion that

Harris had such authority. Allstate also argues that the Amended Complaint fails to satisfy Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. Finally, Allstate advances arguments for dismissing each of the eight individual claims against it on independent grounds. As this Court agrees that Plaintiffs have not pleaded facts sufficient to support any claim based on apparent authority, on which all of Plaintiffs' claims necessarily rest, I recommend that Allstate's motion to dismiss be granted on that ground, without regard to Allstate's other arguments.

### 1. *Lack of Allegations of Apparent Authority*

The Amended Complaint contains few allegations that relate, in particular, to Allstate. Instead, as noted above (*see* n. 3, *supra* ), Plaintiffs claim that "defendants" made and broke a range of promises. At best, Plaintiffs' use of the term "defendants" throughout the Amended Complaint is vague. At other times, Plaintiffs' method of group pleading is incoherent or illogical. [9] Given that Plaintiffs do not allege that Allstate itself engaged in any activity that would give rise to independent liability, Allstate argues that Plaintiff's theory of liability must be premised on Harris's actions and the doctrine of apparent authority. Under this doctrine, as explained by the New York Court of Appeals, [10] liability against a principal may arise if the principal's affirmative conduct causes a third party reasonably to believe that an agent has authority to act on behalf of the principal:

> Essential to the creation of apparent authority are words or conduct of the principal, communicated to a third party, that give rise to the appearance and belief that the agent possesses authority to enter into a transaction. The agent cannot by his own acts imbue himself with apparent authority. Rather, the existence of 'apparent authority' depends upon a factual showing that the third party relied upon the misrepresentation of the agent because of some misleading conduct on the part of the principal-not the agent. Moreover, a third party with whom the agent deals may rely on an appearance of authority only to the extent that such reliance is reasonable.

**\*8** *Hallock v. State of New York,* 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984) (internal quotations and citations omitted); *see also Ford v. Unity Hospital,* 32 N.Y.2d 464, 472–73, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973) ("The apparent authority for which the principal may be held liable must be traceable to him; it cannot be established by the unauthorized acts, representations or

conduct of the agent"). Here, Allstate argues that Plaintiffs have not sufficiently alleged any facts that could support a finding that Harris was authorized by Allstate to make the promises or engage in the transactions that form the basis of Plaintiffs' claims.

Plaintiffs do not deny that they are proceeding against Allstate on a theory of apparent authority (*see* Pl. Opp. Mem. to Allstate Mtn. at 4), but they maintain that their allegations are sufficient to implicate Allstate under that theory. Specifically, the Amended Complaint contains the following allegations regarding the nature of Allstate's business, its relationship with Harris, and the role that Plaintiffs were supposedly led to believe that Allstate would take with respect to Plaintiffs' money and investments:

- Allstate "is purportedly an insurance, retirement, investment, and banking company, purporting to offer Asset Protection, Wealth Transfer, Family Protection Insurance, Financial Products, Asset Management and Accumulation, and Asset Management Short-term Financial Objectives." (Am. Compl. at ¶ 8.)

- Harris "was and is an Agent and Franchisee with, of and for defendant Allstate." (*Id.* at ¶ 10, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "[A]s an Agent of defendant Allstate[,] defendant Harris offered Allstate financial services, while simultaneously operating under the corporate name of defendant Harris Financial Insurance Services, Inc." (*Id.* at ¶ 13, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "At the time the plaintiffs received one million dollars in or about 2006 plaintiff Holmes believed that defendant Harris operated the most successful Allstate operation/ business in the southeast region of the United States of America for the previous ten years, pursuant to representations to that effect by defendants." (*Id.* at ¶ 31, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants represented to plaintiffs that capital invested by plaintiffs with defendants would be invested with defendant Allstate in the name of plaintiff Church." (*Id.* at ¶ 36, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants Harris, HFIS, Bluebox, HF, HFI, BMH, First, Associate, and IAGE used the Allstate name and logo to convince plaintiffs to invest with defendants, assuring plaintiffs that the investments were to be with Allstate."(*Id.* at ¶ 46, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants represented that plaintiffs' capital investment would be maintained and supervised by Allstate." (*Id.* at ¶ 52, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "On the basis of the representations made to plaintiffs by defendants, and relying upon defendants' advice and representation that Allstate was exercising certain controls and safeguards upon defendant Harris, plaintiffs invested approximately five hundred and thirteen thousand dollars with defendants." (*Id.* at ¶ 53, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

**\*9** - Harris "openly conducted plaintiffs' business and discussed plaintiffs' financial transactions during business hours while in Allstate offices, acting as an Agent of Allstate." (*Id.* at ¶ 54, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

- "Defendants represented to plaintiffs that defendant Allstate was the entity that sold certain securities and derivatives, life insurance policies and business insurance policies to plaintiffs." (*Id.* at ¶ 65, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

Plaintiffs also generally allege that each defendant is an "alter ego" of the other defendants. (*Id.* at ¶¶ 15–22, 346 N.Y.S.2d 238, 299 N.E.2d 659.)

Yet, while these allegations may suggest that Harris, holding himself out as an Allstate agent, made certain representations to Plaintiffs regarding Allstate's involvement in the planned investment transactions, missing from the Amended Complaint is any allegation that Allstate *itself* engaged in any affirmative conduct that could have caused Plaintiffs reasonably to believe that Harris had the authority to bind Allstate to promises regarding how Plaintiffs' money would be spent or invested. *See Imburgio v. Toby*, 82 A.D.3d 653, 920 N.Y.S.2d 43, 43 (1st Dep't 2011) (granting motion to dismiss where plaintiffs failed to allege facts that would impute liability to defendant, holding that, "[w]hile plaintiffs asserted that defendant's employee was vested with apparent authority based upon the employee's representations concerning the transactions at issue, such authority may arise only from the conduct of the principal, not the agent").

Despite its repeated references to actions undertaken by "defendants," the Amended Complaint implies that Harris made the promises and engaged or failed to engage in the conduct that underlies this action. (*See* Am. Compl. at ¶ 54 ("Defendant Harris openly conducted plaintiffs' business and

discussed plaintiffs' financial transactions during business hours while in Allstate offices, acting as an Agent of Allstate.").) Indeed, even Plaintiffs' allegations that refer generally to the conduct of "defendants" suggest, in context, that Harris was the actor. For example, when Plaintiffs allege that they made wire transfers to Bluebox, a Harris company, "relying upon defendants' advice and representation that Allstate was exercising certain controls and safeguards" (*id.* at ¶¶ 56–58), Plaintiffs identify no action or words *by Allstate* regarding its involvement with Bluebox, much less any action or words by Allstate that could have led Plaintiffs to have the reasonable belief that Allstate was indeed exercising any such "controls and safeguards." In short, the Amended Complaint contains no allegations that Allstate did anything to make Plaintiffs believe that Harris had the authority to bind Allstate to any promises or that Harris's promises were being made on Allstate's behalf. In fact, neither the Amended Complaint nor common sense suggest any basis on which a reasonable person could have believed that Harris had the authority to bind Allstate to the types of promises alleged.[11]

**\*10** In opposition to Allstate's motion to dismiss, Plaintiffs rely on *Kirschner v. KPMG LLC,* 15 N.Y.3d 446, 912 N.Y.S.2d 508, 938 N.E.2d 941 (2010), for the proposition that "[a] corporation must ... be responsible for the acts of its authorized agents even if particular acts were unauthorized." *Id.* at 465, 912 N.Y.S.2d 508, 938 N.E.2d 941 (cited in Pl. Opp. Mem., at 4.) Plaintiffs' reliance on *Kirschner* is misplaced, as, even assuming that Plaintiffs have adequately pleaded, or can plead, that Harris was an authorized Allstate *insurance agent,* "[t]he mere creation of an agency for some purpose does not automatically invest the agent with 'apparent authority' to bind the principal without limitation." *Ford v. Unity Hospital,* 32 N.Y.2d 464, 472–73, 346 N.Y.S.2d 238, 299 N.E.2d 659 (1973). Rather,

> [a]n agent's power to bind his principal is coextensive with the principal's grant of authority. One who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority. Upon failure to properly determine the scope of authority, and in the face of damages resulting from an agent's misrepresentations, 'apparent authority' is not automatically available to the injured third party to

> bind the principal ... The very basis of the doctrine of apparent authority indicates that the principal can be held liable under the doctrine only where he was responsible for the appearance of authority in the agent to conduct *the transaction in question.*

*Id.* (internal citations and quotations omitted) (emphasis added). Here, other than stating, in general terms, that Allstate, as a company, offers a number of financial services (Am. Compl. at ¶ 8), Plaintiffs have made no factual allegations to support their claim that Allstate ever authorized Harris to act as its agent for any purpose other than, perhaps, the placement of insurance. Plaintiffs' bare allegation that Harris was an "agent" of Allstate is simply insufficient to plead liability by Allstate, under the doctrine of apparent authority, for the wide variety of claims Plaintiffs assert.

Finally, although Plaintiffs allege that Harris was supposed to provide insurance policies for them through Allstate, the Amended Complaint does not allege any failure by Allstate to provide insurance[12] or to honor any insurance obligations. Nor do Plaintiffs allege that Allstate made any false statements regarding the terms of any policy issued to them or regarding whether such a policy had been renewed. Rather, to the extent any insurance policy is even implicated in the Amended Complaint, Plaintiffs merely appear to complain that Harris failed to use Plaintiffs' funds to make regular payments of policy premiums, after promising that he would. Again, this does not suggest any culpable conduct by Allstate.

In sum, the Amended Complaint fails to allege *any* factual basis for Plaintiffs' position that Harris had apparent authority to bind Allstate with respect to any of the many investment schemes alleged in this case. It also fails to allege *any* conduct, whatsoever, by Allstate that could have induced reliance on the part of Plaintiffs. While Plaintiffs allege that "defendants" failed to keep numerous promises, Plaintiffs do not specify that a single promise was ever made or sanctioned by Allstate. For these reasons, Plaintiffs' claims against Allstate cannot stand, and the Amended Complaint should be dismissed, as against Allstate, under Rule 12(b) (6), for failure to state a claim.[13]

**2.** *Futility of Plaintiffs' Proposed Second Amended*
*Complaint*

**\*11** In response to Allstate's motion to dismiss, Plaintiffs
seek leave to file a Second Amended Complaint, presumably
in an attempt to cure any pleading defect. Plaintiffs, however,
have actually submitted three different versions of a proposed
Second Amended Complaint to the Court. Through what
the Court assumes was attorney error, Plaintiffs filed one
version of a proposed amended pleading on the Court's
Electronic Case Filing ("ECF") system, but apparently served
on Allstate (and submitted to this Court as a "courtesy
copy") a nonconforming version. (*See* Second Amended
Complaint ("2d Am. Compl."), Ex. A to Declaration
of Eric Andrew Suffin, dated Aug. 5, 2011 ("8/5/11
Suffin Decl.") (Dkt.35); *see also* Service Copy of Second
Amended Complaint ("Served 2d Am. Compl."), Ex. A to
8/5/11 Suffin Decl.) Then, later, in response to the Harris
Defendants' separate motion to dismiss, Plaintiffs filed yet
a third version, styled as an "Alternative Second Amended
Complaint." (*See* Alternative Second Amended Complaint
("Alt.2d Am.Compl."), Ex. A to 11/10/11 Suffin Decl.) With
regard to allegations concerning Allstate, all three versions
differ only slightly from the Amended Complaint, and none of
the versions cure the defects discussed above, as none allege
facts sufficient to show that Harris had apparent authority to
bind Allstate to any of the alleged promises.

In their proposed amended pleadings, Plaintiffs first add an
allegation that, outside Harris's Forest Park office, there were
signs that displayed (1) the Allstate logo, (2) a telephone
number for "Forest Park Allstate," and (3) the names of
both Harris and defendant HFIS. (*See* 2d Am. Compl. at ¶
51; Alt.2d Am. Compl. at ¶ 59; *see also* Served 2d Am.
Compl. at ¶ 48.) Plaintiffs also add a number of allegations
about information available on Allstate's corporate website,
as follows:

- "Defendant Allstate maintains and at other relevant times
  maintained an internet website address accessible to the
  public @ www.allstate.com." (2d Am. Compl. at ¶ 10;
  Alt.2d Am. Compl. at ¶ 16; *see also* Served 2d Am.
  Compl. at ¶ 10.)

- "At defendant Allstate's website and at other websites
  advertising defendant Allstate[,] defendant Allstate
  represents to the public that defendant Allstate offers
  'financial' 'products' or 'services.' " (2d Am. Compl. at
  ¶ 52; Alt.2d Am. Compl. at ¶ 60; *see also* Served 2d Am.

Compl. at ¶ 49 (same, except for omission of reference
to "services").)

- "Initially in 2004 or 2005, in 2006 and in 2007
  before investing with defendants plaintiffs visited
  www.allstate.com and observed that defendant Allstate
  does stocks and investor relations." (2d Am. Compl. at ¶
  59; Alt.2d Am. Compl. at ¶ 67; *see also* Served 2d Am.
  Compl. at ¶ 56 (same except for omission of reference
  to dates).)

- "Between 2005 and 2011 plaintiffs have visited
  the www.allstate.com website many times since first
  observing that defendant Allstate does stocks and
  investor relations." (2d Am. Compl. at ¶ 60; Alt.2d Am.
  Compl. at ¶ 68; *see also* Served 2d Am. Compl. at ¶ 57
  (same except for omission of reference to dates).)

**\*12** Lastly, Plaintiffs add an allegation that their claims
"may be supported by documents, including but not limited
to documents attached as Exhibits A, B, C and D." (2d Am.
Compl. at ¶ 121; Alt.2d Am. Compl. at ¶ 129; *see also* Served
2d Am. Compl. at ¶ 118.) The four referenced exhibits are
attached to all three versions of Plaintiffs' proposed Second
Amended Complaint. Exhibit A is a photograph of a block
of signs. There is a sign for Allstate at the top of the block,
and underneath the Allstate sign is a sign that reads "Harris
Financial Insurance Services, Inc.," with a phone number.
(Ex. A to 2d Am. Compl., Alt.2d Am. Compl.; Served 2d Am.
Compl.) At the lower right of the block, another sign reads
"Allstate Bryan Harris." (*Id.*)

Exhibit B appears to be a series of screen prints of web pages.
(Ex. B to 2d Am. Compl., Alt.2d Am. Compl., Served 2d Am.
Compl.) The first page, which appears to have been taken
from an Allstate website, lists services offered by Allstate.
(*Id.*) The next two pages seem to be results from some type
of Internet search involving Harris and Allstate. (*See id.*)
None of the listed search results are Allstate websites. (*Id.*)
The next several pages include, *inter alia,* a screen print
apparently taken from another Allstate web page, referring to
Harris and stating, in part: "Bryan Harris is licensed to sell
Allstate insurance products only in the state(s) of Georgia.
If you do not reside in the state(s) of Georgia or you're not
insuring property located in the state(s) of Georgia, please
go to the *Find an Agent* section on allstate.com to search for
another agent." (*Id.*) Also included are a number of web pages
taken from non-Allstate websites, such as superpages.com,
insiderpages.com, and citysearch.com, which refer in some
way to Allstate or Harris. (*Id* ) The exhibit also includes

what appears to be a screen print of a webpage from a Bluebox Entertainment website, listing Harris as the CEO and Director of Operations. (*Id.*) The last page of the exhibit appears to be a screen print of an Allstate web page that refers to an individual named Sam Noah, identified on the page as a Personal Financial Representative in New York; this individual is nowhere mentioned in Plaintiffs' Amended Complaint or memoranda. (*See id.*)

Exhibit C is comprised of several email messages, together with two unsigned promissory notes and certain other documents, which seem to have been email attachments. (*See* Ex. C to 2d Am. Compl ., Alt.2d Am. Compl., Served 2d Am. Compl.) The promissory notes, which are the first documents appearing in this exhibit, do not bear Allstate's name or logo, and, while they identify "Samuel's Temple" as the lender, they do not identify the borrower or the guarantor. (*See id.*) At least some of the emails contained in the exhibit seem to be correspondence between Holmes and Harris, and relate to a variety of topics, including "Blue Box Wiring Information," "Life Insurance," "Bishop Long," and "Tax ID Info." (*See id.*) In certain of the emails, Harris is identified as "Director of Operations" of Bluebox. (*See id.*) The entire exhibit seems disjointed, as the pages do not appear to be in any sort of order, and the pages are variously forwards, backwards, right-side-up, and upside-down. (*See id.*) The meaning of the emails themselves is far from clear,[14] and is not explained anywhere by Plaintiffs.[15]

**\*13** Exhibit D contains an assortment of unrelated documents. It includes a copy of a fund transfer application and some documents related to a wire transfer. (Ex. C to 2d Am. Compl., Alt.2d Am. Compl., Served 2d Am. Compl.) None of these documents bear Allstate's name or logo. (*Id.*) Also included in Exhibit D is a single document that appears to be from Allstate, but nearly all of the identifying information is redacted. (*See id.*) This document may be an example of the type of documents regarding other Allstate policyholders that Harris allegedly transferred to Holmes and that Holmes then stored (*see id., see also supra* at 8 and n. 7), as the document does not appear to relate to Holmes or to any member of his family. Also included in Exhibit D are documents related to a criminal case against former Georgia state representative Walter Ronnie Sailor, Jr. (*Id.; see also supra* at 8, and nn. 6, 11.) Exhibit D also includes documents that appear to have been printed from the Georgia Secretary of State's website and contain corporate information regarding the Harris Defendants. (*Id.*) Finally, Exhibit D contains what

appears to be a screen print of a page from a Bluebox website. (*Id.*)

Finally, the version of the proposed Second Amended Complaint that Plaintiffs served, but did not file, contains an Exhibit E, which is comprised of a series of photographs, the subjects of which are barely discernable and are not identified in any way. (Ex. E to Served 2d Am. Compl.)

Nothing contained in any of Plaintiffs' proposed new allegations, or in any of the above-described proposed exhibits, can render Plaintiffs' claims against Allstate viable. If anything, the new allegations detract from, rather than support, Plaintiffs' arguments regarding the potential liability of Allstate in this case. Citing general statements on Allstate's website regarding the nature of its financial services business cannot substitute for pleading affirmative conduct by Allstate that could have led Plaintiffs to believe that Allstate had authorized *Harris* to act as an investment counselor or to plan investments for clients. In fact, to the extent Plaintiffs' proposed exhibits suggest that Allstate, on its website, ever made any mention of Harris, those exhibits suggest only that Harris was licensed by Allstate to sell insurance in the State of Georgia, not to engage in any other business in Allstate's name or on its behalf. Nor can the necessary authority be reasonably inferred from the fact that Harris, who is claimed to have been an Allstate insurance agent, had an "Allstate" sign outside his office. Nor do Plaintiffs' jumbled array of email messages aid them, as none appear to have been sent from any Allstate account; in fact, all of the emails authored by Harris appear to have been sent from his private email accounts, where he identified himself solely as the Director of Operations of Bluebox.

As nothing contained in any version of Plaintiffs' proposed Second Amended Complaint would cure the defects in Plaintiffs' claims against Allstate, I recommend that Plaintiffs' cross-motion for leave to amend, as against Allstate,[16] be denied as futile. Further, as Plaintiffs are apparently unable to plead any factual foundation, whatsoever, for their claim that Harris had apparent authority to act for Allstate, I recommend that Plaintiffs' claims against Allstate be dismissed with prejudice.

## II. *ALLSTATE'S AND PLAINTIFFS' SANCTIONS MOTIONS*

### A. *Applicable Legal Standards*

## 1. *Rule 11*

**\*14** Under Rule 11 of the Federal Rules of Civil Procedure, when an attorney files a complaint, motion, or other written paper, he or she is representing to the Court that, "to the best of [his or her] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, it is not being presented for any improper purpose," Fed.R.Civ.P. 11(b)(1), and that the claims, defenses, and other legal contentions therein "are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," Fed.R.Civ.P. 11(b)(2). Further, in signing the submission, the attorney is representing that, after reasonable inquiry, he or she believes that "the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3).

A party that believes Rule 11 has been violated may move for sanctions. Fed.R.Civ.P. 11(c)(2). Rule 11, however, provides a "safe harbor": the sanctions motion may not be filed with the Court if, within 21 days of service of the motion, the offending party withdraws the challenged claim or appropriately corrects it. *Id.* Thus, the motion—which "must describe the specific conduct" that allegedly violates the Rule—must be served, but not filed until at least 21 days after service. *Id.* It has been noted that this provision of the Rule, which, in "plain language[,] ... expressly requir[es] the serving of a formal motion," exists for "good reason," *Lancaster v. Zufle,* 170 F.R.D. 7, 7 (S.D.N.Y.1996), as it places the movant's adversary on notice of the motion it will face if the matter is not remedied, *see id.* The Rule 11 "safe harbor" requirement is "strictly construed," *Banfield v. UHS Home Attendants, Inc.,* No. 96 Civ. 4850, 1997 WL 342422, at \*2 (S.D.N.Y. June 23, 1997) (JFK) (citing *Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1328 (2d Cir.1995)), and has even been described as "jurisdictional in nature," *R.B. Ventures, Ltd. v. Shane,* No. 91 Civ. 5678(CSH), 2000 WL 1010400, at \*2 (S.D.N.Y. July 20, 2000); *see also ESI, Inc. v. Coastal Corp. .,* 61 F.Supp.2d 35, 68 (S.D.N.Y.1999) (where movant had not complied with mandatory "safe harbor" requirement, sanctions motion "must be denied without a discussion of the merits of the motion"). It is an abuse of a court's discretion to impose sanctions under Rule 11, where the Rule's "safe harbor" requirement has not been met. *See Hadges,* 48 F.3d at 1328.

In determining whether a plaintiff has engaged in conduct violating Rule 11's requirements, courts apply an objective standard of reasonableness, and look to see whether the attorney's conduct was objectively reasonable at the time the pleading was signed. *See Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 25 (2d Cir.1995); *Greenberg v. Chrust,* 297 F.Supp.2d 699, 703 (S.D.N.Y.2004). Where a court finds that claims or defenses have been asserted for the sake or harassment or some other improper purpose, or that they lack any evidentiary support, a court has the discretionary authority under Rule 11(c) to impose monetary sanctions on either the offending party or its counsel, or both. *Morley v. Ciba–Geigy Corp.,* 66 F.3d 21, 24 (2nd Cir.1995). Where the violation is the assertion of an unwarranted legal claim or defense, however, a court may only impose monetary sanctions against counsel, not the represented party. Fed.R.Civ.P. 11(c)(5)(A). A court may also "award to the prevailing party the reasonable expenses, including attorney's fees, incurred for the motion," Fed.R.Civ.P. 11(c) (2); such an award may be made against either a party or its counsel, *see* Fed.R.Civ.P. 11(c)(5); *see also Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1474 (2d Cir.1988) (holding that Rule 11 sanctions may be imposed upon a represented party when the party "had actual knowledge that filing the paper constituted wrongful conduct, *e.g.* the paper made false statements or was filed for an improper purpose."), *rev 'd on other grounds by Pavelic & LeFlore v. Marvel Entertainment Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989).

**\*15** The 1993 Advisory Committee Note to Rule 11 sets forth certain factors that may be considered by the court when deciding whether to impose sanctions or what sanctions are appropriate in the given circumstances. Those factors include: (1) "[w]hether the improper conduct was willful, or negligent"; (2) "whether it was part of a pattern or activity, or an isolated event"; (3) "whether it infected the entire pleading, or only one particular count or defense"; (4) "whether the person has engaged in similar conduct in other litigation"; (5) "whether it was intended to injure"; (6) "what effect it had on the litigation process in time or expense"; (7) "whether the responsible person is trained in the law"; (7) "what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case"; and (8) "what amount is needed to deter similar activity by other litigants." Fed.R.Civ.P. 11 advisory committee note to 1993 amendments; *see also, e.g., Kochisarli v. Tenoso,* No. 02 Civ. 4320, 2006 WL 721509, at \*8 (E.D.N.Y. Mar.21, 2006) (applying factors, and citing *Simpson v. Putnam County Nat. Bank of Carmel,* 112 F.Supp.2d 284, 291–92 (S.D.N.Y.2000)).

#### 2. *The Court's Inherent Authority*

A court's inherent authority to award attorneys' fees and costs derives from "a court's need to manage its affairs so as to achieve an orderly and expeditious resolution of cases." *Bowler v. U.S. Immigration and Naturalization Service,* 901 F.Supp. 597, 605 (S.D.N.Y.1995). Attorneys' fees may be imposed if a party has continued an action "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* (internal citations omitted). The Second Circuit has reasoned that sanctions under the court's inherent authority should be based on findings that the offending party has asserted colorless claims and has acted in bad faith. *See Eisemann v. Green,* 204 F.3d at 396. [17]

#### B. *Allstate's Motion for Sanctions*

Allstate's motion for Rule 11 sanctions against Plaintiffs and their counsel, Suffin, was properly made and demonstrates that sanctions are warranted, as against Suffin.

#### 1. *Plaintiffs' Failure To Take Advantage of Rule 11's "Safe Harbor"*

As a preliminary matter, Allstate complied with the procedural requirements of Rule 11(a). On June 14, 2011, Allstate sent Suffin a letter, which outlined Plaintiffs' pleading deficiencies in detail, and requested that Plaintiffs voluntarily withdraw the Amended Complaint. (Letter from Allstate to Suffin, dated June 14, 2011, Ex. C to Declaration of Elizabeth D. Schrero in Support of Motion of Defendant the Allstate Corporation for Sanctions Under Rule 11, dated July 29, 2011 ("2/29/11 Schrero Decl.") (Dkt.28).) Counsel for Allstate and Suffin then participated in a telephone conference on June 16, 2011, during which Allstate's counsel reiterated her request for Plaintiffs to withdraw the Amended Complaint. (*See* Memorandum of Law in Support of the Motion of Defendant the Allstate Corporation for Sanctions under Rule 11, dated July 29, 2011 ("Allstate's Sanctions Mem."), (Dkt.29) at 3.) In response, Suffin apparently requested that Allstate consent to an amendment of Plaintiffs' pleadings. (*Id.*) Counsel for Allstate refused to consent without first being presented with any evidence that supported Plaintiffs' claims against Allstate, but told Suffin that, before proceeding with motion practice, she would consider any evidence he could show her that could support Plaintiffs' claims. As AUstate's counsel describes their conversation, she asked Suffin to "come forward with *any* support/evidence of a factual basis for an allegation that Allstate made representations to Plaintiffs concerning Harris' scope of authority in connection with the funds Plaintiffs allegedly sent to Harris and Harris' alleged investment schemes." (*Id.*) (emphasis in original). AUstate's counsel also sent Suffin a letter memorializing their June 16, 2011 telephone conference. (*Id.* at 4.)

**\*16** When Plaintiffs neither withdrew the Amended Complaint nor came forward with any support for their allegations against Allstate, Allstate filed its motion to dismiss on June 28, 2011. (*Id.*) Allstate also prepared a motion for sanctions, which, in accordance with Rule 11(c)(1)(A), it served on Plaintiffs on July 6, 2011 (together with a "safe harbor" letter), but did not file. (*See* Letter from Allstate to Holmes, dated July 6, 2011, Ex. F to July 29 Schrero Decl.) When Plaintiffs did not withdraw their claims within 21 days, Allstate proceeded to file its sanctions motion with the Court. (*See* Allstate's Sanctions Motion.) Accordingly, Allstate's sanctions motion is properly before the Court, and the Court must now determine whether sanctions are justified, and, if so, whether sanctions should be imposed against Plaintiffs, Suffin, or both.

#### 2. *The Relevant Factors Weigh in Favor of Sanctioning Plaintiffs' Counsel.*

On balance, the relevant factors suggest that the imposition of sanctions against Suffin (although not Plaintiffs) would be appropriate in this case. In this regard, the Court notes that the core deficiency in the Amended Complaint is the assertion of claims against Allstate that are not warranted based on the law, a matter that falls under Rule 11(b)(2). Under this section, as noted above, Rule 11 sanctions against a party may not be imposed; such sanctions, where warranted, may only be imposed on counsel. *See Morley,* 66 F.3d at 24.

This case actually began with the filing of a *pro se* Complaint by Holmes. When Suffin then appeared on behalf of Holmes and the Church, Suffin proceeded to file an Amended Complaint. Instead of substantively revising Holmes' pleading, though, Suffin signed and filed an amended pleading that adopted the same flawed theory as Holmes' original *pro se* pleading, as to the claimed liability of Allstate. In other words, in his role as counsel, Suffin appears to have done nothing to disabuse Holmes of the notion that he had viable claims against Allstate for, *inter alia,* conversion and fraud, based solely on Harris's conduct and alleged representations; rather Suffin simply filed a revamped version of the same flawed allegations against Allstate. In fact, the Amended Complaint increased the damages originally claimed by Holmes from $3 million to $10 million (sought "jointly and severally" from each defendant), with

an unspecified part of that sum purportedly representing damages for the death of a Church member. (Am. Compl. at ¶ 94.) Nowhere does the Amended Complaint explain how Holmes and the Church could have standing to seek damages for a congregant's death, much less how Allstate could possibly be responsible for that death.

While this Court cannot conclude that Suffin filed the Amended Complaint in bad faith, *i.e.,* with the deliberate intent to harass Allstate or to cause it harm, it appears that, at a minimum, he failed to give adequate counsel to his clients. Further, even if not "willful," Suffin's decision to adhere to his client's former position (and even to expand it) in the face of Allstate's repeated efforts to point out the obvious legal flaws in those claims was at least reckless. While this litigation is still in an early stage, it is also worth emphasizing that Suffin not only filed an Amended Complaint that contained no allegations capable of supporting Plaintiffs' claims against Allstate, but also submitted three versions of a proposed Second Amended Complaint that are equally deficient. As discussed below, Suffin also met Allstate's sanctions motion by filing a procedurally defective and utterly baseless sanctions motion of his own, against Allstate. (*See* discussion *infra,* at 34–39.) This is sufficient to show a pattern of frivolous filings. *See Kochisarli v. Tenoso,* No. 02 Civ. 4320(DRH)(MLO), 2006 WL 721509, at *8 (E.D.N.Y. Mar. 21, 2006) (imposing sanctions under Rule 11 for, *inter alia,* "submitting essentially the same indecipherable set of counterclaims for a third time").

 **\*17** Moreover, this is not the first time that Suffin has been criticized by the Court for filing a frivolous pleading. In *Bibb v. New York City Housing Authority,* 09 Civ. 9956(NRB), 2010 WL 3958646 (S.D.N.Y. Sept. 30, 2010), as Allstate points out (*see* Allstate's Sanctions Mtn. at n. 5.), Suffin received a warning from the Honorable Naomi Reice Buchwald, U.S.D.J., for filing a complaint that the Court found "wholly lacking in merit, even if every fact in the complaint and supporting affidavit [were] accepted as true." (*Id.* at *6.) Judge Buchwald acknowledged that the defendant's Rule 11 motion—brought against Suffin, his law firm, and plaintiff for filing "baseless and frivolous" claims— was "not unwarranted," but "given Suffin's recent admission to the bar," she "hope[d] a word of caution [would] be sufficient to encourage him to be more circumspect before commencing other actions." (*Id.* at *6–7.) She cautioned:

> We wish to stress to Suffin that it is part of his function as an attorney, when appropriate, to explain to his client that she does not have a legitimate legal claim. Such action may assist the client in appreciating the situation in which she finds herself ... We are hopeful that Suffin will use better judgment in the future.

(*Id.* at *7.) [18] It does not appear that Suffin took the Court's "word of caution" to heart, in this case. Further, while Judge Buchwald noted, in her 2010 opinion, that Suffin was "recently admitted to the bar," he now holds himself out as having been in practice for four years and as having handled matters in a wide range of practice areas. [19] At this point, there is less reason to be forgiving of Suffin's unwillingness or inability to educate and guide his clients when they lack a legitimate claim.

In addition, the pleading defect at issue here—the lack of any allegations capable of supporting a legal claim against Allstate—infected Plaintiffs' entire pleading, as to Allstate. Suffin's filing of a deficient pleading, and equally deficient proposed amended pleadings has also slowed the litigation and necessitated the expenditure of both time and money by Allstate to move against Plaintiffs' claims and to oppose his futile cross-motion to amend.

All of these factors suggest that, while (in the absence of a showing of bad faith) the Court should not exercise its inherent authority to sanction Suffin, at least some Rule 11 sanction would be warranted here. The Court notes, however, that Suffin is a solo practitioner, who may not have significant resources to pay a substantial sanctions award. It is difficult for the Court to determine, without additional information, the amount of a sanctions award that would be needed to deter Suffin from further Rule 11 violations, or, by extension, to deter similar activity by others. This Court will return to this question after first addressing the merits of Plaintiffs' sanctions motion against Allstate, given that Allstate is not only seeking sanctions on its own motion, but is also seeking sanctions for having to oppose Plaintiffs' motion.

### C. Plaintiffs' Sanctions Motion Against Allstate

**\*18**  After Allstate moved for Rule 11 sanctions against Plaintiffs and their counsel, Plaintiffs filed a Rule 11 motion against Allstate. Unlike Allstate's motion, however, Plaintiffs' motion was not properly made, and should not be considered by the Court because of its procedural defects. In any event, even if the Court were to consider the motion, it should be denied as wholly lacking in merit. Indeed, Plaintiffs' sanctions motion is itself frivolous.

### 1. *Plaintiffs' Failure To Satisfy the Procedural Requirements of Rule 11*

On August 22, 2011, Plaintiffs sent a letter to Jay Cho, Esq. ("Cho"), counsel for Allstate, stating that Allstate had violated Rule 1*l*(b)(b)(3). (*See* Letter from Suffin to Cho, dated Aug. 22, 2011 ("8/22/11 Suffin Ltr."), Ex. A to Declaration of Eric Andrew Suffin in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011 ("9/30/11 Suffin Decl.") (Dkt.52) .) This is the provision of Rule 11 under which an attorney is supposed to certify to his or her reasonable, informed belief that "the factual contentions [made in a pleading or other written submission] have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P. 11(b)(3). Here, Suffin's August 22 letter listed certain statements from submissions made by Allstate and, without any elaboration or explanation, merely claimed that the statements were false and without evidentiary support. The letter only stated that, "[p]ursuant to Fed.R.Civ.P. 11(c) and for the specific reasons described below, we request that the parts of the memos and Declaration in violation of Fed.R.Civ.P. 11(b)(3) be withdrawn or appropriately corrected within 21 days or within some other time set by the court." (8/22/11 Suffin Ltr., at 1–2.) The letter did not explicitly state that Plaintiffs were going to file a sanctions motion, and it did not enclose a copy of any sanctions motion.

On August 30, 2011, Suffin wrote another letter to Cho. (Letter from Suffin to Cho, dated Aug. 30, 2011 ("8/30/11 Suffin Ltr."), Ex. B to 11/30/11 Suffin Decl.) The language of the August 30 letter mirrored the language of the August 22 letter, but also complained of additional statements by Allstate. (*See* 8/30/11 Suffin Ltr., at 2.) Like the earlier letter, the August 30 letter did not explicitly state that Plaintiffs were going to file a sanctions motion and it did not include a copy of the sanctions motion that was eventually filed by Plaintiffs. (*Id.*) As explanation for the request to withdraw the listed statements, Suffin merely wrote that they did "not have

evidentiary support as required by Fed.R.Civ.P. 11(b)(3) and were false." (*Id.*)

Plaintiffs then went ahead and filed their Rule 11 motion on September 30, 2011, in disregard of the "safe harbor" procedural requirements set out in the Rule. Although Plaintiffs now ask the Court to "treat the August 22, 2011 and August 30, 2011 letters ... as fulfilling Plaintiffs' requirement to serve the Rule 11 Motion twenty one (21) days before presenting it to the Court" (Plaintiffs' Memorandum of Law in Further Support of Plaintiff's Motion for Rule 11 Sanctions, dated Oct. 24, 2011 ("Pl. Reply to Pl. Sanctions Mtn.") (Dkt.59), at 2), this Court has repeatedly refused to impose sanctions based on mere warning letters, even where the challenged conduct was sanctionable. *See Gamla Enterprises North America, Inc. v. Lunor–Brillen Design U. Vertriebs GMBH,* No. 98 Civ. 992, 2000 WL 193120, at \*3 (S.D.N.Y. Feb.17, 2000) (denying meritorious Rule 11 motion where warning to offending party was given by letter alone, even where warning letter "conformed to the spirit of the rule"); *see also Diamonds.net LLC v. Idex Online, Ltd.,* 254 F.R.D. 475, 476–77 (S.D.N.Y.2008) (finding that a warning letter does not satisfy the Rule 11 requirement of serving a formal motion); *Weeks Stevedoring Co. Inc. v. Raymond Int'l Buildiers, Inc.,* 174 F.R.D. 301, 305 (S.D.N.Y.1997) (same); *Bellistri v. US,* No. 94 Civ. 3768(KMW), 1997 WL 115545, at \*3 (S.D.N.Y. Mar.14, 1997) (same); *Gal v. Viacom International, Inc.,* 403 F.Supp.2d 294, 309 (S.D.N.Y.2005) (same); *Schweizer v. Mulvehill,* 93 F.Supp.2d 376, 413 (S.D.N.Y.2000) (same). [20]

**\*19**  Accordingly, based on the express language of Rule 11 and this Court's precedent, Plaintiffs' sanctions motion should be denied as procedurally defective.

### 2. *Plaintiffs' Motion Is Also Meritless*

In any event, even if Rule 11's procedural requirements could be deemed satisfied by the service of Suffin's warning letters, Plaintiffs' sanctions motion would completely fail on its merits, as it does nothing more than catalog five statements made at various points, by Allstate or its counsel, and assert—without any explanation-that these statements lack evidentiary support. (Plaintiffs' Memorandum of Law in Support of Plaintiffs' Motion for Rule 11 Sanctions, dated Sept. 30, 2011, ("Pl. Sanctions Mem.") (Dkt.53), at 2.) The challenged Allstate statements are as follows:

(1) "... Holmes is claiming to be in wrongful possession of confidential documents belonging to Allstate (which, if true, would have been taken without Allstate's

authorization), the reference to those documents can have no purpose other than to attempt to prompt a settlement offer from Allstate." (Memorandum of Law in Support of the Motion of Defendant the Allstate Corporation To Dismiss the Amended Complaint as Against the Allstate Corporation, dated June 28, 2011 ("Allstate Mtn.–To–Dismiss Mem.") (Dkt.20), at 22, n. 7.)

(2) "... where, as here, the Plaintiff's attorney: (1) has advanced meritless factual allegations that have no evidentiary support; and (2) has failed to investigate the law before bringing an action and filing and serving a complaint that fails woefully to comply with the well established pleading requirements of the FRCP, Allstate must turn to Rule 11 for legal recourse." (Allstate Sanctions Mem. at 1.)

(3) "... there is no good faith basis for Plaintiffs to proceed with the instant action against Allstate." (Id.)

(4) "The obvious frivolity of the Complaint ..." (Id.)

(5) "A copy of a black-lined version of the Proposed Second Amended Complaint showing a comparison against the Complaint, dated August 3, 2011, is attached hereto as Exhibit 'A.' " (Declaration of Elizabeth D. Schrero in Further Support of Motion of Defendant the Allstate Corporation To Dismiss the Amended Complaint and in Opposition to Plaintiffs' Cross–Motion for Leave To Amend Their Amended Complaint, dated Aug. 19, 2011 (Dkt.45), ¶ 2.)

(Id. at 2–3.)

Most of these statements-including statements that Plaintiffs' counsel failed to comply with pleading requirements, lacked good faith in proceeding with unsupported claims against Allstate, and filed an obviously frivolous pleading—are in the nature of arguments advanced on Allstate's motions to dismiss and for sanctions. As they are not "factual contentions," these statements are not even not covered by the provision of Rule 11 on which Plaintiffs rely for their sanctions motion. (See Plaintiffs' Sanctions Mem. at 2 (citing Fed.R.Civ.P. 11(b)(3).) Moreover, for the reasons discussed above, this Court generally agrees that Plaintiffs' claims against Allstate *were* unsupported and frivolous.

**\*20** To the extent Plaintiffs complain about Allstate's supposition that Plaintiffs may have been attempting to exact a settlement from Allstate by referring to Holmes' cache

of confidential Allstate documents, this Court also agrees that this is how Plaintiffs' conduct appeared; indeed, on this subject, Plaintiffs' counsel himself made statements to the Court that lend credence to Allstate's stated concerns. During a case management conference on July 26, 2011, Allstate's counsel told the Court that she had spoken with Suffin about the confidential documents, and that Suffin had demanded $30,000 for the transfer of the documents to Allstate. (July 26, 2011 Rule 16 Conference Transcript, at 10, Ex. D to 10/17/11 Schrero Decl.) Suffin said that counsel had misunderstood his statements, and that he had only "discussed that there may be a dollar amount that would be involved in the transfer." (Id. at 12.) Nonetheless, Suffin did not deny that he had mentioned the $30,000 figure to Allstate's counsel in their conversation (see id. at 13), and when asked by the Court why Holmes even had possession of Allstate documents bearing confidential, personal information of policyholders, Suffin repeatedly expressed his understanding that Holmes believed the documents were "collateral" for his investments. (See id. at 12, 13, 14.) Under the circumstances, Allstate's suggestion that Holmes may have been trying to "prompt a settlement offer" is hardly unsupported.

Finally, the Court could not even discern what Plaintiffs were complaining about, with regard to Allstate's proffered black-lined version of the proposed Second Amended Complaint until Plaintiffs argued, on reply, that Allstate's black-lining did not incorporate the exhibits attached to the proposed amended pleading. (See Pl. Reply to Pl. Sanctions Mtn. at 5.) Plaintiffs' contention on this point is patently frivolous. A black-lined document is intended to track changes made in the text of a document, and Plaintiffs apparently have no quarrel with whether Allstate accurately tracked any proposed modifications to their original allegations. Moreover, Allstate's black-lined document, submitted for the convenience of the Court, shows that exhibits were added to the proposed Second Amended Complaint. (See Ex. A to 8/19/11 Schrero Decl., ¶¶ 48 (highlighting addition of reference to Ex. A), 118 (highlighting addition of allegation that "Plaintiff's causes of action may be supported by documents, including but not limited to documents attached as Exhibits A, B, C and D").)

As Plaintiffs have not demonstrated that a single statement made by Allstate was, in fact, either false or unsupported, Plaintiffs' sanctions motion cannot succeed, even apart from its procedural flaws. To the contrary, it is a plainly meritless motion, and Allstate legitimately asks that Plaintiffs or their counsel be made to bear Allstate's fees and costs in having

to respond to it. (*See* Defendant The Allstate Corporation's Memorandum of Law in Opposition to Plaintiffs' Motion For Sanctions Under Rule 11, dated Oct. 17, 2011 (Dkt.58), at 16; *see also* Fed.R.Civ.P. 11(c) (2) (allowing a court to award the fees and costs of a sanctions motion to the prevailing party).)

#### D. *Appropriate Sanctions Award in This Case*

**\*21** Based on the flaws in Plaintiffs' pleaded claims against Allstate, the fact that Plaintiffs, through counsel, insisted on proceeding with these defective claims despite notice of the defects, and the fact that Allstate has, as a result, incurred fees and costs in what should have been unnecessary motion practice, I recommend that sanctions be awarded in Allstate's favor, and that the award be made against Suffin, as counsel.

As noted above, however, the Court is not currently in a position to determine the appropriate amount of a monetary sanction, given that it lacks information regarding Suffin's financial circumstances. Accordingly, I recommend that Allstate be directed to submit to the Court an itemized statement of the attorneys' fees and costs it incurred on its motion to dismiss, as well as on both of the sanctions motions, and that Suffin be directed to submit a sworn affidavit or declaration made under penalty of perjury, setting out the net income earned by his law practice over the past 12 months. I further recommend that Suffin be required, under Rule 11(c), to pay to Plaintiffs the reasonable fees and expenses incurred in filing or opposing the referenced motions, up to a cap of 10 percent of the annual net income received from his law practice, as reflected in his financial affidavit or declaration. *See Weinraub v. Glen Rauch Securities, Inc.,* 419 F.Supp.2d 507, 520 (S.D.N.Y.2005) (noting that under Rule 11, a court must consider the financial circumstances of the sanctioned party); *see also Association of Holocaust Victims for Restitution of Artwork and Masterpieces v. Bank Austria Creditanstalt AG,* No. 04 Civ. 3600(SWK), 2005 WL 3099592, at \*8 (S.D.N.Y. Nov.17, 2005) ("As a final matter of the [Rule 11] sanctions determination, courts must take into account the financial circumstances of the sanctioned party." (citing *Sassower v. Field,* 973 F.2d 75, 81 (2d Cir.1992)); *Anschutz Petroleum Marketing Corp. v. E.W. Saybolt & Co., Inc.,* 112 F.R.D. 355, 357 (S.D.N.Y.1986) (finding that "adequate deterrence may permissibly fall short of full compensation," and that the court has the discretion to fashion a Rule 11 sanction for purposes of deterrence which awards part, but not all, of the opposing party's attorney's fees); *Becker v. Dunkin' Donuts of America, Inc.,* 665 F.Supp. 211, 217–18 (S.D.N.Y.1987) (taking into

consideration offending litigant's ability to pay, even though sanctions were fully warranted).

### III. *THE HARRIS DEFENDANTS' MOTION TO DISMISS*

As noted above (*see* n. 2, *supra*), the Harris Defendants never properly filed their motion to dismiss on the Court's ECF system, and the Court would be entitled to reject the motion on that basis. I do not recommend this, however, as some of the pleading issues raised by the motion are significant, and, for the sake of efficient case management, it would be preferable to resolve those issues as early as possible. For this reason, this Court has considered the merits of the Harris Defendants' motion.

#### A. *Applicable Legal Standards*

**\*22** The standards governing motions to dismiss brought under Rule 12(b)(6) of the Federal Rules of Civil Procedure are set forth in connection with this Court's discussion of Allstate's motion to dismiss. (*See supra,* at 12.) Additionally relevant to the Harris Defendants' motion are Rules 8(a) and 9(b), which address the question of how specific a plaintiff's allegations must be.

Rule 8(a) states that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under this Rule, a pleading "does not have to set out in detail the facts on which the claim for relief is based, but must give the court and the defendant fair notice of what [the] plaintiffs claim is and the grounds upon which it rests." *Owens v. Suter,* 02 Civ. 8198(SHS), 2003 WL 942554, at \*1 (S.D.N.Y. Mar. 7, 2003) (internal citations and quotations omitted); *see Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("The statement should be plain because the principal function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted."). Rule 8(a) is violated where a plaintiff, by engaging in "group pleading," fails to give each defendant fair notice of the claims against it. *Pierson v. Orlando Regional Healthcare Systems, Inc.,* 619 F.Supp.2d 1260, 1273 (M.D.Fla.2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy the "fair notice" requirement of Rule 8).

Rule 9(b) requires a party to "state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b). To state a claim for fraud under New York law, a party

must plead that: (1) the defendant(s) made a material false representation or omission, (2) the defendant(s) intended to defraud the plaintiff(s) thereby, (3) the plaintiff(s) reasonably relied upon the representation, and (4) the plaintiff(s) suffered damage as a result of this reliance. *Banque Arabe et Internationale D'Investissement v. Md. Nat'l Bank,* 57 F.3d 146, 153 (2d Cir.1995) (relying on New York law) (citations omitted). To satisfy the Rule 9(b) pleading requirements, a complaint alleging fraud must: "(1) specify the statement [or omissions] that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements [or omissions] were made, and (4) explain why the statements [or omissions] were fraudulent. *Scantek Medical, Inc. v. Sabella,* 583 F.Supp.2d 477, 493 (S.D.N.Y.2008) (internal quotations and citations omitted).

In addition, a fraud complaint must also "allege facts that give rise to a strong inference of fraudulent intent," which may be accomplished "(a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.* Motive involves "concrete benefits that could be realized by one or more of the false statements ... alleged" and opportunity is shown by "the means and likely prospect of achieving concrete benefits by the means alleged." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1129 (2d Cir.1994). To allege conscious misbehavior or recklessness, "the Complaint must link the misleading statement with facts that give rise to an inference that the speaker had a basis for knowing it was false." *Shahzad v. H.J. Meyers & Co.,* 923 F.Supp. 57, 60 (S.D.N.Y.1996) (citations omitted).

**\*23** Rule 9(b) also requires plaintiffs to "connect the allegations of fraud to each individual defendant." *Trustees of Plumbers and Pipefitters Nat. Pension Fund v. De–Con Mechanical Contractors, Inc.,* 896 F.Supp. 342, 347 (S.D.N.Y.1995); *see also Mills v. Polar Molecular Corp.,* 12 F.3d 1170, 1175 (2d Cir.1993) ("Rule 9(b) is not satisfied where the complaint vaguely attributes the alleged fraudulent statements to 'defendants.' "). Plaintiffs alleging fraud "may not rely on sweeping references to acts by all or some of the defendants because each named defendant is entitled to be apprised of the facts surrounding the alleged fraud." *Trustees of Plumbers and Pipefitters Nat. Pension Fund,* 896 F.Supp. at 347. Further, the allegations must demonstrate that "each [d]efendant had a specific intent to defraud either by devising, participating in, or aiding and abetting the scheme." *Id.*

The pleading requirements of Rule 9(b) apply both to fraud claims and to "other claims that are premised on fraud." *Daly v. Castro Llanes,* 30 F.Supp.2d 407, 414 (S.D.N.Y.1998) (citing *O'Brien v. Nat'l Property Analysts Partners,* 936 F.2d 674, 676 (2d Cir.1991)). The particularity requirements of Rule 9(b) also apply to negligent misrepresentation claims. *In re Marsh & McLennan Cos. Sec. Litig.,* 501 F.Supp.2d 452, 495 (S.D.N.Y.2006) ("Negligent misrepresentation claims must be pleaded with particularity pursuant to Rule 9(b)."). Accordingly, Plaintiffs' claims of fraud, negligent misrepresentation, and violation of New York York Debtor and Creditor Law § 276 are all subject to Rule 9(b)'s pleading requirements. *See also In re Sharp Intern. Corp.* 403 F.3d 43, 54 (2d Cir.2005) (noting that New York Debtor and Creditor Law § 276 must be pleaded with specificity, under Rule 9(b)).

## B. *Adequacy of Plaintiffs' Allegations Against the Harris Defendants*

In their motion to dismiss, the Harris Defendants argue, first, that Holmes does not have authority to speak for Samuel's Temple and thus lacks "standing" to assert claims on the Church's behalf. Second, the Harris Defendants argue that Plaintiffs' claims as to them fail under Rules 8(a), 9(b), and 12(b)(6) of the Federal Rules of Civil Procedure. While their asserted "standing" argument appears misplaced, the Harris Defendants' arguments for dismissal of the Amended Complaint on the basis of pleading deficiencies are persuasive.

### 1. *Propriety of Naming Samuel's Temple as a Plaintiff*

As an initial matter, the Harris Defendants contend that Samuel's Temple is not controlled by Holmes and that the Church itself never assented to bringing this action. (*See* Harris Defs. Mem., at 6; *see also id.,* at 8 (stating that Holmes "has no authority whatsoever to bring this lawsuit on behalf of the Church").) Rather, the Harris Defendants assert that the person with authority to act for the Church is Shirley Holmes Sulton ("Sulton"), Senior Pastor (and purportedly the only pastor) of Samuel's Temple and Harris's mother, who, they contend, has not authorized this lawsuit. (*Id.*) In support of their position on this point, the Harris Defendants attach a declaration of Sulton, in which she states:

> **\*24** My son Tyrone is not the pastor, nor has he ever been the pastor of Samuel's Temple. Furthermore, he has no executory or signatory

powers associated with the church. I maintain and control all financial matters concerned with the church. Neither the church nor I have instituted any lawsuit or proceedings against Mr. Bryan Michael [Harris]. Any monies that I have sent to Mr. Bryan Michael Harris, whom I consider a loyal and committed son, are personal matters between Mr. Harris and me. I am not, nor will I become a party to the current lawsuit fostered by my son against Mr. Harris. Samuel's Temple COGIC is also not a party to the suit. My son, Tyrone, does not possess the signatory powers of the church to institute a suit against Mr. Harris.

(Declaration of Frank Wheaton in Support of Defendants' Motion to Dismiss the Amended Complaint of Plaintiffs, dated Oct. 10, 2011 ("Wheaton Decl.") (Dkt.56), at Ex. C (Declaration of Shirley Holmes–Sulton, dated Aug. 12, 2011 ("Sulton Decl.")), at 1.) The Harris Defendants also appear to contend that the funds at issue in this case are *Church* funds, and that Holmes has no personal standing to assert claims for recovery of those funds. (*See* Harris Defs. Mem., at 8–9.)

In response to these arguments, Plaintiffs submit certain documents purporting to show the Church's authorization for the suit. (*See* 11/10/11 Suffin Decl., at Ex. C (email from Sulton to Holmes, dated Oct. 18, 2011, and attachment), Ex. D (Resolution and Minutes of Special Meeting of the Samuel Temple Church of God in Christ, Inc.).) Plaintiffs also submit their proposed "Alternative Second Amended Complaint" in response to the Harris Defendants' arguments. (Alt.2d Am.Compl.)

Given that Samuel's Temple has itself been named as a plaintiff in this case and is asserting claims on its own behalf, it is evident that the Harris Defendants' argument regarding the Church is not appropriately styled as a "standing" argument. Certainly, the Church would be a real party in interest to a dispute over the disposition of Church funds. What the Harris Defendants actually argue, with respect to the Samuel's Temple, is that whoever purported to act on its behalf in authorizing this lawsuit was without power to do so. As shown by the parties' competing submissions, this raises an issue of fact that cannot be resolved without a more complete record.

As for the Harris Defendants' seeming argument that Holmes has no standing to challenge the alleged conversion of funds belonging to the Church, it is unclear whether Holmes may be claiming any personal interest in the money, or, alternatively, whether he may be seeking to proceed as a third-party beneficiary to agreements allegedly made between the Church and any of the Harris Defendants regarding the use of the funds in question. For example, while Holmes may have never had a right to direct Harris to purchase a home for him with Church money, if this was something that Harris promised to Samuel's Temple, and Holmes stood to benefit from the purchase, then he may have standing to assert claims against Harris in his own right, for breach of that promise. Moreover, several of the allegations in the Amended Complaint, while confusing because they draw no clear distinction between the two plaintiffs, appear to relate to personal claims by Holmes. For instance, Holmes seems to claim that Harris promised him employment at Bluebox, and then reneged on that promise. Regardless of the viability of such claims, there seems to be little question that Holmes would have a personal stake in their outcome.

**\*25** For these reasons, the Harris Defendants' challenge to Plaintiffs' "standing" should be rejected at this time, without prejudice to raise the issue again at a later juncture, on a clearer pleading and a more complete record, should the case proceed.

### 2. *Sufficiency of Pleading Under Rules 8(a) and 9(b)*

The Harris Defendants are more persuasive in their argument that the Amended Complaint fails to satisfy the pleading requirements of Rules 8(a) and 9(b). The most glaring defect, under both rules, is Plaintiffs' pervasive "group pleading," both with respect to (a) the injuries sustained by "plaintiffs" (referred to collectively) and (b) the alleged misconduct of "defendants" (also referred to collectively). As to the former, as noted above, the Amended Complaint fails to specify whether Holmes entrusted any of his own money to any defendant, and, if not, the nature of the consideration he may have provided for any promises made to him personally. As to the latter, it appears that Plaintiffs or their counsel may have simply conducted an online search for companies of which Harris was an officer (*see* Ex. D to proposed 2d Am. Compl.), and then named those companies as additional defendants without any knowledge or information as to what

role, if any, each of them may have played in the transactions alleged.

Plaintiffs' failure to differentiate among the Harris Entities, so as to allege the nature of each particular defendant' misconduct, has resulted in a failure by Plaintiffs to give each defendant "fair notice" of Plaintiffs' claims and "the grounds upon which [they] rest[ ]," as required by Rule 8(a). *Owens,* 2003 WL 942554, at *1 (internal citations and quotations omitted). For essentially the same reason, and as the Amended Complaint also wholly fails to particularize any statements by Defendants that were allegedly false or misleading, Plaintiffs have grossly violated Rule 9(b), as well. *See Trustees of Plumbers and Pipefitters Nat. Pension Fund,* 896 F.Supp. at 347.

As to the Harris Defendants' arguments regarding the independent insufficiency of each of Plaintiffs' claims under Rule 12(b) (6),[21] the vagueness of much of the Amended Complaint makes it difficult for the Court even to consider those arguments. It is impossible to determine, for example, whether Plaintiffs' conversion claim necessarily duplicates their breach-of-contract claim, as the Harris Defendants argue (*see* Harris Defs. Mem., at 15 (citing *Salem v. Software Guidance and Assistance, Inc.,* No. 96 Civ. 8437(AGS), 1997 WL 777402, at *5 (S.D.N.Y. Dec.16, 1997)*)), when the particular contract(s) at issue are not well identified and when the subject of Plaintiffs' claim of conversion may be money, but may also be tangible goods. (*See, e.g.,* Am. Compl. at ¶ 84 (alleging that Defendants "comingled and fraudulently converted plaintiffs' investment capital for defendant Harris's pecuniary gain"); ¶ 80 (alleging conversion of "various personal property owned by plaintiff Holmes, including a rifle, hard drives, two (2) Mackie speakers, video footage, and sound tools essential to plaintiff Holmes's music and television production, documents, video masters, and music masters").)

**\*26** Similarly, the Court cannot discern whether, as the Harris Defendants argue, Plaintiffs' conversion claim is barred by the applicable three-year statute of limitations (*see* Harris Defs. Mem., at 15), given that the Amended Complaint alleges that Harris converted the physical property of Holmes "[a]t some point in 2008" (Am. Compl. at ¶ 80), but does not specify when in 2008 the alleged conversion occurred. Further, to the extent Plaintiffs are claiming the conversion of money, *see, e.g., Ehrlich v. Howe,* 848 F.Supp. 482, 492 (S.D.N.Y.1994) (noting that an action for conversion of money may lie if the pleading alleges that "the money

converted was in specific tangible funds of which the claimant was the owner and entitled to immediate possession"), the Amended Complaint only alleges when certain funds were transferred to the Harris Defendants (*see* Am. Compl. at ¶¶ 55–58, 60), not when any particular acts of conversion occurred.

Because of the significant pleading defects present in the Amended Complaint against the Harris Defendants—defects that are not remedied by any version of Plaintiffs' proposed Second Amended Complaint—I recommend that the Harris Defendants' motion to dismiss be granted under Rules 8(a) and 9(b) of the Federal Rules of Civil Procedure. In this instance, though, I recommend that the dismissal be without prejudice to filing an amended pleading that actually addresses the defects identified herein, as Plaintiffs may have viable claims against Harris and/or one or more of the Harris Entities, for, *inter alia,* misappropriating a large sum of money allegedly entrusted to them. *See* Fed.R.Civ.P. 15(a) (stating that courts "should freely give leave [to amend] when justice so requires"); *Rich v. Maidstone Fin., Inc.,* No. 98 Civ. 2569(DAB), 2001 WL 286757, at *12 (S.D.N.Y. Mar.23, 2001) (holding that leave to amend should be given when the court "cannot determine that the plaintiff could not, under any circumstances, sufficiently allege its claims" (internal quotation marks and citation omitted)).

Finally, given the defects that have, to date, been manifest in each of Plaintiffs' pleadings or proposed pleadings, I further recommend that Plaintiffs and their counsel be strongly cautioned by the Court that, if they choose to proceed with a further amendment, (1) they take care to plead the claims of the Church and of Holmes individually, with allegations that show a basis for each claim, as to the plaintiff asserting it, (2) they not name as a defendant any corporate entity without a good faith basis for believing that the particular entity engaged in any activity that constituted an actionable wrong, and they provide each such defendant with notice of its specific alleged wrongdoing, and (3) they plead all claims falling within the ambit of Rule 9(b) with the particularity necessary to satisfy that Rule's requirements, as described herein.

### CONCLUSION

For all of the foregoing reasons, I respectfully recommend that the Court:

**\*27** (1) grant Allstate's motion to dismiss the Amended Complaint (Dkt.18), with prejudice;

(2) deny Plaintiffs' cross-motion for leave to amend as against Allstate (Dkt.33);

(3) grant Allstate's sanctions motion to the extent it seeks Rule 11 sanctions against Plaintiffs' counsel, and otherwise deny the motion (Dkt.27);

(4) deny Plaintiffs' motion for sanctions against Allstate (Dkt.51);

(5) impose Rule 11 sanctions on Plaintiffs' counsel in the manner set forth *supra* at 39–41;

(6) grant the Harris Defendants' motion to dismiss the Amended Complaint (*see* Dkt. 55), without prejudice; and

(7) afford Plaintiffs 30 days to file a Second Amended Complaint that cures the pleading defects against the Harris Defendants, as discussed herein.

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report to file written objections. *See also* Fed.R.Civ.P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Laura T. Swain, United States Courthouse, 500 Pearl Street, Room 755, New York, New York 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 525, New York, New York, 10007. Any requests for an extension of time for filing objections must be directed to Judge Swain. FAILURE TO FILE OBJECTIONS WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *IUE AFL–CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir.1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir.1988); *McCarthy v. Manson,* 714 F.2d 234, 237–38 (2d Cir.1983).

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 627238

---

## Footnotes

1     The Harris Entities include: Bluebox Entertainment, Inc. ("Bluebox"), Harris Financial, Inc. ("HF"), Harris Financial Insurance, Inc. ("HFI"), B.M. Harris, Inc. ("BMH"), First One Distributors, Inc. ("First"), Associate Management LLC ("Associate"), I Am Global Ent. LLC, a/k/a Attracknaphobia, LLC ("IAGE"), and Harris Financial Insurance Services, Inc. ("HFIS").

2     The Harris Defendants never actually filed a "motion" to dismiss the Amended Complaint; rather, they only filed a memorandum, with two attached declarations, in support of such a motion. The Court's Docket Clerk advised counsel that a memorandum and declarations in support of a motion should not be filed until a formal "motion" had been filed (*see* Docket entries following Dkt. 56), but it does not appear that counsel ever complied with the Court's rules. Nonetheless, given the nature of the arguments raised by the Harris Defendants in their submission, which relate to the adequacy of Plaintiffs' pleading, this Court has determined that it would be in the interest of effective case management to deem that submission a motion and to consider it as such.

3     The Amended Complaint predominately refers to "plaintiffs," without distinguishing between Samuel's Temple and Holmes. (*See generally* Am. Compl.) Similarly, throughout the Amended Complaint, Plaintiffs refer generally to actions of the "defendants," without differentiating among Allstate, Harris, or any of the Harris Entities. (*See generally id.*)

4    Plaintiffs generally allege that they invested approximately $513,000 with Defendants (*id.* at 53), but the more specific allegations concerning Plaintiffs' investments suggest a total of $543,000 (*see id.* at ¶¶ 56–58, 60 (alleging various wire transfers to Bluebox in amounts totaling $500,000); ¶ 61 (alleging cash investment of $15,000); ¶ 55 (alleging downpayment of $28,000 for real estate)).

5    On or about August 17, 2006, Plaintiffs transferred approximately $80,000 to Bluebox; on or about August 21, 2006, Plaintiffs transferred approximately $50,000 to Bluebox; on or about September 12, 2006, plaintiffs transferred approximately $320,000 to Bluebox; and on or about February 3, 2007, Plaintiffs transferred approximately $50,000 to Bluebox. (*See id.* at ¶¶ 56–58, 60.)

6    The Court takes judicial notice of the fact that Walter Ronnie Sailor, Jr., was a Georgia state assemblyman (not a member of the U.S. Congress), who left office after pleading guilty to federal wire fraud and money laundering charges. *See* http://www.justice . gov/usao/gan/press/2008/06–17–08.pdf

7    At the initial case conference before this Court on July 26, 2011, the parties informed the Court that Holmes was in possession of certain Allstate documents, which contained confidential information related to Allstate's current or former policyholders (the "Allstate Documents"). According to Holmes' counsel, these documents had been given to Holmes, years ago, by Harris. (*See* July 26, 2011 Rule 16 Conference Transcript, at 12, Ex. D to Declaration of Elizabeth D. Schrero in Opposition to Plaintiffs' Motion for Sanctions Under Rule 11, dated Oct. 17, 2011 ("10/17/11 Schrero Decl.") (Dkt.57).) The Court directed Holmes to transfer the Allstate Documents to Allstate's counsel, and directed Allstate to maintain these documents in its possession and to preserve them for use as potential evidence in this case. (*See* Scheduling Order, dated Aug. 4, 2011 (Dkt.30).) At the following case conference on November 1, 2011, the document transfer having been made, Allstate's counsel informed the Court that, among the transferred documents were certain documents in which Allstate claimed no interest, and which appeared, on their face, to be documents, such as ledgers, related to the operations of Harris's business(es). This Court directed Allstate to return that subset of the transferred documents (the "Harris Documents") to counsel for Holmes, and directed counsel for Holmes to maintain the Harris Documents as "Attorneys Eyes Only." This Court further directed counsel for Holmes either to deliver copies of the Harris Documents to counsel for Harris or to make the documents available to Harris's counsel for inspection and copying. (*See* Scheduling Order, dated Nov. 4, 2011 (Dkt.61).)

8    Through an apparent filing error, Plaintiffs' opposition memorandum was filed, in various parts, as Docket entries 34, 36 and 38.

9    For example, the Amended Complaint alleges that "Plaintiffs and defendants agreed that plaintiff Holmes would be Chief Executive Officer, Director of Music Production and Video Production, Musician, Webmaster, Digital Music Engineer and Songwriter, of, for and with defendant Bluebox, while living in real estate purchased with plaintiffs' capital ... plaintiff Church to benefit from potential profits of defendant Bluebox, plaintiffs to be 51% stockholders of defendant Bluebox." (*Id.* at ¶ 47.) It is difficult to understand how defendant Allstate could have made such promises. As another example, Plaintiffs allege that "[i]n or about April, 2007 defendants told plaintiffs that defendants sold the mall that defendants' Forest Park, Georgia office was located in ." (*Id.* at ¶ 67.) Construing the term "defendants" to include all of the Harris Entities, as well as Allstate, would make little sense in this instance because defendants Bluebox, HF, HFI, BMH, First, Associate, and IAGE are not alleged to have had any connection to an office in Forest Park, Georgia, nor does it seem likely that these defendants or Allstate would have been involved in the alleged sale of the mall that contained this office. (*See id.* ¶¶ 12–14.)

10   In this diversity action, plaintiff Holmes alleges that he is a New York resident, and Samuel's Temple also appears to be located in New York. (*See* Am. Compl. at ¶¶ 2, 6, 7.) Defendant Harris is alleged to be a resident of Georgia, and the Harris Entities allegedly have principal places of business, or are incorporated, in Georgia. (*See id.* at ¶¶ 11, 12, 14, 23.) Defendant Allstate is alleged to have its principal place of business

in Illinois. (*See id.* at ¶ 9.) The subject matter of the alleged contract(s) at issue was located in Georgia, and the alleged promises seem to have been made while Harris was in his Georgia office. (*See id.* at ¶¶ 37, 38, 54, 79.) Although this could potentially raise choice of law issues, the parties' submissions all cite New York case law. Such "implied consent ... is sufficient to establish choice of law." *Khubani v. Ionic White, Inc.,* No. 05 Civ. 3706(DC), 2008 U.S. Dist. LEXIS 30610, at *3 (S.D.N.Y. Apr. 3, 2008) (citing *In re Tehran–Berkeley Civil & Environmental Engineers,* 888 F.2d 239, 242 (2d Cir.1989)); *see also Global Switching Inc. v. Kasper,* No. CV–06–412 (CPS), 2006 U.S. Dist. LEXIS 44450, at *32 n. 10 (E.D.N.Y. June 29, 2006) ("In any event, where, as here, the parties are silent about the choice of law question, the Court may apply the law of the forum .") (citing *Michele Pommier Models v. Men Women N.Y. Model Mgmt.,* 14 F.Supp.2d 331, 336 (S.D.N.Y.1998)).

11  For example, it is nearly inconceivable that Allstate would have authorized the transfer to Holmes of a large volume of Allstate documents containing confidential information of other policyholders, or that Allstate would —or even could—have authorized the loan of Plaintiffs' funds to a state legislator or the promise of Holmes' employment with Harris's entertainment company.

12  The Amended Complaint alleges, in fact, that a life insurance policy for Holmes and his children was issued (*id.* at ¶ 82), although Plaintiffs do not make clear whether this policy was issued by Allstate or by another carrier.

13  As the Amended Complaint is defective for the reasons stated herein, the Court need not address Allstate's alternative arguments for dismissal.

14  For example, an email dated October 18, 2006, from Shane Moody, of Clayton Signs Inc., to "Ty" (presumably Holmes), states, in part, "Here is the contract for the Allstate location." (*Id.*) Yet Plaintiffs do not identify Clayton Signs Inc., attach the referenced contract, or explain what it is. Another email, dated January 16, 2007, from Harris to "Ty Maximus" (presumably Holmes), states, "U are spending it before we make it you just have to stop taking 25 to 30,000 a month out of the account and you can keep your inheritance! [Y]ou need to stop and think! I will send over the reports!" (*Id.*) Yet another email, from "Ty Maximus," to Harris, which is embedded in an email dated June 12, 2008, states, "Hey Bryan, We are days away from ending this nightmare ... We now have Jews involved in the purchase of the 125 st property ... Br[y]a[ ]n, I need $150.00 to get my Son back home. They are stuck in Columbia SC, with my over due serviced benz ..." (*Id.*)

15  The Court also notes that some of the documents in both Exhibits C and D appear to contain personal identifying information, including financial account numbers and at least one taxpayer identification number. It thus appears that Plaintiffs' counsel has violated Rule 5.2(a) of the Federal Rules of Civil Procedure by filing these exhibits publicly, without appropriate redaction. By separate Order of January 23, 2011, this Court has directed that these exhibits be placed under seal, pending their appropriate re-submission by Plaintiffs, in accordance with the requirements of Rule 5.2.

16  To the extent Plaintiffs seek to amend their claims against the Harris Defendants, Plaintiffs' application is addressed below.

17  "To ensure ... that fear of an award of attorneys' fees against them will not deter persons with colorable claims from pursuing those claims, we have declined to uphold awards under the bad-faith exception absent both clear evidence that the challenged actions are entirely without color, and are taken for reasons of harassment or delay or for other improper purposes and a high degree of specificity in the factual findings of the lower courts." *Eisemann v. Green,* 204 F.3d at 396 (quoting *Dow Chem. Pacific Ltd. v. Rascator Maritime S.A.,* 782 F.2d 329, 344 (2d Cir.1986) (emphasis added) (internal citations, quotation marks, and brackets omitted).

18  Allstate also points out the Court has previously sanctioned Suffin for violating its rules. *See Dvorkin v. New York–Presbyterian Hospital,* 10 Civ. 3680(GBD)(AJP), 2011 WL 280801, at *4 (S.D.N.Y. Jan. 19, 2011)

(affirming, although modifying, sanction imposed by magistrate judge for counsel's failure to bring his client to a settlement conference, as directed by the Court) (cited in Allstate Mem., at n. 5).

19    *See* http://lawyers .law.cornell.edu/lawyer/eric–andrew–suffin–1327035.

20    *But see Jeffreys v. Rossi,* 275 F.Supp.2d 463, 480 (S.D.N.Y.2003) (finding that movant substantially complied with Rule 11 procedural requirements by serving a "detailed letter," with attached evidentiary support).

21    The Court notes that the arguments advanced by the Harris Defendants, with respect to whether Plaintiffs have adequately pleaded the elements of their individual claims, appear to have been copied nearly verbatim from Allstate's memorandum in support of its motion to dismiss. *Compare* Allstate Mtn.–To–Dismiss Mem. at 4–7; 11–22, *e.g., with* Harris Defs. Mem., at 12–14; 14–23.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 5891888
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Andrea LAPIETRA, Individually and as Power
of Attorney, and Deashon Tarver, Plaintiffs,
v.
CITY OF ALBANY POLICE
DEPARTMENT, et al., Defendants.

9:19-CV-1527 (TJM/TWD)
|
Signed 10/05/2020

**Attorneys and Law Firms**

ANDREA LaPIETRA, Plaintiff, pro se, 1030 Washington
Ave. #2, Albany, NY 12203.

DEASHON TARVER, Plaintiff, pro se, Monte Mario Motel,
Room 21, 947 New Loudon Road, Latham, NY 12110.

**REPORT-RECOMMENDATION AND ORDER**

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge

**I. INTRODUCTION**

 **\*1** This action was commenced by two *pro se* plaintiffs,
Deashon Tarver ("Tarver") and Andrea LaPietra ("LaPietra"),
individually and "as Power of Attorney" for Tarver, pursuant
to 42 U.S.C. § 1983 ("Section 1983"). (Dkt. No. 1.) A
complete history of this action to date can be found in the
prior Decisions and Orders of this Court filed on January 15,
2020, February 26, 2020, and April 6, 2020. (*See* Dkt. Nos.
4, 11, 13.) The Court previously granted LaPietra's motion
to proceed *in forma pauperis* and dismissed any claims that
LaPietra asserted on behalf of Tarver. (Dkt. No. 4 at 4-5.)
The Court also directed Tarver to comply with the filing fee
requirements. *Id.*

On May 22, 2020, Tarver complied with the Court's directives
and submitted a motion to proceed *in forma pauperis*
("IFP Application"). (Dkt. No. 20.) Upon review of Tarver's
IFP application, the Court finds that he has demonstrated
sufficient economic need. *See* 28 U.S.C. § 1915(a)(2).
Accordingly, the Court grants Tarver's IFP Application.

The Court shall now consider the sufficiency of the
allegations set forth in the Complaint in light of 28 U.S.C. §
1915(e) and 28 U.S.C. § 1915A. (Dkt. No. 1.) The Court will
also address Tarver's motion to appoint counsel (Dkt. No. 21)
and LaPietra's motion to appoint counsel (Dkt. No. 6), which
was previously held in abeyance. (*See* Dkt. No. 11.)

**II. SUFFICIENCY OF THE COMPLAINT**

 **A. Standard of Review**
Having found that Plaintiffs meet the financial criteria for
commencing this action *in forma pauperis*, and because
Plaintiffs seek relief from an officer or employee of a
governmental entity, the Court must consider the sufficiency
of the allegations set forth in the Complaint in light of 28
U.S.C. §§ 1915(e) and 1915A. [1] Section 1915(e) of Title 28
of the United States Code directs that, when a plaintiff seeks
to proceed in forma pauperis, "the court shall dismiss the case
at any time if the court determines that – ... (B) the action ...
(i) is frivolous or malicious; (ii) fails to state a claim on which
relief may be granted; or (iii) seeks monetary relief against
a defendant who is immune from such relief." 28 U.S.C. §
1915(e)(2)(B). [2]

 **\*2** Similarly, under 28 U.S.C. § 1915A, a court must review
any "complaint in a civil action in which a prisoner seeks
redress from a governmental entity or officer or employee of a
governmental entity" and must "identify cognizable claims or
dismiss the complaint, or any portion of the complaint, if the
complaint ... is frivolous, malicious, or fails to state a claim
upon which relief may be granted; or ... seeks monetary relief
from a defendant who is immune from such relief." 28 U.S.C.
§ 1915A(b); *see also Carr v. Dvorin*, 171 F.3d 115, 116 (2d
Cir. 1999) (per curiam) (noting that Section 1915A applies to
all actions brought by prisoners against government officials
even when plaintiff paid the filing fee).

Additionally, when reviewing a complaint, the Court may
also look to the Federal Rules of Civil Procedure ("Federal
Rules"). Rule 8 of the Federal Rules provides that a pleading
which sets forth a claim for relief shall contain, *inter alia*,
"a short and plain statement of the claim showing that the
pleader is entitled to relief." *See* Fed. R. Civ. P. 8(a)(2). The
purpose of Rule 8 "is to give fair notice of the claim being
asserted so as to permit the adverse party the opportunity to
file a responsive answer, prepare an adequate defense and
determine whether the doctrine of *res judicata* is applicable."
*Hudson v. Artuz*, No. 95 Civ. 4768, 1998 WL 832708, at \*1

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 128 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

(S.D.N.Y. Nov. 30, 1998) (quoting *Powell v. Marine Midland Bank*, No. 95-CV-0063 (TJM), 162 F.R.D. 15, 16 (N.D.N.Y. June 23, 1995) (other citations omitted)). Although "[n]o technical form is required," the Federal Rules make clear that each allegation contained in the pleading "must be simple, concise, and direct." Fed. R. Civ. P. 8(d).

Further, Rule 10 of the Federal Rules provides in pertinent part that:

> "[a] party must state its claims or defenses in numbered paragraphs, each limited as far as practicable to a single set of circumstances. A later pleading may refer by number to a paragraph in an earlier pleading. If doing so would promote clarity, each claim founded on a separate transaction or occurrence – and each defense other than a denial – must be stated in a separate count or defense.

Fed. R. Civ. P. 10(b). This serves the purpose of "provid[ing] an easy mode of identification for referring to a particular paragraph in a prior pleading[.]" *Flores v. Graphtex*, 189 F.R.D. 54, 54 (N.D.N.Y. 1999) (quotation marks and citations omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Id.* "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Rule 8 of the Federal Rules "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* Thus, a pleading that contains only allegations which "are so vague as to fail to give the defendants adequate notice of the claims against them" is subject to dismissal. *Sheehy v. Brown*, 335 F. App'x 102, 104 (2d Cir. 2009).

Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Id.* (citation omitted).

**B. Summary of the Complaint**

**\*3** The incidents that form the foundation for the Complaint occurred on December 14, 2016, and while Tarver was confined at Albany County Correctional Facility ("Albany County C.F."). The Complaint totals 259 pages and is a rambling, disjointed mix of conclusory allegations, that is, in large part, comprised of excerpts that appear to have been cut and pasted throughout the document from legal articles, statutes, and cases. (Dkt. No. 1. [3] ) Named as defendants are: City of Albany Police Department, Officer Jan Mika, Officer Adam Iannacito, Albany County C.F., CO Burns, Sgt. Remillard, Unknown Officers, Unknown Parole Officers, Unknown Plain Clothes Officer, Unknown Sgt., Unknown Correctional Officers, and Unknown Medical and Dental Workers. The following facts are set forth as alleged by Plaintiffs.

On December 14, 2016, Plaintiffs were at LaPietra's second-floor apartment located at 1030 Washington Avenue, #2, in Albany, New York. (Dkt. No. 1-1 at 5. [4] ) Tarver, identified as LaPietra's "loved one" and boyfriend, was on parole supervision. *Id.* LaPietra left "to pick something up" and Tarver stayed at the apartment. *Id.* She left her apartment keys with Tarver. *Id.* On the way back to the apartment, LaPietra received a telephone call from her "case coordinator" informing her that Albany police officers were outside her apartment. *Id.*

When she returned to the apartment, Tarver "was sitting and being detained, handcuffed in the back seat of a police vehicle that was parked in front of the apartment." *Id.* [5] Tarver was "under arrest" but the police officers did not tell Tarver "what he was under arrest for" and did not read him his "Miranda" rights. *Id.* "They threatened that they were going to taser him[.]" *Id.*

LaPietra states her "apartment was open and the police" had been through the apartment and her personal belongings including "paperwork pertaining to [her] health, government paperwork, [her] garbage, and everything." *Id.* at 5, 6. LaPietra was also questioned by police officers and a sergeant. *Id.* at 6. She stated Tarver did not live with her but admitted he sometimes stayed overnight "with the permission of his

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 129 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

PO." *Id.* LaPietra was also asked other personal questions, including "confidential" conditions of her residence program. *Id.* at 6. "They" also questioned LaPietra about "some items that were in the corner of the dining room" because "they suspected that those items were stolen." *Id.* at 7. Officer Jan Mika said to LaPietra, "oh by the way some parole officers were here earlier." *Id.* at 8-9. She thought that was a "strange comment to make at the time because it did not fit into the context of what [they] were speaking about." *Id.* at 9. [6]

**\*4** LaPietra "was outside with the officers they asked [her] to go sit in [her] car then another officer said no stand over here to the side of the driveway." *Id.* at 7. LaPietra states she was "detained" and "questioned" for more than twenty-minutes and her apartment was searched without a warrant. *Id.* at 7, 15-6.

During the course of Tarver's arrest, he was "pushed up against a police vehicle, his earring was ripping out of his ear ... the police then threated to use a Taser on him ... and then put him on the ground." *Id.* at 101. Tarver was arrested without a warrant and charged with petty larceny. *Id.* at 7. Tarver was "arraigned judicially for a misdemeanor" and "maliciously prosecuted for a felony." *Id.* at 11. Tarver ultimately "took a plea deal." *Id.* at 13.

The Complaint states that defendant "law enforcement officers observed the illegal nature of the search and seizure of the residence and willfully ignored it and participated." *Id.* at 10. Plaintiffs claim that "fellow officers had an opportunity to intervene to prevent further harm and to report the misconduct. Yet they failed to act or intervene." *Id.* The Complaint further claims the Sergeant of the Albany Police Department "participated" in Tarver's arrest, was responsible for the supervision of the defendant police officers, failed to intervene and prevent the ongoing misconduct of the officers, "which resulted in the arrest and prosecution" of Tarver. *Id.* at 10-11. [7]

Later that night, "they" took Tarver from the police station to the emergency room at Albany Medical Center "because he tried to hurt himself." *Id.* at 92. Tarver's hands and feet were shackled. *Id.* at 92-93. At the emergency room, Tarver was denied his right civil rights to use the bathroom and was subjected to excessive force. *Id.* Although Tarver was permitted to use the bathroom at least once while at the emergency room, which "went well," when it "came time for him to go to the bathroom again ... the police said no." *Id.* Tarver became "emotionally upset and swore" and

"stood up." *Id.* "They tackled him to try and force him to lay down onto the hospital bed." *Id.* "Then they shot him with Benadryl." *Id.* "An officer in the process of tackling him fractured his pinky finger. Then they turned around and charged [Tarver] with Felony Assault on an Officer." *Id.* But Tarver had "no intention to either interfere with or assault an officer nor did he assault the officer." *Id.* The use of force aggravated Tarver's preexisting "AC separation." (Dkt. No. 1-1 at 5.)

Tarver was confined at Albany County C.F. from December 2016 until April 2018. During his confinement, Tarver did not receive proper medical care for "an AC separation." (Dkt. No. 1-1 at 3-4, 85, 89.) Although x-rays were taken of Tarver's shoulder, he was told by "a doctor" that, "[w]e don't do surgery here." *Id.* at 85, 126; Dkt. No. 1-6 at 27. Tarver received no other treatment or care for his shoulder complaints and his requests for an MRI and a visit with his personal physician were denied. (Dkt. No. 1-1 at 136; Dkt. No. 1-6 at 27.)

**\*5** During his confinement at Albany County C.F., Tarver, who suffers from "Schizo Affective Disorder," depression, and PTSD, received seven different types of psychiatric medicine that were not administered "as scheduled." (Dkt. No. 1-1 at 3, 124; Dkt. No. 1-6 at 73.) Tarver was not provided with trauma therapy or a social worker. (Dkt. No. 1-1 at 136.)

From October 2017 until April 2018, Tarver was denied adequate dental care for "extreme pain" that impacted his daily activities. (Dkt. No. 1-1 at 4, 124; Dkt. No. 1-6 at 24.) Tarver submitted numerous medical call slips and waited "months" to see a dentist. (Dkt. No. 1-1 at 124; Dkt. No. 1-6 at 22, 24.) When he finally saw a nurse in late October 2017, the nurse informed him that he would "see the dentist in five days" and gave him Motrin for his pain. (Dkt. No. 1-1 at 126; Dkt. No. 1-6 at 22-23.) When Tarver saw the dentist, he was told that there was an "issue with his wisdom teeth and a filling in another tooth" but the dentist "did nothing." (Dkt. No. 1-1 at 126.) In November 2017, Tarver was given Amoxycillin, however, the facility records do not indicate that he suffered from decay or infection. *Id.* Tarver continued to suffer from pain and was told, "we don't do root canals here." *Id.* at 24; Dkt. No. 1-1 at 126. As a result, Tarver had a "tooth fall straight out of his mouth" while at Albany County C.F. (Dkt. No. 1-1 at 126; Dkt. No. 1-6 at 6, 23.)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 130 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

Tarver also claims that his weight, blood sugar, and sleep apnea were not properly monitored at the facility. (Dkt. No. 1-1 at 129; Dkt. No. 1-6 at 7, 27.)

On October 23, 2017, LaPietra wrote to Melanie Trimble ("Trimble") at the Capital Region ACLU, to complain about Tarver's medical and dental care. (Dkt. No. 1-1 at 125.) Trimble relayed LaPietra's concerns to Michael Lyons ("Lyons"), who was surprised that there was a dentist at Albany County C.F. *Id.* LaPietra also called the Sheriff's Office and spoke to Mr. Newman ("Newman"). *Id.* Newman told LaPietra to speak with a sergeant or superintendent during a visit with Tarver, but that the sergeant "can't do anything." *Id.* In December 2017, LaPietra wrote to the Commission of Correction and Inspector General's office to complain about Tarver's medical and dental care. *Id.* at 119-20. The Commission responded to Tarver and instructed him to file a grievance. *Id.* at 126-27.

On March 9, 2018, Tarver received a letter from Prisoner Legal Services "about his rights." (Dkt. No. 1-1 at 4; Dkt. No. 1-6 at 1, 25.) On March 13, 2018, one day after LaPietra filed "papers for this case in the Supreme Court Clerk's office," Tarver was assaulted by defendant C.O. Burns. *Id.* The assault occurred while another officer was performing "a squat and cough" of Tarver in his cell. *Id.* Burns willfully entered Tarver's cell "for the purposes of assault[.]" (Dkt. No. 1-1 at 148-52; Dkt. No. 1-6 at 25-26.) Burns told Tarver that he was not "coughing properly," pushed him onto the bed, punched him in the face, and sprayed him with mace. At the time of the assault, Tarver was naked and in a squat position, with his back facing the officers. *Id.* Defendant Sgt. Remillard was present during the assault and did not intervene on Tarver's behalf. *Id.* Tarver was taken to the nurse so that his eyes could be flushed. (Dkt. No. 1-1 at 148-152; Dkt. No. 1-6 at 25-26.) As a result of being sprayed with mace, his face was swollen and his eyes were "red and bloodshot." (Dkt. No. 1-6 at 25-26.)

**\*6** After the incident, Tarver was placed in "lockdown" without any writing utensils, legal materials, or mail. (Dkt. No. 1-1 at 129, 143; Dkt. No. 1-6 at 26-27.) The "charges" surrounding his lockdown were not properly or timely presented to him, he was not provided with an assistant related to the disciplinary charges, and he was terminated from his job. (Dkt. No. 1-1 at 164-66; Dkt. No. 1-6 at 26-27.) Tarver's property, including letters and books, were confiscated. (Dkt. No. 1-1 at 174, 178.) Tarver was also denied any outdoor or recreational time. *Id.* at 168.

In March 2018, LaPietra visited Tarver. (Dkt. No. 1-1 at 156.) At that time, Burns was "laughing" about the assault and told LaPietra that Tarver was a "bad boy," who hadn't coughed for him. *Id.* LaPietra telephoned the Commission of Corrections to report the assault and mailed a letter on April 2, 2018, to officially complain about the assault, Tarver's inability to file grievances, and mail tampering. *Id.* at 162.

On May 3, 2018, LaPietra called the Commission of Corrections, spoke to Debbie Clark ("Clark") and reported the March 2018 assault. *Id.* at 179. Clark would not share any information with LaPietra. *Id.*

During his confinement at Albany County C.F., Tarver was "blocked from and denied grievance[s]" related to medical and dental care and "solitary confinement in relation to his assault." (Dkt. No. 1 at 2; Dkt. No. 1-1 at 127-128, 141 150; Dkt. No. 1-6 at 27.) The facility also "interfered" with his legal mail. (Dkt. No. 1-1 at 123-24, 144.) For example, Tarver sent a letter to "Judge Keefe," a "consultant" with the Center for Law and Justice. *Id.* Tarver marked the envelope "Attorney Mail" and placed an address on it. *Id.* at 122-23. The mail did not reach the intended recipient and "may have affected his rights to bring a claim against the municipality in a timely manner." *Id.* at 123-24. Tarver was released from "solitary" in April 2018 and transferred to Downstate Correctional Facility, shortly thereafter. *Id.* at 129.

LaPietra alleges that Albany County C.F. would not allow her to wear "a Native American necklace into the facility" in violation of her First Amendment rights. (Dkt. No. 1-1 at 190-193.)

Construing the Complaint liberally, Tarver asserts the following: (1) Fourth Amendment claims for unreasonable search and seizure, false arrest, excessive force, and malicious prosecution; (2) Fourteenth Amendment claims for excessive force, failure-to-protect, and conditions of confinement; (3) First Amendment retaliation claims; (5) Fourteenth Amendment claims related to his medical and dental care; (6) Fourteenth Amendment due process claims; (7) First Amendment access to court and mail interference claims; (8) constitutional claims related to the grievance process; (9) Fourteenth Amendment equal protection claims; (10) Sixth Amendment claims related to the right to counsel; (11) state law claims; and (12) claims pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.* (*See* Dkt. No. 1-1 at 5, 10, 11, 17, 88, 96, 97, 102, 105, 113,

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 131 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

127, 128, 146, 152; 164, 172, 182; Dkt. No. 1-6 at 21-27.) LaPietra asserts the following: (1) Fourth Amendment claims for unreasonable search and seizure and false arrest; (2) state law claims; and (3) First Amendment freedom of religion claim. (*See* Dkt. No. 1-1 at 5, 10, 11, 17, 88, 190-193.)

Plaintiffs seek unspecified injunctive relief, monetary damages, and an order allowing them to file a late notice of claim in state court. (Dkt. No. 1 at 6; Dkt. No. 1-1 at 3, 184-85, 1-6 at 1-2. [8] ) For a more complete statement of Plaintiffs' claims, reference is made to the Complaint.

### C. Nature of Action

**\*7**  Plaintiffs seek relief pursuant to Section 1983, which establishes a cause of action for " 'the deprivation of any rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Wilder v. Virginia Hosp. Ass'n,* 496 U.S. 498, 508 (1990)); *see also Myers v. Wollowitz,* No. 95-CV-0272 (TJM), 1995 WL 236245, at \*2 (N.D.N.Y. Apr. 10, 1995) (finding that "[Section] 1983 is the vehicle by which individuals may seek redress for alleged violations of their constitutional rights"). "Section 1983 itself creates no substantive rights, [but] ... only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James,* 13 F.3d 515, 519 (2d Cir. 1993). Thus, to state a cognizable claim under Section 1983, a complaint must allege "(1) 'that some person has deprived [the plaintiff] of a federal right,' and (2) 'that the person who has deprived [the plaintiff] of that right acted under color of state law.' " *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir. 2005) (quoting *Gomez v. Toledo,* 446 U.S. 635, 640 (1980)) (alteration omitted).

The Court will construe the allegations in the Complaint with the utmost leniency. *See Haines v. Kerner,* 404 U.S. 519, 520 (1972) (holding that a *pro se* litigant's complaint is to be held "to less stringent standards than formal pleadings drafted by lawyers").

## III. ANALYSIS

### A. City of Albany Police Department

The caption of the Complaint lists the City of Albany Police Department as a defendant. (Dkt. No. 1 at 1.) "[U]nder New York law, departments that are merely administrative arms of a municipality do not have a legal identity separate and apart from the municipality and, therefore, cannot sue or be sued." *Davis v. Lynbrook Police Dep't,* 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002) (dismissing § 1983 claim brought against the Lynbrook Police Department); *see also La Grande v. Town of Bethlehem Police Dep't,* No. 1:08-CV-0738 (LEK/DRH), 2009 WL 2868231, at \*2 (N.D.N.Y. Sept. 1, 2009) ("Since the Bethlehem Police Department cannot be sued pursuant to 42 U.S.C. § 1983, [the plaintiff's] [c]omplaint is dismissed as against the Town of Bethlehem Police Department."); *Jenkins v. Liadka,* No. 5:10-CV-1223 (GTS/DEP), 2012 WL 4052286, at \*5 (N.D.N.Y. Sept. 13, 2012) ("Because the Syracuse Police Department is merely an administrative arm of the City of Syracuse, it is not a proper defendant.").

However, in deference to Plaintiffs' *pro se* status, the Court will construe Plaintiffs' claims as if they had been brought against the City of Albany, the real party in interest. *See Solis v. Cty. of Westchester,* No. 94-CV-5102, 1995 WL 14072, at \*1 (S.D.N.Y. Jan. 10, 1995) (noting that the Westchester County Department of Corrections is not a legal entity and that the County of Westchester is the real party in interest).

Pursuant to the standard for establishing municipality liability laid out in *Monell v. Dep't of Soc. Servs. of the City of New York,* 436 U.S. 658 (1978), in order to set forth a cognizable claim for municipal liability under Section 1983, a plaintiff must plead and prove that a deprivation of his constitutional rights "was caused by a governmental custom, policy, or usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell,* 436 U.S. 658); *see also Vippolis v. Vill. of Haverstraw,* 768 F.2d 40, 44 (2d Cir. 1985) ("The plaintiff must first prove the existence of a municipal policy or custom in order to show that the municipality took some action that caused his injuries beyond merely employing the misbehaving officer.") A municipality may be liable for deprivation of constitutional rights under Section 1983 for policies or customs resulting in inadequate training, supervision, or hiring when the failure to train, supervise, or hire amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. *See City of Canton, Ohio v. Harris,* 489 U.S. 378, 388-89 (1989). A plaintiff must also establish a causal connection – an affirmative link–between the policy and the deprivation of his constitutional rights. *Oklahoma v. Tuttle,* 471 U.S. 808, 823 (1985) (plurality opinion).

**\*8**  Here, Plaintiffs have failed to identify or allege any facts plausibly showing the existence of a municipal policy or custom of the City of Albany authorizing, permitting, allowing, or tolerating "abuses in violation of the Constitution" including unreasonable search and seizure, false arrest, and excessive force incidents or any affirmative

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 132 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

link between such a policy and defendants' alleged actions with regard to Plaintiffs. (*See* generally Dkt. No. 1.) Furthermore, Plaintiffs' conclusory allegations that the City of Albany failed to train and supervise defendants, *see id.*, without supporting factual allegations, fails to state a *Monell* claim against the City of Albany that is plausible on its face. *See Tuttle*, 471 U.S. at 824 n.8 ("The fact that a municipal 'policy' might lead to 'police misconduct' is hardly sufficient to satisfy *Monell's* requirement that the particular policy be the 'moving force' behind a constitutional violation.").

Based upon the foregoing, the Court recommends that Plaintiffs' claims under 42 U.S.C. § 1983 against City of Albany Police Department be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

Moreover, notwithstanding a very liberal interpretation of the Complaint, to the extent that Plaintiffs' claims could be construed to be asserted against the City of Albany, as the real party in interest, it is recommended that the claims be dismissed without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### B. Officer Jan Mika

"It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). Thus, "a Section 1983 plaintiff must 'allege a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas*, No. 04-CV-7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar. 31, 2008) (quoting *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986)) (other citation omitted).

Here, the Complaint states that Officer Jan Mika asked LaPietra questions on December 14, 2016, such as her "name, address, date of birth, etc." and also told her, "Oh by the way parole officers were here earlier." (Dkt. No. 1-1 at 10, 46.) However, Plaintiffs do not plead any facts sufficient to plausibly suggest that this defendant was personally involved in any conduct that violated either of Plaintiffs' constitutional rights and, therefore, the Complaint fails to state a cognizable claim against this defendant. *See Cipriani v. Buffardi*, No. 06-CV-0889 (GTS/DRH), 2007 WL 607341, *1 (N.D.N.Y. Feb. 20, 2007) ("Dismissal is appropriate where a defendant is listed in the caption, but the body of the complaint fails to indicate what the defendant did to the plaintiff.") (citation omitted).

Accordingly, it is recommended that Plaintiffs' claims against Officer Jan Mika be dismissed without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

### C. Unknown Officers, Unknown Parole Officers, Unknown Plain Clothes Officer, Unknown Sgt.

Separate from the substantive personal involvement requirement, discussed above, is a pleading requirement that, to adequately state a claim, a plaintiff's complaint must "differentiate which defendant[s] w[ere] involved in [what] unlawful conduct." *Ying Li v. City of New York*, No. 15-CV-1599, 2017 WL 1208422, at *6 (E.D.N.Y. Mar. 31, 2017); *see also Wright v. Orleans Cty.*, No. 14-CV-622, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a § 1983 case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2), which requires a short and plain statement of the claim showing that the pleader is entitled to relief" (citation and quotation marks omitted)); *Holmes v. Allstate Corp.*, No. 11-CV-1543, 2012 WL 627238, at *7, *22 (S.D.N.Y. Jan. 27, 2012) ("Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it.").

**\*9** To satisfy the personal involvement requirement and the rule against group pleading, it is not necessary for a plaintiff to know the name of the defendant. Where a plaintiff does not know the name of a defendant, the plaintiff may identify the defendant in the pleading as John or Jane Doe. However, the pleading must still satisfy the rules governing personal involvement and group pleading as to the John or Jane Doe defendant. *See Little v. Mun. Corp.*, 51 F. Supp. 3d 473, 493-94 (S.D.N.Y. 2014) (dismissing without prejudice excessive force claim asserted against "members of the 'Special Search Team' and 'ESU Officers' " and noting that, "[t]o the extent that [plaintiff] does not know the names of the members of the Special Search Team or ESU Officers involved, he may name 'John Doe' defendants and include as much identifying information as he has knowledge of, for the purpose of filing an amended complaint, should [he] chose to do so"); *Williams v. 120 PCT Undercover*, No. 11-CV-4690, 2011 WL 13128209, at *1 (E.D.N.Y. Oct. 18, 2011) (dismissing complaint without prejudice where plaintiff's claims provided information about the alleged constitutional deprivations, but were brought against "the 120 Precinct and

District 9, a police precinct and district of the New York City Police Department").

Here, Plaintiffs simply list different groups of unidentified defendants in the caption of the Complaint and generally allege that on December 16, 2014, their Fourth Amendment constitutional rights were violated. The use of the terms "they," or "the police" or "officer" as a name for alleged defendants is not adequate to state a claim against a "person" as required in § 1983 actions. *See Williams*, 2011 WL 13128209, at *1 (dismissing complaint with leave to amend where the "[p]laintiff alleges that unnamed undercover police officers used excessive force against him and caused him to sustain injuries on August 26, 2008 but does not identify any particular defendants."). [9]

Moreover, if the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior*) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981); *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin*, 76 F.3d 72, 74 (2d Cir. 1996). Rather, supervisory officials may be considered "personally involved" if they (1) directly participated in the violation; (2) failed to remedy that violation after learning of it through a report or appeal; (3) created, or allowed to continue, a policy or custom under which the violation occurred; (4) had been grossly negligent in managing subordinates who caused the violation; or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).

Based on the foregoing, the Court finds Plaintiffs have failed to adequately plead that any individual defendant was personally involved in any alleged wrongdoing on December 14, 2016, and has contravened the rule against group pleading. Therefore, the Court recommends dismissing Plaintiffs' claims against these "Unknown" defendants without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. [10]

### D. Officer Adam Iannacito

**\*10**  Tarver claims Iannacito used "excessive force on" him on December 14, 2016, in the Emergency Room by, *inter alia*,

by "tackling" Tarver while he was restrained in shackles and prevented him from using the bathroom in violation of his constitutional rights, "which worsened [Tarver's] injury from a prior workplace assault, which was an AC separation." (Dkt. No. 1-1 at 96-113, Dkt. No. 1-6 at 5-6, 20-21.) It appears that during the assault, Iannacito fractured a finger and thereafter "maliciously prosecuted [Tarver] with felony assault on an officer." *Id.*

To the extent Tarver asserts these claims under Section 1983, such claims are time-barred. Although the statute of limitations is an affirmative defense, where it is clear from the face of the complaint that a claim is barred by the applicable statute of limitations, the claim is subject to dismissal for failure to state a claim on initial review. *See Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) (holding that a complaint can be dismissed on initial review based on a defense that appears on the face of the complaint). The applicable statute of limitations for a Section 1983 action is governed by "the law of the state in which the cause of action arose." *Wallace v. Kato*, 549 U.S. 384, 387 (2007). In New York, the general statute of limitations for personal injury claims is three years. *See* N.Y. C.P.L.R. § 214(5).

Here, Tarver executed the Complaint on February 6, 2020. (*See* Dkt. No. 7.) The alleged assault and deprivations by Iannacito at the Emergency Room occurred on December 16, 2016. Accordingly, Tarver's Section 1983 claims against Iannacito are barred by the applicable statute of limitations.

To the extent these claims are asserted under New York law, claims for intentional torts, such as assault and battery, and intentional infliction of emotional distress, are governed by a one-year statute of limitations. N.Y. C.P.L.R. § 215(3); *see also Ashjari v. Nynex Corp.*, 182 F.3d 898 (2d Cir. 1999) ("Under N.Y. C.P.L.R. § 215(3), claims of assault and battery ... must be brought within one year from the date the claim accrued."); *see also Forbes v. Merrill Lynch, Fenner & Smith, Inc.*, 957 F. Supp. 450, 455 (S.D.N.Y. 1997) ("It is well established under New York law that a claim of intentional infliction of emotional distress has a one–year statute of limitations."). Accordingly, Tarver's claims against Iannacito, asserted under state law, are also barred by the applicable statute of limitations.

Therefore, the Court recommends dismissing Tarver's claims against Officer Adam Iannacito without prejudice and with leave to amend pursuant to 28 U.S.C. §§ 1915(e)(2)(ii) and 1915A(b)(1). Because a district court typically should not

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 134 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

dismiss a claim as time-barred without providing a *pro se* plaintiff with "notice and opportunity to be heard" as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered, if Tarver files an amended pleading with claims asserted against this defendant arising from the alleged December 14, 2016, incidents, he should address the issue of timeliness. *See Abbas v. Dixon*, 480 F.3d 636, 640 (2d Cir. 2007).

### E. Albany County C.F.

The caption of the Complaint lists Albany County C.F. as a defendant. (Dkt. No. 1.) However, as set forth above, because the Albany County C.F. is an administrative arm of Albany County, without a legal identity separate and apart from the County, it lacks the capacity to be sued. *See* Part III.A., *supra.*; *see also Lukes v. Nassau Cty. Jail*, No. 12-CV-1139, 2012 WL 1965663, at *2 (E.D.N.Y. May 29, 2012) (dismissing claims against defendant Nassau County Jail because it "is an administrative arm of Nassau County, without a legal identity separate and apart from the County"); *see also Solis v. Cty. of Westchester*, No. 94-CV-5102, 1995 WL 14072, at *1 (S.D.N.Y. Jan. 10,1995) (noting that the Westchester County Department of Corrections is not a legal entity and that the County of Westchester is the real party in interest);

**\*11** Based upon the foregoing, the Court recommends that Plaintiffs' claims under 42 U.S.C. § 1983 against Albany County C.F. be dismissed with prejudice pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b).

Nevertheless, in deference to Plaintiffs' *pro se* status, the Court will construe Plaintiffs' claims as if they had been brought against Albany County, the real party in interest. *See Shabazz v. Johnson City Police Dep't*, No. 3:18-CV-0570 (MAD/DEP), 2018 WL 5660406, at * (June 21, 2018) (reviewing complaint against the real party in interest).

As discussed above, municipal liability is limited under Section 1983 by *Monell*. *See* Part III.A., *supra.*

Here, with one minor exception discussed below, Plaintiffs have failed to identify or allege any facts plausibly showing the existence of a municipal policy or custom of Albany County authorizing, permitting, allowing, or tolerating "abuses in violation of the Constitution" including deliberate medical indifference and excessive force incidents or any affirmative link between such a policy and any defendants' alleged actions with regard to Tarver. *See* Dkt. No. 1-1 at 146-147. *See Missel v. Cty. of Monroe*, 351 F. App'x 543,

545 (2d Cir. 2009) (*Monell* claim requires "factual allegations that would support a plausible inference that the County[ ]'s 'policies' or 'customs' caused ... violations ... of rights."). Furthermore, Plaintiffs' conclusory allegations that Albany County failed to train and supervise defendants, *see id.*, without supporting factual allegations, fails to state a *Monell* claim against Albany County that is plausible on its face. *See Tuttle*, 471 U.S. at 824 n.8.

The Complaint states that "[t]he Albany County [C.F.] refused to allow [LaPietra] to wear a Native American necklace into the facility at a visitation stating that it is not a religion recognized by the United States government and that it had to be a religion like Christianity or the Muslim religion. This is a First Amendment rights violation. It is also inherently false that it is not a form of religion recognized by the United States government because the United States recognizes Natives through the American Indian Religious Freedom Act." (Dkt. No. 1-1 at 190.) Mindful of the Second Circuit's direction that a *pro se* plaintiff's pleadings must be liberally construed, *see Sealed Plaintiff v. Sealed Defendant*, 537 F.3d 185, 191 (2d Cir. 2008), LaPietra has sufficiently plead, albeit thinly, a cognizable claim regarding the aforementioned policy at Albany County C.F.

Accordingly, based upon a very liberal interpretation of the Complaint, to the extent that Plaintiffs' claims could be construed to be asserted against Albany County as the real party in interest, it is recommended that only LaPietra's First Amendment *Monell* claim survives initial review and requires a response and that all other claims be dismissed without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. The Court expresses no opinion as to whether LaPietra's First Amendment *Monell* claim can withstand a properly filed motion to dismiss or for summary judgment.

### F. Fourteenth Amendment Excessive Force and Failure-to-Protect Claims Against Burns and Remillard

**\*12** Tarver contends Burns assaulted him and that Remillard failed to intervene to protect him from harm at Albany County C.F. in March 2018. *See generally* Dkt. No. 1-1. In the context of excessive force and failure-to-protect claims asserted by pretrial detainees, the Supreme Court distinguished between Eighth and Fourteenth Amendment claims in holding that a pretrial detainee alleging that an officer used excessive force against him in violation of

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 135 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

the Fourteenth Amendment need not demonstrate that such officer was subjectively aware that his use of force was unreasonable. *See Kingsley v. Hendrickson*, 576 U.S. 389 (2015); *see also Francis v. City of New York*, No. 17-CIV-1453, 2018 WL 4659478, at *4 (S.D.N.Y. Aug. 21, 2018)* (applying *Kingsley* to failure-to-protect claim). [11] "[A] pretrial detainee must only show that the force purposely or knowingly used against him was objectively unreasonable to prevail on an excessive force claim." *Kingsley*, 576 U.S. at 397. "[I]f the use of force is deliberate – i.e., purposeful and knowing – the pretrial detainee's claim may proceed." *Id.* Courts consider a number of factors when determining objective reasonableness, including:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

*Id.*

Mindful of the Second Circuit's direction that a *pro se* plaintiff's pleadings must be liberally construed, *see Sealed Plaintiff*, 537 F.3d at 191, Tarver has sufficiently plead Fourteenth Amendment excessive force and failure-to-protect claims against Burns and Remillard.

Therefore, the Court recommends that Tarver's Fourteenth Amendment excessive force and failure-to-protect claims against Burns and Remillard survive *sua sponte* review and require a response. The Court expresses no opinion as to whether these claims can withstand a properly filed motion to dismiss or for summary judgment.

### G. Assault and Battery Claims Against Burns

Tarver also asserts assault and battery claims against Burns. To the extent that Tarver asserts these claims under Section 1983, it is duplicative of his excessive force claim and must be dismissed for failure to state a claim upon which relief may be granted. *See Raymond v. Bunch*, 136 F. Supp. 2d 71, 81 (N.D.N.Y. 2001). To the extent these claims are asserted under

New York law, as discussed above, claims for intentional torts are governed by a one-year statute of limitations. N.Y. C.P.L.R. § 215(3); *see also Ashjari v. Nynex Corp.*, 182 F.3d 898 (2d Cir. 1999) ("Under N.Y. C.P.L.R. § 215(3), claims of assault and battery ... must be brought within one year from the date the claim accrued."). As discussed above, although the statute of limitations is an affirmative defense, where it is clear from the face of the complaint that a claim is barred by the applicable statute of limitations, the claim is subject to dismissal for failure to state a claim on initial review. *See Pino*, 49 F.3d at 53.

Here, Tarver executed the Complaint on February 6, 2020. (*See* Dkt. No. 7.) The alleged assault by Burns occurred in March 2018. Accordingly, Tarver's assault and battery claims, asserted under state law, are barred by the applicable statute of limitations.

Therefore, the Court recommends dismissing Tarver's assault and battery claims with leave to amend pursuant to 28 U.S.C. §§ 1915(e)(2)(ii) and 1915A(b)(1). Because a district court typically should not dismiss a claim as time-barred without providing a *pro se* plaintiff with "notice and opportunity to be heard" as to whether there might be a meritorious tolling argument or other reason why the complaint might be considered, if Tarver files an amended pleading with a claim for assault and battery, he should address the issue of timeliness. *See Abbas*, 480 F.3d at 640.

### H. First Amendment Retaliation Claims Against Burns and Remillard

**\*13**  Tarver claims that Burns and Remillard acted with retaliatory intent when they assaulted him because he received legal mail and filed a state court lawsuit. (*See generally* Dkt. No. 1-1.) Retaliation claims find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). In a prison setting, prison officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *Id.* at 381-83. However, as the Second Circuit has repeatedly cautioned, such claims are easily incanted and prone to abuse, as inmates often attribute adverse actions to retaliatory animus. *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). Courts must therefore approach retaliation claims with "skepticism and particular care." *Id.* Accordingly, claims of retaliation must be supported by specific facts; conclusory statements are not sufficient. *Flaherty v. Coughlin*, 713

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 136 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz*, 534 U.S. at 506.

To establish a *prima facie* First Amendment retaliation claim, the plaintiff must establish "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gill*, 389 F.3d at 380 (citing *Dawes*, 239 F.3d at 492).

The filing of lawsuits and grievances is protected conduct for purposes of First Amendment retaliation claims. *See Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995); *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir. 1996). Therefore, the allegations in the Complaint plausibly suggest that Tarver was engaged in protected conduct. Moreover, the alleged assault constituted an "adverse action" against Tarver that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights. *See Rivera v. Goord*, 119 F. Supp. 2d 327, 339-340 (S.D.N.Y. 2000).

An inmate bears the burden of showing "the protected conduct was a substantial or motivating factor" in the defendant's decision to take action against the plaintiff. *Graham*, 89 F.3d at 79. In evaluating whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, "a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his motivation." *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.* A showing of temporal proximity, without more, has generally been found insufficient to survive summary judgment. *See Roseboro v. Gillespie*, 791 F. Supp. 2d 353, 370 (S.D.N.Y. 2011) (citations omitted).

Here, Tarver has not adequately stated a claim for retaliation against Burns and Remillard because he has not alleged facts to suggest that they were aware Tarver received a letter from Prisoner Legal Services or that LaPietra filed a lawsuit in state court. Moreover, there is no allegation that Burns or Remillard were defendants in that lawsuit. As a result, Tarver has failed to allege plausibly that the lawsuit was causally connected to Burns' or Remillard's allegedly adverse actions. *See Wilson v.*

*Kelly*, No. 9:11-CV-00030 (MAD/RFT), 2012 WL 3704996, at *9 (N.D.N.Y. Aug. 27, 2012) (claim dismissed due to failure by plaintiff to allege plausibly that protected activity was causally connected to any alleged adverse action taken by the defendant where plaintiff failed to allege that the defendant was aware of the protected activity).

**\*14** Therefore, the Court recommends that Tarver's retaliation claims against Burns and Remillard be dismissed with leave to amend pursuant to 28 U.S.C. §§ 1915(e)(2)(ii) and 1915A(b)(1).

### I. ADA Claims [12]

Tarver claims that, as a prisoner with a mental illness, he was entitled to modifications of his conditions of confinement in the SHU. (Dkt. No. 1-1 at 170.) Title II of the ADA provides, in pertinent part, that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The ADA is applicable to inmates in state correctional facilities. *See Pennsylvania Dep't of Corr. v. Yeskey*, 524 U.S. 206, 213 (1998). "Under Title II of the ADA ... prison officials may not discriminate against inmates on the basis of disability in administering work programs." *Harrington v. Vadlamudi*, No. 9:13-CV-795 (BKS/RFT), 2015 WL 4460994, at *3 (N.D.N.Y. July 21, 2015) (citations omitted). To successfully plead a Title II claim, "[t]he inmate must establish that he (1) is a qualified individual with a disability; (2) is being excluded from participation in, or being denied benefits of some service, program or activity by reason of his or her disability; and (3) the entity providing the service is a public entity." *Allah v. Goord*, 405 F.Supp.2d 265, 274 (S.D.N.Y. 2005).

Here, the Complaint does not clearly indicate who Tarver is suing for violations of his rights under the ADA and what relief, if any, he seeks with respect to that claim. Assuming Tarver asserts this claim against individual officers, he has not indicated whether those officers are sued in their individual capacity, official capacity, or both. (*See generally* Dkt. No. 1.) To the extent that Tarver seeks monetary damages against any defendant, in his or her individual capacity, the Second Circuit has held Title II of the ADA does not provide for individual capacity suits for monetary damages. *See Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). While individuals may be sued under the ADA in their

Case 1:25-cv-00774-AJB-ML Document 16 Filed 12/30/25 Page 137 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

official capacities, a plaintiff must plead that the defendant "was motivated by discriminatory animus or ill-will based on the plaintiff's disability." *See Keitt v. New York City*, 882 F. Supp. 2d 412, 455-57 (S.D.N.Y. 2011) (holding that under *Garcia*, claims for money damages against state officials in their official capacities under Title II of the ADA are barred by the Eleventh Amendment, absent a showing that a violation was motivated by discriminatory animus or ill will due to the disability) (citing *Garcia*, 280 F.3d at 112).

Even assuming Tarver was disabled under the ADA, the Complaint fails to state a viable cause of action against any individual defendant because Tarver does not allege facts to plausibly suggest that any defendant discriminated against him. *See Wenger v. New York State Dep't of Health*, No. 5:14-CV-885 (DNH/TWD), 2015 WL 3397958, at *5 (N.D.N.Y. May 26, 2015) (dismissing the discrimination claim under ADA where the complaint "provide[d] few specifics regarding [the plaintiff's] care, the services of which he was allegedly deprived, or programs in which he was allegedly not allowed to participate, or any reasons therefor articulated by [the defendants").

 **\*15**  Although "Title II [...] suits for prospective injunctive relief may ... proceed against individual officers in their official capacity," *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009), an inmate's request for injunctive relief becomes moot when the inmate is released from custody. *See Roque v. Armstrong*, 392 F. Supp. 2d 382, 386-87 (D. Conn. 2005) (finding that the plaintiff's request for injunctive relief under the ADA for the provision of medical care became moot when he was discharged from prison) (citations omitted); *see also McAlpine v. Thompson*, 187 F.3d 1213, 1215 (10th Cir. 1999) (noting that an inmate's claim for prospective injunctive relief regarding conditions of confinement is rendered moot upon his release from confinement). In April 2020, Tarver notified the Court that he was no longer incarcerated. (*See* Dkt. No. 15.)

Accordingly, the Court recommends dismissing Tarver's ADA claims for monetary damages and injunctive relief for failure to state a claim upon which relief may be granted.

### J. Remaining Claims

The remaining constitutional and state law claims are asserted by Tarver against "Unknown Corrections Officers," and "Unknown Medical and Dental Workers." (*See* Dkt. No. 1 at 1; Dkt. No. 1-1 at 1.)

The Complaint fails to identify any corrections officers or medical personnel involved in Tarver's medical treatment, dental treatment, the decision to confine Tarver to keeplock, decisions related to Tarver's mail or property, decisions related to grievances or visitors at the facility, or any of other remaining alleged constitutional violations. As previously discussed, the use of the terms, "they," "corrections officers," "medical and dental workers," or "all facility employees" as a name for alleged defendants is not adequate to state a claim against a "person" as required in Section 1983 actions. *See* Part.III.C., *supra.*; *see also Ferguson*, 1991 WL 115759, at *1 ("The allegations plaintiff makes against the Otisville Correctional Facility Medical Staff are not sufficient to state a cause of action."). Moreover, the Court notes that while the Complaint includes a plethora of constitutional claims arising from Tarver's confinement at Albany County C.F., the pleading lacks any specificity related to those claims including dates, times, and locations of the alleged violations.

Because the Complaint fail to identify any individuals personally involved in the remaining alleged constitutional violations and state law claims, the Court recommends dismissing the remaining claims without prejudice and with leave to amend pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted. *See Martin v. UConn Health Care*, No. 3:99-CV-2158, 2000 WL 303262, at *1 (D. Conn. Feb. 9, 2000) (giving the plaintiff leave to file an amended complaint "provided he can identify at least one physician or other health care provider who has been deliberately indifferent to his medical needs") (citing *Soto v. Brooklyn Correctional Facility*, 80 F.3d 34 (2d Cir. 1996) (permitting plaintiff to file amended complaint where inmate named only correctional facility and was not aware of the requirement that he name individuals)). [13]

## IV. MOTIONS TO APPOINT COUNSEL

 **\*16**  It is well-settled that there is no right to appointment of counsel in civil matters. *Burgos v. Hopkins*, 14 F.3d 787, 789 (2d Cir. 1994). Title 28 of United States Code Section 1915 specifically provides that a court may request an attorney to represent any person "unable to afford counsel." 28 U.S.C. § 1915(e)(1). Appointment of counsel must be done carefully in order to preserve the "precious commodity" of volunteer lawyers for those litigants who truly need a lawyer's assistance. *Cooper v. A. Sargenti, Inc.*, 877 F.2d 170, 172-73 (2d Cir. 1989).

In *Terminate Control Corp. v. Horowitz*, 28 F.3d 1335 (2d Cir. 1994), the Second Circuit reiterated the factors that a court must consider in ruling upon such a motion. In deciding whether to appoint counsel, the court should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider a number of other factors in making its determination. *See id.* at 1341 (quoting *Hodge v. Police Officers*, 802 F.2d 58, 61 (2d Cir. 1986)); *Sawma v. Perales*, 895 F.2d 91, 95 (2d Cir. 1990). Among these are

> [t]he indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross-examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues, and any special reason ... why appointment of counsel would be more likely to lead to a just determination.

*Hodge*, 802 F.2d at 61. None of these factors are controlling, however, and each case should be decided on its own facts. *Id.*

Here, the main facts upon which this Court may base its decision as to whether this lawsuit is of substance are those portions of Plaintiffs' Complaint wherein they state the facts surrounding their claims. Where a plaintiff does not provide a Court with evidence, as opposed to mere allegations, relating to his or her claims, such party does not meet the first requirement imposed by the Second Circuit relative to applications seeking appointment of *pro bono* counsel. *See Harmon v. Runyon*, No. 96-CV-6080, 1997 WL 118379 (S.D.N.Y. Mar. 17, 1997).

Furthermore, even if the Court were to assume that this case may be of substance, these claims do not present overly complex issues. In addition, the record currently before the Court indicates that Plaintiffs have an ability to investigate pertinent facts and present the case. While it is possible, should this case proceed to a trial, that there will be conflicting evidence implicating the need for cross-examination, as is the case in many actions brought by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel." *Velasquez v. O'Keefe*, 899 F. Supp. 972, 974 (N.D.N.Y. 1995). Further, if this case proceeds to trial, it is

highly probable that this Court will appoint trial counsel at the final pretrial conference. This Court is not aware of any special reason why appointment of counsel at this time would be more likely to lead to a just determination of this litigation.

For all of these reasons, the Court finds that appointment of counsel is unwarranted and Plaintiffs' motions are denied without prejudice. (Dkt. Nos. 6, 21.) Plaintiffs may file another motion for appointment of counsel in the event that they can demonstrate that, in light of specific changed circumstances, consideration of the above factors warrants granting the application.

**\*17 WHEREFORE**, it is hereby

**ORDERED** that Tarver's IFP Application (Dkt. No. 20) is **GRANTED**; [14] and it is further

**RECOMMENDED** that Plaintiffs' claims against City of Albany Police Department and Albany County Corrections Facility be **DISMISSED WITH PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**RECOMMENDED** that the Clerk be directed to revise the docket sheet to **ADD** Albany County as a defendant in this action; and it is further

**RECOMMENDED** that Tarver's Fourteenth Amendment excessive force and failure-to-protect claims against C.O. Burns and Sgt. Remillard **SURVIVE** initial review and require a response; and it is further

**RECOMMENDED** that LaPietra's First Amendment *Monell* claim against Albany County **SURVIVES** initial review and requires a response; and it is further

**RECOMMENDED** that the remaining claims be **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** [15] pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action must bear the case number assigned to this action and be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 139 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

13261-7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of same was served on all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a proper certificate of service will be stricken from the docket.** Plaintiffs must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiffs are also required to promptly notify the Clerk's Office and all parties or their counsel, in writing, of any change in his or her address; their failure to do so may result in the dismissal of the action**; and it is further

 **\*18  ORDERED** that Plaintiffs' motions for counsel (Dkt. Nos. 6, 21) are **DENIED WITHOUT PREJUDICE**; and it is further

**ORDERED** that the Clerk of the Court shall serve a copy of this Report-Recommendation and Order on Plaintiffs, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. [16] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette,* 984 F.2d 85, 87 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a).

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 5891888

---

## Footnotes

1    Tarver was incarcerated at Mid-State Correctional Facility at the time the action was commenced. *See* http://nysdoccslookup.doccs.ny.gov (DIN 18A1582) (last visited Sept. 27, 2020). Therefore, 28 U.S.C. § 1915A is applicable. *See Rogers v. New York City Police Dep't,* No. 12 CV 3042, 2012 WL 4863161, at \*1 n.3 (E.D.N.Y. Oct. 12, 2012) (a plaintiff who has been released from incarceration is still considered a prisoner under § 1915A if he was imprisoned at the time the action was commenced); *see also Brown v. Jacobson,* No. 98 Civ. 0565, 1999 WL 1125122, at \*5 (S.D.N.Y. Dec. 8, 1999) (prisoner's complaint subject to heightened scrutiny under the Prison Litigation Reform Act of 1999 even after release from custody because it concerns prison officials' misconduct).

2    To determine whether an action is frivolous, a court must look to see whether the complaint "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989).

3    The Complaint includes exhibits. (*See* Dkt. No. 1-1 through Dkt. No. 1-6.) To the extent that the exhibits are relevant to the incidents described in the Complaint, the Court will consider the Complaint as well as any documents attached. *See Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir. 1991) (the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference).

4    LaPietra is "part of an independent living program for a health-related reason." (Dkt. No. 1-1 at 5.) Her apartment is on the second floor.

5    According to Tarver, he was "coming down the stairs, and had the door to stairwell open a crack, and he and the officer saw each other through the glass cutout window in the door to the house/vestibule. The officer pushed in on the door to the house and entered into the vestibule while [Tarver] was still in the stairwell. At

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 140 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

some point, he asked [Tarver] what he was doing there and he said he lived there; He cuffed him, sat him down on the outside stoop, asked what was in his pocket, and he told them the keys and his wallet and they took the keys and wallet out of his pocket and immediately went in the other 2 doors without even checking on who he was, that he had a parole condition, or where he lived, which could have been easily ascertained."

6    LaPietra continues: "If there were parole officers there they were not there when I got there and they were not the ones who originally went into the apartment or conducted a search. They city officer who entered did not have a warrant to enter, but they had a witness [Tarver's] counsel later told me. If there was a witness I saw no signs of them." (Dkt. No. 1-1 at 9.) "It would have been more than reasonable to doubt anything [Tarver] said and because the officer had access to [Tarver's] wallet and had him handcuffed it would have been reasonable enough to ascertain whose residence it was, and that [Tarver] had a parole condition, to contact his parole officer, or to obtain a warrant. None of this was done." *Id.* at 9-10.

7    The complaint further states that "They also called and invited parole officers to the scene to illegally search the residence as well. Someone is responsible for the arrival of officers in plain clothes and parole officers who also illegally searched the residence." (Dkt. No. 1-1 at 11.)

8    While not entirely clear, it appears Plaintiffs filed a "late notice of claim in regard to the Albany Police and Albany County Correctional Facility violating [their] civil rights," as alleged in Complaint but State Court Judge Hon. Kimberly A. O'Conner "denied" that request. (Dkt. No. 1-6 at 1.) The Court notes, however, "New York's General Municipal Law has only vested the power to grant notice of claim extensions to the New York State supreme courts and county courts." *Farquharson v. Lafayette*, No. 19-cv-3446 (NSR), 2020 WL 1699985, at *13 (S.D.N.Y. Apr. 7, 2020) (citing N.Y. Gen. Mun. Law § 50-e(7)). Thus, "[f]ederal courts are not authorized to grant such extensions." *Id.* (citing *Davis v. City of New York*, No. 12 Civ. 3297 (PGG), 2018 WL 10070540, at *13 (S.D.N.Y. Mar. 30, 2018) ("New York has given the power to extend deadlines for serving [a] notice of claim to state supreme courts and county courts, and federal courts are not authorized to grant such extensions."); *Dayton v. City of Middletown*, 786 F. Supp. 2d 809, 824-25 (S.D.N.Y. 2011) ("[T]his Court lacks jurisdiction, pursuant to § 50-e(7), to deem Plaintiffs' 5/30/09 Amended Notice of Claim for their state law claims against Orange County timely filed, or to grant an extension of time to file a late notice of claim."). The Court further notes that to the extent Plaintiffs seek to collaterally attack a state court's judgment rendered before filing this action in federal court, such claims may be barred under *Rooker-Feldman* doctrine, which divests the federal court of jurisdiction to consider actions that seek to overturn state court judgments. *See generally District of Colombia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923). This doctrine also bars the federal court from considering claims that are "inextricably intertwined" with a prior state court determination. *Fernandez v. Turetsky*, No. 12-CV-4092, 2014 WL 5823116, at *3 (E.D.N.Y. Nov. 7, 2014) (citing *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

9    *See Williams*, 2011 WL 13128209, at *1 (giving the plaintiff leave to file an amended complaint to name the individuals responsible for the alleged deprivation of his rights and noting if "if plaintiff cannot identify the individual defendant(s) within the time allowed in this order or because they were undercover, he may designate the individual as John (or Jane) Doe #1, and so on.").

10    Inasmuch as the Court is recommending dismissal of Plaintiffs' Fourth Amendment claims without prejudice, the Court does not address the merits, timeliness, and/or whether any such claims are barred by *Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994).

11    It is unclear whether Tarver was a pretrial detainee or was serving a sentence at the time of the events complained of in the complaint. For purposes of this initial review, the Court assumes that Tarver was a pretrial detainee when his claims arose.

12    Tarver does not specify what portions of the ADA are triggered. Reading the complaint liberally, it appears that he brings this action under Title II.

13    Rule 10(a) of the Federal Rules of Civil Procedure provides that, "the title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). A party not named in the caption of the complaint is not a party to the action. *Abbas v. U.S.*, No. 10-CV-0141, 2014 WL 3858398, at *2 (W.D.N.Y. Aug. 1, 2014) (the failure to name a party in the caption makes it "infeasible for the Court to determine which of the individual officers mentioned in the body of the complaint should be deemed to be defendants to which claims"). "If people are not also named in the caption of the [ ] complaint, they will not be defendants in the case." *Whitley v. Krinser*, No. 06-CV-0575, 2007 WL 2375814, at *1 (W.D.N.Y. Aug. 15, 2007); *see also Robles v. Armstrong*, No. 3:03-CV-1634, 2006 WL 752857, at *1 n.1 (D. Conn. Mar. 17, 2006) ("The plaintiff refers to John Doe/Jane Doe of the Correctional Managed Health Care Program and John Doe/Jane Doe Members of the Revitalization Committee in the body of the amended complaint. Rule 10(a) of the Federal Rules of Civil Procedure requires that all defendants be listed in the caption of the complaint. Because the John and Jane Does are not listed in the caption of the amended complaint, they are not defendants and the court does not consider claims against them."). In this instance, while LaPietra claims that she notified certain individuals about "the issues" at Albany County C.F., including Newman, Lyons, and Trimble, *see* Dkt. No. 1-1 at 136, 139; Dkt. No. 1-6 at 22, the aforementioned individuals are not identified as defendants in the caption of the complaint or the list of parties. Thus, the Court will not construe the complaint to include any claims or causes of action against these individuals. For the same reason, the Court will not construe the complaint to include any claims or cause of actions against other private individuals referenced in the body of the complaint, including attorneys and grocery store employees, as they are not identified as defendants in the caption of the complaint or list of parties.

14    Tarver should note that, although the Court has granted his IFP Application, he will still be required to pay fees that he may incur in this action, including copying and/or witness fees.

15    If the District Court approves this Report-Recommendation, and if Plaintiffs choose to file an amended complaint, any amended complaint must comply with Rules 8 and 10 of the Federal Rules. Any such amended complaint must be signed by both Plaintiffs and clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the constitutional deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. *See Bass*, 790 F.2d at 263. Any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original and renders it of no legal effect.").

16    If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2020 WL 7021589
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Andrea LAPIETRA, Individually and as Power
of Attorney, and Deashon Tarver, Plaintiffs,
v.
CITY OF ALBANY POLICE
DEPARTMENT, et al., Defendants.

9:19-CV-1527
|
Signed 11/30/2020

**Attorneys and Law Firms**

Andrea LaPietra, Albany, NY, pro se.

Deashon Tarver, Albany, NY, pro se.

**DECISION and ORDER**

THOMAS J. McAVOY, Senior United States District Judge

**I. INTRODUCTION**

 **\*1** This *pro se* action was referred to the Hon. Thérèse W.
Dancks, United States Magistrate Judge, to review Tarver's
*in forma pauperis* application [1] and for an initial review of
the Complaint pursuant to 28 U.S.C. § 1915(e). Judge Dancks
issued a Report-Recommendation and Order on October 5,
2020. Dkt. No. 24. On October 16, 2020, plaintiffs requested
an extension of time to file objections, citing a delay in
receipt of the Report-Recommendation and Order, limited
resources due to the coronavirus pandemic, the restriction
on library access because of the coronavirus pandemic, a
death in the family of one of the plaintiffs, and because
the plaintiffs were intending to seek the help of an attorney
regarding their objections. This application was granted by
Judge Dancks on October 19, 2020, and plaintiffs were given
until November 19 2020 to file their objections. On November
19, 2020, plaintiffs filed a letter with the Court requesting an
additional 2-3 week extension to file objections, citing that
they were intending to consult with a specified attorney and
because they intended to obtain information from Tarver's
doctor that they wanted to incorporate in their objections.
Plaintiffs' request for an additional extension of time to
file objections is denied. They have failed to demonstrate
good cause for an additional extension of time. Further,

Plaintiffs will suffer no prejudice by the denial of this request
because Judge Dancks recommends that certain claims be
allowed to proceed, that others be dismissed without prejudice
and with leave to replead, and that plaintiffs' motion for
appointment of counsel (which may now be moot) be denied
with leave to renew. While Judge Dancks recommends that
claims against the Albany Police Department and the Albany
County Corrections Facility be dismissed with prejudice, she
also recommends that these claims be allowed to proceed
against the real parties in interest, the City of Albany and
Albany County, respectively. In this regard, Judge Dancks
recommends that the claims against the Albany Police
Department be allowed to be repled against the City of
Albany, and that the County of Albany be added to the docket
as the real party in interest in the claims against the Albany
County Corrections Facility.

Because plaintiffs expressed an intention to file objections but
waited until the last day to request an extension, the Court will
deem them to have filed a general objection and will review
Judge Dancks's recommendations accordingly.

**II. STANDARD OF REVIEW**

When objections to a magistrate judge's report and
recommendation are lodged, the district court makes a "*de
novo* determination of those portions of the report or specified
proposed findings or recommendations to which objection
is made." *See* 28 U.S.C. § 636(b)(1). After reviewing the
report and recommendation, the Court may "accept, reject, or
modify, in whole or in part, the findings or recommendations
made by the magistrate judge. The judge may also receive
further evidence or recommit the matter to the magistrate
judge with instructions." 28 U.S.C. § 636(b).

**III. DISCUSSION**

 **\*2** After conducting a *de novo* review of the issues addressed
by Judge Dancks in her Report-Recommendation and Order,
the Court adopts the recommendations for the reasons stated
in Judge Dancks's thorough report.

**IV. CONCLUSION**

For the reasons discussed above, plaintiffs' letter motion
for an extension of time to file objections to the Report-
Recommendation and Order (Dkt. No. 31) is **DENIED**.
Further, the Court **ACCEPTS** and **ADOPTS** Judge Dancks's
recommendations in the Report-Recommendation and Order
(Dkt No. 24). Therefore, it is hereby

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 143 of 340

LaPietra v. City of Albany Police Department, Not Reported in Fed. Supp. (2020)

**ORDERED** that plaintiffs' claims against City of Albany Police Department and Albany County Corrections Facility are **DISMISSED WITH PREJUDICE** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted; and it is further

**ORDERED** that the Clerk is directed to revise the docket sheet to **ADD** Albany County as a defendant in this action; and it is further

**ORDERED** that Tarver's Fourteenth Amendment excessive force and failure-to-protect claims against C.O. Burns and Sgt. Remillard **SURVIVE** initial review and require a response; and it is further

**ORDERED** that LaPietra's First Amendment *Monell* claim against Albany County **SURVIVES** initial review and requires a response; and it is further

**ORDERED** that the remaining claims are **DISMISSED WITHOUT PREJUDICE AND WITH LEAVE TO AMEND** pursuant to 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) for failure to state a claim upon which relief may be granted.

If plaintiffs choose to file an amended complaint, any amended complaint must comply with Rules 8 and 10 of the Federal Rules. Any such amended complaint must be signed by both plaintiffs and clearly set forth facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, the revised pleading should allege facts demonstrating the specific involvement of any of the named defendants in the deprivations alleged in sufficient detail to establish that they were tangibly connected to those deprivations. Any such amended complaint will replace the existing Complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the Court.

If plaintiffs intend to file an amended complaint they must do so within thirty (30) days of the date of this Decision and Order. If they fail to timely do so, the case will proceed on the remaining claims in the Complaint.

The Clerk can terminate all defendants EXCEPT Albany County, C.O. Burns, and Sgt. Remillard.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in Fed. Supp., 2020 WL 7021589

---

**Footnotes**

1    The Court previously granted LaPietra's motion to proceed *in forma pauperis* and dismissed any claims that LaPietra asserted on behalf of Tarver. (Dkt. No. 4 at 4-5.)

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 144 of 340

Lewis v. Bartosh, Not Reported in Fed. Rptr. (2023)

🚩 KeyCite Yellow Flag

Distinguished by Salaman v. Carney, D.Conn., August 22, 2025

2023 WL 8613873

Only the Westlaw citation is currently available.

United States Court of Appeals, Second Circuit.

Oswald A. LEWIS, Plaintiff-Appellant,

v.

Christopher BARTOSH, Deputy U.S. Marshal Brian Banks, Deputy Ryan Thomas Westfield, Deputy Robert Ledogar, Deputy Antony Dineen, Defendants-Appellees, Bureau of Alcohol, Tobacco, Firearms and Explosives, (ATF), United States Marshals Service, (USMS), Howard Stern, Bureau of Alcohol Firearm and Explosives (ATF), Ayesha Winston, Bureau of Alcohol, Firearm and Explosives (ATF), Patrick Donahue, United States Marshal Service (USMS), Sandy Rao, United States Marshal Service (USMS), Defendants.

22-3060-pr

|

December 13, 2023

Appeal from a judgment of the United States District Court for the Eastern District of New York (Kovner, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

For Plaintiff-Appellant: Oswald A. Lewis, pro se, Joint Base MDL, NJ.

For Defendants-Appellees: Varuni Nelson, Kevan Cleary, Melanie M. Speight, Assistant United States Attorneys, of counsel, for Breon Peace, United States Attorney for the Eastern District of New York, Brooklyn, NY.

Present: Barrington D. Parker, Eunice C. Lee, Sarah A. L. Merriam, Circuit Judges.

### SUMMARY ORDER

**\*1** In 2016, Plaintiff-Appellant Oswald Lewis, proceeding *pro se*, brought *Bivens* [1] claims against various Deputy

United States Marshals, among others (together, Defendants-Appellees), including for use of excessive force during an arrest at his home and for failure to intervene in that use of force. Lewis's *Bivens* claims partially survived summary judgment. *See Lewis v. Bureau of Alcohol, Tobacco & Firearms*, No. 16-CV-1057(KAM)(JO), 2018 WL 4853043, at *11–12 (E.D.N.Y. Oct. 4, 2018). In July 2022, on the eve of trial, the district court *sua sponte* recognized that the Supreme Court's recent decision in *Egbert v. Boule*, 596 U.S. 482 (2022) might foreclose Lewis's claims under *Bivens* and invited the parties to brief the issue. After receiving that briefing, the district court determined that *Egbert* foreclosed Lewis's remaining claims against the Defendants-Appellees and entered judgment for them. *See Lewis v. Westfield*, 640 F. Supp. 3d 249, 252–55 (E.D.N.Y. 2022). Lewis appealed the decision to this Court.

We assume the parties' familiarity with the underlying facts, the procedural history, and the issues on appeal. Our review is *de novo. Garcia v. Hartford Police Dep't*, 706 F.3d 120, 126 (2d Cir. 2013) (per curiam); *see also Vengalattore v. Cornell Univ.*, 36 F.4th 87, 101 (2d Cir. 2022) (The availability of "a private right of action is of course a purely legal ruling, which we review *de novo.*").

As an initial matter, and contrary to Lewis's arguments that the district court wrongly reopened the judgment, the district court was permitted to *sua sponte* raise the effect of the *Egbert* decision. A district court may exercise its discretion to revisit its earlier rulings in the same case when, among other things, there has been a change of controlling law. *See Off. Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 167 (2d Cir. 2003). While Lewis invokes preclusion doctrines, preclusion affects subsequent lawsuits, not usually "later stages of the *same* litigation." *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999) (emphasis added). [2]

We otherwise agree with the district court that *Egbert* precludes Lewis's *Bivens* claims. In *Egbert*, the Supreme Court emphasized once again that "recognizing a cause of action under *Bivens* is a disfavored judicial activity." *Egbert*, 596 U.S. at 491 (internal quotation marks omitted). "[I]f a claim arises in a new context" — such as if it involves "a new category of defendants" — or if there is an "alternative remedial structure," a *Bivens* remedy is generally "unavailable." *Id.* at 492, 493 (internal quotation marks omitted).

Lewis v. Bartosh, Not Reported in Fed. Rptr. (2023)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 145 of 340

**\*2** The district court concluded that several of the factors recognized in *Egbert* precluded a *Bivens* remedy here, including the professional identity of Defendants-Appellees (Deputy Marshals, rather than federal narcotics agents) and the existence of an alternative remedial scheme through which the Directors of the Marshals Service must investigate reported misconduct. *See Lewis,* 640 F. Supp. 3d at 253–55 (citing 28 U.S.C. § 561(g); 28 C.F.R. § 0.111(n)); *see also Egbert,* 596 U.S. at 497–98 (explaining that a similar remedial scheme "independently foreclose[d]" a *Bivens* remedy against the Border Patrol agents). In response to the former, Lewis argues primarily that *Egbert* should be read to shield only agents of the Department of Homeland Security. But *Egbert* rebuts Lewis's position by indicating that new *Bivens* contexts arise whenever there is "a new category of defendants." *Egbert,* 596 U.S. at 492 (internal quotation marks omitted). And even giving Lewis's submissions the liberal construction afforded to litigants proceeding *pro se,* we do not proceed further in our discussion because Lewis does not address the district court's finding of an available alternative remedial scheme [3] and has, therefore, abandoned any challenge to that determination. *See Green v. Dep't of Educ. of City of N.Y.,* 16 F.4th 1070, 1074 (2d Cir. 2021) (per curiam).

In sum, Lewis has not provided any reason to disturb the district court's ruling that his claims arose in a new *Bivens* context. Finding his remaining arguments to be unavailing or without merit, we **AFFIRM** the judgment of the district court. Accordingly, the related pending motion in this matter is **DENIED**.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 8613873

---

### Footnotes

1    *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971) (holding that there is an implied cause of action for money damages against federal officials for violations of the Fourth Amendment).

2    While the clerk of the district court entered partial judgment in favor of Defendants-Appellees after the original summary judgment decision, the district court did not direct partial entry of judgment under Fed. R. Civ. P. 54(b). Thus, the clerk's entry would not have cabined the subsequent exercise of the district court's discretion because there was no finality.

3    Lewis asserted that "even alternative remedies did not foreclose a *Bivens* action," but this statement neither addresses the district court's discussion nor accurately reflects the law.

---

2025 WL 1019139
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Antonio MADERA, Plaintiffs,

v.

UNITED STATES of America, The City of New York, Craig W. Tietjen, William Arnold, Metehan Egilmez, Omar Saad and Douglas Lopez, Defendants.

24-cv-2903 (PKC)
|
Signed April 4, 2025

**Attorneys and Law Firms**

Cassandra Rohme, Joshua Joseph Lax, Adam Ivan Strychaluk, Liakas Law, P.C., New York, NY, for Plaintiff.

Kellyanne Holohan, New York City Law Department, New York, NY, for Defendant The City of New York.

Silvia L. Serpe, Kimberly Lindsay Friedman, Serpe LLC, New York, NY, Elizabeth Wolstein, Schlam Stone & Dolan LLP, New York, NY, for Defendant Craig W. Tietjen.

David J, Goldsmith, Elizabeth Wolstein, Schlam Stone & Dolan LLP, New York, NY, for Defendant William Arnold.

Bertrand Rolf Madsen, Madsen Law P.A., Tampa, FL, Elizabeth Wolstein, Schlam Stone & Dolan LLP, New York, NY, for Defendant Metehan Egilmez.

Danielle Marryshow, DOJ-United States Attorney's Office, New York, NY, for Defendant United States of America.

OPINION AND ORDER

CASTEL, United States District Judge

 *1  Defendants Craig W. Tietjen, William Arnold and Metehan Egilmez are officers employed by the United States Park Police (the "Park Police" and "Park Police defendants"). Plaintiff Antonio Madera asserts that they deprived him of protections guaranteed by the United States Constitution when they used excessive force against him, participated in his false arrest and malicious prosecution and denied him medical treatment. Madera brings a claim against the Park Police defendants under 42 U.S.C. § 1983, asserting that

although they are federal officers, they acted under color of state law because they conspired with members of the New York City Police Department ("NYPD") and exercised power afforded to them by a New York statute. In the alternative, Madera asserts that the Park Police defendants acted under the color of federal law, and brings a claim under Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971). He also asserts that their actions denied him access to a public accommodation on the basis of race, and brings a claim under the New York City Human Rights Law (the "NYCHRL").

The Park Police defendants move to dismiss all claims against them pursuant to Rule 12(b)(6), Fed. R. Civ. P. As will be explained, the section 1983 claim will be dismissed because, accepting the truth of Madera's allegations, the Park Police defendants enforced New York law in their capacity as federal officers, not as state actors. The Bivens claim will be dismissed because the claim arises in a "new context" and there are "special factors" that preclude extension of the Bivens remedy. Egbert v. Boule, 596 U.S. 482 (2022). Lastly, the NYCHRL claim will be dismissed as to the Park Police defendants because Madera does not plausibly allege that their conduct amounted to the denial of a public accommodation.

BACKGROUND.

For the purposes of this Rule 12(b)(6) motion and in its summary of the Complaint, the Court accepts Madera's non-conclusory factual allegations as true. See, e.g., In Re Shanda Games Ltd. Sec. Litig., 128 F.4th 26, 41 (2d Cir. 2025).

On January 7, 2020, Madera was near Battery Place and West Street in Lower Manhattan, where he managed ticket-selling agents as an employee of Midtown Tours, a tourism company. (Second Amended Complaint (the "Complaint" or "Compl't") ¶¶ 29-33.) The Park Police defendants, along with NYPD officer Omar Saad, approached Madera from behind and demanded to search him. (Compl't ¶ 35.) Madera objected and asked why the officers wanted to conduct a search. (Compl't ¶ 36.) When Madera walked away, the Park Police defendants struck him in the head and body with what Madera believes were police batons and forced him to the ground while continuing to strike him. (Compl't ¶¶ 39-40.) Madera did not resist arrest or attempt to strike any officer. (Compl't ¶¶ 42-43.)

The officers refused to provide Madera with medical treatment and a bystander called an ambulance. (Compl't ¶

45.) Madera was transported to a hospital, where he showed signs of traumatic brain injury, including confusion, agitation, looping words and inability to recall the date or year. (Compl't ¶ 47.) Tietjen and Arnold were not forthcoming with medical staff about the extent of the force used against Madera and did not disclose that he had been mute and unresponsive for several minutes. (Compl't ¶¶ 48-50.) Tietjen and Arnold told hospital staff that Madera suffered from a psychiatric episode and they would not permit staff to examine him unless he was sedated. (Compl't ¶¶ 54-55.) Madera states that he has a severe allergy to a sedative called Haldol and successfully objected to its administration. (Compl't ¶¶ 56-58.) Madera asserts that Tietjen and Arnold prevented hospital staff from administering a more thorough examination that would have revealed that he had suffered traumatic brain injury. (Compl't ¶¶ 52-53.)

*2 At the insistence of Tietjen and Arnold, Madera was removed from the hospital approximately an hour after he arrived, and taken to the NYPD's First Precinct, where Madera continued to show symptoms consistent with a traumatic brain injury. (Compl't ¶¶ 59-62.) While Madera was in rear handcuffs, Arnold threw him to the ground and left him there for several minutes, before he was taken to a holding cell, where Arnold, Tietjen and defendant Douglas Lopez engaged in additional acts of force, including strikes to the face. (Compl't ¶¶ 63-69.)

Madera asserts that the individual defendants made false statements to the Brooklyn District Attorney for use in his prosecution. (Compl't ¶¶ 71-73.) Madera was charged with obstruction of government administration, resisting arrest and harassment in the second degree, arraigned on January 8, 2020, and released on his own recognizance. (Compl't ¶ 74-75.) All charges against him were dropped on July 14, 2020. (Compl't ¶ 77.)

Pursuant to 42 U.S.C. § 1983, Madera asserts that the Park Police defendants deprived him of the protections of the Fourth and Fourteenth Amendments by subjecting him to excessive force, falsely arresting him, maliciously prosecuting him and denying him medical treatment, all while acting color of state law. (Compl't ¶¶ 81-93.) In the alternative, Madera brings a Bivens claim against the Park Police defendants, premised on the assertion that they acted under the color of federal law. (Compl't ¶¶ 176-81.) He separately brings a claim under the NYCHRL, asserting that because he is Black, defendants denied him access to a

public sidewalk, which he asserts is a public accommodation. (Compl't ¶¶ 167-75.)

This action was originally filed in the New York Supreme Court, New York County. (ECF 1.) On April 17, 2024, the United States removed the action to federal court pursuant to 28 U.S.C. § 2679(d)(2) because the Second Amended Complaint added the Park Police defendants as parties. (ECF 1.) The Second Amended Complaint also brought common law claims of false arrest, malicious prosecution and assault and battery against the Park Police defendants. (Compl't ¶¶ 94-114.) By a Stipulation and Order of August 6, 2024, the United States was substituted as defendant for each Park Police defendant under the Federal Tort Claims Act for the three common law claims. (ECF 18.) Only the Park Police defendants have filed a motion to dismiss.

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.' " Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth. Iqbal, 556 U.S. at 678. Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief." Id. at 679. "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.' " Michael Grecco Products, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir. 2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).

DISCUSSION

I. MADERA'S SECTION 1983 CLAIM AGAINST THE PARK POLICE DEFENDANTS WILL BE DISMISSED.

*3 Madera seeks to hold the Park Police defendants liable under 42 U.S.C. § 1983, urging that because they were enforcing New York law and worked in collaboration with NYPD officers, they acted under color of state law and are liable as state actors. But federal law enforcement officers often act jointly with state officials or enforce a state law based on powers expressly afforded to them as federal officers, not as state actors. Because the Complaint does

not plausibly allege facts describing the extremely limited circumstances in which a federal official can be liable as a state actor under section 1983, Madera's section 1983 claim will be dismissed.

Section 1983 provides for an action to redress "the deprivation of any rights, privileges or immunities secured by the Constitution and laws" committed by a person acting under color of state law. "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " West v. Atkins, 487 U.S. 42, 49 (1988) (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).

"The determination as to whether a non-state party acts under color of state law requires an intensely fact-specific judgment unaided by rigid criteria as to whether particular conduct may be fairly attributed to the state." Arar v. Ashcroft, 585 F.3d 559, 568 (2d Cir. 2009). Typically, however, "[a]n action brought pursuant to 42 U.S.C. § 1983 cannot lie against federal officers." Kingsley v. Bureau of Prisons, 937 F.2d 26, 30 n. 4 (2d Cir. 1991); accord United States v. Acosta, 502 F.3d 54, 60 (2d Cir. 2007) ("Section 1983, of course, does not apply to allegedly unlawful acts of federal officers ...."). "A federal actor may be subject to section 1983 liability where there is evidence that the federal actor was engaged in a 'conspiracy' with state defendants." Beechwood Restorative Care Ctr. v. Leeds, 436 F.3d 147, 154 (2d Cir. 2006). "[E]ven specific allegations of conspiracy, if conclusory, would not be sufficient to state a claim for conspiratorial violation of [a plaintiff's] rights." Morales v. City of New York, 752 F.3d 234, 237 (2d Cir. 2014).

Judge Garnett recently summarized the circumstances in which federal officers may be liable under section 1983:

> Federal actors can potentially be held liable under § 1983 under extremely limited circumstances where their conduct is the joint product of the exercise of a State power and of a non-State power and where the state or its officials played a significant role in the result. Cooperation between state and federal bureaucracies is insufficient; federal actors must have acted with

an improper motive rather than just in a spirit of cooperation with the state defendants. Moreover, federal officers who conspire with a state officer may act under color of state law, but since federal officials typically act under color of federal law, they are rarely deemed to have acted under the color of state law.

Escobar v. Correa, 2024 WL 4042122, at *6 (S.D.N.Y. Sept. 4, 2024) (citations, quotation marks and alterations omitted).

In Escobar, Judge Garnett granted a motion to dismiss a section 1983 claim brought against two deputy United States Marshals who allegedly used excessive force alongside NYPD members to arrest a plaintiff who absconded from a Queens County court after his bail was revoked. Id. at *1, *6-8 & n. 3. The plaintiff was then transported from the Bronx to central booking in Queens. Id. at *2. Judge Garnett concluded that the deputy Marshals acted pursuant to a federal grant of authority as deputized members of the federal Marshal Fugitive Task Force. Id. at *7. The execution of a state warrant and presence of deputized state law-enforcement officers did not alter the federal nature of the conduct, and it was "plainly insufficient" to merely allege that the task force included state employees and that defendants acted in violation of state law. Id.

*4 Section 2.15(9) of the New York Criminal Procedure Law expressly provides that Park Police officers can enforce New York's criminal laws, including the authority to make a warrantless arrest and to use physical force in making an arrest. N.Y. C.P.L. §§ 2.15(9), 2.20(1)(a), (b). "[U]nder CPL 2.15, certain 'federal law enforcement officers' are accorded limited peace officer powers." People v. Page, 35 N.Y.3d 199, 206 (2020). Section 2.15(9) incorporates several provisions of CPL section 140.25. "In fact, U.S. Park Police are granted broader authorities [under section 2.15(9)] than most of their federal counterparts." Evans v. Solomon, 681 F. Supp. 2d 233, 241-42 (E.D.N.Y. 2010).

In adopting section 2.15, "[t]he obvious intention was to grant the designated federal officers specified powers to enforce New York (as distinguished from federal) law and to extend those powers to locations beyond federal property." N.Y. C.P.L. § 2.15, Practice Commentary (McKinney's). "[S]ection 2.15 does establish that when circumstances such as those

faced by [the officer] arise, New York encourages federal officers to enforce New York law." United States v. Hoy, 137 F.3d 726, 731 n.1 (2d Cir. 1998); see also United States v. Samuels, 2004 WL 2823079, at *3 (S.D.N.Y. Dec. 7, 2004) (DEA agents lawfully made a warrantless arrest for driving with a defective tail light under New York law, consistent with CPL section 2.15) (Patterson, J.); People v. Boyea, 44 A.D.3d 1093, 1094 (3d Dep't 2007) (Border Patrol officer's "status as a federal agent did not deprive him of authority" to search vehicle for violation of state law).

Madera urges that the grant of authority under section 2.15(9) demonstrates that the Park Police defendants acted under color of state law when they arrested Madera and used force against him. But without more, enforcement of a state law in the course of a federal officer's work does not make that officer a state actor. Section 2.15 conditions its grant of authority on the officer's position at one of the identified federal agencies. While the Court has been unable to locate any authority that discusses section 2.15 in relation to section 1983, Evans considered section 2.15(9) in the context of a Bivens claim premised on the officer acting under color of federal law, and concluded that the statute permitted a Park Police officer to make a warrantless stop for a traffic offense. 681 F. Supp. 2d at 241-44. In criminal proceedings, the Second Circuit has cited section 2.15 to support the conclusion that a defendant can be guilty of the crime of assaulting a federal officer who is in the process of enforcing a state law. Hoy, 137 F.3d at 731 (a deputy Marshal "is expected and authorized" to intervene "where there is harm or a threat of harm as a consequence of the violation of state law."); cf. United States v. Reid, 517 F.2d 953, 964 (2d Cir. 1975) ("If DEA agents or other federal law enforcement officers do what they are properly expected to do in the enforcement of state criminal laws, they should have the same federal protection they would receive in the performance of their other duties."). These decisions support the conclusion that a federal officer enforcing a state law under section 2.15 does so under color of federal law, not as a state actor.

That the Park Police defendants acted within the scope of their authority as federal officers is further supported by sections .06 and .07 of Park Police General Order No. 2101. (ECF 32-7.) The General Order "allows the exercise of such state law enforcement authority when there is some sort of unexpected occurrence that requires immediate action" while "outside the National Park System" and states that "[p]rosecution of all state law offenses ... shall be handled only in State court." Gen. Order § 2101.06(C). The General Order quotes from CPL section 2.15(9) when noting that a Park Police officer may make an arrest under New York law where there is reasonable cause to believe that "any offense" has been committed. Id. § 2101.07(A)(1). While this General Order is not among the policies currently in effect on the Park Police website,[1] it is consistent with the plain language of CPL 2.15(9) and it supports the conclusion that Park Police officers act in a federal capacity when enforcing New York law. Cf. Hoy, 137 F.3d at 730 (courts and Congress use "expansive reasoning" when determining whether enforcement of state law is part of an officer's official duties, including consideration of unwritten policies).

**\*5** Madera also urges that the Park Police defendants could not have acted under color of federal law because they were not on federal property during the events described in the Complaint, and even accompanied Madera to the NYPD precinct. (Opp. Mem. at 17-18.) But, as previously discussed, there is ample precedent recognizing that federal law enforcement officers have authority to enforce state law, and the view of the Park Police as set forth in the General Order permits the exercise of state law enforcement authority "outside the National Park System."

To the extent that the Complaint purports to describe the Park Police defendants as participants in a conspiracy, conclusory allegations that they "conspired" or acted "in conspiracy" (Compl't ¶¶ 82-83, 85) with state actors are legal labels not afforded a presumption of truth. See, e.g., Doe v. Fenchel, 837 Fed. App'x 67, 68-69 (2d Cir. 2021) (" 'A complaint containing only conclusory, vague, or general allegations of conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss.' ") (quoting Sommer v. Dixon, 709 F.2d 173, 175 (2d Cir. 1983) (per curiam)). As Judge Garnett observed, mere cooperation between state and federal officers is insufficient, and a plaintiff must identify an improper motive of the federal actors. Escobar, 2024 WL 4042122, at *6 ("[c]ooperation between state and federal bureaucracies is insufficient; federal actors must have acted with an improper motive rather than just in a spirit of cooperation with the state defendants.") (quotation marks omitted).[2]

Accepting the truth of the Complaint's non-conclusory factual allegations, Madera describes actions taken by federal law enforcement officers to enforce state law based on their authority as federal officials, and not as state actors. The motion to dismiss Madera's section 1983 claim will therefore be granted.

## II. MADERA'S BIVENS CLAIM WILL BE DISMISSED.

Pleading in the alternative, Madera also brings a Bivens claim, asserting that the Park Police Defendants deprived him of rights guaranteed by the Constitution while acting under color of federal law. (Compl't ¶¶ 176-81.) Because Madera's claim arises in a new context and special factors counsel against an extension of the Bivens remedy, the claim fails as a matter of law and will be dismissed. Egbert v. Boule, 596 U.S. 482 (2022).

To state a valid Bivens claim against a federal official in his or her individual capacity, a plaintiff must allege that he or she "has been deprived of a constitutional right by a federal agent acting under color of federal authority." Thomas v. Ashcroft, 470 F.3d 491, 496 (2d Cir. 2006). Not all such wrongs, however, give rise to a Bivens action. The Supreme Court historically recognized three categories of Bivens claims and since emphasized that "expanding the ... remedy is now a 'disfavored' judicial activity." Ziglar v. Abbasi, 582 U.S. 120, 135 (2017) (quoting Iqbal, 556 U.S. at 675). The approved claims arose in: (i) Bivens itself, a Fourth Amendment search-and-seizure suit against federal narcotics officers; (ii) Davis v. Passman, 442 U.S. 228 (1979), a Fifth Amendment due process suit against a congressman-employer on the grounds of gender discrimination; and (iii) Carlson v. Green, 446 U.S. 14 (1980), an Eighth Amendment cruel and unusual punishment suit against federal prison authorities for failure to provide adequate medical treatment. See Ziglar, 582 U.S. at 130-31. "After those decisions, however, the Court changed course," and has "consistently rebuffed requests to add to the claims allowed under Bivens." Hernandez v. Mesa, 589 U.S. 93, 99, 102 (2020).

**\*6** A bifurcated framework governs whether a Bivens claim should proceed. First, the court determines "whether the request involves a claim that arises in a 'new context'" for a Bivens action. Id. at 102. The court's "understanding of a 'new context' is broad," and the court " 'regard[s] a context as 'new' if it is different in a meaningful way from previous Bivens cases decided by'" the Supreme Court. Id. (quoting Ziglar, 528 U.S. at 147). "[A] case that involves a new category of defendants" is a new context that does not allow for a Bivens remedy because it is a "situation[ ] in which a court is not undoubtedly better positioned than Congress to create a damages action." Egbert, 596 U.S. at 492 (quotation marks omitted).

Second, "if a claim arises in a new context, a Bivens remedy is unavailable if there are 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.'" Id. (quoting Ziglar, 582 U.S. at 136). If "Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a Bivens remedy," "even if a court independently concludes that the Government's procedures are not as effective as an individual damages remedy." Id. at 498 (quotation marks omitted). "If there is even a single reason to pause before applying Bivens in a new context, a court may not recognize a Bivens remedy." Id. (quotation marks omitted). "While our cases describe two steps, those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." Id.

Following Egbert, the Second Circuit has issued two summary orders affirming dismissal of Bivens claims against new categories of defendants. Cohen v. Trump, 2024 WL 20558, at *2-3 (2d Cir. Jan. 2, 2024) (affirming dismissal of Bivens claim because Bureau of Prisons officials are a new category of defendants and claim related to solitary confinement would have extended the Bivens remedy) (summary order); Lewis v. Bartosh, 2023 WL 8613873, at *2 (2d Cir. Dec. 13, 2023)) (affirming dismissal of Bivens claim because deputy United States Marshals are a new category of defendants and an alternative remedial scheme was in place) (summary order); see also Escobar, 2024 WL 4042122, at *4 (citing Cohen and Lewis in dismissing Bivens claim against deputy Marshal).

Judge Chen of the Eastern District of New York recently dismissed a Bivens claim against a Park Police officer because it was brought "against an officer from a different agency than in Bivens," noting that "the difference in agency is now sufficient, after Egbert, to create a new context." Gray v. Gomez, 728 F. Supp. 3d 264, 271 (E.D.N.Y. 2024) (quotation marks and alterations omitted). In Gray, the officer allegedly used a taser upon plaintiff when a fight broke out at a barbecue. Id. at 266. Plaintiff was arrested and transported by Park Police officers to an NYPD precinct and charged in Kings County Criminal Court, and all charges were later dismissed. Id. at 266-67. Plaintiff brought a Bivens claim asserting false arrest, excessive force and deprivation of the right to fair trial. Id. at 267. While plaintiff's factual allegations broadly paralleled those in Bivens itself, including a line-level law-enforcement officer allegedly using excessive

force and making a warrantless false arrest in violation of established law, the "caution" advised in Egbert and the Second Circuit's summary orders in Cohen and Lewis led Judge Chen to conclude that defendant's role as a Park Police officer presented a new context for Bivens purposes. Id. at 269-72.

**\*7** On the second prong of the Bivens analysis, Judge Chen concluded that complaint procedures used by the Park Police were a special factor that made the Bivens remedy unavailable. Id. at 273 ("the existence of the Park Police's complaint procedures alone forecloses Plaintiff's claims.") (emphasis in original). She stated that, under Egbert, "the Court ultimately 'cannot second guess' that remedial structure by superimposing a Bivens remedy' where it does not already exist." Id. (quoting Egbert, 596 U.S. at 498); see also Lewis, 2023 WL 8613873, at \*1 ("if there is an 'alternative remedial structure,' a Bivens remedy is generally 'unavailable.' ") (quoting Egbert, 596 U.S. at 492, 493).

This Court is persuaded by Judge Chen's thorough opinion, which addressed a Bivens claim factually similar to Madera's. Egbert, and its application in the Cohen and Lewis summary orders, require the conclusion that Madera's claim against the Park Police defendants presents a "new context" under Bivens. The Court further concludes that the Internal Affairs Unit of the Park Police provides a complaint procedure for the investigation of claims. The Park Police website states: "The United States Park Police Internal Affairs Unit documents and investigates allegations of misconduct against Department personnel that are received both through internal (administrative) and external (citizen generated) means.... The supervisor assigned to the case will conduct a thorough investigation, to include an interview of the involved employee and any witnesses that have been identified." [3] When a complaint is sustained, "appropriate disciplinary action will be taken against the affected employee." The agency's alternative remedial scheme "preclude[s] a Bivens remedy here ...." Lewis, 2023 WL 8613873, at \*2 (citing Marshals Service remedial scheme); see also Kunstler v. Central Intelligence Agency, 2023 WL 8776339, at \*5 (S.D.N.Y. Dec. 19, 2023) (CIA's internal remedial process precluded Bivens relief) (Koeltl, J.). [4]

Because Madera's Bivens claim arises in a new context and because the availability of Park Police complaint procedures is a special factor that makes a Bivens remedy unavailable, the Bivens claim fails as a matter of law and will be dismissed.

## III. THE COURT DECLINES TO REACH DEFENDANTS' ARGUMENTS ON TIMELINESS.

**\*8** As an alternative grounds for dismissal, the Park Police defendants urge that Madera's section 1983 and Bivens claims should be dismissed as time-barred because they were not filed within the three-year limitations period. See Kane v. Mount Pleasant Central School District, 80 F.4th 101, 104 (2d Cir. 2023); Tapia-Ortiz v. Doe, 171 F.3d 150, 151 (2d Cir. 1999).

In response, Madera argues that the claims were subject to tolling under New York Executive Order 202.8, under which then-Governor Cuomo tolled the time period for the commencement of personal-injury actions due to the Covid-19 pandemic. See 9 C.R.R.-N.Y. § 8.202. District Courts have reached conflicting conclusions about the applicability of that Executive Order to section 1983 claims. See Miehle-Kellogg v. County of Suffolk, 2024 WL 5120017, at \*10-12 (E.D.N.Y. Dec. 16, 2024) (surveying authorities and concluding that Executive Order 202.8 tolls section 1983 claims). The Second Circuit has not yet spoken to the issue. See Mallet v. New York State Dep't of Correction & Community Supervision, 126 F.4th 125, 134 n.7 (2d Cir. 2025) (declining to address the issue as "not necessary to decide this appeal."). The Court is unaware of authority that considers what effect, if any, the Executive Order has on the tolling of a Bivens claim.

Because the Complaint does not plausibly state a claim against the Park Police defendants under section 1983 or Bivens, the Court need not decide whether the claims were timely brought, including the issue of whether the Executive Order tolled the period to bring these claims.

## IV. MADERA DOES NOT PLAUSIBLY STATE A CLAIM AGAINST THE PARK POLICE DEFENDANTS UNDER THE NYCHRL.

Madera asserts that the Park Police defendants violated the NYCHRL. (Compl't ¶¶ 167-75.) He asserts that a sidewalk is a public accommodation under the NYCHRL and that he was treated differently than non-Black individuals who used that same public accommodation. (See id.)

The NYCHRL applies to "any person who is the owner ... or employee of any place or provider of public accommodation ...." NYC Admin. Code § 8-107(4). "The term 'place or provider of public accommodation' includes providers, whether licensed or unlicensed, of goods, services,

facilities, accommodations, advantages or privileges of any kind, and places, whether licensed or unlicensed, where goods, services, facilities, accommodations, advantages or privileges of any kind are extended, offered, sold, or otherwise made available." Id. § 8-102. The NYCHRL makes it unlawful "[b]ecause of any person's actual or perceived race ... [to] withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities, or privileges of the place or provider of public accommodation ...." Id. § 8-107(4)(1)(a). The NYCHRL provides that its terms "shall be construed liberally for the accomplishment of [its] uniquely broad and remedial purposes." Id. § 8-130(a). "[E]ven under the City HRL, the general principle of liberal construction does not substitute for evidence ...." Russell v. New York Univ., 42 N.Y.3d 377, 385 (2024) (quotation marks and brackets omitted).

In discussing administrative enforcement of the New York State Human Rights Law (the "NYSHRL"), the Appellate Division has noted that while law enforcement "could" provide a public accommodation "under certain circumstances," "arrest and incarceration are properly viewed as the antithesis of a public accommodation." Letray v. New York State Div. of Human Rights, 181 A.D.3d 1296, 1297 (4th Dep't 2020) (emphasis in original; quotation marks and ellipsis omitted). It affirmed the dismissal of petitioner's administrative complaint for lack of jurisdiction, stating that "it defies logic to suggest that law enforcement is providing 'conveniences' or 'services' to those arrested and detained." Id.; see also O'Brien v. City of Syracuse, 2023 WL 6066036, at *24 n. 11 (N.D.N.Y. Sept. 18, 2023) (concluding that the NYSHRL "does not apply to police-citizen encounters ....") (citing Letray). While the NYSHRL differs from the NYCHRL, they are both construed liberally. See, e.g., Griffith v. Coney Food Corp., 2020 WL 4748452, at *3 n. 4 (E.D.N.Y. Aug. 17, 2020).

**\*9** In D.H. v. City of New York, 309 F. Supp. 3d 52, 81 (S.D.N.Y. 2018), the undersigned assumed without deciding

that services offered by the NYPD could constitute a public accommodation under the NYCHRL and NYSHRL, but that an officer's determination of probable cause to arrest a person was not a service, accommodation or other act covered by the NYCHRL and NYCHRL, and was instead "a power bestowed by statute to police and peace officers that is held in check by two centuries of established judicial precedent" and "subject to well-developed state and federal constitutional restraints." Id. The Court dismissed plaintiffs' claim that their arrests were unlawful under the NYCHRL. Id.

Madera argues that the NYCHRL claim is directed to the NYPD's interference with his use and enjoyment of a public sidewalk on the basis of race, as opposed to "mere arrest and detention ...." (Opp. Mem. 23.) But his NYCHRL claim expressly alleges that defendants "stopped, questioned, arrested, assaulted, battered, frisked, and [used] excessive force" against him, resulting in "serious physical injuries ... because of the Constitutional violations carried out and/or allowed by Defendants." (Compl't ¶¶ 169, 172.) The claimed deprivations of Madera's constitutional rights are the same actions that allegedly deprived him of use and enjoyment of the public sidewalk. For the reasons set forth in Letray and D.H., an officer's actions during an arrest and use of force while making an arrest do not plausibly allege the denial of a public accommodation under the NYCHRL.

Madera's NYCHRL claim will therefore be dismissed as to the Park Police defendants.

CONCLUSION.

The motion to dismiss filed by Craig W. Tietjen, William Arnold and Metehan Egilmez is GRANTED. (ECF 30.)

SO ORDERED.

**All Citations**

Slip Copy, 2025 WL 1019139

---

## Footnotes

1    https://www.nps.gov/subjects/uspp/u-s-park-police-general-orders.htm (last visited April 4, 2025)

2    On the question of whether defendants acted under the color of state law, the Court does not afford weight to certain language in the Stipulation and Order substituting the United States as defendant on Madera's FTCA

claims. (ECF 18.) While that Stipulation and Order provides that defendants' alleged wrongful acts occurred within the scope of their federal employment as Park Police, it also states that "[n]othing in this Stipulation shall be construed to impact Plaintiff's <u>Bivens</u> or Section 1983 claims ...." (<u>Id.</u>)

3    https://www.nps.gov/subjects/uspp/file-a-complaint.htm (last visited: April 4, 2025)

4    <u>Hicks v. Ferreyra, 64 F.4th 156 (4th Cir. 2023),</u> affirmed a jury verdict and damages awarded on a <u>Bivens</u> claim brought by a secret service agent who asserted that he had been unlawfully detained by Park Police officers. Among other things, the Fourth Circuit noted that defendants did not identify an alternative remedial procedure offered by the Park Police. <u>Id. at 168 n. 3</u>. The <u>Hicks</u> defendants also first challenged the availability of <u>Bivens</u> relief in an interlocutory appeal filed after the district court denied a motion for summary judgment on qualified immunity grounds, and apparently did not raise the issue with the district court until a motion brought under Rule 50(a) during the trial. <u>See</u> <u>id. at 163-64</u>. The absence of an alternative remedy and the procedural history of <u>Hicks</u> distinguish that case from Madera's claims. Courts outside of the Fourth Circuit have declined to adopt the reasoning of <u>Hicks</u>. <u>See</u> <u>Lovett v. United States, 2024 WL 4286054, at *6 (D.D.C. Sept. 25, 2024)</u> (<u>Hicks</u> did not follow <u>Egbert</u>'s "admonition to resist 'superficial similarities' when asking whether a case presents a new context."); <u>Gray</u>, 728 F. Supp. 2d at 270-72 (discussing <u>Hicks</u> but concluding that " 'our watchword is caution.' ") (quoting <u>Egbert, 596 U.S. at 491</u>).

---

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 154 of 340

Martinez v. D'Agata, Not Reported in Fed. Supp. (2019)

KeyCite Yellow Flag

Distinguished by Powell v. United States,   S.D.N.Y.,   August 31, 2020

2019 WL 6895436
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jason MARTINEZ, Plaintiff,
v.
Steven D'AGATA, Mark Hess, Andrew Frank,
Anthony Costales, and Sean Grogan, Defendants.

16 CV 44 (VB)
|
Signed 12/16/2019
|
Filed 12/18/2019

**Attorneys and Law Firms**

Jonathan Robert Goldman, Sussman and Associates, Michael Howard Sussman, Sussman & Watkins, Goshen, NY, for Plaintiff.

Robert Varga, Law Office of Thomas K. Moore, White Plains, NY, Eric Daniel Feldman, Law Firm of Louis Ginsberg, P.C., New York, NY, for Defendants Detective Steven D'Agata, Mark Hess.

Eric Daniel Feldman, Law Firm of Louis Ginsberg, P.C., New York, NY, for Defendant John Doe 1-3.

Andrew Edward Krause, United States Attorney's Office, New York, NY, for Defendants Andrew Frank, Anthony Costales, Sean Grogan.

## OPINION AND ORDER

Briccetti, United States District Judge:

**\*1** Plaintiff Jason Martinez brings a Fourth Amendment claim against defendants Investigators Andrew Frank and Sean Grogan for failing to intervene while unnamed individuals used excessive physical force against plaintiff without justification. Plaintiff also asserts a Fifth Amendment claim against defendants Frank, Grogan, and Detective Anthony Costales (collectively, the "federal defendants"), and a Fourteenth Amendment claim against Detectives Steven D'Agata and Mark Hess (collectively, the "Liberty

defendants"), for deliberate indifference to serious medical needs.

Before the Court are motions for summary judgment filed by the federal defendants and the Liberty defendants. (Docs. ##103, 110).

For the reasons set forth below, the federal defendants' motion is GRANTED, and the Liberty defendants' motion is DENIED.

The Court has subject matter jurisdiction under 28 U.S.C. § 1331.

## BACKGROUND

The parties submitted briefs, declarations with exhibits, and statements of material fact pursuant to Local Civil Rule 56.1, which reflect the following factual background.

The federal defendants were members of the United States Marshals Service's New York/New Jersey Regional Fugitive Task Force when the events relevant to this action occurred. The task force is overseen by the United States Marshals Service, a federal agency. Its members are appointed Special Deputy United States Marshals, even though the members are employees of different state and local law enforcement agencies.

The Liberty defendants were members of the Village of Liberty Police Department when the events relevant to this action occurred.

I. Plaintiff's Arrest
Plaintiff, a registered level-two sex offender, moved from Liberty, New York, to his friend's home in Maspeth, Queens, in January 2015.

Thereafter, D'Agata of the Liberty Police Department provided Frank of the task force with a warrant authorizing plaintiff's arrest for failing to report a recent address change. [1] On February 18, 2015, Frank sent an e-mail to members of the task force seeking assistance to execute the arrest warrant the following day.

At least eight members of the task force participated in the operation to apprehend plaintiff. The group met at 5:30

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 155 of 340

Martinez v. D'Agata, Not Reported in Fed. Supp. (2019)

a.m. on February 19, 2015, at the New York City Police Department's 104th Precinct, in Queens, and proceeded to plaintiff's friend's home at 52-24 71st Street in Maspeth, where plaintiff was staying with his family.

Plaintiff was arrested that morning.

### A. Apprehension and Arrest
The parties offer differing accounts of plaintiff's arrest.

Plaintiff testified the task force members entered the home of Jaime Morales, plaintiff's friend, in search of plaintiff. According to plaintiff, two task force members—whom plaintiff described as a short, "bald", and "chubby" white man and a tall black man—went into the basement and handcuffed plaintiff. (Doc. #116 ("Sussman Aff."), Ex. 3 ("Pl. Dep.") at 55, 60–61). [2] The officers pushed plaintiff's head into a protruding pipe, and then proceeded with plaintiff upstairs toward the backyard. (Id. at 62). Plaintiff testified he was dragged from the house to a snow bank where the two task force members "pushed [his] face first into the snow bank" and struck him with a flashlight in the back of his head. (Id. at 68, 143). Plaintiff then was repeatedly "kicked in [his] groin area ... until [he] started losing consciousness." (Id. at 71).

**\*2** Morales testified he heard somebody "getting beat up downstairs" and indicated this occurred both inside and outside the house. (Sussman Aff. Ex. 2 ("Morales Dep.") at 58). Morales further testified he heard plaintiff's wife screaming and telling the officers to stop. (Morales Dep. at 61). Plaintiff's wife also testified plaintiff was screaming.

Defendants tell a different story. Members of the task force testified that they knocked on the door, waited two to five minutes and heard a door slam, and then someone opened the front door. According to the federal defendants, Frank, Costales, and three other task force members entered Morales's home after a brief conversation with one of the residents.

Grogan testified that as members of the task force went to the front door, he and task force member Canario attempted to access the back of the house but were unable to do so. Instead, Grogan and Canario proceeded to a residence three or four houses away from 52-24 71st Street. While Grogan could not recall seeing plaintiff prior to his arrest, he did recall Canario yelling stop at someone who was "four or five houses" away. (Doc. #108 ("Krause Decl.") Ex. B ("Grogan

Dep.") at 38). When Grogan and Canario arrived at the place where the unidentified person had been standing, Grogan encountered a chain link fence and "obvious footprints." (Id. at 41). Kurzhals, another task force member, said he saw the suspect "running, but slowly. Limping, running." (Krause Decl. Ex. E ("Kurzhals Dep.") at 40). Eventually, Kurzhals caught up with plaintiff, drew his weapon, and told plaintiff to stop running and lay on the ground. Kurzhals then arrested plaintiff. [3]

According to Frank, plaintiff was apprehended "at a location several blocks away" from Morales's home. (Doc. #105 ("Frank Decl.") ¶ 6). Frank drove over to the site of plaintiff's arrest and saw plaintiff lying in a snow bank. Frank observed plaintiff was "bleeding from the bottom of his feet." (Krause Decl. Ex. A ("Frank Dep.") at 36). Frank testified he drove plaintiff back to the house before leaving for the 104th Precinct.

Plaintiff, however, denies any attempt to flee and maintains he did not jump over any fence. (Pl. Dep. at 33). Plaintiff testified that the officers who drove him to the 104th Precinct were the same officers that beat him up. However, both Frank and Grogan state that they did not see plaintiff until after he was arrested by Kurzhals, and Frank said plaintiff later apologized for running from the house.

### B. Transport to the Precinct
A task force member had called for medical assistance to respond to Morales's home and subsequently redirected the ambulance to the 104th Precinct.

Frank and Grogan transported plaintiff to the precinct, five minutes from 52-24 71st Street. Plaintiff testified he was unconscious during the ride, vomited on his shirt, experienced pain in his groin, and had difficulty breathing. Frank and Grogan recalled plaintiff's heavy breathing but attributed it to the fact that plaintiff had just been running. (Frank Dep. at 48–50). Plaintiff did not request medical care during this drive.

### II. Medical Treatment at the 104th Precinct
At 6:28 a.m., emergency medical technicians ("EMTs") Edith Moog and Siewnarine Persad of the New York City Fire Department treated plaintiff at the precinct. The medical evaluation lasted approximately thirty minutes and included checks of plaintiff's breathing, skin, temperature, and vitals, as well as head-to-toe and neurological assessments. The EMTs also applied wound dressings. The EMTs did not perform

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 156 of 340

Martinez v. D'Agata, Not Reported in Fed. Supp. (2019)

any exam that involved palpating any body parts, which they would do only when an individual makes a specific complaint of injury. Nor did the EMTs remove plaintiff's clothing because standard practice is to not remove a patient's clothing unless the patient asked for them to do so or they had express permission.

**\*3** According to the EMTs' report, plaintiff suffered "soft tissue injuries." (Krause Decl. Ex. Q at ECF 2). Plaintiff did not tell the EMTs that he suffered an injury to his groin area, and he declined to be transported to a hospital for further medical treatment. However, plaintiff refused to sign a document stating that he declined medical treatment.

The federal defendants were present during the EMTs' evaluation.

### III. Transfer of Custody

Frank and Grogan brought plaintiff to the Sex Offender Management Unit ("SOMU") at 100 Centre Street in Manhattan. Plaintiff did not request medical treatment during the drive from Queens to Manhattan. Around 6:30 a.m., Frank called D'Agata to inform him they had plaintiff in custody.

Frank and Grogan turned plaintiff over to Costales at SOMU. Plaintiff testified he spoke with only one law enforcement officer, an individual he described as "short, chubby, maybe like my height [5'6"], real chubby." (Pl. Dep. at 102). Plaintiff claims he told that officer—whom he identifies as Costales—he was in pain and required medical attention, and that his request was denied. Plaintiff testified he did not get medical attention at SOMU and was told he could go to the hospital after he was released.

Plaintiff's physical description of the law enforcement officer whom he identifies as Costales does not match Costales's description of himself. Costales claims he is six feet and two inches tall. (Doc. #108 ("Costales Decl.") ¶ 3). Moreover, Frank, Grogan, and Costales all testified that they each spent no more than fifteen minutes at SOMU.

### IV. Transport to Liberty

Plaintiff remained at SOMU from 7:30 a.m. to about 8:00 p.m., when he was picked up by Liberty Police Department Detectives D'Agata and Hess. The Liberty defendants drove plaintiff to Liberty, New York, approximately a two-hour drive. During the drive, plaintiff asserts he asked to be taken to the hospital, but that request was denied. The Liberty

defendants dispute this assertion and maintain they asked plaintiff if he wanted to go to the hospital, but that plaintiff declined. (Doc. #112 ("Varga Decl.") Ex. K ("D'Agata Dep.") at 49). The Liberty defendants drove plaintiff to the Liberty police station.

At the police station, the Liberty defendants read plaintiff his Miranda rights and interviewed plaintiff. Before the interview began, however, plaintiff "said he was in pain, and he pointed to his abdominal stomach area" and "lifted his shirt," at which point the Liberty defendants saw plaintiff's bruises. (Varga Decl. Ex. L ("Hess Dep.") at 42). The Liberty defendants then interviewed plaintiff for approximately twenty-seven minutes.

The Liberty defendants assert that after plaintiff showed them his bruises, plaintiff told them he would see a doctor after he was released from custody. However, plaintiff insists he asked for medical care and his request was denied.

### V. Medical Attention

After about an hour at the police station, plaintiff was transferred to the Sullivan County Jail, arriving after midnight on February 20, 2015. There, it was determined plaintiff should be transferred to Catskill Regional Medical Center for treatment. According to an admission note at Catskill Regional Medical Center, plaintiff "injured his toes while attempting to elude the police while barefoot" and the injuries to his "groin, back, and right hand were the result of the physical altercation with the police." (Krause Decl. Ex. R at ECF 6).

**\*4** At 8:56 a.m. that same morning, plaintiff was transferred and admitted to Albany Medical Center, where he was diagnosed with rhabdomyolysis, a right groin hematoma, and an injury to his right testicle. (Krause Decl. Ex. R at ECF 3). The urologist, Dr. Robert C. Welliver, indicated "[b]y the time we were consulted, the testis was not viable as it had been well over 4 hours since his injury." (Krause Decl. Ex. R at ECF 4). Plaintiff remained at Albany Medical Center until February 24, 2015, after which he was transferred back to Sullivan County Jail.

Plaintiff's right testicle returned to normal blood flow by March 9, 2015. (Krause Decl. Ex. S at ECF 2). Defendants' expert Dr. Arnold Melman attributed the healing to plaintiff's medical treatment being done "rapidly and appropriately." (Varga Decl. Ex. X at ECF 3). Plaintiff disputes this assessment.

## DISCUSSION

### I. Legal Standard

The Court must grant a motion for summary judgment if the pleadings, discovery materials before the Court, and any affidavits show there is no genuine issue as to any material fact and it is clear the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).[4]

A fact is material when it "might affect the outcome of the suit under the governing law.... Factual disputes that are irrelevant or unnecessary" are not material and thus cannot preclude summary judgment. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A dispute about a material fact is genuine if there is sufficient evidence upon which a reasonable jury could return a verdict for the non-moving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. at 248. The Court "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried." Wilson v. Nw. Mut. Ins. Co., 625 F.3d 54, 60 (2d Cir. 2010). It is the moving party's burden to establish the absence of any genuine issue of material fact. Zalaski v. City of Bridgeport Police Dep't, 613 F.3d 336, 340 (2d Cir. 2010).

If the non-moving party has failed to make a sufficient showing on an essential element of his case on which he has the burden of proof, then summary judgment is appropriate. Celotex Corp. v. Catrett, 477 U.S. at 323. If the non-moving party submits "merely colorable" evidence, summary judgment may be granted. Anderson v. Liberty Lobby, Inc., 477 U.S. at 249–50. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation." Brown v. Eli Lilly & Co., 654 F.3d 347, 358 (2d Cir. 2011). The mere existence of a scintilla of evidence in support of the non-moving party's position is likewise insufficient; there must be evidence on which the jury could reasonably find for him. Dawson v. Cty. of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the Court construes the facts, resolves all ambiguities, and draws all permissible factual inferences in favor of the non-moving party. Dallas Aerospace, Inc. v. CIS Air Corp., 352 F.3d 775, 780 (2d Cir. 2003). If there is any evidence from which a reasonable inference could be drawn in favor of the non-moving party on the issue on which summary judgment is sought, summary judgment is improper. See Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004).

**\*5** In deciding a motion for summary judgment, the Court need only consider evidence that would be admissible at trial. Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).

### II. Failure to Intervene Claim

#### A. Bivens Standard

The federal defendants argue the Supreme Court's recent decision in Ziglar v. Abbasi, 137 S. Ct. 1843 (2017), precludes a private right of action for failure to intervene when excessive force was used to effectuate an arrest, and that plaintiff's claim against them should therefore be dismissed.[5]

The Court agrees.

"For a plaintiff to enforce his constitutional rights he must have a cause of action. That is, there must be a statute passed by Congress or a judicially implied claim for relief." Rivera v. Samilo, 370 F. Supp. 3d 362, 366 (E.D.N.Y. 2019). Because plaintiff cannot identify a statute to prosecute this action, the question remains "whether there is a judicially implied claim for relief." Id.

"In Bivens v. Six Unknown Narcotics Agents, 403 U.S. 388 (1971), the Supreme Court recognized an implied private action for damages against federal officers alleged to have violated a citizen's constitutional rights." McGowan v. United States, 825 F.3d 118, 123 (2d Cir. 2016). Specifically, the Court implied a private right of action under the Fourth Amendment for an unreasonable search and seizure claim against FBI agents for handcuffing a man in his own home without a warrant. Rivera v. Samilo, 370 F. Supp. 3d at 366 (discussing Bivens v. Six Unknown Narcotics Agents, 403 U.S. at 389, 397).

Since Bivens, the Supreme Court has recognized a damages remedy for constitutional violations in only two other contexts: (1) under the Fifth Amendment's Due Process Clause for gender discrimination against a congressman for firing his female secretary, Davis v. Passman, 442 U.S. 228, 99 (1979), and (2) under the Eighth Amendment's prohibition on cruel and unusual punishment against prison officials for

failure to treat an inmate's asthma which led to his death, Carlson v. Green, 446 U.S. 14 (1980).

Recently, the Supreme Court emphasized that "[t]hese three cases—Bivens, Davis, and Carlson—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." Ziglar v. Abbasi, 137 S. Ct. at 1855. The Abbasi Court expressed the need for restraint in expanding the Bivens remedy to additional contexts and cautioned that courts should not imply rights and remedies pursuant to Bivens as a matter of course. Id. at 1856–57. Indeed, "the Court has made clear that expanding the Bivens remedy is now a 'disfavored' judicial activity." Id. at 1857.

**\*6** The Supreme Court set out a two-step inquiry for courts to determine whether to infer a Bivens cause of action in a new context or against a new category of defendants. "First, the court must determine whether a plaintiff's claims arise in a new Bivens context." Rivera v. Samilo, 370 F. Supp. 3d at 367. "If the case is different in a meaningful way from previous Bivens cases decided by [the Supreme Court], then the context is new." Ziglar v. Abbasi, 137 S. Ct. at 1859. The Court provided some examples of ways in which a case "might differ in a meaningful way" including:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusions by the Judiciary into the functioning of other branches; or the presence of special factors that previous Bivens cases did not consider.

Ziglar v. Abbasi, 137 S. Ct. at 1860.

"Second, if the claim arises in a new context, a court must consider whether there are special factors counseling hesitation in creating a Bivens remedy." Ramirez v. Tatum, 2018 WL 6655600, at \*5 (S.D.N.Y. Dec. 19, 2018) (citing Ziglar v. Abbasi, 137 S. Ct. at 1857), reconsideration denied,

2019 WL 2250339 (S.D.N.Y. May 24, 2019). "The question of what special factors counsel hesitation 'must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action or proceed.' " Id. (citing Ziglar v. Abbasi, 137 S. Ct. at 1857–58). "Thus, to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate before answering that question in the affirmative." Id. (citing Ziglar v. Abbasi, 137 S. Ct. at 1858). "[I]f there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new Bivens cause of action." Ziglar v. Abbasi, 137 S. Ct. at 1858).

Few courts in this Circuit have considered a plaintiff's Bivens claim for excessive force in effectuating an arrest with a warrant post-Abassi. In Lehal v. Cent. Falls Det. Facility Corp., 2019 WL 1447261, at \*11 (S.D.N.Y. Mar. 15, 2019), a district court reasoned that because the case "directly involved a Fourth Amendment claim that the arresting federal agents had used unreasonable force in arresting the plaintiff" the claim did not present a new Bivens context. Next the Lehal court found several other Abbasi factors similarly weighed in favor of this determination such as the type of federal officers (i.e., arresting agents), who carried out the same type of official action, and the substantial judicial guidance as to the unconstitutionality of employing excessive force in the course of an arrest. Id. at \*11. The Lehal court concluded it was not apparent that allowing plaintiff to proceed on excessive-force claims "would risk disruptive intrusion by the Judiciary into the functioning of other branches," or that such a finding would "erode legitimate distinctions between Fourth Amendment claims that fall within the contours of the Bivens decision and those that do not." Id. (citing Ziglar v. Abbasi, 137 S. Ct. at 1860).[6]

**\*7** However, in Rivera v. Samilo, 370 F. Supp. 3d at 369, a district court performed a similar analysis on an excessive force claim involving DEA agents and refused to recognize a Bivens remedy for a "claim aris[ing] from the force allegedly applied in making a lawful street arrest." There, the court determined that the claim presented a new Bivens context, as it differed meaningfully from Bivens, notably that the arrest did not take place in plaintiff's home and therefore did not implicate plaintiff's privacy rights. Id. at 369. The court then found that special factors counseled against recognizing a new Bivens claim. Id. at 369–70.

Other courts have left open the question of whether excessive force and failure to intervene claims present a new Bivens context. See, e.g., Ojo v. United States, 2019 WL 3852391, at *13 (E.D.N.Y. Aug. 15, 2019), report and recommendation adopted, 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019); Johnson v. O'Connell, 2018 WL 5085702, at *13 (S.D.N.Y. Oct. 17, 2018).

B. Application
The Court declines to find a Bivens remedy for plaintiff's claim against the federal defendants for failure to intervene.

Concerning the first step in the new Bivens analysis, there is a meaningful difference between Bivens and plaintiff's allegations. First, the officers in this case operated under a different legal mandate than the officers in Bivens. Ziglar v. Abbasi, 137 S. Ct. at 1860. Bivens involved a warrantless arrest and search of the plaintiff's home, whereas this case involves an arrest made pursuant to a warrant, outside plaintiff's home. Second, the type of officers involved in Bivens were DEA agents, whereas here the officers were appointed members of a federal task force. Third, the Court in Bivens reasoned that the right at issue was primarily a Fourth Amendment right to privacy, Bivens v. Six Unknown Narcotics Agents, 403 U.S. at 389, whereas here the Fourth Amendment right plaintiff asserts is to be free from excessive force. And fourth, plaintiff's theory of liability is based on Frank and Grogan's alleged failure to intervene rather than the underlying excessive force violation.

As for the second step, special factors counsel hesitation in creating a new Bivens remedy. Plaintiff clearly had multiple alternatives to bringing a Bivens claim. Plaintiff could have pursued his claim under the Federal Tort Claims Act ("FTCA"). See Rivera v. Samilo, 370 F. Supp. 3d at 369–70. In addition, he could have sought relief in state court. Id. at 370. Given these alternative remedial structures, the Court declines to infer a new Bivens cause of action for failure to intervene.

Accordingly, plaintiff's failure to intervene claim against Frank and Grogan fails as a matter of law.

III. Deliberate Indifference to Medical Needs Claim
The federal and Liberty defendants argue plaintiff fails as a matter of law to establish a claim for deliberate indifference to medical needs.

The Court agrees with the federal defendants but disagrees with the Liberty defendants.

A. Legal Standard
Plaintiff was a pretrial detainee at the time of his arrest. Deliberate indifference to medical needs claims brought by pretrial detainees against state actors under Section 1983 are analyzed under the Fourteenth Amendment's Due Process Clause, rather than the Eighth Amendment because "[p]retrial detainees have not been convicted of a crime and thus 'may not be punished in any manner—neither cruelly and unusually nor otherwise.' " Darnell v. Pineiro, 849 F.3d at 29 (quoting Iqbal v. Hasty, 490 F.3d 143, 168 (2d Cir. 2007)). Likewise, deliberate indifference to medical needs claims brought against federal actors under Bivens are analyzed under the Fifth Amendment's Due Process Clause. Laurent v. Borecky, 2018 WL 2973386, at *4 (E.D.N.Y. June 12, 2018) (rejecting argument that a pretrial detainee's Fifth Amendment due process claim arises in a new Bivens context).

*8 To succeed on a claim of constitutionally inadequate medical care, a plaintiff must make a sufficient showing of "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).

To establish a claim for deliberate indifference to serious medical needs, a plaintiff must satisfy a two-prong test comprising an objective prong and a mens rea prong. Darnell v. Pineiro, 849 F.3d at 29 ("the elements for establishing deliberate indifference under the Fourteenth Amendment [are] the same as under the Eighth Amendment"). Namely, plaintiff must establish "the challenged conditions were sufficiently serious," and defendants "acted with at least deliberate indifference to the challenged conditions." Id.

For the objective prong, a pretrial detainee must establish the challenged conditions "either alone or in combination, pose[d] an unreasonable risk of serious damage to his health." Darnell v. Pineiro, 849 F.3d at 30 (quoting Walker v. Schult, 717 F.3d 119, 125 (2d Cir. 2013)). "There is no 'static test' to determine whether a deprivation is sufficiently serious; instead, 'the conditions themselves must be evaluated in light of contemporary standards of decency.' " Id. (quoting Blissett v. Coughlin, 66 F.3d 531, 537 (2d Cir. 1995)).

In the context of medical care, two inquiries determine whether a deprivation is objectively serious. "The first inquiry is whether the prisoner was actually deprived of adequate

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 160 of 340

**Martinez v. D'Agata, Not Reported in Fed. Supp. (2019)**

medical care." Salahuddin v. Goord, 467 F.3d 263, 279 (2d Cir. 2006). Because "the prison official's duty is only to provide reasonable care," prison officials are liable only if they fail " 'to take reasonable measures' in response to a medical condition." Id. at 279–80 (quoting Farmer v. Brennan, 511 U.S. 825, 847 (1994)).

The second inquiry is "whether the inadequacy in medical care is sufficiently serious." Salahuddin v. Goord, 467 F.3d at 280. If the allegedly offending conduct "is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Id. If the offending conduct is the "medical treatment given," however, "the seriousness inquiry is narrower." Id. When "the prisoner is receiving appropriate on-going treatment for his condition," and brings a "denial of medical care claim based on a temporary delay or interruption in treatment," courts look to "the severity of the temporary deprivation alleged by the prisoner," not "the severity of the prisoner's underlying medical condition." Smith v. Carpenter, 316 F.3d 178, 186 (2d Cir. 2003).

To satisfy the mens rea prong, a pretrial detainee must sufficiently show defendants "recklessly failed to act with reasonable care to mitigate the risk that the condition posed to the pretrial detainee even though the [defendants] knew, or should have known, that the condition posed an excessive risk to health or safety." Darnell v. Pineiro, 849 F.3d at 35. The mens rea prong "is defined objectively" and "can be violated when an official does not have subjective awareness that the official's acts (or omissions) have subjected the pretrial detainee to a substantial risk of harm." Id.

### B. Application
**\*9** Here, no reasonable juror could conclude Frank or Grogan deprived plaintiff of adequate medical treatment. Following plaintiff's arrest, Frank and Grogan brought him to the 104th Precinct, five minutes away, where plaintiff was immediately treated by the EMTs. The medical evaluation lasted approximately thirty minutes and included checks of plaintiff's breathing, skin, temperature, and vital signs, as well as head-to-toe and neurological assessments. The EMTs also applied wound dressings. Moreover, plaintiff does not allege he requested further medical attention during the two car rides with Frank and Grogan—from Morales's home to the precinct and then from the precinct to SOMU. Further, plaintiff did not tell Frank or Grogan he suffered injuries to his groin and testicles.

Accordingly, the deliberate indifference claim against Frank and Grogan fails. The undisputed facts demonstrate Frank and Grogan provided plaintiff with adequate medical care.

Likewise, no reasonable juror could conclude Costales deprived plaintiff of adequate medical treatment. Costales, like Frank and Grogan, was present for the EMT evaluation at the 104th Precinct. Costales then took custody of plaintiff after he was transferred to SOMU. Although Costales stated he spent no more than fifteen minutes at SOMU, plaintiff claims he told an officer—whom he identifies as Costales—he was in pain and required medical attention, and that his request was denied. However, plaintiff's physical description of the officer he spoke to does not match Costales's description of his appearance. [7]

Thus, the record evidence does not support a finding that Costales deprived plaintiff of adequate medical care.

However, construing the facts and drawing all reasonable inferences in plaintiff's favor, the Court concludes that a reasonable juror could find that the Liberty defendants deliberately denied or unreasonably delayed plaintiff's medical treatment. First, plaintiff may be able to satisfy the objective prong. As a preliminary matter, the parties dispute whether the Liberty defendants offered plaintiff medical care at all. Moreover, there is evidence that plaintiff's condition was sufficiently serious. Even though defendants' expert, Dr. Melman, reported plaintiff's injuries were not permanent and have not prevented him from fathering a child, plaintiff has provided evidence, such as the contemporaneous statements of Albany Medical's Dr. Welliver, that the delay of more than four hours in treatment could have caused irreparable harm. Smith v. Carpenter, 316 F.3d at 186 (in a claim for "denial of medical care claim based on a temporary delay" courts look to "the severity of the temporary deprivation alleged by the prisoner.").

Second, plaintiff may be able to satisfy the mens rea prong as well. The Liberty defendants drove plaintiff from SOMU to Liberty, New York, two hours away. Plaintiff testified he repeatedly asked for medical attention and requested to be taken to a hospital. The Liberty defendants dispute this claim and insist they asked plaintiff if he needed to go to the hospital and he said no. Yet prior to his interview at the Liberty police station, plaintiff told the Liberty defendants "he was in pain, and he pointed to his abdominal stomach area" and "lifted his shirt," at which point the Liberty defendants saw the bruises. (Hess Dep. at 42). Plaintiff testified he told the

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 161 of 340

Martinez v. D'Agata, Not Reported in Fed. Supp. (2019)

Liberty defendants he was kicked in the groin. Nevertheless, the Liberty defendants held plaintiff for at least an hour and proceeded to conduct an interview with plaintiff, which lasted approximately twenty-seven minutes.

**\*10** After the interview, instead of being taken for medical treatment, plaintiff was taken to the Sullivan County Jail. Shortly after he arrived at the jail, plaintiff was transferred to Catskill Regional Medical Center, and then on to Albany Medical Center for medical treatment. Thus, a reasonable juror could conclude that the approximately four hour window from when the Liberty defendants took custody of plaintiff at SOMU to when he was transferred to Sullivan County Jail constituted an unreasonable delay in medical care, and these defendants were deliberately indifferent to plaintiff's medical needs despite plaintiff's repeated complaints and visible injuries.

Accordingly, there is sufficient admissible evidence in the record from which a reasonable juror could conclude D'Agata and Hess were deliberately indifferent to plaintiff's medical needs.

IV. Qualified Immunity
The Liberty defendants argue they are entitled to qualified immunity.

The Court disagrees.

Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986). "A qualified immunity defense is established if (a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Salim v. Proulx, 93 F.3d 86, 89 (2d Cir. 1996).

In the context of an inadequate medical care claim, "to establish their qualified immunity defense, the defendants must show that it was objectively reasonable for them to believe that they had not acted with the requisite deliberate

indifference." Odom v. Kerns, 2008 WL 2463890, at \*13 (S.D.N.Y. June 18, 2008) (citing McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004)).

Here, as explained above, there are genuine material issues of fact as to whether the Liberty defendants were deliberately indifferent to plaintiff's medical needs, and whether their decision to bring plaintiff to the police station for questioning and then to jail rather than to a hospital or for medical treatment constituted deliberate indifference. Thus, summary judgment in favor of the Liberty defendants on the basis of qualified immunity is inappropriate.

## CONCLUSION

Defendants Frank, Grogan, and Costales's motion for summary judgment is GRANTED.

Defendants D'Agata and Hess's motion for summary judgment is DENIED.

Plaintiff's Section 1983 Fourteenth Amendment claim against D'Agata and Hess for deliberate indifference to medical needs will proceed. Plaintiff's claims against Frank, Grogan, and Costales are dismissed.

**The Court will conduct a status conference on January 27, 2020, at 2:30 p.m. at which time the Court will set a trial date and a schedule for pretrial submissions. To conserve resources, to promote judicial efficiency, and in an effort to achieve a faster disposition of this case, the parties, prior to that date, are directed to discuss whether they are willing to consent, under 28 U.S.C. § 636(c), to conduct all further proceedings, including trial, before the assigned Magistrate Judge.**

The Clerk is instructed to terminate the motions. (Docs. ##103, 110).

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 6895436

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 162 of 340

Martinez v. D'Agata, Not Reported in Fed. Supp. (2019)

---

### Footnotes

1    Plaintiff claims he reported his change of address but also concedes the validity of the arrest warrant is not at issue here. (Doc. #119 ("Pl. Br.") at 31).

2    "Doc. #_____ at ECF_____" refers to the page numbers automatically assigned by the Court's Electronic Case Filing system. "Pl. Dep. #_____" refers to the to the page numbers in the top right of the transcript of plaintiff's deposition.

3    Kurzhals testified Grogan and Canario appeared after he had apprehended plaintiff, but he could not recall who helped him place handcuffs on plaintiff. (Kurzhals Dep. at 44–45).

4    Unless otherwise indicated, case quotations omit all internal citations, quotations, footnotes, and alterations.

5    Plaintiff argues the defendant task force members are not in fact federal defendants. The Court rejects this assertion. The task force members were appointed Special Deputy Marshals for the federal task force at the relevant times. The Court finds defendants Frank and Grogan were "acting in the capacity of a federal employee because of [their] involvement on the task force"; therefore, "Bivens is the appropriate jurisdictional basis for this action." Aikman v. Cty. of Westchester, 691 F. Supp. 2d 496, 499 (S.D.N.Y. 2010). See also Ochoa v. Bratton, 2017 WL 5900552, at *6 (S.D.N.Y. Nov. 28, 2017); Hester-Bey v. Donaruma, 2017 U.S. Dist. LEXIS 43378, *8, 2017 WL 1148613 (E.D.N.Y. Mar. 23, 2017).

6    The Lehal court did not reach a determination of whether defendants "could be held liable on a Bivens claim based on any alleged failure to intervene in the claimed use of force by [another defendant]." Lehal v. Cent. Falls Det. Facility Corp., 2019 WL 1447261, at *17.

7    Nor does plaintiff argue that he cannot identify the individual who allegedly deprived him medical care while at SOMU. Instead plaintiff insists he "spoke at SOMU with defendant Costales, though, at his deposition, he did not know this officer's name." (Doc. #117, ¶¶ 64–67).

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 5671935
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Ruslan MIRVIS, Plaintiff,

v.

Herman QUAY, Warden; Eleazar Garcia, Associate
Warden; Jonathan White, Captain; "John"
Poe, Lieutenant; "John" Metzger, Lieutenant;
"John" Calixte, Correction Officer; "John Doe"
#1-3, Correction Officers; "G." Gonzalez,
Correction Officer; "Jane Doe," Correction
Officer; and Maury "Doe," Counselor, Defendants.

19-CV-2573 (LDH) (VMS)
|
Signed September 1, 2023

**Attorneys and Law Firms**

Philip M. Hines, Uri Nazryan, Held & Hines, LLP, Brooklyn,
NY, for Plaintiff.

Sean Patrick Greene-Delgado, United States Attorney's
Office, Brooklyn, NY, for Defendant Federal Bureau of
Prisons.

Matthew Modafferi, Frier Levitt LLC, New York, NY, Sean
Patrick Greene-Delgado, United States Attorney's Office,
Brooklyn, NY, Kimberly Francis, DOJ-USAO, Brooklyn,
NY, for Defendants Lieutenant Poe, Lieutenant Metzger,
"John" Calixte.

**MEMORANDUM AND ORDER**

LaSHANN DeARCY HALL, United States District Judge:

**\*1** Ruslan Mirvis ("Plaintiff") brings the instant action
asserting *Bivens* claims against former Warden Herman
Quay, Associate Warden Eleazar Garcia, Captain Jonathan
White, former Lieutenant Thomas Pope, Lieutenant
Veronica Metzger, Senior Officer Specialist Pierre Calixte,
Correctional Counselor Lawrence Murray, and former
Correctional Officer George Gonzalez [1] (collectively,
"Defendants") for violations of his rights, privileges,
and immunities under the Fifth, Eighth, and Fourteenth
Amendments of the United States Constitution. Defendants

move pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure. [2]

**BACKGROUND** [3]

**I. June 6 – July 7, 2017 Sexual Assaults**
Plaintiff was a pretrial detainee at MDC Brooklyn. (Am.
Compl. ¶ 9, ECF No. 26.) On a daily basis, between June
6, 2017, and July 7, 2017, Plaintiff was sexually threatened,
abused, and assaulted by two inmates in the J-72 housing
area. (*Id.* ¶ 28.) During this period, the two inmates frequently
used objects to sexually assault Plaintiff. (*Id.* ¶ 33.) Typically,
one inmate would restrain Plaintiff while the other would
beat him and insert an object into Plaintiff's anus. (*Id.* ¶ 33.)
During this time, the same inmates demanded that Plaintiff
direct his family to deposit money into their respective
MDC Brooklyn commissary accounts. (*Id.* ¶ 34.) Plaintiff
acquiesced to their demands out of fear, and, over time,
Plaintiff directed his family to deposit thousands of dollars
into the inmates' accounts. (*Id.*) Eventually, Plaintiff refused
because his family could no longer afford any payments. (*Id.*
¶ 35.)

On July 7, 2017, the two inmates attacked Plaintiff and
sodomized him with a broomstick (the "July 7 attack"). (*Id.*
¶ 36.) During the attack, Plaintiff screamed out to officers for
help but did not receive a response. (*Id.*) Following the attack,
Plaintiff returned to his cell and pushed the panic button. (*Id.*
¶ 37.) Correctional Officer ("C.O.") John Doe 1 arrived, and
Plaintiff reported the attack to him. (*Id.*) Following, C.O. John
Doe 1 informed Plaintiff he would "be right back" but did not
return. (*Id.*) Throughout that evening, Plaintiff continued to
cry out for help and eventually a correctional officer escorted
Plaintiff to an "SIS location." (*Id.* ¶ 38.) There, Plaintiff
informed Defendant Lt. Pope, the supervisor in charge of the
SIS location, what had occurred and informed him of his need
for urgent medical attention. (*Id.*) Defendant Lt. Metzger was
also present and mockingly told Plaintiff that he should "learn
to defend himself." (*Id.* ¶¶ 39–40.) Neither Defendants Lt.
Pope or Lt. Metzger offered immediate medical or mental
health care to Plaintiff, nor did they arrange for Plaintiff to
receive such care. (*Id.* ¶¶ 38, 40.)

**\*2** Eventually, Plaintiff was escorted to a medical unit where
pictures and X-Rays were taken of his injuries, and he was
provided aspirin. (*Id.* ¶ 41.) Following, he was placed in a
special housing unit ("SHU"). (*Id.*) Plaintiff spent at least one
month in the SHU, and during that time, Plaintiff repeatedly

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 164 of 340

Mirvis v. Quay, Not Reported in Fed. Supp. (2023)

complained to C.O. John Doe 2 of continuing pain and swelling to his ribs and swelling of his mouth. (*Id.* ¶ 42.) C.O. John Doe 2 ignored Plaintiff's complaints. (*Id.*) A month later, Plaintiff was informed that he sustained three fractured ribs and needed an extraction of his tooth. (*Id.* ¶ 43.)

Additionally, during the June 6, 2017, to July 7, 2017 period, Plaintiff informed C.O. Gonzalez approximately five to six times, Counselor Maury two to three times, and C.O. Jane Doe twice that he was being sexually abused and threatened by the two inmates. [4] (*Id.* ¶ 48.) In response, Defendant C.O. Gonzalez told Plaintiff that this is what happens in prison and suggested he beat his attackers with a "lock in a sock" next time they come after him. (*Id.*) Plaintiff also sent at least 85 emails to Defendants Warden Quay, Associate Warden Garcia, Cpt. White, and other MDC Brooklyn staff. (*Id.* ¶ 49.) Defendants failed to provide adequate responses to his emails, investigate the allegations, separate Plaintiff from his two attackers, or take any action to remedy the situation. (*Id.* ¶ 50.)

According to the amended complaint, the two inmates who assaulted Plaintiff were known by Defendants to be violent gang members who were involved in other incidents while at MDC Brooklyn and no remedial action was taken. (*Id.* ¶¶ 28-30.) Specifically, Defendants were aware the two inmates extorted and sexually abused another inmate assigned to the J-72 unit. (*Id.* ¶ 31.) Nonetheless, no action was taken against the inmates. (*Id.*)

## II. January 27 – February 3, 2019 Power Outage

From about January 27, 2019, through February 3, 2019, MDC Brooklyn underwent a power outage. (*Id.* ¶ 44.) During that time, MDC Brooklyn did not have hot, hot water, or electricity and Plaintiff was repeatedly denied medical care by the MDC staff. (*Id.*) On or about February 5, 2019, Plaintiff reported to Defendants C.O. Calixte and Lt. Metzger that he was experiencing numbness to his left side and that he had vomited blood. (*Id.* ¶ 45.) In response, Defendant Lt. Metzger told Plaintiff, he was "sick in the head." (*Id.*) Plaintiff was eventually taken to the hospital and diagnosed with a hole in his stomach and pinched nerve. (*Id.* ¶ 46.) Plaintiff was confined to the hospital for at least three days. (*Id.*)

## STANDARD OF REVIEW

To withstand a Rule 12(b)(6) motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the alleged facts allow the court to draw a "reasonable inference" of a defendant's liability for the alleged misconduct. *Id.* While this standard requires more than a "sheer possibility" of a defendant's liability, *id.*, "[i]t is not the Court's function to weigh the evidence that might be presented at trial" on a motion to dismiss. *Morris v. Northrop Grumman Corp.*, 37 F. Supp. 2d 556, 565 (E.D.N.Y. 1999). Instead, "the Court must merely determine whether the complaint itself is legally sufficient, and, in doing so, it is well settled that the Court must accept the factual allegations of the complaint as true." *Id.* (citations omitted).

## DISCUSSION

### I. Failure to Exhaust

**\*3** Defendants urge the Court to dismiss the amended complaint on the grounds that Plaintiff failed to exhaust his administrative remedies as required by the Prisoner Litigation Reform Act of 1995 (the "PLRA"). [5] (Defs.' Mem. L. Supp. Mot. Dismiss ("Defs.' Mem.") at 23-25, ECF No. 65.) The PLRA provides that a prisoner may not bring an action under federal law "with respect to prison conditions ... until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

In *Ross v. Blake*, the Supreme Court made clear that the exhaustion requirements of the PLRA were mandatory and only subject to limited exceptions. *See* 136 S. Ct. 1850, 1856 (2016). However, and of particular relevance here, the Supreme Court recognized that exhaustion can be mandated only where "[administrative] remedies [are] indeed [ ] 'available' to the prisoner." *Id.* Following *Ross*, the Second Circuit found that administrative remedies could be unavailable to inmates under three circumstances. *See Williams v. Correction Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016). *First*, an administrative remedy is unavailable when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* (quoting *Ross*, 136 S. Ct. at 1859). *Second*, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* Put differently, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* at 123–24 (quoting

*Ross*, 136 S. Ct. at 1856). *Third*, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 124 (quoting *Ross*, 136 S. Ct. at 1860). Importantly, "failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement" and, thus, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Williams*, 829 F.3d at 122 (quoting *Jones v. Bock*, 549 U.S. 199, 216 (2007)). That said, "a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the PLRA exhaustion requirement." *Id.* (citing *Jones*, 549 U.S. at 215).

Here, the Court declines to dismiss Plaintiff's claims for failure to exhaust. Plaintiff's amended complaint does not itself contain any allegations that would make it clear that the PLRA exhaustion requirement was not satisfied. Rather, the amended complaint alleges Plaintiff sent at least 85 emails to Defendants Warden Quay, Captain Garcia, Captain White, and numerous other MDC Brooklyn staff. (Am. Compl. ¶ 49.) Plaintiff further alleges the staff provided inadequate responses, failed to investigate, and failed to separate Plaintiff from his two attackers. (*Id.* ¶ 50.)

## II. Plaintiff's Deliberate Indifference Claims Under *Bivens*

In *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, the Supreme Court, for the first time, recognized a constitutional cause of action for damages against federal officers. 403 U.S. 388 (1971). Specifically, the Supreme Court held that a plaintiff may sue federal officers in their individual capacities for violating her Fourth Amendment protection against unreasonable searches and seizures. *Id.* at 389, 395–97. In doing so, the Supreme Court "held that courts must 'adjust their remedies so as to grant the necessary relief' when 'federally protected rights have been invaded.'" *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (quoting *Bivens*, 403 U.S. at 392). Consistent with its holding in *Bivens*, the Supreme Court later found implied rights of action and granted *Bivens* remedies in two additional contexts: one where a plaintiff alleged gender discrimination in violation of the Fifth Amendment's Due Process Clause, *Davis v. Passman*, 442 U.S. 228 (1979), and the other where a plaintiff complained of deliberate indifference to medical needs in violation of the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14 (1980). The Supreme Court has not explicitly extended *Bivens* to other contexts in the ensuing

forty years. Indeed, in *Ziglar v. Abbasi*, the Supreme Court made plain that *Bivens* would not operate as the "substantial equivalent of 42 U.S.C. § 1983" to permit recovery in any new context and new category of defendant. 137 S. Ct. at 1855 (internal quotation marks omitted). Instead, the Supreme Court noted a change in its approach to recognizing implied causes of action, now clearly disfavoring extending *Bivens* to "new context[s]." *Id.* at 1864.

**\*4** When determining whether *Bivens* is being extended into such a new context, the Supreme Court has indicated that, while not exhaustive, factors that might be instructive include:

> [T]he rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1860.

### A. Plaintiff's Deliberate Indifference to His Serious Medical Needs Claims

### 1. Availability of a Remedy Under *Bivens*

Plaintiff alleges Defendants were deliberately indifferent to his serious medical needs arising out of the July 7 attack and the February 2019 blackout at MDC Brooklyn (collectively, the "deliberate medical indifference claims"). (Pl.'s Mem. at 12–21.) In response, Defendants argue that, by nature of Plaintiff's pre-trial status and other factual distinctions, recognizing such a claim would extend *Bivens* to a new context. (Defs.' Mem. at 7.) The Court disagrees with Defendants.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 166 of 340

Mirvis v. Quay, Not Reported in Fed. Supp. (2023)

In *Carlson v. Greene*, the Supreme Court held that the Eighth Amendment's prohibition against cruel and unusual punishment gave an inmate a damages remedy for failure to provide adequate medical treatment. *See* 446 U.S. at 17–18. There, the inmate had a known chronic asthmatic condition, but, against the advice of doctors, the plaintiff was nonetheless held in a corrections center with known inadequate medical facilities. *Id.* at 16 n.1. And, officials

> failed to give him competent medical attention for some eight hours after he had an asthmatic attack, administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative which further impeded his breathing, and delayed for too long a time his transfer to an outside hospital.

*Id.* Ultimately, the alleged failure to provide medical treatment resulted in the inmate's death. *Id.*

Similarly, here, as to Plaintiff's deliberate indifference to medical issues claims, Plaintiff alleges repeated concerns and complaints related to injuries resulting from ongoing sexual assaults and at least three specific instances of reporting to officers who did not immediately provide medical care. (Am. Compl. ¶¶ 27–33, 37–40.) Plaintiff further alleges reports to specific officers that he was experiencing numbness to his left side and vomiting blood. (*Id.* ¶ 45.) Again, the amended complaint contains allegations that Plaintiff reported these medical issues, but the officers failed to act. (*Id.*) Thereafter, Plaintiff alleges he experienced severe pain, fractured ribs, a hole in his stomach, and a pinched nerve. (*Id.* ¶ 46.) In other words, at base, Plaintiff in the instant action, like the respondent in *Carlson*, alleges "federal jailers[ ] fail[ed] to provide adequate medical treatment[.]" *Gonzalez v. Hasty,* 755 F. App'x 67, 69 (2d Cir. 2018).

Nonetheless, Defendants maintain that, although the Supreme Court has previously extended *Bivens* to an Eighth Amendment deliberate medical indifference claim in *Carlson*, Plaintiff's status as a pretrial detainee requires his claims be considered under the Fifth Amendment. (Defs.' Mem. at 7–8.) Therefore, as Defendants' argument goes, Plaintiff's claims arise under a new *Bivens* context. (*Id.*) To be sure, the Supreme Court has not explicitly recognized a *Bivens* remedy for deliberate indifference to serious medical needs under the Fifth Amendment. However, contrary to Defendants' contention, that Plaintiff's claims arise under a different constitutional provision is not necessarily dispositive as to whether Plaintiff's claims implicate a new *Bivens* context.

**\*5** In *Abbasi*, the Supreme Court considered a Fifth Amendment due process claim, brought against a warden by several pretrial detainees under *Bivens* for "deliberate indifference to prisoner abuse." 137 S. Ct. at 1864. In determining whether the claim arose under a new *Bivens* context, the Court recognized the parallels to *Carlson,* where "the Court did allow a *Bivens* claim for prisoner mistreatment —specifically, for failure to provide medical care." *Id.* Despite these parallels, the Supreme Court concluded that plaintiffs sought to extend *Bivens* in a new context. *Id.* In reaching this conclusion, the Supreme Court noted first that there was a difference in the constitutional right at issue. *Id.* Like here, the claim was predicated on the Fifth Amendment, while *Carlson* was predicated on the Eighth Amendment. *Id.* At least equally important to the Court's calculus was that the judicial guidance with regard to the plaintiffs' pretrial abuse claims at issue was less developed than the legal claim at issue in *Carlson*. In particular, the Supreme Court raised the concern that although "the Court has long made clear the standard for claims alleging failure to provide medical treatment to a prisoner ... [t]he standard for a claim alleging that a warden allowed guards to abuse pre-trial detainees is less clear under the Court's precedents." *Id.* at 1864–65. That concern is not present here.

In this case, Plaintiff does not bring a pre-trial abuse claim. Rather, Plaintiff seeks to hold federal officials liable for damages he sustained as a result of their indifference to his medical claims as a pretrial detainee. If the claims proceed, in assessing its sufficiency, the Court would employ the same analysis that it would have had Plaintiff's claims arose under the Eighth Amendment. Indeed, the Second Circuit has noted that "[w]e have often applied the Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment ... [w]e see no reason why the analysis should be different under the Due Process Clause of the Fifth Amendment." *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d. Cir. 2000).

In deciding a Fifth Amendment medical indifference claim, the Court would ask whether Plaintiff pleaded a sufficiently

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 167 of 340

Mirvis v. Quay, Not Reported in Fed. Supp. (2023)

serious medical need and that the official acted with a culpable state of mind. *Compare Cannenier v. Skipper-Scott*, 18-cv-2383, 2019 WL 764795, at *4 (S.D.N.Y. Feb. 20, 2019) (considering a deliberate indifference to serious medical need claim under the Eighth Amendment), *with Laurent v. Borecky*, No. 17-cv-3300, 2018 WL 2973386, at *5 (E.D.N.Y. June 12, 2018) (considering a deliberate indifference claim brought under the Fifth Amendment and finding that while "this case ... presents a different constitutional right at issue ... it bears an extremely strong resemblance to [one of] the three *Bivens* claims the [Supreme] Court has approved in the past[ ]") (alternations in original) (internal quotation marks omitted). In other words, there is clear judicial guidance on the "standard[s] for alleging failure to provide medical treatment to a prisoner." *Laurent*, 2018 WL 2973386 at *5. As such, Plaintiff's *Bivens* claims for deliberate indifference to serious medical needs under the Fifth Amendment arise in the same context as the Eighth Amendment claim recognized in *Carlson*. In so finding, the Court joins several other district courts within this circuit to find the same. *See, e.g.*, *id.*; *Geritano v. AUSA Office for E.D.N.Y.*, No. 20-cv-0781, 2020 WL 2192559, at *4 (S.D.N.Y. May 5, 2020) ("Courts in this district have held that a federal pretrial detainee may bring a medical claim under the Fifth Amendment because such a claim is the same context as an Eighth Amendment claim already recognized in *Carlson*."); *Sisk v. MCC, et al.*, No. 20-CV-10293, 2021 WL 412487, at *3 (S.D.N.Y. Feb. 3, 2021) ("Federal pretrial detainees may bring a Fifth Amendment claim for failure to provide medical treatment as a *Bivens* action because such a claim bears a strong resemblance to the claim in *Carlson*"); *Martinez v. D'Agata*, No. 16-cv-44, 2019 WL 6895436, at *7 (S.D.N.Y. Dec. 18, 2019) ("Plaintiff was a pretrial detainee at the time of his arrest .... deliberate indifference to medical needs claims brought against federal actors under *Bivens* are analyzed under the Fifth Amendment's Due Process Clause."); *Morgan v. Shivers*, No. 14-cv-7921, 2018 WL 618451, at *7 n.4 (S.D.N.Y. Jan. 29, 2018) ("The Court notes that, even in light of the proscription against creating new *Bivens* remedies, it would be counterintuitive if a convicted prisoner could remedy a federal officer's failure to provide medical care amounting to punishment, but a pre-trial detainee—who, unlike convicted prisoners, cannot be punished at all, could not.") (internal quotation marks omitted).

**\*6** Certainly, the Court is mindful of the Supreme Court's recent decision in *Egbert v. Boule*, which has been interpreted to significantly constrict the pathway for redress under *Bivens*. 142 S. Ct. 1793, 1818 (2022). Indeed, post-*Egbert*,

at least two district courts have interpreted the current scope of *Bivens* to preclude relief for pre-trial detainees alleging deliberate indifference to their medical needs. *See Choice v. Michalak*, No. 21-CV-0060, 2022 WL 4079577, at *4 (N.D. Ill. Sept. 6, 2022) (holding that because the plaintiff's claim arose under the Fifth Amendment instead of the Eighth Amendment, "it implicate[d] a different constitutional right," and therefore was meaningfully different from *Carlson*); *see also Stennis v. Armstrong*, No. 18 CV 7846, 2023 WL 1319561, at *6-7 (N.D. Ill. Jan. 31, 2023) (reasoning that plaintiff's status as a pretrial detainee claiming a right to adequate medical care under the Fifth Amendment arises under a new context). Nonetheless, this Court cannot draw the same conclusion.

Imagine twin brothers, Alex and Terence, are each charged with bank robbery and held in the same cell at a federal facility. Alex has already pleaded guilty, was sentenced, and is awaiting placement at a permanent facility. Terence denied any wrongdoing and remained held as a pre-trial detainee. Both Alex and Terence were diagnosed as chronic asthmatics. In facts strikingly similar to *Carlson*, prison officials were aware that the two brothers suffered from a chronic asthmatic condition, as the two recently returned from a week-long hospital stay. On the same day, both Alex and Terence each suffered from a severe asthmatic attack. Prison officials declined to provide medical attention for nearly six hours. Once medical attention was provided, prison officials administered contra-indicated drugs that exacerbated each brother's medical condition. Despite the advice of prison doctors, the two brothers were not transferred to a hospital for over twelve hours, where they were subsequently pronounced dead.

As Defendants would have it, only Alex, the brother who pleaded guilty, would have the ability to seek relief based on a claim for indifference to his medical needs. Terence, on the other hand, would be denied any such recourse. Yet, the only difference between the two brothers lies in their status — one is a convicted felon who may bring an Eighth Amendment claim and the other is a pre-trial detainee who seeks to prove his innocence, and therefore, must pursue any claim under the Fifth Amendment. Under these circumstances, the Court finds that this distinction is neither meaningful nor relevant. In drawing this conclusion, this Court is mindful of Justice Sotomayor's sage counsel in her dissent to *Egbert*. There she writes, "although [the *Egbert*] opinion will make it harder for plaintiffs to bring a successful *Bivens* claim ... the lower courts should not read it to render *Bivens* a dead letter." *Egbert*,

Mirvis v. Quay, Not Reported in Fed. Supp. (2023)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 168 of 340

142 S. Ct. at 1823 (Sotomayor, J., concurring in part and dissenting in part). I have not.

### 2. Existence of Actionable Claims

Having determined that Plaintiff can bring a Fifth Amendment claim for deliberate indifference to his serious medical needs under *Bivens*, the Court must consider whether Plaintiff has sufficiently alleged a constitutional violation.

As a threshold matter, personal involvement of a defendant is a prerequisite to any *Bivens* claim. *See Ashcroft*, 556 U.S. at 676; *Ganek v. Leibowitz*, 874 F.3d 73, 92 (2d Cir. 2017). Specifically, "[b]ecause the doctrine of *respondeat superior* does not apply in *Bivens* actions, a plaintiff must allege that the individual defendant was personally involved in the constitutional violation." *Thomas v. Ashcroft*, 470 F.3d 491, 496 (2d Cir. 2006). Indeed,

> [t]he personal involvement of a supervisory defendant may be shown by evidence that the defendant: (1) directly participated in the constitutional violation; (2) failed to remedy the violation after learning of it through a report or appeal; (3) created a custom or policy fostering the violation or allowed the custom or policy to continue after learning of it; (4) was grossly negligent in supervising subordinates who caused the violation; or (5) failed to act on information indicating that unconstitutional acts were occurring.

**\*7** *Id.* at 496–97.

Defendants argue that Plaintiff does not allege Defendants were aware of his medical complaints or that any Defendants were personally involved in any constitutional violation arising from his deliberate medical indifference claims. (Defs.' Mem. at 19.) The Court agrees as to Defendants Quay, Garcia, White, Gonzalez, and Maury because the amended complaint contains only conclusory allegations as to their personal involvement.

As to former Warden Quay, Associate Warden Garcia, [6] and Cpt. White, the amended complaint only generally alleges that Plaintiff informed them of "what was happening to him"— referring to the alleged sexual assault and extortion—but "no remedial action was taken." (Am. Compl. ¶ 32.) The amended complaint also alleges that Quay, White, and Garcia were amongst a group of Defendants to whom Plaintiff sent "at least eighty-five [ ] emails ... wherein he described" the details alleged in the amended complaint. (*Id.* ¶ 49.) Similarly, the amended complaint alleges Plaintiff informed Defendants Gonzalez, White, and Maury that he was being extorted and had been sexually abused several times. (*Id.* ¶¶ 48, 49.) However, Plaintiff does not allege that any of these communications related to Plaintiff's deliberate medical indifference claims.

The same conclusion cannot be reached as to Defendants Lt. Pope, Lt. Metzger, and C.O. Calixte. As to the July 7 attack, Plaintiff alleges sufficient personal involvement of Defendants Lt. Pope and Lt. Metzger. After being taken to the SIS location, Plaintiff alleges he informed Lt. Pope of the attack and made him aware of his need for medical attention. (Am. Compl. ¶ 38.) Lt. Pope laughed in response without taking further action. (*Id.*) Similarly, with respect to Lt. Metzger, Plaintiff alleges Lt. Metzger was in the vicinity at the time Plaintiff told Lt. Pope, heard about the attack, and told Plaintiff he should learn to defend himself. (*Id.* ¶¶ 39–40.) Likewise, as to the allegations of deliberate indifference to Plaintiff's medical needs following the 2019 blackout at MDC Brooklyn, Plaintiff alleges he reported to C.O. Calixte and Lt. Metzger that he was experiencing numbness to his left side and that he had vomited blood. (*Id.* ¶ 45.) These Defendants remained indifferent to his pleas. (*Id.*) According to the amended complaint, Defendant Metzger simply told Plaintiff that he was "sick in the head." (*Id.* ¶ 45.) Accordingly, Plaintiff has sufficiently alleged personal involvement as to Lt. Pope, Lt. Metzger, and C.O. Calixte.

Beyond the personal involvement of each defendant, "[t]o establish an unconstitutional denial of medical care, a prisoner must prove deliberate indifference to his serious medical needs." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994) (internal quotation marks and modification omitted). Successful assertion of a claim for deliberate indifference requires a plaintiff to allege facts sufficient to satisfy both the objective and subjective prongs of the standard. *Id.* The objective prong requires "the alleged deprivation must be, in objective terms, sufficiently serious." *Id.* (internal quotation marks omitted). "The serious medical needs

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 169 of 340

Mirvis v. Quay, Not Reported in Fed. Supp. (2023)

standard contemplates a condition of urgency such as one that may produce death, degeneration, or extreme pain." *Charles v. Orange Cnty.*, 925 F.3d 73, 86 (2d Cir. 2019). Indeed, within the Second Circuit, factors considered include: "(1) whether a reasonable doctor or patient would perceive the medical need in question as 'important and worthy of comment or treatment,' (2) whether the medical condition significantly affects daily activities, and (3) 'the existence of chronic and substantial pain.' " *Laurent*, 2018 WL 2973386, at *3 (quoting *Brock v. Wright*, 315 F.3d 158, 162 (2d Cir. 2003)). A plaintiff must allege deliberate indifference, or that the "charged official ... act[ed] with a sufficiently culpable state of mind." *Hathaway*, 99 F.3d at 553. The required state of mind is:

> **\*8** [T]he equivalent of criminal recklessness; namely, when the prison official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* Notably here, the "subjective prong" is defined objectively, and courts must determine whether the official "knew, or should have known, that the condition posed an excessive risk to health or safety." *Darnell v. Pineiro*, 849 F.3d 17, 35 (2d Cir. 2017); *see also Morgan*, 2018 WL 618451, at *7 ("[T]he second requirement—the *mens rea* prong of deliberate indifference to serious medical needs claims—must be analyzed objectively: courts must determine whether the official knew, or should have known that his or her conduct posed an excessive risk to health or safety.") (internal quotation marks omitted).

Defendants urge dismissal on the grounds that the deprivation Plaintiff alleges is not sufficiently serious as a matter of law. (Defs.' Mem. at 20–21.) Specifically, Defendants maintain Plaintiff failed to plead sufficient factual allegations to support a claim that these Defendants disregarded a serious medical need. (*Id.*) The Court disagrees. Plaintiff alleges an attack whereby he was anally sodomized with a broomstick. (Am. Compl. ¶ 36.) He further alleges he cried out for help, complaining of "severe pain" in his anus, mouth, and ribs following the attack. (*Id.* ¶¶ 36, 38.) Likewise, following

the 2019 MDC Blackout, Plaintiff alleges he experienced numbness in his left side and was vomiting blood. (*Id.* ¶ 45.) Upon being taken to the hospital, doctors diagnosed him with a hole in his stomach and a pinched nerve. (*Id.* ¶ 46.) These allegations sufficiently establish a serious medical need, for which the denial of treatment "could result in further significant injury or the unnecessary and wanton infliction of pain." *Abreu v. Lipka*, 778 F. App'x 28, 31–32 (2d Cir. 2019) ("The medical need is considered 'serious' where the denial of treatment 'could result in further significant injury or the unnecessary and wanton infliction of pain.' ") (quoting *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000)).

Next, Defendants argue that Plaintiff has not sufficiently pleaded a deliberate indifference claim because "medical care was afforded [to him] in a matter of hours on each occasion." (Defs.' Mem. at 22.) Not so. With respect to the July 7 attack, Plaintiff alleges Defendants did not offer him "immediate" medical care and thus delayed his treatment. (Am. Compl. ¶ 40.) And, with respect to Plaintiff's medical condition during the 2019 MDC Blackout, Plaintiff alleges he was denied medical treatment for several days. (Am. Compl. ¶¶ 44–45.) These allegations are sufficient. *See, e.g.*, *Lombardo v. Graham*, 807 F. App'x 120, 123 (2d Cir. 2020) (delay of only 28 hours does not necessitate dismissal); *Moco v. Janik*, No. 17-cv-398, 2019 WL 3751628, at *3 (W.D.N.Y. Aug. 8, 2019) ("Although he may have received care eventually, Plaintiff has sufficiently alleged that Defendants denied or delayed treatment for a serious medical need.").

Accordingly, Plaintiff has sufficiently alleged a claim for deliberate indifference to his serious medical needs as to Defendants Lt. Metzger, Lt. Pope, and C.O. Calixte.

### B. Plaintiff's Deliberate Indifference to His Safety Claim

#### 1. Availability of a Remedy Under *Bivens*

**\*9** In addition to Plaintiff's claims for deliberate indifference to his serious medical needs, Plaintiff also brings a claim for failure to protect or deliberate indifference to his safety. (Pl.'s Mem. at 21–22.) Defendants challenge this claim on the basis that it arises in a new *Bivens* context not recognized by the Supreme Court. (Defs.' Reply at 11–12, ECF No. 69.) The Court agrees. Indeed, Plaintiff does not dispute that the claim arises in a new context, legally and factually distinct from claims previously recognized under *Bivens*. (Pl.'s Mem. 22–

23). Accordingly, the Court must consider whether special factors counsel hesitation against allowing Plaintiff's *Bivens* claim to proceed. [7] Defendants maintain that they do. (Defs.' Mem. at 12–13.) The Court agrees.

### 2. Special Factors Counseling Hesitation [8]

Where, as here, a court determines a claim arises under a new *Bivens* context, the court must then consider "whether there are any special factors that counsel hesitation about granting the extension." *Hernandez v. Mesa*, 140 S. Ct. 735, 743 (2020) (internal quotation marks omitted). The crux of this inquiry being "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S. Ct. at 1858. Notably, in *Abbasi*, the Supreme Court acknowledged the phrase "special factors counselling hesitation" had not previously been defined and identified several factors for the court to consider. *Id.* at 1857; *see also Crespo v. Hurwitz*, No. 17-cv-6329, 2020 WL 7021658, at *5 (E.D.N.Y. Nov. 30, 2020) (noting special factors might include "an alternative remedial scheme, the manner in which [ ] Congress has structured its regulatory authority, the burden of a damages remedy on the Government and individual employees, or any other unforeseeable factor that would counsel restraint"). Of particular relevance here, courts must consider whether "there is an alternative remedial structure present ... [as] that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S. Ct. at 1858. Importantly, "when alternative methods of relief are available, a *Bivens* remedy usually is not." *Id.* Here, Defendants argue that alternative processes exist to provide redress for Plaintiff's claims. (Defs.' Mem. at 12.) Namely, Defendants point to the Federal Torts Claim Act (the "FTCA"), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, equitable remedies, such as a petition for habeas relief or an injunction, New York state law claims, and the BOP's Administrative Remedy Program. (Defs.' Mem. at 12–15.)

**\*10** Defendants principally rely on the FTCA in arguing that Plaintiff has other avenues of redress for his claims. (Defs.' Mem. at 13–14.) It is true that Plaintiff has an available remedy under the FTCA, which provides a cause of action against the United States for any "negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1). And, Plaintiff has at least suggested to this Court that he has a separate pending action under the FTCA. (Pl.'s Mem. at 3 ("These lawsuits are pending, as is the evaluation of Plaintiff's potential [FTCA] claim against the United States.").) The Court, however, is not altogether persuaded that the FTCA, standing alone, provides sufficient alternative relief in light of the Supreme Court's prior guidance in *Carlson*. In *Carlson*, the Supreme Court considered whether Congress's enactment of the FTCA preempted a *Bivens* remedy under the Eighth Amendment by "creat[ing] an equally effective remedy for constitutional violations." 446 U.S. at 19. Ultimately, the Supreme Court determined it was "crystal clear" Congress viewed the FTCA as "parallel, complementary causes of action," and identified several significant differences between claims brought under the FTCA and *Bivens*, including that any remedy under *Bivens* is recoverable against individuals. *Id.* at 20. The Supreme Court determined the "FTCA is not a sufficient protector of the citizens' constitutional rights, and without a clear congressional mandate we cannot hold that Congress relegated respondent exclusively to the FTCA remedy." *Id.* at 23.

This Court is mindful that at least one circuit court and sister courts in this district have concluded "that *Carlson's* analysis of adequate alternative remedies cannot survive *Abbasi* and dismissed *Bivens* claims because the FTCA provides an adequate alternative remedy." *Scott v. Quay*, No. 19-cv-1075, 2020 WL 8611202, at *8 (E.D.N.Y. Nov. 16, 2020) (collecting cases). However, neither the Supreme Court nor the Second Circuit has explicitly "decided whether, in the wake of *Abbasi*, the availability of an FTCA action precludes the *Bivens* remedy." *Id.* And, absent clear guidance, this Court joins others unwilling to determine that the FTCA alone is a sufficient alternate remedy. *See Powell v. United States*, No. 19-cv-11351, 2020 WL 5126392, at *10 (S.D.N.Y. Aug. 31, 2020) ("The Supreme Court has not been bashful in signaling its skepticism of the *Bivens* remedy—if the Court intended to overrule *Carlson*, I am quite sure it would simply do so."); *Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 711 (S.D.N.Y. 2020) ("The Supreme Court's prior rulings in [*Carlson*] and [*Robbins*], remain good law ... [t]he Court will follow that precedent.").

That said, Defendants argue, and Plaintiff does not contest, several other alternative remedies exist, including under New York state laws, BOP regulations, and the federal habeas statute. The Court agrees. Indeed, the Supreme Court

has recognized these and similar remedies to be adequate alternatives to a claim under *Bivens*. *See Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 74 (2001) ("Inmates in respondent's position also have full access to remedial mechanisms established by the BOP, including suits in federal court for injunctive relief and grievances filed through the BOP's Administrative Remedy Program[.]"); *Abbasi*, 137 S. Ct. at 1863 ("Indeed, the habeas remedy, if necessity required its use, would have provided a faster and more direct route to relief than a suit for money damages. A successful habeas petition would have required officials to place respondents in less-restrictive conditions immediately; yet this damages suit remains unresolved some 15 years later."). Taken together, the Court believes there exists special factors counseling hesitation and, accordingly, Plaintiff's deliberate indifference to safety claim is dismissed.

### III. Plaintiff's Conditions of Confinement Allegations

Defendants maintain that to the extent Plaintiff's amended complaint challenges the conditions of confinement during the blackout at MDC, such a claim would arise under a new *Bivens* context. (Defs.' Mem at 11–12.) In response, Plaintiff represents that he has actions related to the blackout that remain pending, including an FTCA claim against the United States and his participation in class action lawsuits against the MDC and Defendant Quay. (Pl.'s Mem. at 3.) Plaintiff, however, does not substantively respond to Defendants' legal argument. Because Plaintiff's opposition is devoid of any response to Defendants' arguments, the Court need not address Defendants' arguments on the merits as Plaintiff's claims are deemed abandoned. *See, e.g.*, *Malik v. City of New York*, 841 F. App'x 281, 284 (2d Cir. 2021) (internal citations and quotation marks omitted) ("When a party fails adequately to present arguments in a brief, a court may properly consider those arguments abandoned ... [e]specially in the case of a counseled party where a court may ... infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.").

### IV. Qualified Immunity

**\*11** In a footnote, Defendants argue they are entitled to dismissal because their actions were protected under the doctrine of qualified immunity. Specifically, as to Plaintiff's "medical claims," Defendants maintain that it was objectively

reasonable for Defendants to believe that their actions, taken in response to a developing emergent situation, did not violate any clearly established constitutional rights. [9] (Defs.' Mem. at 25 n.8.) The Court disagrees.

The doctrine of qualified immunity shields government officials from civil liability if their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The issues on qualified immunity are: (1) whether plaintiff has shown facts making out [a] violation of a constitutional right; (2) if so, whether that right was 'clearly established'; and (3) even if the right was 'clearly established,' whether it was 'objectively reasonable' for the officer to believe the conduct at issue was lawful." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 154 (2d Cir. 2013) (quoting *Taravella v. Town of Wolcott*, 599 F.3d 129, 133–34 (2d Cir. 2010)). As to medical indifference claims specifically, "to establish their qualified immunity defense, the defendants must show that it was objectively reasonable, for them to believe that they had not acted with the requisite deliberate indifference." *McKenna v. Wright*, 386 F.3d 432, 437 (2d Cir. 2004) (internal citations and quotation omitted). On the face of these pleadings, the facts of which are accepted as true, the Court is unwilling to draw such a conclusion.

### CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss for failure to state a claim is GRANTED in part and DENIED in part. Specifically, Defendants' motion to dismiss Plaintiff's deliberate indifference as to his safety claim is GRANTED. Defendants' motion to dismiss Plaintiff's deliberate indifference as to his medical needs claims against Defendants Quay, Garcia, White, Gonzalez, and Maury is GRANTED. Defendants' motion to dismiss Plaintiff's deliberate indifference as to his medical needs claims against Defendants Pope, Metzger, and Calixte is DENIED.

SO ORDERED.

### All Citations

Not Reported in Fed. Supp., 2023 WL 5671935

Mirvis v. Quay, Not Reported in Fed. Supp. (2023)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 172 of 340

## Footnotes

1      Plaintiff also brings the instant action against Correctional Officer John Doe #1, Correctional Officer John Doe #2, Correctional Officer John Doe #3, and Correctional Officer Jane Doe. *See* (Am. Compl. ¶¶ 19, 21, ECF No. 26.) However, Plaintiff has not served these outstanding Defendants. Accordingly, the amended complaint is dismissed as to these defendants.

2      In the alternative, Defendants move pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment on all claims. (Defs.' Mem. L. Supp. Mot. Dismiss ("Defs.' Mem.") at 2–3, ECF No. 65.) The Court declines to entertain a motion for summary judgment.

3      The following facts are taken from the amended complaint and are assumed to be true for the purposes of this memorandum and order.

4      Plaintiff alleges that he also told several housing unit officers. (Am. Compl. ¶ 48.)

5      Inconsistently, the Defendants state in their Reply Memorandum that they "do not argue that [P]laintiff had any pleading burden regarding exhaustion, nor do they seek dismissal under Rule 12(b)(6) in connection with [P]laintiff's failure to exhaust." (Reply Mem. at 15.)

6      The amended complaint alleges Garcia was responsible for correctional service, food service, and health services. (Am. Compl. ¶ 13.)

7      In support of his argument, Plaintiff cites the Supreme Court's decision in *Farmer v. Brennan*, 511 U.S. 825 (1994). In *Farmer*, the complaint alleged prison officials placed petitioner in the prison's "general population despite knowledge that the penitentiary had a violent environment and a history of inmate assaults, and despite knowledge that petitioner, as a transsexual who 'projects feminine characteristics,' would be particularly vulnerable to sexual attack by some USP–Terre Haute inmates." 511 U.S. at 831. There, the Supreme Court acknowledged "prison conditions may be restrictive and even harsh, but gratuitously allowing the beating or rape of one prisoner by another serves no legitimate penological objective, any more than it squares with evolving standards of decency." *Id.* at 833 (internal quotation and alteration omitted). And while the Supreme Court did not explicitly recognize this as an extension of the *Bivens* remedy, it did not reject the petitioner's argument on *Bivens* grounds, and at least one court in this district have understood this to mean "conditions of confinement actions under the Eighth Amendment includes both medical care and safety, [in other words,] they are not distinct claims." *Walker v. Schult*, 463 F. Supp. 3d 323, 331 (N.D.N.Y. 2020). While the Court does, to some extent, find this argument persuasive, it is contrary to the Supreme Court's explicit guidance in *Abbasi*, which came after the *Farmer* decision. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) ("These three cases—*Bivens, Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself.").

8      The Court takes into consideration the Supreme Court's recent decision in *Egbert v. Boule*, 142 S. Ct. 1793 (2022), which supports this Court's finding that special factors counsel hesitation. In its supplemental briefing in opposition to the motion to dismiss, Plaintiff argues that the holding in *Egbert* reaffirms the two-step inquiry, requiring a court to determine, first, whether a claim arises in a new context, and second, whether there are any special factors counseling hesitation. (Pl. Supp. Opp. Mem. at 1, ECF No. 85.) Defendants argue that while the *Egbert* Court did not explicitly replace the two-step inquiry, the Supreme Court made clear that the inquiry "often boils down to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." (Defs.' Supp. Mem. at 4, ECF No. 86.) Nonetheless, Defendants apply the two-step analysis, arguing that the case should be dismissed because there are special

Case 1:25-cv-00774-AJB-ML     Document 16     Filed 12/30/25     Page 173 of 340

**Mirvis v. Quay, Not Reported in Fed. Supp. (2023)**

factors counseling hesitation. The Court agrees. Applying the two-step analysis in this case does not alter the Court's finding.

9       Defendants make a similar argument as to the Plaintiff's "power-outage-related" complaints, separate from Plaintiff's medical complaints. Having deemed any such claims as abandoned, the Court need not rule on Defendants' entitlement to qualified immunity.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 174 of 340

2024 WL 4989300
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Fredrick OEHLER, Plaintiff,

v.

Theresa NIETZEL, Matthew Albanese, Matthew
DellaPenta, Peter Colafrancesdri, E. Gaczewski,
John Doe(s) Customs and Border Protection
Officers, and the United States, Defendants.

23-cv-00956(JLS)(JJM)
|
Signed August 6, 2024

**Attorneys and Law Firms**

Chad A. Davenport, R. Anthony Rupp, III, Timothy P. Noonan, Jr., Rupp Pfalzgraf LLC, Buffalo, NY, for Plaintiff.

Erin Elizabeth Molisani, Erie County Department of Law, Buffalo, NY, for Defendant Theresa Nietzel.

Evelyn S. Yarborough, DOJ-Civ, Raleigh, NC, James E.B. Bobseine, Office of the United States Attorney, Buffalo, NY, for Defendant United States.

**REPORT AND RECOMMENDATION**

JEREMIAH J. MCCARTHY, United States Magistrate Judge

**\*1** Plaintiff Fredrick Oehler commenced this action for alleged civil rights violations arising from his online purchase of a device, identified as a fuel filter, that was determined by Customs and Border Protection ("CBP") to be an illegal firearm silencer. This began a series of events culminating in the execution of a search warrant at Oehler's residence, followed by criminal charges against him which were later dismissed. *See* Complaint [1]. [1]

Before the court are the motions by (1) defendants Therese Nietzel and Matthew Albanese (collectively, the "County Defendants") to dismiss the Complaint pursuant to Fed. R. Civ. P. ("Rule") 12(b)(6) [4]; (2) defendants Matthew DellaPenta, Peter Colafranceschi (incorrectly identified in the Complaint as Peter Colafrancesdri) and Edward Gaczewski (identified as E. Gaczewski) (collectively, the "Individual Federal Defendants") to dismiss the Complaint pursuant

to Rule 12(b)(6) and for substitution of a party [16]; (3) defendant United States to dismiss the Complaint pursuant to Rule 12(b)(1) and 12(b)(6) [17]; and (4) Oehler's cross-motion [20] to strike the Declaration of Gregory Stimmel submitted in support of the United States' motion to dismiss, all of which have been referred to me by District Judge John L. Sinatra, Jr. for initial consideration [5]. Having reviewed the parties' submissions [4, 16, 17, 20, 22-29], I recommend that Oehler's motion to strike [20] [2] and the Individual Federal Defendants' motion to dismiss and substitute [16] be granted, and that the remaining motions [4, 17] be granted in part and denied in part.

**BACKGROUND**

Oehler's Complaint alleges that the Bureau of Alcohol Tobacco and Firearms ("ATF") had an increasing concern "regarding the proliferation of fuel filters that are sometimes modified and used as unregistered firearms silencers", causing it to instruct CBP "and other law enforcement agents that they should target packages containing fuel filters ... even though [the] ATF knows that other components and further steps are required to convert the fuel filter into an illegal firearm silencer". [1], ¶¶35, 40. Specifically, it alleged that in order for a fuel filter to constitute a "firearms silencer" under the National Firearms Act, "the owner must purchase baffles and a converter that allows the fuel filter to attach to a firearm", as well as "drill holes through the baffles to allow a projectile to pass through and to prevent the fuel filter and firearm from exploding". Id., ¶¶26-28.

Oehler was allegedly swept up in the ATF's enforcement efforts. He allegedly ordered a fuel filter for one of his vehicles through a commercial website. Id., ¶¶21-22. When the package containing the fuel filter arrived in the United States, it was examined by John Doe CBP Officers, and was "incorrectly classified ... as a firearms silencer". Id., ¶¶30-31.

**\*2** On or about January 25, 2021, defendant Matthew DellaPenta, a Special Agent ("SA") with the Department of Homeland Security ("DHS") was notified that CBP had intercepted a package containing a firearm silencer destined for Oehler's residence. Id., ¶32. The John Doe CBP Officers allegedly provided him with "misleading photographs" of the contents of the package that showed a "fuel filter case, fuel filter core and two end caps", but "were insufficient to determine whether the package included other necessary components to convert the fuel filter into an illegal firearm

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 175 of 340

suppressor - i.e., baffles and a converter so that the recipient of the package could attach the fuel filter to a firearm". Id., ¶33. In turn, SA DellaPenta passed this information along to Theresa Nietzel, a Detective with the Erie County Sheriff's Office, and requested her assistance "to investigate and seize the package". Id., ¶50.

On January 28, 2021, CBP mailed Oehler a "Notice of Seizure", which advised him that the package was seized because it contained an illegal firearm silencer. Id., ¶51. Oehler also received an "Election of Proceedings" form that provided him with a variety of options, including abandonment of the package. Id., ¶52. On or about February 1, 2021, Oehler returned the Election of Proceedings form, indicating that he intended to abandon the package and its contents. Id., ¶55.

Despite Oehler's having abandoned the package, SA DellaPenta proceeded with the investigation by conducting surveillance to confirm Oehler's residence. Id., ¶56. Oehler alleges "[u]pon information and belief" that "prior to receiving such a notification from CBP Officers, John Doe(s), SA DellaPenta and/or Detective Nietzel were aware that ... Oehler had an inventory of assault weapons that [they] believed to be illegal" that they "wished to seize". Id., ¶¶58-59. He further alleges "upon information and belief" that despite them "knowing or having strong reason to know that the notification of a firearm silencer" from CBP was false, they used it to obtain the search warrant to seize the weapons. Id., ¶60.

On February 10, 2021, Detective Nietzel "applied for a search warrant ... from [Justice] Christopher J. Burns ... of the Erie County Supreme Court." Id., ¶57. Detective Nietzel's supporting Affidavit stated that she had "received information from a reliable law enforcement source, and fellow officer, [SA] ... DellaPenta ... that [Oehler] ... will be receiving a firearm silencer at [his] residence to be delivered during a controlled delivery" ([4-1] at 3, ¶2), and attached a Supporting Deposition of Fact from SA DellaPenta stating that CBP had seized a package addressed to Oehler that contained "one firearm silencer in violation of US Law". Id. at 7.

Detective Nietzel's Affidavit did not mention that the package contained a purported fuel filter, but the search warrant application attached photographs of the mailing label of the package identifying the contents as a fuel filter. See id. at 11-13. The search warrant application was based on a violation of New York Penal Law § 265.02(2), which

criminalizes the "[p]ossession of a firearm silencer", defined as "an attachment for causing the firing of any gun ... to be silent, or intended to lessen or muffle the noise of the firing of any gun". Id. at 3, ¶2(d). See New York Penal Law § 265.00(2) (defining "firearm silencer").

Oehler alleges that "Detective Nietzel and/or SA DellaPenta" "should have opened the package to determine its contents, but instead they relied entirely on the conclusion by unknown CBP Officers, John Doe(s), that the package contained a firearm silencer when in fact they knew or should have known that it did not". Complaint [1], ¶68.

The search warrant for Oehler's residence was executed by Detective Nietzel and Matthew Albanese, a Deputy with the Sheriff's Office, as well SA DellaPenta and fellow DHS SAs Peter Colafranceschi and Edward Gaczewski (id., ¶¶79-80), and resulted in the seizure of a number of firearms. Id., ¶82. Following the search, Oehler was arrested and charged in criminal complaints signed by Detective Nietzel with four counts of possession of an assault rifle in violation of New York Penal Law § 265.02(7), and with one count of possession of a firearm silencer in violation of New York Penal Law § 265.02(2). Id., ¶¶85, 87, 91. Oehler alleges that Detective Nietzel "knew, or should have known, that the fuel filter [he] purchased ... was not modified and therefore it is not a firearm silencer". Id., ¶90.

**\*3** After being provided with a copy of a prior decision from Justice Burns (People v. John Andrews, Case No. 2020-0079) that suppressed evidence from a "bogus search warrant" obtained under similar circumstances - i.e., by falsely alleging that the defendant "was having a firearm silencer delivered to his residence when in fact the item that was delivered was a legal solvent trap", the District Attorney "agreed to dismiss the charges ... without a trial and with prejudice". Id., ¶¶99-100.

As a result of this alleged conduct, Oehler asserts the following Causes of Action:

-- First: Unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments based on the execution of the search warrant against all defendants under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971), and 42 U.S.C. § 1983;

-- Second: Unreasonable search and seizure in violation of the Fourth and Fourteenth Amendments for presenting a

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 176 of 340

false affidavit in support of the search warrant against SA DellaPenta, Detective Nietzel, and John Doe CBP Officers under Bivens and 42 U.S.C. § 1983;

-- Third: Failure to intervene in violation of the Fourth and Fourteenth Amendments, as well as state law, against all defendants under the Federal Tort Claims Act ("FTCA"), Bivens, and 42 U.S.C. § 1983;

-- Fourth: Conspiracy to violate rights under the Fourth and Fourteenth Amendments, as well as state law, against all defendants under Bivens and 42 U.S.C. § 1983;

-- Fifth: False arrest in violation of the Fourth and Fourteenth Amendments, as well as state law, against all defendants under the FTCA, Bivens, and 42 U.S.C. § 1983;

-- Sixth: False imprisonment in violation of the Fourth and Fourteenth Amendments, as well as state law, against all defendants under the FTCA, Bivens, and 42 U.S.C. § 1983; and

-- Seventh: Malicious prosecution in violation of the Fourth and Fourteenth Amendments, as well as state law, against all defendants under the FTCA, Bivens, and 42 U.S.C. § 1983.

## DISCUSSION

The standards for dismissal under Rule 12(b)(6) and Rule 12(b)(1) differ. "To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must allege enough facts to state a claim for relief that is plausible on its face ... and provide more than a formulaic recitation of the elements of a cause of action or naked assertions devoid of further factual enhancement." Shara v. Maine-Endwell Central School District, 46 F.4th 77, 82 (2d Cir. 2022).

By contrast, "[i]n resolving a motion to dismiss under Rule 12(b)(1), the district court must take all uncontroverted facts in the complaint (or petition) as true, and draw all reasonable inferences in favor of the party asserting jurisdiction. But where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits. In that case, the party asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." Tandon v. Captain's Cove Marina of Bridgeport, Inc., 752 F.3d 239, 243 (2d Cir. 2014).

## A. The County Defendants' Motion to Dismiss pursuant to Rule 12(b)(6)

### 1. Official Capacity, Bivens, FTCA and State Law Claims

Oehler acknowledges that "any state law, Bivens, FTCA, and Monell [v. Department of Social Services of the City of New York, 436 U.S. 658 (1978)] claims against the County Defendants should be dismissed". Oehler's Memorandum of Law [22] at 2 n. 1. [3] Therefore, I recommend that these claims be dismissed.

### 2. 42 U.S.C. § 1983: Unreasonable Search and Seizure Causes of Action

**\*4** "Ordinarily, ... [a] search pursuant to a warrant issued by a neutral magistrate is presumed reasonable because such warrants may issue only upon a showing of probable cause." Walczyk v. Rio, 496 F.3d 139, 155-56 (2d Cir. 2007). "A section 1983 plaintiff challenging a warrant [on the basis that a law enforcement officer materially misled the issuing magistrate] must make the same showing that is required at a suppression hearing under Franks v. Delaware, 438 U.S. 154, 155-56 ... (1978): the plaintiff must show that the affiant knowingly and deliberately, or with a reckless disregard of the truth, made false statements or material omissions in his application for a warrant, and that such statements or omissions were necessary to the finding of probable cause." Velardi v. Walsh, 40 F.3d 569, 573 (2d Cir. 1994). This must be established by a "substantial preliminary showing". Franks, 438 U.S. at 155. See also Shabazz v. Johnson City Police Department, 2019 WL 2617016, *3 (N.D.N.Y. 2019).

Arguing that there was no Fourth Amendment violation, the County Defendants seek dismissal of the First and Second Causes of Action.

#### a. Detective Nietzel

The County Defendants argue that Detective Nietzel's supporting Affidavit "was not false. The warrant indicates that the contents of the package was a 'firearm silencer' [and] [Oehler] admits that a fuel filter can be converted into a silencer". County Defendants' Memorandum of Law [4-3] at 15 (citing Complaint [1], ¶27) (emphasis in original). [4] However, this argument would require me to disregard the

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 177 of 340

allegations of the Complaint stating that the device was not a "firearm silencer". *See, e.g.*, Complaint [1], ¶¶34, 38, 88, 90, 91.

The Complaint alleges that this falsehood was made with reckless disregard for the truth because Detective Nietzel "should have opened the package to determine its contents, but instead they relied *entirely* on the conclusion by unknown CBP Officers ... that the package contained a firearm silencer". Id., ¶68 (emphasis added). However, Detective Nietzel was entitled to "rely - *as long as such reliance is reasonable* - on information provided by other law enforcement officials". Hewitt v. City of New York, 2012 WL 4503277, *4 (E.D.N.Y. 2012), aff'd, 544 F. App'x 24 (2d Cir. 2013) (emphasis added); Bernard v. United States, 25 F.3d 98, 103 (2d Cir. 1994) ("the determination of probable cause does not turn on whether Agent # 1's observations were accurate, but on whether [the arresting officer] was reasonable in relying on those observations"); Saunders v. Cavada, 2024 WL 681228, *7 (E.D.N.Y. 2024) ("when assessing probable cause to arrest, police officers are entitled to rely - as long as such reliance is reasonable - on information provided by other law enforcement officials, including identifications which may later turn out to be mistaken"). There may be reasons why it was unreasonable for Detective Nietzel to rely on the assessment of other law enforcement agencies that the package contained a firearm silencer, rather than a fuel filter, but these are not alleged in the Complaint.

"Unsupported conclusory allegations of falsehood or material omission cannot support a Franks challenge; ... the plaintiff must make specific allegations". Velardi, 40 F.3d at 573. Without more, Oehler's allegation "[u]pon information and belief" that Detective Nietzel knew or had "reason to know that the notification of a firearm silencer ... was false" (Complaint [1], ¶¶57; 68), fails to plausibly allege that she knowingly presented false information to Justice Burns. 5 *See* Kates v. Greece Police Department, 2017 WL 11548970, *4 (W.D.N.Y. 2017) (dismissing unlawful search and seizure claim where "conclusory allegation does not suffice to meet the Franks standard - a 'high one' "). Therefore, I recommend that this claim be dismissed.

**b. Deputy Albanese**

 **\*5**  The County Defendants argue that the claims against Deputy Albanese must be dismissed because he

"merely executed a facially-valid search warrant". County Defendants' Memorandum of Law [4-3] at 16. I agree.

"To establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show ... the defendant's personal involvement in the alleged constitutional deprivation." Kravitz v. Purcell, 87 F.4th 111, 129 (2d Cir. 2023). The only allegation against Deputy Albanese is that he participated in the execution of the search warrant. *See* Complaint [1], ¶79. Without any allegations that he participated in obtaining the search warrant or otherwise had reason to know that false information was used to obtain the search warrant, I recommend that this claims as against him be dismissed.

### 3. 42 U.S.C. § 1983: False Arrest/Imprisonment

"False arrest is simply false imprisonment accomplished by means of an unlawful arrest. Jenkins v. City of New York, 478 F.3d 76, 88 n.10 (2d Cir. 2007). Since "[s]uch claims are one and the same", I have addressed them together. Oudekerk v. Lehoisky, 2024 WL 1693850, *4 (N.D.N.Y. 2024).

Oehler's false arrest claim appears to be premised on two theories. First, that the evidence supporting the charges was obtained in violation of his "constitutionally protected rights pursuant to a bogus warrant". Complaint [1], ¶86. This "is essentially a fruit-of-the-poisonous tree argument ... that ... has no applicability in the Section 1983 context". Vassiliou v. City of New York, 2021 WL 76916, *7 (E.D.N.Y. 2021). *See also* Townes v. City of New York, 176 F.3d 138, 145 (2d Cir. 1999) ("[t]he fruit of the poisonous tree doctrine cannot link the unreasonable seizure and search to [the plaintiff's] conviction and incarceration because this evidentiary doctrine is inapplicable to civil § 1983 actions"); Arroyo v. City of New York, 683 F. App'x 73, 75 (2d Cir. 2017) (Summary Order) ("[t]he fact that the gun was later suppressed does not preclude a determination that there was arguable probable cause for the arrest").

Second, Oehler alleges that Detective Nietzel falsely charged him with possession of a firearm silencer when she "knew, or should have known, that the fuel filter purchased by [him] was not modified and therefore it was not a firearm silencer". Complaint [1], ¶¶87, 90. That allegation is insufficient to support Oehler's false arrest/imprisonment claims because "[t]he existence of probable cause to arrest for some criminal offense - even an offense other than the one identified by the arresting officer at the time of arrest - defeats a false arrest Fourth Amendment claim". Glasgow v. Beary, 2 F.

Supp. 3d 419, 422 (E.D.N.Y. 2014). *See also* Kass v. City of New York, 864 F.3d 200, 206 (2d Cir. 2017) ("[a]n officer is entitled to qualified immunity from a federal false arrest and imprisonment claim if he had arguable probable cause to arrest the plaintiff for any offense, regardless of the offense with which the plaintiff was actually charged"); Banyan v. Sikorski, 2024 WL 2137882, *8 (S.D.N.Y. 2024) ("a false arrest claim fails if there was probable cause to arrest the plaintiff for any offense" (emphasis omitted)). As the County Defendants argue, Oehler's "own Complaint demonstrates that several assault weapons were found in violation of [the] Penal Law" (County Defendants' Reply Memorandum of Law [25-1] at 10), and there is no allegation that probable cause did not exist to arrest Oehler for those violations. *See* Complaint [1], ¶¶82, 85. Therefore, I recommend that this claim be dismissed.

### 4. Malicious Prosecution

**\*6** To prevail on a § 1983 claim for malicious prosecution, a plaintiff must show "a seizure or other perversion of proper legal procedures implicating his personal liberty and privacy interests under the Fourth Amendment", and that "criminal proceedings were initiated or continued against him, with malice and without probable cause, and were terminated in his favor". Lanning v. City of Glens Falls, 908 F.3d 19, 24 (2d Cir. 2018).

#### a. Detective Nietzel

The County Defendants argue that there was "probable cause for the arrest" and that Oehler has "set forth only vague and conclusory assertions ... that defendants acted with malice". County Defendants' Memorandum of Law [4-3] at 22. Neither of these arguments are persuasive.

In contrast to Oehler's false arrest claim, "the defendant must have possessed probable cause as to *each offense charged*" to support a malicious prosecution claim. Costello v. Milano, 20 F. Supp. 3d 406, 415 (S.D.N.Y. 2014) (emphasis added); Knox v. Khan, 2019 WL 1099952, *8 (E.D.N.Y. 2019) ("to defeat a malicious prosecution claim, defendants must have reasonable or probable cause for each offense charged"); D'Angelo v. Kirschner, 288 F. App'x 724, 726-27 (2d Cir. 2008) (Summary Order) ("a finding of probable cause to arrest as to one charge does not necessarily defeat a claim of malicious prosecution as to other criminal charges that were resolved in the plaintiff's favor").

As discussed above, the Complaint does not allege that probable cause was lacking for the four charges against Oehler for violating New York Penal Law § 265.02(7), which criminalizes the possession of certain assault rifles. *See* Complaint [1], ¶¶85-86. Oehler only challenges the existence of probable cause for the remaining charge for violating New York Penal Law § 265.02(2), which criminalizes the possession of a firearm silencer. Id., ¶87.

The Complaint alleges that following the execution of the search warrant and presumably the opening of the package, Detective Nietzel "knew or should have known" that Oehler was "not in possession of a firearm silencer; rather, he purchased and was in possession of a fuel filter that, when unmodified, is legal to own". Id., ¶¶88, 90. Based solely on the allegations before me, and without the benefit of the accusatory instrument, and supporting papers, or any other evidence, I conclude that Oehler has sufficiently pled a lack of probable cause for the unlawful possession of a firearm silencer charge. [6] At this stage, the absence of probable cause also gives rise to the existence of malice. *See* Johnson v. City of Rochester, 2023 WL 8237560, *8 (W.D.N.Y. 2023) ("[g]enerally, the lack of probable cause - while not dispositive - tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause").

Alternatively, the County Defendants rely on qualified immunity for dismissal. *See* County Defendants' Memorandum of Law [4-3], Point I. "[O]fficers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was clearly established at the time." District of Columbia v. Wesby, 583 U.S. 48, 62-63 (2018). To be "clearly established", the law must be "sufficiently clear that every reasonable official would understand that what he is doing is unlawful." Id. at 63. "In the context of ... malicious prosecution claims, an officer is entitled to qualified immunity if he had either probable cause or arguable probable cause". Dufort v. City of New York, 874 F.3d 338, 354 (2d Cir. 2017).

**\*7** The Second Circuit has noted that since "on a Rule 12(b) (6) ... motion, the facts supporting the qualified immunity defense must appear on the face of the complaint, asserting qualified immunity as a defense in the earliest stages of litigation, before development of a relevant factual record, usually fails to result in dismissal of the complaint".

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 179 of 340

Therefore, it "has admonished defendants moving to dismiss a suit by reason of qualified immunity" that they "would in almost all cases be well advised to move for summary judgment, rather than for dismissal under Rule 12(b)(6)". Pourkavoos v. Town of Avon, 823 F. App'x 53, 59 (2d Cir. 2020) (Summary Order).

This case is not unique. While there may be arguments following discovery as to why Detective Nietzel is entitled to qualified immunity for the malicious prosecution claim, at this stage the allegations of the Complaint fail to establish her entitlement to that relief.

**b. Deputy Albanese**

The County Defendants argue that there is no allegation that Deputy Albanese "initiated or continued a criminal prosecution; only that defendant Nietzel did so". County Defendants' Memorandum of Law [4-3] at 22. I agree. The sole allegation against Deputy Albanese is that he was among the law enforcement officers who executed the search warrant at Oehler's residence. *See* Complaint [1], ¶79. Oehler argues that Deputy Albanese "was listed as an officer who assisted in ... [his] arrest" (Oehler's Memorandum of Law [22] at 15), but even if that allegation was sufficient to support a malicious prosecution claim against him, it is not contained in the Complaint. *See* Fischer v. Forrest, 286 F. Supp. 3d 590, 604 (S.D.N.Y. 2018), aff'd, 968 F.3d 216 (2d Cir. 2020) ("[i]t is black letter law that a plaintiff may not alter his pleadings through a brief"). Therefore, I recommend this claim be dismissed as against Deputy Albanese.

**5. Failure to Intervene**

"It is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." Anderson v. Branen, 17 F.3d 552, 557 (2d Cir. 1994). "Liability attaches on the theory that the officer, by failing to intervene, becomes a 'tacit collaborator' in the illegality." Cornell v. Village of Clayton, 2023 WL 5965431, *8 (N.D.N.Y. 2023).

"To state a failure-to-intervene claim, a plaintiff must allege that (1) the officer had a realistic opportunity to intervene and prevent the harm; (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated; and (3) the officer did not take reasonable

steps to intervene." Debellis v. Soloman, 2022 WL 902635, *4 (S.D.N.Y. 2022).

**a. Detective Nietzel**

As the primary actor in the relevant events (*i.e.*, the applicant for the search warrant, arresting officer, and the criminal complainant), it is not entirely clear how Detective Nietzel failed to intervene in the constitutional violations of others. The only conduct that Oehler points to as constituting a failure to intervene is Detective Nietzel's alleged failure to "review ... [the] contents [of the package] before assisting the federal officers with obtaining a search warrant". Oehler's Memorandum of Law [22] at 12.

However, for the reasons discussed above, it is not sufficiently alleged that Detective Nietzel unreasonably relied on the information received from SA DellaPenta concerning the contents of the package. As pled, there is nothing to suggest that a reasonable officer in Detective Nietzel's position would know that Oehler's constitutional rights were being violated. Therefore, I recommend that this claim be dismissed as against Detective Nietzel.

**b. Deputy Albanese**

**\*8** The only allegation of the Complaint against Deputy Albanese is that he participated in the execution of the search. *See* Complaint [1], ¶79. This falls well short of stating a failure to intervene claim against him. Therefore, I recommend that this claim be dismissed as against Deputy Albanese.

**6. Conspiracy**

"To state a claim for § 1983 conspiracy, a plaintiff must allege (1) an agreement between two or more state actors ...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal, causing damages." Eldars v. State University of New York at Albany, 2021 WL 4699221, *3 (2d Cir. 2021) (Summary Order). "Complaints containing only conclusory, vague, or general allegations that the defendants engaged in a conspiracy fail to state a claim." Id.

"A conspiracy need not be shown by proof of an explicit agreement but can be established by showing that the

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

parties have a tacit understanding to carry out the prohibited conduct." Thomas v. Roach, 165 F.3d 137, 146 (2d Cir. 1999). However, "a plaintiff must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end". Webb v. Goord, 340 F.3d 105, 110 (2d Cir. 2003).

The Complaint fails to allege a factual basis supporting the existence of any express or tacit agreement to unlawfully search, arrest, or prosecute Oehler. Even if the failure of Detective Nietzel to open the package or to more closely review the photographs and confirm the existence of a firearm silencer could be considered reckless, lacking is sufficient allegations that there was any agreement between law enforcement officers to deprive Oehler of his constitutional rights. See Beechwood Restorative Care Center v. Leeds, 436 F.3d 147, 154 (2d Cir. 2006) ("[c]ooperation between state and federal bureaucracies acting in their regulatory spheres supports no inference that the federal actors acted with an improper motive").

**B. The Individual Federal Defendants' Motion to Dismiss pursuant to Rule 12(b)(6) and For Substitution of a Party pursuant to 28 U.S.C. § 2679**

**1. FTCA, Fourteenth Amendment, and 42 U.S.C. § 1983 Claims**

Oehler does not oppose the Individual Federal Defendants' motion to the extent that it seeks to dismiss the Fourteenth Amendment claims, as well as those being asserted under 42 U.S.C. § 1983 and the FTCA. See Oehler's Memorandum of Law [23] at 2 n. 1. Nor does he offer any opposition to the Individual Federal Defendants' motion to substitute the United States as the proper defendant for his state law claims pursuant to 28 U.S.C. § 2679(d)(1). [7] Therefore, I recommend that these claims be dismissed, and that the motion for substitution be granted.

**2. Bivens Claims**

42 U.S.C. § 1983 "entitles an injured person to money damages if a state official violates his or her constitutional rights", but "Congress did not create an analogous statute for federal officials." Ziglar v. Abbasi, 582 U.S. 120, 130 (2017). In Bivens that the Supreme Court first "held that it had authority to create 'a cause of action under the Fourth Amendment' against federal agents who allegedly manacled the plaintiff and threatened his family while arresting him

for narcotics violations." Egbert v. Boule, 596 U.S. 482, 490 (2022). "Over the following decade, the Court twice again fashioned new causes of action under the Constitution - first, for a former congressional staffer's Fifth Amendment sex-discrimination claim, see Davis v. Passman, 442 U.S. 228 ... (1979); and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment, see Carlson v. Green, 446 U.S. 14 ... (1980)." Id. at 490-91.

**\*9** However, "[s]ince deciding Carlson in 1980, additional causes of action arising under Bivens have not been implied". Smith v. Arrowood, 2023 WL 6065027, \*3 (W.D.N.Y. 2023). Most recently in Egbert, supra, the Supreme Court addressed the availability of Bivens civil remedies for Fourth Amendment violations. It reiterated the court's previous two-part test for establishing Bivens liability: first, the court asks "whether the case presents a new Bivens context - i.e., is it meaningfully different from the three cases in which the Court has implied a damages action." Egbert, 596 U.S. at 492. "Second, if a claim arises in a new context, a Bivens remedy is unavailable if there are any 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." Id.

However, it explained that "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy". Id. The creation of "a cause of action under Bivens" remains "a disfavored judicial activity", because "in all but the most unusual circumstances, prescribing a cause of action is a job for Congress, not the courts". Id. at 486, 491. "If there is even a single reason to pause before applying Bivens in a new context, a court may not recognize a Bivens remedy." Id. at 492.

**a. New Context**

A new context exists where the claim is "different in a meaningful way from previous Bivens cases decided by th[e] [Supreme] Court". Abbasi, 582 U.S. at 139. The line of demarcation for what qualifies as a "new context" has been described as a "low threshold". Quinones-Pimentel v. Cannon, 2022 WL 826344, \*22 (D.P.R. 2022), aff'd, 85 F.4th 63 (1st Cir. 2023). See also Elhady v. Unidentified CBP Agents, 18 F.4th 880, 883 (6th Cir. 2021) ("[t]he context is new if it differs in virtually any way from the Bivens trilogy" - i.e., Davis and Carlson, supra). The Supreme Court has

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 181 of 340

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

identified a number of ways that a case might differ in a meaningful way, including:

> "the rank of officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusions by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous Bivens cases did not consider."

Abbasi, 582 U.S. at 139-40.

In Bivens, the Court recognized an implied damages remedy against federal officers arising from a warrantless search of a residence and warrantless seizure by agents of the Federal Bureau of Narcotics (now the Drug Enforcement Agency ("DEA")). See 403 U.S. at 389-90. There are some commonalities between the facts of Bivens and those alleged here. Oehler focuses on the fact that in Bivens the same "Constitutional right [was] at issue - the right to be free from unreasonable search and seizures under the Fourth Amendment". Oehler's Memorandum of Law [23] at 4. However, that commonality is insufficient: courts must "look beyond the constitutional provisions invoked". Hernandez v. Mesa, 589 U.S. 93, 103 (2020). See also Egbert, 596 U.S. at 495 ("[w]hile Bivens and this case do involve similar allegations of excessive force and thus arguably present almost parallel circumstances or a similar mechanism of injury, ... these superficial similarities are not enough to support the judicial creation of a cause of action").

There are meaningful differences between the facts in Bivens and the allegations presented here. For instance, unlike Bivens, which addressed the conduct of the DEA, this case addresses the conduct of CBP and HSI employees. "Difference[s] in agency is now sufficient, after [Egbert], to create a new context." Sigalovskaya v. Braden, 2023 WL 6385761, *5 (E.D.N.Y. 2023) ("the claim involves a new category of defendants because they are not agents of the Federal Bureau of Narcotics, but instead are HSI special agents"); Karman v. U.S. Customs & Border Protection, 2023 WL 5806313, *6 (N.D.N.Y. 2023), adopted in relevant part, 2024 WL 123780 (N.D.N.Y. 2024) ("[f]ollowing the Supreme Court's decisions in Hernandez and Egbert, district courts have concluded that a Bivens action does not exist for claims against federal immigration officials"); Lewis v. Westfield, 640 F. Supp. 3d 249, 253 (E.D.N.Y. 2022), aff'd,

2023 WL 8613873 (2d Cir. 2023) ("[t]he defendants are Deputy Marshals, rather than federal narcotics agents"). See also Cohen v. Trump, 2024 WL 20558, *2 (2d Cir. 2024) (Summary Order) (a suit against Bureau of Prisons and United States Probation and Pretrial Services "involves 'new categor[ies] of defendants' that were not contemplated in Bivens").

\*10    Additionally, the malicious prosecution and failure to intervene claims, neither of which were at issue in Bivens, also present new contexts. See Sigalovskaya, 2023 WL 6385761 at *4 ("[p]laintiff's malicious prosecution and failure to intervene claims are new contexts because Bivens did not involve a malicious prosecution or failure to intervene claim"). The same holds true for Oehler's conspiracy claim (see Milton v. McClintic, 2022 WL 4852825, *2 (W.D.N.Y. 2022)),[8] as well as his Fourth Amendment unreasonable search claims. See Annappareddy v. Pascale, 2021 WL 1603987 (4th Cir. 2021) ("[w]hat Bivens involved was the Fourth Amendment right to be free of unreasonable warrantless searches and seizures; this case, by contrast, involves searches and a seizure conducted with a warrant. It thus implicates a distinct Fourth Amendment guarantee ... governed by different legal standards"). See also Bissereth v. United States, 2023 WL 4373888, *8 (D. Mass. 2023) ("since Abbasi and Egbert, courts have generally held that the existence of a warrant makes a case 'meaningfully different' from Bivens, because the legal mandate under which defendants were operating diverges from the warrantless narcotics-investigation circumstances in Bivens"); Cuney v. Choi, 2022 WL 16743984, *4 (N.D.N.Y. 2022) ("[p]laintiff's claim that Defendant exceeded the scope of warrants authorizing the search of electronic data is meaningfully different from the warrantless search and arrest in Bivens, and presents a new context").

Oehler's reliance on Meeks v. Larsen, 611 F. App'x 277 (6th Cir. 2015) and Powell v. United States, 2022 WL 1645545 (S.D.N.Y. 2022), both decided before Egbert, do not compel a different conclusion. See Oehler's Memorandum of Law [23] at 5-6.

### b. Special Factors

"If there are alternative remedial structures in place, that alone, like any special factor, is reason enough to limit the power of the Judiciary to infer a new Bivens cause of action." Egbert, 596 U.S. at 493. Oehler acknowledges that

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 182 of 340

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

the Individual Federal Defendants "are correct that DHS's administrative grievance procedure provides an 'alternative remedy' to Bivens, and would be a 'special factor' counseling against the application of Bivens". Oehler's Memorandum of Law [23] at 2 n. 1. Based on that concession, I recommend that Oehler's Bivens claims against the Individual Federal Defendants be dismissed.

## C. Oehler's Motion to Strike

When deciding a Rule 12(b)(6) motion to dismiss, the court the court may look beyond the allegations of the Complaint to the "[1] documents attached to the complaint as an exhibit or incorporated by reference; [2] matters of which judicial notice may be taken; and [3] documents upon whose terms and effect the complaint relies heavily, *i.e.*, documents that are 'integral' to the complaint." Tal v. Computech International, Inc., 2023 WL 7347219, *3 (E.D.N.Y.), adopted, 2023 WL 7339051 (E.D.N.Y. 2023). All other materials presented in connection with a Rule 12(b) (6) motion are considered extraneous and "the court must, in its discretion, either exclude these materials or convert the motion to one for summary judgment." Herrnson v. Hoffman, 2020 WL 6323637, *1 (S.D.N.Y. 2020). *See also* Rule 12(d). However, where "the court simply refers to supplementary materials, but does not rely on them or use them as a basis for its decision, the 12(b)(6) motion is not converted into a motion for summary judgment". Hayden v. County of Nassau, 180 F.3d 42, 54 (2d Cir. 1999).

The Complaint [1] makes the following allegations concerning the ATF's memos and guidance concerning fuel filters:

"39. ... ATF has issued memos and other forms of guidance to Federal law enforcement officers, including CBP officers, telling them to target packages with fuel filters.

40. Upon information and belief, as part of these memos and guidance, ATF instructs CBP and other law enforcement agents that they should target packages containing fuel filters and further that they should take misleading photographs of the fuel filter so that it appears to be a firearm silencer, even though ATF knows that other components and further steps are required to convert the fuel filter into an illegal firearm silencer.

 **\*11** 41. ATF further instructs CBP and other law enforcement officers to use those misleading photographs

and send to local law enforcement agents, along with a false notification that the unmodified fuel filter is in fact a firearm silencer."

In support of its motion to dismiss the Complaint, the United States relies on the Declaration of Gregory Stimmel, the Acting Deputy Division Chief of the Firearms and Ammunition Technology Division of the ATF ("FATD") [17-2]. The Declaration attaches FATD Technical Bulletins 17-01 and 20-01, which include "examples and pictures of common firearm silencers marketed as inline fuel filters." Stimmel Declaration [17-2], ¶5. Among the examples is a photograph of a device marketed as the NAPA 4003 filter that appears nearly identical to the photograph of the seized device contained in the search warrant. *Compare* Stimmel Declaration [17-2], ¶7 *with* Exhibit 3 to the search warrant [4-1] at 13. According to Stimmel, this device has "no fluid filtering capability" and has a "monocore silencer baffle" that allows it to function as a firearm silencer without any modifications (id., ¶8), in contradiction to the allegations of the Complaint that an unmodified fuel filter could not function as a firearm silencer. *See* Complaint [1], ¶¶27, 28, 34.

Oehler seeks to strike the Stimmel Declaration and attachments [20]. The United States responds that Technical Bulletins 17-02 and 20-01 are incorporated by reference in the Complaint and that the Stimmel Declaration merely authenticates them. *See* United States' Opposition [28], Points I and II.

"For a document to be incorporated by reference, the complaint must make *clear*, *definite, and substantial references* to the document." SuperCom, Ltd. v. Sabby Volatility Warrant Master Fund Ltd., 2023 WL 3919450, *2 (S.D.N.Y. 2023) (emphasis added). The vague references in the Complaint to "memos and guidance" fall short of that standard. The term "Technical Bulletin" does not appear in the Complaint, much less the specific Technical Bulletins the United States relies upon. Therefore, I conclude that the Technical Bulletins are not incorporated by reference into the Complaint. Nor do I see any reason to consider the Stimmel Declaration which is offered to authenticate the Technical Bulletins.

Although I have the option of converting the United States' Rule 12(b)(6) motion into one for summary judgment, it does not request that occur here, and states that it is not offering the Technical Bulletins "for their truth, or for any purpose contrary to the Rule 12(b)(6) standard". United

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 183 of 340

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

States' Opposition [28] at 6. At most, the United States asks that the Technical Bulletins be considered as "supplementary information". Id. at 7. Therefore, I recommend that Oehler's motion to strike be granted, with the United States reserving its right to file a summary judgment motion based on the Technical Bulletins and other evidence.

## D. The United States' Motion to Dismiss pursuant to Rules 12(b)(1) and 12(b)(6)

### 1. Bivens, 42 U.S.C. § 1983, and State Law Claims

Oehler clarifies that he only brought suit against the United States "under the FTCA", and acknowledges that "[t]he United States is correct that any state law, Section 1983, or Bivens actions against it must be dismissed because it has not waived sovereign immunity." Oehler's Memorandum of Law [24] at 2 n. 1. Therefore, I recommend that those claims be dismissed.

### 2. FTCA Claims

**\*12**  The FTCA waives "sovereign immunity of the United States for certain torts committed by federal employees' acting within the scope of their employment." Brownback v. King, 592 U.S. 209, 212 (2021). "A claim is actionable under the FTCA if it alleges the six elements of [28 U.S.C.] § 1346(b), which are that the claim be: '[1] against the United States, [2] for money damages, [3] for injury or loss of property, or personal injury or death [4] caused by the negligent or wrongful act or omission of any employee of the Government [5] while acting within the scope of his office or employment, [and] [6] under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.' " Id.

The FTCA's waiver of sovereign immunity is also subject to enumerated exceptions. See 28 U.S.C. § 2680. "Plaintiffs bear the initial burden of showing that their claims against the United States fall within the FTCA's limited waiver of sovereign immunity". Cangemi v. United States, 13 F.4th 115, 130 (2d Cir. 2021).

The Complaint [1] asserts FTCA claims for failure to intervene, false arrest, false imprisonment, and malicious prosecution. Id. at Third, Fifth, Sixth and Seventh Causes of Action.

### a. Failure to Intervene

The United States argues that Oehler's "failure to intervene allegations cannot support a claim against the United States under the FTCA" because "[n]o such tort exists under New York State law". Oehler's Memorandum of Law [17-1] at 11. "[F]or liability to arise under the FTCA, a plaintiff's cause of action must be comparable to a cause of action against a private citizen' in the jurisdiction where the tort occurred. This 'private analogue' requirement asks whether a private person would be responsible for similar negligence under the laws of the State where the acts occurred." McGowan v. United States, 825 F.3d 118, 125 (2d Cir. 2016)

Since "[o]rdinary citizens have no duty under federal or New York law to intervene to prevent or stop ... a constitutional violation .... this is not a claim with respect to which a private individual could be held liable under New York law, so as to support a claim against the U.S. under the FTCA". James v. City of Rochester, 673 F. Supp. 3d 279, 291 (W.D.N.Y. 2023). See also Ashanti v. City of New York, 77 Misc. 3d 1225(A), *7 (N.Y. Sup. Ct. 2023), aff'd, 225 A.D.3d 443 (1st Dept. 2024) ("[p]laintiff acknowledges that failure to intervene does not exist under New York State law"); Simon v. City of New York, 2015 WL 2069436, *2 n. *4 (S.D.N.Y. 2015) ("there is no authority for the proposition that private parties have an affirmative duty to intervene in preventing alleged constitutional violations").

Although Oehler cites to Wilson v. City of New York, 161 A.D.3d 1212, 1215 (2d Dept. 2018) (see Oehler's Memorandum of Law [24] at 16), Wilson addressed a failure to intervene claim brought pursuant to 42 U.S.C. § 1983. Therefore, I recommend that this claim be dismissed for lack of subject matter jurisdiction. See Finelli v. Drug Enforcement Agency, 1993 WL 51105, *5 (S.D.N.Y. 1993) ("[t]he United States has not waived its sovereign immunity with respect to the[ ] constitutional tort claims and, thus, no subject matter jurisdiction exists against the United States on such claims").

### b. False Arrest/Imprisonment and Malicious Prosecution Claims Based on the Conduct of the HSI SAs

The United States argues that the false arrest/imprisonment and malicious prosecution claims "under the FTCA against the United States based upon conduct by HSI [SAs] must be

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 184 of 340

dismissed because a neutral magistrate found that probable cause supported the actions that [Oehler] alleges were unlawful". United States' Memorandum of Law [17-1] at 11.

**\*13**  "Where an *arrest warrant* has been issued by a court of competent jurisdiction, there is a presumption that the arrest under that warrant was made on probable cause, thus precluding liability for false arrest, false imprisonment, or malicious prosecution". Martinez v. City of New York, 153 A.D.3d 803, 806 (2d Dept. 2017) (emphasis added). Here, however, there is no allegation that Oehler's arrest was pursuant to an arrest warrant. The only warrant alleged in the Complaint - and the one that the United States appears to rely upon - granted authority to search Oehler's residence, not to arrest him. Therefore, the United States' reliance on the presumption of probable cause is misplaced.

The United States also relies on Technical Bulletin 20-01 to counter the Complaint's allegations that modifications to the fuel filter shipped to Oehler would be required in order to convert it to a firearm silencer. *See* United States' Memorandum of Law [17-1] at 13. Although that appears to be persuasive evidence supportive of its position, I have recommended that the Bulletin be stricken for purposes of this motion.

The United States also points to the federal definition of "firearm silencer" (18 U.S.C. § 921(A)(25)) to argue that "any of the individual parts [shipped to Oehler] fit[ ] the definition of firearm silencer". Id. at 13-14.[9] Although Oehler also relies on the federal definition of firearm silencer (Oehler Memorandum of Law [24], § I), neither the search warrant nor the criminal complaints relate to the federal offense, and instead charged Oehler with a violation of New York Penal Law § 265.02(2) that is based on the definition of "firearm silencer" set forth in New York Penal Law § 265.00(2).

The United States argues that the court "need not to assume [that Oehler] is correct about the law regarding fuel filters". United States' Reply Brief [27] at 3. I agree that courts "are not bound to accept as true a legal conclusion couched as a factual allegation", Papasan v. Allain, 478 U.S. 265, 286 (1986), but that is not what has occurred here. Oehler makes a variety of factual allegations supportive of the fact that probable cause was lacking that he possessed a firearm silencer. For instance, he alleges that he purchased a "fuel filter" through a "commercial website" for "one of his vehicles", and that the fuel filter he purchased "came with only one end cap drilled", and [t]herefore, unmodified, could

not possibly be used as a firearm silencer". Complaint [1], ¶¶22, 29.

There may be other arguments sufficient to warrant dismissal of these claims as pled or evidence sufficient to entitle the United States to summary judgment, but they have not been argued or presented at this stage. Therefore, I recommend that this portion of the motion be denied.

### c. Claims Based on the Conduct of the John Doe CBP Officers

In seeking dismissal of these claims the United States raises a number of subject matter jurisdiction challenges. In addition to its argument that Oehler failed to timely satisfy the FTCA's presentment requirements, the United States contends that his FTCA claims are barred by the due care and detained goods exceptions (28 U.S.C. §§ 2680(a), (c)), and because his claims lack a private party analogue. *See* United States' Memorandum of Law [17-1] at §§ IV, VI-VIII. It also challenges the facial sufficiency of the Complaint. *See* id., § V.

**\*14**  Generally, "[a] court faced with a motion to dismiss pursuant to both Rules 12(b)(1) and 12(b)(6) must decide the jurisdictional question first because a disposition of a Rule 12(b)(6) motion is a decision on the merits and, therefore, an exercise of jurisdiction." Dutrow v. New York State Gaming Commission, 2014 WL 11370355, *3 (E.D.N.Y. 2014), aff'd, 607 Fed. Appx. 56 (2d Cir. 2015); Sinochem International Co. Ltd. v. Malaysia International Shipping Corp., 549 U.S. 422, 430-31 (2007) ("a federal court ... may not rule on the merits of a case without first determining that it has ... subject-matter jurisdiction"). Therefore, I will first address each of the United States' jurisdictional challenges. *See* United States' Memorandum of Law [17-1], §§ IV, VI-VIII.

### i. Oehler's Compliance with the FTCA's Presentment Requirements

"If a plaintiff fails to comply with the FTCA's requirements, the court lacks subject matter jurisdiction." Santiago v. United States, 2004 WL 758196, *1 (E.D.N.Y. 2004). Among those requirements, the FTCA states that "[a] tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues *or* unless action is begun within six months after the date of mailing, by certified or registered

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 185 of 340

mail, of notice of final denial of the claim by the agency to which it was presented". 28 U.S.C. § 2401(b) (emphasis added).

Notwithstanding its "use of the word 'or' to join its requirements, FTCA claimants must comply with both the two-year filing of claim *and* the six-month filing of suit requirements". Gutierrez-Flores v. U.S. Department of Justice, 2024 WL 343137, *4 (W.D.N.Y. 2024) (emphasis added); United States v. Wong, 575 U.S. 402, 405 (2015); Willis v. United States, 719 F.2d 608, 610 (2d Cir. 1983); Ellison v. United States, 531 F.3d 359, 363 (6th Cir. 2008). As the Second Circuit has explained:

> "It is beyond dispute that 'or' generally is a disjunctive .... However, ... '[w]ere we to read the 'or' in the section as really intending the disjunctive, a claimant who filed a claim with the agency within two years would then be able to bring it to a District Court at any remote future time after the agency denied him relief.' It could also be said that such a reading would mean that there would be no time limitation on the filing of claims with agencies".

Willis, 719 F.2d at 610.

The United States' motion focuses on Oehler's compliance with the two-year claim presentment deadline. First, it argues that Oehler never filed an administrative claim with CBP. *See* United States' Memorandum of Law [17-1] at 16. Although the FTCA requires the claim to "be presented to the Federal agency whose activities gave rise to the claim" (28 C.F.R. § 14.2(b)(1)), there is "no requirement that such a claim be filed with every affected agency". Thomas v. United States, 2005 WL 757268, *7 (E.D. La. 2005), aff'd, 176 F. App'x 474 (5th Cir. 2006). "When more than one Federal agency is or may be involved in the events giving rise to the claim, an agency with which the claim is filed shall contact all other affected agencies in order to designate the single agency which will thereafter investigate and decide the merits of the claim." 28 C.F.R. § 14.2(b)(2). So long as the claim provides notice of the "potential involvement" of another agency, it is deemed to have also been filed with that agency. Mohammad v. VA Rooming House, 2008 WL 428011, *4 (E.D.N.Y. 2008).

The United States argues that neither Oehler's claim (form SF-95) dated January 20, 2023 ([1-1] at 4) nor cover letter (id. at 2) identified any CBP involvement. However, the SF-95 attached and expressly referenced paragraphs of a Complaint dated January 20, 2023 that is substantially similar to the Complaint that was ultimately filed in this action,

which identified John Doe CBP Officers as defendants and identified their alleged conduct. [1-1] at 7-32. Since even a cursory review of that Complaint reveals the existence of an alleged injury resulting from the conduct of unidentified CBP Officers, I conclude that Oehler is deemed to have filed his claim with CBP. *Compare with* Green v. United States, 2022 WL 966864, *9 (S.D. 2022) ("[r]eading the administrative claim in its entirety, Plaintiffs simply failed to put the DVA on notice that they were also asserting claims against the DOD. One passing reference to a singular act or omission by a DOD employee was not sufficient to notify the DVA of a claim against the DOD").

 **\*15**  As to the timeliness of that claim, Oehler does not dispute that ICE's receipt of the claim, rather than the date the claim was mailed, governs its timeliness (*see* Cooke v. United States, 918 F.3d 77, 82 (2d Cir. 2019); Joseph v. United States, 2024 WL 360663, *4 (E.D.N.Y. 2024)), or that his claim was received by ICE on January 31, 2023 (Litz Declaration [17-4], ¶8). *See* United States' Memorandum of Law [17-1] at 15-17. Instead, he disputes the accrual date of his claim against the John Doe CBP Officers. The United States argues that "the last of CBP's alleged tortious conduct occurred on January 25, 2021", when it allegedly provided false and misleading information concerning the contents of the package to HSI. United States' Memorandum of Law [17-1] at 17. *See* Complaint [1], ¶¶32-33. By contrast, Oehler argues that "it is improper to cut off the John Doe defendants' liability on January 25, 2021, the last day they communicated with their fellow officers regarding the contents of the package". Oehler's Memorandum of Law [24] at 9. Although neither party offers much on this issue, I conclude that Oehler has the better argument.

"Federal law determines the date that an FTCA claim accrues." A.Q.C. ex rel. Castillo v. United States, 656 F.3d 135, 139 (2d Cir. 2011). Generally, "[a]n FTCA claim accrues at the time of the plaintiff's injury". Tourchin v. United States, 2009 WL 39007, *1 (2d Cir. 2009) (Summary Order); Ramos ex rel. Diaz v. Bronx-Lebanon Hospital Center, 2011 WL 4634191, *1 (S.D.N.Y. 2011) ("[t]he FTCA's two-year statute of limitations generally begins to run at the time of injury"). Here, Oehler did not have notice of his injury until the search was executed on or about February 11, 2021, within two years of when ICE received his claim. *See* James v. County of Albany, N.Y., 1993 WL 539546, *1 (N.D.N.Y. 1993) ("[i]n the case of false arrest or unreasonable search and seizure, the cause of action accrues on the day of the arrest or search

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 186 of 340

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

and seizure"). Therefore, I conclude that Oehler satisfied the FTCA's presentment requirements.

### ii. Private Analogue

The United States argues that there can be no private analogue here "[b]ecause only the federal government has the authority to enforce federal laws at ports of entry, and make customs determinations concerning lawful entry, detention, and seizure of goods and merchandise". United States' Memorandum of Law [17-1] at 25. However, "all Government activity is inescapably 'uniquely governmental' in that it is performed by the Government". Indian Towing Co. v. United States, 350 U.S. 61, 67 (1955). As the Second Circuit has explained, "[t]o say that the challenged action is one that only the federal government does in fact perform does not necessarily mean that no private analogue exists". Liranzo v. United States, 690 F.3d 78, 94 (2d Cir. 2012). " '[T]he presence of identical private activity' [is] not required to find a private analogue, because the FTCA's statutory phrase 'under *like* circumstances' does not mean 'under the *same* circumstances.' " Id. (*quoting* Indian Towing Co., 350 U.S. at 64, 67 (emphasis in original)).

Moreover, under the FTCA's private analogue requirement, "a plaintiff's *cause of action* must be comparable to a *cause of action* against a private citizen recognized in the jurisdiction where the tort occurred." Watson v. United States, 865 F.3d 123, 134 (2d Cir. 2017) (emphasis added). "This requires that the claims have 'private-sector analogue[s]' in the relevant state's tort law." Leticia v. United States, 2023 WL 7110953, *19 (E.D.N.Y. 2023) (*quoting* United States v. Olson, 546 U.S. 43, 45 (2005)).

The causes of action here are for false arrest, false imprisonment and malicious prosecution and the government fails to make any argument that there is not a private analogue in New York State's tort law for those offenses. *See* Liranzo, 690 F.3d at 96 ("the FTCA explicitly waives sovereign immunity for '*any* claim' based on the 'acts or omissions of investigative or law enforcement officers' 'arising ... out of ... false imprisonment [and] false arrest.' 28 U.S.C. § 2680(h) (emphasis added). The plain language of the statute suggests that the United States has indeed waived its sovereign immunity from suit as to Liranzo's 'claim,' which 'aris[es] ... out of ... false imprisonment [and] false arrest' "). Therefore, I conclude that Oehler satisfies the private analogue requirements.

### iii. Due Care Exception

**\*16** The FTCA waiver of sovereign immunity excludes "[a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid". 28 U.S.C. § 2680(a). "This exception is part of the statutory scheme which is intended to assure that 'the legality of a rule or regulation should (not) be tested through the medium of a damage suit for tort.' " Myers & Myers, Inc. v. U. S. Postal Service, 527 F.2d 1252, 1261 (2d Cir. 1975).

To determine whether the due care exception bars a particular claim, both parties agree that the two-part test of Welch v. United States, 409 F.3d 646, 652 (4th Cir. 2005) applies. "Under Welch, a court first 'determines whether the statute or regulation in question specifically prescribes a course of action for an officer to follow' and, second, if it finds in the affirmative, 'inquires as to whether the officer exercised due care in following the dictates of that statute or regulation.' " D.J.C.V. v. United States, 605 F. Supp. 3d 571, 589 (S.D.N.Y. 2022).

The United States argues that "the CBP John Doe(s) are alleged to have targeted a shipment, conducted a physical examination of the shipment and device contained therein, and determined that the device's components were designed and intended for use in assembling or fabricating a firearm silencer". United States' Memorandum of Law [17-1] at 21. Since this was contraband, "pursuant to 19 U.S.C. § 1595a(c)(1)(C) - which specifically prescribes a course of action to be taken in this instance - a CBP officer [was] mandated to seize" it. Id. *See also* id. at 22 ("CBP had both the authority and, indeed, the responsibility to seize the imported merchandise pursuant to 19 U.S.C. § 1595a(c)(1)(C)").

That may be so, but Oehler's claims against the John Doe CBP Officers do not arise from the seizure of the fuel filter, but rather from the alleged false notification they provided to other law enforcement officers that Oehler had received a firearm silencer. The United States points to no statute or regulation that required them to make such a notification. *See* Oehler's Memorandum of Law [24] ("the United States fail[s] to identify a statute that permitted the federal officers' conduct"). Therefore, I conclude that this exception does not apply.

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 187 of 340

**Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)**

#### iv. The Detained Goods Exception

The FTCA specifically excepts from its waiver of sovereign immunity "[a]ny claim arising in respect of ... the detention of any goods, merchandise, or other property by any officer of customs or excise or any other law enforcement officer". 28 U.S.C. § 2680(c). [10] Oehler argues that the detained good exception " 'does not apply where the goods [*i.e.*, fuel filter] are no longer in the possession of the government, and therefore cannot be regarded as being detained.' " Mora v. United States, 955 F.2d 156, 160 (2d Cir. 1992) (*citing* Alliance Assurance Co. v. United States, 252 F.2d 529, 533-34 (2d Cir. 1958))." Oehler's Memorandum of Law [24] at 12.

Oehler's argument is not persuasive. In Alliance Assurance, the Second Circuit held that § 2680(c) "does not and was not intended to bar actions based on the negligent destruction, injury or loss of goods in the possession or control of the customs authorities". 252 F.2d at 534. However, in Kosak v. United States, 465 U.S. 848, 854–62 (1984), the Supreme Court rejected that interpretation of § 2680(c), under which claims for loss of detained property would not be excluded from the FTCA. Although the Second Circuit subsequently "endorsed its holding of Alliance Assurance in the Mora opinion", Deutsch v. United States, 2004 WL 633236, *7 (E.D.N.Y. 2004), the Second Circuit has since recognized that the holding in Alliance Assurance "was explicitly rejected by the Supreme Court in Kosak". Adeleke v. United States, 355 F.3d 144, 154 (2d Cir. 2004). *See also* Hallock v. United States, 253 F. Supp. 2d 361, 368 n. 12 (N.D.N.Y. 2003) ("Mora is not followed to the extent it relies upon its prior decision in Alliance Assurance Co. ... The Supreme Court [in Kosak] specifically took issue with the statement by the court in Alliance Assurance that the exception does not bar actions based on the negligent destruction of property in the possession or control of customs officers and the Court's holding, on its face, seems very much to usurp, or at the very least contradict, the statement"); Schreiber v. United States, 1997 WL 563338, *4 (S.D.N.Y. 1997) ("[i]t is difficult to make sense of the Mora court's citation of the language in Alliance Assurance that the Supreme Court cast aside in Kosak ... without any mention of Kosak").

**\*17** I have doubts that Oehler's claims, which focus on the John Doe CBP Officers' alleged false notification and relate to his post-search arrest and prosecution, arise from the detention of his fuel filter. *See* Cervantes v. United States,

330 F.3d 1186, 1189 (9th Cir. 2003) ("the exception does not protect the government, whatever it does with a once-detained good, for the rest of that good's existence. The plain text of the statute says the claim must relate to the detention, not to any activity that happened to involve a once-detained item"). However, since these arguments were not raised by Oehler, who bears the burden of demonstrating that his claims fall within the FTCA's limited waiver of sovereign immunity, I conclude that this exception to the United States' waiver of sovereign immunity applies, and recommend that the claim be dismissed. In any event, even if sovereign immunity did not bar Oehler's claims, I would conclude, for the reasons that follow, that the claims, as pled, fail to state a claim.

#### v. Failure to State a Claim [11]

The United States challenges the facial sufficiency of the Complaint, arguing that Oehler "pleads absolutely no facts whatsoever that even indicate any CBP employees were present for, let alone participated in, [his] arrest or confinement of any kind", or that "any CBP officers initiated, or in any way participated in, [his] state criminal prosecution". United States' Memorandum of Law [17-1] at § V.

Oehler's response focuses on the Franks liability of the John Doe CBP Officers. For instance, he contends that although the "CBP officers were not present for the execution of the search warrant", they may still be "held responsible for their actions leading up to the issuance of the warrant", and that "[w]hen assessing a challenge to a warrant, the conduct of each officer in the chain of information [is] analyzed as a potential source of Franks liability, not just the officer who drafted the warrant application or those who conducted the search." Oehler's Memorandum of Law [24] at 6 (*citing* United States v. Calisto, 838 F.2d 711 (3d Cir. 1988)). However, the Complaint asserts no unreasonable search and seizure claim under the FTCA. *See* Complaint [1], First and Second Claims for Relief.

In any event, even if such claims were asserted against the United States pursuant to the FTCA, lacking are any allegations that the John Doe CBP Officers "had any contact with [Detective Nietzel] the search warrant affidavit affiant" or "even knew a search warrant was being obtained". United States' Reply Brief [27] at 10. The only FTCA claims asserted here relate to Oehler's subsequent arrest and prosecution, but there are no allegations that the John Doe CBP Officers played any role in Oehler's arrest or prosecution. *See* Jordan

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 188 of 340

v. Pisano, 80 Misc. 3d 1207(A), \*6 (N.Y. Sup. Ct. 2023) ("the amended complaint does not plead any facts establishing that Officer Pisano was responsible for the prosecution of plaintiff, in that the amended complaint fails to allege what Officer Pisano did to make him liable for malicious prosecution").

**\*18** Citing to Kenneson v. Parker, 2022 WL 444887 (D. Conn. 2022), Oehler argues in passing that the initiation element of a malicious prosecution claim can be established "by providing 'false information' in [a] warrant application". Oehler's Memorandum of Law [24] at 6. However, in Kenneson the defendants allegedly knowingly failed to include exculpatory information in an application for an *arrest* warrant, 2022 WL 4448875, \*3-4, whereas here the allegedly false information was used in obtaining a search warrant.

"To initiate a prosecution, a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." Manganiello v. City of New York, 612 F.3d 149, 163 (2d Cir. 2010). A law enforcement officer initiates a criminal proceeding for purposes of a malicious prosecution claim by bringing "formal charges and ha[ving] the person arraigned, or fill[ing] out complaining and corroborating affidavits or sw[earing] to and sign[ing] a felony complaint; or "[a]lternatively, an officer initiates a prosecution by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." Santiago v. City of Yonkers, 2023 WL 2648649, \*8 (S.D.N.Y. 2023). *See also* Herrera-Amador v. New York City Police Department, 2021 WL 3012583, \*5 (E.D.N.Y. 2021). The Complaint contains no allegations that the John Doe CBP Officers had any involvement in charging Oehler, provided false information to the prosecutor, or otherwise played any role in Oehler's prosecution. Therefore, as pled, I recommend that the FTCA claims based on the conduct of the John Doe CBP Officers be dismissed.

## CONCLUSION

For these reasons, I recommend that:

-- Oehler's motion to strike [20] be granted;

-- the County Defendants' motion to dismiss [4] be granted, except to the extent that it seeks to dismiss the malicious prosecution claim against Detective Nietzel;

-- the Individual Federal Defendants' motion to substitute and dismiss [16] be granted; and

-- the United States' motion to dismiss [17] be granted, except to the extent that it seeks to dismiss the FTCA claims against the United States for malicious prosecution and false arrest/imprisonment premised on the conduct of HSI SAs DellaPenta, Colafranceschi, and Gaczewski.

Unless otherwise ordered by Judge Sinatra, any objections to this Report and Recommendation must be filed with the clerk of this court by August 20, 2024. Any requests for extension of this deadline must be made to Judge Sinatra. A party who "fails to object timely ... waives any right to further judicial review of [this] decision". Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 72(b) and (c) of this Court's Local Rules of Civil Procedure, written objections shall "specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection ... supported by legal authority", and must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or identifying the new arguments and explaining why they were not raised to the Magistrate Judge". Failure to comply with these provisions may result in the district judge's refusal to consider the objections.

## All Citations

Not Reported in Fed. Supp., 2024 WL 4989300

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 189 of 340

---

## Footnotes

1    Bracketed references are to CM/ECF docket entries and page references are to CM/ECF pagination.

2    Although a motion to strike is ordinarily non-dispositive, out of an abundance of caution I have treated it as dispositive since it bears on the United States' motion to dismiss.

3    "[T]he Monell standard applies to Plaintiff's official capacity claims." Fate v. Petranker, 2020 WL 3640007, *7 (S.D.N.Y. 2020).

4    Curiously, both parties base their arguments on the federal definition of "firearm silencer", which is different from the state definition applicable to the search warrant. See County Defendants' Memorandum of Law [4-3] at 15; Oehler's Memorandum of Law [22] at 7.

5    Although not raised by Oehler as a falsehood or material omission, the Complaint alleges that on February 1, 2021 Oehler provided CBP with a form indicating that he "wished to 'ABANDON' the package and fuel filter" (Complaint [1], ¶55), yet that fact is not mentioned in the subsequent search warrant application, which characterized this as a "controlled delivery" suggesting that the package remained in transit.

6    It appears from the Complaint that Oehler was charged with possession of the fuel filter that was the subject of the controlled delivery, but this is not expressly alleged.

7    28 U.S.C. § 2679(d)(1) states that "[u]pon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant."

8    For the reasons discussed above and those argued by the Individual Federal Defendants (Individual Federal Defendants' Memorandum of Law [16-1] at 21-22; Reply Memorandum of Law [26] at 8-9), I conclude that Oehler's conspiracy claim is also not sufficiently pled.

9    Contrary to the United States' own argument, Technical Bulletin 17-02, states that "the statute speaks of a device 'for' silencing or muffling. Therefore, mere possession of a 'solvent trap' or components which *could* be used in the assembly of a firearm silencer does not necessary constitute possession of a firearms silencer. Intent must be demonstrated or communicated." [17-1] at 11 (emphasis in original).

10   As the United States recognizes, 28 U.S.C. § 2680(c) contains an exception for certain claims based on injury or loss of goods while in the possession of CBP, which is inapplicable here. See United States' Memorandum of Law [17-1] at 23 n. 6.

11   The United States treats this portion of its motion as being brought pursuant to Rule 12(b)(6). However, "in the unique context of the FTCA, all elements of a meritorious claim are also jurisdictional .... So ... a plaintiff must plausibly allege all six FTCA elements not only to state a claim upon which relief can be granted but also for a court to have subject-matter jurisdiction over the claim. That means a plaintiff must plausibly allege that the United States, if a private person, would be liable to the claimant under state law both to survive a merits determination under Rule 12(b)(6) and to establish subject-matter jurisdiction." Brownback, 592 U.S. at 217-18. See also Salomone v. United States, 618 F. Supp. 3d 146, 151 (S.D.N.Y. 2022) ("if the FTCA claims fail to state a claim upon which relief can be granted under Rule 12(b)(6), the Court lacks subject matter jurisdiction over the claims and will dismiss them pursuant Rule 12(b)(1)").

Oehler v. Nietzel, Not Reported in Fed. Supp. (2024)

**End of Document**                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Blue-Striped Flag

Appeal Filed by   Salaman v. Carney,   2nd Cir.,   September 25, 2025

2025 WL 2432674
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Luis SALAMAN, Plaintiff,
v.
David CARNEY, et al., Defendants.

CASE NO. 3:25-CV-482 (KAD)
|
Signed August 22, 2025

**Attorneys and Law Firms**

Luis Salaman, Central Falls, RI, Pro Se.

## INITIAL REVIEW ORDER
## RE: COMPLAINT (ECF NO. 1)

Kari A. Dooley, United States District Judge

**\*1** On March 24, 2025, Plaintiff, Luis Salaman ("Salaman"), an inmate at Wyatt Detention Facility ("Wyatt") in Central Falls, Rhode Island, filed this Complaint *pro se* under 42 U.S.C. § 1983, naming seventeen federal agents as Defendants. The Complaint brings claims pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*") for: (1) excessive force and an unreasonable search and seizure under the Fourth Amendment; (2) substantive due process violations under the Fourteenth Amendment; (3) denial of equal protection under the Fourteenth Amendment; (4) cruel and unusual punishment and deliberate indifference to serious medical needs under the Eighth Amendment; and (5) recklessness. As set forth herein, all of the claims in Plaintiff's Complaint are DISMISSED pursuant to 28 U.S.C. § 1915A.

## Standard of Review

The Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A(a)–(b). In reviewing a *pro se* complaint, the Court must assume the truth of the

allegations and interpret them liberally to "raise the strongest arguments [they] suggest[ ]." *Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants). Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a right to relief. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

## Allegations

The Court has considered all of the allegations set forth in the Complaint and recites herein only those facts pertinent to its initial review.

In the early morning hours of April 5, 2022, members of the New Haven FBI Safe Street Gang Task Force and the FBI swat team (collectively, the "Swat Team") assembled, to conduct a "raid" on a home in New Haven, Connecticut. Compl., ECF No. 1 at ¶ 23. Without announcing themselves, the Swat Team rammed doors in the home and threw flashbangs.[1] *Id.* Salaman was asleep with his girlfriend in the home when the noise from the Swat Team's entry awakened the couple. *Id.* Salaman did not hear the Swat Team announce themselves, but he heard someone shout "open the mother fucking door." *Id.* Salaman also heard someone speaking on a loudspeaker or bullhorn outside the home. *Id.* That person was saying, "[t]his is the FBI[.] [W]e know you are there or inside[.] [O]pen the door or come out with your hands up ..." *Id.*

**\*2** Salaman knew who was in the home when he heard the announcement. *Id.* at ¶ 24. Salaman attempted to comply with the Swat Team's demands by reaching for the door to open it. *Id.* As Salaman did so, Defendant Special Agent ("SA") David Carney, without warning, "started to recklessly shoot live rounds with his shot gun ...." *Id.* The Swat Team leader—Defendant SA Bullets Campbell—ordered agents to "shotgun breach" the kitchen door. *Id.* Six shotgun blasts were fired at the door. *Id.* The shots penetrated the door and struck Salaman in his hands and knees. *Id.at* ¶ 24–25. Agents then slammed Salaman on the floor and dragged him into the living room. *Id.* at ¶ 25.

Defendant Carney came into the living room and pointed his shotgun at Salaman. *Id.* at ¶ 27. Defendant Carney told Salaman not to move and to put his hands behind his back. *Id.* Salaman told Defendant Carney that Salaman could not do so because he was injured. *Id.* Defendant Carney told Salaman not to move, handcuffed Salaman, and told him that someone would look at his injuries. *Id.* Defendant Carney took Salaman downstairs and outside. *Id.* at ¶ 28. Salaman told Defendant Carney that he was in pain. *Id.* Agents walked Salaman to a car, where another agent asked Salaman questions. *Id.* Defendants SA Burke and SA Domachowski transported Salaman in a car to the FBI field office in New Haven. *Id.* During the car ride, Salaman told Defendants Burke and Domachowski that he was in pain and needed medical treatment. *Id.* Defendants Burke and Domachowski told Salaman that he would be evaluated at the field office. *See id.*

Salaman told Defendants Burke and Domachowski, as well as Defendant SA Tae Kim, that he was in pain when they arrived at the field office. *Id.* at ¶ 29. Those same Defendants placed Salaman in an interview room, but allowed him to leave to use the bathroom. *Id.* Once back in the interview room, Defendant Burke told Salaman that paramedics were en route to evaluate him. *Id.* at ¶ 30. Paramedics soon arrived to assess Salaman's injuries. *Id.* Salaman told paramedics he was in pain, and the paramedics cleaned and bandaged Salaman's wounds. *Id.* Defendant Burke photographed Salaman's injuries and told Salaman that agents would take him to the hospital "to be looked at," though agents failed to do so. *Id.* Salaman was instead taken to court, where another agent told Salaman that he would be taken to the hospital after court. *Id.* at ¶ 31. Instead, after his court proceeding, agents transported Salaman to Wyatt. *Id.* at ¶ 32. Wyatt medical staff evaluated Salaman at the jail. *Id.* Salaman has remained at Wyatt and has never been to the hospital. *Id.*

**Discussion**

Through this civil action, Salaman seeks damages, as well as injunctive and declaratory relief, against seventeen federal agents (collectively, "Defendants"). *See* Compl. at pp. 2–6, 31–32. Salaman asserts five claims against Defendants for: (1) excessive force and unreasonable search and seizure under the Fourth Amendment; (2) substantive due process violations under the Fourteenth Amendment; (3) equal protection violations under the Fourteenth Amendment; (4) cruel and unusual punishment and deliberate indifference to serious medical needs under the Eighth Amendment; and (5) recklessness. *Id.* at pp. 17–28. The Court will address these claims—each of which arises under *Bivens*—in turn.

*Bivens Actions Generally*

Section 1983 creates a specific damages remedy for plaintiffs whose constitutional rights are violated by state officials. *See Ziglar v. Abbasi,* 582 U.S. 120, 130 (2017). But Congress has not created a similar statutory remedy for such claims against federal officials (*e.g.*, FBI agents) acting under the color of federal law. *See id.* To state a claim for relief under *Bivens*, a plaintiff must allege facts plausibly showing that: (1) the challenged action was attributable to a federal agent acting under color of federal authority, and (2) such conduct deprived him of a constitutional right. *See Thomas v. Ashcroft,* 470 F.3d 491, 496 (2d Cir. 2006) (citing *Bivens,* 403 U.S. at 389).

**\*3** Nevertheless, not all constitutional violations give rise to a damages remedy under *Bivens*. The Supreme Court has recognized a remedy for damages in three contexts: (1) a Fourth Amendment search and seizure suit against federal narcotics officers (*Bivens*); (2) a Fifth Amendment due process suit against a congressman-employer on the grounds of gender discrimination (*Davis v. Passman,* 442 U.S. 228 (1979)); and (3) an Eighth Amendment cruel and unusual punishment suit against federal jailers for failure to provide adequate medical treatment (*Carlson v. Green,* 446 U.S. 14 (1980)). *See Abbasi,* 582 U.S. at 131. After those decisions, however, the Supreme Court has "consistently rebuffed requests to add to the claims allowed under *Bivens*." *Hernández v. Mesa,* 589 U.S. 93, 102 (2020); *see also Egbert v. Boule,* 596 U.S. 482, 502 (2022) ("[I]f we were called to decide *Bivens* today, we would decline to discover any implied causes of action in the Constitution."). Indeed, "[g]iven the notable change in the [Supreme] Court's approach to recognizing implied causes of action ..., the Court has made clear that expanding the *Bivens* remedy is now a 'disfavored' judicial activity." *Abbasi,* 582 U.S. at 135.

To determine whether a plaintiff's claim may proceed under *Bivens*, courts must conduct a two-step analysis. *Egbert,* 596 U.S. at 492. The first step asks "whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningful[ly]' different from the three cases in which the [Supreme] Court has implied a damages action." *Id.* (quoting *Abbasi,* 582 U.S. at 139). "A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the

problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Abbasi*, 582 U.S. at 139–40. "A claim may arise in a new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernández*, 589 U.S. at 103.

If a case arises in a "new *Bivens* context," courts proceed to the second step, and consider "whether there are any special factors that counsel hesitation about granting the extension." *Id.* at 102 (cleaned up). The Supreme Court "ha[s] not attempted to 'create an exhaustive list' of factors that may provide a reason not to extend *Bivens*, but [it] ha[s] explained that 'central to [this] analysis' are 'separation-of-powers principles.' " *Id.* (quotation omitted). Accordingly, a court "ask[s] whether 'there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy,' and 'whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed[.]' *Id.* (quotation omitted). If "Congress has created 'any alternative, existing process for protecting the [injured party's] interest' that itself may 'amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.' " *Abbasi*, 582 U.S. at 137 (alteration in original) (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)).

In *Egbert*, the Supreme Court observed that the two-part test "often resolve[s] to a single question" of "whether there is any reason to think that Congress might be better equipped to create a damages remedy." 596 U.S. at 492. The Supreme Court has further instructed that "a plaintiff cannot justify a *Bivens* extension based on 'parallel circumstances' with *Bivens, Passman*, or *Carlson* unless [the plaintiff] also satisfies the 'analytic framework' prescribed by the last four decades of intervening case law." *Id.* at 501. Indeed, "[i]f there is even a single 'reason to pause before applying *Bivens* in a new context,' a court may not recognize a *Bivens* remedy." *Id.* at 492 (quoting *Hernández*, 598 U.S. at 102).

**\*4** Here, the Court will consider each of Salaman's claims against the backdrop of this framework.

Fourth Amendment Claims

In Count One, Salaman asserts a Fourth Amendment violation for excessive force and unreasonable search and seizure. *See* Compl. at p. 17. The Court construes Count One as asserting two distinct claims arising under the Fourth Amendment, and addresses each in turn.

*Excessive Force*

Salaman alleges that he was subjected to excessive force when, in connection with his arrest on April 5, 2022, Defendant Carney "recklessly shot through [Salaman's] front kitchen door with his shotgun," striking Salaman in his hands and knees.

Until recently, courts in this Circuit were "split as to whether excessive force claims present a new context under *Bivens*." *Carattini v. Behun*, No. 21-CV-9373 (NSR), 2024 WL 3274663, at *3 (S.D.N.Y. July 2, 2024). But in *Edwards v. Gizzi*, the Second Circuit weighed in. *See* 107 F.4th 81 (2d Cir. 2024) (*per curiam*). In that case, the Second Circuit affirmed the district court's dismissal of a *Bivens* claim "seeking damages from court-security officers and deputy U.S. Marshals for using excessive force while restraining [plaintiff] in a courtroom." *See id.* at 82. Judge Park, concurring in the judgment, concluded that "an Eighth Amendment claim for excessive force against officers in the United States Marshals Service and court-security personnel–'is different in a meaningful way' from the three *Bivens* claims the Supreme Court has recognized." *Id.* (Park, J., concurring) (quoting *Abbasi*, 572 U.S. at 139). However, Judge Robinson, also concurring in the judgment, recognized that a Fourth Amendment claim for excessive force may still be viable. *See id.* at 88 (Robinson, J., concurring) (citing *Snowden v. Henning*, 72 F.4th 237, 239–40, 245–46 (7th Cir. 2023)) (allowing a "straightforward application of *Bivens* itself" to proceed in a Fourth Amendment claim against a DEA agent for excessive force in making an arrest). Thus, because *Edwards* concerned only an excessive force claim arising under the Eighth Amendment, it does not resolve the question of whether a Fourth Amendment excessive force claim "is different in a meaningful way from the three *Bivens* claims the Supreme Court has recognized." *Edwards*, 107 F.4th at 82 (Park, J., concurring) (internal quotation marks omitted).

But while *Edwards* does not squarely address the issue, the Court is guided by other recent, non-precedential Second Circuit decisions "affirming the district courts' findings that the plaintiffs' Fourth Amendment *Bivens* claims presented a 'new context.' " *Carattini*, 2024 WL 3274663, at *3 n.3

(citing *Cohen v. Trump*, No. 23-35, 2024 WL 20558, at **2–3 (2d Cir. Jan. 2, 2024) (summary order) (affirming dismissal of *Bivens* claims alleging unlawful seizure, based on "new context" presented by lawsuit against federal officials); *Lewis v. Bartosh*, No. 22-3060, 2023 WL 8613873, at *2 (2d Cir. Dec. 13, 2023) (summary order) (affirming dismissal of *Bivens* claim alleging excessive force, based on "new context" presented by suit against Deputy U.S. Marshals)). "While not explaining their application of the two-part test from *Egbert* with precision, the panels in *Cohen* and *Lewis* both relied on the different agencies and federal officers involved, as well as the existence of an alternative remedy, in declining to infer a *Bivens* cause of action in those cases." *Gray v. Gomez*, 728 F. Supp. 3d 264, 271–72 (E.D.N.Y. 2024) (footnote omitted) (citing *Cohen*, 2024 WL 20558 at *2–3; *Lewis*, 2023 WL 8613873 at *1).

**\*5** Recent district court decisions addressing Fourth Amendment *Bivens* claims are in accord with the Second Circuit's decisions in *Cohen* and *Lewis*. *See, e.g., Escobar v. Correa*, No. 22-CV-8434 (MMG), 2024 WL 4042122, at **4–5 (S.D.N.Y. Sept. 4, 2024) (dismissing *Bivens* claim against U.S. Marshals who allegedly "used 'brutal, retaliatory excessive force' against Plaintiff" when arresting him in a home because claim involved new category of defendant and plaintiff could bring claim under the FTCA); *Shaw v. United States Marshall*, No. 24-CV-5644 (HG), 2024 WL 4574146, at *2 (E.D.N.Y. Oct. 24, 2024) (dismissing *Bivens* claim against U.S. Marshal who allegedly breached the door of plaintiff's home and destroyed her property while searching home, because claim involved new category of defendant and plaintiff could bring claim under the FTCA); *German-Andujar v. U.S. Customs & Border Prot.*, No. 24-CV-6190 (EAW), 2025 WL 1101514 (W.D.N.Y. Apr. 14, 2025) (dismissing *Bivens* claim against border patrol agent who allegedly tackled and beat plaintiff fleeing from an "unwarranted" search because claim involved new category of defendant and plaintiff could bring claim under the FTCA).

This case is partially distinguishable from *Cohen, Lewis*, and the district court cases cited above, because this case does not "involve[ ] a 'new category of defendants.' " *Egbert*, 596 U.S. at 492 (quotation omitted). Indeed, like the plaintiff in *Bivens*, Salaman sues FBI agents. *See* Compl. at ¶¶ 5–21; *Abbasi*, 582 U.S. at 140 (noting that *Bivens* involved "a claim against FBI agents for handcuffing a man in his own home without a warrant."). Nevertheless, even if a claim does not involve a "new category of defendants," a *Bivens* remedy may still be "unavailable" if there is an "alternative

remedial structure." *See Lewis*, 2023 WL 8613873, at *1 (noting that " 'if a claim arises in a new context'— such as if it involves 'a new category of defendants'—*or* if there is an 'alternative remedial structure,' a *Bivens* remedy is generally 'unavailable.' " (alteration omitted; emphasis added)); *Escobar*, 2024 WL 4042122 at *4 (noting that "a *Bivens* remedy is unavailable 'if Congress already has provided, or has authorized the Executive to provide, an alternative remedial structure,' even if existing or alternative remedies do not provide complete relief." (quoting *Egbert*, 596 U.S. at 493)). Such an "alternative remedial structure" is available here.

Indeed, as with the plaintiffs in *Escobar, Shaw*, and *German-Andujar*, Salaman could bring a claim under the Federal Torts Claims Act ("FTCA") related to the FBI agents' alleged use of excessive force. *See, e.g., Oliveras v. Basile*, 440 F. Supp. 3d 365, 374–76 (S.D.N.Y. 2020) (concluding that the FTCA provided alternative remedial structure precluding *Bivens* remedy for false arrest and excessive force claims in connection with injurious detonation of explosive devices during raid). [2] As such, the Court concludes that the availability of this "alternative remedial structure" forecloses a *Bivens* action against FBI agents for excessive force under the Fourth Amendment. *See Egbert*, 596 U.S. at 497 (that "Congress has provided alternative remedies for aggrieved parties in [plaintiff's] position ... independently foreclose a *Bivens* action here."). Thus, any Fourth Amendment excessive force claim must be dismissed. *See* 28 U.S.C. § 1915A(b)(1).

*Search and Seizure Claim*

**\*6** Salaman's Fourth Amendment search and seizure claim arises from Defendants' no-knock raid and arrest of Salaman in his home in the early morning of April 5, 2022. Unlike Salaman's excessive force claim, his unlawful search and seizure claim remains in the "heartland" of *Bivens* cases. *See Edwards*, 107 F.4th at 87 (Robinson, J., concurring). Indeed, *Bivens* held that a plaintiff who was handcuffed by FBI agents in his home without a warrant was entitled to pursue monetary damages for a Fourth Amendment violation. *See Bivens*, 403 U.S. at 397; *Abbasi*, 582 U.S. at 140. It follows that Salaman's search and seizure claim is not "meaningfully different" from the claim considered in *Bivens*. *See, e.g., Prado v. Perez*, 451 F. Supp. 3d 306, 315 (S.D.N.Y. 2020) (concluding that plaintiff's claim that he was unconstitutionally arrested and searched "does not differ in a meaningful way from the core *Bivens* context, and thus does not present a 'new context.' ").

Accordingly, the Court considers the merits Salaman's search and seizure claim.

The Fourth Amendment protects the rights of the people "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "A 'search' in the context of the Fourth Amendment occurs when the police intrude upon a person's reasonable expectation of privacy or if the police otherwise trespass upon one's person, house, papers, or effects for the purpose of acquiring information." *Conroy v. Caron*, 275 F. Supp. 3d 328, 340 (D. Conn. 2017). "A 'seizure' under the Fourth Amendment occurs when the police intentionally terminate one's freedom of movement by means of physical force or by show of their official law enforcement authority." *Id.* "In general, to search, seize property from, or arrest a person in that person's home, the Fourth Amendment requires a state actor to have probable cause and a warrant, absent 'exigent circumstances or some other exception.' " *Hart v. Myers*, 183 F. Supp. 2d 512, 518 (D. Conn. 2002), *aff'd*, 50 F. App'x 45 (2d Cir. 2002) (quoting *United States v. Gori*, 230 F.3d 44, 50 (2d Cir. 2000)). "[B]ecause warrantless searches are presumptively unreasonable, it is the government's burden to show that a warrantless search, seizure or arrest fits within one of the narrowly tailored exceptions to the warrant requirement of the Fourth Amendment." *Id.* at 519 (internal citation and quotation marks omitted).

Here, Salaman alleges that the Swat Team forcefully entered a home in which he was sleeping and arrested him. *See* Compl. at ¶¶ 23, 27. This was undoubtedly a seizure. And although Salaman does not indicate one way or another whether the arrest was pursuant to a warrant founded upon probable cause or whether it was a warrantless arrest, the Court takes judicial notice of the fact that Salaman was arrested pursuant to a warrant. *See United States v. Salaman*, Case No. 3:22-CR-76 (SRU), at ECF No. 11. Throughout the prosecution of Salaman's criminal case, he was represented by counsel and eventually convicted at trial of several offenses. *See id.* at ECF Nos. 499, 502. And having been presented before a Magistrate Judge on the Complaint/warrant, *see id.* at ECF No. 7, Salaman was certainly aware that he was arrested pursuant to a warrant. *Cf. Llorens v. Slavin*, No. 3:21-CV-1096 (SVN), 2021 WL 5988632, at *4 (D. Conn. Dec. 17, 2021) (permitting Fourth Amendment claim to proceed because "there [we]re no facts to suggest that Plaintiff was engaged in illegal activity or that Defendants had previously obtained a warrant for Plaintiff's arrest."). The Complaint

therefore fails to state a Fourth Amendment claim under *Bivens*.

Fourteenth Amendment Claims

Salaman also asserts two claims under the Fourteenth Amendment: a substantive due process claim and an equal protection claim, both brought under *Bivens*. *See* Compl. at pp. 20, 24.

*Substantive Due Process*

**\*7** A substantive due process claim may be brought under either the Fifth or Fourteenth Amendment. *See County of Sacramento v. Lewis*, 523 U.S. 833 (1998) (analyzing a substantive due process claim under the Fourteenth Amendment); *Lombardi v. Whitman*, 485 F.3d 73, 78 (2d Cir. 2007) (analyzing a substantive due process claim under the Fifth Amendment); *Tyus v. Newton*, No. 3:13-CV-1486 (SRU), 2016 WL 6090719, at *7 (D. Conn. Oct. 18, 2016) ("Claims of due process violations arising under the Fifth and Fourteenth Amendments are analyzed under the same standards."). But regardless, "the Supreme Court has 'narrowed the scope of substantive Due Process to claims that are not covered by other provisions of the Constitution.' " *20 Dogwood LLC v. Vill. of Roslyn Harbor*, No. 23-930, 2024 WL 1597642, at *1 (2d Cir. Apr. 12, 2024) (summary order) (quoting *Hu v. City of New York*, 927 F.3d 81, 103 (2d Cir. 2019)). Thus, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing' such a claim." *Albright v. Oliver*, 510 U.S. 266 (1994) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989) (internal quotations omitted)).

Here, because the Fourth and Eighth Amendments plainly apply to the challenged actions of Defendants, any substantive due process claim must be dismissed. Indeed, Salaman's substantive due process claim arises from the same factual allegations as his Fourth Amendment and Eight Amendment claims, namely, that Defendants subjected Salaman to excessive force and unlawfully entered his residence and arrested him, and were later deliberately indifferent to his serious medical needs. *See Hu*, 927 F.3d at 104 (affirming dismissal of a substantive due process claim because it "rest[ed] on the same set of factual allegations" as plaintiff's equal protection claim and therefore "must be analyzed under the Equal Protection Clause"); *Nadeau v. Anthony*, No. 3:03-CV-34 (AWT), 2003 WL 22872150, at *2 (D. Conn. Dec.

2, 2003) ("[P]laintiff may not pursue a cause of action under the Fourteenth Amendment for violation of his right to substantive due process when a cause of action for his claim exists under the Fourth Amendment.").

*Equal Protection*

Salaman's equal protection claim fares no better. While the Supreme Court "ha[s] allowed a *Bivens* action to redress a violation of the equal protection component of the Due Process Clause of the Fifth Amendment," *Iqbal*, 556 U.S. at 675 (citing *Davis*, 442 U.S. at 228), Salaman's equal protection claim applies in a "new context" even though "it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized." *Hernández*, 589 U.S. at 103; *see, e.g.*, *Sabir v. Williams*, No. 3:20-CV-8 (VAB), 2020 WL 3489522, at *6 (D. Conn. June 26, 2020) (concluding that the plaintiff's "equal protection claim concerning prison commissary classifications is contextually distinct from [the] gender discrimination employment claim" in *Davis*). Moreover, special factors counsel against applying Plaintiff's equal protection claim in a new *Bivens* context, because Plaintiff has an alternative available remedy under the FTCA. *See id.* (concluding plaintiff also had "alternative remedies available through the Bureau of Prison's administrative remedies process or a different lawsuit seeking injunctive relief."). Accordingly, Salaman's equal protection claim must be dismissed.

Eighth Amendment Claims

In Count Four, Salaman asserts two claims under the Eighth Amendment: a cruel and unusual punishment claim and a deliberate indifference to medical needs claim, both brought under *Bivens*. *See* Compl. at p. 26.

"Although [Salaman] alleges both 'deliberate indifference' and 'cruel and unusual punishment' by [members of the Swat Team], 'these claims are based on the same facts and are different ways of phrasing the same Eighth Amendment claim.' " *Mitchell v. Schauer*, No. 3:23-CV-896 (JAM), 2024 WL 1973434, at *3 n.43 (D. Conn. May 3, 2024) (quotation omitted); *see also* *Quint v. Lantz*, 248 F. App'x 218, 220 (2d Cir. 2007) (summary order) ("To prevail on a cruel-and-unusual punishment claim, a plaintiff must establish both that his medical condition is 'objectively serious,' and that the defendants he seeks to hold liable acted with 'deliberate indifference' to his medical needs."); *Washington v. City of Binghamton*, 152 F.3d 922 (2d Cir. 1998) (Deliberate indifference to medical needs claims are brought "under the Eighth Amendment's Cruel and Unusual Punishments Clause").

**\*8** While the Supreme Court has recognized an implied damages remedy under the Eighth Amendment in suits against federal jailers for failure to provide adequate medical treatment, *see* *Abbasi*, 582 U.S. at 131 (citing *Carlson*, 446 U.S. 14), the Eighth Amendment does not apply to federal pretrial detainees like Salaman. *See* *Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000) (concluding that federal pretrial detainee's claims were analyzed under the Fifth Amendment, not Eighth Amendment, "[b]ecause as a pretrial detainee [plaintiff] was not being 'punished[.]' "). Accordingly, notwithstanding that both *Carlson* and this case involve allegations of deliberate indifference to serious medical needs, Salaman's claim "arises in a new *Bivens* context" because it "is different in a meaningful way from previous *Bivens* cases decided by th[e] [Supreme] Court." *Abbasi*, 582 U.S. at 147. First, "[t]he constitutional right is different here, since *Carlson* was predicated on the Eighth Amendment and this claim is predicated on the Fifth." *Abbasi*, 582 U.S. 120, 148 (2017). Second, the magnitude of the alleged deliberate indifference is also different. In *Carlson*, it resulted in the plaintiff's death. *See* *Carlson*, 446 U.S. at 16 n.1. Here, by Salaman's own photos, it involved an untreated cut on Plaintiff's knuckle and a dime-sized scrape on his knee. [3] *See* Compl. at Ex. 1 (p. 49), Ex. 2 (p. 50).

Additionally, special factors counsel against applying Plaintiff's claim in a new *Bivens* context because once again, Plaintiff has an alternative available remedy under the FTCA. *See, e.g.*, *Bettis v. Grijalva*, No. 21-CV-7505 (GWG), 2023 WL 4141869, at *7 (S.D.N.Y. June 23, 2023) ("[T]he existence of a tort remedy for deliberate indifference to medical needs under the FTCA by itself strongly counsels against the creat[ion] of a *Bivens* remedy."). Accordingly, this claim must be dismissed. *See, e.g.*, *Bravo v. U.S. Marshals Serv.*, 684 F. Supp. 3d 112, 125–26 (S.D.N.Y. 2023) (dismissing federal pretrial detainee's deliberate indifference *Bivens* claim against U.S. Marshals because, among other reasons, the conduct was not as serious as in *Carlson* and plaintiff could sue under the FTCA).

Recklessness Claim

Lastly, Salaman asserts a freestanding claim for "recklessness" under *Bivens*. *See* Compl. at p. 28. Because "recklessness" is not an independent constitutional tort under

Section 1983, the Court construes Salaman's "recklessness" claim as being brought under Connecticut state law. *See Medeiros v. O'Connell*, 150 F.3d 164, 170 (2d Cir. 1998) (noting that a police officer's "recklessness[ ] is not enough to impose constitutional liability" as a substantive due process violation); *Maitland v. Devlin*, No. 3:19-CV-828 (JCH), 2020 WL 13547731, at **2–4 (D. Conn. Jan. 14, 2020) (discussing statutory and common law "recklessness" causes of action under Connecticut state law). Nevertheless, it is well-settled that a plaintiff cannot assert a *Bivens* claim against a federal official for a violation of state statutory or common law, because "[a] plaintiff bringing a claim under *Bivens* must allege that he has been deprived of a *constitutional right* by a federal agent acting under color of federal authority." *Thomas*, 470 F.3d at 496 (emphasis omitted). Accordingly, Salaman's recklessness claim must be dismissed.

Claims for Injunctive and Declaratory Relief

In addition to seeking damages, Salaman also seeks injunctive and declaratory relief. *See* Compl. at p. 31. However, it is well-settled that "[t]he only remedy available in a *Bivens* action is an award for monetary damages from defendants in their individual capacities." *See Higazy v. Templeton*, 505 F.3d 161, 169 (2d Cir. 2007); *Cicchiello v. Warden*

*Danbury FCI*, No. 3:24-CV-1240 (VAB), 2025 WL 437305, at *2 (D. Conn. Feb. 7, 2025) ("Bivens provides only for money damages and not for injunctive or declaratory relief."); *see, e.g.*, *Berry v. Golden*, No. 3:24-CV-292 (KAD), 2024 WL 2862294, at *2 (D. Conn. June 6, 2024) (dismissing request for injunctive relief based on *Bivens* claims); *see also Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72 (2001) ("For people in Bivens'[s] shoes, it is damages or nothing.") (citation omitted). Accordingly, and insofar as Salaman's entire Complaint is brought under *Bivens*, his claims for injunctive and declaratory relief must be dismissed.

**Conclusion**

**\*9** For all of the foregoing reasons, the Complaint is **DISMISSED**. The Clerk of Court is directed to close this case.

**SO ORDERED** this 22nd day of August 2025 at Bridgeport, Connecticut.

**All Citations**

Slip Copy, 2025 WL 2432674

---

**Footnotes**

1    "A flashbang is an explosive diversionary device that generates a blinding light and deafening noise to give police a tactical advantage by temporarily disorienting those nearby." *Flournoy v. City of Chicago*, 829 F.3d 869, 872 (7th Cir. 2016).

2    Neither the Supreme Court nor the Second Circuit has explicitly "decided whether, in the wake of *Abbasi*, the availability of an FTCA action precludes the *Bivens* remedy." *Scott v. Quay*, No. 19-CV-1075, 2020 WL 8611292, at *8 (E.D.N.Y. Nov. 16, 2020). Thus, "absent clear guidance," some courts have been "unwilling to determine that the FTCA alone is a sufficient alternate remedy." *See Mirvis v. Quay*, No. 19-CV-2573 (LDH), 2023 WL 5671935, at *10 (E.D.N.Y. Sept. 1, 2023). But while the Supreme Court and Second Circuit may not have explicitly stated that the FTCA in particular precludes a *Bivens* remedy, it need not do so because " '*any* alternative, existing process for protecting the [injured party's] interest' ... itself may 'amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.' " *Abbasi*, 582 U.S. at 137 (emphasis added; alteration in original) (quoting *Wilkie*, 551 U.S. at 550); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 73–74 (2001) (recognizing that state tort law provided alternative means for relief); *Minneci v. Pollard*, 565 U.S. 118, 127–130 (2012) (same).

3    These injuries are unlikely "sufficiently serious" to state a deliberate indifference claim on the merits, even if a *Bivens* remedy were available. *See, e.g.*, *Montavon v. Town of Southington*, No. 3:95-CV-1141, 1997 WL 835053, at *4 (D. Conn. Sept. 29, 1997) (plaintiff's cuts and scrapes, unaccompanied by profuse bleeding or

other conditions, did not constitute a medical condition that was sufficiently serious for purposes of Fourteenth Amendment).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag

Declined to Extend by Bray v. Bon Secours Mercy Health, Inc., 6th Cir. (Ohio), March 29, 2024

2020 WL 8611292

Only the Westlaw citation is currently available.

United States District Court, E.D. New York.

David SCOTT, Jeremy Cerda, Osman Ak, Merudh Patel, Gregory Hardy, and Larry Williams, individually and on behalf of all others similarly situated, Plaintiffs,

v.

Former Warden Herman E. QUAY, Facilities Manager John Maffeo, and the United States of America, Defendants.

19-CV-1075 (MKB) (SMG)

|

Filed 11/16/2020

REPORT & RECOMMENDATION

Steven M. Gold United States Magistrate Judge

INTRODUCTION

**\*1** Plaintiffs David Scott, Jeremy Cerda, Osman Ak, Merudh Patel, Gregory Hardy, and Larry Williams were each detained at the Metropolitan Detention Center ("MDC") in Brooklyn, New York, on January 27, 2019, when a portion of the facility lost electrical power. Am. Compl. ¶¶ 3, 8, Dkt. 29. Plaintiffs bring this action on behalf of themselves and all others similarly situated, asserting claims under *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971), against defendants Herman E. Quay, the former Warden of the MDC, and John Maffeo, the Facilities Manager of the MDC. Am. Compl. ¶¶ 352–69. Plaintiffs Scott and Cerda also assert a claim on their own behalf and on behalf of a putative class for negligence under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671, *et seq.*, against the United States of America. Am. Compl. ¶¶ 370–80.

Defendants now move to dismiss the *Bivens* claims for failure to state a claim under Rule 12(b)(6) and the FTCA claim for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure. Not. of Mot. to Dismiss, Dkt. 65; Mem. of Law in Supp. of Defs.' Mot. to Dismiss

("Defs.' Mem. of Law") 3–5, Dkt. 66. The Honorable Margo K. Brodie has referred defendants' motion to dismiss to me for report and recommendation. Order dated June 6, 2020. For the reasons discussed below, I respectfully recommend that the motion to dismiss be granted with respect to the *Bivens* claims against Quay and Maffeo and denied with respect to the FTCA claim against the United States.

BACKGROUND

On February 22, 2019, plaintiffs Scott and Cerda commenced this action by filing a Complaint asserting *Bivens* claims against Quay. Compl., Dkt.1. On November 15, 2019, plaintiffs filed an Amended Complaint, adding Ak, Patel, Hardy, and Williams as plaintiffs, Maffeo and the United States of America as defendants, and a claim for negligence brought by plaintiffs Scott and Cerda under the FTCA. Am. Compl., Dkt. 29.

As alleged in the Amended Complaint, on January 27, 2019, the MDC sustained a partial power outage when an electrical panel caught fire in the jail's control room. *Id.* ¶ 45. The outage caused the failure of "a number of systems and equipment, including overhead lighting and electrical outlets in cells and common areas, phones, computer systems, and overhead lighting and electrical outlets in staff offices and common areas" and the facility thus "switched to emergency lighting." *Id.* ¶¶ 3, 46.

Plaintiffs claim that, as a result of the partial power outage, they were subjected to unconstitutional conditions of confinement, including a lack of light, heat, hot meals, clean water, and hot water, prolonged detention in cells, plumbing disruptions, lack of access to e-mail, television, and social telephone calls and visits, curtailment of communication with counsel, and denial of, or indifference to, requests for medical attention and care. *Id.* ¶¶ 57–300. Plaintiffs also allege that defendants failed to provide them with, among other things, extra blankets, bedding, clothing, portable space heaters, flashlights, and toiletries during the partial power outage. *Id.* ¶¶ 7, 50, 310. These disruptions allegedly persisted until power was fully restored on February 3, 2019. *Id.* ¶ 22.

**\*2** Plaintiffs further allege that Warden Quay and Facilities Manager Maffeo, as prison officials, knew that the MDC's infrastructure was failing, that problems with electricity and heat were foreseeable, and that a power outage could occur "at any time." *Id.* ¶¶ 16–17, 23–44, 301–03, 320–

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 200 of 340

22. Moreover, plaintiffs allege that, during the period of the partial power outage, Quay and Maffeo were personally aware of the detainees' adverse conditions of confinement and nevertheless failed to take adequate steps to prevent or alleviate these conditions when they occurred. *Id.* ¶¶ 16–17; 303–12, 323–24. In particular, plaintiffs allege that Quay was aware of "specific warning signs concerning the jail's electricity and heat," including three blackouts that occurred in the weeks leading up to the partial power outage, *id.* ¶¶ 26, 28, and that Maffeo refused to let electricians into certain relevant areas of the MDC during that time, *id.* ¶ 33. Plaintiffs allege that, according to Con Edison, the partial power outage was due to the MDC's failure to remedy preexisting issues; rather than fixing these issues, the MDC kept putting "more demands for more power on a weaker system." *Id.* ¶ 39.

### DISCUSSION

### I. Plaintiffs' *Bivens* Claims

#### A. Legal Standard Applicable to *Rule 12(b)(6)*

Defendants Quay and Maffeo move to dismiss the *Bivens* claims against them for failure to state a claim pursuant to *Rule 12(b)(6) of the Federal Rules of Civil Procedure.* Defs.' Mem. of Law at 3. A complaint may survive a motion to dismiss brought under *Rule 12(b)(6)* only if it includes "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Iqbal sets forth a two-pronged approach for analyzing motions to dismiss brought under *Rule 12(b)(6)*. First, the district court must "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679. Although "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Id.* Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.*

Furthermore, when considering a motion under *Rule 12(b)(6)*, a court may generally "look only to the allegations on the face of the complaint." *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007). However, "[i]n certain circumstances, the court may ...

consider documents other than the complaint," *id.*, such as "documents attached to the complaint or incorporated in it by reference, ... matters of which judicial notice may be taken, or ... documents either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993).

#### B. Bivens and Recent Supreme Court Developments

In *Bivens*, the Supreme Court recognized a damages remedy for violations of the Fourth Amendment's prohibition on unreasonable searches and seizures by federal law enforcement officers. *403 U.S. at 391–97*. Implying a cause of action for violations of the Fourth Amendment, the Court determined, was simply a natural extension of its view that a Court should ensure that every violation of a federally protected right has a remedy. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017).

Since first recognizing an implied right of action under the Constitution, the Supreme Court has allowed a *Bivens* claim to proceed in only two other contexts: (1) a federal employee's employment discrimination claim asserted pursuant to the due process clause of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 (1979), and (2) a claim for damages under the Eighth Amendment brought by the estate of a federal prisoner who died after receiving inadequate medical care, *Carlson v. Green*, 446 U.S. 14 (1980). The Court has not extended *Bivens* again in the forty years since *Carlson* was decided. *Abbasi*, 137 S. Ct. at 1855 ("These three cases—*Bivens, Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself."); *see Minneci v. Pollard*, 565 U.S. 118, 124–25 (2012) (collecting cases).

**\*3** The Court has also, since *Carlson*, altered its perspective on implied rights of action under the Constitution and noted that its "recent precedents cast doubt on the authority of courts to extend or create private causes of action." *Jesner v. Arab Bank, PLC*, 138 S. Ct. 1386, 1402 (2018). In *Abbasi*, the Court acknowledged the marked change in its approach to implying causes of action:

> In the mid-20th century, the Court followed a different approach to recognizing implied causes of action than it follows now. During this "*ancien regime*," the Court assumed it to be a proper judicial function to provide such

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 201 of 340

Scott v. Quay, Not Reported in Fed. Supp. (2020)

remedies as are necessary to make effective a statute's purpose.

\*\*\*

Later, the arguments for recognizing implied causes of action for damages began to lose their force.

\*\*\*

Given the notable change in the Court's approach to recognizing implied causes of action ... the Court has made clear that expanding the *Bivens* remedy is now a "disfavored" judicial activity.

137 S. Ct. at 1855, 1857 (internal quotation marks and citations omitted). The Court went so far as to say that, were *Bivens*, *Davis*, and *Carlson* being decided today, the analysis —and, presumably, the outcome—might be different. *Id.* at 1856.

Since *Abbasi*, the central inquiry when faced with a potential expansion of *Bivens* is " 'who should decide' whether to provide for a damages remedy, Congress or the courts," and that the answer to that question "most often will be Congress." *Id.* at 1857 (quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983)). "[S]eparation-of-powers principles are or should be central to the analysis." *Id.*

*Abbasi* instructs that deciding whether a *Bivens* claim is cognizable involves two steps. First, a court must determine whether the plaintiff's claims are different from those asserted in previous *Bivens* cases, such that the case presents a "new *Bivens* context." *Id.* at 1859. Second, if a case does present a "new *Bivens* context," a court must then consider whether "there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' " *Id.* at 1857 (quoting *Carlson*, 446 U.S. at 18). The Supreme Court has not announced a definitive list of those "special factors" that "counsel[ ] hesitation," *id.*, but it has stressed that the question to ask is "whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id.* at 1858. A "special factor" is one that "cause[s] a court to hesitate before answering that question in the affirmative." *Id.* Notably, the Supreme Court stated in *Abbasi* that

if there is an alternative remedial stricture present in a certain case, that

alone may limit the power of the Judiciary to infer a new *Bivens* cause of action. For if Congress has created any alternative, existing process for protecting the injured party's interest that itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.

*Id.* (internal quotation marks, alterations, and citations omitted). To constitute a special factor counseling hesitation, an alternative remedy, such as one under state law, "need not be perfectly congruent" with a potential *Bivens* remedy. *Minneci*, 565 U.S. at 129.

*C. This Case Presents a New Bivens Context*

**\*4** A case presents a "new context" if it is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]." *Abbasi*, 137 S. Ct. at 1859. Nevertheless, "even a modest extension is still an extension." *Id.* at 1864. The Court in *Abbasi* listed some relevant measures of difference, including the rank of the officers involved, the constitutional right asserted, the level of generality of the official action in question, the extent of the judicial guidance available to the officer in question, whether the officer was operating under specific statutory or other legal mandates, and whether there is a risk that the Judiciary would be interfering with the functioning of another branch of the government. *Id.* at 1860.

Here, the Amended Complaint alleges that, during the partial power outage between January 27, 2019, and February 3, 2019, plaintiffs were subjected to harsh conditions of confinement that included, but were not limited to, (1) confinement to cells with no light, Am. Compl., ¶¶ 70, 97, 135, 163, 168, 186, 227; (2) lack of heat while outdoor temperatures were below freezing, *id.* ¶¶ 63, 90, 105, 123, 148, 169, 192, 233; (3) lack of hot meals and hot water, *id.* ¶¶ 73, 76, 126, 146, 152, 237, 239; (4) prolonged detention in cells, *id.* ¶¶ 69, 114, 128, 145, 174, 198, 236; (5) plumbing disruptions, *id.* ¶¶ 119, 206; (6) lack of access to e-mail, social visits, telephone calls, and television, *id.* ¶¶ 71, 78, 124, 151, 156, 175, 181, 201, 209, 242–43; and (7) curtailment of communication with counsel, *id.* ¶¶ 79, 124, 155, 210, 244.

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 202 of 340

Plaintiffs allege that these conditions of confinement violated their Fifth and Eighth Amendment rights. *Id.* ¶¶ 352–69.

Plaintiffs argue that their claims do not arise in a new *Bivens* context because they are not meaningfully different from the claim the Supreme Court permitted to proceed in *Carlson.* Mem. of Law in Opp. to Defs.' Mot. to Dismiss ("Pls.' Mem. of Law") 6, Dkt. 69. The holding in *Abbasi,* though, undermines plaintiffs' contention. As in this case, plaintiffs in *Abbasi* complained of harsh conditions of confinement. Some of the complaints made in *Abbasi* resemble those made by plaintiffs here, including allegations that detainees were held in their cells for 23 hours each day, denied access to basic hygiene products in their cells, and barred from communicating with the outside world. 137 S.Ct. at 1853. The *Abbasi* plaintiffs sought to hold the facility's warden responsible for allowing these harsh conditions to occur, as plaintiffs do here. *Id.* at 1863. However, the Court held that such claims present a new *Bivens* context because they "bear little resemblance" to the three *Bivens* claims that were previously approved by the Court: "a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Id.* at 1860.

Plaintiffs in *Abbasi* also alleged that the warden violated their Fifth Amendment rights by allowing prison guards to abuse them. *Id.* at 1853. While the Supreme Court in *Abbasi* recognized that there were "significant parallels" to *Carlson* in that both cases involved claims of prisoner mistreatment, it ultimately concluded that the *Abbasi* plaintiffs' prisoner mistreatment claims arose in a new context. *Id.* at 1864. Stressing that "even a modest extension is still an extension," the Court noted that the claims in *Carlson* were predicated on the Eighth Amendment while those in the case before it were brought by pre-trial detainees under the Fifth Amendment. *Id.* The Court further noted that the legal standard applicable to the failure to provide medical care alleged in *Carlson* was well-established, while in contrast "[t]he standard for a claim alleging that a warden allowed guards to abuse pre-trial detainees is less clear under the Court's precedents." *Id.* at 1864–65.

**\*5** As noted above, plaintiffs in this case bring conditions of confinement claims under both the Fifth and Eighth Amendments. To the extent plaintiffs' claims invoke the Fifth Amendment and relate to conditions of confinement other than inadequate medical care, the distinction from *Carlson*

noted in *Abbasi* applies here as well. *See White v. Hess,* 2020 WL 1536379, at \*7 (E.D.N.Y. Mar. 31, 2020) (holding that non-medical conditions of confinement claims present a new *Bivens* context); *Fernandini v. United States,* 2019 WL 2493758, at \*10 (S.D.N.Y. Feb. 14, 2019) (holding that non-medical "inhumane" prison conditions present a new *Bivens* context), *report and recommendation adopted in relevant part,* 2019 WL 1033797, at \*6 (S.D.N.Y. Mar. 5, 2019).

Plaintiffs' Eighth Amendment claims, particularly those alleging a denial of medical care, arguably raise a closer question because they are brought pursuant to the same constitutional provision and involve the same type of harsh condition as the claims in *Carlson.* Nevertheless, these claims too arise in a new *Bivens* context.

For one thing, the legal standards applicable to plaintiffs' claims in this case, like those applicable to the claims asserted in *Abbasi,* are less clear than those that governed the claims in *Carlson.* Plaintiff in *Carlson* was the mother of a deceased prisoner, suing as administratrix of his estate. 446 U.S. at 16. Plaintiff alleged that prison officials, though "fully apprised of the gross inadequacy of medical facilities and staff" at the federal detention center and of the seriousness of her son's "chronic asthmatic condition," confined him in that facility "against the advice of doctors" and failed to provide "competent medical attention for some eight hours after he had an asthmatic attack, administered contra-indicated drugs which made his attack more severe, attempted to use a respirator known to be inoperative ..., and delayed for too long a time his transfer to an outside hospital." *Id.* at 16 n.1. The claims before the Court here, in contrast, involve conditions plaintiffs endured over the course of one week in the wake of an emergency partial power outage and "bear little resemblance" to the chronic failure to provide adequate medical care alleged in *Carlson,* which ultimately resulted in the inmate's death. [1] While the Supreme Court "has long made clear the standard for claims alleging failure to provide medical treatment to a prisoner," *Abbasi,* 137 S.Ct. at 1864, the degree to which officials must maintain the infrastructure of detention facilities, or to which they may be held to account for failing to provide a range of services during a time-limited emergency, is less clearly established.

**\*6** Moreover, any contention that claims do not arise in a new context simply because they invoke the same Amendment as a previously recognized *Bivens* claim was squarely rejected in *Hernandez v. Mesa,* 140 S.Ct. 735 (2020). In that case, the Court stated that "[a] claim may arise in a

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 203 of 340

new context even if it is based on the same constitutional provision as a claim in a case in which a damages remedy was previously recognized," and that to argue otherwise is to demonstrate "a basic misunderstanding of what our cases mean by a new context." 140 S.Ct. at 743.

Finally, a common-sense look at the facts at issue in the two cases makes it clear that plaintiffs' claims here arise in a significantly different context than those in *Carlson*. *Carlson* involved allegations concerning the ongoing "gross inadequacy" of the medical facilities at a prison and extreme deviations from the standard of care for a common medical condition. This case, in contrast, involves questions about an alleged failure to maintain the electrical system in a detention facility and to respond properly when that system failed in mid-winter, resulting in a loss of power during a period with frigid temperatures. While the standard of deliberate indifference may govern liability in both circumstances, the different contexts involved will require the Courts to make distinct inquires. In particular, the exigencies of the power outage likely required prison officials to prioritize certain needs of the detainees in a way that would not have been required in *Carlson*; this difference will alter the deliberate indifference analysis.

For all these reasons, and bearing in mind the Supreme Court's admonition that even a modest extension is still an extension, I conclude that plaintiffs' claims in this action arise in a new *Bivens* context. [2]

### D. There Are Special Factors Counselling Hesitation

Having concluded that this case arises in a "new *Bivens* context," I now consider whether "there are 'special factors counselling hesitation in the absence of affirmative action by Congress.' " *Abbasi*, 137 S.Ct. at 1857 (quoting *Carlson*, 446 U.S. at 18). This threshold is a "remarkably low" one. *Arar v. Ashcroft*, 585 F.3d 559, 574 (2d Cir. 2009).

In *Abbasi*, the Court identified some criteria for considering whether hesitation is warranted. First, it noted that "the decision to recognize a damages remedy requires an assessment of its impact on governmental operations systemwide," which entails examining the "burdens on Government employees who are sued personally, as well as the projected costs and consequences to the Government itself when ... the legal system [is] used to bring about the proper formulation and implementation of public policies." *Abbasi*,

137 S.Ct. at 1858. Second, some cases will arise "in a context in which Congress has designed its regulatory authority in a guarded way, making it less likely that Congress would want the Judiciary to interfere." *Id.* It may also be that "feature[s] of [the] case—difficult to predict in advance—cause[ ] a court to pause before acting without express congressional authorization." *Id.* The Court concluded this aspect of its discussion by noting that, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy as part of the system for enforcing the law and correcting a wrong, the courts must refrain from creating the remedy[;]" to do otherwise would fail "to respect the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *Id.*

### 1. Separation-of-Powers Concerns are a Special Factor Counselling Hesitation

**\*7** Defendants argue that "[e]xpanding *Bivens* to cover plaintiffs' conditions claim ... would imply a remedy in damages based on judicial second-guessing of judgments by prison officials." Defs.' Mem. of Law at 20. As defendants correctly note, *see* Defs.' Reply at 12, Congress has delegated the management of the federal prison system to the U.S. Attorney General and the Bureau of Prisons ("BOP"), both of which are within the executive branch of the federal government. 18 U.S.C. §§ 4001(b)(1) ("The control and management of Federal penal and correctional institutions, except military or naval institutions, shall be vested in the Attorney General ..."); 4042(a)(1) ("The [BOP], under the direction of the Attorney General, shall ... have charge of the management and regulation of all Federal penal and correctional institutions[.]"). Plaintiffs' claims regarding unconstitutional conditions of confinement, particularly to the extent they involve the allocation of scarce resources to the maintenance of infrastructure of the MDC as opposed to other pressing needs, implicate the administration of prisons, which, in turn, involves "separation of powers concerns [that] counsel a policy of judicial restraint." *Turner v. Safley*, 482 U.S. 78, 85 (1987).

### 2. Congress's Silence is Ambiguous

Defendants also argue that, in the years since the enactment of the Prison Litigation Reform Act ("PLRA") in 1996, "Congress has never provided a damages remedy to federal prisoners complaining of constitutional violations," thus

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 204 of 340

indicating Congress's reluctance to extend *Bivens* to new contexts. Defs.' Mem. of Law at 18–19 (citing *Abdo v. Balsick*, 2019 WL 6726230, at *7 (D. Colo. Dec. 11, 2019)). In opposition, plaintiffs note that the Court in *Abbasi* did not affirmatively conclude that Congress's silence suggested its reluctance to expand *Bivens*; rather, the Court merely stated "[i]t *could be argued* that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Abbasi*, 137 S. Ct. at 1865 (emphasis added); *see* Pls.' Mem. of Law at 18. Plaintiffs also assert that "Congress presumed the existence of a *Bivens* remedy for prison conditions claims" and, by its plain language, "intended only to reduce frivolous suits by adding an administrative exhaustion requirement." Pls.' Mem. of Law at 17 (emphasis omitted). Indeed, plaintiffs argue, "[w]hen the PLRA was debated and passed, not only had the Supreme Court already recognized a constitutional remedy for prisoner mistreatment claims in *Carlson*, but other circuit courts had routinely done so as well." *Id.* at 17–18 (listing cases in which *Bivens* was recognized as a vehicle for asserting prisoner and detainee abuse claims).

Having considered the parties' arguments, I conclude that the evidence of congressional intent here is too ambiguous to provide meaningful support for either side's position. *See Wilkie v. Robbins*, 551 U.S. 537, 554 (2007) ("It would be hard to infer that Congress expected the Judiciary to stay its *Bivens* hand, but equally hard to extract any clear lesson that *Bivens* ought to spawn a new claim."); *Turkmen v. Ashcroft*, 2018 WL 4026734, at *8 (E.D.N.Y. Aug. 13, 2018) (report and recommendation pending). Inferring intent from inaction necessarily involves speculation, and the degree of speculation involved increases greatly when an inference about intent is based upon the inaction of a legislative body with hundreds of members, each of whom may have their own reasons for not acting. Therefore, I decline to infer what views Congress may have with respect to extending *Bivens* from its failure to pass a law that either provides or precludes a *Bivens*-type remedy for violations of constitutional rights.

### *E. An Alternative Remedy Is Available*

As noted above, the availability of alternative remedies "alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S.Ct. at 1858. Here, plaintiffs not only have an alternative remedy available, they have invoked it.

#### 1. The FTCA Provides a Sufficient Alternative Remedy

Defendants argue that "plaintiffs had an alternative existing process because they could have brought—and in fact, in this action, have brought—tort claims under the FTCA." Defs.' Mem. of Law 14–15. Indeed, the Amended Complaint in this action includes a claim for negligence under the FTCA based upon the same alleged conditions of confinement asserted in support of plaintiffs' *Bivens* claims. Am. Compl. ¶¶ 370–80.

**\*8** Plaintiffs argue that the Supreme Court's holding in *Carlson* precludes any argument that a plaintiff's ability to sue under the FTCA impedes that plaintiff's right to bring a *Bivens* claim. Pls.' Mem. of Law at 12. The Supreme Court in *Carlson* deemed it "crystal clear" that "Congress views FTCA and *Bivens* as parallel, complementary causes of action," *Carlson*, 446 U.S. at 20. In subsequent decisions, moreover, the Supreme Court has reiterated that "an FTCA claim is simply not a substitute for a *Bivens* action." *Bueno Diaz v. Mercurio*, 442 F. Supp. 3d 701, 710 (S.D.N.Y. 2020) (internal quotation marks and citations omitted); *see Wilkie*, 551 U.S. at 553 (noting that the "FTCA and *Bivens* remedies were 'parallel, complementary causes of action' and that the availability of the former did not preempt the latter" (quoting *Carlson*, 446 U.S. at 20)); *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68 (2001) (quoting *Carlson*, 446 U.S. at 20)); *Bush*, 462 U.S. at 378 (noting that "[n]o statute expressly declared the FTCA remedy to be a substitute for a *Bivens* action").

The reasoning and result in *Abbasi*, though, call into serious question the continued viability of the test articulated in *Carlson* for when the availability of an alternative remedy precludes a *Bivens* claim. In *Carlson*, the Supreme Court stated that a *Bivens* claim is precluded by an alternative remedy only "when defendants show that Congress has provided an alternative remedy which it explicitly declared to be a *substitute* for recovery directly under the Constitution and viewed as equally effective." *Carlson*, 446 U.S. at 18–19 (emphasis in original). In contrast, the Court in *Abbasi* more broadly concluded that "if Congress has created *any* alternative, existing process for protecting the injured party's interest[,] that itself may amount to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages." *Abbasi*, 137 S. Ct. at 1858 (internal quotation marks, alterations, and citation omitted) (emphasis added). In emphasizing that "expanding the *Bivens* remedy is now considered a disfavored judicial activity," the Court also observed that its conclusion in *Carlson* "might

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 205 of 340

have been different if [it] were decided today." *Id.* at 1856, 1857 (internal quotation marks and citation omitted).

The Second Circuit has not yet decided whether, in the wake of *Abbasi*, the availability of an FTCA action precludes a *Bivens* remedy. *See* Tr. of Oral Arg. at 6:4-5, Dkt. 91. The Fifth Circuit, though, has invoked the availability of an FTCA claim as a basis for dismissing a *Bivens* action. *Oliva v. Nivar*, 973 F.3d 438, 444 (5th Cir. 2020). Several decisions rendered by district courts within the Second Circuit have similarly concluded that *Carlson*'s analysis of adequate alternative remedies cannot survive *Abbasi* and dismissed *Bivens* claims because the FTCA provides an adequate alternative remedy. *See, e.g.*, *Sosa v. Bustos*, 2020 WL 1940550, at *4 (S.D.N.Y. Apr. 22, 2020); *Oliveras v. Basile*, 440 F. Supp. 3d 365, 372–74 (S.D.N.Y. 2020); *Morrison v. United States*, 2019 WL 5295119, at *3 (S.D.N.Y. Oct. 18, 2019); *Abdoulaye v. Cimaglia*, 2018 WL 1890488, at *7 (S.D.N.Y. Mar. 30, 2018); *Morgan v. Shivers*, 2018 WL 618451, at *5–*6 (S.D.N.Y. Jan. 29, 2018); *see also Style v. Mackey*, 2020 WL 3055319, at *4 (E.D.N.Y. June 8, 2020); *Rivera v. Samilo*, 370 F. Supp. 3d 362, 369 (E.D.N.Y. 2019). In contrast, some courts have continued to rely on *Carlson* and concluded that "[t]he FTCA standing on its own" does not provide a sufficient alternative remedy and thus "does not give the Court reason to hesitate in extending *Bivens*." *Powell v. United States*, 2020 WL 5126392, at *10 (S.D.N.Y. Aug. 31, 2020) (noting that "[t]he Supreme Court has not been bashful in signaling its skepticism of the *Bivens* remedy—if the Court intended to overrule *Carlson*, I am quite sure it would simply do so"); *see Bueno Diaz*, 442 F. Supp. 3d at 711.

*9 Plaintiffs argue further that "[t]he Westfall Act's amendments to the FTCA contemplate the continued viability of suits against individual federal officers for constitutional violations." Pls.' Mem. of Law at 13. The Westfall Act of 1988 provides that a claim against the United States under the FTCA is the exclusive civil remedy for negligent or wrongful acts or omissions by employees of the federal government. 28 U.S.C. § 2679(b)(1). The Act also provides, however, that this limitation does not apply to "a civil action against an employee of the Government which is brought for a violation of the Constitution of the United States." 28 U.S.C. § 2679(b)(2)(A). Arguably, by enacting legislation specifically discussing civil actions against government employees for violations of constitutional rights—but declining to eliminate or narrow them—Congress implicitly approved of such actions. *See Abbasi*, 137 S. Ct. at 1880–81 (Breyer, J., dissenting) (arguing that the exception for lawsuits claiming

constitutional violations in the Westfall Act makes it clear that Congress views the FTCA and *Bivens* as providing "parallel, complementary causes of action" (quoting *Carlson*, 446 U.S. at 20)).

The problem with plaintiffs' Westfall Act argument is that it failed to persuade the *Abbasi* majority. In his dissent, Justice Breyer invoked passage of the Westfall Act as an indication of Congress's "accept[ance of] *Bivens* actions as part of the law." *Id.* at 1880 (Breyer, J., dissenting). However, the majority, while making explicit reference to the Westfall Act, held, largely on separation-of-powers grounds, that extending *Bivens* to new contexts is now a "disfavored" judicial activity." *Id.* at 1856–57 (majority opinion) (internal quotation marks and citation omitted). Clearly, then, the majority in *Abbasi*—though plainly aware of Justice Breyer's arguments to the contrary—rejected the notion that, by passing the Westfall Act, Congress suggested its support for *Bivens* actions.

Finally, plaintiffs point out that the Supreme Court recently stated in *Hernandez v. Mesa*, 140 S. Ct. 735 (2020) that "the Westfall Act 'left *Bivens* where it found it,' leaving *Carlson* untouched as binding precedent." Pls.' Mem. of Law at 14 (quoting *Hernandez*, 140 S. Ct. at 748 n.9). The majority in *Hernandez*, though, did not explicitly state that the FTCA fails as a general matter to provide an alternative remedy to a *Bivens* claim. Rather, when considered in context, it is clear that the majority was merely observing, in that case involving a U.S. Border Patrol Agent's cross-border shooting of a 15-year-old Mexican child, that "the FTCA bars '[a]ny claim arising in a foreign country.' " *Hernandez*, 140 S. Ct. at 748 (quoting 28 U.S.C. § 2680(k)).

Having considered the authorities cited above and the arguments presented by the parties, I agree with those district courts that have held that, post-*Abbasi*, "the FTCA as a potential remedy counsels hesitation in extending a *Bivens* remedy," *Abdoulaye*, 2018 WL 1890488, at *7, and supports dismissal of plaintiffs' *Bivens* claims.

### 2. Other Alternative Remedies

Defendants argue that plaintiffs could have sought relief through alternative means in addition to an FTCA claim, including a habeas petition, a motion for injunctive relief, or an administrative claim pursuant to the PLRA. Defs.' Mem. of Law 16–17. Defendants have failed to explain, however,

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 206 of 340

how plaintiffs could have invoked any of these means of seeking relief while confined to their cells during the power outage, or what relief they might have sought or obtained if they filed a habeas petition, motion for injunctive relief, or administrative claim after power was restored and the harsh conditions of confinement they complain about here had abated. Defendants further contend that plaintiffs could have pursued New York state law claims, but relief under state law is unavailable where, as here, it is alleged that defendants acted within the scope of their employment. *See Rivera*, 370 F. Supp. 3d at 370 ("Plaintiff had some avenues for redress under New York state law to the extent he claimed that [defendant's] actions placed him outside the scope of his federal employment."). Because none of these alternative remedies were, as a practical matter, available to plaintiffs in any meaningful way, I do not find them to be an additional basis for hesitation.

**\*10** Nevertheless, because I find that separation-of-power concerns are a special factor counselling hesitation and the FTCA provides a sufficient alternative remedy, I respectfully recommend that defendants' motion to dismiss be granted with respect to the *Bivens* claims against Quay and Maffeo.[3]

## II. Plaintiffs' FTCA Claim

### A. Legal Standard Applicable to *Rule 12(b)(1)*

Defendant United States of America moves to dismiss the FTCA claim asserted by plaintiffs Scott and Cerda for lack of subject-matter jurisdiction pursuant to *Rule 12(b)(1) of the Federal Rules of Civil Procedure*. *See* Defs.' Mem. of Law at 4–5. "A case is properly dismissed for lack of subject matter jurisdiction under *Rule 12(b)(1)* when the district court lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *see Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005)). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova*, 201 F.3d at 113; *see Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014). In evaluating whether a plaintiff has met that burden, " '[t]he court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff,' but 'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.' " *Morrison v. Nat'l Austl. Bank Ltd.*, 547 F.3d 167, 170

(2d Cir. 2008) (citations omitted), *aff'd*, 561 U.S. 247 (2010). Moreover, a court evaluating a *Rule 12(b)(1)* motion may consider affidavits and other materials outside the pleadings. *See Pyskaty v. Wide World of Cars, LLC*, 856 F.3d 216, 223 (2d Cir. 2017); *Samele v. Zucker*, 324 F. Supp. 3d 313, 321 (E.D.N.Y. 2018).

### B. Plaintiffs Scott and Cerda Exhausted their Administrative Remedies

The FTCA waives sovereign immunity for injuries arising within the scope of the tortious conduct of federal officers or agents acting within the scope of their office or employment. *See* 28 U.S.C. § 1346(b)(1). Plaintiffs seeking to bring a claim under the FTCA must first exhaust their administrative remedies by presenting their claim to the appropriate federal agency and receiving a final denial of the claim in writing. 28 U.S.C. § 2675(a). A failure of the federal agency to dispose of a claim within six months may, at the claimant's option, be deemed a final denial. *Id.* Notably, "[f]ailure to exhaust the agency's administrative remedies within the statute of limitations will render the claim forever barred." *Roberson v. Greater Hudson Valley Family Health Ctr., Inc.*, 2018 WL 2976024, at \*2 (S.D.N.Y. June 12, 2018) (internal quotation marks and citation omitted). The exhaustion requirement is "jurisdictional and cannot be waived." *Celestine v. Mount Vernon Neighborhood Health Cir.*, 403 F.3d 76, 82 (2d Cir. 2005).

**\*11** In addition, FTCA claims are subject to two limitations periods: first, a tort claim must be presented to the appropriate federal agency within two years of its accrual, and second, the subsequent federal action must be commenced within six months after the agency mails its final denial. 28 U.S.C. § 2401(b). If either deadline is not met, the claim is "forever barred." *Id.* Like a failure to exhaust, failure to comply with the FTCA's limitations periods constitutes a jurisdictional defect that deprives the court of subject matter jurisdiction. *Abdelmoneim v. Dep't of Army*, 2014 WL 1277905, at \*2 (E.D.N.Y. Mar. 27, 2014).

Here, plaintiffs Scott and Cerda filed their administrative tort claims with the BOP on April 30, 2019, two months after the action was commenced against Quay. Am. Compl. ¶¶ 95, 133. The BOP issued a final denial on October 31, 2019. *Id.* Thereafter, plaintiffs filed an Amended Complaint on November 15, 2019, adding—for the first time—an FTCA claim by Scott and Cerda against the United States.[4]

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 207 of 340

Defendants argue that "the FTCA requires jurisdiction to exist at the time of the filing of the original Complaint, depriving the Court of jurisdiction" over the FTCA claim asserted by Scott and Cerda. Defs.' Mem. of Law at 26. The question then becomes whether the Amended Complaint may serve as the pleading that instituted Scott's and Cerda's FTCA claim, or whether they filed the original Complaint prematurely because their administrative tort claims had not yet been filed or denied.

An action brought under the FTCA "shall not be instituted" against the United States until the claim has been finally denied. 28 U.S.C. § 2675(a). The Supreme Court has determined that, in this context, "the normal interpretation of the word 'institute' is synonymous with the words 'begin' and 'commence.' " *McNeil v. U.S.*, 508 U.S. 106, 112 (1993). In other words, a plaintiff must fully exhaust administrative remedies before invoking the judicial process. *See id.* Indeed, courts have noted that "[a]llowing claimants generally to bring suit under the FTCA before exhausting their administrative remedies and to cure the jurisdictional defect by filing an amended complaint would render the exhaustion requirement meaningless and impose an unnecessary burden on the judicial system." *Duplan v. Harper*, 188 F.3d 1195, 1199 (10th Cir. 1999) (holding that the district court had jurisdiction over an FTCA claim because the government *agreed* that "the amended complaint effectively constituted a new action and agreed to administrative closure of the first action pending exhaustion"); *see Hoffenberg v. Provost*, 154 F. App'x 307, 310 (3d Cir. 2005) (holding that the FTCA claim was properly dismissed as unexhausted because it was still pending before the BOP when plaintiff filed his original complaint alleging an FTCA claim; therefore, the date on which the amended complaint was filed, which was after the conclusion of the BOP proceedings, could not serve as the date the federal suit was instituted).

 **\*12** In this case, unlike in *Hoffenberg*, the original Complaint did not include any claims under the FTCA or against the United States or the BOP as a defendant; rather, the original Complaint alleged only *Bivens* claims against Quay. In a case involving circumstances more like those at issue here, the Eighth Circuit held that an FTCA claim that was unexhausted when the original complaint was filed, but exhausted at the time of the amended complaint, could go forward. *See Mackovich v. U.S.*, 630 F.3d 1134, 1135–36 (8th Cir. 2011). In *Mackovich*, the claims asserted in the original and amended complaints were different: the plaintiff initially sued under the FTCA for medical malpractice, then

abandoned that claim in his amended complaint and sued under the FTCA claiming that he slipped and fell in a poorly maintained dining area. *See id.* at 1134. The Court construed plaintiff's amended complaint as "an entirely new action." *Id.* at 1136. Similar results were reached in cases where plaintiffs amended existing complaints to add a new FTCA claim. *See Corley v. United States Dep't of Justice*, 2016 WL 11395009, at \*5 (E.D.N.Y. Sept. 6, 2016) (denying motion to dismiss as unexhausted because "[p]laintiff made no claims or allegations in his original complaint about his treatment at the MCC. Plaintiff filed his amended complaint alleging FTCA claims about his treatment at the MCC only after his related administrative claims were finally denied"), *report and recommendation adopted sub nom. Corley v. United States*, 2016 WL 5394705 (E.D.N.Y. Sept. 27, 2016); *Malouf v. Turner*, 814 F. Supp. 2d 454, 461 (D.N.J. 2011) ("As Plaintiff's action did not raise a claim under the FTCA for tort damages related to his January 2009 slip and fall until he filed his Amended Complaint, which occurred after exhaustion of his administrative tort claim by the BOP, the Court finds no jurisdictional restriction in the plain language of the statute."); *Grancio v. De Vecchio*, 572 F. Supp. 2d 299, 310–11 (E.D.N.Y. 2008); *Vitrano v. United States*, 2008 WL 1752221, at \*4 (S.D.N.Y. Apr. 16, 2008) ("When and if [plaintiff] is able to plead satisfaction of jurisdictional prerequisites, he will be entitled to assert [FTCA] claims either by amending his complaint here or by filing a new action."). Thus, because plaintiffs Scott and Cerda asserted their FTCA claim against the United States for the first time in the Amended Complaint, the date of the Amended Complaint is the date the federal suit was instituted for jurisdictional purposes. By that date, of course, the claim had properly been exhausted.

Although the government relies on *McKiver v. Fed. Bureau of Prisons of New York*, 2019 WL 1369460 (S.D.N.Y. Mar. 26, 2019), the holding in that case is based on facts that are readily distinguishable from those presented here. In *McKiver*, the district court held that the FTCA claims against individual federal employees should be dismissed as unexhausted because plaintiff filed his administrative tort claims with the court, not with the appropriate federal agency, and did so only *after* he instituted the action. *McKiver*, 2019 WL 1369460, at \*4. The court noted that "[t]he only potential argument to be made to the contrary" is that the action was not instituted until the Attorney General certified that the individual federal employees "were acting within the scope of their official duties," at which the time a tort claim against the individuals could be deemed a claim against the United States. *Id.* (citing *Grancio*, 572 F. Supp. 2d at 311).

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 208 of 340

However, the court held that the case was distinguishable from *Grancio* because plaintiff's "initial pleadings included his FTCA claim," not just tort claims more generally, and explicitly named the BOP as a defendant. *Id.* Moreover, the court had already "effectively deemed the suit to be against the United States" in an earlier decision. *Id.*

For these reasons, I conclude that plaintiffs Scott and Cerda have exhausted their administrative remedies and properly asserted their FTCA claim only after having received a written denial of their administrative tort claims.

### C. The Discretionary Function Exception

Defendants alternatively challenge the Court's jurisdiction by invoking the FTCA's discretionary function exception to the federal government's limited waiver of sovereign immunity. The exception bars liability for "[a]ny claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). A claim that falls within this exception must be dismissed for lack of subject matter jurisdiction. *See Huntress v. United States*, 810 F. App'x 74, 76 (2d Cir. 2020) (petition for a writ of certiorari filed); *Fazi v. United States*, 935 F.2d 535, 539 (2d Cir. 1991).

Courts decide whether the discretionary function exemption applies according to the so-called *Berkovitz-Gaubert* test, a reference to *Berkovitz v. United States*, 486 U.S. 531 (1988) and *United States v. Gaubert*, 499 U.S. 315 (1991). Under that test, the exception applies only when the following two conditions are met: "(1) the acts alleged to be negligent must be discretionary, in that they involve an element of judgment or choice and are not compelled by statute or regulation, and (2) the judgment or choice in question must be grounded in considerations of public policy or susceptible to policy analysis." *USAA Cas. Ins. Co. v. Permanent Mission of Republic of Namibia*, 681 F.3d 103, 111–12 (2d Cir. 2012) (quoting *Coulthurst v. United States*, 214 F.3d 106, 109 (2d Cir. 2000)).

**\*13** "Plaintiffs bear the initial burden to state a claim that is not barred by the [discretionary function exception]." *Molchatsky v. United States*, 713 F.3d 159, 162 (2d Cir. 2013). However, "[n]either the Second Circuit nor the United States Supreme Court has explicitly answered whether the United States or a plaintiff bears the ultimate burden of proving

the applicability of the discretionary function exception." *Fernandini*, 2019 WL 1033797, at *3 n.1 (quoting *Ruiz ex rel. E.R. v. United States*, 2014 WL 4662241, at *4 n.5 (E.D.N.Y. Sept. 18, 2014)).

Where "a regulation, rule, or statute 'allows the employee discretion,' a 'strong presumption' arises that the employee's acts 'are grounded in policy when exercising that discretion.' " *Enigwe v. Zenk*, 2007 WL 2713849, at *9 (E.D.N.Y. Sept. 14, 2007) (quoting *Gaubert*, 499 U.S. at 324). Pursuant to statute, the BOP has "charge of the management and regulation of all Federal penal and correctional institutions," 18 U.S.C. § 4042(a)(1), and must "provide suitable quarters and provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States," *id.* § 4042(a)(2). The statute "does not direct the BOP how to fulfill [these] duties, nor does the statute mandate particular conduct by the BOP"; rather, "[t]he statute gives the BOP officials great discretion to administer their duties as they see fit." *Ojo v. United States*, 2019 WL 3852391, at *7 (E.D.N.Y. Aug. 15, 2019), *report and recommendation adopted*, 2019 WL 4602823 (E.D.N.Y. Sept. 23, 2019); *see also Fernandini*, 2019 WL 1033797, at *4 (concluding that "decisions regarding the best way to comply with this broad statutory mandate are discretionary in nature"); *Enigwe*, 2007 WL 2713849, at *8 (noting that "in general decisions regarding the best way to safeguard prisoners are discretionary in nature"); *Scrima v. Hasty*, 1998 WL 661478, at *3 (S.D.N.Y. Sept. 24, 1998) ("The absence of specific guidelines of appropriate conduct by BOP officials in administering" their duties to provide suitable quarters and provide for the safekeeping, care, and subsistence of inmates "leaves judgment or choice to BOP officials"). It thus appears that the first prong of the *Berkovitz-Gaubert* test is satisfied.

However, "[t]he inquiry as to whether the discretionary function exception is applicable does not end simply with a finding that a discretionary function is involved." *Scrima*, 1998 WL 661478, at *3. Rather, to fall within the exception, the challenged conduct must be "based on 'considerations of public policy,' since the purpose of the exception is to 'prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Enigwe*, 2007 WL 2713849, at *8 (quoting *Berkovitz*, 486 U.S. at 537)*; see also Hartman v. Holder*, 2009 WL 792185, at *6 (E.D.N.Y. Mar. 23, 2009) (noting that the presumption that arises when a statute or regulation allows a government agent to exercise discretion "is not irrefutable"). Thus, even

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 209 of 340

conduct within the discretion of a government official may not fall within the discretionary function exception.

In this regard, the Second Circuit has held, under the so-called "negligent guard theory," that an official's "lazy or careless failure to perform his or her discretionary duties" are negligent acts that "neither involve an element of judgment or choice within the meaning of *Gaubert* nor are grounded in considerations of governmental policy." *Chen v. United States*, 2011 WL 2039433, at *6 (E.D.N.Y. May 24, 2011), *aff'd*, 494 F. App'x 108 (2d Cir. 2012) (quoting *Coulthurst*, 214 F.3d at 109, 110)*; see also Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 475–76 (2d Cir. 2006); *Young v. United States*, 2014 WL 1115911, at *15 (E.D.N.Y. Mar. 20, 2014) (stating that a "[p]laintiff can overcome the FTCA's discretionary function exception if he can demonstrate that the officers' actions in [his] case were the result of laziness, carelessness, or inattentiveness, rather than grounded in policy considerations"); *Hartman*, 2009 WL 792185, at *7–*8. "Where the negligent guard theory applies, a plaintiff's claims are not barred by the discretionary function exception." *Chen*, 2011 WL 2039433, at *6.

 **\*14** When the facts alleged in a complaint suggest "numerous potential ways" in which a government official's conduct may have resulted in the injuries complained of, and only some of those ways fall within the discretionary function exception while others support a finding of laziness, carelessness or inattentiveness, a court "err[s] in assuming that the negligence alleged in the complaint involved only discretionary functions." *Coulthurst*, 214 F.3d at 109, 110. A court need not determine "the merits of the negligent guard theory in [a particular] case, or even ... its capacity to withstand summary judgment," to allow a claim to proceed at the pleading stage. *Triestman*, 470 F.3d at 476; *see also Aurecchione*, 426 F.3d at 638.

The facts alleged in plaintiffs' Amended Complaint, if believed, could support a finding that the injuries plaintiffs claim to have suffered were caused by the laziness, carelessness, or inattentiveness of Warden Quay and Facilities Manager Maffeo. With respect to MDC's infrastructure, for example, plaintiffs allege that Warden Quay was aware of warning signs about the electricity and heat at the MDC in the weeks leading up to the power outage, and point out in particular that the MDC sustained several power outages in the three months leading up to the January 27, 2019 outage. Am. Compl. ¶¶ 26–29. According to plaintiffs, Con Edison has attributed the January 27, 2019 outage to a failure to

address pre-existing infrastructure problems at the MDC. *Id.* ¶ 39.

Plaintiffs similarly allege that the MDC had been struggling with heating issues for two weeks prior to January 27, 2019. *Id.* ¶¶ 32, 34–35. The inadequate heat during the outage was made worse, plaintiffs allege, by the failure of MDC staff to reset heating controls properly after coils were repaired on January 21, 201. *Id.* ¶ 49.

The Amended Complaint includes similarly specific allegations with respect to the failure of prison officials to address the harsh conditions that ensued after power was lost. For example, despite frigid temperatures, prison officials did not provide detainees with additional blankets or warm clothing. *Id.* ¶¶ 66, 143, 171, 195, 235, 264, 267. Detainees were locked in their cells and no provisions were made for them to be able to make telephone calls or visit the law library. *Id.* ¶¶ 71, 124, 151, 175, 242, 273. Nor were any arrangements made to provide medical care or prescription drugs, even to detainees with serious conditions. *Id.* ¶¶ 82, 224, 245–51, 279–80. Officials apparently took no steps to provide flashlights, clean water, hot food, or clean bedding and laundry. *Id.* ¶¶ 77, 111, 118, 285–88, 291, 310(e)(iv).

According to plaintiffs, Warden Quay did not have a plan in place to address an emergency like the January 27, 2019 power outage before it occurred and took no steps to develop one once power was lost. *Id.* ¶ 310(a). The Warden even failed to transfer detainees who required powered equipment for respiratory support until several days into the outage. *Id.* ¶ 310(c). And when the City of New York offered to provide emergency blankets and generators, Warden Quay declined the offer. *Id.* ¶ 312.

Defendants rely on *Spotts v. United States*, 613 F.3d 559 (5th Cir. 2010) to support their contention that the discretionary function exemption supports dismissal. *Spotts*, however, is readily distinguishable from this case. First, the conditions of confinement challenged in *Spotts* arose in the aftermath of a natural disaster—a hurricane—that no amount of maintenance could have avoided. *Id.* at 563. Moreover, the primary contention made by the plaintiffs in *Spotts* was that the warden declined to evacuate the entire prison in preparation for a natural disaster and not, like here, that prison officials failed to maintain the building properly even after warnings that a loss of power was likely. *Id.* at 563–65. Finally, there is no discussion in *Spotts* of the negligent guard theory pressed by plaintiffs here. *Id.* at 572–73.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 210 of 340

Scott v. Quay, Not Reported in Fed. Supp. (2020)

**\*15**  It is conceivable that the United States could establish that MDC officials engaged in the conduct and made the decisions challenged by plaintiffs based upon considerations of public policy. Indeed, the individual defendants (named only in the *Bivens* claims discussed above) have submitted declarations that tend to support such a conclusion. Decls. of Herman Quay & John Maffeo, Dkt. 65-1. But the well-pleaded allegations of the Amended Complaint may also support a finding that the power outage was the result of careless inattention to the deteriorating infrastructure at the MDC and that the harsh conditions that ensued when power was lost were not properly addressed out of lack of concern and laziness.

For all these reasons, I conclude that plaintiffs have "presented facts that the Court concludes support[ ] a finding that [Quay's and Maffeo's] decisions were careless or inattentive and not rooted in policy considerations. At the Rule 12(b)(1) stage, that is all that is required for plaintiff[s'] cause of action to continue." *Hartman,* 2009 WL 792185, at *11.* I therefore respectfully recommend that defendants' motion to dismiss Scott's and Cerda's FTCA claim against the United States be denied.

**CONCLUSION**

For the reasons stated above, I respectfully recommend that the motion to dismiss be granted with respect to the *Bivens* claims asserted against defendants Quay and Maffeo and denied with respect to the FTCA claim brought by plaintiffs Scott and Cerda against the United States.

Any objections to the recommendations made in this Report must be made within three weeks [5] after filing of this Report and Recommendation and, in any event, on or before December 7, 2020. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). Failure to file timely objections may waive the right to appeal the District Court's order. *See Small v. Sec'y of Health & Human Servs.,* 892 F.2d 15, 16 (2d Cir. 1989) (discussing waiver under the former ten-day limit).

**All Citations**

Not Reported in Fed. Supp., 2020 WL 8611292

---

**Footnotes**

1    The Amended Complaint alleges that plaintiffs experienced a variety of conditions with respect to their medical care. Am. Compl. ¶¶ 86–92 (alleging that before and during the partial power outage, plaintiff Scott had numbness in his hands, a skin fungus requiring topical treatments, and an abscess under his armpit for which he was taking antibiotics and was not seen by a Nurse Practitioner until February 4, 2019 per Court Order); 100, 128–29, 131 (alleging that plaintiff Cerda, who had major depression and anxiety and thought about hurting himself, was not offered any mental health treatment during the partial power outage, and did not report his condition to staff until February 1, 2019); 217–22 (alleging plaintiff Hardy's kidney medication was not delivered to him during the partial power outage, thereby causing pain and swollen glands; he also had "trouble breathing" and his requests for medical care were ignored); 245–51 (alleging that plaintiff Williams, who suffers from hyperthyroidism and takes daily medication, ran out of this medication on February 1, 2019, began experiencing heart palpitations, dizziness, diarrhea, stomach cramps, headaches, anxiety, and nightmares, and was not provided medical care despite his repeated requests during the partial power outage).

2    Defendants also argue that the Supreme Court has never implied a *Bivens* remedy under the Fifth Amendment for pre-trial detainees, like plaintiffs Scott and Cerda, or under the Eighth Amendment for convicted—but not yet sentenced—prisoners, like plaintiff Williams. Defs.' Mem. of Law at 8–9 (citing *Bell v. Wolfish,* 441 U.S. 520, 527–28, 535 (1979); *Lareau v. Manson,* 651 F.2d 96, 102 (2d Cir. 1981)). Because I conclude for other reasons that plaintiffs' claims arise in a new context, I do not reach the question of whether

Scott v. Quay, Not Reported in Fed. Supp. (2020)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 211 of 340

the status of plaintiffs as pre-trial detainees or convicted but not yet sentenced defendants is by itself sufficient to constitute a "new context."

3    Defendants also argue that "plaintiffs have failed to plead any specific facts alleging that Facilities Manager Maffeo personally violated their constitutional rights." Defs.' Mem. of Law at 21. Because I recommend dismissal of plaintiffs' *Bivens* claims on other grounds, I do not consider this alternative argument in support of dismissal of plaintiffs' *Bivens* claim against Maffeo.

4    In the original Complaint, plaintiffs Scott and Cerda asserted two *Bivens* claims against Warden Quay. Compl., Dkt. 1. The Amended Complaint restates the original *Bivens* claims and asserts them on behalf of original plaintiffs Scott and Cerda and newly added plaintiffs Ak, Patel, Hardy, and Williams, and asserts them against original defendant Quay and newly added defendant Maffeo. The Amended Complaint also adds a claim under the FTCA on behalf of plaintiffs Scott and Cerda. Although defendants argue that "the Court lacks jurisdiction over the FTCA claims" brought by plaintiffs Ak, Patel, Hardy, and Williams because "the Amended Complaint was filed before they exhausted their administrative remedies," Defs.' Mem. of Law at 26, it is clear that these plaintiffs do not assert FTCA claims in the Amended Complaint.

5    The Court is giving the parties an additional week to file their objections in light of the Thanksgiving holiday next week.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2025 Thomson Reuters. No claim to original U.S. Government Works.    13

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 212 of 340

Shaw v. United States Marshall, Not Reported in Fed. Supp. (2024)

KeyCite Yellow Flag

Distinguished by Salaman v. Carney, D.Conn., August 22, 2025

2024 WL 4574146
Only the Westlaw citation is currently available.
United States District Court, E.D. New York.

Mia SHAW, Plaintiff,

v.

UNITED STATES MARSHALL [sic], Defendant.

24-CV-5644 (HG) (LB)
|
Signed October 24, 2024

**Attorneys and Law Firms**

Mia Shaw, Staten Island, NY, Pro Se.

## MEMORANDUM & ORDER

HECTOR GONZALEZ, United States District Judge:

**\*1** Plaintiff Mia Shaw brings this *pro se* action against the United States Marshal alleging violations of her civil rights. ECF No. 1 (Complaint). Plaintiff's application to proceed *in forma pauperis* ("IFP") is granted. ECF No. 2 (IFP Motion). However, for the reasons stated below, Plaintiff's complaint is dismissed, without prejudice, for lack of subject matter jurisdiction.

## BACKGROUND

Plaintiff alleges that on May 10, 2024, between approximately 4:30 A.M. and 5:00 A.M., "the U.S. Marshall's [sic] entered" her home on Staten Island "by breaking the door" and destroyed other property in search of a firearm. ECF No. 1 at 5. Plaintiff was not arrested and did not sustain physical injuries. Plaintiff alleges that the United States Marshals did not have a warrant, and "interrogat[ed]" and "threatened" her minor children "in a separate room." *Id.* at 5–6. Plaintiff seeks unspecified money damages. ECF No. 1 at 6.

## LEGAL STANDARD

A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007).[1] "A claim is plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Matson v. Bd. of Educ.,* 631 F.3d 57, 63 (2d Cir. 2011) (quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009)). Although all allegations contained in the complaint are assumed to be true, this tenet is "inapplicable to legal conclusions." *Iqbal,* 556 U.S. at 678.

A *pro se* complaint "must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007). The Court's obligation "to construe a *pro se* complaint liberally" continues to apply "[e]ven after *Twombly*" established the plausibility standard for assessing pleadings. *Newsome v. Bogan,* 795 F. App'x 72, 72 (2d Cir. 2020) (quoting *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009)). However, a district court shall review an in forma pauperis action and dismiss it where it finds the action "(i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B). In addition, "[i]f the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

## DISCUSSION

Plaintiff attempts to bring this action pursuant to *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics,* 403 U.S. 388 (1971) ("*Bivens*"). ECF No. 1 at 4. However, Plaintiff has failed to state a claim under *Bivens.* Under *Bivens,* a plaintiff can sue a federal official or employee in their individual capacity for an alleged constitutional violation in certain specific circumstances. These limited circumstances include a claim under the Fourth Amendment against federal narcotics officers for a warrantless arrest and search, *see Bivens,* 403 U.S. at 397, a claim under the Fifth Amendment for sex discrimination against a congressman, *see Davis v. Passman,* 442 U.S. 228 (1979), and a claim under the Eighth Amendment against federal prison officials for failure to provide adequate medical treatment, *see Carlson v. Green,* 446 U.S. 14 (1980). Claims that do not fall within these and other enumerated specific circumstances cannot proceed under *Bivens. See Ziglar v. Abbasi,* 582 U.S. 120, 135 (2017) (explaining that "expanding the *Bivens* remedy is now disfavored").

Shaw v. United States Marshall, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 213 of 340

**\*2** Recently, the Second Circuit held that claims against officers of the United States Marshals Service ("USMS") cannot proceed under *Bivens* as such claims would impose liability against a new category of defendants. *See Edwards v. Gizzi*, 107 F.4th 81 (2d Cir. July 12, 2024) (per curiam) (affirming district court dismissal of plaintiff's excessive force claim against deputy U.S. Marshals and court security officers). Accordingly, to the extent Plaintiff is attempting to sue individual USMS officers [2] her complaint cannot proceed under *Bivens*.

If Plaintiff seeks to sue the USMS, a federal agency, that claim also cannot proceed under *Bivens*, because under the doctrine of sovereign immunity the USMS is immune from suit. *See Robinson v. Overseas Military Sales Corp.*, 21 F.3d 502, 510 (2d Cir. 1994) (noting that sovereign immunity prevents plaintiffs from bringing *Bivens* actions against the United States, federal agencies, and individual federal defendants in their official capacities); *see also Bravo v. U.S. Marshals Serv.*, 684 F. Supp. 3d 112, 124 (S.D.N.Y. July 26, 2023) (holding that plaintiff's *Bivens* claims against the USMS had to be dismissed because "[t]he Supreme Court has expressly declined to extend *Bivens* liability to federal agencies or other entities") (citing *F.D.I.C. v. Meyer*, 510 U.S. 471, 484–86 (1994) and *O'Donoghue v. United States Soc. Sec. Admin.*, 828 F. App'x 784, 787 (2d Cir. 2020)). As such, the USMS cannot be sued under *Bivens*.

However, the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671–80, provides a waiver of sovereign immunity for injuries arising from the tortious conduct of federal officers acting within the scope of their employment. 28 U.S.C. §§ 2671 *et seq.* Before filing a lawsuit under the FTCA, a plaintiff must file an administrative tort claim with the appropriate federal agency, here the USMS, within "two years after such claim accrues." 28 U.S.C. § 2401(b). The FTCA authorizes suits only against the United States and not against federal agencies or individuals. *Rivera v. United States*, 928 F.2d 592, 609 (2d Cir. 1991) ("The only proper federal institutional defendant in such an action is the United States."); 28 U.S.C. § 2679(b)(1). An FTCA complaint against the United States must be filed with the district court within six months from the date the administrative claim is denied, or if the agency fails to reach a decision on the administrative claim, within six months from the date a plaintiff first presents their claim to the federal agency. 28 U.S.C. § 2675(a). The Court lacks subject matter jurisdiction over an FTCA lawsuit if the plaintiff has not exhausted

their administrative remedies before filing suit. *McNeil v. United States*, 508 U.S. 106, 112–113 (1993); *Adeleke v. United States*, 355 F.3d 144, 153 (2d Cir. 2004) (failure to exhaust administrative remedies is a jurisdictional bar to FTCA claims).

Here, there is no indication that Plaintiff has filed a federal tort claim with the USMS regarding what allegedly occurred at her home on May 10, 2024. And, in any event, she has not named the United States, the only proper defendant in an FTCA claim. Therefore, the Court lacks jurisdiction to entertain an FTCA claim at this time.

\* \* \*

Although district courts typically allow *pro se* plaintiffs an opportunity to amend their complaints, "leave to amend need not be granted when amendment would be futile." *Terry v. Inc. Vill. of Patchogue*, 826 F.3d 631, 633 (2d Cir. 2016). "Where it appears that granting leave to amend is unlikely to be productive ... it is not an abuse of discretion to deny leave to amend." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 62 (2d Cir. 2016). Here, the Court declines to grant Plaintiff leave to amend because the nature of the defects in Plaintiff's claims, as discussed herein, would render any amendment futile. *See, e.g.*, *Bravo*, 684 F. Supp. 3d at 126 (finding that amendment of *pro se* plaintiff's complaint, which attempted to assert *Bivens* claims against the USMS, "would not be productive"); *Davila v. Lang*, 343 F. Supp. 3d 254, 272, 283 (S.D.N.Y. Oct. 23, 2018) (dismissing *pro se* plaintiff's FTCA claim without leave to amend because plaintiff had not demonstrated that he first presented his claim to the appropriate agency and exhausted his administrative remedies).

## CONCLUSION

**\*3** Accordingly, Plaintiff's complaint, filed IFP, is dismissed without prejudice, for lack of subject matter jurisdiction. Because there is no indication that Plaintiff has already filed a federal tort claim with the USMS, the Court cannot entertain a potential claim under the FTCA.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum and Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444–45 (1962).

Shaw v. United States Marshall, Not Reported in Fed. Supp. (2024)

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 214 of 340

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2024 WL 4574146

---

## Footnotes

1     Unless otherwise indicated, when quoting cases, all internal quotation marks, alteration marks, emphases, footnotes, and citations are omitted.

2     The Court notes that Plaintiff did not identify any individual officers of the USMS as defendants in this action.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

149 F.4th 226
United States Court of Appeals, Second Circuit.

Karina SIGALOVSKAYA, Plaintiff-Appellant,

v.

Special Agent Abigail BRADEN, Special Agent Luann
Walter, Special Agent Megan Buckley and Special
Agent Robert Mancene, Individually and in their Official
Capacity as Special Agents, Defendants-Appellees. *

No. 23-7625-cv
|
August Term, 2024
|
Argued December 3, 2024
|
Decided August 27, 2025

Appeal from the United States District Court for the Eastern
District of New York.

**Attorneys and Law Firms**

Jon L. Norinsberg, Jon L. Norinsberg, Esq., PLLC, New York,
NY, for Plaintiff-Appellant.

Dara A. Olds (Varuni Nelson, on the brief), Assistant United
States Attorneys, for Breon Peace, United States Attorney
for the Eastern District of New York, Brooklyn, NY, for
Defendants-Appellees.

Before: Lynch, Lee, and Pérez, Circuit Judges.

**Opinion**

Judge Lee concurs in the judgment in a separate opinion.

Judge Pérez concurs in the judgment in a separate opinion.

Judge Lynch dissents in part in a separate opinion.

Per Curiam:

 **\*227** Plaintiff-Appellant Karina Sigalovskaya brought
claims of false arrest, malicious prosecution, abuse of
process, and the denial of a fair trial against Abigail
Braden, Luann Walter, Megan Buckley, and Robert Mancene
(collectively, "Defendants"), four special agents of the
Homeland Security Investigations ("HSI") unit within the
Department of Homeland Security ("DHS"). These claims

arose from a 2013 incident in which the HSI special agents
allegedly unlawfully entered and searched Sigalovskaya's
home, separated her from her children, and fabricated
evidence by falsely accusing her of making a confession that
ultimately resulted in Sigalovskaya's arrest and subsequent
pretrial detention. Following summary judgment, three
claims and two defendants remained: false arrest and
malicious prosecution claims against Braden and a failure-
to-intervene claim against Mancene. Before trial was set to
commence, Defendants moved for judgment on the pleadings,
contending that the Supreme Court's then-recent decision in
*Egbert v. Boule*, 596 U.S. 482, 142 S.Ct. 1793, 213 L.Ed.2d
54 (2022), foreclosed Sigalovskaya's remaining claims. The
district court granted the motion, concluding that following
*Egbert*, Sigalovskaya has no cause of action under *Bivens v.
Six Unknown Named Agents of Federal Bureau of Narcotics*,
403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). *See
Sigalovskaya v. Braden*, No. 15-CV-34 (LDH), 2023 WL
6385761, at \*4–7 (E.D.N.Y. Sept. 29, 2023). On appeal,
Sigalovskaya challenges the district court's dismissal of her
false arrest and malicious prosecution claims. The judgment
of the district court is affirmed.

Eunice C. Lee, Circuit Judge, concurring:

Appellant Karina Sigalovskaya alleges that during a
warrantless entry and search of her home, a federal law
enforcement officer falsely claimed that she confessed to
taking pornographic images of her own child. According to
Sigalovskaya, this falsified evidence resulted in her arrest on
felony criminal charges, temporary loss of guardianship of her
two children, and placement on the New York sex offender
registry. Although Sigalovskaya's allegations are certainly
grievous, I find that, in keeping with the Supreme Court's
jurisprudence on damages claims against federal officers, the
district court properly concluded that Sigalovskaya does not
have a cause of action under *Bivens* because (1) her claims
are rooted in the alleged fabrication of evidence, which is a
context meaningfully different from that of *Bivens*, and (2)
there are special factors that weigh against extending *Bivens*
here.

**BACKGROUND** [1]

On February 11, 2013, HSI Special Agents Braden, Walter,
Buckley, and Mancene, then employed within the HSI's
Child Exploitation Group, arrived at Sigalovskaya's Brooklyn
apartment, seeking to arrest Evidal Ifraimov, Sigalovskaya's

common-law husband. HSI had been investigating Ifraimov for approximately eight months on allegations of possession of child pornography.

Upon their arrival, the special agents "pound[ed]" on the door and yelled "police." Am. Compl. ¶¶ 9–10, *Sigalovskaya v. Braden*, No. 15-CV-34 (LDH) (E.D.N.Y. Feb. 12, 2016), Dkt. No. 16. After Sigalovskaya immediately answered the door, **\*228** Special Agents Walter, Buckley, and Mancene forced their way into the apartment without obtaining Sigalovskaya's consent to enter. Once inside the apartment, Special Agents Walter, Buckley, and Mancene separated Sigalovskaya from her two children and, again without her consent, searched the apartment after Sigalovskaya informed them that her husband was not home.

While the search was ongoing, Ifraimov called Sigalovskaya. The agents demanded that she answer the call on speakerphone and speak to him in English.

After speaking to Ifraimov, Sigalovskaya received a call from his attorney, who instructed her to tell the police, "Leave my house now, you are trespassing," which Sigalovskaya did. *Id.* ¶¶ 28–29 (emphasis omitted). Despite this directive, the special agents remained in Sigalovskaya's home, conferring amongst themselves for about ten minutes before Special Agent Braden returned to the room where Sigalovskaya was being held and demanded that she write a statement.

Sigalovskaya alleges that Special Agents Walter, Buckley, and Mancene began to "lob[ ]" accusations that she had helped a "grown man"—Ifraimov—"touch a girl inappropriately." *Id.* ¶ 33. Further, Special Agent Braden claimed that she had proof of Ifraimov's unlawful activities and proceeded to show Sigalovskaya two redacted non-pornographic photographs depicting Sigalovskaya's five-year-old daughter from the waist up, clothed in a long-sleeve shirt. When asked if she recognized the girl in the photos and where the photos were taken, Sigalovskaya responded that the girl was her daughter and that it appeared the photos had been taken in one of the rooms of her home. However, Sigalovskaya denied taking the photographs. Notwithstanding this denial, Special Agent Braden "falsely" claimed that Sigalovskaya had confessed to taking the purportedly pornographic photographs and stated that her eleven-year-old son also participated in taking such pictures. *Id.* ¶¶ 47–48. The special agents "then forwarded these false and misleading statements" to the U.S. Attorney's Office for the Eastern District of New York. *Id.* ¶ 52.

"As a result of defendants' false 'evidence,' " Sigalovskaya was arrested and charged with a violation of 18 U.S.C. § 2251(a), sexual exploitation of children, and 18 U.S.C. § 2252(a)(4)(B), certain activities relating to material involving the sexual exploitation of minors. *Id.* ¶ 55. Sigalovskaya was denied bail at her arraignment and consequently held at the Metropolitan Detention Center for approximately three weeks, where she was subjected to invasive strip searches, propositioned by other inmates, and exposed to inmates with communicable diseases.

Then, on March 5, 2013, all charges against Sigalovskaya were dropped following a motion to dismiss filed by the U.S. Attorney's Office. Despite the dismissal, the New York State Administration for Children Services ("ACS") filed a petition to permanently revoke Sigalovskaya's guardianship over her two children, which resulted in Sigalovskaya being unable to see or speak to her children for three months. After multiple court appearances and legal fees, Sigalovskaya regained full custody of her children, but was required to have ACS visit her apartment twice per month for a period of time. Additionally, Sigalovskaya was placed on the New York State Sex Offender Registry.

On January 6, 2015, Sigalovskaya initiated the underlying civil action and filed her amended, operative complaint on February 12, 2016. Following the close of discovery, Defendants moved for summary judgment. On March 15, 2019, the district court granted the motion for summary **\*229** judgment in part, dismissing Sigalovskaya's fair trial claim as duplicative of the malicious prosecution claim, dismissing the abuse of process claim as an unrecognized cause of action under *Bivens*, and dismissing the false arrest and malicious prosecution claims against Special Agents Walter and Buckley, as well as the malicious prosecution claim against Special Agent Mancene, based on a finding that the special agents lacked the kind of personal involvement necessary to sustain these claims against them. However, the district court denied the motion for summary judgment with respect to Sigalovskaya's false arrest and malicious prosecution claims against Special Agent Braden, finding that there remained a genuine dispute of material fact as to whether Special Agent Braden had probable cause to arrest Sigalovskaya. The district court also denied the motion for summary judgment as to Sigalovskaya's false arrest claim against Special Agent Mancene, determining that the claim could proceed under a failure-to-intervene theory. The district

court further concluded that neither Mancene nor Braden were entitled to qualified immunity on summary judgment.

Following the district court's decision, the only remaining claims were the false arrest and malicious prosecution claims against Special Agent Braden and the failure-to-intervene claim against Special Agent Mancene. Although the trial was set for October 7, 2019, due to scheduling conflicts and the COVID-19 pandemic, it was rescheduled for October 11, 2022.

On June 8, 2022, four months before trial was set to begin, the Supreme Court rendered its decision in *Egbert v. Boule*, which held that a plaintiff could not assert a Fourth Amendment excessive force claim and a First Amendment retaliation claim against a U.S. Border Patrol agent under *Bivens*. 596 U.S. at 494, 497, 142 S.Ct. 1793. Thereafter, on September 15, 2022, Defendants filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12(c), contending that, following *Egbert*, Sigalovskaya's false arrest, malicious prosecution, and failure-to-intervene claims presented new contexts under *Bivens* and that special factors militated against extending a *Bivens* remedy for those claims. [2]

On September 29, 2023, after supplemental briefing on the matter, the district court granted the motion for judgment on the pleadings, dismissing Sigalovskaya's remaining claims. Applying the two-step analysis for evaluating *Bivens* claims developed in *Ziglar v. Abbasi*, 582 U.S. 120, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017), and refined in *Egbert*, the district court concluded that: (1) Sigalovskaya's malicious prosecution and failure-to-intervene claims arose as new *Bivens* contexts, since *Bivens* did not involve such claims; (2) although the false arrest claim "ha[d] parallels to *Bivens*," because the federal agency here differed from the federal agency in *Bivens*, and the fabrication of evidence was the primary "focus of [Sigalovskaya's] complaint," the false arrest claim was also a new *Bivens* context; and (3) special factors, including the existence of alternative remedies for relief, foreclosed any *Bivens* remedy for Sigalovskaya's claims. *Sigalovskaya*, 2023 WL 6385761 at *4–6. This appeal followed.

## DISCUSSION

We review a district court's dismissal of a complaint pursuant to a Rule 12(c) motion **\*230** for judgment on the

pleadings *de novo*, "accepting all factual allegations in the [c]omplaint as true and drawing all reasonable inferences in the nonmoving party's favor." *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 78 (2d Cir. 2015) (alterations adopted) (internal quotation marks omitted). Sigalovskaya contends that her Fourth Amendment, false arrest, and malicious prosecution claims should be allowed to proceed to trial as viable *Bivens* claims.

### A. The *Bivens* Framework

In 1971, the Supreme Court rendered its decision in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, recognizing for the first time an implied damages action "to compensate persons injured by federal officers who violated the [Fourth Amendment's] prohibition against unreasonable search and seizures." *Abbasi*, 582 U.S. at 131, 137 S.Ct. 1843 (citing *Bivens*, 403 U.S. at 397, 91 S.Ct. 1999). In the years that followed, the Supreme Court recognized an implied cause of action for constitutional violations in two other contexts. In *Davis v. Passman*, 442 U.S. 228, 248–49, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Court held that under the Due Process Clause of the Fifth Amendment, an administrative assistant had the right to sue a congressman for firing her based on gender discrimination. A year later, in *Carlson v. Green*, 446 U.S. 14, 17–19, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980), the Court recognized the right of prisoners to bring a cruel and unusual punishment claim under the Eighth Amendment against federal prison officials for failing to provide adequate medical treatment.

"These three cases—*Bivens*, *Davis*, and *Carlson*—represent the only instances in which the Court has approved of an implied damages remedy under the Constitution itself." *Abbasi*, 582 U.S. at 131, 137 S.Ct. 1843. In the more than four decades since the Supreme Court last endorsed the creation of an implied cause of action arising from constitutional violations, it has "consistently refused to extend *Bivens* liability to any new context or new category of defendants." *Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001); *see also Egbert*, 596 U.S. at 486, 142 S.Ct. 1793 (citing eleven cases in which the Court declined to create an implied damages remedy under *Bivens*). This is because, as the Supreme Court made clear in *Egbert*, "creating a cause of action is a legislative endeavor ... [a]nd the Judiciary's authority to do so at all is, at best, uncertain." 596 U.S. at 491, 142 S.Ct. 1793.

Though "recognizing a cause of action under *Bivens* is 'a disfavored judicial activity,' " the Supreme Court has not "dispense[d] with *Bivens* altogether." *Id.* (quoting *Abbasi*, 582 U.S. at 135, 137 S.Ct. 1843). To that end, in analyzing a proposed framework under *Bivens*, courts generally apply the two-step framework articulated in *Abbasi*. *See Abbasi*, 582 U.S. at 139, 137 S.Ct. 1843. Under *Abbasi's* two-step framework, a court first considers "whether the case presents 'a new *Bivens* context'—*i.e.*, is it 'meaningfully' different from the three cases in which the [Supreme] Court has implied a damages action." *Egbert*, 596 U.S. at 492, 142 S.Ct. 1793 (alteration adopted) (quoting *Abbasi*, 582 U.S. at 139, 137 S.Ct. 1843). "[I]f a claim arises in a new context," the court then considers whether there are " 'special factors' indicating that the Judiciary is at least arguably less equipped than Congress to 'weigh the costs and benefits of allowing a damages action to proceed.' " *Id.* (quoting *Abbasi*, 582 U.S. at 136, 137 S.Ct. 1843). "[T]h[e]se steps often"—but not necessarily always—"resolve to a single question: whether there is any reason to think that **\*231** Congress might be better equipped to create a damages remedy." *Id.*

## B. New Context Analysis

The Supreme Court's "understanding of a new [*Bivens*] context is broad." *Hernandez v. Mesa*, 589 U.S. 93, 102, 140 S.Ct. 735, 206 L.Ed.2d 29 (2020) (internal quotation marks omitted). Though not exhaustive, factors that give rise to a new *Bivens* context include

> the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Abbasi*, 582 U.S. at 140, 137 S.Ct. 1843.

On appeal, Sigalovskaya concedes that her malicious prosecution claim arises under a new *Bivens* context but contends that the false arrest claim falls squarely within a Fourth Amendment claim under *Bivens*. In finding otherwise, the district court concluded that following *Egbert*, the involvement of a federal agency that differed from the federal agency in *Bivens* was sufficient to create a new context. *See Sigalovskaya*, 2023 WL **6385761**, at \*5. Accordingly, the district court determined that because this case involves HSI special agents rather than agents of the former Federal Bureau of Narcotics, the case at bar "involves a new category of defendants," and thus the false arrest claim presented a new *Bivens* context. *Id.* Sigalovskaya asserts that the district court's determination is erroneous because (1) *Egbert* pronounced no such "new rule" that the difference in agency is now sufficient to find a new context; and (2) if taken to its logical conclusion, the district court's ruling would "preclude Fourth Amendment search-and-seizure claims under *Bivens* altogether" since federal agents no longer work for the defunct Federal Bureau of Narcotics. Appellant's Br. at 24– 26.

Sigalovskaya raises sound and persuasive arguments for why the district court incorrectly concluded that after *Egbert*, the difference in agency alone suffices to find that the false arrest claim presents a new *Bivens* context. First, as Sigalovskaya notes, in *Egbert*, the Supreme Court did not devote *any* substantive discussion to the new context inquiry. Rather, the Court simply noted that the Ninth Circuit accepted, without discussion, that the "Fourth Amendment claim [alleging excessive force] presented a new context for *Bivens* purposes," and then engaged in an in-depth analysis of the special factors inquiry. *Egbert*, 596 U.S. at 494, 142 S.Ct. 1793. Defendants nevertheless argue that *Egbert* does inform the new context analysis of Sigalovskaya's claims because we have, on at least two occasions following *Egbert*, affirmed district court decisions finding that claims raised against "a new category of defendants" presented a new *Bivens* context, *see Lewis v. Bartosh*, No. 22-3060-pr, 2023 WL 8613873, at \*2 (2d Cir. Dec. 13, 2023) (summary order) (internal quotation marks omitted); *Cohen v. Trump*, No. 23-35, 2024 WL 20558, at \*2 (2d Cir. Jan. 2, 2024) (summary order) (internal quotation marks omitted).

However, not only are *Lewis* and *Cohen* non-precedential decisions, but unlike the special agents involved here, the category of defendants in each of those cases is notably distinguishable from the type of law enforcement officers in

*Bivens*. As noted earlier, the Supreme Court has instructed that in determining whether a **\*232** case presents a new *Bivens* context, courts are to consider, among others factors, "the rank of the officers involved" and the "statutory or other legal mandate" under which they operate. *Abbasi*, 582 U.S. at 140, 137 S.Ct. 1843. It is therefore unsurprising that in *Lewis* and *Cohen*, respectively, we summarily affirmed the dismissal of claims against high-ranking officials of the Executive Branch, including a former U.S. President, and Deputy Marshals charged under law with overseeing the protection of the Judicial Branch, where these categories of defendants differ from that of the line-level, criminal law enforcement officers involved in both *Bivens* and the instant action. *See Lewis*, 2023 WL 8613873, at \*1; *Cohen*, 2024 WL 20558, at \*1.

Moreover, as Sigalovskaya convincingly argues, the dismissal of a Fourth Amendment *Bivens* claim based solely on the difference in federal agency would, if taken to its logical conclusion, preclude a damages remedy for any *Bivens* search-and-seizure claim since the Federal Bureau of Narcotics—the agency at issue in *Bivens*—no longer exists. Such a conclusion would be contrary to the Supreme Court's jurisprudence, as the Court has not "dispense[d] with *Bivens*." *Egbert*, 596 U.S. at 491, 142 S.Ct. 1793; *see also Hicks v. Ferreyra*, 64 F.4th 156, 166 (4th Cir. 2023) (The "severe narrowing of the *Bivens* remedy in other contexts does not undermine the vitality of *Bivens* in the warrantless-search-and-seizure context of routine criminal law enforcement.").

While I find the federal agency distinction unpersuasive, the district court did not rely on this argument as the sole basis for its conclusion that Sigalovskaya's false arrest claim arises under a new *Bivens* context. The district court also concluded that the false arrest claim presented a new *Bivens* context because "the focus of [Sigalovskaya's] complaint is the fabrication of evidence that led to her arrest and prolonged detention." *Sigalovskaya*, 2023 WL **6385761**, at \*5. This "type of misconduct," the district court reasoned, was "new" and meaningfully different from the misconduct at issue in *Bivens*—an "illegal entry" into the plaintiff's home "during which agents searched [the home] 'from stem to stern' after [the plaintiff] had been 'manacled' " in front of his wife and children. *Id.* (quoting *Bivens*, 403 U.S. at 389, 91 S.Ct. 1999). I conclude that on this point, the district court did not err.

Sigalovskaya argues that the district court "placed undue emphasis on [her] false confession claim," without recognizing the "extensive search-and-seizure allegations

raised in the complaint that are inextricably intertwined with the false confession allegations. Appellant's Br. at 28, 30–31. Specifically, she contends that the allegations in her complaint fall squarely within *Bivens* because in it, she alleged, among other things, that:

> i) Defendants proceeded to force their way past [Sigalovskaya] into her apartment, without obtaining her consent to enter the premises; ii) Defendants did not have an arrest warrant for [her]; iii) Defendants had not attempted to obtain an arrest warrant for [her] prior to entering her apartment; iv) [a]t the time when Defendant Special Agents entered the apartment on February 11, 2013, Defendants knew that they had no evidence against Plaintiff; v) [w]hen [Sigalovskaya] informed defendant Special Agents that her common-law husband, Evidal Ifraimov, was not home, Defendants began to unlawfully search her apartment; and vi) [o]n the advice of counsel, [Sigalovskaya] instructed Defendants to "leave my house now, you are trespassing," but Defendants refused to do so.

**\*233** *Id.* at 28 (internal quotation marks and emphases omitted). Sigalovskaya asserts that these allegations are "on all four with *Bivens*" given that "[b]oth cases involve a warrantless entry ... a warrantless search inside of Plaintiff's apartment ... [and] a warrantless arrest inside of Plaintiff's residence." *Id.* at 29.

Though Sigalovskaya's complaint contains allegations of an unlawful search and seizure, I am unconvinced that these allegations suffice to find that the claim at issue—the false arrest claim—does not present a new *Bivens* context. First, it is important to note that at this stage of the proceedings, Sigalovskaya's false arrest claim remains viable only against Special Agent Braden. Sigalovskaya has not challenged the district court's grant of partial summary judgment in favor of Defendants, which dismissed the claims against Special Agents Buckley and Walter, and thus, any arguments that Sigalovskaya may have had regarding that decision are abandoned. *See Chunn v. Amtrak*, 916 F.3d 204, 206 n.1 (2d Cir. 2019). Moreover, Sigalovskaya has also expressly stated that she "appeals the District Court's dismissal of her false arrest and malicious prosecution claims, but not her failure to intervene claim." Appellant's Br. at 16 n.2. Thus, the question is whether, as asserted against Special Agent Braden, Sigalovskaya's false arrest claim is in line with *Bivens*. In reviewing the amended complaint at face value, I find that the answer to this question is no.

Importantly, the allegations in the complaint that could give rise to an unlawful search and seizure claim are levied against the other special agents, but not Special Agent Braden. In one paragraph, the complaint states that "Special Agent Luann Walter, Special Agent Megan Buckley, and Special Agent Robert Mancene," *but not Special Agent Braden*, "proceeded to force their way past [Sigalovskaya] into her apartment, without obtaining her consent to enter the premises." Am. Compl. ¶ 12. In a subsequent paragraph, the complaint alleges that "Special Agent Luann Walter, Special Agent Megan Buckley, and Special Agent Robert Mancene," *but not Special Agent Braden*, "immediately separated [Sigalovskaya] from her two children." *Id.* ¶ 13. Thereafter, the complaint states that it was "Special Agent Luann Walter, Special Agent Megan Buckley, and Special Agent Robert Mancene," *but not Special Agent Braden*, who "began frantically searching the apartment." *Id.* ¶ 14. Consequently, Sigalovskaya's complaint charges the other special agents—not the one with whom her false arrest claim remains potentially viable—with unlawfully entering and searching her home, and separating her from her children.

Moreover, Sigalovskaya's complaint makes it clear that what precipitated her arrest, and what is at the crux of her false arrest claim, is the allegation that Special Agent Braden falsely claimed that Sigalovskaya had confessed to taking the purportedly pornographic pictures of her daughter, and then forwarded the fabricated evidence to the U.S. Attorney's Office. *See* Am. Compl. ¶¶ 46–49, 52. Indeed, the complaint expressly states that it was the "false evidence" that resulted in Sigalovskaya's arrest. *Id.* ¶ 55 (internal quotation marks omitted). Thus, though Sigalovskaya alleges that she had been arrested and detained without probable cause, *id.* ¶ 94, unlike the plaintiff in *Bivens*, her false arrest claim centers on the allegation of fabricated evidence, rather than a warrantless search or seizure offending "primarily rights of privacy." *Bivens*, 403 U.S. at 390, 91 S.Ct. 1999; *see also id.* at 408, 91 S.Ct. 1999 (Harlan, *J.*, concurring) ("The personal interests protected by the **\*234** Fourth Amendment are those we attempt to capture by the notion of 'privacy.' ").[3]

In recent years, our sister circuits have found that claims involving the fabrication of evidence present a new *Bivens* context. *See, e.g., Sheikh v. U.S. Dep't of Homeland Sec.*, 106 F.4th 918, 925 (9th Cir. 2024) (finding that a Fourth Amendment claim against HSI agents based on an allegation of fabricated evidence that led to the plaintiff's indictment presented a new context under *Bivens*); *Ahmed v. Weyker*, 984 F.3d 564, 568–70 (8th Cir. 2020) (finding that a false arrest

claim based on a police officer's allegedly false information that led to the plaintiff's warrantless arrest constituted a new context); *Cantú v. Moody*, 933 F.3d 414, 423 (5th Cir. 2019) (concluding that an unlawful seizure claim under the Fourth Amendment presented a new context when the claim was based on officers falsifying affidavits rather than an allegation that the officers "entered his home without a warrant or violated his rights of privacy"); *see also Annappareddy v. Pascale*, 996 F.3d 120, 136 (4th Cir. 2021) (finding that a plaintiff's Fourth Amendment false arrest claim against federal investigators presented a new context, in part, because the "alleged misdeeds" were different than those at issue in *Bivens*, seeing as "sharing information with prosecutors and other investigators" is "a different part of police work than the apprehension, detention, and physical searches at issue in *Bivens*" (quoting *Farah v. Weyker*, 926 F.3d 492, 498–99 (8th Cir. 2019))).

As in these other cases, and as explained above, Sigalovskaya's false arrest claim is rooted in her allegation that Special Agent Braden falsified evidence that resulted in her arrest and prolonged detention, not in any of the allegations surrounding an unlawful search and seizure in her home. Accordingly, while Sigalovskaya's case draws parallels to *Bivens*, in the decades since last endorsing the creation of an implied damages remedy for constitutional violations, the Supreme Court has made clear that "a modest extension [of *Bivens*] is still an extension," *Abbasi*, 582 U.S. at 147, 137 S.Ct. 1843, "even if [the claim] is based on the same constitutional provision," *Hernandez*, 589 U.S. at 103, 140 S.Ct. 735. For these reasons, I find that Sigalovskaya's false arrest claim presents a new *Bivens* context.

## C. Special Factors Analysis

Sigalovskaya argues that even if her false arrest claim presents a new context, there are no special factors counseling against extending *Bivens* to either this claim or the malicious prosecution claim. As to this issue, Sigalovskaya raises three main arguments, none of which I find persuasive.

First, Sigalovskaya argues that *Egbert* and the Supreme Court's more recent *Bivens* cases—*Hernandez* and *Abbasi*—"together ... stand for the proposition that a *Bivens* claim will not lie where 'national security is at issue.' " Appellant's Br. at 34 (quoting *Egbert*, 596 U.S. at 494, 142 S.Ct. 1793). Thus, according to Sigalovskaya, because there are no national security concerns at issue in this case, the special factors identified by the Supreme Court through its

recent jurisprudence are inapplicable here. While it is true that *Egbert*, *Hernandez*, and *Abbasi* arose within the context of national security matters, those cases do not stand for the proposition that the special factors inquiry merely considers **\*235** whether national security concerns are at issue. Rather, the critical question, as analyzed below, is and has always been "whether there is *any* rational reason (even one) to think that *Congress* is better suited to 'weigh the costs and benefits of allowing a damages action to proceed.' " *Egbert*, 596 U.S. at 496, 142 S.Ct. 1793 (quoting *Abbasi*, 582 U.S. at 136, 137 S.Ct. 1843).

But even if Sigalovskaya were correct that the Supreme Court's more recent *Bivens* cases were primarily focused on national security, it is possible, if not probable, that national security concerns could be implicated by extending a *Bivens* remedy to Sigalovskaya's claims against an HSI special agent. As the district court noted, HSI, as the principal investigative body of DHS, operates both nationally *and* internationally. *See Sigalovskaya*, 2023 WL **6385761**, at \*6. Sigalovskaya does not dispute this fact but rather attempts to shift the focus to the fact that the agents here were "domestic law enforcement agents" investigating traditional criminal law. Appellant's Br. at 19–20, 35. However, *Egbert* instructs us that "the special factors analysis" cannot be applied "at such a narrow level of generality" that a court only looks to the claims as asserted against the *specific* federal agent(s) involved in the case. 596 U.S. at 496, 142 S.Ct. 1793 (alteration adopted) (internal quotation marks omitted). Accordingly, the fact that Sigalovskaya has brought claims against a special agent investigating traditional criminal law domestically says little, if anything at all, about the potential implications of extending a *Bivens* remedy to false arrest and malicious prosecution claims against HSI special agents more generally.

Second, Sigalovskaya argues that the district court erred in finding that 8 C.F.R. § 287.10 provided an alternative remedy to her *Bivens* claims because that regulation applies to immigration officers, not HSI agents. Despite Sigalovskaya's arguments to the contrary, following *Egbert*, the grievance procedure under § 287.10 provides an alternative remedy that does foreclose Sigalovskaya's claims.

Section 287.10 provides, in pertinent part, that "[a]ny persons wishing to lodge a complaint pertaining to violations of enforcement standards contained in § 287.8 may contact the Department of Homeland Security, Office of the Inspector General" and that such alleged violations "shall

be investigated expeditiously." 8 C.F.R. § 287.10(a)–(b). Sigalovskaya contends that this regulation only applies to immigration officers because § 287.8, which is incorporated by reference, states that the "standards for enforcement activities contained in this section must be adhered to by every immigration officer involved in enforcement activities," *id.* § 287.8. But under that regulation, immigration officers encompass special agents. *See id.* § 287.8(a)(1) (iv) (providing that special agents who have completed basic immigration law enforcement training are considered immigration officers that have the authority to use non-deadly force when appropriate). Also, Sigalovskaya's own complaint acknowledges that HSI is a part of U.S. Immigration and Customs Enforcement ("ICE"). Am. Compl. ¶ 7. Accordingly, it is not unreasonable—as Sigalovskaya suggests—for § 287.10 to apply to HSI special agents, even though it is listed under the subchapter of DHS's regulations governing "Immigration Regulations."

Lastly, Sigalovskaya argues that there is no reason to question whether the judiciary is less equipped to weigh the costs and benefits of allowing her false arrest and malicious prosecutions claims to proceed to trial given that federal courts, particularly those within this Circuit, are uniquely qualified to adjudicate constitutional claims **\*236** against law enforcement officials based on allegations of fabricated evidence. A similar argument was rejected by the Supreme Court in *Egbert*. There, the Court held that the Ninth Circuit erred in extending *Bivens* to the plaintiff's First Amendment claim on the basis that "retaliation claims are 'well-established,' " explaining that "just because plaintiffs often plead unlawful retaliation to establish a First Amendment violation is not a reason to afford them a cause of action to sue federal officers for money damages." *Egbert*, 596 U.S. at 499–500, 142 S.Ct. 1793. Thus, following *Egbert*, Sigalovskaya's argument regarding "this Circuit's jurisprudence on fabricated evidence claims," Appellant's Br. at 42, is not a basis to provide a *Bivens* remedy for her claims. For these reasons, I find that there are special factors counseling against extending *Bivens* to Sigalovskaya's false arrest and malicious prosecution claims.

\* \* \*

Had Sigalovskaya's claims been asserted against state officers, she would have an explicit damages remedy afforded by 42 U.S.C. § 1983. But in the more than fifty years since the Supreme Court decided *Bivens*, "Congress [has] not provide[d] a specific damages remedy for plaintiffs whose

constitutional rights were violated by agents of the Federal Government." *Abbasi,* 582 U.S. at 130, 137 S.Ct. 1843. Against this backdrop, the Supreme Court has made clear that expanding the *Bivens* remedy is a "disfavored judicial activity," *id.* at 135, 137 S.Ct. 1843 (internal quotation marks omitted), and that courts should be wary of doing so when "there is *any* rational reason (even one) to think that *Congress* is better suited to weigh the costs and benefits of allowing a damages action to proceed," *Egbert,* 596 U.S. at 496, 142 S.Ct. 1793 (internal quotation marks omitted). Remaining faithful to the Supreme Court's firm guidance, I conclude that, for the reasons stated above, Sigalovskaya has no cause of action in this case and her amended complaint was properly dismissed.

Myrna Pérez, Circuit Judge, concurring:

We may dispose of this case for the identical reason that the Supreme Court set forth in *Egbert v. Boule,* 596 U.S. 482, 142 S.Ct. 1793, 213 L.Ed.2d 54 (2022). Sigalovskaya, like the plaintiff in *Egbert,* may avail herself of a particular remedial structure set forth within the Department of Homeland Security's ("DHS's") regulations. I therefore concur in affirming the grant of judgment on the pleadings to the defendants in this case. Sigalovskaya's false-arrest claim otherwise likely presents no new *Bivens* context, but we need not consider that question today.

Sigalovskaya's claims may not proceed here because the Supreme Court has instructed that where "Congress has provided alternative remedies for aggrieved parties," that alternative remedial structure "*independently* foreclose[s] a *Bivens* action. *Id.* at 497, 142 S.Ct. 1793 (emphasis added). "So long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy." *Id.* at 498, 142 S.Ct. 1793. Put differently, an alternative remedial scheme "alone" is a "special factor" under the Supreme Court's *Bivens* jurisprudence that terminates the action. *Id.* at 493, 142 S.Ct. 1793 (quoting *Ziglar v. Abbasi,* 582 U.S. 120, 137, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017)).

Here, Congress has provided for just such an alternative remedial scheme—the very same one that the Supreme Court found independently dispositive in *Egbert.* Under 8 C.F.R. § 287.10(a), DHS must "expeditiously" investigate "[a]lleged violations of [its] standards for enforcement **237** activities." *See also id.* § 287.10(b) (establishing a grievance process). Given that this regulation "independently

foreclose[d] relief in *Egbert,* *see* 596 U.S. at 497, 142 S.Ct. 1793, that is enough to end our inquiry here. *See Sigalovskaya v. Braden,* No. 15-CV-34 (LDH), 2023 WL **6385761**, at *6 (E.D.N.Y. Sept. 29, 2023) (conducting a similar analysis below).[1]

If I were to consider whether Sigalovskaya's suit presents a "new context" today, I would find no meaningful daylight between Sigalovskaya's false-arrest claim and the claim presented in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).[2] For over fifty years, the Supreme Court has repeatedly declined to overrule *Bivens. See Egbert,* 596 U.S. at 490–91, 142 S.Ct. 1793; *Hernandez v. Mesa,* 589 U.S. 93, 103, 140 S.Ct. 735, 206 L.Ed.2d 29 (2020); *Ziglar,* 582 U.S. at 131, 134, 137 S.Ct. 1843. Rather, plaintiffs may bring *Bivens* actions against federal officers who have committed certain alleged constitutional violations that resemble *Bivens* claims the Court has previously recognized. *See Egbert,* 596 U.S. at 490–92, 142 S.Ct. 1793.

In *Bivens,* the plaintiff claimed that the defendant agents made a warrantless entry into his apartment, searched it, and arrested him on narcotics charges. 403 U.S. at 389, 91 S.Ct. 1999. He alleged, among other things, that the arrest was effectuated without probable cause, in violation of the Fourth Amendment. *Id.* Sigalovskaya's complaint here hews closely to those facts and to that legal claim. That she additionally alleged that the government fabricated evidence in effecting her false arrest does not transform that claim into a legally distinct one for purposes of any "new context" inquiry. Respecting precedent, we must not parse *Bivens* actions before us with so discerning an eye that we fail to heed the Court's instruction that *Bivens* claims may, under certain previously recognized contexts, proceed. Here, at bottom, Sigalovskaya, just like Bivens, alleged that federal government agents lacked probable cause, but proceeded with her arrest.

The Supreme Court has repeatedly recognized *Bivens* actions in the contexts it has delineated, where special factors do not counsel otherwise. Here, the alternative remedial structure is a special factor that independently precludes relief. I would decide this case based solely on the DHS regulation that sufficed in *Egbert* and leave to another panel, on another day, the appropriate manner for going about a "new context" inquiry where such a remedial structure is absent.

Gerard E. Lynch, Circuit Judge, dissenting in part:

Sigalovskaya's false arrest claim does not present a new context. And because **\*238** that is sufficient for her false arrest claim to survive Defendants' motion for judgment on the pleadings, I respectfully dissent in part from the judgment affirming the dismissal of that claim. I concur in the judgment insofar as it affirms the dismissal of Sigalovskaya's claim for malicious prosecution, as allowing that claim would extend *Bivens* to a new context and special factors counsel against recognizing such a claim.

To determine whether Sigalovskaya has alleged a viable *Bivens* claim, we first must assess whether her claim arises in "a new *Bivens* context." *Egbert v. Boule*, 596 U.S. 482, 492, 142 S.Ct. 1793, 213 L.Ed.2d 54 (2022) (internal quotation marks omitted). For a case to present a new context, the case must be "different in a *meaningful* way from previous *Bivens* cases decided by [the Supreme] Court." *Ziglar v. Abbasi*, 582 U.S. 120, 139, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017) (emphasis added).

Like Judge Pérez, I see no meaningful difference between Sigalovskaya's false arrest claim and the unreasonable search and seizure claim in *Bivens* because just like the plaintiff in *Bivens*, Sigalovskaya alleges that her arrest was effectuated "without probable cause" in violation of the Fourth Amendment. Joint App'x 54 ¶ 94; *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388, 389, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (characterizing Bivens's complaint as alleging that his "arrest was made without probable cause"). The fact that the lack of probable cause in this case stemmed from Defendants' alleged fabrication of evidence whereas the lack of probable cause in *Bivens* did not is of no moment. Sigalovskaya's arrest violated the Fourth Amendment, if the allegations in her amended complaint are true, because the arresting agents – just like the agents in *Bivens* – lacked evidence sufficient to create probable cause to believe that she committed a crime. That Defendants *pretended* that they did have such evidence is not a *meaningful* difference because the core issue – an arrest without probable cause – is the same in both cases. [1]

To conclude that such a factual difference is sufficient for Sigalovskaya's false arrest claim to present a new context, as Judge Lee suggests, would effectively overrule *Bivens* without saying so. That is because it is highly improbable that any case will present the same exact facts that were present in *Bivens*. Accordingly, imbuing minute factual distinctions

with legal significance does not seem faithful to the Supreme Court's admonition that *Bivens* is still good law, *see Egbert*, 596 U.S. at 491, 142 S.Ct. 1793, and I share the concerns voiced in the dissent in *Edwards v. Gizzi* that drawing fine factual distinctions to conclude a case presents a new context in effect overrules *Bivens* "*sub silentio*." 107 F.4th 81, 90–91 (2d Cir. 2024) (Parker, J., dissenting).

Because Sigalovskaya's false arrest claim does not present a new context, I would not reach the second step of the analysis, which requires us to evaluate "if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed." **\*239** *See Egbert*, 596 U.S. at 492, 142 S.Ct. 1793 (internal quotation marks omitted). The Supreme Court has made clear that the purpose of the special factors analysis is to determine if there is a "reason to pause before applying *Bivens* in a *new context* or to a new class of defendants." *Hernandez v. Mesa*, 589 U.S. 93, 102, 140 S.Ct. 735, 206 L.Ed.2d 29 (2020) (emphasis added). It therefore follows that if a case does not present a new context, there is no need to reach the second step of the analysis. I accordingly disagree with Judge Pérez that the mere presence of a special factor, here, an alternative remedial regime, is sufficient to preclude a *Bivens* remedy for Sigalovskaya's false arrest claim. Because *all* law enforcement agencies have internal disciplinary procedures for investigating and punishing rogue agents, that rationale too would represent a de facto overruling of *Bivens*.

It is telling that here, as in *Edwards*, a majority of the panel dismisses a *Bivens* claim without being able to agree on a rationale for distinguishing *Bivens*. See *Edwards*, 107 F.4th at 82 (Park, J. concurring): *id.* at 86–87 (Robinson, J., concurring). I sympathize with my colleagues' plight. They are doing what the Supreme Court appears to want them to do, when the Supreme Court has not offered a coherent, intellectually honest basis for reflexively distinguishing cases that are "materially indistinguishable" from *Bivens* itself, *see Egbert*, 596 U.S. at 513, 142 S.Ct. 1793 (Sotomayor, J., concurring in part and dissenting in part), while solemnly stating that *Bivens* is still good law, *see id.* at 491, 142 S.Ct. 1793; *Ziglar*, 582 U.S. at 134, 137 S.Ct. 1843. Four Justices recognized in *Egbert* that this charade is untenable. *See Egbert*, 596 U.S. at 503–04, 142 S.Ct. 1793 (Gorsuch, J., concurring); *id.* at 526–27, 142 S.Ct. 1793 (Sotomayor, J., joined by Breyer and Kagan, JJ., dissenting in part and concurring in part).

I cannot say it better than Judge Parker so eloquently put it in *Edwards*:

> [T]he fact that the Supreme Court continues to express serious doubts about *Bivens*' future does not, in my view, grant a license to *sub silentio* do for the Supreme Court what it has thus far been unwilling to do itself. If the Supreme Court plans to take away important protections against constitutional violations and allow federal officials to act unconstitutionally without

consequence unless and until Congress acts, then it should face the nation and say as much. It should not delegate that work to us.

*107 F.4th at 91.*

I therefore respectfully dissent from the judgment affirming the dismissal of Sigalovskaya's false arrest claim.

**All Citations**

149 F.4th 226 (Mem)

---

### Footnotes

\*    The Clerk of the Court is respectfully directed to amend the case caption as set forth above.

1    The factual allegations in Sigalovskaya's operative amended complaint are accepted as true for the purposes of these proceedings.

2    On August 26, 2022, Defendants filed a letter, giving Sigalovskaya and the district court notice of their intent to file the motion for judgment on the pleadings. On September 15, 2022, Defendants' motion, along with Sigalovskaya's opposition, was formally filed with the district court.

3    Notably, Sigalovskaya does not meaningfully dispute the district court's finding that although "the amended complaint contains allegations concerning the Defendants search of her home, ... [Sigalovskaya] does not bring a cause of action based upon those facts." *Sigalovskaya*, 2023 WL **6385761**, at *5 n.4.

1    The investigation and grievance mechanisms described in § 287.10 apply to "immigration officer[s]" in the Department of Homeland Security. *See* 8 C.F.R. § 287.8; *see id.* § 287.10(a) (incorporating § 287.8 by reference). In consulting a DHS organizational chart, the defendant Homeland Security Investigations agents are organized under DHS's Immigration and Customs Enforcement ("ICE"). *See Organizational Structure*, U.S. Immigr. & Customs Enf't, https://www.ice.gov/leadership/organizational-structure [https://perma.cc/3G2Y-B6XM] (last visited Nov. 14, 2024). In our procedural posture, we may properly take judicial notice of this fact. *See Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) ("When considering a motion made pursuant to Rule 12(b)(6) [or Rule 12(c)] we may take judicial notice of documents from official government websites." (internal quotation marks and citation omitted)).

2    In contrast, Sigalovskaya's malicious-prosecution claim, as her counsel conceded at oral argument, appears to raise a new context. *See* Oral Arg. Audio Recording at 8:41–9:30.

1    Nor does this case present a new context, as Defendants argue, because the arresting agents were from the Department of Homeland Security, while the federal agents in *Bivens* were from the Federal Bureau of Narcotics. *See Bivens*, 403 U.S. at 389, 91 S.Ct. 1999. But as Judge Lee correctly points out, the Federal Bureau of Narcotics does not exist anymore. Accordingly, if *Bivens* is still good law, the liability it creates

cannot be escaped merely by changing the name of the agency for which the officers work, any more than by changing the shape or colors of their badges.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Silva v. Canarozzi, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 226 of 340

2019 WL 1596346
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

Gerald J. SILVA, Plaintiff,

v.

M. CANAROZZI, et al., Defendants.

CASE NO. 3:18-cv-1771 (MPS)

|

Signed 04/15/2019

**Attorneys and Law Firms**

Gerald J. Silva, Danbury, CT, pro se.

## INITIAL REVIEW ORDER

Michael P. Shea, United States District Judge

**\*1** Plaintiff Gerald J. Silva, currently incarcerated at the Federal Correctional Institution in Danbury, Connecticut, filed this case under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics,* 403 U.S. 388 (1971), against seven defendants: Counselor M. Canarozzi, Counselor G. Hornkohl, Case Manager J. Draper, Unit Manager S. Moore, Warden D.K. Williams, Regional Director Michael Carvajal, and Federal Bureau of Prisons Director Mark S. Inch. Silva contends that the defendants discriminated and retaliated against him, denied him due process, and defamed him. He seeks damages and injunctive relief from the defendants in their individual and official capacities. For the reasons set forth below, the complaint is DISMISSED pursuant to 28 U.S.C. § 1915A(b)(1).

### I. Legal Standard

The Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. 28 U.S.C. § 1915A. This requirement applies to all prisoner filings regardless whether the prisoner pays the filing fee. *Nicholson v. Lenczewski,* 356 F. Supp. 2d 157, 159 (D. Conn. 2005) (citing *Carr v. Dvorin,* 171 F.3d 115 (2d Cir. 1999) (per curiam) ). Here, Silva paid the filing fee.

Although detailed allegations are not required, the complaint must include sufficient facts to afford the defendants fair notice of the claims and the grounds upon which they are based and to demonstrate a plausible right to relief. *Bell Atlantic v. Twombly,* 550 U.S. 544, 555–56 (2007). Conclusory allegations are not sufficient. *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The plaintiff must plead "enough facts to state a claim to relief that is plausible on its face." *Twombly,* 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). The Court must construe *pro se* pleadings liberally, *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009), and interpret them to raise the "strongest arguments that they suggest." *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 472 (2d Cir. 2006). To plead a cognizable legal claim, however, a *pro se* plaintiff must meet the standard of facial plausibility. *See Hogan v. Fischer,* 738 F.3d 509, 515 (2d Cir. 2013) ("[A] *pro se* complaint must state a plausible claim for relief.") (citing *Harris v. Mills,* 572 F.3d 66, 73 (2d Cir. 2009) ).

### II. Allegations in the Complaint

On February 27, 2018, defendant Canarozzi filed a false incident report stating that the plaintiff had installed a curtain on his bed. The curtain had been installed by another inmate on a bed that was not assigned to Silva. ECF No. 1, ¶ 1. Defendant Canarozzi falsely stated in the report that he previously had counseled the plaintiff twice about the curtain. *Id.,* ¶ 2. Silva considers the report defamatory—"a permanent 'black mark' on [his] otherwise stellar prison record and personal reputation." *Id.,* ¶ 3.

**\*2** Defendants Hornkohl and Draper reviewed the report with Silva the following day. He presented his evidence that the report was false. *Id.,* ¶ 4. Defendants Hornkohl and Draper did not agree with his arguments and sanctioned him with loss of commissary privileges. *Id.,* ¶ 6. Defendants Hornkohl and Draper did not investigate the charges. Silva contends that they were negligent and biased against him. *Id.,* ¶ 7.

Defendant Moore reviewed the incident report and sanctions without investigating. *Id.,* ¶ 9. She did not meet or communicate with the plaintiff before making her decision. *Id.,* ¶ 10. Silva exhausted his administrative remedies by appealing the disciplinary charge to the warden, Regional Office, and Central Office. *Id.,* ¶ 12.

Following this incident, "the administration" retaliated against the plaintiff. He was subjected to unnecessary and unwarranted urine screenings. One screening was conducted at 4:00 a.m. on June 14, 2018. The plaintiff was awakened from a deep sleep causing the return of "severe medical symptoms." *Id.*, ¶ 15. The plaintiff characterizes these actions as medical abuse in addition to retaliation. *Id.*, ¶ 16.

Although many inmates were hanging temporary partitions, including complete bed enclosures, when the incident report was filed and continue to do so, defendant Canarozzi did not discipline any other inmate. *Id.*, ¶ 17. Because another inmate continued to hang partitions near the plaintiff's bed, the plaintiff stopped using his bed for personal and "medical purposes. *Id.*, ¶ 20. This interfered with the plaintiff's "self-care plans for chronic medical issues." *Id.*, ¶ 21.

### III. Discussion

#### A. Money Damages

Plaintiff filed this action under *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971). *Bivens* permits suits against federal officials for certain constitutional violations in their individual capacities for money damages. *See FDIC v. Meyer*, 510 U.S. 471, 485-86 (1994) (*Bivens* authorized lawsuits for monetary damages against federal officials in their individual capacities only); *Caraveo v. U.S. Equal Emp't Opportunity Comm'n*, 96 F. App'x 738, 740 (2d Cir. 2004) ("Bivens actions, however, do not lie against ... federal employees sued in their official capacities."). *Bivens* allows suits only against officials who personally commit conduct proscribed by the Constitution. Thus, "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Iqbal*, 556 U.S. at 676.

The plaintiff alleges that defendant Canarozzi issued him a false disciplinary report, and the report was defamatory; defendants Hornkohl, Draper, and Moore negligently failed to investigate the matter; "the administration" retaliated against him by subjecting him to unwarranted urine screenings that disturbed his sleep; and defendant Canarozzi failed to issue disciplinary reports to other inmates for hanging partitions, thereby singling him out.

To date, the Supreme Court has recognized a *Bivens* remedy for three constitutional violations: (1) unreasonable searches and seizures under the Fourth Amendment, *Bivens*, 403 U.S. 388; gender discrimination in employment under the Due Process Clause of the Fifth Amendment, *Davis v. Passman*, 442 U.S. 228 (1979); and the imposition of cruel and unusual punishment under the Eighth Amendment, *Carlson v. Green*, 446 U.S. 14 (1980). The Supreme Court has explained that "expanding the *Bivens* remedy is now a disfavored judicial activity," and it has therefore "consistently refused to extend *Bivens* to any new context or new category of defendants." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1857 (2017) (citations omitted); *accord Correctional Servs. Corp. v. Malesko*, 534 U.S. 61, 75 (2001) (Scalia, J., concurring) ("*Bivens* is a relic of the heady days in which this Court assumed common-law powers to create causes of action—decreeing them to be 'implied' by the mere existence of a statutory or constitutional prohibition.... [W]e have abandoned that power to invent 'implications' in the statutory field. There is even greater reason to abandon it in the constitutional field, since an 'implication' imagined in the Constitution can presumably not even be repudiated by Congress.") (citations omitted). Indeed, the Supreme Court has not recognized a new *Bivens* remedy since 1980. "*Ziglar* also made it clear that the only recognized implied rights of action were the narrow situations presented in *Bivens, Davis,* and *Carlson,* and lower courts must scrutinize attempts to expand the Bivens remedy, even where courts had assumed the availability of such a remedy." *Gonzalez v. Hasty*, 269 F. Supp. 3d 45, 57 (E.D.N.Y. 2017), aff'd, 755 F. App'x 67 (2d Cir. 2018).

**\*3** The plaintiff asserts constitutional claims and tort claims. His constitutional claims are based on violation of his Fifth Amendment right to due process and his First Amendment right to be free from retaliation. None of these claims has been recognized by the Supreme Court or the Second Circuit as a cognizable *Bivens* claim. *See, e.g., Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) ("We have never held that *Bivens* extends to First Amendment claims."). Further, "the existence of alternative remedies usually precludes a court from authorizing a *Bivens* action." *Ziglar*, 137 S. Ct. at 1865. A federal prisoner may challenge the execution of his sentence, including prison disciplinary actions and prison conditions, by filing a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241. *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008). ("This court has long interpreted § 2241 as applying to challenges to the execution of a federal sentence, including such matters as the administration of parole, prison disciplinary actions, prison transfers, type of detention and prison conditions.") (quotation marks and alterations omitted). [1] In light of this alternative avenue

Silva v. Canarozzi, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 228 of 340

for relief and the Supreme Court's expressed reluctance to recognize new causes of action under *Bivens*, I decline to extend *Bivens* to encompass Silva's claims here. *See Ojo v. United States*, 2019 WL 1025225, at *7–*10 (E.D.N.Y. Mar. 4, 2019) (declining to imply a *Bivens* remedy for prisoner's equal protection claim challenging prison dental policy). Silva also asserts tort claims for negligence and defamation. Negligence is not cognizable in a *Bivens* action. *See Schweiker v. Chilicky*, 487 U.S. 412, 447 (1988) (holding that "in order to prevail in any *Bivens* action," a plaintiff "must ... prove a deliberate abuse of governmental power rather than mere negligence"). Silva's claims under *Bivens* are therefore dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

Claims based on the negligent or wrongful acts or omissions of federal employees must be brought under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b). *See* 28 U.S.C. § 2679(b)(1) (claim against the United States under the FTCA is exclusive remedy for tort claims against federal employee); *see also Castro v. United States*, 34 F.3d 106, 110 (2d Cir. 1994) ("[A] claimant's exclusive remedy for non-constitutional torts by a government employee acting within the scope of his employment is a suit against the government under the FTCA.") (citations omitted). I decline to construe Silva's tort claims as filed under the FTCA. The FTCA has several jurisdictional requirements, including that a lawsuit cannot be filed unless the claim has been presented to the appropriate federal agency, here the Federal Bureau of Prisons. *See Cooke v. United States*, 918 F.3d 77 (2d Cir. 2019). As presented, the claim must include notification of the incident and a request for money damages in a sum certain. 28 C.F.R. § 14.2(a). Although Silva alleges that he "completed and exhausted ... all governmental administrative remedies" by appealing the disciplinary finding, he has not attached copies of the remedies. I cannot determine whether the administrative appeals the Silva describes would satisfy the FTCA filing requirement. In addition, Silva does not indicate whether he has presented his First Amendment retaliation claim or his Due Process claims to the Bureau of Prisons in any form.

For the foregoing reasons, Silva's claims for money damages against the defendants in their individual and official capacities are DISMISSED.

## B. Injunctive Relief

In addition to money damages, Silva requests several forms of injunctive relief. Injunctive relief is not available in a *Bivens* action. *See Polanco v. U.S. Drug Enforcement Admin.*, 158 F.3d 647, 652 (2d Cir. 1998) (noting that *Bivens* action is "(by definition) a claim for money damages"). Nevertheless, "[i]f a pro se litigant pleads facts that would entitle him to relief, that petition should not be dismissed because the litigant did not correctly identify the statute or rule of law that provides the relief he seeks." *Thompson v. Choinski*, 525 F.3d 205, 209 (2d Cir. 2008). "A motion pursuant to § 2241 generally challenges the execution of a federal prisoner's sentence, including such matters as ... prison disciplinary actions ... and prison conditions." *Jiminian v. Nash*, 245 F.3d 144, 146 (2d Cir. 2001).

Even assuming habeas relief is available, Silva's due process claims fail on the merits. Silva asserts that the defendants violated his right to due process by failing to investigate and reverse defendant Canarozzi's false disciplinary report. "In order to establish a violation of due process, a petitioner must demonstrate that he or she possessed a life, liberty or property interest, a government official deprived him of one of those interests, and the procedures provided prior to the deprivation of that interest were constitutionally inadequate or insufficient." *Anderson v. Williams*, No. 3:15CV1364 (VAB), 2017 WL 855795, at *7 (D. Conn. Mar. 3, 2017). "[A] prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." *Tellier v. Fields*, 280 F.3d 69, 80 (2d Cir. 2000) (alterations omitted).

**\*4** Silva alleges that the defendants placed a "black mark" in his record and deprived him of his commissary privileges without due process. The Second Circuit has held that a prisoner placed in administrative confinement after an alleged disciplinary infraction did not face an "atypical and significant" deprivation giving rise to a protected liberty interest where the administrative confinement lasted fewer than 101 days. *Sealey v. Giltner*, 197 F.3d 578, 589–90 (2d Cir. 1999) ("The conditions of the Auburn SHU are doubtless unpleasant and somewhat more severe than those of general population, but the degree of incremental harshness, endured for 101 days, is not an atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.") (quotation marks omitted). Courts in this circuit have routinely held that that "temporary deprivations of privileges, such as commissary trips and telephone use, do not meet the standard of an atypical and significant hardship." *Pottinger v. Sanchez*, No. 3:15-cv-1236 (VLB), 2016 WL 1254200,

Silva v. Canarozzi, Not Reported in Fed. Supp. (2019)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 229 of 340

at *4 (D. Conn. Mar. 29, 2016) (collecting cases). Silva does not allege that he suffered any other concrete adverse consequence because of the false disciplinary report, nor does he not provide any basis to conclude that he has a protected interest in having a blemish-free record. As a result, Silva has not pled facts supporting an inference that he was deprived a protected property or liberty interest, and he has failed to state a claim for relief under the Due Process Clause.

Next, Silva contends that the prison "administration" under the supervision of defendant Williams retaliated against him for appealing the disciplinary report by waking him up at 4:00 a.m. for an unwarranted urine screening. "[T]o sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004) (quotation marks omitted). Courts "approach prisoner retaliation claims "with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act." Dorsey v. Fisher, 468 F. App'x 25, 27 (2d Cir. 2012).

Even assuming Silva has stated a claim for First Amendment retaliation, the injunctive relief he requests is not available under § 2241. Federal prisoners may challenge the execution of their sentence, including the conditions of confinement, by seeking a writ of habeas corpus. The injunctive relief that Silva requests is not related to the conditions of his confinement. For example, he requests "letters of apology from all of the defendants individually," and an order requiring the Bureau of Prisons to "replace the false incident report with copies of the [a]fore[ ]mentioned letters of apology in all systems and files." ECF No. 1 at 13, ¶¶ 1, 3. Silva does not contend that the presence of the disciplinary report in his file has had any material impact on the duration or conditions of his confinement. He does not request that the Court require the defendants to reinstate his commissary privileges—the only deprivation he articulates in his complaint arguably related to the conditions of confinement. The writ of habeas corpus is "an extraordinary remedy ... [and] its use has been limited to cases of special urgency...." Hensley v. Mun. Court, San Jose Milpitas Judicial Dist., Santa Clara Cty., California, 411 U.S. 345, 351, 93 S. Ct. 1571, 1575, 36 L.Ed. 2d 294 (1973). It is not available to remedy a subjective reputational harm without some connection between that harm and the execution of Silva's sentence. [2]

#### IV. Conclusion

**\*5** The complaint is dismissed without prejudice pursuant to 28 U.S.C. § 1915A and the Clerk is directed to close this case. Within **thirty days** of this order, Silva may file a motion to reopen together with an amended complaint in which he attempts to address the defects identified in this ruling or otherwise to plead a cognizable claim, including any claim for equitable relief under 28 U.S.C. § 2241.

**SO ORDERED** this 15th day of April 2019 at Hartford, Connecticut.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 1596346

---

### Footnotes

1    "[H]abeas corpus does not provide for money damages." Jenkins v. Haubert, 179 F.3d 19, 24 (2d Cir. 1999).

2    Silva also requests broader injunctive relief that appears unrelated to the factual allegations in his complaint. For example, he seeks "court appointed external monitoring and oversight" over the Bureau's petition process, "especially for those alleging retaliatory behaviors." ECF No. 1 at 13, ¶ 8. He does not allege that he ever filed a petition complaining of retaliatory behaviors. He also requests an order requiring the Bureau to "re-install the fixed privacy/sanitation partitions in the housing units." Id., ¶ 10. He does not allege that he ever sought to install such a partition, and the crux of his complaint in this case is that he was falsely accused of doing so.

**Silva v. Cañarozzi, Not Reported in Fed. Supp. (2019)**

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 230 of 340

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 6065027
Only the Westlaw citation is currently available.
United States District Court, W.D. New York.

Dana SMITH, Plaintiff,

v.

Richard ARROWOOD, Charles Carroll,
and Christian Devinney, Defendants.

6:21-CV-6318 EAW
|
Signed September 18, 2023

**Attorneys and Law Firms**

Ted A. Barraco, Pittsford, NY, for Plaintiff.

John M. Campolieto, City of Rochester Law Department, Rochester, NY, Mary K. Roach, U.S. Attorney's Office, Buffalo, NY, for Defendant Richard Arrowood.

**DECISION AND ORDER**

ELIZABETH A. WOLFORD, Chief Judge

**INTRODUCTION**

 *1  Plaintiff Dana Smith ("Plaintiff") filed this action seeking relief under 42 U.S.C. § 1983 and *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971), for violations of his Fourth and Fourteenth Amendment rights and other state law claims. (Dkt. 1). Before the Court is a motion to dismiss filed by defendants Charles Carroll ("Defendant Carroll") and Christopher DeVinney ("Defendant DeVinney") (collectively, "the Moving Defendants"). (Dkt. 39). Because the second amended complaint fails to state a cognizable *Bivens* claim against the Moving Defendants, the motion to dismiss is granted.

**DISCUSSION**

**I. Factual Background**

The following facts are taken from Plaintiff's second amended complaint (Dkt. 34). As required on a motion to dismiss, the Court treats Plaintiff's factual allegations as true and must draw all inferences in Plaintiff's favor.

On June 19, 2020, at approximately 8:00 p.m., the Moving Defendants, along with defendant Richard Arrowood ("Defendant Arrowood") and other law enforcement officers, arrived at a private residence at 1755 Falls Street, in the City of Niagara Falls, New York. (*Id.* at ¶ 8). Plaintiff alleges that these law enforcement officers were part of a United States Marshals Service task force [1] charged with executing fugitive warrants and they intended to take Plaintiff into custody. (*Id.* at ¶¶ 5, 6 & 9).

Defendant Arrowood approached the residence and shouted to Plaintiff that he wanted to speak to him. (*Id.* at ¶ 9). None of the officers were wearing uniforms or advised Plaintiff that they were police officers. (*Id.*). Plaintiff retreated into the residence and attempted to close the door, but Defendant Arrowood and Defendant Carroll forced their way into the residence and tried to physically subdue Plaintiff. (*Id.* at ¶ 10). Defendant DeVinney endeavored to breach the front door along with Defendant Arrowood and Defendant Carroll, and he was in a position to stop them but did not attempt to do so. (*Id.* at ¶ 11). Once inside, Defendant Arrowood shot Plaintiff more than once with a .45 caliber handgun at point-blank range. (*Id.* at ¶ 14). The gunshots caused Plaintiff serious injuries including two bullet-entry wounds, significant blood loss, injury to his diaphragm and spleen, multiple broken bones, a collapsed lung, and nerve damage. (*Id.*). Defendant Carroll and Defendant Arrowood, with the assistance of other unnamed members of the task force team who entered through the back door of the residence, dragged Plaintiff out of his residence and into the yard. (*Id.*).

 *2  Plaintiff alleges that there was neither an arrest nor search warrant authorizing the entry into his residence and his arrest. (*Id.* at ¶ 18). Likewise, no defendant sought permission to enter the home. (*Id.* at ¶ 13).

Plaintiff asserts a first cause of action against the Moving Defendants and Defendant Arrowood for violation of his Fourth Amendment rights and a second cause of action for assault against Defendant Arrowood for violation of his Fourth and Fourteenth Amendment rights. Plaintiff's claim against Defendant Carroll arises from Defendant Carroll's forced entry into Plaintiff's residence without a warrant and Plaintiff also asserts that both Defendant Carroll and Defendant DeVinney failed to intervene to prevent Defendant Arrowood from shooting him.

## II. Procedural Background

Plaintiff commenced the instant action on April 14, 2021, against the Moving Defendants and Defendant Arrowood, as well as additional defendants employed by federal and local authorities who were allegedly involved in the incident. (Dkt. 1). After initial motion practice, on August 31, 2022, the Court issued a Decision and Order dismissing many of the claims and defendants, but granting Plaintiff leave to amend his complaint as against Defendant Arrowood, Defendant Carroll, and Defendant DeVinney. (Dkt. 33). Familiarity with that Decision and Order is assumed for purposes of this Decision and Order.

On September 19, 2022, Plaintiff filed his second amended complaint. (Dkt. 34). On October 11, 2022, Defendant Carroll and Defendant DeVinney filed the instant motion to dismiss. (Dkt. 39). On October 17, 2022, Defendant Arrowood filed his answer to the second amended complaint. (Dkt. 41). On November 10, 2022, Plaintiff filed a response in opposition to the motion to dismiss. (Dkt. 43). On November 17, 2022, Defendant Carroll and Defendant DeVinney filed their reply. (Dkt. 44).

## DISCUSSION

### I. Legal Standard

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the [pleading], documents attached to the [pleading] as exhibits, and documents incorporated by reference in the [pleading]." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010). A court should consider the motion by "accepting all factual allegations as true and drawing all reasonable inferences in favor of the [claimant]." *Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016). To withstand dismissal, a claimant must set forth "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the [claimant] pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)).

"While a [pleading] attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a [claimant]'s obligation to provide the grounds of his entitle[ment] to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955 (internal quotations and citations omitted). "To state a plausible claim, the [pleading]'s '[f]actual allegations must be enough to raise a right to relief above the speculative level.' " *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 218 (2d Cir. 2014) (quoting *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955).

## II. Defendant Carroll and Defendant DeVinney's Motion to Dismiss

**\*3** Defendant Carroll and Defendant DeVinney move to dismiss Plaintiff's second amended complaint, arguing that Plaintiff fails to state a *Bivens* claim upon which relief may be granted because the recent United States Supreme Court decision of *Egbert v. Boule*, —— U.S. ——, 142 S. Ct. 1793, 213 L.Ed.2d 54 (2022), forecloses a constitutional damages remedy against these defendants for the claims asserted in this case. The Court agrees. [2]

### A. Limitations on *Bivens* Claims

While 42 U.S.C. § 1983 "entitles an injured person to money damages if a state official violates his or her constitutional rights," Congress has not "create[d] an analogous statute for federal officials. Indeed, in the 100 years leading up to *Bivens,* Congress did not provide a specific damages remedy for plaintiffs whose constitutional rights were violated by agents of the Federal Government." *Ziglar v. Abbasi*, 582 U.S. 120, 130, 137 S.Ct. 1843, 198 L.Ed.2d 290 (2017). "In *Bivens*, the Court held that it had authority to create 'a cause of action under the Fourth Amendment' against federal agents who allegedly manacled the plaintiff and threatened his family while arresting him for narcotics violations." *Egbert*, 142 S. Ct. at 1802 (quoting *Bivens*, 403 U.S. at 397, 91 S.Ct. 1999). "Over the following decade, the Court twice again fashioned new causes of action under the Constitution —first, for a former congressional staffer's Fifth Amendment sex-discrimination claim, *see Davis v. Passman*, 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979); and second, for a federal prisoner's inadequate-care claim under the Eighth Amendment, *see Carlson v. Green*, 446 U.S. 14, 100 S.Ct. 1468, 64 L.Ed.2d 15 (1980)." *Id.*

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 233 of 340

Smith v. Arrowood, Not Reported in Fed. Supp. (2023)

Since deciding *Carlson* in 1980, additional causes of action arising under *Bivens* have not been implied. In *Ziglar*, the Supreme Court explained that "expanding the *Bivens* remedy is now a disfavored judicial activity," and that the key question to be asked "is who should decide whether to provide for a damages remedy, Congress or the courts?" 582 U.S. at 135, 137 S.Ct. 1843 (quotations omitted). The *Ziglar* Court further explained that the *Bivens* remedy may not be extended into a new context if there are "special factors counselling hesitation in the absence of affirmative action by Congress," *id.* at 136, 137 S.Ct. 1843 (citation omitted), and that a context is new "[i]f the case is different in a meaningful way from previous *Bivens* cases" decided by the Supreme Court, *id.* at 139, 137 S.Ct. 1843. Examples of where a case may be different include "the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider." *Id.* at 139-40, 137 S.Ct. 1843. Ultimately, "if there are sound reasons to think Congress might doubt the efficacy or necessity of a damages remedy[,] the courts must refrain from creating [one]." *Id.* at 137, 137 S.Ct. 1843.

**\*4** More recently, in *Egbert*, the plaintiff brought a *Bivens* action against a United States Border Patrol agent, alleging that the agent violated his Fourth Amendment rights through the use of excessive force and violated his First Amendment rights to protection from retaliation. 142 S. Ct. at 1802. The Supreme Court reiterated that "[e]ven a single sound reason to defer to Congress is enough to require a court to refrain from creating ... a [*Bivens*] remedy." *Id.* at 1803 (quotation omitted). In other words, "[i]f there is a rational reason to think" that the answer to the question "who should decide whether to provide for a damages remedy, Congress or the Courts?" is Congress, "as it will be in most every case," then "no *Bivens* action may lie." *Id.* (citation omitted). The Supreme Court explained further that "if [it] were called to decide *Bivens* today, [it] would decline to discover any implied causes of action in the Constitution." *Id.* at 1803.

The *Egbert* decision further expounded on the applicable test, indicating that while prior cases describe a court's analysis as a two-step process consisting of an inquiry into whether the case presents "a new *Bivens* context" and whether there

are "special factors" indicating that the judiciary is less equipped than Congress to determine if the action should proceed, "those steps often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." *Id.* The Court held that although the plaintiff presented a Fourth Amendment claim, as in *Bivens*, "superficial similarities are not enough to support the judicial creation of a cause of action." *Id.* at 1805; *see also Smith v. Garcia*, No. 21-CV-578 NGG RJR, 2022 WL 17852393, at \*7 (E.D.N.Y. Dec. 22, 2022) ("While both cases concern potential violations of an individual's Fourth Amendment rights, the Supreme Court has made clear that a claim brought under the same constitutional provision as a previously successful *Bivens* claim may still be found to arise in a new context."); *Cohen v. United States*, No. 21-CV-10774 (LJL), 640 F.Supp.3d 324, 2022 WL 16925984, at \*6 (S.D.N.Y. Nov. 14, 2022) ("[T]he *Egbert* Court made clear that, effectively, [the special factors inquiry] operates as a bar to a *Bivens* claim in all cases except, perhaps, those involving Fourth, Fifth and Eighth Amendment claims factually indistinguishable from *Bivens*, [*Davis*], or *Carlson*.").

### B. Plaintiff's amended complaint does not state cognizable *Bivens* claims.

As noted, one assessment for the Court to consider in assessing the availability of a *Bivens* remedy is whether the case presents "a 'new context' or involves a 'new category' of defendants." *Hernandez v. Mesa*, — U.S. —, 140 S. Ct. 735, 743, 206 L.Ed.2d 29 (2020) (quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 68, 122 S.Ct. 515, 151 L.Ed.2d 456 (2001)). The "understanding of a 'new context' " is construed broadly to include any context that is "different in a meaningful way from previous *Bivens* cases decided by [the Supreme Court]." *Id.*; *see also Karman v. U.S. Customs and Border Prot.*, No. 823CV345 (LEK/CFH), 2023 WL 5806313, at \*3 (N.D.N.Y. Sept. 7, 2023) ("Yet, '[b]ecause implied causes of action are disfavored, the Court has been reluctant to extend *Bivens* liability to any new context or new category of defendants.' " (quoting *Krul v. Brennan*, 501 F. Supp. 3d 87, 101 (N.D.N.Y. 2020) (internal quotation marks omitted))).

Here, Defendant Carroll and Defendant DeVinney argue that the claims in Plaintiff's amended complaint are asserted against a new category of defendants, noting that unlike the narcotics agents in *Bivens*, Defendant Carroll and Defendant DeVinney were members of a United States Marshals Service fugitive task force. Plaintiff argues that the distinction

Smith v. Arrowood, Not Reported in Fed. Supp. (2023)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 234 of 340

between federal agencies is without significance, and that the "constitution applies equally to all federal law enforcement officers." (Dkt. 43 at 3). Not only does Plaintiff cite no legal authority for his contention, but numerous courts applying *Egbert* have found similar distinctions meaningful and sufficient to support a conclusion that a claim presented a new context. *See Karman*, 2023 WL 5806313, at *6 ("Following the Supreme Court's decisions in *Hernandez* and *Egbert*, district courts have concluded that a Bivens action does not exist for claims against federal immigration officials."); *Campbell v. City of Yonkers*, No. 19 CV 2117 (VB), 2023 WL 4867459, at *8 (S.D.N.Y. July 31, 2023) (finding meaningful difference between plaintiff's claim and *Bivens* where "the officers involved in *Bivens* were federal drug enforcement agents, whereas here the officers were FBI agents, task force officers, and other local law enforcement officers"); *James v. City of Rochester*, No. 23-CV-6057DGL, 2023 WL 3356931, at *3 (W.D.N.Y. May 11, 2023) (dismissing claims against members of United States Marshals task force arising from a death occurring in the execution of an arrest warrant in light of *Egbert*); *Diaz Cruz v. United States*, No. 20-CV-891(EK)(SJB), 2023 WL 2574756, at *3 (E.D.N.Y. Mar. 20, 2023) ("Under the Supreme Court's restrictive rubric, this case plainly presents a new context. First, Officer Santana is an ICE agent, whereas *Bivens* involved federal narcotics agents."); *Lewis v. Westfield*, 640 F. Supp. 3d 249, 250 (E.D.N.Y. 2022) ("Plaintiff's excessive-force and failure-to-intervene claims present a new *Bivens* context. The defendants are Deputy Marshals, rather than federal narcotics agents."), *appeal docketed*, (2d. Cir. Nov. 30, 2022); *Edwards v. Gizzi*, No. 20-CV-7371 (KMK), 2022 WL 309393, at *7 (S.D.N.Y. Feb. 2, 2022) ("Additionally, 'the officers involved in *Bivens* were federal narcotics agents, an investigatory and enforcement force, whereas here, the officers [include] U.S. Marshals ...' ") (quoting *Style v. Mackey*, No. 17-CV-1691, 2020 WL 3055319, at *4 (E.D.N.Y. June 8, 2020)), *appeal docketed* (2d. Cir. March 25, 2022); *see also Clutts v. Lester,* No. 20-CV-80-CJW-KEM, 2023 WL 3901489, at *5 (N.D. Iowa June 8, 2023) ("Numerous courts have found that the position of Deputy U.S. Marshals renders claims meaningfully different."); *Senatus v. Lopez*, No. 20-CV-60818, 2022 WL 16964153, at *5 (S.D. Fla. Oct. 12, 2022) ("Defendants here were members of a fugitive task force deputized by the United States Marshals. Recently, other courts have held that where the defendants are governmental officials different than the narcotics agents in *Bivens*, affording the plaintiff relief would constitute an impossible extension of *Bivens* into a 'new context.' "),

*report and recommendation adopted*, No. 20-60818-CIV, 2022 WL 16961323 (S.D. Fla. Nov. 16, 2022).

**\*5** In addition, to the extent that Plaintiff asserts a failure to intervene claim (the only claim asserted against Defendant DeVinney), such a claim presents a new context and does not constitute a cognizable *Bivens* claim. *See Johnson v. Santiago*, 624 F. Supp. 3d 295, 300 (E.D.N.Y. 2022) ("As courts in this circuit have recognized, 'a claim for failure to protect based on the allegation that [Defendant] was present during the attack on Plaintiff but did not help Plaintiff or intervene' presents a new *Bivens* context.") (quotation and citation omitted); *Cannenier v. Skipper-Scott*, No. 18 CIV. 2383 (LGS), 2019 WL 764795, at *5 (S.D.N.Y. Feb. 20, 2019) ("The Supreme Court has recognized only three *Bivens* contexts, none of which include failure to protect ..."); *Martinez v. D'Agata*, No. 16 CV 44 (VB), 2019 WL 6895436, at *7 (S.D.N.Y. Dec. 18, 2019) (declining to find *Bivens* remedy for claim against federal defendants for "failure to intervene rather than the underlying excessive force violation"); *see also Looper v. Jones*, No. 22-40579, 2023 WL 5814910, at *2 (5th Cir. Sept. 8, 2023) ("Even though *Carlson* created a cause of action for an asthmatic prisoner's Eighth Amendment failure to medicate claim, it did not create a cause of action for a prisoner's Eighth Amendment failure to protect or intervene claim."); *Arias v. Herzon*, No. 17-CV-516-LM, 2023 WL 4204657, at *6 (D.N.H. June 27, 2023) ("Regardless of whether a failure-to-intervene claim is an alternative theory of liability or separate constitutional violation, *Bivens* did not involve any theory that the defendant officers' failure to intervene should subject them to bystander liability under *Bivens*. And, in light of the Supreme Court's recent *Bivens* jurisprudence, this seems like a meaningful difference.").

While a closer question may be presented as to Plaintiff's Fourth Amendment claim against Defendant Carroll, who allegedly directly participated in the warrantless entry into Plaintiff's home, this claim still cannot survive an inquiry of whether there is any reason to think that Congress might be better equipped to create a damages remedy. The answer, "as it will be in most every case," *Egbert*, 142 S. Ct. at 1803, is yes. *See Challenger v. Bassolino*, No. CV1815240(KM) (MAH), 2023 WL 4287204, at *8 (D.N.J. June 30, 2023) ("The case law has recognized that these reasons counsel in particular against the wisdom of creating a new *Bivens* claim against U.S. Marshals."), *appeal docketed* (3d Cir. July 27, 2023); *Robinson v. Heinze*, No. 1:18-CV-131-TCB, 2023 WL 1774998, at *7 (N.D. Ga. Feb. 3, 2023) ("*Egbert*'s

analysis applies to this case. Like border patrol agents who routinely face issues of security, the Defendants in this case were U.S. Marshals in a fugitive task force expressly carrying out a statutory mandate."), *appeal docketed* (11th Cir. March 3, 2023); *McIntyre v. United States Marshal Serv.*, No. CV181268KMMAH, 2023 WL 2447424, at *6 (D.N.J. Mar. 10, 2023) (holding that "implying a damages remedy [against United States Marshals] presents questions better fit for Congress to address").

Specifically, alternative remedies exist for aggrieved parties in Plaintiff's position and preclude *Bivens* relief here. *See Egbert*, 142 S. Ct. at 1804 ("If there are alternative remedial structures in place, 'that alone,' like any special factor, is reason enough to 'limit the power of the Judiciary to infer a new *Bivens* cause of action.' " (quoting *Ziglar*, 137 S. Ct. at 1858)); *Lewis*, 640 F. Supp. at 254-55 ("In *Egbert*, the Supreme Court held that the existence of alternative remedial schemes is a special factor that counsels hesitation in extending *Bivens*—even with respect to extensions involving Fourth Amendment claims in 'the common and recurrent sphere of law enforcement.' " (quoting *Egbert*, 142 S. Ct. at 1805 (internal quotation marks omitted))).

In *Lewis*, the district court specifically examined the existence of alternative remedial structures for claims asserted against members of the U.S. Marshals Service:

> The Director of the Marshals Service is statutorily obligated to "supervise and direct the United States Marshals Service in the performance of its duties." 28 U.S.C. § 561(g). And by regulation, the Director "shall" investigate "alleged improper conduct on the part of U.S. Marshals Service personnel." 28 C.F.R. § 0.111(n). Anyone aggrieved by a Deputy Marshal's conduct may file a grievance alleging improper conduct. *Ibid.* A complaint form for doing so is available on the website of the Marshals Service. *See* Complaint Form Regarding United States Marshal Service Personnel or Programs, https://www.usmarshals.gov/resources/forms/complaint-form-regarding-united-states-marshals-service-personnel-or-programs (last visited 11/10/2022). In addition, by statute, the Attorney General is required to ensure that "any component" of the Department that receives a "nonfrivolous allegation of criminal wrongdoing or administrative misconduct by an employee of the Department of Justice ... shall report that information to the Inspector General." 5 U.S.C. App. 3 § 8E(d). Congress has also authorized the Department's Inspector General to "investigate allegations of criminal wrongdoing

> or administrative misconduct by an employee of the Department of Justice," "refer such allegations to the Office of Professional Responsibility," or refer them to "the internal affairs office of the appropriate component" of the Department, including the USMS. *Id.* § 8E(b)(2). The Department's Inspector General provides a link on its website through which any person may report allegations of wrongdoing. *See* Hotline, https://oig.justice.gov/hotline (last visited 11/10/2022).

**\*6** 640 F. Supp. 3d at 254-55. As a result, the *Lewis* court concluded that a *Bivens* claim could not stand. *Id.* ("*Egbert* made clear that remedial schemes of this sort 'foreclose a *Bivens* action,' because '[s]o long as Congress or the Executive has created a remedial process that it finds sufficient to secure an adequate level of deterrence, the courts cannot second-guess that calibration by superimposing a *Bivens* remedy.' ... Accordingly, this Court may not extend *Bivens* to provide an implied civil damages action for Lewis's claims against Deputy Marshals in this case.").

In addition, "[t]he FTCA applies to false arrest, false imprisonment, and malicious prosecution claims when they are asserted against 'law enforcement officers of the United States Government,' where 'law enforcement officer' is defined as 'any officer of the United States who is empowered by law to execute searches, to seize evidence, or to make arrests for violations of Federal law.' " *Parker v. Blackerby*, 368 F. Supp. 3d 611, 618 (W.D.N.Y. 2019); *Smith*, 2022 WL 17852393, at *6 (noting that in *Egbert*, the Supreme Court "found administrative procedures almost identical to those required prior to filing an FTCA claim with a court to be a sufficient alternative remedy within the special-factors analysis"); *see also Lucas v. Garland*, No. CV 23-225WES, 2023 WL 4706818, at *8 n.11 (D.R.I. July 24, 2023) (foreclosing *Bivens* claim noting that "Plaintiff has (or could have had) alternative remedies. These include the USMS internal grievance procedures, as well as potential state law tort claims and any claim Plaintiff might have brought under the Federal Tort Claims Act"). It is not necessary that alternative avenues of redress provide complete relief to Plaintiff — "the court must ask only whether it, rather than the political branches, is better equipped to decide whether existing remedies should be augmented by the creation of a new judicial remedy." *Egbert*, 142 S. Ct. at 1804 (quotation omitted).

In sum, applying the standard set forth in *Ziglar* and *Egbert*, there can be no *Bivens* remedy in the circumstances presented here. The context here is different from those limited

circumstances where the Supreme Court has previously implied a cause of action under the Constitution. And, as "in most every case," *Egbert, 142 S. Ct. at 1803,* there is at least one rational reason to defer to Congress as to the availability of a damages remedy. These considerations lead inexorably to the conclusion that it is Congress, and not this Court, that should determine whether a damages remedy is available under the circumstances presented here. Accordingly, Plaintiff's claims are not cognizable under *Bivens,* and the motion to dismiss by Defendant Carroll and Defendant DeVinney must be granted.

## CONCLUSION

For the foregoing reasons, Defendant Carroll and Defendant DeVinney's motion to dismiss (Dkt. 39) is granted.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2023 WL 6065027

---

## Footnotes

1    Defendant Carroll and Defendant DeVinney are alleged to be "law enforcement officers acting under color of legal authority of the United States Marshall's [sic] NY/NJ Regional Fugitive Warrant Task Force" (Dkt. 34 at ¶ 5), and they are represented in this action by the United States Attorney's Office. By contrast, Defendant Arrowood is alleged to be a City of Rochester Police Department officer assigned to the task force who was acting "under color of state law" (*id.* at ¶ 6), and he is represented in this action by the City of Rochester Law Department.

2    Plaintiff argues that Defendant Carroll and Defendant DeVinney's motion to dismiss his second amended complaint seeks to reargue matters that were decided in the Court's prior Decision and Order on the previously filed motions to dismiss (Dkt. 33) and is essentially a motion to reconsider (Dkt. 43 at 2-3). However, as noted by Defendant Carroll and Defendant DeVinney, in the prior Decision and Order, the Court expressly stated that the question of whether Plaintiff had stated a proper claim under *Bivens* was not before it and no opinion as to the merit of such an argument was issued. (Dkt. 33 n. 7) ("While *Bivens* provides a limited remedy in only certain narrowly prescribed situations, the Federal Defendants do not argue for purposes of the instant motion that the allegations in Plaintiff's amended complaint could not support a cognizable *Bivens* claim. Because the matter is not before the Court, nothing in this Decision and Order should be construed to resolve the question as to whether a *Bivens* claim lies as to all of Plaintiff's asserted constitutional claims. *See generally Egbert v. Boule,* ––– U.S. –––, 142 S. Ct. 1793, 1800, 213 L.Ed.2d 54 (2022).").

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 237 of 340

Stollman v. Williams, Not Reported in Fed. Rptr. (2025)

2025 WL 2784215

Only the Westlaw citation is currently available.

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING TO A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

United States Court of Appeals, Second Circuit.

Shmuel STOLLMAN and Elisa Stollman, individually and on behalf of their infant children E.S. and L.S., Plaintiffs-Appellants,

v.

Lakeasha WILLIAMS, Miriam Ortiz-Downes, Glenn Hyman, Kai Hayes, City of New York, Annemarie Fuschetti, Ebony Russell, Carmela Montanile, Tonya Wheelock, Edward O'Connor,

Keren Ennette, Defendants-Appellees. [*]

No. 23-7610
|
September 30, 2025

Appeal from a judgment of the United States District Court for the Southern District of New York (John P. Cronan, *Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the September 27, 2023 judgment of the district court is **AFFIRMED**. [1]

**Attorneys and Law Firms**

For Plaintiffs-Appellants: Carolyn A. Kubitschek (David J. Lansner, on the brief), Lansner & Kubitschek, New York, NY.

For Defendants-Appellees:Amy McCamphill (Richard Dearing, Melanie T. West, on the brief), for Muriel Goode-Trufant, Corporation Counsel of the City of New York, New York, NY.

PRESENT: JOHN M. WALKER, JR., SUSAN L. CARNEY, RICHARD J. SULLIVAN, Circuit Judges.

## SUMMARY ORDER

**\*1** Shmuel Stollman and Elisa Stollman ("Plaintiffs"), the parents of a severely autistic and nonverbal child ("E.S."), appeal from a grant of summary judgment in favor of the City of New York (the "City"), officials with the City's Administration for Children's Services ("ACS") (the "ACS Defendants"), and school employees (the "School Defendants") (together, "Defendants") on various claims stemming from the School Defendants' decision to report Plaintiffs to ACS for suspected child abuse. After the ACS Defendants withdrew a petition they had filed against Mr. Stollman pursuant to Article 10 of the New York Family Court Act, N.Y. Fam. Ct. Act § 1011 *et seq.* ("Article 10"), Plaintiffs brought suit under 42 U.S.C. § 1983, individually and on behalf of their infant children, for violations of the First, Fourth, and Fourteenth Amendments and New York state law. We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

We review a district court's grant of summary judgment *de novo* and view the evidence in the light most favorable to the non-moving party below. *See James v. N.Y. Racing Ass'n*, 233 F.3d 149, 152 (2d Cir. 2000). Summary judgment is appropriate "only when there is no genuine issue as to any material fact." *Id.* A dispute is "genuine" when the evidence on the issue "would permit a reasonable juror to find for the party opposing the motion." *Figueroa v. Mazza*, 825 F.3d 89, 98 (2d Cir. 2016).

## I. First-Amendment Retaliation Claims Against the School Defendants.

Plaintiffs assert that, in retaliation for Mrs. Stollman's complaints against E.S.'s school and teachers, the School Defendants filed a report with ACS that falsely suggested that the Stollmans had neglected and sexually abused E.S. "To state a First Amendment retaliation claim, a plaintiff must establish that: (1) his speech or conduct was protected by the First Amendment; (2) the defendant took an adverse action against him; and (3) there was a causal connection between this adverse action and the protected speech." *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 272 (2d Cir. 2011).

Here, there is no dispute that Mrs. Stollman engaged in protected speech when she complained to the school about its substandard care of E.S., who – according to Mrs. Stollman – returned home on various occasions with bruises and a wet diaper. The parties do not dispute that school psychologist Annemarie Fuschetti, one of the school officials involved in making the report, was aware of that speech. But even assuming that it could be said that the school's call to ACS one day after Mrs. Stollman's most recent complaint to the school by itself established the requisite causal link between those two events, the record contains no evidence from which a reasonable factfinder could find that the school's call to ACS was adverse or retaliatory.

**\*2** We have recognized that the protective actions of mandated reporters such as teachers, who face liability for inadequate action, are due "unusual deference," and that "absent a clear showing of retaliatory or punitive intent," such decisions "cannot be considered adverse or retaliatory." *Id.* at 274 (internal quotation marks omitted); *see also Dole v. Huntington Union Free Sch. Dist.*, 699 F. App'x 85, 87 (2d Cir. 2017) ("If the school officials who called [Child Protective Services] have a sufficient basis to suspect potential abuse, we owe unusual deference to their decisions to report reasonably suspected abuse and neglect." (alteration accepted and internal quotation marks omitted)).

Nothing in the record suggests that the School Defendants acted with retaliatory or punitive intent. Although Plaintiffs insist that the School Defendants' allegations concerning E.S.'s poor hygiene were knowingly false and misleading, they offer no evidence of such willfulness or bad faith. And while Plaintiffs counter that a prior investigation into similar reports of neglect on the part of the Stollmans had been dropped by ACS, the agency noted when it closed this case in February 2017 that "school officials *continue to report* the concerns that E.S.... arrives at school with soiled diaper." App'x at 307 (alteration accepted and emphasis added). There is nothing in the record to suggest that Fuschetti or another school official involved in making the report was anything other than reasonably troubled by the reports of E.S.'s poor hygiene. And the fact that a prior investigation was dropped does not support the inference that a later report was pretextual.

As for the suspected sexual abuse, there is no dispute that, beginning in October 2017, E.S. returned home from school crying. Around this same time, on October 19, a substitute teacher reported to another school psychologist, Edward O'Connor, that E.S. selected troubling words – including "sleeping bag" and "men" – on an iPad given to her by the school for communication purposes. *Id.* at 309 (internal quotation marks omitted). Later that day, O'Connor questioned E.S. about whom she slept with, prompting E.S. to select the words "thick more men" and "asleep, no, cover, teacher." *Id.* at 312–13 (internal quotation marks omitted). Several days later, on the morning of October 27, Fuschetti was informed both that E.S. had returned home from school crying and that paraprofessional Kathleen Wheelock had observed E.S. pressing "man, finger, butt" – albeit as part of a longer string of "room men room town shopping cart doghouse watch seatbelt finger man lunch they are going history thunder man finger butt many tired." *Id.* at 328 (internal quotation marks omitted).

While Plaintiffs now posit that E.S. was incapable of communicating via the iPad, Mr. Stollman himself testified that he could communicate with E.S. "[t]hrough her communication device, an iPad," Dist. Ct. Doc. No. 133-7 at 20, and Tonya Wheelock, E.S.'s one-on-one classroom paraprofessional, testified that E.S. "used the iPad to express her needs and her wants," Dist. Ct. Doc. No. 150-3 at 47. The School Defendants were not obliged to ignore the possibility that E.S.'s emotional state and her choice of words on the iPad were linked. Nor were they required to rule out all possible alternatives before filing the report. In fact, school officials have a legal obligation to report concerning activity to ACS. *See* N.Y. Soc. Serv. L. § 413(1)(a) (requiring school officials to file a report "when they have reasonable cause to suspect" child abuse). Though E.S. pressed the more troubling words as part of larger sequences, the school observed a pattern that emerged over the course of about eight days. Both ACS's written summary of the school's initial call and the school's follow-up report merely chronicled these observations, and neither report ever asserted that sexual abuse had occurred, let alone that Mr. Stollman was suspected of sexual abuse. To the contrary, the ACS call summary acknowledged that it was "[u]nknown what specifically [was] occurring and who [was] responsible." Dist. Ct. Doc. No. 130-7 at 5.

**\*3** Keeping in mind that mandatory reporters "deserve unusual deference from the judiciary," *Cox*, 654 F.3d at 274 (internal quotation marks omitted), we agree with the district court that, on the record before it, no reasonable factfinder could conclude that the school's report to ACS was adverse or retaliatory. We therefore affirm the district court's grant of

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 239 of 340

Stollman v. Williams, Not Reported in Fed. Rptr. (2025)

summary judgment on Plaintiffs' First Amendment retaliation claims.

## II. Fourth Amendment Claims Against the ACS Defendants for Unreasonably Searching E.S.

An inspection of a child's body for evidence of abuse may implicate the child's Fourth Amendment interests. *Tenenbaum v. Williams*, 193 F.3d 581, 605–06 (2d Cir. 1999). Because parents have "rights to control the care and custody of their children," we have held that "intrusive examinations of their children for evidence of abuse [may] not be undertaken without parental consent or judicial authorization." *N.G. v. Connecticut*, 382 F.3d 225, 237 (2d Cir. 2004). Plaintiffs contend that there is a genuine dispute as to whether they consented to an inspection of E.S. that took place during a home visit by ACS caseworker Miriam Ortiz-Downes ("Ortiz"), during which Mr. Stollman lifted E.S.'s dress and Mrs. Stollman removed E.S.'s diaper.

We agree with the district court that the Stollmans consented to this examination. Mrs. Stollman admitted at her deposition that, before inspecting E.S.'s body, Ortiz asked, "Can I just take a look for any marks or bruises[?]," to which Mrs. Stollman responded, "Okay." Dist. Ct. Doc. No. 133-8 at 50. Mr. Stollman similarly confirmed at his deposition that he "agree[d] that the body check should be conducted." Dist. Ct. Doc. No. 133-7 at 44.

Plaintiffs nevertheless contest the voluntariness of their consent because Ortiz "announce[ed]" her authority to inspect E.S. in a manner that effectively communicated that "the [parents] ha[d] no right to resist." *Bumper v. North Carolina*, 391 U.S. 543, 550 (1968). But the record belies that contention. During his deposition, Mr. Stollman characterized Ortiz's request as a "*suggest[ion]* to see [E.S.'s] body," Dist. Ct. Doc. No. 133-7 at 42 (emphasis added), and Mrs. Stollman similarly testified that Ortiz simply asked if she could "just take a look for any marks or bruises," Dist. Ct. Doc. No. 133-8 at 50. The more authoritative statements attributed to Ortiz – such as "I have to look at marks and bruises" and "[i]t's my job," *id.* at 84 – fall short of demonstrating coercion. *Cf. United States v. Ruiz-Estela*, 481 F.2d 723, 728 (2d Cir. 1973) (finding coercion when uniformed officer took defendant to a secluded stairwell and told him "he would have to go through a baggage search" (internal quotation marks omitted)); *United States v. Mapp*, 476 F.2d 67, 78 (2d Cir. 1973) (finding coercion when officer entered defendant's bedroom with a gun in hand, announced that she was under arrest, and said "[w]e want the package" (internal quotation marks omitted)).

In addition, Plaintiffs were present the entire time and even assisted Ortiz with aspects of the inspection. This is not a situation where the parents were never consulted or were kept in the dark while the search was being conducted for an investigatory purpose. *Cf. Van Emrik v. Chemung Cnty. Dep't of Soc. Servs.*, 911 F.2d 863, 865 (2d Cir. 1990) (finding no consent when "parents were not consulted" about x-rays and "[t]heir understanding was that some additional x-rays of the [child's] injured leg were [medically necessary]"). Accordingly, we affirm the grant of summary judgment in favor of the ACS Defendants on the unreasonable search claim brought on behalf of E.S.

## III. Fourth Amendment Claims Against the ACS Defendants for Malicious Prosecution.

**\*4** Plaintiffs next claim that the ACS Defendants' filing of an Article 10 petition against Mr. Stollman amounted to malicious prosecution in violation of his Fourth Amendment rights. We agree with the district court that, at the very least, the ACS Defendants were entitled to qualified immunity as to those claims.

Qualified immunity shields "officials from suit unless [1] the official violated a statutory or constitutional right and [2] was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (internal quotation marks omitted). To prevail on a malicious-prosecution claim under section 1983, a plaintiff must establish "(1) the commencement or continuation of a criminal proceeding by the defendant against the plaintiff, (2) the termination of the proceeding in favor of the accused, (3) the absence of probable cause for the criminal proceeding," "(4) actual malice," and "(5) a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Alexander v. City of Syracuse*, 132 F.4th 129, 158 (2d Cir. 2025) (internal quotation marks omitted). We have never found that the initiation of a child-removal proceeding may give rise to a malicious prosecution claim. *Cf. id.* (referencing "criminal proceeding[s]"); *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010) (same); *see also Emerson v. City of New York*, 740 F. Supp. 2d 385, 392 (S.D.N.Y. 2010) (finding that plaintiff could not bring malicious-prosecution claim "since he was neither arrested nor otherwise detained in connection with the neglect and abuse proceedings"). Given the lack of authority for such a claim, qualified immunity is appropriate because Plaintiffs' "purported [Fourth Amendment] right was not clearly established by prior case law." *Booker v. Graham*,

974 F.3d 101, 106 (2d Cir. 2020) (internal quotation marks omitted). Accordingly, the district court properly granted ACS Defendants qualified immunity on Plaintiffs' malicious prosecution claims.

## IV. Fourteenth Amendment Due Process Claims Against the ACS Defendants.

Undoubtedly, "[t]he interest of natural parents in the care, custody, and management of their child is a fundamental liberty interest protected by the Fourteenth Amendment." *Cox*, 654 F.3d at 275 (internal quotation marks omitted). Plaintiffs contend that the removal of Mr. Stollman from his home and the attendant separation from his minor children violated Plaintiffs' rights to substantive and procedural due process, beginning when Mr. Stollman was asked to leave for three days before the child-safety conference was held and continuing until he was allowed to return on February 14, 2018, almost four months later. We disagree.

### A. Procedural Due Process.

Because "[p]arents ... have a constitutionally protected liberty interest in the care, custody[,] and management of their children," they generally may not be deprived of that interest "without ... due process." *Tenenbaum*, 193 F.3d at 593. Plaintiffs contend that their due process rights were violated when Defendants failed to provide Mr. Stollman with a hearing prior to his removal from the home. We have held, however, that "officials may remove a child from his or her parents' custody before a hearing is held where there is an objectively reasonable basis for believing that a threat to the child's health or safety is imminent." *Gottlieb v. County of Orange*, 84 F.3d 511, 520 (2d Cir. 1996). Given E.S.'s concerning iPad use, and – more importantly – Ortiz's personal observations of what she deemed to be inappropriate contact between Mr. Stollman and E.S, we cannot say that a pre-deprivation hearing was required here. *See Southerland v. City of New York*, 680 F.3d 127, 149 (2d Cir. 2012) ("[T]he peril of sexual abuse" is an "imminent danger justifying emergency removal." (internal quotation marks omitted)). To the extent Plaintiffs argue the three-day delay between Mr. Stollman's departure from the home on October 27 and his post-deprivation hearing on October 30 was unreasonable, we have concluded that similar delays do not give rise to a procedural due-process violation. *See Cecere v. City of New York*, 967 F.2d 826, 830 (2d Cir. 1992) (determining that four-day delay did not violate due process clause).

**\*5**   Plaintiffs next argue that they were deprived of procedural due process because Defendants conducted a constitutionally inadequate investigation. But given the "need for unusual deference" to the decisions of state officials confronted with allegations of child abuse, we have held that "[a]n investigation passes constitutional muster provided simply that case workers have a reasonable basis for their findings of abuse." *Wilkinson ex rel. Wilkinson v. Russell*, 182 F.3d 89, 104 (2d Cir. 1999) (internal quotation marks omitted). Though Plaintiffs criticize several aspects of the investigation, it cannot be said that ACS lacked a reasonable basis for its investigation. Indeed, while Plaintiffs hotly dispute E.S.'s ability to communicate via her iPad (and thus discount the significance of E.S.'s selection of certain words that might normally be suggestive of sexual abuse in the home), the ACS Defendants sent their own caseworker to visit the home, which "generated significant information supporting a finding of abuse" after she observed what she perceived to be inappropriate kissing and touching between Mr. Stollman and E.S. *Id.* at 106. Plaintiffs attempt to discredit Ortiz's observations by insisting that the ACS Defendants ignored the opinion of a family caregiver, Jackie, and E.S.'s pediatrician, Dr. Jeffrey Teitelbaum, who opined that Mr. Stollman had not sexually abused E.S. But these opinions, even if sincerely held, are not the sort of "overwhelming exculpatory information" that the ACS Defendants were bound to credit over the observations of their own case worker. *Id.* at 104. Considering our "unusual deference" in this area, *id.*, we agree with the district court that Plaintiffs cannot show that the investigation into the suspected abuse was constitutionally inadequate.

Finally, Plaintiffs assert that the ACS Defendants fabricated evidence against them in a manner that deprived them of a fair trial. But even putting aside whether a hearing for the return of custody pursuant to section 1028 of the New York Family Court Act qualifies as a "trial" for Fourteenth-Amendment purposes, Plaintiffs point to no specific examples of "fabricated" evidence that were produced by the ACS Defendants, relying instead on Ortiz's deposition testimony that she "didn't know" whether Mr. Stollman was sexually abusing E.S. App'x at 383 (internal quotation marks omitted). But actual knowledge was not required. Ortiz described what she observed, which provided the basis for the Article 10 petition. While Plaintiffs disagree with Ortiz's conclusions, they do not allege that she perjured herself or manufactured false facts in her report. Disagreement alone is not enough for an unfair trial claim.

For all these reasons, Plaintiffs cannot show a procedural due-process violation at any point from the start of the investigation to the eventual withdrawal of the Article 10 petition about nine months later on July 17, 2018.

**B. Substantive Due Process.**

"To state a claim for a violation of th[e] substantive due process right of [parental] custody, a plaintiff must demonstrate that the state action depriving him of custody was so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even if it were accompanied by full procedural protection." *Cox,* 654 F.3d at 275 (internal quotation marks omitted). Here, Mr. Stollman was separated from his family for three days before a child-safety conference was convened and a family-court judge approved the temporary deprivation of custody (which Mr. Stollman himself consented to through counsel). Such "brief removals ... generally do not rise to the level of a substantive due process violation, at least where the purpose of the removal is to keep the child safe during investigation and court confirmation of the basis for removal." *Southerland,* 680 F.3d at 153 (internal quotation marks omitted) (finding no violation for four-day separation prior to child-safety conference). While Plaintiffs strenuously disagree with ACS's determination that separation was appropriate, they do not argue that ACS made its decision arbitrarily or was motivated by some improper purpose.

To the extent that Mr. Stollman is asserting a due-process violation for the period of separation that occurred after the child-safety conference, the fact that the family court approved the three-day removal, coupled with the fact that Mr. Stollman consented to the ongoing separation, means that "any liability" related to the continued separation "can no longer be attributed to the [Defendants] who removed the child." *Id.* This is particularly so when the family court was not misled by fabricated evidence. Similarly, while Plaintiffs assert that the ongoing home visits by ACS after Mr. Stollman returned to the home amounted to coercive interference, those visits were also approved by the family court. In any event, "[w]here there is no actual loss of custody, no substantive due process claim can lie." *Cox,* 654 F.3d at 276. As a result, Plaintiffs cannot show a substantive due-process violation. [2]

**\*6** \* \* \*

We have considered Plaintiffs' remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

**All Citations**

Not Reported in Fed. Rptr., 2025 WL 2784215

---

**Footnotes**

\*      The Clerk of Court is respectfully directed to amend the case caption as set forth above.

1      Plaintiffs also appeal from the district court's order entered on September 30, 2024 denying their motion to alter the judgment. Because Plaintiffs do not advance any arguments apart from those challenging the grant of summary judgment itself, we consider any separate challenge to that September 30, 2024 order abandoned. *See Anderson v. Branen,* 27 F.3d 29, 30 (2d Cir. 1994).

2      Because the district court properly denied Plaintiffs' claims against the individual defendants, Plaintiffs may not prevail on their municipal-liability claims under *Monell v. New York City Department of Social Services,* 436 U.S. 658 (1978). *See Barrett v. Orange Cnty. Hum. Rights Comm'n,* 194 F.3d 341, 350 (2d Cir. 1999). In addition, because Plaintiffs do not challenge the district court's decision not to exercise supplemental jurisdiction over their state-law claims, we affirm the dismissal of those claims without prejudice to refiling in state court.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 242 of 340

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

2014 WL 6685476
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Kylie Ann TURCZYN, Deceased, by and through
Barbara McGREGOR, as Administratrix of
the Estate of Kylie Ann Turczyn, Plaintiff,
v.
CITY OF UTICA et al., Defendants.

No. 6:13–cv–1357 (GLS/ATB).
|
Signed Nov. 26, 2014.

**Attorneys and Law Firms**

Office of Frank Policelli, Frank Policelli, Esq., of Counsel,
Utica, NY, for the Plaintiff.

City of Utica—Corporation Counsel, Mark C. Curley, Esq.,
Merima Smajic, Esq., Zachary C. Oren, Esq., of Counsel,
Utica, NY, for the Defendants.

### *MEMORANDUM–DECISION AND ORDER*

GARY L. SHARPE, Chief Judge.

### I. *Introduction*

**\*1**  Plaintiff Kylie Ann Turczyn, deceased, by and through
Barbara McGregor, as administratrix of the estate of Kylie
Ann Turczyn, commenced this action against defendants City
of Utica, City of Utica Police Dept., and Elizabeth Shanley
alleging substantive due process claims pursuant to 42 U.S.C.
§ 1983 and separate state law causes of action. (Am.Compl.,
Dkt. No. 12.) Pending is defendants' motion to dismiss for
failure to state a claim. (Dkt. No. 19.) For the reasons that
follow, the motion is granted in part and denied in part.

### II. *Background*

#### A. *Facts* [1]
Shanley, an Oneida County domestic violence investigator,
was at all relevant times assigned by the Police Department to
accomplish the goals of reducing "occurrence[s] of domestic

violence by increasing reporting and by identifying and
tracking repeat victims and/or offenders," and "increas[ing]
victims' access to supportive services by encouraging [them]
to report their abuse, thereby increasing arrest rates for
domestic offenders." (Am.Compl.¶ 10.) On June 22, 2012,
Thomas Anderson, Turczyn's former boyfriend and the father
of her daughter, broke into Turczyn's home armed with a 9
mm rifle. (*Id.* ¶ 11.) Anderson repeatedly shot Turczyn, taking
her life in view of their four-year-old daughter, G.T. (*Id.*)
Anderson then dispatched himself. (*Id.*)

In the twelve months preceding this horrific event, Turczyn
made between five and ten complaints to Utica police
officers, "including informing them of a specific threat by
Anderson to kill her." (*Id.* ¶ 12.) Turczyn specifically told
Shanley "that Anderson was armed and had threatened to
kill her." (*Id.* ¶ 12(d).) Despite their knowledge of domestic
violence between Turczyn and Anderson, neither Shanley,
New York State Police, nor Utica Police took any steps to
arrest Anderson, investigate Turczyn's complaints, or follow-
up with Anderson "as is the policy and protocol of the
domestic violence unit." (*Id.* ¶ 14.)

On June 18, 2012, Shanley told Turczyn to seek an order of
protection, which she attempted to do, but was told by an
unknown person at the Oneida County Family Court to return
the following day because the court was " 'too busy.' " (*Id.*
¶¶ 15–16.) The following day, Turczyn left a voice message
for Shanley, explaining that she was unable to obtain an order
of protection and that Anderson had a gun and planned to
kill her that week. (*Id.* ¶¶ 16–18.) Despite her knowledge,
"Shanley took no action." (*Id.* ¶ 17.) Shanley also mistakenly
believed that Turczyn's issues with Anderson were outside of
the purview of Utica Police and should, instead, be dealt with
by New York State Police; however, "she did not inform any
other police agency or take any action herself." (*Id.* ¶¶ 18, 19,
20.)

#### B. *Procedural History*
Turczyn commenced this action by filing a complaint on
October 31, 2013. (Dkt. No. 1.) Defendants thereafter moved
to dismiss, (Dkt. No. 10.) In response, Turczyn filed an
amended complaint as of right, which is now the operative
pleading. (*See generally* Am. Compl.) In her amended
complaint, Turczyn alleges the following causes of action:
(1) a denial of substantive due process rights under the Fifth
and Fourteenth Amendments due to deliberate indifference;
(2) a *Monell* [2] claim against the City; (3) negligence; (4)

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 243 of 340

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

a "derivative action" on behalf of G.T.; and (5) negligent infliction of emotional distress. (*Id.* ¶¶ 37–74.) Defendants now move to dismiss the amended pleading pursuant to Rules 8(a)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. (Dkt. No. 19.)

### III. *Standard of Review*

**\*2** The standard of review under Fed.R.Civ.P. 12(b)(6) is well settled and will not be repeated here. For a full discussion of the standard, the court refers the parties to its prior decision in *Ellis v. Cohen & Slamowitz, LLP,* 701 F.Supp.2d 215, 218 (N.D.N.Y.2010).

### IV. *Discussion*

**A.** *Preliminary Matters*

At the outset, it is noted that some of Turczyn's claims are deemed abandoned by her failure to oppose their dismissal. *See Barmore v. Aidala,* 419 F.Supp.2d 193, 201–02 (N.D.N.Y.2005) ("The failure to oppose a motion to dismiss a claim is deemed abandonment of the claim, and, in the Northern District of New York, is deemed consent to granting that portion of the motion." (internal citations omitted)); *Hanig v. Yorktown Cent. Sch. Dist.,* 384 F.Supp.2d 710, 723 (S.D.N.Y.2005) ("[B]ecause [the] plaintiff did not address [the] defendant's motion to dismiss with regard to [a particular] claim, it [wa]s deemed abandoned and ... dismissed."). In particular, Turczyn squarely opposed dismissal of her substantive due process claim as against Shanley, (Dkt. No. 20 at 8–12), and scarcely, but sufficiently to save the claim from dismissal for abandonment, offered reasons why her substantive due process claim as against the City should survive defendants' motion, (*id.* at 5–7). Aside from the substantive due process claim, Turczyn failed to offer any opposition to defendants' motion, which also sought dismissal of her pendent causes of action. (Dkt. No. 19, Attach. 6 at 31–40 & n. 15.) Accordingly, Turczyn's pendent state law claims, (Am.Compl.¶¶ 59–74), are dismissed.

Additionally, it is clear that the Police Department must be dismissed as urged by defendants, (Dkt. No. 19, Attach. 6 at 2 n. 2), because "a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence." *Varela v. City of Troy,* No. 1:10–cv–1390, 2014 WL 2176148, at \*6 (N.D.N.Y. May 22, 2014) (internal

quotation marks omitted). As such, all claims as against the Police Department are dismissed.

The court also notes that both parties have submitted certain evidence that is outside of the pleadings (Dkt. No. 19, Attachs. 3, 4; Dkt. No. 20, Attachs. 1, 2.) Beginning with defendants, they submitted a January 2, 2013 stipulation of discontinuance, which, on its face, purports to memorialize McGregor's agreement to withdraw the notice of claim filed on behalf of Turczyn and to discontinue with prejudice, (Dkt. No. 19, Attach.3), and a December 28, 2012 letter, which appears to memorialize a conversation regarding the discontinuation of legal action and execution of a stipulation, (Dkt. No. 19, Attach.4). Relying on a single out-of-Circuit decision, *see Raines v. Haverford Coll.,* 849 F.Supp. 1009, 1010 (E.D.Pa.1994), which does not appear directly to support their position nor does it give this court confidence that the kinds of documents at issue here were contemplated by that decision, defendants assert that the documents may be considered on their motion to dismiss as "part of the record of this case." (Dkt. No. 19, Attach. 6 at 25 n. 11.) Turczyn argues that defendants' reliance on the stipulation is inappropriate at this juncture, yet she offers the affidavit of McGregor, submitted to dispute the validity of the stipulation, (Dkt. No. 20, Attach.1), without any explanation as to why the court should or may consider it. (Dkt. No. 20 at 12–13.)

**\*3** The court has excluded from its consideration of this motion to dismiss the exhibits offered by defendants as well as the McGregor affidavit. *See* Fed.R.Civ.P. 12(d). The existence of some document or documents that may extinguish a plaintiff's claims, such as a release or stipulation of discontinuance, is an affirmative defense, *see Beede v. Stiefel Labs., Inc.,* No. 1:13–cv–120, 2014 WL 896725, at \*3 (N.D.N.Y. Mar.6, 2014), and " '[a]n affirmative defense may be raised by a pre-answer motion to dismiss under Rule 12(b)(6) ... if the defense appears on the face of the complaint,' " *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.,* 620 F.3d 137, 145 (2d Cir.2010) (quoting *Pani v. Empire Blue Cross Blue Shield,* 152 F.3d 67, 74 (2d Cir.1998)).

Here, the stipulation defense is not apparent from the face of the amended complaint. Moreover, the court refuses to consider the documents in question as part of the record of this case, a proposition for which no in-Circuit authority has been offered nor has any been discovered by this court. As such, the documents offered by defendants, (Dkt. No. 19, Attachs.3, 4), are not properly before the court, and their argument that Turczyn's claims must be dismissed because of

those documents is rejected. McGregor's affidavit, (Dkt. No. 20, Attach.1), which was also improvidently submitted for consideration, is likewise excluded. The court now turns to the merits of defendants' arguments regarding the substantive due process and *Monell* claims.

## B. *Rule 8*

First, defendants argue that Turczyn's § 1983 due process claim is subject to dismissal under the Rule 8 plausibility analysis—specifically because of Turczyn's failure to allege facts supportive of a sufficient nexus between Shanley's omissions and Turczyn's death. (Dkt. No. 19, Attach. 6 at 23–24.) The court disagrees. The amended complaint plausibly alleges a causal connection between the conduct of defendants—their alleged conscience-shocking failure to protect Turczyn, (Am.Compl.¶ 49)—and her injuries, *i.e.,* the allegations plausibly suggest that defendants' acts were a substantial factor in bringing about Turczyn's injuries. *See Gierlinger v. Gleason,* 160 F.3d 858, 872 (2d Cir.1998) ("[I]n all § 1983 cases[ ] the plaintiff must prove that the defendant's action was a proximate cause of the plaintiff's injury."). Accordingly, this argument is rejected.

## C. *Rule 12(b)(6)*

Defendants argue that Turczyn has failed to state a substantive due process claim as against Shanley or the City. (Dkt. No. 19, Attach. 6 at 220, 26–31.) Defendants contend that Turczyn alleges only passive conduct on the part of Shanley that does not give rise to a substantive due process violation. (*Id.* at 10–12.) More generally, defendants assert that Turczyn has failed to plead facts to show "implicit prior assurances through repeated sustained inaction," and that, even if she did, the state action alleged does not rise to the level of conscience-shocking behavior. (*Id.* at 15–20.) Alternatively, defendants argue that Shanley is entitled to qualified immunity. (*Id.* at 20–23.) With respect to the City, defendants contend that Turczyn has failed to allege facts that support a claim of municipal liability. (*Id.* at 26–31.) For reasons explained below, defendants' motion is denied with respect to Turczyn's substantive due process claim against Shanley, but granted with respect to her *Monell* claim against the City.

**\*4** Only one relevant exception to the general rule that no substantive due process claim lies for a state's failure to protect an individual from private violence, *see DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), potentially applies in this case. That exception imposes liability for failure to

protect where state actors in some way affirmatively assist "in creating or increasing the danger to the victim." *Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 428 (2d Cir.2009) (internal quotation marks and citation omitted); *see Pena v. DePrisco,* 432 F.3d 98, 110 (2d Cir.2005). "[R]epeated, sustained inaction by government officials, in the face of potential acts of violence, might constitute 'prior assurances,' rising to the level of an affirmative condoning of private violence, even if there is no explicit approval or encouragement." *Okin,* 577 F.3d at 428 (quoting *Dwares v. City of N.Y.,* 985 F.2d 94, 99 (2d Cir.1993)). Moreover, when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others, those officials can be held liable under section 1983 for injury caused by the misconduct" "even though none of the defendants [is] alleged to have communicated the approval explicitly." *Id.* at 428–29 (quoting *Pena,* 432 F.3d at 111)). In a nutshell, "[t]he affirmative conduct of a government official may give rise to an actionable due process violation if it communicates, explicitly or implicitly, official sanction of private violence." *Id.* at 429.

A successful substantive due process claim also requires that the plaintiff show "that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " *Id.* at 431 (quoting *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 847 n. 8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998). A hierarchy of intent provides guidance on the likelihood that a particular harm rises to the necessary level. Intentionally inflicted harms are most likely to meet the standard, while reckless and negligent inflictions of harm are each less likely, in graduated downward steps, to show conscience-shocking state action. *Id.* As for recklessly inflicted injuries, " '[d]eliberate indifference that shocks in one environment may not be so patently egregious in another.' " *Id.* (quoting *Lewis,* 523 U.S. at 850"). Accordingly, the inquiry is highly fact specific.

Unlike *Town of Castle Rock v. Gonzales,* 545 U.S. 748, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005), or *Neal v. Lee County,* Civil Action No. 1:08CV262, 2010 WL 582437 (N.D.Miss. Feb.12, 2010)—cases in which police had limited interaction with either the victim or killer prior to the victim's demise, and upon which defendants rely for dismissal of the claim against Shanley, (Dkt. No. 19, Attach. 6 at 3–5, 7–8)—the allegations here go substantially farther. Turczyn alleges several occasions [3] when Shanley knew of

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 245 of 340

Turczyn ex rel. McGregor v. City of Utica, Not Reported in F.Supp.3d (2014)

Anderson's threatening acts and did nothing, which arguably communicated to him prior assurances that there would be no penalty to pay for his conduct. (Am.Compl.¶¶ 12–13.) "This is so even though none of the defendants are alleged to have communicated the approval explicitly." *Pena,* 432 F.3d at 111. *Okin* has specifically recognized the liability that may arise under these circumstances. *See* 577 F.3d at 428–29 (explaining that liability under § 1983 attaches when "state officials communicate to a private person that he ... will not be arrested, punished, or otherwise interfered with while engaging in misconduct that is likely to endanger the life, liberty or property of others" (quoting *Pena,* 432 F.3d at 111)).

 **\*5** The amended complaint also pleads facts that demonstrate, at this juncture, egregious behavior that shocks the contemporary conscience. As in *Okin,* the allegations here tend to show that Shanley, who was tasked with accomplishing certain goals related to curbing domestic violence, was deliberately indifferent as to whether or not Anderson would make good on his multiple threats against Turczyn's life over a twelve-month-period. (Am.Compl.¶ ¶ 10, 12.) These allegations sufficiently support that Shanley's affirmative conduct was the product of deliberate indifference that shocks the conscience, and would provide a reasonable jury with a valid basis to so find. *See Conradt v. NBC Universal, Inc.,* 536 F.Supp.2d 380, 394–95 (S.D.N.Y.2008).

Finally, Shanley is not entitled to qualified immunity at this juncture. Her argument on this issue is two-fold. First, Shanley asserts that no constitutional violation occurred, and, second, she claims that, even if a constitutional violation occurred, the right was not clearly established. (Dkt. No. 19, Attach. 6 at 20–23.) The first prong of the argument is easily swept aside by reference to the preceding paragraphs that explain that the amended complaint alleges a cognizable substantive due process violation. As for whether or not the right was clearly established, which is a prerequisite to qualified immunity, *see Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), this question has been resolved by the Second Circuit. On the issue, the court has explained that it is "clearly established," under the state-created danger theory, "that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim, and as that is the substantive due process violation alleged here, qualified immunity does not apply." *Okin,* 577 F.3d at 434. Accordingly, Shanley is not entitled to qualified immunity at this time.

As for the City, defendants assert that Turczyn has failed to plead a *Monell* claim because the amended complaint merely alleges legal conclusions. (Dkt. No. 19, Attach. 6 at 26–31.) With respect to Turczyn's allegation that the City failed to properly train or supervise its employees, defendants contend that the amended complaint is too conclusory, but that, even if adequately pleaded, Turczyn's municipal liability claim must nonetheless fail because she has not alleged deliberate indifference. (*Id.* at 29–31.)

It is well settled that "the inadequacy of police training may serve as the basis for § 1983 liability ... where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Oh. v. Harris,* 489 U.S. 378, 380, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). The deliberate indifference standard is "stringent" and requires "proof that a municipal actor disregarded a known or obvious consequence of his action." *Connick v. Thompson,* ——U.S. ——, ——, 131 S.Ct. 1350, 1360, 179 L.Ed.2d 417 (2011) (internal quotation marks and citation omitted). A showing of deliberate indifference requires that: (1) "a policymaker knows 'to a moral certainty' that her employees will confront a given situation"; (2) "the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation"; and (3) "the wrong choice by the ... employee will frequently cause the deprivation of a citizen's constitutional rights." *Walker v. City of N.Y.,* 974 F.2d 293, 297–98 (2d Cir.1992) (quoting *City of Canton,* 489 U.S. at 390 n. 10).

 **\*6** Here, because Turczyn has failed to adequately plead that the City's failure to train and supervise amounted to deliberate indifference, she has failed to state a claim of municipal liability. The amended complaint uses the label "deliberate indifference" in reference to Turczyn's municipal liability claim and generically references the City's failure to properly train and supervise, but it fails to allege facts that support either conclusory notion. (Am.Compl.¶¶ 45, 52.) Turczyn's pleading failure mandates dismissal of her *Monell* claim against the City. *See Gauthier v. Kirkpatrick,* Civil Action No. 2:13–cv–187, 2013 WL 6407716, at \*10 (D.Vt. Dec.9, 2013) (dismissing failure to train *Monell* claim because the plaintiff failed to plead facts that supported the deliberate difference elements); *Santos v. New York City,* 847 F.Supp.2d 573, 577 (S.D.N.Y.2012); *see also Worrell v. City of N.Y.,* No. 12–CV–6151, 2014 WL 1224257, at \*13 (E.D.N.Y. Mar. 24, 2014).

### V. *Conclusion*

**WHEREFORE,** for the foregoing reasons, it is hereby

**ORDERED** that defendants' motion to dismiss (Dkt. No. 19) is **GRANTED IN PART** and **DENIED IN PART** as follows:

**GRANTED** with respect to all claims alleged as against the City of Utica Police Dept. and the Clerk is directed to terminate the City of Utica Police Dept. from this action; and

**GRANTED** with respect to Turczyn's *Monell* claim against the City (Am.Compl.¶ ¶ 51–58), which is hereby **DISMISSED WITHOUT PREJUDICE,** and the Clerk is directed to terminate the City of Utica from this action; and

**GRANTED** with respect to all of Turczyn's pendant state law claims, (Am.Compl.¶ ¶ 59–74), which are hereby

**DISMISSED;** and **DENIED** in all other respects; and it is further

**ORDERED** that the sole remaining defendant, Shanley, shall file an appropriate responsive pleading within the time allotted by the rules; and it is further

**ORDERED** that the parties shall contact Magistrate Judge Andrew T. Baxter in order to schedule further proceedings; and it is further

**ORDERED** that the Clerk provide a copy of this Memorandum–Decision and Order to the parties.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 6685476

---

### Footnotes

1    The facts are presented in the light most favorable to plaintiff.

2    *See Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

3    In fact, Turczyn claims that she lodged five to ten complaints—of which Shanley was aware—with the Utica Police within the twelve months preceding the murder. (Am.Compl.¶¶ 12, 13.) So many occurrences may amount to "repeated [and] sustained inaction ... in the face of potential acts of violence." *Okin,* 577 F.3d at 428.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 247 of 340

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

2019 WL 981850
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,

v.

SYRACUSE POLICE
DEPARTMENT, et al., Defendants.

Civil Action No. 5:18-CV-1471 (GTS/DEP)
|
Signed 01/07/2019

**Attorneys and Law Firms**

FOR PLAINTIFF: Jeramie White, Pro se, 18-B-0311, Cayuga
Correctional Facility, P.O. Box 1186, Moravia, NY 13118.

ORDER, REPORT, AND RECOMMENDATION

DAVID E. PEEBLES, CHIEF U.S. MAGISTRATE JUDGE

 *1 This is a civil rights action brought by *pro se* plaintiff
Jeramie White, a New York State prison inmate, pursuant to
42 U.S.C. § 1983, against the Syracuse Police Department
("SPD") and five of its officers. In his complaint, plaintiff
alleges that defendants violated his constitutional rights
during the course of his arrest on February 13, 2017. Plaintiff's
complaint and accompanying application for leave to proceed
*in forma pauperis* ("IFP") have been referred to me for
review. Based upon my consideration of those materials, I will
(1) grant plaintiff's amended IFP application, (2) recommend
dismissal of his claim against the SPD with leave to replead,
and (3) recommend that his complaint otherwise be accepted
for filing.

I. BACKGROUND

Plaintiff commenced this action on or about December 20,
2018. Dkt. No. 1. According to plaintiff, he and two friends
were on their way to play indoor basketball when their vehicle
was pulled over for a traffic infraction. *Id.* at 4; Dkt. No. 1-1 at
4. Plaintiff alleges that after the stop, defendant William Kittle
forcibly removed White from the vehicle and that Kittle, in
addition to defendants Abraham Mamoun and Shawn Hauck,
proceeded to use excessive force against him during the
course of his arrest. Dkt. No. 1 at 4-5, 6-7; *see also* Dkt. No.
1-1 at 4, 8. Plaintiff further alleges that defendants Altimonda

and Fiorini were present and had an obligation to intervene
and prevent the unlawful use of force, but failed to do so. *Id.*
at 5, 7.

Plaintiff was ultimately arrested and charged with resisting
arrest, in violation of N.Y. Penal Law § 205.30, and
second-degree obstruction of governmental administration, in
violation of N.Y. Penal Law § 195.05. Dkt. No. 1-1 at 4. As
relief, plaintiff seeks compensatory and punitive damages in
the amount of $1,000,000. Dkt. No. 1 at 8.

A. Plaintiff's Amended IFP Application [1]
When a civil action is commenced in a federal district court,
the statutory filing fee, currently set at $400, must ordinarily
be paid. 28 U.S.C. § 1914(a). A court is authorized, however,
to permit a litigant to proceed IFP if it determines that he
is unable to pay the required filing fee. 28 U.S.C. § 1915(a)
(1). [2] Because I conclude that plaintiff meets the requirements
for IFP status, his amended application for leave to proceed
without prepayment of fees is granted. [3]

B. Sufficiency of Plaintiff's Complaint

1. Governing Legal Standard

 *2 Because I have found that plaintiff meets the financial
criteria for commencing this case IFP, I must next consider
the sufficiency of the claims set forth in his complaint in light
of 28 U.S.C. § 1915(e). Section 1915(e) directs that, when
a plaintiff seeks to proceed IFP, "the court shall dismiss the
case at any time if the court determines that ... the action ...
(i) is frivolous or malicious; (ii) fails to state a claim on
which relief may be granted; or (iii) seeks monetary relief
against a defendant who is immune from such relief." 28
U.S.C. § 1915(e)(2)(B). Similarly, 28 U.S.C. § 1915A(b)
directs a court to review any "complaint in a civil action in
which a prisoner seeks redress from a governmental entity
or officer or employee of a governmental entity," and to
"identify cognizable claims or dismiss the complaint, or any
portion of the complaint, if the complaint ... is frivolous,
malicious, or fails to state a claim upon which relief may be
granted; or ... seeks monetary relief from a defendant who is
immune from such relief." 28 U.S.C. § 1915A(b); *see also*
*Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) ("We have
found both sections [1915 and 1915A] applicable to prisoner
proceedings *in forma pauperis*.").

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 248 of 340

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

In deciding whether a complaint states a colorable claim, a court must extend a certain measure of deference in favor of *pro se* litigants, *Nance v. Kelly*, 912 F.2d 605, 606 (2d Cir. 1990) (per curiam), and caution should be exercised in ordering *sua sponte* dismissal of a *pro se* complaint before the adverse party has been served and the parties have had an opportunity to address the sufficiency of plaintiff's allegations, *Anderson v. Coughlin*, 700 F.2d 37, 41 (2d Cir. 1983). The court, however, also has an overarching obligation to determine that a claim is not legally frivolous before permitting a *pro se* plaintiff's complaint to proceed. *See, e.g.*, *Fitzgerald v. First East Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (holding that a district court may *sua sponte* dismiss a frivolous complaint, notwithstanding the fact that the plaintiff paid the statutory filing fee). "Legal frivolity ... occurs where 'the claim is based on an indisputably meritless legal theory [such as] when either the claim lacks an arguable basis in law, or a dispositive defense clearly exists on the face of the complaint.' " *Aguilar v. United States*, Nos. 99-MC-0304, 99-MC-0408, 1999 WL 1067841, at *2 (D. Conn. Nov. 8, 1999) (quoting *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437 (2d Cir. 1998) ); *see also Neitzke v. Williams*, 490 U.S. 319, 325 (1989) ("[D]ismissal is proper only if the legal theory ... or factual contentions lack an arguable basis."); *Pino v. Ryan*, 49 F.3d 51, 53 (2d Cir. 1995) ("[T]he decision that a complaint is based on an indisputably meritless legal theory, for the purposes of dismissal under section 1915(d), may be based upon a defense that appears on the face of the complaint.").

When reviewing a complaint under section 1915(e), the court is guided by the Federal Rules of Civil Procedure. Specifically, Rule 8 provides that a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The purpose of Rule 8 "is to give fair notice of the claim being asserted so as to permit the adverse party the opportunity to file a responsive answer, prepare an adequate defense and determine whether the doctrine of res judicata is applicable." *Powell v. Marine Midland Bank*, 162 F.R.D. 15, 16 (N.D.N.Y. 1995) (McAvoy, J.) (quotation marks and italics omitted).

A court should not dismiss a complaint if the plaintiff has stated "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662,

678 (2009). Although the court should construe the factual allegations of a complaint in a light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Twombly*, 550 U.S. at 555). Thus, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged–but it has not 'show[n]'–'that the pleader is entitled to relief.' " *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2) ).

### 2. Analysis of Plaintiff's Claims

**\*3** Although a municipality is subject to suit pursuant to section 1983, *see Monell v. Dept. of Soc. Servs.*, 436 U.S. 658, 690 (1978), a municipal police department does not have the capacity to be sued as an entity separate from the municipality in which it is located. *See Krug v. Cnty. of Rennselaer*, 559 F. Supp. 2d 223, 247 (N.D.N.Y. 2008) (citing *Orraca v. City of N.Y.*, 879 F. Supp. 148 (S.D.N.Y. 1995) ); *Turczyn ex rel. McGregor v. City of Utica*, No. 13-CV-1357, 2014 WL 6685476, at *2 (N.D.N.Y. Nov. 26, 2014) (Sharpe, J.); *see also Hoisington v. Cnty. of Sullivan*, 55 F. Supp. 2d 212, 214 (S.D.N.Y. 1999) ("Under New York law, a department of a municipal entity is merely a subdivision of the municipality and has no separate legal existence. Therefore, municipal departments like the Department of Social Services are not amenable to suit and no claims lie directly against the Department."). Although I would ordinarily recommend that, for the sake of judicial efficiency, the court substitute the City of Syracuse in place of the SPD, plaintiff's complaint contains no factual allegations that would support a *Monell* claim against the City of Syracuse. Accordingly, I recommend dismissal of plaintiff's claims asserted against the SPD.

With respect to his remaining claims, although plaintiff makes passing reference to his rights arising under the Eighth and Fourth Amendments, *see* Dkt. No. 1 at 6, it is clear from the factual allegations that he is asserting claims for excessive force and the failure to intervene arising under the Fourth Amendment. *See generally* Dkt. No. 1; *see also Edrei v. Maguire*, 892 F.3d 525, 533 (2d Cir. 2018) ("Arrestees may invoke the Fourth Amendment's prohibition against 'unreasonable' seizures."). In light of the court's obligation to liberally construe a *pro se* litigant's pleadings, I find that plaintiff's complaint should be accepted for filing and the

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 249 of 340

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

individual officer defendants should be required to respond in accordance with the local rules of practice for this court and the Federal Rules of Civil Procedure.[4]

C. Whether to Permit Amendment

Ordinarily, a court should not dismiss a complaint filed by a *pro se* litigant without granting leave to amend at least once "when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark*, 927 F.2d 698, 704-05 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a) ("The court should freely give leave when justice so requires."); *see also Mathon v. Marine Midland Bank, N.A.*, 875 F. Supp. 986, 1003 (E.D.N.Y. 1995) (permitting leave to replead where court could "not determine that the plaintiffs would not, under any circumstances, be able to allege a civil RICO conspiracy"). An opportunity to amend is not required, however, where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000); *see also Cortec Indus. Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice."). Stated differently, "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.*, 987 F.2d 129, 131 (2d Cir. 1993); *accord, Brown v. Peters*, No. 95-CV-1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept. 22, 1997) (Pooler, J.).

In this case, while I recommend dismissal of plaintiff's claim against the SPD, plaintiff could potentially amend his complaint to assert a cognizable cause of action against a defendant, such as the City of Syracuse, which is amenable to suit. Accordingly, I recommend that plaintiff be granted leave to amend his complaint. If plaintiff chooses to file an amended complaint, he must clearly and concisely set forth the facts that give rise to the claims, including the dates, times, and places of the alleged underlying acts, and each individual who committed each alleged wrongful act. In addition, plaintiff is informed that any such amended complaint will replace the existing complaint, and must be a wholly integrated and complete pleading that does not rely upon or incorporate by reference any pleading or document previously filed with the court. *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994) ("It is well established that an amended complaint ordinarily supersedes the original, and renders it of no legal effect." (internal quotation marks omitted) ).

II. SUMMARY, ORDER, AND RECOMMENDATION

**\*4** Having reviewed plaintiff's amended application for leave to proceed in this action IFP, I conclude that he has met the applicable requirements for leave to proceed without prepayment of fees, and will therefore grant his application. Turning to the merits of his complaint, to the extent that it names five police officers and alleges a violation of 42 U.S.C. § 1983, I conclude that those claims are not subject to dismissal at this procedural juncture. I recommend a finding, however, that plaintiff's claim against the SPD is legally deficient and subject to dismissal, but that plaintiff should be afforded an opportunity to amend with respect to that claim. Accordingly, it is hereby

ORDERED that plaintiff's amended application for leave to proceed in this action without prepayment of fees (Dkt. No. 6) is GRANTED; and it is further

ORDERED that plaintiff's original application for leave to proceed in this action without prepayment of fees (Dkt. No. 2) is DENIED as moot; and it is further

RECOMMENDED that plaintiff's complaint (Dkt. No. 1) be accepted for filing with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini; and it is further

RECOMMENDED that plaintiff's remaining cause of action against the Syracuse Police Department be otherwise DISMISSED with leave to replead within thirty days of the issuance of an order adopting this recommendation; and it is further

RECOMMENDED that, in the event plaintiff does not choose to file an amended complaint and the above recommendations are adopted, the case should move forward with respect to plaintiff's Fourth Amendment cause of action against defendants Mamoun, Kittle, Hauck, Altimonda, and Fiorini.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report.[5] FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993).

Case 1:25-cv-00774-AJB-ML   Document 16   Filed 12/30/25   Page 250 of 340

White v. Syracuse Police Department, Not Reported in Fed. Supp. (2019)

**All Citations**

Not Reported in Fed. Supp., 2019 WL 981850

---

**Footnotes**

1   Plaintiff filed both an original and amended motion to proceed in this action IFP. Dkt. Nos. 2, 6. While the two motions contain slightly different information concerning plaintiff's financial status, only the amended motion contains the required certification from an official at the correctional facility in which plaintiff is confined. *Compare* Dkt. No. 3 *with* Dkt. No. 7. Accordingly, plaintiff's original IFP application is denied as incomplete.

2   The total cost for filing a civil action in this court is $400.00, consisting of the civil filing fee of $350.00, *see* 28 U.S.C. § 1914(a), and an administrative fee of $50.00. Although an inmate granted IFP status is not required to pay the $50.00 administrative fee, he is required to pay, over time, the full amount of the $350.00 filing fee regardless of the outcome of the action. *See* 28 U.S.C. § 1915(b)(3).

3   Plaintiff is reminded that, although his IFP application has been granted, he will still be required to pay fees that he incurs in this action, including copying and/or witness fees.

4   The court expresses no opinion concerning whether plaintiff's claims can survive a properly filed motion to dismiss or motion for summary judgment, or whether he may prevail at trial.

5   If you are proceeding *pro se* and are served with this report, recommendation, and order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the report, recommendation, and order was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 974824
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jeramie WHITE, Plaintiff,

v.

SYRACUSE POLICE DEPARTMENT; Abraham
Mamoun, Syracuse Police Dept.; William Kittle,
Syracuse Police Dept.; Shawn Hauck, Syracuse
Police Dept.; Altimonda, Syracuse Police Dept.;
and Fiorini, Syracuse Police Dept., Defendants.

5:18-CV-1471 (GTS/DEP)
|
Signed 02/28/2019

**Attorneys and Law Firms**

JERAMIE WHITE, 18-B-0311, Plaintiff, Pro Se, Cayuga
Correctional Facility, P.O. Box 1186, Moravia, New York
13118.

**DECISION and ORDER**

Hon. Glenn T. Suddaby, Chief U.S. District Judge

**\*1** Currently before the Court, in this *pro se* civil rights
action filed by Jeramie White ("Plaintiff") against the
Syracuse Police Department and five of its employees
("Defendants"), is United States Magistrate Judge David
E. Peebles' Report-Recommendation recommending that (1)
Plaintiff's Complaint be accepted for filing by the Court
with respect to Plaintiff's Fourth Amendment cause of action
against Defendants Mamoun, Kittle, Hauck, Altimonda and
Fiorini, and (2) Plaintiff's remaining cause of action against
the Syracuse Police Department be dismissed with leave to
replead within thirty days of the issuance of an Order adopting
the Report-Recommendation. (Dkt. No. 9.) Plaintiff did not
submit an objection to the Report-Recommendation, and the
deadline by which to do so has expired. (*See generally* Docket
Sheet.) [1]

Based upon a review of this matter, the Court can find
no clear error in the Report-Recommendation: [2] Magistrate
Judge Peebles employed the proper standards, accurately
recited the facts, and reasonably applied the law to those
facts. As a result, the Court accepts and adopts the Report-
Recommendation for the reasons stated therein; Plaintiff's
Complaint is accepted for filing with respect to his Fourth
Amendment cause of action against Defendants Mamoun,
Kittle, Hauck, Altimonda and Fiorini; and Plaintiff's
remaining cause of action against the Syracuse Police
Department is dismissed with leave to replead within thirty
days of the issuance of this Decision and Order.

**ACCORDINGLY**, it is

**ORDERED** that Magistrate Judge Peebles' Report-
Recommendation (Dkt. No. 9) is **ACCEPTED** and
**ADOPTED** in its entirety; and it is further

**ORDERED** that Plaintiff's Complaint is accepted for filing
with respect to Plaintiff's Fourth Amendment cause of action
against Defendants Mamoun, Kittle, Hauck, Altimonda and
Fiorini; and it is further

**\*2 ORDERED** that Plaintiff's remaining cause of action
against the Syracuse Police Department is **DISMISSED with
leave to replead within THIRTY (30) DAYS** of the issuance
of this Decision and Order.

**ORDERED** that, in the event Plaintiff files an Amended
Complaint within the above-referenced thirty-day period, it
shall be referred to Magistrate Judge Peebles for review; and
it is further

**ORDERED** that, in the event Plaintiff does not file an
Amended Complaint within the above-referenced thirty-
day period, this action shall move forward with respect to
his Fourth Amendment cause of action against Defendants
Mamoun, Kittle, Hauck, Altimonda and Fiorini, and the Clerk
of the Court is directed to issue summonses and USM-285
forms at that time for service by the U.S. Marshal Service.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 974824

## Footnotes

1    The Court notes that, on January 11, 2019, Plaintiff filed a letter from the City of Syracuse Citizen Review
     Board dated December 31, 2018, outlining its findings with respect to this matter. (Dkt. No. 10.) In its letter,
     the Citizen Review Board upheld Plaintiff's claim for excessive force against "Det. One," recommended a
     written reprimand against that individual, and absolved "Det. Two," "Sgt. One," and "Lt. One" from wrongdoing
     regarding the use of excessive force. (*Id.*) The Court does not liberally construe this letter as any sort of
     Objection to the Report-Recommendation.

2    When no objection is made to a report-recommendation, the Court subjects that report-recommendation to
     only a clear error review. Fed. R. Civ. P. 72(b), Advisory Committee Notes: 1983 Addition. When performing
     such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face of the record
     in order to accept the recommendation." *Id.*; *see also Batista v. Walker*, 94-CV-2826, 1995 WL 453299, at
     *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's]
     report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal
     quotation marks omitted).

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 253 of 340

Williams v. 120 PCT Undercover, Not Reported in Fed. Supp. (2011)

2011 WL 13128209
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, E.D. New York.

Ozan WILLIAMS, Plaintiff,
v.
120 PCT UNDERCOVER; District 9, Defendants.

11-CV-4690 (KAM) (CLP)
|
Signed October 17, 2011
|
Filed 10/18/2011

**Attorneys and Law Firms**

Ozan Williams, Fishkill, NY, pro se.

**MEMORANDUM AND ORDER**

MATSUMOTO, United States District Judge

**\*1**  *Pro se* plaintiff Ozan Williams, currently incarcerated at the George R. Vierno Center on Rikers Island, filed the instant action on September 21, 2011 pursuant to 42 U.S.C. § 1983. As set forth below, the court grants plaintiff's request to proceed *in forma pauperis* pursuant to 28 U.S.C. § 1915 and directs him to file an amended complaint within 30 days of the entry date of this order.

**Background**

Plaintiff alleges that on August 26, 2008, "at 91 Broad Street, Staten Island, N.Y. 10304" he was beaten twice by undercover cops "for no reason." (ECF No. 1, Complaint ("Compl.") at ¶ IV.) Plaintiff further alleges that he received medical treatment, but that he "still can't see good." (*Id.* at ¶ IV.A.) The remedy plaintiff seeks is unclear, but he states: "my health first and stop[p]ing these same police from getting me locked up ...." (*Id.* at ¶ V.)

**Standard of Review**

The court is aware that plaintiff is proceeding *pro se* and "a *pro se* complaint, however inartfully pleaded, must be

held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (citation omitted). The court is obliged to construe plaintiff's pleadings liberally and interpret them as raising the strongest arguments they suggest. *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 471 (2d Cir. 2006). Nevertheless, 28 U.S.C. § 1915A requires the court to screen a civil complaint "in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and thereafter "dismiss the complaint, or any portion of the complaint," if it is "frivolous, malicious, or fails to state a claim upon which relief may be granted." 28 U.S.C. § 1915A(a), (b)(1). *See Abbas v. Dixon*, 480 F.3d 636, 639 (2d Cir. 2007) (discussing *sua sponte* standard pursuant to § 1915A).

**Discussion**

To sustain a claim pursuant to § 1983, a plaintiff must show that the defendants (a) acted under color of state law (b) to deprive the plaintiff of a constitutional right. *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994). Here, plaintiff has not named any parties who can be sued in this complaint.

To the extent plaintiff has named the 120 Precinct and District 9, a police precinct and district of the New York City Police Department are not a proper parties to this action. Section 396 of the Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the city of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter § 396 (2009). That provision has been construed to mean that "New York City departments, as distinct from the City itself, lack the capacity to be sued." *Ximines v. George Wingate High Sch.*, 516 F.3d 156, 160 (2d Cir. 2008); *Jenkins v. City of New York*, 478 F.3d 76, 93 n.19 (2d Cir. 2007) (NYPD not a suable entity).

**Leave to Amend**

If a liberal reading of the pleading "gives any indication that a valid claim might be stated," the court must grant leave to amend it. *See Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000). In this circuit, it is well settled that a "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006) (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)).

Case 1:25-cv-00774-AJB-ML    Document 16    Filed 12/30/25    Page 254 of 340

Williams v. 120 PCT Undercover, Not Reported in Fed. Supp. (2011)

Plaintiff alleges that unnamed undercover police officers used excessive force against him and caused him to sustain injuries on August 26, 2008 but does not identify any particular defendants. Therefore, the court grants plaintiff leave to file an amended complaint within 30 days from the date of this order. In the amended complaint, plaintiff must provide a short statement of claim, including the dates and times of all relevant events to the best of his recollection, and the relief he seeks. Plaintiff must also name the individuals responsible for the alleged deprivation of his civil rights. If plaintiff cannot identify the individual defendant(s) within the time allowed in this order or because they were undercover, he may designate the individual as John (or Jane) Doe #1, and so on. For example, *Police Officer John Doe #1, employed at _____ on _____ (date) and _____ (time); Police Officer John Doe #2, employed at_____ on (date) and _____ (time)*. The same defendants named in the caption of the amended complaint must also be named and their actions described in the statement of claim. The amended complaint shall replace the original complaint.

**Conclusion**

**\*2** For the reasons set forth above, plaintiff must file an amended complaint in order to proceed with this action. If plaintiff elects to file an amended complaint, it shall be captioned "AMENDED COMPLAINT" and bear the same docket number as this order, 11-CV-4690 (KAM) (CLP) and shall be filed within 30 days from the entry of this order. If plaintiff fails to file an amended complaint within the time allowed or show good cause why he cannot comply, the case shall be dismissed without prejudice and judgment shall enter. The court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of an appeal. *Coppedge v. United States*, 369 U.S. 438, 444-45 (1962). The Clerk of Court is respectfully requested to serve a copy of this Order on plaintiff and note service in the docket.

**SO ORDERED.**

Dated: October 17, 2011.

**All Citations**

Not Reported in Fed. Supp., 2011 WL 13128209

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

611 Fed.Appx. 8
This case was not selected for
publication in West's Federal Reporter.
RULINGS BY SUMMARY ORDER DO NOT HAVE
PRECEDENTIAL EFFECT. CITATION TO A
SUMMARY ORDER FILED ON OR AFTER JANUARY
1, 2007, IS PERMITTED AND IS GOVERNED BY
FEDERAL RULE OF APPELLATE PROCEDURE 32.1
AND THIS COURT'S LOCAL RULE 32.1.1. WHEN
CITING A SUMMARY ORDER IN A DOCUMENT
FILED WITH THIS COURT, A PARTY MUST
CITE EITHER THE FEDERAL APPENDIX OR AN
ELECTRONIC DATABASE (WITH THE NOTATION
"SUMMARY ORDER"). A PARTY CITING A
SUMMARY ORDER MUST SERVE A COPY OF IT ON
ANY PARTY NOT REPRESENTED BY COUNSEL.
United States Court of Appeals, Second Circuit.

Guynell WRIGHT, Plaintiff–Appellant,

v.

CITY OF SYRACUSE, Jeffrey T. Wright, Andrew
Nolan, Donald Thompson, Robert Calkin, John M.
O'Connor, III, Thomas Scimone, Defendants–Appellees.

No. 14–1635–cv
|
April 16, 2015.

**Synopsis**

**Background:** Terminated African American city employee brought action against employer for racial discrimination, retaliation, hostile work environment, and due process violations. The United States District Court for the Northern District of New York, Glenn T. Suddaby, J., 2014 WL 1293527, granted employer's motion for summary judgment and dismissed the complaint. Employee appealed.

**Holdings:** The Court of Appeals held that:

[1] termination of employee did not give rise to an inference of racial discrimination, so as to create prima facie case under Title VII;

[2] absence of causal connection between any protected activity and termination precluded Title VII retaliation claim;

[3] incidents cited by employee were insufficient to establish hostile work environment claim;

[4] termination did not violate employee's due process rights; and

[5] city was not liable for alleged discrimination as a matter of law.

Affirmed.

**Procedural Posture(s):** On Appeal; Motion for Summary Judgment.

West Headnotes (7)

**[1]    Federal Courts**  ⬤  **Failure to mention or inadequacy of treatment of error in appellate briefs**

Terminated employee's claims against employer for breach of contract, violation of the New York State Constitution, and punitive damages, which were not addressed in his appellate briefs, were waived.

1 Case that cites this headnote

**[2]    Civil Rights**  ⬤  **Discharge or layoff**

Termination of African American city employee did not give rise to an inference of racial discrimination, so as to create prima facie case under Title VII, and, furthermore, employer provided a legitimate, nondiscriminatory reason for any adverse action, where employee was given several opportunities to keep his job despite his continued and serious misconduct. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

6 Cases that cite this headnote

**[3]    Civil Rights**  ⬤  **Motive or intent; pretext**

Circumstances behind termination of African American city employee did not give rise to an inference of racial discrimination even under a "cat's paw" theory, given absence of evidence of

2015 Fair Empl.Prac.Cas. (BNA) 181,250

any act by his supervisors that was motivated by discriminary animus with the specific intent to cause his termination. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

5 Cases that cite this headnote

[4] **Civil Rights** — Causal connection; temporal proximity

**Municipal, County, and Local Government** — Other particular offices or positions

**Public Employment** — Causal connection; temporal proximity

Even if African American city employee engaged in protected activities known to his employer, absence of any causal connection between those activities and his termination precluded Title VII retaliation claim. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

5 Cases that cite this headnote

[5] **Civil Rights** — Hostile environment; severity, pervasiveness, and frequency

Incidents cited by African American city employee did not rise to the level of severity or pervasiveness to establish a hostile work environment on the basis of his race. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

1 Case that cites this headnote

[6] **Constitutional Law** — Termination or discharge

**Municipal, County, and Local Government** — Requisites and sufficiency of hearing

**Public Employment** — Requisites and sufficiency of hearing

Article 78 proceeding provided to African American city employee after his termination, by New York state law, was an adequate adversarial hearing for purposes of due process. U.S.C.A.

Const.Amend. 14; N.Y.McKinney's CPLR 7801 et seq.

3 Cases that cite this headnote

[7] **Civil Rights** — Employment practices

Where terminated African American city employee failed to establish individual liability on his claims of discrimination, retaliation, hostile work environment, and deprivation of due process, his § 1983 claim of liability against the city for those purported violations failed as a matter of law. Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

9 Cases that cite this headnote

**\*9** Appeal from a judgment of the United States District Court for the Northern District of New York (Glenn T. Suddaby, Judge).

UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the District Court is **AFFIRMED.**

**Attorneys and Law Firms**

A.J. Bosman, Bosman Law Office, Rome, NY, for Plaintiff–Appellant.

Ann Magnarelli Alexander, Assistant Corporation Counsel, for Robert Stamey, Corporation Counsel, Syracuse, NY, for Defendants–Appellees.

PRESENT: JOSÉ A. CABRANES, ROBERT D. SACK, GERARD E. LYNCH, Circuit Judges.

### SUMMARY ORDER

Plaintiff-appellant Guynell Wright appeals from the District Court's March 31, 2014 judgment granting defendants' motion for summary judgment and dismissing the complaint in its entirety.

### BACKGROUND

Wright's racial discrimination, retaliation, hostile work environment, and due process claims principally stem from the termination of his employment by the City of Syracuse (the "City") on February 24, 2010. Wright—an African–American man—had been employed by the City since 1988 as a laborer in the Street Cleaning Bureau of the City's Department of **\*10** Public Works ("DPW"). He was a member of the AFSCME Local 400 bargaining unit ("Local 400") and his employment was covered by a collective bargaining agreement between Local 400 and the City.

During the course of Wright's employment, the City subjected him to official discipline on several occasions. For instance, between 1993 and 2007, Wright was suspended eight times for a variety of infractions, including reporting late and failing to report for work, fighting with and threatening co-workers, insubordination, and theft of City property. In January 2009, Wright was terminated for another incident of insubordination, in which he was accused of acting belligerent and threatening to a supervisor. The City, however, entered into a settlement agreement with Local 400 to permit Wright to continue working. Finally, in February 2010, Wright was detained by the police after attempting to turn in scrap metal belonging to the City to a commercial recycling facility. For this offense, Wright's employment was terminated.

### DISCUSSION

Wright's operative complaint asserts 21 causes of action under multiple statutes, including 42 U.S.C. §§ 2000e et seq. ("Title VII"); 42 U.S.C. § 1983 ("Section 1983"); id. § 1981 ("Section 1981"); and the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"). The District Court granted defendants' motion for summary judgment and dismissed the complaint in its entirety.

We review the District Court's grant of summary judgment de novo, viewing the facts "in the light most favorable to the non-moving party and draw[ing] all reasonable inferences in that party's favor." Cox v. Warwick Valley Cent. Sch. Dist., 654 F.3d 267, 271 (2d Cir.2011). Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106

S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks omitted).

[1] Upon de novo review, we agree with the District Court that defendants are entitled to summary judgment. First, Wright waived several of his claims on appeal by failing to address them in his briefs. See Norton v. Sam's Club, 145 F.3d 114, 117 (2d Cir.1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). Specifically, he waived his claims for breach of contract, violation of the New York State Constitution, and punitive damages, as well as his claims against John and Jane Doe.

As to his remaining claims, Wright's briefs fail to differentiate them by the statutory cause of action or the defendant sued. Rather, Wright has simply grouped his claims into four categories—discrimination, retaliation, hostile work environment, and deprivation of due process. We address each of these categories of claims in turn. [1]

**\*11** [2] [3] First, Wright's discrimination claims under Title VII are analyzed under the burden-shifting analysis set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case of intentional discrimination, a plaintiff must show: (1) that he is a member of a protected class; (2) that he was qualified for the position he held; (3) that he suffered an adverse employment action; and (4) that the adverse action took place under circumstances giving rise to an inference of discrimination. Reynolds v. Barrett, 685 F.3d 193, 202 (2d Cir.2012). We agree with the District Court that Wright has failed to establish that any of the adverse employment actions he suffered—including his termination—took place under circumstances giving rise to an inference of racial discrimination. [2] Even if Wright did make out a prima facie case of discrimination, however, defendants here provided legitimate, non-discriminatory reasons for these adverse actions, and Wright failed to provide any evidence that these reasons were pretext for racial discrimination. Rather, the record shows that Wright was given several opportunities to keep his job, despite his continued and serious misconduct. We therefore affirm the dismissal of Wright's discrimination claims.

[4] Second, Wright's retaliation claims under Title VII are also analyzed under the McDonnell Douglas burden shifting framework. To establish a prima facie case of retaliation, a plaintiff must show: "(1) participation in a protected activity;

(2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." *See Hicks v. Baines,* 593 F.3d 159, 164 (2d Cir.2010) (internal quotation marks omitted). Even assuming that Wright engaged in protected activities known to defendants, there is no evidence—either direct or circumstantial—to support a causal connection between these activities and any of the adverse employment actions suffered by Wright. Again, the record reflects that the disciplinary actions taken against Wright—including his termination—were due to his persistent and serious misconduct, not due to his engaging in protected activities. We therefore affirm the dismissal of Wright's retaliation claims.

 **[5]**    Third, to establish a hostile work environment claim under Title VII, a plaintiff is required to provide evidence that his workplace was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment." *Redd v. New York Div. of Parole,* 678 F.3d 166, 175 (2d Cir.2012) (internal quotation marks and ellipses omitted). We agree with the District Court that none of the incidents cited by Wright to  **\*12**  support this claim rose to the level of severity or pervasiveness to establish a hostile work environment claim on the basis of his race. We therefore affirm the dismissal of Wright's hostile work environment claims.

 **[6]**    Fourth, Wright asserts that his termination violated his rights under Due Process Clause of the Constitution. It is well settled that procedural due process is satisfied "if the government provides notice and a limited opportunity to be heard prior to termination, so long as a full adversarial hearing

is provided afterwards." *Locurto v. Safir,* 264 F.3d 154, 171 (2d Cir.2001). In this case, before he was terminated, Wright was: (1) informed of the disciplinary charges against him; (2) afforded a disciplinary hearing; and (3) permitted to grieve his termination. Wright now argues that the Article 78 proceeding provided after his termination by New York state law was not an adequate adversarial hearing. We have previously held, however, that "[a]n Article 78 proceeding ... constitutes a wholly adequate post-deprivation hearing for due process purposes." *Id.* at 175. We therefore affirm the dismissal of Wright's due process claim.

 **[7]**    Finally, we affirm the District Court's dismissal of Wright's Section 1983 claims brought against the City, pursuant to *Monell v. Department of Social Services.,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Because Wright failed to establish individual liability on his claims of discrimination, retaliation, hostile work environment, and deprivation of due process, his claim of liability against the City for these purported violations fails as a matter of law. *See City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986).

### *CONCLUSION*

We have considered all of the arguments raised by Wright on appeal and find them to be without merit. For the reasons stated above, the March 31, 2014 judgment of the District Court is **AFFIRMED.**

**All Citations**

611 Fed.Appx. 8, 2015 Fair Empl.Prac.Cas. (BNA) 181,250

## Footnotes

1    New York courts "require the same standard of proof for claims brought under the NYSHRL as for those brought under Title VII." *Leopold v. Baccarat, Inc.,* 174 F.3d 261, 264 n. 1 (2d Cir.1999), and, for present purposes, those brought under sections 1981 and 1983, *see Patterson v. Cnty. Of Oneida, N.Y.,* 375 F.3d 206, 225 (2004) ("Most of the core substantive standards that apply to claims of discriminatory conduct in violation of Title VII are also applicable to claims of discrimination in employment in violation of § 1981 or the Equal Protection Clause."). Accordingly, our holdings with respect to Wright's Title VII claims for discrimination, retaliation, and hostile work environment apply with equal force to any analogous Section 1981, Section 1983, or NYSHRL claims.

**Wright v. City of Syracuse, 611 Fed.Appx. 8 (2015)**

2015 Fair Empl.Prac.Cas. (BNA) 181,250

2    To the extent that Wright argues that the district court erred in failing to apply a "cat's paw" theory of liability to his discrimination claim, that argument is unavailing. Even assuming that such a theory applies, *see Nagle v. Marron,* 663 F.3d 100, 117–18 (2d Cir.2011), Wright fails to adduce evidence of any act by his supervisors that was motivated by discriminatory animus, with the specific intent to cause his termination, and was the proximate cause of his termination. *Cf. Staub v. Proctor Hosp.,* 562 U.S. 411, 131 S.Ct. 1186, 1194, 179 L.Ed.2d 144 (2011). Accordingly, even under a "cat's paw" theory, the circumstances of Wright's termination do not give rise to an inference of racial discrimination.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

2015 WL 5316410
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

David WRIGHT and Sarah Harris, Plaintiffs,

v.

ORLEANS COUNTY, Orleans County Sheriff, County of Orleans Major Crime Task Force, Albion Police Department, Village of Albion, Town of Albion, New York State Office of Fire Prevention and Control, Niagara County Sheriff, Albion Fire Department, Rocco Sidari, both individually and in his capacity as Albion Fire Chief, Jeremy Grahm, both individually and in his capacity as an employee of Albion Fire Department, Jeffrey Gifaldi, both individually and in his capacity as Investigator for the Village of Albion Police Department, Joseph Fuller, both individually and in his capacity as a police officer for the Village of Albion Police Department, John Doyle, both individually and in his capacity as police officer for the Village of Albion Police Department, Karol L. Hughes, both individually and in his capacity as police officer for the Village of Albion Police Department, Erik Holter, both individually and in his capacity as Investigator with the New York State Office of Fire Prevention and Control, Donald Clawson, Michael Jutrowski, Adriean Ann Park, Paul E. Savage, Randi Shadic, Steven M. Nassivera, Nicholas Long, The Hartford, and Sentinel Insurance Company, Ltd., Defendants.

No. 14–CV–00622A(F).
|
Signed Sept. 10, 2015.

**Attorneys and Law Firms**

Elliott, Stern & Calabrese, LLP David S. Stern, of Counsel, Rochester, NY, for Plaintiffs.

Webster Szanyi, LLP, Michael P. McClaren, Andrew Dylan, and Florina Altshiler, of Counsel, Buffalo, NY, for Defendants Orleans County, Oleans County Sheriff, County of Orleans Major Crime Task Force, Albion Police Department, Village of Albion, Town of Albion, Niagara County Sheriff, Jeffrey Gifaldi, Joseph Fuller, John Doyle, and Karol L. Hughes.

Eric T. Schneiderman, New York State Attorney General, STephanie Joy Calhoun, Assistant Attorney General, of Counsel, Buffalo, NY, for Defendants New York State Office of Fire Prevention and Control, Eric Holter, and Randi Shadic.

Gennet Kallman Antin & Robinson, P.C. Mark Leigh Antin, and Michael Scott Leavy, of Counsel New York, NY, for Defendant Paul E. Savage.

Leclair Korona Giordano Cole LLP, Laurie A. Giordano, and Michael E. Nicholson, of Counsel, Rochester, NY, for Steven M. Nassivera, The Hartford, and Sentinel Insurance Company, Limited.

Walsh, Roberts & Grace, Buffalo, NY, for Albion Fire Department, Rocco Sidari, and Jeremy Grahm.

REPORT and RECOMMENDATION

DECISION and ORDER

LESLIE G. FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

**\*1** This action was referred to the undersigned by Honorable Richard J. Arcara on October 16, 2014, for all pretrial matters including preparation of a report and recommendation on dispositive motions. The matter is presently before the court on motions to dismiss filed on October 15, 2014, by Defendants Orleans County, Orleans County Sheriff, County of Orleans Major Crime Task Force, Albion Police Department, Village of Albion, Town of Albion, Niagara County Sheriff, Jeffrey Gifaldi, Joseph Fuller, John Doyle, and Karol L. Hughes (Doc. No. 22), on November 3, 2014 by Defendants Steven M. Nassivera, The Hartford, and Sentinel Insurance Company, Limited (Doc. No. 28), on November 7, 2014, by Defendant Paul E. Savage (Doc. No. 30), and on November 17, 2014, by Defendants New York State Office of Fire Prevention and Control, Eric Holter, and Randi Shadic (Doc. No. 33), as well as Plaintiffs' motion for leave to file an amended complaint, filed December 8, 2014 (Doc. No. 36). [1]

### *BACKGROUND*

Plaintiffs Sarah Harris ("Harris"), and David Wright ("Wright") (together, "Plaintiffs"), commenced this civil rights action on August 1, 2014, alleging Defendants violated their constitutional rights in connection with the investigation of a fire that destroyed Harris's business, and subsequent indictment, arrest, and prosecution of Plaintiffs for arson and criminal mischief in connection with the fire. Defendants to this action include Orleans County ("Orleans County"), Orleans County Sheriff ("Orleans County Sheriff"), County of Orleans Major Crime Task Force ("the Crime Task Force"), Albion Police Department ("Albion Police"), Village of Albion ("the Village"), Town of Albion ("the Town"), New York State Office of Fire Prevention and Control ("Fire Prevention Office"), Niagara County Sheriff ("Niagara County Sheriff"), Albion Fire Department ("Fire Department"), Rocco Sidari ("Sidari"), Jeremy Grahm ("Grahm"), Jeffrey Gifaldi ("Gifaldi"), Joseph Fuller (Fuller"), John Doyle ("Doyle"), Karol L. Hughes ("Hughes"), Erik Holter ("Holter"), Donald Clawson ("Clawson"), Michael Jutrowski ("Jutrowski"), Adriean Ann Park ("Park"), Paul E. Savage ("Savage"), Randi Shadic ("Shadic"), Steven M. Nassivera ("Nassivera"), Nicholas Long ("Long"), The Hartford ("Hartford"), and Sentinel Insurance Company, LTD ("Sentinel") (together, "Defendants"). Plaintiffs assert four claims for relief including (1) false arrest, Complaint ¶¶ 43–52 ("false arrest claim"); (2) malicious prosecution, Complaint ¶¶ 53–61 ("malicious prosecution claim"); (3) negligent hiring, supervision and retention, Complaint ¶¶ 62–69 ("supervisory liability claim"); and (4) false arrest, malicious prosecution, and deprivation of a fair trial in violation of Plaintiffs' civil rights under 42 U.S.C. § 1983 (" § 1983"), and the New York State Constitution, Complaint ¶¶ 70–75 ("civil rights claim"). On September 26, 2014, Defendants Fire Department, Grahm, and Sidari ("Fire Department Defendants"), filed an Answer (Doc. No. 12).

*2  On October 15, 2014, Defendants Orleans County, Orleans County Sheriff, the Crime Task Force, Albion Police, the Village, the Town, Niagara County Sheriff, Gifaldi, Fuller, Doyle, and Hughes ("Prosecuting Defendants") filed a motion to dismiss (Doc. No. 22) ("Prosecuting Defendants' Motion"), supported by the attached Declaration of Andrew Dylan, Esq. (Doc. No. 22–1) ("Dylan Declaration"), and the Memorandum of Law in Support of Motion to Dismiss (Doc. No. 22–2) ("Prosecuting Defendants' Memorandum"). On November 3, 2014, Defendants Hartford, Sentinel and Nassivera ("Insurance Defendants"), filed a motion to dismiss (Doc. No. 28) ("Insurance Defendants' Motion"), attaching

the Memorandum of Law in Support of Motion to Dismiss (Doc. No. 28–1) ("Insurance Defendants' Memorandum"). On November 7, 2014, Defendant Savage filed a motion to dismiss or, alternatively, for summary judgment (Doc. No. 30) ("Savage's Motion"), attaching in support the Memorandum of Law of Defendant Paul E. Savage (Doc. No. 30–1) ("Savage's Memorandum"), a Statement of Facts in Support of Motion for Summary Judgment (Doc. No. 30–2) ("Savage's Statement of Facts"), the Affidavit of Paul E. Savage in Support of Motion to Dismiss or for Summary Judgment (Doc. No. 30–3) ("Savage's Affidavit"), and the Declaration of Michael S. Leavy, Esq., in Support of Motion to Dismiss or for Summary Judgment (Doc. No. 30–4) ("Leavy Declaration"), with exhibits 1 through 4, and 5 (Docs. Nos. 30–5 through 30–10, and exhibit 3 (Doc. No. 31) ("Savage's Exh(s). ___"). On November 17, 2014, Defendants Fire Prevention Office, Holter, and Shadic ("Fire Prevention Defendants"), filed a motion to dismiss (Doc. No. 33) ("Fire Prevention Defendants' Motion"), attaching Defendants' New York State Office of Fire Prevention and Control, Erik Holter, and Randi Shadic Memorandum of Law in Support of Motion to Dismiss for Failure to State a Claim Pursuant to F.R.C.P. 12(b)(6) (Doc. No. 33–1) ("Fire Prevention Defendants' Memorandum").

In opposition to the motions to dismiss, Plaintiffs filed on December 8, 2014, the Cross–Notice of Motion [*sic* ] (Doc. No. 36) ("Plaintiff's Motion"), seeking leave to file an amended complaint, attaching the Declaration of David S. Stern, Esq. ("Stern Declaration"), the Memorandum in Support of Plaintiff [*sic* ] Opposition to Defendants' Motions to Dismiss Complaint and in Support of Cross Motion Permitting Plaintiffs to Amend Their Complaint ("Plaintiffs' Memorandum"), with a copy of the proposed amended complaint attached as Exh. A ("Proposed Amended Complaint"). Plaintiffs' Memorandum contains legal argument in support of Plaintiffs' Motion seeking leave to file an amended complaint but does not respond to the various arguments made by the Defendants moving to dismiss.

On December 23, 2014, Prosecuting Defendants filed in further support of dismissal the Reply Declaration of Florina Altshiler, Esq. (Doc. No. 38) ("Altshiler Reply Declaration"), attaching exhibits A and B ("Prosecuting Defendants' Reply Exh(s). ___"). On January 12, 2015, Savage filed the Reply Memorandum of Law of Defendant Paul E. Savage in Further Support of Motion to Dismiss Complaint Pursuant to Fed.R.Civ.P. 12(b)(6), or, Alternatively, for

Summary Judgment Pursuant to Fed.R.Civ.P. 56(a) (Doc. No. 41) ("Savage Reply"). On January 14, 2015, the Insurance Defendants filed the Attorney Declaration of Laurie A. Giordano, Esq. (Doc. No. 42) ("Giordano Reply Declaration"), attaching the Memorandum in Reply to Plaintiffs' Opposition to Motion to Dismiss and in Opposition to Plaintiffs' Motion to Amend the Complaint (Doc. No. 42–1) (Insurance Defendants' Reply"), the Fire Prevention Defendants filed the Declaration of Assistant Attorney General Stephanie Joy Calhoun (Doc. No. 43) ("Calhoun Reply Declaration"), and the Prosecuting Defendants filed the Amended Reply Declaration of Florina Altshiler, Esq. (Doc. No. 44) ("Amended Altshiler Reply Declaration"), attaching exhibits A and B ("Prosecuting Defendants' Exh(s). ___"). Oral argument was deemed unnecessary.

**\*3** Based on the following, the Prosecuting Defendants' Motion should be GRANTED in part and DENIED in part; the Insurance Defendants' Motion should be GRANTED; Savage's Motion should be GRANTED insofar as it seeks to dismiss the Complaint for failure to state a claim and is DISMISSED as moot as to the alternative request for summary judgment; and the Fire Prevention Defendants' Motion should be GRANTED; Plaintiffs' Motion is GRANTED in part and DENIED in part.

### FACTS

Because the motions pending before the court include motions by various Defendants to dismiss for failure to state a claim, and Plaintiffs' crossmotion for leave to file an amended complaint alleging additional facts so as to avoid dismissal of the action, the court, in the interest of completeness and clarity, separately considers the facts of both the Complaint and the Proposed Amended Complaint, as well as facts found in a report prepared by an insurance investigator incorporated by reference into the Proposed Amended Complaint.

### The Complaint

The facts as pleaded in the Complaint, although sparse, assert that on August 13, 2012, "Defendants began an arson investigation of the Plaintiffs herein arising from a fire loss that occurred on or about that date located at 158 Hamilton Street, Albion, New York." Complaint ¶ 32. Defendants appeared before an Orleans County grand jury ("the Grand Jury")[2] and presented evidence resulting in an indictment on March 15, 2013 ("the Indictment"),[3] charging Plaintiffs

with violations of New York Penal Law ("N.Y. Penal Law") § 150.10(1) (Arson in the Third Degree) ("the arson charge"), and § 145.00(1) (Criminal Mischief in the Fourth Degree) ("the criminal mischief charge") (together, "the criminal charges"). After the Indictment was returned, Plaintiffs were arrested on the charges and tried in Orleans County Court, before County Court Judge James P. Punch ("Judge Punch") ("the trial"). The trial commenced on November 12, 2013, and continued through November 22, 2013, when Judge Punch dismissed both charges against Harris[4] and the jury returned a verdict acquitting Wright on both charges. Plaintiffs maintain that the investigation and prosecution damaged their personal and social reputations, as well as their business reputation and standing in the business community and that those involved in investigating the fire failed to thoroughly discern whether the fire was electrical in nature and not an arson.

### The Proposed Amended Complaint

The Proposed Amended Complaint Plaintiffs seek leave to file provides more facts including that on March 13, 2012, Plaintiff Harris opened her own business, a novelty/smoke shop and second-hand clothing store ("the shop"), located at 158 Hamilton Street, in Albion, New York. Proposed Amended Complaint ¶¶ 33–34. The building in which the shop was located had recently been purchased and extensively renovated by Harris and her boyfriend, Plaintiff Wright, and Plaintiffs, in addition to their hard work and labor, invested $ 18,000 in the premises, $ 45,000 in inventory, $ 10,000 in display cases, and $ 35,000 in "tattoo flash"[5] and artwork. *Id.* ¶¶ 35–37. On August 12, 2012, a fire ("the fire"), heavily damaged the shop and resulted in a total loss of its inventory and contents. *Id.* ¶¶ 38, 40. Harris was notified of the fire by a customer, one Amber M. Mesita ("Mesita"), who telephoned Plaintiff in the early morning of August 12, 2012. Harris and Wright then "rushed" to the shop and were told by Mesita that she informed Defendant Ablion Police Officer John Doyle ("Doyle"), who was the first police officer to arrive at the scene of the fire, that Mesita smelled what she recognized as the odor of an electrical fire. *Id.* ¶ 45. Doyle interviewed both Harris and Wright, preparing written statements for their signatures, *id.* ¶ 46, but never recorded Mesita's observation regarding the odor of an electrical fire. *Id.* ¶ 47. On August 13, 2012, Defendants commenced an arson investigation of the fire ("the investigation"). Plaintiffs cooperated with the investigation, including consenting to further interviews by insurance investigators Defendants Paul Savage ("Savage") and Steve Nassivera ("Nassivera"), and insurance adjuster

Jennifer Holler ("Holler"), [6] as well as Defendants Albion Police Officer Jeffrey Gifaldi ("Gifaldi") and Sergeant Joseph Fuller ("Fuller"). Proposed Amended Complaint ¶¶ 48–50. Defendant Donald Clawson ("Clawson"), who was known in the community to have a psychiatric and criminal history, contacted the Albion Police, the Orleans County Sheriff, and Defendant Hartford Insurance Company ("Hartford"), reporting that Wright burned down the shop, hoping to receive reward money for reporting the arson. *Id.* ¶¶ 51–53. According to Plaintiffs, "the investigators in this case were overcome by their eagerness and zeal of convicting Plaintiffs demonstrated by their conduct in selectively choosing evidence and ignoring blunt holes in their case." *Id.* ¶ 54. Plaintiffs assert that Clawson reported Wright started the fire in a red plastic bucket, despite Savage and Holter's conclusion that if the fire originated in the red plastic bucket, it would have been burnt beyond recognition. *Id.* ¶ 55. Plaintiffs allege Defendant Albion Fire Department Chief Rocco Sidari ("Sidari"), failed to hire an arson investigator to conduct a proper investigation of the fire and coached witnesses, including Albion Fire Department employee Jeremy Grahm ("Grahm"), and another, unidentified firefighter, to testify that "the fire appeared as if it were from an incendiary origin...." *Id.* ¶¶ 57–59. Plaintiffs similarly assert Defendant police investigator Gifaldi, despite knowing Clawson's reputation, "cajoled" witnesses, including Defendants Adrian Park ("Park"), and Michael Jutrowski ("Jutrowski"), into testifying at trial against Plaintiffs with threats of jail. *Id.* ¶¶ 60–62. Plaintiffs' describe Park's trial testimony as informing the jury Gifaldi had forced her to testify against Plaintiffs, while Jutrowski testified Wright started the fire "by flipping a cigarette above the inflammable ceiling tiles," *id.* ¶¶ 63, which conflicted with Prosecuting Defendants' own investigation. *Id.* ¶ 64.

 **\*4** Harris's insurance company, Defendant Hartford, retained fire origin and cause investigation firm PT & C Forensic Consulting Services, P.A. ("PT & C"), [7] based in Atlanta, Georgia, to conduct a forensic investigation of the fire's origin and caused, which was conducted on August 15, 2012, by Savage, PT & C's Senior Fire & Explosion Consultant. Proposed Amended Complaint ¶ 65. In his report ("Investigative Report"), dated September 10, 2012, Savage, based on his investigation including three fire debris samples for which laboratory analysis revealed no accelerants present, concluded the fire originated along the rear wall of the shop's office, that the ignition source, the first material ignited, and ignition sequence were all unknown, and the fire's "cause classification" was "undetermined with incendiary not

eliminated." *Id.* ¶¶ 65–66. Although Gifaldi subsequently provided Savage with Defendant Niagara County Sheriff's Office Forensic Laboratory report ("Niagara County Forensic Laboratory Report"), indicating accelerants were present in one of two fire debris samples, consistent with a "medium petroleum distillate," such as mineral spirits, paint thinners, and charcoal starters, such findings did not change Savage's conclusion in the Investigative Report. *Id.* ¶ 67. Plaintiffs assert Gifaldi agreed with Savage's conclusion that the fire originated in the shop's rear office wall near Harris's desk, *id.* ¶ 68, yet Defendant Albion Police employees, including Doyle, Fuller, Gifaldi, and Hughes, failed to secure video footage from a security digital video recorder ("DVR"), which Plaintiffs maintain would have established Plaintiffs did not set the fire. *Id.* ¶ 71.

Plaintiffs assert Defendant Erik Holter ("Holter"), an investigator with Defendant Fire Prevention Office, failed to conduct a proper fire investigation to determine whether an electrical short caused the fire, and instead simply rubber-stamped Gifaldi's investigation despite its obvious short-comings. Proposed Amended Complaint ¶ 72. According to Plaintiffs, Nassivera intentionally misused tape recorded statements of Plaintiffs when testifying at the trial, interpreting inaudible portions of the audio recordings so as to slant the meaning against Plaintiffs. *Id.* ¶ 73. Gifaldi allegedly "interviewed witnesses of known doubtfulness," and provided false Grand Jury testimony to secure the Indictment, including stating the shop's security system and DVR were not operating at the time of the fire, and that Plaintiffs had purposefully shut off a fire alarm system which Plaintiffs maintain was abandoned by the shop's former tenant. *Id.* ¶ 74. Gifaldi allegedly embellished his job title at the trial, claiming to be a "Level II" arson investigator when no such designation exists, and also falsely testified that he failed to take any contemporaneous hand written notes which were contradicted by witnesses who reported observing Gifaldi taking notes.

### Fire Investigative Reports

 **\*5** The Proposed Amended Complaint refers to both the Investigative Report prepared by Savage and a supplement to the Investigative Report ("Supplemental Report"), prepared by Savage regarding the Niagara County Forsenic Laboratory Report. In particular, Savage reported that Defendant Albion Police Department ("Albion Police"), initially listed the fire's cause as "undetermined pending further investigation." Investigative Report at 2. According to Savage, although there was smoke and heat damage throughout the shop,

most of the shop's fire damage occurred in the shop's office, particularly at the rear wall near Harris's desk and a large sofa. *Id.* at 3. Wright's desk, located at the office's doorway, had less damage but the remains of a medium sized red plastic trash can with "fire/melt damage" and which had "melted into itself," was found in front of Wright's desk instead of in its regular location between Harris's desk and the large sofa. *Id.* The caption to photo 52 accompanying the Investigative Report ("Photo 52") [8] depicting the red plastic trash can states "[t]he red trash can did not burn here, there is no corresponding fire damage to [Wright's] [9] wood desk. This may have been moved/kicked around by fire department personal [*sic* ] during suppression. It should have been at the rear wall next to [Harris's] desk."

Savage reported that close examination of the shop's rear entry door revealed a "very loose" striker plate that "was not loose from pry damage, but would have to [have] been loosened by unscrewing the two large metal/steel screws that hold it in place against the jamb." Investigative Report at 3. Because the loosened strike plate moved, the rear door hardware "plunger was not able to seat properly in the striker plate and could move easily." *Id.* Savage essentially ruled out the fire's cause as electrical as "[e]xamination of structural electrical conductors and receptacles showed no arc damage or any indication of being related to the cause of the fire." *Id.* A power strip on the floor near Harris's desk "sustained total fire damage" although Harris "stated it was not plugged in or being used." *Id.*

Savage reported that in an on-scene interview Harris stated that on Sunday, March 11, 2012, she was in the shop's office at 11:00 P.M ., reviewing bills and invoices while she waited for Wright to drive her home. Investigative Report at 4. Wright arrived around midnight and drove Harris to her home where they later received a telephone call notifying them the shop was on fire. *Id.* The fire had been extinguished by the time Plaintiffs returned to the shop, but the fire trucks remained on the scene. Harris stated that "things were not too good with bills." *Id.*

Savage also interviewed Wright who described helping Harris with the shop, receiving from his realtor ex-father-in-law household items and clothing from 'house clean outs' to be sold second-hand in the shop. Savage Report at 4. Wright stated he had received from a friend with a recent financial settlement two loans for the shop, the first for $ 20,000 and the second for $ 50,000. *Id.* Wright admitted the shop was behind on its bills. *Id.* Wright further stated he picked up Harris

the night of the fire, setting the alarm system and turning on a DVD recorder for outside cameras before leaving with Harris at midnight, taking their laptop computers with them. *Id.* Wright and Harris went to Harris's home where they fell asleep and were awoken by a telephone call informing them of the fire at the shop. *Id.* Wright stated they "had to find a ride so they could get back to the shop taking about 30 to 40 minutes." *Id.* Both Harris and Wright denied having a key to the shop's rear door, stating "it could be secured with a good slam shut." *Id.*

**\*6** Savage concluded the fire originated along the rear wall of the store's office, that the fire's cause was "undetermined with incendiary not eliminated," and noting that no accelerants had been detected on any fire debris samples collected at the scene of the fire. Investigative Report at 4. In his report, Savage also commented that

> This fire is still being investigated by the Albion Police. Several pieces of interview information are not clear. Although the lab report is negative for ignitable/flammable liquids in the samples collected, this does not remove the possibility of manual open flame to paper or other combustibles. There are other issues with regards to the structure and with the insured's ability to drive away from the shop at closing yet needing to "find a ride" back to the scene.

*Id.* at 5.

In a supplemental letter report issued on November 7, 2012 ("Supplemental Report"), [10] Savage indicated Defendant Albion Police Detective Jeff Gifaldi ("Gifaldi") had advised of the discovery in the fire debris of an accelerant consistent with a medium petroleum distillate such as mineral oil, but that the discovery did not change Savage's conclusion and the fire's cause remained undetermined "with incendiary still not eliminated." Supplemental Report at 1.

### DISCUSSION

Pending before the court are motions to dismiss filed by Prosecuting Defendants, Insurance Defendants, Defendant Savage, and Fire Prevention Defendants ("moving Defendants"). The other named Defendants to this action, including the Albion Fire Department, Rocco Sidari, Jeremy Grahm, Donald Clawson, Michael Jutrowski, Adrieann Ann Park, and Nicholas Long (the non-moving Defendants"), have not moved to dismiss. In opposition to the motions to dismiss, Plaintiffs have moved for leave to file an amended complaint, but have not otherwise responded in opposition to the moving Defendants' arguments in support of dismissal.

**1. Insufficient Service of Process**

Defendant Crime Task Force moves to dismiss the Complaint for insufficient service of Process based on Plaintiffs' failure to file the affidavit required under Fed.R.Civ.P. 4(l)(1) indicating service was made. Prosecuting Defendants' Memorandum at 4. A review of the docket, however, establishes an Affidavit of Process Server was filed on October 3, 2014 (Doc. No. 21–2), stating that on August 27, 2014, one Eric Harling, an Investigator with the Crime Task Force, was personally served with a copy of the summons and verified Complaint. Accordingly, Prosecuting Defendants' Motion should be DENIED insofar as they seek dismissal of the action as against the Crime Task Force for insufficient service of process. [11]

**2. Motion to Dismiss**

Pending before the court are four motions to dismiss the Complaint filed by the Prosecuting Defendants, the Insurance Defendants, Savage, and the Fire Prevention Defendants. On a motion to dismiss under Fed.R.Civ.P. 12(b)(6) ( "Rule 12(b)(6)"), the court looks to the four corners of the complaint and is required to accept the plaintiff's allegations as true and to construe those allegations in the light most favorable to the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Goldstein v. Pataki,* 516 F.3d 50, 56 (2d Cir.2008) (court is required to liberally construe the complaint, accept as true all factual allegations in the complaint, and draw all reasonable inferences in the plaintiff's favor). The Supreme Court requires application of "a 'plausibility standard,' which is guided by '[t]wo working principles.' " *Harris v. Mills,* 572 F.3d 66, 71–72 (2d Cir.2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007), and quoting *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)). "First, although 'a court must accept as true all of the allegations contained in a

complaint,' that 'tenet' 'is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris,* 572 F.3d at 72 (quoting *Iqbal,* 556 U.S. at 678). " 'Second, only a complaint that states a plausible claim for relief survives a motion to dismiss,' and '[d]etermining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.' " *Id.* (quoting *Iqbal,* 556 U.S. at 679).

**\*7** "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal,* 556 U.S. at 678 (quoting *Twombly,* 550 U.S. at 570). "A claim will have 'facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.' " *Sykes v. Bank of America,* 723 F.3d 399, 403 (2d Cir.2013) (quoting *Ashcroft,* 556 U.S. at 678); *see Twombly,* 550 U.S. at 570 (the complaint must plead "enough facts to state a claim to relief that is plausible on its face"). The factual allegations of the complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true." *Twombly,* 550 U.S. at 570. " 'In adjudicating a motion to dismiss, a court may consider only the complaint, any written instrument attached, and any document upon which the complaint heavily relies.' " *ASARCO LLC v. Goodwin,* 756 F.3d 191, 198 (2d Cir.2014) (quoting *In re Thelen LLP,* 736 F.3d 213, 219 (2d Cir.2013)).

In the instant case, a thorough review of the Complaint establishes it fails to state any viable claim against Prosecuting Defendants, Insurance Defendants, Savage, and Fire Prevention Defendants.

**A. Capacity to be Sued**

Preliminarily, the court addresses the Prosecuting Defendants' argument, Prosecuting Defendants' Memorandum at 2–4, that the Orleans County Sheriff, the Crime Task Force, the Albion Police, and the Niagara County Sheriff lack the capacity to be sued, requiring dismissal of the Complaint as against them. Plaintiffs have not responded in opposition to this argument, nor have Prosecuting Defendants argued in further support of the argument.

The "[c]apacity to sue or be sued is determined ... by the law of the state where the court is located," Fed.R.Civ.P. 17(b), here, the law of New York which, as relevant, provides

that a "municipal corporation" may sue or be sued. N.Y. General Municipal Law ("N.Y.Gen.Mun.Law") § 50. Further, a "municipal corporation," as defined, "includes only a county, town, city and village." N.Y. Gen. Mun. Law § 2.

An administrative arm of a municipal corporation, however, does not exist separate and apart from the municipality and does not have its own legal identity. *Laboy v. Ontario County, N.Y.,* ––– F.Supp.3d ––––; 2015 WL 1977251, at * 6 (W.D.N.Y. May 4, 2015). In the instant case, the Orleans County Sheriff and the Crime Task Force are administrative arms of Orleans County, the Albion Police is an administrative arm of the Village of Albion, and the Niagara County Sheriff is an administrative arm of the County of Niagara. *See Phillips v. Cortland City Police,* 2013 WL 5462951, at * 2 (N.D.N.Y. Sept.30, 2013) ("Because the Defendant Police Department is an administrative arm of the City of Cortland, it lacks the capacity to be sued."); *McKenzie v. County of Erie,* 2013 WL 5348084, at * 2 (W.D.N.Y. Sept.23, 2013) (dismissing claims against various Erie County departments, including the Erie County Sheriff's Department, the Erie County Holding Center, the Erie County Department of Health, and the Erie County Department of Mental Health, as each such department "is merely an administrative arm of the County, and they therefore lack the capacity to be sued."). As such, the Orleans County Sheriff, the Crime Task Force, the Albion Police, and the Niagara County Sheriff cannot sue or be sued. *Id.* Accordingly, the Prosecuting Defendants' Motion should be GRANTED as to all claims set forth in the Complaint against the Orleans County Sheriff, the Crime Task Force, the Albion Police, and the Niagara County Sheriff.[12]

### B. Niagara County Sheriff

 **\*8** Prosecuting Defendants also seeks dismissal of the malicious prosecution and negligence claims against Niagara County Sheriff for failing to plead any facts indicating the Niagara County Sheriff was involved in the criminal prosecution against Plaintiffs, which occurred in Orleans County. Prosecuting Defendants' Memorandum at 10–11. Plaintiffs have not responded in opposition to this argument.

A thorough reading of the Complaint reveals no factual allegations against Niagara County Sheriff. Further, the Complaint indicates that the criminal prosecution of which Plaintiffs complain occurred in Orleans County where the shop is located. The Complaint thus fails to state any viable claim against Niagara County Sheriff.

Prosecuting Defendants' Motion should thus be GRANTED as to Niagara County Sheriff.

### C. Civil Rights Claims

The Prosecuting Defendants are alleged in the fourth claim pursuant to § 1983 to have violated Plaintiffs' civil rights. Complaint ¶¶ 70–75. An individual may seek damages against any person who, under color of state law, subjects such individual to the deprivation of any rights, privileges, or immunities protected by the Constitution or laws of the United States. 42 U.S.C. § 1983. Under § 1983 an action is permitted "against a 'person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws.' " *Patterson v. County of Oneida, N.Y.,* 375 F.3d 206, 225 (2d Cir.2004) (quoting 42 U.S.C. § 1983). Section § 1983, however, " 'is not itself a source of substantive rights.' " *Id.* (quoting *Baker v. McCollan,* 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). Rather, § 1983 "merely provides 'a method for vindicating federal rights elsewhere conferred....' " *Id.* The elements of a § 1983 claim include (1) the deprivation of a federal constitutional or statutory right, (2) by a person acting under color of state law. *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005). Thus, "[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed." *Id.* (citing *Graham v. Connor,* 490 U.S. 386, 394, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); and *Baker,* 443 U.S. at 140).

In the instant case, Plaintiffs allege Prosecuting Defendants subjected them to unlawful arrest, malicious prosecution, and denial of a fair trial in violation of their Fourth, Fifth, Sixth and Fourteenth Amendment rights.

### D. False Arrest and Malicious Prosecution Claims

Plaintiffs assert claims for false arrest and malicious prosecution under both New York common law and § 1983. Complaint ¶¶ 43–52 (New York common law false arrest); 53–61 (New York common law malicious prosecution); and 70–75 (§ 1983 false arrest and malicious prosecution). The common law false arrest claim and the civil rights claim are asserted only against some of the Prosecuting Defendants, including the Orleans County Sheriff, the Crime Task Force, and the Albion Police Department, whereas the common law malicious prosecution claim is asserted against all Prosecuting Defendants, Defendant Savage, the Insurance

Defendants, and the Fire Prevention Defendants, as well as against the non-moving Defendants. As discussed below, the existence of probable cause, as evidenced by the Indictment, requires the dismissal of these claims.

**\*9** Plaintiffs' first claim is a New York tort claim for false arrest. Complaint ¶¶ 43–52. "Under New York law, a plaintiff claiming false arrest must show, *inter alia,* that the defendant intentionally confined him without his consent and without justification." *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir.1996) (citing *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 313–14 (N.Y.), *cert. denied,* 423 U.S. 929, 96 S.Ct. 277, 46 L.Ed.2d 257 (1975)). The elements of a false arrest claim under New York law include that (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged. *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994) (citing *Benjamin v. United States,* 554 F.Supp. 82, 85 (E.D.N.Y.1982)).

Plaintiffs' second claim is for malicious prosecution in violation of New York common law. Complaint ¶¶ 53–61. "To establish a malicious prosecution claim under New York Law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) the termination of the proceeding in plaintiff's favor; (2) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Manganiello v. City of New York,* 612 F.3d 149, 161 (2d Cir.2010) (internal quotation marks and citations omitted).

The fourth claim alleges both false arrest and malicious prosecution in violation of § 1983. Complaint ¶¶ 70–75. The same false arrest and malicious prosecution claims Plaintiffs bring under New York common law may be brought under § 1983 because such claims invoke the Fourth Amendment's protection of an individual's liberty interest with respect to criminal prosecutions. *See Singer v. Fulton County Sheriff,* 63 F.3d 110, 115–16 (2d Cir.1995) (Fourth Amendment is the source of § 1983 claims for malicious prosecution and false arrest).

"A § 1983 claim for false arrest, resting on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as a claim for false arrest under New York law. *Weyant,* 101 F.3d at 852. "In analyzing § 1983 claims for unconstitutional false arrest, we have

generally looked to the law of the state in which the arrest occurred." *Jaegly v. Couch,* 439 F.3d 149, 151 (2d Cir.2006) (internal quotation marks omitted). Similarly, "[a] § 1983 claim for malicious prosecution looks to the relevant state common law." *Gonzalez v. City of Schenectady,* 728 F.3d 149, 162 (2d Cir.2013) (citing *Janetka v. Dabe,* 892 F.2d 187, 189 (2d Cir.1989)). Under New York law, a plaintiff must show that the underlying proceeding was terminated in his favor to make out a malicious prosecution claim. *Id.* " 'Where the prosecution did not result in an acquittal, it is deemed to have ended in favor of the accused, for these purposes, only when its final disposition is such as to indicate the innocence of the accused.' " *Id.* (quoting *Murphy v. Lynn,* 118 F.3d 938, 948 (2d Cir.1997)).

**\*10** As stated, Background, *supra,* at 4, Plaintiffs allege New York common law claims for false arrest and malicious prosecution, as well as § 1983 claims based on false arrest, malicious prosecution, and denial of a fair trial. The existence of probable cause for the arrest and malicious prosecution of Plaintiffs, however, is a complete defense to Plaintiffs' common law false arrest and malicious prosecution claims, as well as Plaintiffs' § 1983 false arrest and malicious prosecution claims. *See Manganiello v. City of New York,* 612 F.3d 149, 161–62 (2d Cir.2010) (probable cause is complete defense to malicious prosecution claim in violation of New York common law and § 1983); *Jaegly v. Couch,* 439 F.3d 149, 152 (2d Cir.2006) ("Under New York law, the existence of probable cause is an absolute defense to a false arrest claim."); (*Singer v. Fulton County Sheriff,* 63 F.3d 110, 118 (2d Cir.1995) (probable cause is complete defense to false arrest in violation of civil rights claim).

Further, an indictment by a grand jury establishes a rebuttable presumption of probable cause.[13] *Manganiello,* 612 F.3d at 162 (citing *Savino v. City of New York,* 331 F.3d 63, 72 (2d Cir.2003)). The presumption of probable cause "may be rebutted only 'by evidence that the indictment was procured by 'fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith.' " *Manganiello,* 612 F.3d at 162 (quoting *Savino,* 331 F.3d at 72 (quoting *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248, 1251 (N.Y.1983))). Where there is some indication in the police records that, as to a fact crucial to the existence of probable cause, the arresting officers may have 'lied in order to secure an indictment,' and 'a jury could reasonably find that the indictment was secured through bad faith or perjury,' the presumption of probable cause created by the indictment may be overcome." *Id.* (quoting *Boyd v. City of New York,* 336

F.3d 72, 77 (2d Cir.2003)). " 'Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.' " *Id.* (quoting *Ricciuti v. N.Y.C. Transit Authority,* 124 F.3d 123, 130 (2d Cir.1997) (quoting *United States v. Agurs,* 427 U.S. 97, 104, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976))).

Nevertheless, "probable cause can exist even where it is based on mistaken information, so long as the arresting officer acted reasonably and in good faith in relying on that information." *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir.1994) (citing *Colon v. City of New York,* 60 N.Y.2d 78, 468 N.Y.S.2d 453, 455 N.E.2d 1248 (N.Y.1983)). Further, "that plaintiff was ultimately acquitted after trial does not negate the existence of probable cause [rebutting the presumption of probable cause afforded by the indictment]." *Nadal v. City of New York,* 105 A.D.3d 598, 964 N.Y.S.2d 100, 101 (1st Dept.2013) (citing *Jenkins v. City of New York,* 2 A.D.3d 291, 770 N.Y.S.2d 22, 24 (1st Dept.2003) ("Despite plaintiff's subsequent acquittal, there was nonetheless probable cause for the arresting officers' actions.")).

**\*11** In the instant case, the Indictment returned by the Orleans County Grand Jury on March 15, 2013, establishes the requisite probable cause to extinguish Plaintiffs' common law false arrest and malicious prosecution claims, as well as Plaintiffs' § 1983 claims based on false arrest and malicious prosecution. Significantly, Plaintiffs do not allege in the Complaint any facts which, if true, would establish that the Indictment was secured through bad faith or perjury by persons acting under color of state law, such as law enforcement officers, so as to rebut the presumption of probable cause supporting the Indictment, and a plain reading of the Complaint reveals no allegations to that effect.

Accordingly, Plaintiffs' New York common law claims for false arrest and malicious prosecution, as well as the § 1983 claim for false arrest and malicious prosecution fail to state a claim for which relief could be granted and the motions to dismiss should be GRANTED as to these claims.

### E. Fair Trial

Insofar as Plaintiffs' civil rights claim can be construed as alleging a violation of their right to a fair trial, *see* Complaint ¶ 33 (alleging unspecified Defendants appeared before the Grand Jury and intentionally or negligently misrepresented and falsified facts and evidence); ¶ 34

(alleging unspecified Defendants presented false, fraudulent and perjured testimony to the Grand Jury and at trial); and ¶ 73 (alleging violations of, *inter alia,* Plaintiffs' Fifth, Sixth, and Fourteenth Amendments), the Complaint may be liberally construed as asserting a denial of the fundamental right to a fair trial which must be dismissed for failure to state a claim. *See Bertuglia v. City of New York,* 839 F.Supp.2d 703, 723 (S.D.N.Y.2012) (" 'Pursuant to § 1983 and prevailing case law, denial of a right to a fair trial is a separate and distinct cause of action.' " (quoting *Nibbs v. City of New York,* 800 F.Supp.2d 574, 575 (S.D.N.Y.2011))).

"The Constitution guarantees a fair trial through the Due Process Clauses [of the Fifth and Fourteenth Amendments], but it defines the basic elements of a fair trial largely through the several provisions of the Sixth Amendment .... " *Strickland v. Washington,* 466 U.S. 668, 684–85, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (analyzing habeas petition asserting denial of fair trial based on violation of right to counsel under Sixth Amendment). Specifically, "the due process analysis is basically the same under both the Fifth and Fourteenth Amendments." *Chew v. Dietrich,* 143 F.3d 24, 28 n. 4 (2d Cir.1998). "[T]he [Supreme] Court has held that the due process clause of the Fifth Amendment prohibits federal action if the same action taken by a state would be proscribed under the Fourteenth Amendment." *United States Postal Service v. Brennan,* 574 F.2d 712, 717 n. 10 (2d Cir.1978) (citing *Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)). Here, however, Plaintiffs challenge only actions allegedly taken by Defendants under New York law and, as such, Plaintiffs allege only a violation of the Fourteenth Amendment, rather than the Fifth Amendment. The Complaint thus fails to state any § 1983 claim based on a violation of the Fifth Amendment.

**\*12** Although a due process violation, including denial of the right to a fair trial, can be established by demonstrating that state action deprived Plaintiffs of a property or liberty interest protected by the Fourteenth Amendment, *Velez,* 401 F.3d at 85, the Fourteenth Amendment is relevant to Plaintiffs' fair trial claim only insofar as the Fourteenth Amendment's Due Process Clause make the Sixth Amendment applicable to Defendants as state actors. *See Tennesee v. Lane,* 541 U.S. 509, 523, 124 S.Ct. 1978, 158 L.Ed.2d 820 (2004) (recognizing the Sixth Amendment applies to the states via the Fourteenth Amendment). Further, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more

generalized notion of substantive due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Accordingly, because the Sixth Amendment provides the "explicit source of constitutional behavior" for Plaintiffs' fair trial claim, the claim cannot be analyzed under the Fourteenth Amendment.

The Sixth Amendment provides

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him, to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

U.S. Const. Amend. 6.

Further, that the government must prove the elements of the charged crime beyond a reasonable doubt "is a requirement and a safeguard of due process of law in the historic, procedural content of 'due process.' " *In re Winship,* 397 U.S. 358, 362, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (quoting *Leland v. Oregon,* 343 U.S. 790, 802–03, 72 S.Ct. 1002, 96 L.Ed. 1302) (1952) (Frankfurter, J., dissenting)). "It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of the false evidence fabricated by a government officer." *Zahrey v. Coffey,* 221 F.3d 342, 355 (2d Cir.2000). "Such a claim based on fabrication of evidence may be properly pled where a plaintiff alleges that defendants fabricated evidence, which was likely to influence a jury's decision, and forwarded it to prosecutors." *McHenry v. Bell,* 2015 WL 2354438, at *8 (N.D.N.Y. May 15, 2015) (citing *Bertuglia,* 839 F.Supp.2d at 724; and *Ricciuti,* 124 F.3d at 130). " 'The constitutional right in question is the right not to be deprived of liberty as a result of the fabrication of evidence by a government

officer acting in an investigating capacity ... provided that the deprivation of liberty ... can be shown to be the result of the [officer's] fabrication of evidence." *Id.* (internal quotation marks and citations omitted). "When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial...." *Ricciuti,* 124 F.3d at 130. Further, "[i]t has long been established that a prosecutor who knowingly uses false evidence at trial to obtain a conviction acts unconstitutionally." *Zahrey,* 221 F.3d at 355.

**\*13** In the instant case, although Plaintiffs allege unidentified Defendants presented falsified information to the Grand Jury as well as at trial, the failure to specify what constituted the allegedly falsified information is fatal to Plaintiffs' fair trial claim. Nor does Plaintiffs' assertion, Complaint ¶ 35, that exculpatory evidence was withheld from the Grand Jury require a different result because the prosecutor is not required to disclose to the grand jury "substantial exculpatory evidence" in its possession. *United States v. Williams,* 504 U.S. 36, 51–55, 112 S.Ct. 1735, 118 L.Ed.2d 352 (1992) ("requiring the prosecutor to present exculpatory as well as inculpatory evidence would alter the grand jury's historical role, transforming it from an accusatory to an adjudicatory body."). Here, none of the individual moving Defendants are alleged by Plaintiffs to have acted in a manner by which Plaintiffs' trial was unfairly compromised.

Accordingly, the motions to dismiss should be GRANTED insofar as Plaintiffs' claim they were denied a fair trial by any named Defendant.

### F. Personal Involvement

Prosecuting Defendants and Insurance Defendants argue in support of dismissal that Plaintiffs' have failed to allege the requisite personal involvement of individual Defendants in the asserted claims, relying instead on "group pleading" allegations which are insufficient to put the Defendants on notice as to the claims asserted against them and thus fail to comport with Fed.R.Civ.P. 8 ("Rule 8"). Prosecuting Defendants' Memorandum at 6–8; Insurance Defendants' Memorandum at 5–6. Fire Prevention Defendants argue the Complaint fails to allege any of the Fire Prevention Defendants were personally involved in the asserted unlawful conduct. Fire Prevention Defendants' Memorandum at 5–6.

" 'It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a

prerequisite to an award of damages under § 1983.' " *Spavone v. New York State Dept. of Correctional Services,* 719 F.3d 127, 135 (2d Cir.2013) (quoting *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Pleadings that fail to differentiate as to which defendant was involved in the alleged unlawful conduct are insufficient to state a claim. *See, e.g., Holmes v. Allstate Corp.,* 2012 WL 627238, at ——7 and 22 (S.D.N.Y. Jan.27, 2012) (commenting that "[p]laintiffs' method of group pleading is incoherent or illogical" and "Rule 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it." (citing *Pierson v. Orlando Regional Healthcare Systems, Inc.,* 619 F.Supp.2d 1260, 1273 (M.D.Fla.2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy the "fair notice" requirement of Rule 8))); *Zurich American Ins. Co. v. Dah Sing Bank, Ltd.,* 2004 WL 1328215, at *6 (S.D.N.Y. June 15, 2004) (dismissing complaint as against one defendant bank against whom not "a single factual allegation" was made but, rather, "lumps the three bank defendants together and asserts that they collectively processed the checks."). Such "group pleading" is insufficient for purposes of Rule 8(a) (2) which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *See Iqbal,* 566 U.S. at 678 ("the pleading standard Rule 8 announces does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." (citations and quotation marks omitted)).

**\*14** Here, Plaintiffs' failure to specify against which moving Defendants their claims are asserted requires dismissal of Plaintiffs' claims as to those Defendants.

### G. Supervisory Liability

Plaintiffs' third claim alleges supervisory liability under § 1983 and New York law against Defendants Orleans County, the Town, the Village, the Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, the Niagara County Sheriff, Hartford, and Sentinel for negligent hiring, supervision, and retention. Complaint ¶¶ 62–69.

### 1. § 1983

Supervisory liability under § 1983

can be shown in one or more of the following ways: (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

*Hernandez v. Keane,* 341 F.3d 137, 145 (2d Cir.2003) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

There can be no supervisory liability for gross negligence of a subordinate, however, unless the subordinate has actually violated a plaintiff's constitutional rights. *Raspardo v. Carlone,* 770 F.3d 97, 123 (2d Cir.2014) (citing *Poe v. Leonard,* 282 F.3d 123, 134 (2d Cir.2002) (holding a supervisor may not be held liable under § 1983 for acts of a subordinate unless both the subordinate's violation of the plaintiff's rights and the supervisory liability doctrine under which the plaintiff wishes to hold the supervisor liable are clearly established). *See also Blyden v. Mancusi,* 186 F.3d 252, 265 (2d Cir.1999) ("Of course, for a supervisor to be liable under Section 1983, there must have been an underlying constitutional deprivation."); *Elek v. Inc. Village of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (where the plaintiff "has not established any underlying constitutional violation, [the plaintiff] cannot state a claim for § 1983 supervisory liability."). In the instant case, because Plaintiff has failed to state any constitutional deprivation claim against any individual Defendant, there is no basis for any claim for supervisory liability as against Defendants Orleans County, Orleans County Sheriff, the Village, the Town, and Niagara County Sheriff.

Alternatively, assuming, *arguendo,* Plaintiff had stated an underlying § 1983 claim against an individual Defendant, "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on

*respondeat superior.*" *Hernandez,* 341 F.3d at 144 (citing *Al–Jundi v. Estate of Rockfeller,* 885 F.2d 1060, 1065 (2d Cir.1989)). " ' Absent some personal involvement by [the supervisory official] in the allegedly unlawful conduct of his subordinates,' he cannot be liable under section 1983.' " *Id.* at 144–45 (quoting *Gill v. Mooney,* 824 F.2d 192, 196 (2d Cir.1987)). Even an imperfect investigation, without more, does not give rise to a constitutional violation. *Friedman v. New York City Admin. for Children's Services,* 502 Fed.Appx. 23, 27 (2d Cir. Nov.6, 2012) (citing *Wilkinson v. Russell,* 182 F.3d 89, 106 (2d Cir.1999)).

**\*15** A plaintiff, however, " 'cannot base liability solely on [a defendant's] supervisory capacity or the fact that he held the highest position of authority' within the relevant governmental agency or department." *Houghton v. Cardone,* 295 F.Supp.2d 268, 276 (W.D.N.Y.2003) (quoting *Burgess v. Morse,* 259 F.Supp.2d 240, 248 (W.D.N.Y.2003)). Simply put, "the conclusory assertion that a supervisory official was personally involved in the deprivation of constitutional rights, without support factual allegations, is not sufficient to state a claim under § 1983." *Roberites v. Huff,* 2012 WL 1113479, at * 6 (W.D.N.Y. Mar.30, 2012).

Here, Plaintiffs merely allege that Defendants Orleans County, the Town, the Village, the Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, the Niagara County Sheriff, Hartford, and Sentinel "were grossly negligent in training and supervising the individual [*sic* ] named defendant officers who arrested the Plaintiff and fabricated false charges against them with malice, with respect to the proper exercise of their police powers in a manner consistent with the Fourth and Fourteenth Amendments to the Constitution of the United States, and with the relevant provisions of the Constitution of the State of New York," Complaint ¶ 66, that "the negligence of the defendants in the aforesaid respects was so gross as to constitute deliberate indifference to the rights of the Plaintiff[s], *id.* ¶ 67, and that such Defendants "are vicariously liable to the Plaintiff for the actions of their employees .... " *Id.* ¶ 68. There are, however, no facts alleged to support these conclusory allegations. *See Otis–Wisher v. Medtronic, Inc.,* —— Fed.Appx. ——, 2015 WL 3557011, at * 2 (2d Cir. June 9, 2015) (conclusory allegations do not satisfy plausibility requirement under *Iqbal* ). As such, the Complaint fails to state a claim for supervisory liability as against Defendants Orleans County, the Town, the Village, the Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, the Niagara County Sheriff, Hartford, and Sentinel.

### 2. New York Common Law

Plaintiffs' negligent hiring, supervision and retention claim is also alleged under New York Law against Orleans County, the Town, the Village, Albion Police Department, Orleans County Sheriff, the Crime Task Force, the Fire Prevention Office, Niagara County Sheriff, Hartford, and Sentinel. Complaint ¶ 66. "Under New York law, a claim for negligent hiring, supervision or retention, 'in addition to the standard elements of negligence,' requires 'a plaintiff [to] show: (1) that the tort-feasor and the defendant were in an employee-employer relationship; (2) that the employer 'knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels.' " *Bouchard v. New York Archdiocese,* 719 F.Supp.2d 255, 261 (S.D.N.Y.2010) (quoting *Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir.2004) (quoting *Kenneth R. v. Roman Catholic Diocese of Brooklyn,* 229 A.D.2d 159, 654 N.Y.S.2d 791, 792 (2d Dept.1997)). Here, Plaintiffs have failed to plead any of these elements.

**\*16** With regard to the first element, Plaintiffs have failed to allege that any of the individually named moving Defendants were in an employee-employer relationship with any of the other moving Defendants in a supervisory capacity. For example, none of the individually sued police officers, *i.e.,* Doyle, Fuller, Gifaldi, or Hughes, is alleged to be an employee of any of the sued municipal Defendants. Nor, have Plaintiffs alleged any facts establishing any supervisory Defendant knew or should have known that any employee named as a Defendant had a propensity for the alleged unlawful conduct. Finally, there is no allegation that any tort was committed on any supervisory Defendant's property or with such Defendant's chattels. Accordingly, Plaintiffs' have failed to allege a claim for negligent hiring, supervision or retention under New York law.

The Motions to Dismiss should be GRANTED as to Plaintiffs' Third Claim alleging supervisory liability.

### H. Municipal Liability

With regard to the claims against Orleans County, the Town, and the Village, it is settled that municipalities may not be held liable under § 1983 solely on the basis of *respondeat superior* unless the alleged "deprivation of the plaintiff's rights under federal law is caused by a governmental custom, policy, or

usage of the municipality." *Jones v. Town of East Haven,* 691 F.3d 72, 80 (2d Cir.2012) (citing *Monell v. Department of Social Services,* 436 U.S. 658, 691, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "Absent such a custom, policy, or usage, a municipality cannot be held liable on a respondeat superior basis for the tort of its employee. *Id.* "[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality. The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the injury alleged." *Board of Commissioners of Bryan County, Oklahoma v. Brown,* 520 U.S. 397, 404, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997). As such, municipal liability may be found "when the execution of a government's policy or custom ... inflicts the injury that the government as an entity is responsible for under § 1983." *Monell,* 436 U.S. at 691.

Here, Plaintiffs have not alleged that the Town, Village, or Orleans County maintained any policy pursuant to which Plaintiffs allegedly were subjected to false arrest and malicious prosecution or denial of a fair trial. Nor do Plaintiffs claim such moving Defendants routinely disregard any applicable policy in making arrests or conducting criminal prosecutions. Accordingly, insofar as Plaintiffs assert claims based on *respondeat superior* against the Town, Village and County, such claims must be dismissed.

### I. Statutory Immunity

The Insurance Defendants assert statutory immunity insofar as Plaintiffs' claims are based on the release of information relative to the fire investigation. Insurance Defendants' Memorandum at 8. As relevant, New York Insurance Law ("N.Y.Ins.Law") § 319 (" § 319"), provides that

> **\*17** Each insurer authorized to issue policies covering losses incurred to personal or real property through fire shall contact the appropriate law enforcement agency and release information in its possession resulting from an investigation conducted by it pertaining to any such fire loss, should the insurer be of the opinion that the fire was caused by other than accidental means.

N.Y. Ins. Law § 319(b).

Significantly, insurance providers are granted immunity for all conduct under § 319 pursuant to N.Y. Ins. Law § 3432 (" § 3432"), which provides

> In the absence of fraud or bad faith, there shall be no liability on the part of, and no cause of action of any nature shall arise against, an insurer ... or any person acting on their behalf with respect to obligations and duties performed pursuant to the sections referred to in subsection (b) hereof.

N.Y. Ins. Law § 3432(a).

As relevant, such civil or criminal "immunity shall apply to * * * information, reports, assistance in investigations, notification, made in the absence of fraud or bad faith, to any authorized law enforcement agency" pursuant to § 319. N.Y. Ins. Law § 3432(b)(4). Significantly, the Complaint is devoid of any allegation that any of the Insurance Defendants engaged in any fraud or bad faith so as to render the statutory immunity inapplicable. The Complaint thus fails to state a claim against the Insurance Defendants.

### J. Defendant Savage

Savage is a defendant only to Plaintiffs' New York common law malicious prosecution claim. Complaint ¶ 54. As discussed, Discussion, *supra,* at 22–24 (citing caselaw), the existence of probable cause, a required element of a malicious prosecution claim under New York law for which the Indictment creates a rebuttable presumption, is fatal to this claim. Furthermore, the Complaint is devoid of any factual allegations pertaining to Savage and, as such, falls far short of pleading the requisite malice for a malicious prosecution claim. The Complaint thus fails to state any claim against Savage whose motion to dismiss should be GRANTED.

### K. Non–Moving Defendants

As stated, Discussion, *supra,* at 15, the other named Defendants to this action, including the Albion Fire Department, Rocco Sidari, Jeremy Grahm, Donald Clawson, Michael Jutrowski, Adrienn Ann Park, and Nicholas Long,

have not moved to dismiss the Complaint for failure to state a claim, and the court therefore expresses no opinion as to whether the claims asserted against the non-moving Defendants are viable. *See Grant v. County of Erie,* 542 Fed.Appx. 21, 24 (2d Cir. Oct.17, 2013) (reversing district court's *sua sponte* dismissal of action for failure to state a claim based on failure to provide plaintiff with notice of the grounds for dismissal and an opportunity to be heard).

### L. Dismissal with Prejudice

The moving Defendants seek dismissal of the Complaint with prejudice. *See* Insurance Defendants' Motion at 2 (seeking as relief "an order dismissing the action in its entirety as to [Insurance Defendants]"); Fire Prevention Defendants' Memorandum at 7; Altshiler Reply Declaration ¶¶ 5–6 (asserting probable cause requires dismissal of claims in their entirety); and Savage Reply at 2 (requesting dismissal with prejudice). Generally, the court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Branum v. Clark,* 927 F.2d 698, 705 (2d Cir.1991). Nevertheless, where further amendment of the complaint would be futile, dismissal of the complaint with prejudice to filing an amended complaint is not an abuse of discretion. *See Van Buskirk v. the New York Times Co.,* 325 F.3d 87, 92 (2d Cir.2003) (affirming district court's dismissal of complaint with prejudice for failure to state a claim where amendment of complaint would have been futile).

**\*18** In the instant case, the futility of permitting Plaintiffs to file an Amended Complaint is discussed below. Discussion, *infra,* at 37–49. Accordingly, based on that analysis, the Motions to Dismiss for failure to state a claim should be GRANTED as to Prosecuting Defendants, the Insurance Defendants, Savage, and the Fire Prevention Defendants against whom the Complaint should be DISMISSED with prejudice.

### 3. Motion to Amend

In opposing moving Defendants motions to dismiss, Plaintiffs move for leave to file an amended complaint which Plaintiffs assert should be granted because the "more detailed description of the Defendants [*sic* ] culpable conduct is provided in the [Proposed] Amended Complaint apprising each defendant of its specific acts and omissions presented in this litigation and will provide judicial economy for the Court and litigants." Plaintiffs' Memorandum at 11. Plaintiffs further argue that should leave to amend be granted,

Defendants will not suffer any substantial prejudice, nor is Plaintiff's Motion brought for undue delay, in bad faith, or for any dilatory motive. *Id.* at 11–12. Moving Defendants argue in opposition that Plaintiffs' Proposed Amended Complaint fails to cure the deficiencies in the Complaint such that Plaintiffs' Motion is futile and should be denied. In particular, Prosecuting Defendants argue that the Proposed Amended Complaint fails to allege facts rebutting the presumption of probable cause attributed to the Indictment and truncating the false arrest and malicious prosecution claims against the Prosecuting Defendants, and also fails to allege facts supporting any claim for negligent hiring, supervision or retention, Altshiler Reply Declaration ¶¶ 4–6; Amended Altshiler Reply Declaration ¶¶ 8–10, and that insofar as Plaintiffs seek to allege Defendant Gifaldi "testified falsely" and "vaguely allege that 'defendants [*sic* ] own investigation proved their testimony would be false,' " Amended Altshiler Reply Declaration ¶ 4, witnesses, including law enforcement officials, are absolutely immune from liability for testimony, even if such testimony is perjured. *Id.* ¶¶ 5–6. Defendant Savage argues in opposition to Plaintiffs' Motion that the Proposed Amended Complaint is devoid of any allegation of wrongdoing against Savage and contains only an admission that Savage committed no tort. Savage Reply at 3–4. In opposition to Plaintiffs' Motion, Insurance Defendants argue the Proposed Amended Complaint fails to cure any of the group-pleading and vagueness deficiencies of the Complaint, Insurance Defendants' Reply at 3–4, also fails to address Insurance Defendants' statutory immunity under New York law, *id.* at 4, and thus is futile. *Id.* at 4–7. The Fire Prevention Defendants argue in opposition to Plaintiffs' Motion that the Proposed Amended Complaint fails to allege any involvement by Defendant Shadic with the fire investigation and subsequent prosecution, Calhoun Reply Declaration ¶¶ 6–8, alleges only that Defendant Holter was involved in the fire investigation, *id.* ¶ 9, and did not conduct a proper arson investigation but instead "rubber-stamped" Gifaldi's investigation which fails to allege the malice required for a malicious prosecution. *Id.* ¶ 10. Fire Prevention Defendants further argue that Proposed Amended Complaint's lack of any allegation that Shadic or Holter was personally involved in any constitutional deprivation against Plaintiffs also precludes any supervisory liability claim against Defendant Fire Prevention Office.

**\*19** Under Fed.R.Civ.P. 15(a), leave to amend "shall be freely given when justice so requires." *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962); *Burns v. Imagine Films Entertainment, Inc.,* 165 F.R.D. 381, 384

(W.D.N.Y.1996) (quoting Fed.R.Civ.P. 15(a)). Therefore, "an amended pleading may be filed pursuant to Rule 15(a) where the new allegations do not unduly prejudice an opponent, are not the result of undue delay or bad faith, and are not futile." Warren v. Goord, 2006 WL 1582385, at * 7 (W.D.N.Y. May 26, 2006). Further, "[a]n amendment to a pleading is futile if it could not withstand a motion to dismiss under Rule 12(b)(6)." Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir.2002). In ruling on a motion under Rule 12(b)(6), and, thus, in considering the plausibility of a proposed amended pleading, the court may consider only "the fact as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated into the complaint by reference." McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.2007). Here, Defendant Savage filed in support of his motion to dismiss [14] exhibits, including copies of the Investigative Report and its accompanying photographs, as well as the Supplementary Report, both of which the court may consider because Plaintiffs have referenced them in their Proposed Amended Complaint. See Avon Pension Fund v. GlaxoSmithKline PLC, 343 Fed .Appx. 671, * 3 n. 2 (2d Cir. Aug.24, 2009) (considering, on motion seeking leave to file amended complaint filed in opposition to motion to dismiss complaint, the transcript of physician's testimony not attached to proposed amended complaint but incorporated by reference).

In the instant case, moving Defendants do not argue that permitting Plaintiffs to file an amended complaint will result in any undue prejudice, undue delay, or bad faith; rather, moving Defendants maintain that Plaintiffs' Motion should be denied on the ground of futility because the Proposed Amended Complaint, like the Complaint, fails to state a claim for which relief can be granted. Here, a thorough reading of the Proposed Amended Complaint establishes that it fails to cure the defects of the Complaint, such that Plaintiffs' Motion should be denied as to the Prosecuting Defendants, the Insurance Defendants, Defendant Savage, and the Fire Prevention Defendants that have opposed Plaintiffs' Motion.

### 1. Prosecuting Defendants

The Proposed Amended Complaint asserts against the Prosecuting Defendants claims for common law false arrest, malicious prosecution, negligent hiring, and supervision, and retention, as well as § 1983 violations for false arrest, malicious prosecution and denial of a fair trial. The Proposed Amended Complaint, as discussed in connection with the

Complaint, Discussion, supra, at 17–18, fails to establish any basis upon which Defendants Orleans County Sheriff, the Crime Task Force, the Albion Police, and the Niagara County Sheriff may be sued given that such Defendants, as administrative arms of municipal corporations, do not exist separate and apart from the municipality and thus do not have their own legal identity. Laboy, —— F.Supp.3d at ——; 2015 WL 1977251, at * 6 (W.D.N.Y. May 4, 2015).

**\*20** With regard to Defendants Orleans County, the Town, the Village, Doyle, Fuller, Gifaldi, and Hughes, as discussed, Discussion, supra, at 22–24, the Indictment creates a rebuttable presumption of probable cause that defeats the common law and § 1983 false arrest and malicious prosecution claims. Significantly, Plaintiffs do not describe what was put before the Grand Jury that Plaintiffs maintain was false or fraudulent and the Proposed Amended Complaint is devoid of any factual allegations that any Defendant cajoled or importuned any witness to appear to testify untruthfully before the Grand Jury so as to obtain the Indictment. See Rohman v. New York City Transit Authority (N.Y.CTA), 215 F.3d 208, 217 (2d Cir.2000) (defendant to malicious prosecution claim must be shown to have knowingly provided false or fabricated evidence or importuned authorities to act). The Proposed Amended Complaint also lacks reasonable clarity as to whether Plaintiffs assert any moving Defendant was responsible for submitting the Investigative Reports to the Grand Jury as evidence on which the Grand Jury could indict Plaintiffs. Nevertheless, that Plaintiffs sue Savage, whose only participation in the events leading to Plaintiffs' arrest and prosecution is the preparation of the Investigative Reports, strongly implies Plaintiffs believe the Investigative Reports were presented to the Grand Jury.

Nor is the Investigative Report inconsistent with a finding of probable cause, the absence of which is a necessary element of the false arrest and malicious prosecution claims. In particular, the Investigative Report states the Albion Police initially listed the fire's cause as "undetermined pending further investigation." Investigative Report at 2. Savage determined the fire's origin was located near the rear wall of the shop's office near Harris's desk and a large sofa where most of the fire damage had occurred. Id. at 3. Although the remains of a medium sized red plastic trash can with "fire/ melt damage" and which had "melted into itself," was found in front of Wright's desk instead of in its regular location between Harris's desk and the large sofa, id., the caption to Photo 52 depicting the red plastic trash can indicates the trash can may have been kicked by fire department personnel

while extinguishing the fire. An electrical cause of the fire, as Plaintiffs urge, Proposed Amended Complaint ¶¶ 45–47, is inconsistent with Savage's determination that "[e]xamination of structural electrical conductors and receptacles showed no arc damage or any indication of heat related to the cause of the fire," Investigative Report at 3, and that a power strip on the floor near Harris's desk "sustained total fire damage" although Harris "stated it was not plugged in or being used." *Id.*

Further, the Investigative Report contains a motive for arson. In particular, when interviewed by Savage, both Harris and Wright reported the shop was having financial difficulties and Wright further stated he had personally borrowed $ 70,000 for the shop. Investigative Report at 4. It is noted in the Investigative Report that Plaintiffs' inability after being notified of the fire to return to the shop for 30 to 40 minutes because Plaintiffs "had to find a ride" was inconsistent with Plaintiffs' statements to Savage that Wright drove Plaintiff to her home where they both remained until learning of the fire. *Id.* at 5. The statement given by both Harris and Wright that the shop's rear door "could be secured with a good slam shut," *id.* at 4, is inconsistent with the finding that the door's striker plate was "very loose" such that "[t]he plunger was not able to seat properly in the striker plate and could easily move. *Id.* at 3. Moreover, although the Investigative Report does not contain a conclusive determination of the cause of the fire, the Investigative Report states that "incendiary was not eliminated," *id.* at 4, and the Supplemental Report states that "incendiary still not eliminated." Supplemental Report at 1. It is significant that Plaintiffs do not challenge the accuracy of the Investigative or Supplemental Reports, nor do Plaintiffs attribute any part of the reports to fraud or bad faith. The Investigative Report and the Supplemental Report thus are not inconsistent with probable cause supporting both the Indictment and the subsequent arrest and prosecution of Plaintiffs. Thus, the Proposed Amended Complaint does not plausibly allege that any of the Prosecuting Defendants was responsible for the malicious prosecution of Plaintiffs as Plaintiffs allege, and is therefore futile.

**\*21** With regard to Defendant Doyle, the Proposed Amended Complaint alleges only that Doyle failed to report Mesita's observation that she perceived an electrical fire odor at the scene of the fire. Proposed Amended Complaint ¶¶ 45–47. Such allegations, however, assert a claim of negligent investigation which is not recognized under New York law, *see McCray v. City of New York,* 2007 WL 4352748, at \* 29 (S.D.N.Y. Dec.11, 2007) (citing *Jenkins v. City of New*

*York,* 1992 WL 147647 at \* 8 (S.D.N.Y. June 15, 1992) (citing *Pandolfo v. U.A. Cable Systems,* 171 A.D.2d 1013, 568 N.Y.S.2d 981, 982 (4th Dept.1991))), nor is negligent investigation a basis for § 1983 liability in the absence of some special relationship creating an affirmative duty. *See, e.g., Daniels v. Williams,* 474 U.S. 327, 332–33 (1986) (negligent inaction will not suffice to establish a constitutional violation because Due Process clause is not implicated by a state official's negligent act causing unintended loss or injury to life, liberty, or property). *See also Daniels,* 474 U.S. at 332– 33.

The Proposed Amended Complaint fails to set forth any allegation of unlawful conduct undertaken by Defendants Fuller and Hughes. Rather, Fuller is alleged to have conducted interviews of Harris and Wright at the Albion Police Station, Proposed Amended Complaint ¶ 49, which interview of Wright was subsequently lost by unidentified Albion Police, Proposed Amended Complaint ¶ 49, and both Fuller and Hughes are alleged to have informed Harris that the shop's security "DVR was sent out for testing to obtain the images captured on it during [ ] the evening in question," but "the Albion Police Department and its investigators failed to safeguard this important piece of exculpatory evidence." *Id.* ¶ 72. Both of these allegations assert, at most, the Fuller was negligent in investigating the fire which, as discussed, Discussion, *supra,* at 43–44, is not a ground for liability under either state law or § 1983.

Defendant Gifaldi is named as a Defendant in the Proposed Amended Complaint's common law and § 1983 false arrest and malicious prosecution claims. As discussed, Discussion, *supra,* at 22–24, the Indictment creates a presumption of probable cause that is a complete defense to these claims, and none of the proposed factual allegations against Gifaldi rebuts the presumption. Specifically, Gifaldi is alleged to have failed to secure video footage from a security DVR which would have established Plaintiffs did not set the fire, Proposed Amended Complaint ¶ 71, but such failure, if true, constitutes investigatory negligence which is insufficient to sustain liability for false arrest and malicious prosecution under New York law or § 1983. *See Daniels,* 474 U.S. at 332–33 (negligent inaction not actionable under § 1983); *McCray,* 2007 WL 4352748, at \* 29 (negligent investigation not recognized under New York law). Gifaldi is also alleged to have "interviewed witnesses of known doubtfulness," and provided false Grand Jury testimony to secure the Indictment, Proposed Amended Complaint ¶ 74, embellished his job title at the trial, claiming to be a "Level II" arson investigator

when no such designation exists, *id.* ¶ 75, and also falsely testified at trial that he failed to take any contemporaneous hand written notes which was contradicted by witnesses who reported observing Gifaldi taking notes. *Id.* ¶ 76. A law enforcement officer is absolutely immune from under § 1983 based on perjurious testimony either before the Grand Jury or given at trial. *Coggins v. Buonora,* 776 F.3d 108, 112 (2d Cir.2015) (citing *Rehberg v. Paulk,* ——U.S. ——, 132 S.Ct. 1497, 1506, 182 L.Ed.2d 593 (2012)). Further, Plaintiffs' assertions that Gifaldi coerced Defendants Adrian Parks ("Parks"), and Michael Jutrowski ("Jutrowski"), into falsely testifying against Plaintiffs, Proposed Amended Complaint ¶¶ 61–63, is negated by the assertion that "Defendants' own investigation provided [the testimony of Parks and Jutrowski] would be false and conflicted with the statements given by these witnesses." *Id.* ¶ 64. The Proposed Amended Complaint thus fails to state a claim against Gifaldi.

**\*22** Accordingly, Plaintiffs' motion is DENIED as to the Prosecuting Defendants.

### 2. Insurance Defendants

Insurance Defendants are listed as Defendants in the Proposed Amended Complaint's state common law malicious prosecution claim and negligent hiring, supervision and retention claims. Insurance Defendants are correct, Insurance Defendants' Reply at 3–4, that the Proposed Amended Complaint fails to cure any of the group-pleading and vagueness deficiencies of the Complaint. *See* Discussion, *supra,* at 28–29. In particular, the Proposed Amended Complaint's allegations against the Insurance Defendants assert only that the Insurance Defendants never determined the fire's cause, Proposed Amended Complaint ¶ 39 ("the cause of the fire was never determined."), but that someone else alerted law enforcement that Plaintiffs intentionally started the fire. *Id.* ¶ 51 ("defendant Donald Clawson tipped off police Wright committed arson and burned down Harris's shop. Records indicate Clawson contacted Crime Stoppers and was seeking reward money for his lead."), and ¶ 52 ("Clawson contacted the Albion Police Department and/or Orleans County Sheriff and/or Hartford Insurance Co. and told these agencies and the insurance company David Wright committed arson and burned down Harris's shop."). No liability for malicious prosecution can be attributed to the Insurance Defendants based on the failure to determine the cause of the fire.

Nor is there any allegation that the Insurance Defendants improperly importuned or cajoled any law enforcement

officers or the prosecutor to charge Plaintiffs. *Rohman,* 215 F.3d at 217 (defendant must have played an " 'active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act). Although the Proposed Amended Complaint asserts Nassivera, when testifying at trial, "intentionally misused tape recorded statements of the Plaintiffs," which "contained many inaudible portions and Nassivera filled in the blanks during his testimony with slanted interpretations" because Nassivera, as Hartford's agent "was motivated to sabotage Plaintiff Harris'[s] fire claim in any manner he could," Proposed Amended Complaint ¶ 73, Nassivera's trial testimony, even if perjured, is entitled to absolute immunity. *Coggins,* 776 F.3d at 112 (citing *Rehberg,* 132 S.Ct. at 1506).

Moreover, the Proposed Amended Complaint fails to avoid the Insurance Defendants' statutory immunity pursuant to § 3432(a) and (b)(4). Significantly, Plaintiffs failed to allege any fraud or bad faith on the part of the Insurance Defendants as to the "information, reports, assistance in investigations, [and] notifications" as required to avoid the applicable immunity. Even if the Insurance Defendants relied in some way on a source, Clawson, as a person of dubious credibility, such reliance is insufficient to support a malicious prosecution claim. *See Husbands v. City of New York,* 2007 WL 2454106, at * 8 (S.D.N.Y. Aug.16, 2007) (holding with regard to false arrest and malicious prosecution claims that questionable credibility of witness's testimony "does not vitiate the basis for probable cause").

**\*23** Accordingly, Plaintiffs' Motion is DENIED on the basis of futility as to Insurance Defendants against whom the Proposed Amended Complaint fails to state a claim.

### 3. Defendant Savage

Savage is named in the Proposed Amended Complaint as a Defendant only to the malicious prosecution claim under New York common law. Proposed Amended Complaint ¶ 103. The Proposed Amended Complaint asserts only that Savage, working on contract with Hartford, performed a forensic investigation of the fire to determine the fire's origin and cause and prepared a report regarding the investigation in which Savage concluded the fire's origin was along the shop's office's rear wall, that the ignition source, the first material ignited, and the ignition sequence were "unknown," such that the fire's "cause classification" was "undetermined with incendiary not eliminated." Proposed Amended Complaint ¶ 65. Even upon being provided additional fire debris samples one of which, upon laboratory

analysis, was positive for fire accelerant "consistent with a 'medium petroleum distillate' such as mineral spirits, some paint thinners, and some charcoal starters," Savage did not consider the findings sufficiently significant to support altering her original conclusion that the fire's cause was undetermined. *Id.* ¶ 67. Nothing within these allegations plausibly implies that Savage engaged in any fraud or bad faith so as to subject Savage to any liability in connection with Plaintiffs' arrest and criminal prosecution for the fire. *See Otis–Wisher,* 2015 WL 255701, at *1 (to withstand dismissal allegation must plausibly establish defendant's liability). Even assuming, *arguendo,* the New York and § 1983 claims for false arrest and malicious prosecution could be brought against Savage, a private actor, *see Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (§ 1983 liability requires defendant act under color of state law), Savage's conclusion in the Investigative Report and the fire's cause was "undetermined with incendiary not eliminated," a conclusion favorable to Plaintiffs, simply cannot be the basis for any such claims.

Plaintiffs' Motion thus is DENIED as to Savage.

### 4. Fire Prevention Defendants

The Proposed Amended Complaint's malicious prosecution claim is asserted against all Fire Prevention Defendants, Proposed Amended Complaint ¶ 103 (Holter and Shadic), and ¶ 109 (Fire Prevention Office), and the negligent hiring, supervision and retention claim is asserted against Fire Prevention Office. *Id.* ¶¶ 112, 115, and 117. Insofar as the Proposed Amended Complaint fails to allege any involvement by Defendant Shadic with the fire investigation and subsequent prosecution, it fails to state a claim as against Shadic and is therefore futile. The Proposed Amended Complaint's allegation that Defendant Holter was involved in the fire investigation, *id.* ¶ 9, and did not conduct a proper arson investigation but instead "rubber-stamped" Gifaldi's investigation, *id.* ¶ 10, fails to plead the requisite element of malice for a malicious prosecution claim because it, at most, asserts a claim for negligent investigation which, as discussed, Discussion, *supra,* at 43–44, does not support a false arrest or malicious prosecution claim. Further, absent any claim stated against either Shadic or Holter, there is no basis for finding Shadic or Holter was personally involved in either the alleged malicious prosecution of Plaintiffs, such that the Fire Prevention Office cannot be held liable for negligent hiring, supervision or retention of these individual Defendants. *See Bouchard,* 719 F.Supp.2d at 261 ("A cause of action for negligent hiring or retention requires allegations that the employer ... failed to investigate

a prospective employee notwithstanding knowledge of 'facts that would lead a reasonably prudent person to investigate that prospective employee.' " (quoting *Richardson v. City of New York,* 2006 WL 3771115, at *3 (S.D.N.Y. Dec.21, 2006))).

**\*24** Plaintiffs' Motion is DENIED as to the Fire Prevention Defendants.

### 5. Non-moving Defendants

Although Plaintiffs' Motion is DENIED with regard to the Prosecuting Defendants, the Insurance Defendants, Defendant Savage, and the Fire Prevention Defendants and, assuming the District Judge agrees with the undersigned's recommendation that the action be dismissed as against the moving Defendants for failure to state a claim, the non-moving Defendants have not opposed Plaintiffs' Motion seeking leave to file the Proposed Amended Complaint which, despite failing to cure the deficiencies of the Complaint, does provide additional facts which are helpful to understand Plaintiffs' claims. Accordingly, insofar as Plaintiffs' Motion is unopposed by the non-moving Defendants, Plaintiffs' Motion is GRANTED as to these non-moving Defendants. Plaintiffs are directed to file **within ten (10) days** the Amended Complaint only asserting claims against the non-moving Defendants, but should not attempt to re-plead the claims that for which dismissal with prejudice is recommended as to the moving Defendants. Nothing in the foregoing Report and Recommendation and Decision and Order is intended to indicate how the court may rule on any possible motions by nonmoving Defendants addressed to the Amended Complaint.

### CONCLUSION

Based on the foregoing, the Prosecuting Defendants' Motion (Doc. No. 22) should be GRANTED in part and DENIED in part; the Insurance Defendants' Motion (Doc. No. 28) should be GRANTED; Savage's Motion (Doc. No. 30) should be GRANTED insofar as it seeks to dismiss the Complaint for failure to state a claim and is DISMISSED as moot as to the alternative request for summary judgment; and the Fire Prevention Defendants' Motion (Doc. No. 36) should be GRANTED; Plaintiffs' Motion is GRANTED in part and DENIED in part.

SO ORDERED as to Plaintiff's Motion to Amend and Savage's Motion for Summary Judgment.

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(d) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 5316410

---

### Footnotes

1    Although Defendants' motions to dismiss are dispositive, while Plaintiffs' motion to amend is nondispositive, the undersigned addresses all pending motions in this combined Report and Recommendation/Decision and Order in the interest of judicial economy.

2    Plaintiffs do not specify which Defendants appeared before the Grand Jury.

3    Exh. A.

4    Why the criminal charges were dismissed against Harris is not stated in the record.

5    "Tattoo flash" refers to "common designs, usually drawn on paper or cardboard and displayed prominently on the walls or in binders in tattoo shops." What is Tattoo Flash?, available at http://tattoo.about.com/od/tattoosartandphotoss/fl/What-is-Tattoo-Flash.htm, last visited September 9, 2015.

6    Holler is not named as a Defendant in either the Complaint or in the Proposed Amended Complaint.

7    PT & C is not named as a defendant to this action.

8    Savage's Exh. 2–b (Doc. No. 30–7) at 26.

9    Unless otherwise indicated, all bracketed material has been added.

10    Savage's Exh. 5 (Doc. No. 31).

11    Inasmuch as the Crime Task Force is not a suable entity, *see* Discussion, *infra,* at 17–18, the action should be dismissed as to this Defendant, and the issue of service on the Crime Task Force, the manner of which Prosecuting Defendants do not challenge, is academic.

12    Fire Prevention Defendants did not similarly argue in support of dismissal that the Fire Prevention Office also, as an administrative arm of the state, similarly lacks the capacity to be sued.

13    Although an indictment subsequent to an arrest does not give rise to a presumption of probable cause to defeat a false arrest claim, *Broughton v. State,* 37 N.Y.2d 451, 373 N.Y.S.2d 87, 335 N.E.2d 310, 313 (N.Y.1975) (holding arraignment and subsequent indictment of defendant did not generate presumption of

probable cause to support arrest), in the instant case, according to the Complaint, Plaintiffs were indicted prior to the arrest. Complaint ¶ 39 ("as a result of said indictment the Plaintiffs were both arrested and deprived of their liberty ...."). An arrest is privileged if based on probable cause in accord with the fourth element under New York law. *See Bernard,* 25 F.3d at 102 (affirming district court's grant of summary judgment in favor of government on plaintiff's false arrest claim where the only element in dispute, *i.e.,* that the confinement was privileged, was established by the existence of probable cause to support the arrest).

14    Savage moved, in the alternative, for summary judgment. Based on the court's recommendation that the Complaint be dismissed as to Savage, Savage's alternative motion for summary judgment is DISMISSED as moot.

---

**End of Document** <span style="float:right">© 2025 Thomson Reuters. No claim to original U.S. Government Works.</span>

KeyCite Yellow Flag

Distinguished by Jorgensen v. County of Suffolk, E.D.N.Y., September 1, 2021

246 F.Supp.3d 578
United States District Court, E.D. New York.

YING LI, Plaintiff,

v.

The CITY OF NEW YORK, Det. Matthew Degnan, Lt. Thomas Conforti, Det. David Moser, Lt. John Perdoch, Det. John Phelan, P.O. Yatyu Yam, Sgt. Guisella Rodriguez, Lt. Arthur Hall, Det. Michael Heffernan, Sgt. Timothy Cai, Det. Douglas Lee, Det. Dennis Chan, Sgt. "FNU" Manfredi ("First Name Unknown"), ADA P. Leigh Bishop, Dr. Kristen Landi, "John Does 1–15" (Names Fictitious and Presently Unknown), Dr. Fernanda Kupferman, and Flushing Hospital Medical Center, Defendants.

15–CV–1599 (PKC)
|
Signed 03/31/2017

**Synopsis**

**Background:** Arrestee brought § 1983 action against city, city employees, including police officers who allegedly investigated her, county assistant district attorney, and hospital and one of its employees, alleging that she was wrongfully accused of being responsible for the death of her infant daughter. Defendants filed motions to dismiss.

**Holdings:** The District Court, Pamela K. Chen, J., held that:

[1] arrestee adequately alleged that officer participated in the initiation of arrestee's criminal proceeding, as required to state malicious prosecution claim;

[2] arrestee adequately alleged that physician participated in the initiation of arrestee's criminal proceeding, as required to state malicious prosecution claim;

[3] arrestee sufficiently alleged a favorable termination for purposes of her malicious prosecution claim;

[4] arrestee's malicious abuse of process claim accrued, and three-year statute of limitations began to run, when criminal case against arrestee was dismissed;

[5] arrestee failed to state claim for failure to intervene;

[6] arrestee's allegations were sufficient to support conspiracy claim; and

[7] arrestee's allegations were sufficient to support claim for unreasonably prolonged detention.

Motions granted in part and denied in part.

**Procedural Posture(s):** Motion to Dismiss; Motion to Dismiss for Failure to State a Claim.

West Headnotes (128)

**[1]** **Federal Civil Procedure** 🔑 Matters considered in general

In considering defendants' motion to dismiss for failure to state a claim in § 1983 action brought by arrestee against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter, district court would consider criminal complaint against arrestee, given that arrestee's amended complaint in § 1983 action repeatedly referred to the criminal complaint, and therefore incorporated it by reference. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 12(b)(6).

1 Case that cites this headnote
More cases on this issue

**[2]** **Evidence** 🔑 Cities, towns, townships, and villages

**Evidence** 🔑 Particular Cases

District court would take judicial notice of indictment, transcript of criminal court conference, and two press releases in § 1983 action brought by arrestee against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter, for the limited purpose of establishing their existence and legal

effect, and determining the statements that they contained without considering the truth of those statements; the criminal court records and the press releases related to arrestee's allegations that the criminal case was terminated favorably to her and the date on which the criminal charges were dropped. 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

More cases on this issue

**[3]      Evidence 🔑 Notice not taken**

District court declined to take judicial notice of grand jury minutes in underlying criminal proceeding in § 1983 action brought by arrestee against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter, given that city sought to rely on the substance and truth of the testimony set forth in those minutes, and not just the fact of the testimony being given or the date on which it was given. 42 U.S.C.A. § 1983.

More cases on this issue

**[4]      Civil Rights 🔑 Substantive or procedural rights**

Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of federal rights established elsewhere. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[5]      Civil Rights 🔑 Nature and elements of civil actions**

To state a claim under § 1983, a plaintiff must plausibly allege (1) that the defendants deprived him of a right secured by the Constitution or laws of the United States, and (2) that they did so under color of state law. 42 U.S.C.A. § 1983.

8 Cases that cite this headnote

**[6]      Civil Rights 🔑 Color of Law**

As a general matter, liability under § 1983 is proper only with respect to individuals acting

under "color of state law," i.e., state actors, or individuals acting in concert with a state actor. 42 U.S.C.A. § 1983.

**[7]      Civil Rights 🔑 Persons Liable in General**

An individual defendant is not liable under § 1983 absent personal involvement. 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

**[8]      Civil Rights 🔑 Complaint in general**

Pleadings that do not differentiate which individual defendant was involved in the unlawful conduct are insufficient to state a claim under § 1983. 42 U.S.C.A. § 1983.

53 Cases that cite this headnote

**[9]      Civil Rights 🔑 Criminal law enforcement; prisons**

Arrestee failed to allege personal involvement in criminal proceedings required to maintain action under § 1983 against police officers, alleging that she was wrongfully accused of being responsible for the death of her infant daughter; arrestee did not allege that any of the officers had even a minimal role in arresting, investigating, or prosecuting her. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[10]     Civil Rights 🔑 Vicarious or respondeat superior liability in general**

Individual defendant may not be held liable under § 1983 merely by his connection to the events through links in the chain of command. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[11]     Civil Rights 🔑 Arrest and detention**

A claim for false arrest under § 1983, resting on the Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as that

under New York law. U.S. Const. Amend. 4; N.Y.McKinney's Const. Art. 1, § 12; 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

[12]  **Federal Courts**  Constitutional rights, civil rights, and discrimination in general

In analyzing § 1983 claims for false arrest, courts generally look to the law of the state in which the arrest occurred. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[13]  **False Imprisonment**  Nature and Elements of False Imprisonment

Under New York law, a false arrest claim requires a plaintiff to show that the defendant intentionally confined him without his consent and without justification.

4 Cases that cite this headnote

[14]  **False Imprisonment**  Nature and form of remedy

Pursuant to New York law, false arrest and false imprisonment are synonymous.

5 Cases that cite this headnote

[15]  **Civil Rights**  Time to Sue
**Federal Courts**  Civil rights and discrimination cases

Statute of limitations for § 1983 claims filed in federal court in New York is determined by New York State's statute of limitations for personal injury actions. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

4 Cases that cite this headnote

[16]  **Federal Courts**  Computation and tolling

While the applicable limitations period of a § 1983 cause of action is determined by state law, the accrual date is a question of federal law. 42 U.S.C.A. § 1983.

[17]  **Limitation of Actions**  Civil rights

Under federal law, a § 1983 false arrest claim accrues at the time that the alleged false arrest ends, i.e., when the arrestee becomes held pursuant to legal process, for example, when he is bound over by a magistrate or arraigned on charges. 42 U.S.C.A. § 1983.

6 Cases that cite this headnote

[18]  **Limitation of Actions**  Civil rights

Arrestee's § 1983 false arrest claim against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter accrued, and three-year statute of limitations began to run, when arrestee made her initial appearance in state court or when she was arraigned on the indictment. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

More cases on this issue

[19]  **Limitation of Actions**  Concealment of Cause of Action
**Limitation of Actions**  Suspension or stay in general; equitable tolling

Doctrine of equitable tolling is not limited to fraudulent concealment.

1 Case that cites this headnote
More cases on this issue

[20]  **Limitation of Actions**  Estoppel to rely on limitation

Equitable estoppel is applicable where the plaintiff knew of the existence of the cause of action, but the defendant's conduct caused plaintiff to delay in bringing suit.

[21]  **Limitation of Actions**  Concealment of Cause of Action
**Limitation of Actions**  Suspension or stay in general; equitable tolling

Under doctrine of equitable tolling based on fraudulent concealment, when a defendant fraudulently conceals the wrong, the statute of limitations does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action.

1 Case that cites this headnote
More cases on this issue

**[22]** **Limitation of Actions** 🔑 What constitutes concealment

**Limitation of Actions** 🔑 Suspension or stay in general; equitable tolling

To benefit from doctrine of equitable tolling based on fraudulent concealment, the plaintiff must submit non-conclusory evidence of conspiracy or other fraudulent wrong which precludes his possible discovery of harms that he suffered.

1 Case that cites this headnote
More cases on this issue

**[23]** **Limitation of Actions** 🔑 Suspension or stay in general; equitable tolling

Arrestee's conclusory allegation that defendants' fraud, misrepresentation, and deception, prevented her from filing a timely § 1983 false arrest claim against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter were insufficient to support equitable tolling of three-year limitations period. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

More cases on this issue

**[24]** **Malicious Prosecution** 🔑 Nature and elements of malicious prosecution in general

To establish a malicious prosecution claim under New York law, a plaintiff must prove: (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding;

and (4) actual malice as a motivation for defendant's actions.

23 Cases that cite this headnote

**[25]** **Civil Rights** 🔑 Criminal prosecutions

In establishing a violation of a Fourth Amendment right in relation to a § 1983 malicious prosecution claim, a plaintiff must demonstrate a sufficient post-arraignment deprivation of liberty. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[26]** **Civil Rights** 🔑 Criminal prosecutions

The Fourth Amendment right implicated in a § 1983 malicious prosecution claim is the right to be free of unreasonable seizure of the person, i.e., the right to be free of unreasonable unwarranted restraints on personal liberty. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[27]** **Malicious Prosecution** 🔑 Instigation of or participation in prosecution

In a malicious prosecution claim under New York law, to initiate or continue a criminal proceeding, a defendant must do more than report the crime or give testimony; he must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act.

11 Cases that cite this headnote

**[28]** **Malicious Prosecution** 🔑 Presumptions and burden of proof

In a malicious prosecution claim under New York law, an active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating affidavit, or signed a felony complaint.

9 Cases that cite this headnote

**[29]    Malicious Prosecution  🔑  Instigation of or participation in prosecution**

Defendant could have initiated a prosecution, for purposes of a malicious prosecution claim under New York law, by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor.

15 Cases that cite this headnote

**[30]    Civil Rights  🔑  Criminal prosecutions**

**Civil Rights  🔑  Criminal law enforcement; prisons**

Arrestee's allegations that police officer swore to criminal complaint accusing her of being responsible for the death of her infant daughter adequately alleged that officer initiated prosecution, as required to state malicious prosecution claim against officer under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[31]    Civil Rights  🔑  Criminal prosecutions**

**Civil Rights  🔑  Criminal law enforcement; prisons**

Arrestee's allegations that physician employed by city who swore under oath in criminal complaint against her, which accused her of being responsible for the death of her infant daughter, and made assertions that were false and "unsupportable by any medical science or clinical or forensic evidence," adequately alleged that physician participated in the initiation of arrestee's criminal proceeding, as required to state malicious prosecution claim against physician under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[32]    Malicious Prosecution  🔑  Mode of Termination**

Under New York law, there are two ways to establish a favorable termination, for purposes of a malicious prosecution claim: (1) an adjudication of the merits by the tribunal in

the prior action, or (2) an act of withdrawal or abandonment on the part of the party prosecuting the prior action.

2 Cases that cite this headnote

**[33]    Malicious Prosecution  🔑  Mode of Termination**

Fact that a criminal prosecution never reached the merits does not preclude a plaintiff from alleging a favorable termination, for purposes of a malicious prosecution claim under New York law.

7 Cases that cite this headnote

**[34]    Malicious Prosecution  🔑  Mode of Termination**

New York law does not require a malicious prosecution plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence.

5 Cases that cite this headnote

**[35]    Malicious Prosecution  🔑  Mode of Termination**

Under New York law, any final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action, unless the disposition was inconsistent with the innocence of the accused.

2 Cases that cite this headnote

**[36]    Civil Rights  🔑  Criminal Law Enforcement; Police and Prosecutors**

Arrestee's allegations that she was wrongfully accused of being responsible for the death of her infant daughter, and that district attorney had ultimately dismissed charges against her, sufficiently alleged a favorable termination for purposes of her malicious prosecution claim under § 1983, even though she did not allege the specific disposition of the underlying criminal

case. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

[37]    **False Imprisonment**    False imprisonment and malicious prosecution distinguished

Under New York law, probable cause for malicious prosecution is different from probable cause for false arrest.

15 Cases that cite this headnote

[38]    **Malicious Prosecution**    Belief in guilt of accused

For a malicious prosecution claim under New York law, probable cause to prosecute consists of facts and circumstances that would lead a reasonably prudent person to believe the plaintiff guilty.

14 Cases that cite this headnote

[39]    **Malicious Prosecution**    Criminal Prosecutions

Under New York law, probable cause to prosecute is evaluated in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest.

8 Cases that cite this headnote

[40]    **Malicious Prosecution**    Finding of grand jury

Under New York law, a grand jury indictment gives rise to a presumption that probable cause exists and thereby defeats a claim for malicious prosecution.

2 Cases that cite this headnote

[41]    **Malicious Prosecution**    Finding of grand jury

Under New York law, if plaintiff is to succeed in malicious prosecution action after he has been indicted, he must establish that the indictment

was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith; plaintiff may demonstrate fraud or perjury through evidence establishing that the witnesses have not made a complete and full statement of facts either to the grand jury or to the district attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.

5 Cases that cite this headnote

[42]    **Civil Rights**    Criminal law enforcement; prisons

Arrestee's allegations that grand jury indicted her based upon falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses, in connection with accusation that she was responsible for the death of her infant daughter, and police officers failed to inform district attorney's office of exculpatory evidence and that hospital and physician made no efforts to seek a diagnosis other than "shaken baby syndrome," were sufficient to overcome presumption of probable cause afforded grand jury indictment, for purposes of arrestee's malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[43]    **Civil Rights**    Attorneys, jurors, and witnesses; public defenders

Grand jury witness is entitled to absolute immunity in § 1983 actions. 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

[44]    **Malicious Prosecution**    Necessity

To plead a malicious prosecution claim under New York law, plaintiff must allege malice for each of the defendants.

8 Cases that cite this headnote

[45]    **Malicious Prosecution**    Nature and elements

**Malicious Prosecution** 🔑 Motive of prosecution

In a malicious prosecution claim under New York law, malice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff.

3 Cases that cite this headnote

**[46]    Civil Rights** 🔑 Criminal prosecutions

Arrestee's allegations that police officer signed criminal complaint accusing her of being responsible for the death of her infant daughter knowing that its content was false and fabricated adequately pled malice as to officer, as required to state malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[47]    Civil Rights** 🔑 Criminal prosecutions

Arrestee's allegations that physician employed by city swore under oath in criminal complaint, which accused her of being responsible for the death of her infant daughter, and made a statement that was false and "unsupportable by any medical science or clinical or forensic evidence," adequately pled malice as to city physician, as required to state malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[48]    Civil Rights** 🔑 Criminal prosecutions

Arrestee's allegations that, despite lab results showing high alkaline phosphatase and low calcium, consistent with metabolic bone disease, hospital and physician made no effort to seek a diagnosis other than "shaken baby syndrome," based on their motives in concealing exculpatory medical evidence in order to assist prosecutor, adequately pled malice as to hospital and physician, as required to state malicious prosecution claim under § 1983. U.S.C.A. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[49]    Federal Courts** 🔑 Constitutional rights, civil rights, and discrimination in general

Court looks to state law for the elements of a § 1983 abuse of process claim. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[50]    Process** 🔑 Nature and elements in general

Under New York law, a malicious abuse-of-process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with the intent to do harm without excuse of justification and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process.

11 Cases that cite this headnote

**[51]    Process** 🔑 Process, what constitutes

In the context of an abuse of process claim under New York law, legal process means that a court issued the process, and the plaintiff will be penalized if he violates it.

7 Cases that cite this headnote

**[52]    Process** 🔑 Improper, ulterior, collateral, or unlawful purpose

The crux of a malicious abuse of process claim under New York law is the collateral objective element.

9 Cases that cite this headnote
More cases on this issue

**[53]    Process** 🔑 Improper, ulterior, collateral, or unlawful purpose

To plead collateral objective element of a claim under New York law for malicious abuse of process, a plaintiff must plausibly plead not that defendant acted with an improper motive, but rather an improper purpose; plaintiff must claim that the defendant aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution.

8 Cases that cite this headnote

More cases on this issue

**[54]    Limitation of Actions  🔑  Civil rights**

Arrestee's § 1983 malicious abuse of process claim against, inter alia, city and its employees alleging that she was wrongfully accused of being responsible for the death of her infant daughter accrued, and three-year statute of limitations began to run, when criminal case against arrestee was dismissed, without prosecution and following her husband's conviction, at which time prosecution's alleged purpose of using her as leverage to get her husband to plead guilty became clear. 42 U.S.C.A. § 1983; N.Y. CPLR § 214.

More cases on this issue

**[55]    Limitation of Actions  🔑  Torts**

**Limitation of Actions  🔑  Nature of harm or damage, in general**

Under New York law, a claim for abuse of process accrues at such a time as the criminal process is set in motion, typically at arrest, against the plaintiff; however, accrual cannot be appropriate before such time as plaintiff is aware, or ought to be aware, of those facts providing a basis for his claim.

7 Cases that cite this headnote

**[56]    Process  🔑  Probable cause**

Under New York law, probable cause is not a complete defense to malicious abuse of process. U.S. Const. Amend. 4.

5 Cases that cite this headnote

**[57]    Process  🔑  Particular cases**

Arrestee's allegations that physician employed by city swore under oath in criminal complaint, which accused her of being responsible for the death of her infant daughter, and made a statement that was false and "unsupportable by any medical science or clinical or forensic

evidence," and police officer signed criminal complaint knowing that its content was false and fabricated adequately pled involvement in the use of legal process, as required to state malicious abuse of process claim under New York law against physician and officer.

1 Case that cites this headnote

**[58]    Process  🔑  Officers and public employees**

Arrestee failed to allege certain police officers and other city employees participated in the investigation of the criminal case against her relating to the death of her infant daughter, including her arrest and detention, as required to maintain malicious abuse of process claim under New York law in § 1983 action against those officers and city employees. 42 U.S.C.A. § 1983.

**[59]    Civil Rights  🔑  Arrest, search, and detention**

Arrestee's conclusory allegations that all defendants in her § action, namely city, city employees, including police officers who allegedly investigated her, county assistant district attorney, and hospital and one of its employees failed to intervene to prevent other defendants from violating her constitutional rights not to be subjected to false arrest, malicious prosecution, and abuse of process, in connection with accusation that arrestee was responsible for the death of her infant daughter, failed to state § 1983 claim for failure to intervene. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[60]    Civil Rights  🔑  Police, Investigative, or Law Enforcement Activities**

Law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence.

4 Cases that cite this headnote

**[61]    Civil Rights  🔑  Police, Investigative, or Law Enforcement Activities**

**Civil Rights**  ⚷  Use of force in general

**Civil Rights**  ⚷  Arrest and detention

Law enforcement officer who fails to intercede in conduct of other officers is liable for preventable harm caused by action of other officers if officer observes or has reason to know that excessive force is being used, that citizen has been unjustifiably arrested, or that any constitutional violation has been committed by other law enforcement officials, and if observing officer had realistic opportunity to intervene to prevent harm from occurring.

4 Cases that cite this headnote

[62]  **Conspiracy**  ⚷  Definition and Elements in General

To survive a motion to dismiss on a plaintiff's § 1983 conspiracy claim, the plaintiff must allege(1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages. 42 U.S.C.A. § 1983.

5 Cases that cite this headnote

[63]  **Conspiracy**  ⚷  Civil rights conspiracies

Complaints asserting § 1983 conspiracy claims that contain only conclusory, vague, or general allegations that defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[64]  **Conspiracy**  ⚷  Civil rights conspiracies

To state a § 1983 conspiracy claim against a private entity, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act. 42 U.S.C.A. § 1983.

[65]  **Conspiracy**  ⚷  Civil rights conspiracies

Arrestee's allegations that city employees, including police officers and physician, and hospital and its employee acted jointly in wrongfully accusing her of being responsible for the death of her infant daughter were sufficient to support § 1983 conspiracy claim. 42 U.S.C.A. § 1983.

[66]  **Conspiracy**  ⚷  Intracorporate conspiracy doctrine in general

Under the intra-corporate conspiracy doctrine, there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment.

1 Case that cites this headnote

[67]  **Civil Rights**  ⚷  Arrest and detention

**Search, Seizure, and Arrest**  ⚷  Duration

**Search, Seizure, and Arrest**  ⚷  Duration of confinement in general; release

Unreasonably prolonged pretrial detention where exculpatory evidence is readily available can form the basis of a § 1983 claim against police officers as a violation of the Fourth Amendment's protection against unreasonable seizures. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[68]  **Civil Rights**  ⚷  Arrest and detention

To state a § 1983 claim for unreasonably prolonged detention, plaintiff must allege that (1) she has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) the actions of the officers violated that right, and (3) the officers' conduct shocks the conscience. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

7 Cases that cite this headnote

**[69]    Criminal Law** 🔑 **Intervention of Public Officers**

**Prisons** 🔑 **Duration of confinement; discharge and release**

Arrestee's allegations that certain city employees, including police officers and physician, disregarded and concealed exculpatory evidence in criminal investigation relating to accusation that arrestee was responsible for the death of her infant daughter for over four years while arrestee remained in prison were sufficient to support § 1983 claim for unreasonably prolonged detention under Fourth Amendment. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

**[70]    Criminal Law** 🔑 **Intervention of Public Officers**

**Search, Seizure, and Arrest** 🔑 **Duration**

**Search, Seizure, and Arrest** 🔑 **Duty to investigate; exculpatory evidence**

Failure to obtain or disclose evidence that is only arguably exculpatory does not shock the conscience, for purposes of § 1983 claim for unreasonably prolonged detention under the Fourth Amendment. U.S. Const. Amend. 4; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[71]    Constitutional Law** 🔑 **Local government**

Fourteenth Amendment's prohibition against states depriving a person of life, liberty, or property, without due process of law, applies to municipalities. U.S. Const. Amend. 14.

1 Case that cites this headnote

**[72]    Constitutional Law** 🔑 **Arbitrariness**

Due Process Clause was intended to secure the individual from the arbitrary exercise of the powers of government. U.S. Const. Amend. 14.

**[73]    Constitutional Law** 🔑 **Procedural due process in general**

Procedural due process requires that government action depriving an individual of substantial interest in life, liberty, or property be implemented in a fair manner. U.S. Const. Amend. 14.

2 Cases that cite this headnote

**[74]    Constitutional Law** 🔑 **Substantive Due Process in General**

Substantive due process bars certain government actions regardless of the fairness of the procedures used to implement them, in order to prevent governmental power from being used for purposes of oppression. U.S. Const. Amend. 14.

**[75]    Constitutional Law** 🔑 **Substantive Due Process in General**

While a procedural due process claim challenges the procedure by which deprivation of liberty is effected, a substantive due process claim challenges the fact of the deprivation itself. U.S. Const. Amend. 14.

2 Cases that cite this headnote

**[76]    Constitutional Law** 🔑 **Duration and timing of deprivation; pre- or post-deprivation remedies**

Procedural due process violation occurs when the government deprives a person of a protected life, liberty, or property interest without first providing notice and an opportunity to be heard. U.S. Const. Amend. 14.

2 Cases that cite this headnote

**[77]    Constitutional Law** 🔑 **Particular claims**

**Constitutional Law** 🔑 **Duration and timing of deprivation; pre- or post-deprivation remedies**

To determine whether a § 1983 due process claim is plausibly alleged, the court evaluates the sufficiency of the allegations with respect to the liberty or property interest alleged and the process due before deprivation of that interest. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[78]** **Constitutional Law** 🔑 Right to fair trial in general

Fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights. U.S. Const. Amend. 14.

8 Cases that cite this headnote

**[79]** **Constitutional Law** 🔑 Investigative activity in general

**Constitutional Law** 🔑 Evidence

Defendant's due process right to a fair trial is violated when exculpatory evidence is withheld, i.e., when a *Brady* violation occurs, and also when an officer forwards fabricated evidence to prosecutors. U.S. Const. Amend. 14.

3 Cases that cite this headnote

**[80]** **Civil Rights** 🔑 Criminal prosecutions

**Constitutional Law** 🔑 Right to fair trial in general

**Criminal Law** 🔑 Official Action, Inaction, Representation, Misconduct, or Bad Faith

Plaintiff need not have gone to a full trial on the merits in order to have an actionable § 1983 due process claim based on the denial of a fair trial. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

7 Cases that cite this headnote

**[81]** **Civil Rights** 🔑 Criminal prosecutions

**Constitutional Law** 🔑 Evidence

**Criminal Law** 🔑 Responsibility of and for police and other agencies

Police officers can be held liable for *Brady* due process violations under § 1983 if they

withhold exculpatory evidence from prosecutors. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

**[82]** **Criminal Law** 🔑 Responsibility of and for police and other agencies

Once a police officer turns over exculpatory evidence to the prosecutor, that officer satisfies his constitutional obligations under *Brady*. U.S. Const. Amend. 14.

**[83]** **Criminal Law** 🔑 Constitutional obligations regarding disclosure

Elements of *Brady* violation are: (1) evidence at issue must be favorable to accused, either because it is exculpatory or because it is impeaching; (2) that evidence must have been suppressed by state, either willfully or inadvertently; and (3) prejudice must have ensued.

7 Cases that cite this headnote

**[84]** **Criminal Law** 🔑 Materiality and probable effect of information in general

To establish prejudice, as element of *Brady* violation, a plaintiff must show the evidence was material, i.e., whether the evidentiary suppression undermines confidence in the outcomes of the trial.

4 Cases that cite this headnote

**[85]** **Constitutional Law** 🔑 Search, Seizure, and Confiscation

**Constitutional Law** 🔑 Investigative activity in general

**Constitutional Law** 🔑 Evidence

**Criminal Law** 🔑 Responsibility of and for police and other agencies

**Health** 🔑 Records and duty to report; confidentiality in general

Arrestee's allegations that police officers and physicians failed to disclose exculpatory evidence in investigation of her infant's death,

did not document or inform the district attorney's office of exculpatory evidence, and falsely reported facts in reports and search warrant affidavits, and that prejudice ensued because it resulted in her arrest, were sufficient to support procedural due process claim based on *Brady* violation in § 1983 action. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[86]    Criminal Law**    Requisites of fair trial

Fabrication of evidence constitutes a violation of the right to a fair trial. U.S. Const. Amends. 5, 6, 14.

15 Cases that cite this headnote

**[87]    Criminal Law**    Requisites of fair trial

To state a fair trial claim based on fabrication of evidence, a plaintiff must allege that an (1) investigating official (2) fabricated information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result. U.S. Const. Amends. 5, 6, 14.

20 Cases that cite this headnote

**[88]    Constitutional Law**    Protection of Children;  Child Abuse, Neglect, and Dependency

**Constitutional Law**    Search, Seizure, and Confiscation

**Constitutional Law**    Investigative activity in general

**Infants**    False reports and accusations

Arrestee's allegations that certain city employees, including police officers and physician, knowingly provided and/or swore to false information in criminal complaint, reports, and search warrant affidavits accusing her of being responsible for the death of her infant daughter were sufficient to support procedural due process claim against city employees based

on fabrication of evidence in § 1983 action. U.S. Const. Amends. 5, 6, 14; 42 U.S.C.A. § 1983.

**[89]    Constitutional Law**    Protection of Children;  Child Abuse, Neglect, and Dependency

**Infants**    Medical institutions and professionals in general

**Infants**    False reports and accusations

Arrestee's allegations that physician employed by hospital ignored evidence suggesting that her infant daughter's death was not caused by "shaken baby syndrome," including lab results that were consistent with metabolic bone disease, and provided false information to physician employed by city, who based her conclusions in criminal investigation on that false information, were sufficient to support procedural due process claim against hospital and its employee based on fabrication of evidence in § 1983 action. U.S. Const. Amends. 5, 6, 14; 42 U.S.C.A. § 1983.

**[90]    Limitation of Actions**    Civil rights

Fabrication of evidence claims accrue when the plaintiff learns that evidence was fabricated and an injury was caused by the fabrication. U.S. Const. Amends. 5, 6, 14.

4 Cases that cite this headnote

**[91]    Limitation of Actions**    Burden of proof in general

Because the statute of limitations is an affirmative defense, the burden is on the defendant to establish when a federal claim accrues.

**[92]    Limitation of Actions**    Civil rights

Allegation that arrestee always believed in her innocence was insufficient for city employees, including police officers and physician, to establish that her *Brady* violation and fabrication of evidence claims accrued at the time of her arrest in § 1983 action alleging that she was

wrongfully accused of being responsible for the death of her infant daughter. U.S. Const. Amends. 5, 6, 14; 42 U.S.C.A. § 1983.

1 More cases on this issue

**[93]    Constitutional Law** 👈 Substantive Due Process in General

Due process protection in the substantive sense limits what the government may do in both its legislative and its executive capacities. U.S. Const. Amend. 14.

**[94]    Constitutional Law** 👈 Personal and bodily rights in general

**Constitutional Law** 👈 Families and Children

**Constitutional Law** 👈 Privacy and Sexual Matters

The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity. U.S. Const. Amend. 14.

**[95]    Constitutional Law** 👈 Substantive Due Process in General

Criteria to identify what is fatally arbitrary, in context of substantive due process claim, differ depending on whether it is legislation or a specific act of a governmental officer that is at issue. U.S. Const. Amend. 14.

**[96]    Constitutional Law** 👈 Egregiousness; "shock the conscience" test

For executive action to violate substantive due process, it must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience; it is not enough that the government act was incorrect or ill-advised, rather, only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional. U.S. Const. Amend. 14.

1 Case that cites this headnote

**[97]    Constitutional Law** 👈 Protection of Children; Child Abuse, Neglect, and Dependency

**Infants** 👈 Medical institutions and professionals in general

Arrestee's allegations that physician employed by city as well as hospital and its employee failed to "exhaust all possibilities" before rendering "shaken baby syndrome" diagnosis in investigation of her infant daughter's death were insufficient to support substantive due process claim based on failure to investigate in § 1983 action. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[98]    Constitutional Law** 👈 Arbitrariness

The due process right to be free from arbitrary government action, to the extent it exists, is the right to be free of arbitrary government action that infringes a protected right. U.S. Const. Amend. 14.

**[99]    Civil Rights** 👈 Arrest and detention

Arrestee's allegations in § 1983 action that she was wrongfully accused of being responsible for her infant daughter's death and held for more than four years in pretrial detention, and that defendants, including hospital and its employee, encouraged this for the purpose of using her confinement as a "bargaining chip" to pressure her husband to plead guilty, were insufficient to support speedy trial claim against hospital and its employee, absent allegations supporting a causal link between conduct of hospital and its employee and the delay in arrestee's criminal case being resolved. U.S. Const. Amend. 6; 42 U.S.C.A. § 1983.

**[100]    Civil Rights** 👈 Common law or state law torts

Section 1983 action, like its state tort analogs, employs the principle of proximate causation. 42 U.S.C.A. § 1983.

**[101]    Civil Rights** 🔑 **Arrest and detention**

The chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment, in civil rights action arising from arrest.

**[102]    Civil Rights** 🔑 **Arrest and detention**

Arrestee's allegations in § 1983 action that city employees, including police officers and physician, wrongfully accused her of being responsible for her infant daughter's death and that she was held for more than four years in pretrial detention for the purpose of using her confinement as a "bargaining chip" to obtain a guilty plea from her husband, coupled with her criminal case being dismissed shortly after her husband's conviction, were sufficient to state a speedy trial claim as to the city employees who were involved in her prosecution. U.S. Const. Amend. 6; 42 U.S.C.A. § 1983.

**[103]    Constitutional Law** 🔑 **Conditions**

Pretrial detainee's claim of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment. U.S. Const. Amends. 8, 14.

**[104]    Civil Rights** 🔑 **Criminal law enforcement; prisons**

　　　 **Civil Rights** 🔑 **Criminal law enforcement; prisons**

Pretrial detainee's allegations in § 1983 action against city employees, including police officers and physician, as well as hospital and its employee, that defendants, inter alia, refused usual and customary medical services, forced her to give birth while handcuffed and shackled, refused her the opportunity to breastfeed or bond with her infant after childbirth, and took away her

infant two-and-a-half days after delivery failed to support claim of unconstitutional conditions of confinement, absent factual allegations establishing the personal involvement of any defendant with respect to those conditions. U.S. Const. Amend. 14; 42 U.S.C.A. § 1983.

**[105]    Civil Rights** 🔑 **Criminal law enforcement; prisons**

Arrestee's allegations in § 1983 action that city, with deliberate indifference, failed to provide adequate training for its police officers who worked on "shaken baby syndrome" cases or to properly instruct city employees of applicable laws were sufficient to state *Monell* claim against the city. 42 U.S.C.A. § 1983.

**[106]    Civil Rights** 🔑 **Governmental Ordinance, Policy, Practice, or Custom**

Municipality may be liable under § 1983 if a municipal policy or custom causes deprivation of rights protected by the Constitution. 42 U.S.C.A. § 1983.

14 Cases that cite this headnote

**[107]    Civil Rights** 🔑 **Complaint in general**

For a *Monell* claim to survive a motion to dismiss for failure to state a claim, a plaintiff must allege sufficient factual detail and not mere boilerplate allegations that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 12(b)(6).

13 Cases that cite this headnote

**[108]    Civil Rights** 🔑 **Governmental Ordinance, Policy, Practice, or Custom**

　　　 **Civil Rights** 🔑 **Lack of Control, Training, or Supervision; Knowledge and Inaction**

A policy or custom may be established, for purposes of alleging municipal liability under § 1983, by any of the following: (1) a formal policy officially endorsed by the municipality; (2)

actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff. 42 U.S.C.A. § 1983.

15 Cases that cite this headnote

[109]    **Civil Rights**   Criminal law enforcement; prisons

Arrestee's allegations in § 1983 action that physician employed by hospital had a history of overzealously diagnosing "shaken baby syndrome," of which hospital was aware and with knowledge that law enforcement would rely on those conclusions in directing the course of an arrest and prosecution, and that hospital perpetuated policy of having its staff conduct investigations for non-medical purposes in order to see those accused of "shaken baby syndrome" arrested, prosecuted, and convicted, were sufficient to state *Monell* claim against hospital. 42 U.S.C.A. § 1983.

[110]    **Civil Rights**   Vicarious or respondeat superior liability in general

Doctrine of respondeat superior is not available to render a supervisor liable under § 1983 for the unconstitutional conduct of his subordinates. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

[111]    **Civil Rights**   Vicarious or respondeat superior liability in general

Just as a municipal entity cannot be held liable under § 1983 pursuant to the doctrine of respondeat superior, a private corporation cannot be held liable under respondeat superior for the allegedly unconstitutional conduct of its employee. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[112]    **Civil Rights**   Adequacy, Availability, and Exhaustion of State or Local Remedies

**Civil Rights**   Existence of other remedies; exclusivity

There is no private right of action under the New York State Constitution where remedies are available under § 1983. 42 U.S.C.A. § 1983.

4 Cases that cite this headnote

[113]    **Civil Rights**   Government Agencies and Officers

District courts are encouraged to determine the availability of an absolute immunity defense in § 1983 action at the earliest appropriate stage. 42 U.S.C.A. § 1983.

[114]    **Civil Rights**   Attorney General and prosecuting attorneys

Prosecutors performing core prosecutorial functions are entitled to absolute immunity in § 1983 action. 42 U.S.C.A. § 1983.

2 Cases that cite this headnote

[115]    **Civil Rights**   Attorney General and prosecuting attorneys

Prosecutorial functions protected by absolute immunity in § 1983 action include conduct preliminary to the initiation of a prosecution, such as whether to present a case to a grand jury, whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present. 42 U.S.C.A. § 1983.

[116]    **Civil Rights**   Attorney General and prosecuting attorneys

Prosecutor was entitled to absolute immunity in arrestee's § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter, even though arrestee claimed that prosecutor concealed evidence and misrepresented facts. 42 U.S.C.A. § 1983.

**[117]    Civil Rights** 🔑 **Attorney General and prosecuting attorneys**

Prosecutor is entitled to absolute immunity in § 1983 action even in the face of allegations of deliberate withholding of exculpatory information or his knowing use of perjured testimony. 42 U.S.C.A. § 1983.

3 Cases that cite this headnote

**[118]    Federal Courts** 🔑 **Prosecutors and attorneys general**

To the extent arrestee's claims against prosecutor in § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter were asserted against prosecutor in her official capacity, they were barred because prosecutor acted on behalf of state, which was immune under the Eleventh Amendment. U.S. Const. Amend. 11; 42 U.S.C.A. § 1983.

**[119]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware. 42 U.S.C.A. § 1983.

**[120]    Civil Rights** 🔑 **Defenses; immunity and good faith**

Qualified immunity from § 1983 claims for money damages is an affirmative defense as to which the defendant officers or officials bear the burden of proof. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[121]    Civil Rights** 🔑 **Government Agencies and Officers**

**Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

In analyzing the applicability of qualified immunity from § 1983 claims for money damages, courts conduct a two-step analysis: first, courts determine whether the facts show that the officer's conduct violated plaintiff's constitutional rights, and second, if there was a constitutional violation, courts determine whether the right was clearly established at the time of the officer's actions; courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand. 42 U.S.C.A. § 1983.

**[122]    Civil Rights** 🔑 **Good faith and reasonableness; knowledge and clarity of law; motive and intent, in general**

Even if the constitutional right at issue was clearly established in certain respects, an officer is still entitled to qualified immunity from § 1983 claims for money damages if officers of reasonable competence could disagree on the legality of the action at issue in its particular factual context. 42 U.S.C.A. § 1983.

**[123]    Civil Rights** 🔑 **Sheriffs, police, and other peace officers**

Police officers were not entitled to qualified immunity as to arrestee's false arrest and malicious prosecution claims based on alleged fabrication of evidence and suppression of exculpatory evidence in § 1983 action alleging that she was wrongfully accused of being responsible for the death of her infant daughter; there were several plausible alternative explanations to "shaken baby syndrome" as the cause of death, including a genetic disorder and the child's prior medical history, that the officers chose to ignore. 42 U.S.C.A. § 1983.

1 Case that cites this headnote

**[124]    Federal Civil Procedure** 🔑 **Fact issues**

Where district court could not find, as a matter of law, that physician employed by city was acting in a prosecutorial role rather than an investigatory one in connection with accusation that arrestee was responsible for the death of her infant daughter, the availability of absolute immunity from arrestee's false arrest and malicious prosecution claims based on alleged fabrication of evidence and suppression of exculpatory evidence in § 1983 action could not be decided as a matter of law on motion to dismiss. 42 U.S.C.A. § 1983.

4 Cases that cite this headnote
More cases on this issue

**[125]    Civil Rights** 🔑 **Persons Protected, Persons Liable, and Parties**

Physician employed by hospital who had diagnosed arrestee's infant daughter with "shaken baby syndrome," and who allegedly took an active role in criminal investigation accusing arrestee of being responsible for the death of infant, was not entitled to statutory immunity under the New York Child Protective Services Act from arrestee's false arrest and malicious prosecution claims based on alleged fabrication of evidence and suppression of exculpatory evidence on motion to dismiss in § 1983 action. 42 U.S.C.A. § 1983; N.Y. Social Services Law § 413(1)(a).

**[126]    Federal Civil Procedure** 🔑 **Pleading over**

Although it is the usual practice upon granting a motion to dismiss to allow leave to replead, such leave should be denied where the proposed amendment would be futile. Fed. R. Civ. P. 15(a).

1 Case that cites this headnote

**[127]    Federal Civil Procedure** 🔑 **Pleading over**

An amendment to a pleading is considered futile if the claim is time-barred due to the expiration of the applicable statute of limitations period. Fed. R. Civ. P. 15(a).

2 Cases that cite this headnote

**[128]    Federal Civil Procedure** 🔑 **Form and sufficiency of amendment; futility**

District court would deny as futile arrestee's request for leave to amend her complaint a second time in § 1983 action against city, city employees, including police officers who allegedly investigated her, county assistant district attorney, and hospital and one of its employees, alleging that she was wrongfully accused of being responsible for the death of her infant daughter; the court already permitted arrestee the opportunity to amend the complaint and urged her to correct certain deficiencies, however, arrestee did not heed the court's advice, nor make good use of that opportunity to prune her complaint of invalid claims or to add useful or relevant factual allegations or particularity to her complaint. 42 U.S.C.A. § 1983; Fed. R. Civ. P. 15(a).

More cases on this issue

**Attorneys and Law Firms**

**\*591** Corey T. Lee, C.T. Lee & Associates, Ameer Nadav Benno, Benno & Associates P.C., Poupa Jenny Marashi, New York, NY, for Plaintiff.

Qiana Charmaine Smith–Williams, New York City Law Department, Gregory John Radomisli, Brian Scott Osterman, Martin Clearwater & Bell LLP, New York, NY, for Defendants.

**MEMORANDUM & ORDER**

PAMELA K. CHEN, United States District Judge:

On March 26, 2015, Plaintiff Ying Li commenced this action against Defendants pursuant to 42 U.S.C. § 1983 ("Section 1983") and New York law. (*See* Dkt. 1.) Plaintiff's ten-count Amended Complaint alleges numerous theories of liability against Defendants. (*See* Dkt. 36, Amended Complaint ("Am. Compl.").) In general, Plaintiff alleges that she was wrongfully accused of being responsible for the

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

death of her infant daughter. (*Id.*) The Amended Complaint makes claims against two groups of defendants: (i) the first group is **\*592** composed of the City of New York (the "City") and various City employees (collectively, the "City Defendants"), including twelve named New York City Police Department ("NYPD") officers who allegedly investigated Plaintiff (the "Officer Defendants") [1]; Dr. Kristen Landi ("Dr. Landi"), a physician employed by the City; Queens County Assistant District Attorney P. Leigh Bishop ("ADA Bishop"); and fifteen "John Doe" defendants; and (ii) the second group is composed of Flushing Hospital Medical Center ("Flushing Hospital" or "FHMC") and one of its employees, Dr. Fernanda Kupferman ("Dr. Kupferman") (collectively, the "Medical Center Defendants").

Plaintiff asserts the following ten counts, of which eight are against all Defendants: Count 1 (false arrest and imprisonment), Count 2 (malicious prosecution), Count 3 (malicious abuse of process), Count 4 (failure to intervene), Count 5 (conspiracy), Count 6 (unreasonably prolonged detention), Count 7 (violation of due process), Count 8 (*Monell* liability against the City), Count 9 (*Monell*-type liability against Flushing Hospital), and Count 10 (violation of the New York State Constitution). Except for Count 10, all of Plaintiff's claims are alleged as federal claims pursuant to Section 1983.

Presently before the Court are two separate motions to dismiss filed by the two groups of Defendants pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure ("FRCP"). For the reasons set forth below, both the City Defendants' and Medical Center Defendants' motions are GRANTED IN PART and DENIED IN PART. Furthermore, all claims against the following Defendants are dismissed in their entirety: ADA Bishop, Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan.

## BACKGROUND

### I. THE FACTS [2]

Early in the morning of October 23, 2007, Annie, the 8–1/2–week-old daughter of Plaintiff and her husband Hang Bin Li, suddenly went limp while being fed. (Am. Compl. ¶¶ 92, 95.) The Lis called 911 and took Annie to the emergency room at Flushing Hospital. (Am. Compl. ¶¶ 95, 98, 108.) Annie was unresponsive when she arrived at the emergency room, where she was revived and placed on life support. (Am. Compl. ¶ 98.) [3]

Suspecting child abuse, Flushing Hospital called Det. Phelan and the NYPD Child Abuse Squad that day. (Am. Compl. ¶ 101.) Det. Phelan went to the hospital, spoke **\*593** with the hospital staff, looked at medical charts, and met with the Lis. (Am. Compl. ¶¶ 101–103.) P.O. Yam, an officer who spoke Mandarin, accompanied Det. Phelan. (Am. Compl. ¶ 101.) The Lis were taken to Det. Phelan's office at the Queens Child Abuse Squad. (Am. Compl. ¶ 104.) When they arrived at the 109th precinct, other officers and sergeants, including Defendant Manfredi, were present. (Am. Compl. ¶ 105.) Det. Heffernan also came to the Precinct that night. (Am. Compl. ¶ 105.) Dets. Phelan and Degnan interrogated Plaintiff, alone, for about an hour while P.O. Yam interpreted. (Am. Compl. ¶ 106.) They then interrogated Hang Bin Li. (Am. Compl. ¶ 106.) Afterwards, Dets. Degnan and Heffernan drove the Lis back to Flushing Hospital. (Am. Compl. ¶ 108.) At the hospital, Dets. Degnan and Heffernan had extended conversations with the hospital staff, including Dr. Kupferman. (Am. Compl. ¶ 108.)

The next day, October 24, 2007, Det. Phelan went to the Lis' house, and Plaintiff's husband gave written consent for Det. Phelan to search the home. (Am. Compl. ¶ 110.) Later, detectives from the 109th Precinct went to search the Lis' home after getting a warrant. (Am. Compl. ¶ 110.) Subsequently, the Lis were interviewed again by numerous people, including Dets. Heffernan and Moser, officers from the Queens Homicide Squad, and medical personnel at Flushing Hospital, including Dr. Kupferman. [4] (Am. Compl. ¶¶ 112–15.) Det. Chan served as an interpreter from the afternoon of October 24, 2007, until the morning hours of October 25, 2007. (Am. Compl. ¶ 112.) During these interviews, according to Plaintiff, Dets. Heffernan and Moser and Dr. Kupferman repeatedly screamed at the Lis that they had killed their daughter and that unless the Lis told them which one of them had hurt Annie, the doctors could not help her. (Am. Compl. ¶ 115.) They also promised the Lis that they could see Annie if they admitted to hurting her. (Am. Compl. ¶ 116.) After being repeatedly told this, Hang Bin Li stated that he might have inadvertently bumped Annie's head lightly against a table while trying to resuscitate her. (Am. Compl. ¶ 117.)

On October 25, 2007, Dr. Kupferman conducted a "forensic interview" of Plaintiff. (Am. Compl. ¶ 120.) A day later, Annie was confirmed brain dead, and was diagnosed with

"Shaken Baby Syndrome" ("SBS"). [5] (Am. Compl. ¶¶ 123, 134.) That evening, the Lis were again taken to the 109th precinct, and Dets. Degnan, Heffernan, and Chan questioned the Lis separately until the next morning. (Am. Compl. ¶ 124.) Hang Bin Li also gave a written statement regarding the events that had occurred on October 22 and 23. (*Id.*) Annie was removed from life support on October **\*594** 28. (Am. Compl. ¶ 125.) On October 29, Dets. Moser, Degnan, Heffernan, and Sgt. Cai questioned Hang Bin Li at the 109th precinct. (Am. Compl. ¶ 126.) Throughout the multiple investigations and interviews, Plaintiff denied any wrongdoing. (Am. Compl. ¶ 127.) Unidentified Defendants ordered Plaintiff to remain in and about her home from approximately October 26, 2007 up to her arrest five months later. (Am. Compl. ¶ 131.)

On March 11, 2008, Plaintiff and her husband were arrested for Annie's death based on the conclusion that Annie had died of SBS. (Am. Compl. ¶¶ 133–34.) Plaintiff was charged with two counts of Manslaughter in the First Degree, and one count of Endangering the Welfare of a Child. (Am. Compl. ¶¶ 146.) The grand jury indicted Plaintiff on various charges, including Manslaughter in the Second Degree. (Am. Compl. ¶ 181, 184, Ex. C.) Plaintiff pled not guilty to all charges. (Am. Compl. ¶ 179.) Plaintiff's husband was also indicted for one count of Murder in the Second Degree, two counts of Manslaughter in the Second Degree, and one count of Endangering the Welfare of a Child. (Am. Compl. ¶ 185.) Unable to make bail, Plaintiff was held at the Riker's Island correctional facility for about four years without a trial. (*See* Am. Compl. ¶¶ 180, 234.) On March 26, 2012, Plaintiff was released after her bail was reduced. (Am. Compl. ¶ 197.) On January 2, 2013, ADA Bishop moved to dismiss the criminal charges against Plaintiff. (Dkt. 63–6, Ex. F.) Hang Bin Li's trial began the next day. (Am. Compl. ¶ 199.) On February 1, 2013, he was convicted of reckless manslaughter. (Am. Compl. ¶ 200.)

## II. PROCEDURAL HISTORY

Plaintiff filed this action on March 26, 2015. (Dkt. 1.) On November 19, 2015, she filed the Amended Complaint. (Dkt. 36.) On March 7, 2016, Defendants moved to dismiss the Amended Complaint pursuant to FRCP 12(b)(6). (Dkt. 53, 58.)

## DISCUSSION [6]

## I. COURT'S CONSIDERATION OF MATERIAL EXTRANEOUS TO THE AMENDED COMPLAINT

Plaintiff and Defendants both seek to have the Court consider certain information and documents outside of the Amended Complaint. Both parties have attached to their moving papers the Queens County criminal court complaint ("criminal complaint") against Plaintiff (Dkt. 60, Ex. B; **\*595** Dkt. 63, Ex. B) and the transcript of the court conference at which ADA Bishop moved to dismiss the criminal charges against Plaintiff (Dkt. 60, Ex. C; Dkt. 63, Ex. F). The City Defendants also submitted the grand jury minutes (Dkt. 65, Ex. A) with their Reply brief. Plaintiff also has submitted a copy of the manslaughter indictment returned by the grand jury against her (Dkt. 63, Ex. C) and two press releases from the Queens District Attorney's Office, dated March 12, 2008, and September 11, 2015 (Dkt. 63, Exs. D, E). The March 12, 2008 press release discusses the District Attorney's charging of Plaintiff and her husband. (*See* Ex. D, Dkt. 63–4, at ECF 2.) [7] The September 11, 2015 press release notes that the Queens District Attorney and the New York City Chief Medical Examiner were to host the 2015 New York City Abusive Head Trauma / Shaken Baby Syndrome Conference. (*See* Ex. E, Dkt. 63–5 at ECF 2.)

In determining the adequacy of a claim under Rule 12(b)(6), courts are generally limited to the facts alleged in the complaint, documents attached to the complaint, documents incorporated by reference in the complaint, and facts that may be judicially noticed. *See DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)); *see also Wilson v. Kellogg Co.*, 628 Fed.Appx. 59, 60 (2d Cir. 2016) (summary order) (noting that the court may consider matters of which judicial notice may be taken in deciding a Rule 12(b)(6) motion). However, even if the complaint does not expressly cite a document, the complaint is deemed to include that document if it is "integral" to the complaint. *L–7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (quoting *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004)); *Sira*, 380 F.3d at 67 (document not expressly cited in the complaint was "incorporated into the pleading because [it] was integral to [plaintiff's] ability to pursue" his cause of action); *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint.") (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–153 (2d

Cir. 2002)); Fed. R. Evid. 201 (a court may take judicial notice of "a fact that is not subject to reasonable dispute because it ... can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

[1] [2] By repeatedly referring to the criminal complaint, the Amended Complaint incorporates it by reference.[8] As for Plaintiff's other exhibits, *i.e.*, the indictment, the transcript of the criminal court conference, and the two press releases, the Court takes judicial notice of them, but for the limited purpose of establishing their existence and legal effect, and determining the statements that they contain without considering the truth of those statements. **\*596** *See, e.g., Bejaoui v. City of New York*, No. 13-cv-5667, 2015 WL 1529633, at \*6 (E.D.N.Y. Mar. 31, 2015) (recognizing disagreement among district courts in the Second Circuit as to whether incident reports, arrest reports, and police complaints may be judicially noticed, but still taking notice of the plaintiff's State court indictment and criminal court order to establish their existence and legal effect); *Global Network Commc'ns, Inc. v. City of New York*, 458 F.3d 150, 157 (2d Cir. 2006) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quoting *Int'l Star Class Yacht Racing Assn'n v. Tommy Hilfiger U.S.A., Inc.*, 146 F.3d 66, 70 (2d Cir. 1998))); *see, e.g., Garcia–Garcia v. City of New York*, No. 12-cv-1302, 2013 WL 3832730 (S.D.N.Y. July 22, 2013) (taking judicial notice of criminal complaints and indictments for the limited fact that plaintiff was arrested and charged with certain crimes).[9] Here, the criminal court records and the press releases relate to Plaintiff's allegations that the criminal case was terminated favorably to her and the date on which the criminal charges were dropped.[10] (Am. Compl. ¶¶ 201, 212.)

[3] The Court, however, declines to take judicial notice of the grand jury minutes in *People v. Hang Bin Li and Ying Li*, Indictment No. 603/08 (Dkt. 65, Ex. A), which the City Defendants have attached to their Reply brief, because the City seeks to rely on the substance and truth of the testimony set forth in those minutes, and not just the fact of the testimony being given or the date on which it was given. *See St. John's Univ., N.Y. v. Bolton*, 757 F.Supp.2d 144, 156 (E.D.N.Y. 2010) ("[T]he court may, *at its discretion*, consider matters of which judicial notice may be taken...." (emphasis added) (citation omitted)).

## II. LEGAL STANDARD

Under Rule 12(b)(6) of the FRCP, a defendant may move for dismissal on the ground that the complaint "fail[s] to state a claim upon which relief can be granted." To withstand a Rule 12(b)(6) motion, a complaint must plead sufficient facts "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable **\*597** inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 556, 127 S.Ct. 1955). In ruling on a 12(b)(6) motion, a court must accept the factual allegations set forth in the complaint as true and must draw all reasonable inferences in favor of the plaintiff. *See Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). However, that " 'tenet is inapplicable to legal conclusions,' and '[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.' " *Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (quoting *Iqbal*, 556 U.S. at 668, 129 S.Ct. 1937). A complaint that "tenders 'naked assertion[s]' devoid of 'further factual enhancement' " will not suffice. *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937 (quoting *Twombly*, 550 U.S. at 557, 127 S.Ct. 1955). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level...." *Twombly*, 550 U.S. at 555, 127 S.Ct. 1955. A complaint should be dismissed where a plaintiff has not "nudged [its] claims across the line from conceivable to plausible[.]" *Id.* at 570, 127 S.Ct. 1955.

## III. PLAINTIFF'S SECTION 1983 CLAIMS

[4] [5] Plaintiff has brought this action pursuant to 42 U.S.C. § 1983 ("Section 1983"), which provides a cause of action for anyone subjected "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws" by a person acting under color of state law. 42 U.S.C. § 1983. "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999) (citing *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985)); *see Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010). To state a claim under Section 1983, a plaintiff must plausibly allege "(1) that the defendants deprived him of a right 'secured by the Constitution or laws of the United States'; and (2) that they did so 'under color of state law.' " *Giordano v. City of New York*, 274 F.3d 740, 750 (2d Cir.

2001) (quoting *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)); *see Flynn v. James*, 513 Fed.Appx. 37, 39 (2d Cir. 2013).

### A. Liability of Medical Center Defendants as Private Actors

**[6]** Plaintiff asserts her federal claims not only against the City Defendants but also against the Medical Center Defendants, who ordinarily would be considered non-State actors. *See White v. St. Joseph's Hosp.*, 369 Fed.Appx. 225, 226 (2d Cir. 2010) ("[P]rivate actors and institutions, such as the hospitals ... are generally not proper *§ 1983* defendants because they do not act under color of state law.") (citing *Amer. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50, 119 S.Ct. 977, 143 L.Ed.2d 130 (1999)); *see also Kia P. v. McIntyre*, 235 F.3d 749, 756 (2d Cir. 2000) (finding that a hospital was not a State actor to the extent it acted in its capacity as a private provider of medical care). As a general matter, liability under Section 1983 is proper only with respect to individuals acting under "color of state law," *i.e.*, State actors, or individuals acting in concert with a State actor. *See* 42 U.S.C. § 1983; *Jones v. City of New York*, No. 12-cv-9144, 2013 WL 4028183, at *6 n.3 (S.D.N.Y. Aug. 8, 2013) ("Section 1983 addresses only those injuries caused by state actors or those acting under color of state law.") (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). For a private entity to be held liable under Section 1983, a plaintiff must establish that the private entity acted as a "willful participant in joint activity with the State or its agents." **\*598** *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (citation and quotation marks omitted).

Although the Medical Center Defendants argue that they are not State actors and therefore not subject to liability under Section 1983, they also note that this issue may be more appropriate to be decided on summary judgment. (*See* Dkt. 55 at 19 n.3.) Because the Medical Center Defendants essentially defer arguing the issue, the Court reserves consideration of the issue for summary judgment. For purposes of ruling on Defendants' motions to dismiss, the Court assumes without deciding that the Medical Center Defendants are State actors who acted "under color of state law."

### B. City Defendants' Request to Dismiss the Individual Officer Defendants for Lack of Personal Involvement

**[7]** **[8]** The City Defendants point out—and rightfully so —that Plaintiff has failed to allege any personal involvement by many of the named Officer Defendants. (Dkt. 59 at 6.)

"An individual defendant is not liable under *§ 1983* absent personal involvement." *Morris v. Eversley*, 282 F.Supp.2d 196, 202 (S.D.N.Y. 2003) (citing *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994)); *Spavone v. New York State Dept. of Corr. Servs.*, 719 F.3d 127, 135 (2d Cir. 2013) ("It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under *§ 1983*.") (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)). Pleadings that do not differentiate which defendant was involved in the unlawful conduct are insufficient to state a claim. *See, e.g., Wright v. Orleans Cnty.*, No. 14-cv-0622A, 2015 WL 5316410, at *13 (W.D.N.Y. Sept. 10, 2015) (noting in a *§ 1983* case that "[g]roup pleading is insufficient for purposes of Rule 8(a)(2) [of the FRCP] which requires a short and plain statement of the claim showing that the pleader is entitled to relief." (citation and quotation marks omitted)); *Holmes v. Allstate Corp.*, No. 11–civ–1543, 2012 WL 627238, at *7, *22 (S.D.N.Y. Jan. 27, 2012) ("Plaintiffs' method of group pleading is incoherent or illogical" and "[FRCP] 8(a) is violated where a plaintiff, by engaging in 'group pleading,' fails to give each defendant fair notice of the claims against it."); *Pierson v. Orlando Regional Healthcare Systems, Inc.*, 619 F.Supp.2d 1260, 1273 (M.D. Fla. 2009) (dismissing complaint because group-pleading method of collectively referring to individual defendants and two physician groups as "Peer Review Defendants" throughout complaint did not satisfy [FRCP] 9(a)).

#### 1. Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, and Sgt. Manfredi

**[9]** The Amended Complaint fails to allege facts from which it can be reasonably inferred that Lt. Conforti, Det. Perdoch, Sgt. Rodriguez, Lt. Hall, and Det. Lee had any involvement in Plaintiff's Queens County criminal proceedings. Though the lengthy Amended Complaint devotes six paragraphs to each of these Defendants (*see* Am. Compl. ¶¶ 19–22, 82–83 (for Lt. Conforti); Am. Compl. ¶¶ 27–30, 81–82 (for Det. Perdoch); Am. Compl. ¶¶ 39–42, 82–83 (for Sgt. Rodriguez); Am. Compl. ¶¶ 43–46, 82–83 (for Lt. Hall); Am. Compl. ¶¶ 55–58, 82–83 (for Det. Lee)), these paragraphs simply recite the same conclusory, formulaic, and non-substantive allegations as to each of these Defendants, asserting that they were "acting within the course and scope of their employment" and "under color of state law," that they are being sued in their individual and official capacities, and that they should be referred to as "CITY DEFENDANTS" or "OFFICER DEFENDANTS." In short, Plaintiff does not allege that any of these five

officers had even a minimal role in arresting, investigating, or prosecuting **\*599** her. For Sgt. Manfredi, Plaintiff alleges nothing more than that he was present at the 109th Precinct when the Lis arrived with Det. Phelan. (*See* Am. Compl. ¶¶ 104–105.)[11]

[10]  Based on Plaintiff's counsel's representation at the pre-motion conference, it appears that Plaintiff named some of these individual Defendants because they were listed as having supervisory roles in the Queens County District Attorney's press release (dated March 12, 2008). (*See* Ex. D, Dkt. 63–4 at ECF 3.) Even though the Court takes judicial notice of the press release, as noted, it does not take judicial notice of the press release for the truth of its contents, *i.e.*, that the identified officers were, in fact, supervisors at the time of Plaintiff's arrest and prosecution. *See Roth*, 489 F.3d at 509. Furthermore, the mere listing of these officers as supervisors in a press release is insufficient to create an inference of personal involvement absent further allegations, especially because "a defendant [may not] be held liable merely by his connection to the events through links in the chain of command." *Reynolds v. Goord*, No. 98-cv-6722, 2000 WL 235278, at *7 (S.D.N.Y. Mar. 1, 2000); *Colon*, 58 F.3d at 873–74 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim.").

### 2. P.O. Yam, Sgt. Cai, and Det. Chan

With respect to P.O. Yam, Sgt. Cai, and Det. Chan, the allegations in the Amended Complaint are also insufficient to show personal involvement in unlawful conduct that supports any of Plaintiff's claims. Based on the Amended Complaint, the participation of these officers was limited to serving as translators during the investigations of Plaintiff's criminal case.[12] (*See* Am. Compl. ¶¶ 35–38, 101, 104, 106 (for P.O. Yam); Am. Compl. ¶¶ 51–54, 126 (for Sgt. Cai); Am. Compl. ¶¶ 59–62, 112, 119 (for Det. Chan); Am. Compl. ¶ 82–83 (for all Defendants).) While these translating officers are alleged to have been present during the interviews of the Lis by the other City Defendants, there are no other allegations from which to infer that these three officers were involved, in any way, in the conduct that gives rise to Plaintiff's Section 1983 claims, *e.g.*, arresting Plaintiff without probable cause, initiating criminal process against her, forwarding false or fabricated evidence to the prosecution, or concealing exculpatory information from the prosecutors or the defense. The translating officers' mere presence at the Lis' interviews

is simply not enough to allege their direct involvement in the *unlawful* conduct at issue in this case, as opposed to their incidental involvement in some of the events related to Plaintiff's arrest and detention. All claims against P.O. Yam, Sgt. Cai, and Det. Chan are, therefore, dismissed.

### 3. Dets. Moser, Phelan, and Heffernan

With respect to Dets. Moser, Phelan, and Heffernan, the Court finds that Plaintiff has provided sufficient allegations as to **\*600** their personal involvement in the conduct giving rise to some, but not all, of Plaintiff's claims, as discussed *infra*. (*See* Am. Compl. ¶¶ 112, 119, 126, 130 (alleging Det. Moser's involvement in the investigation of the Lis); ¶¶ 102–104, 106, 109–111 (alleging Det. Phelan's involvement to the extent that he went to the hospital, spoke to the hospital staff, examined relevant medical charts, and interrogated Ying Li); ¶¶ 112, 126, 130 (alleging Det. Heffernan's involvement to the extent that he interrogated Hang Bin Li and other witnesses).)

\* \* \*

Accordingly, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan are dismissed as Defendants due to the insufficiency of allegations establishing personal involvement. *See Zurich American Ins. Co. v. Dah Sing Bank, Ltd.* No. 03–civ–7778, 2004 WL 1328215, at *6 (S.D.N.Y. Jun. 15, 2004) (dismissing claims against one defendant bank where plaintiff did not put forth "a single factual allegation" but instead "lump[ed] the three bank defendants together and assert[ed] that they collectively processed the checks"); *Hernandez v. Goord*, 312 F.Supp.2d 537, 548 (S.D.N.Y. 2004) (dismissing individual defendants who were merely listed at the beginning of the complaint and were never connected in the complaint to any particular adverse action); *see also S.B. v. City of New York*, No. 14-cv-1021, 2016 WL 4530455, at *13 (E.D.N.Y. Aug. 29, 2016) (dismissing claims where the complaint did "not even directly name any of the defendants or allege the particular actions they undertook" (citation omitted)); *Barber v. Ruzzo*, No. 10-cv-1198, 2011 WL 4965343, at *2 (N.D.N.Y. Oct. 19, 2011) ("Simply stating that [defendants] were 'personally and actively involved in the continuation of criminal proceedings against [a plaintiff],' is grossly insufficient to establish personal involvement in the actual prosecution.").

## IV. FALSE ARREST

**[11]**   **[12]**   **[13]**   **[14]**   A claim for false arrest under Section 1983, resting on the Fourth Amendment right to be free from unreasonable seizures, including arrest without probable cause, is substantially the same as that under New York law. [13] *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007) (citing *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996)). In analyzing Section 1983 claims for false arrest, courts "generally look[ ] to the law of the state in which the arrest occurred." *Dancy v. McGinley*, 843 F.3d 93, 107 (2d Cir. 2016) (quoting *Jaegly v. Couch*, 439 F.3d 149, 151 (2d Cir. 2006)). Under New York law, a plaintiff must establish, *inter alia*, that "the defendant intentionally confined him without his consent and without justification." *Id.* at 107 (quoting *Weyant*, 101 F.3d at 852) (quotation marks omitted); *see also Ackerson v. City of White Plains*, 702 F.3d 15, 19 (2d Cir. 2012) (citing *Broughton v. State of New York*, 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975)).

### A. Plaintiff's False Arrest Claim is Barred by the Statute of Limitations

**[15]**   The statute of limitations for Section 1983 claims filed in federal court in New York is determined by New York State's statute of limitations for personal injury actions. *See* **\*601** *Owens v. Okure*, 488 U.S. 235, 251, 109 S.Ct. 573, 102 L.Ed.2d 594 (1989) (discussing *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985), which held that courts deciding claims under Section 1983 should "borrow" the State statute of limitations for personal injury actions); *see also Pearl v. City of Long Beach*, 296 F.3d 76, 79 (2d Cir. 2002) (citing *Owens* ). In New York State, the applicable statute of limitations for personal injuries is three years. N.Y. C.P.L.R. § 214 (McKinney). Thus, Plaintiff should have filed her false arrest claim within three years of the date on which the cause of action accrued.

**[16]**   **[17]**   While the applicable limitations period is determined by State law, the accrual date "is a question of federal law". *Wallace v. Kato*, 549 U.S. 384, 388, 127 S.Ct. 1091, 166 L.Ed.2d 973 (2007) ("[T]he accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." (emphasis in the original)). Under federal law, a Section 1983 false arrest accrues at the time that the alleged false arrest ends, *i.e.,* when the arrestee "becomes held pursuant to [legal] process—when, for example, he is bound over by a magistrate or arraigned on charges." *Wallace*, 549 U.S. at 389, 127 S.Ct. 1091; *see also Lynch v. Suffolk Cnty. Police Dep't, Inc.*, 348

Fed.Appx. 672, 675 (2d Cir. 2009) (summary order) (applying *Wallace* to find that plaintiff's § 1983 false arrest claim was time-barred).

**[18]**   Here, the Medical Center Defendants and the City Defendants contend that Plaintiff's false arrest claim as to all Defendants is time-barred. (Dkt. 55 at 4; Dkt. 64 at 3.) Plaintiff concedes this (Dkt. 66 at 6), and the Court agrees. Plaintiff was arrested on March 11, 2008 in connection with her daughter's death. (Am. Compl. ¶ 133.) For Plaintiff's false arrest claim to be timely, she must have made an initial appearance or been arraigned on or after March 26, 2012, *i.e.*, three years from the filing of her complaint. *See Wallace*, 549 U.S. at 389, 127 S.Ct. 1091 (false arrest accrues when plaintiff's false arrest ends and plaintiff becomes held pursuant to legal process). However, Plaintiff alleges that she was arrested on March 11, 2008 and that she was incarcerated as of that date until March 26, 2012. [14] Because Plaintiff did not bring her false arrest claim until March 2015, it is plainly barred by the applicable three-year statute of limitations.

### B. Equitable Tolling

**[19]**   **[20]**   Recognizing that the statute of limitations has run, Plaintiff contends that equity demands tolling of the statute of limitations. (Dkt. 66 at 7.) Plaintiff's claim for equitable tolling is based on the notion of fraudulent concealment. [15] *See Pearl*, 296 F.3d at 81–84 (noting that the "taxonomy of tolling, in the context of avoiding a **\*602** statute of limitations, includes at least three phrases: equitable tolling, fraudulent concealment of a cause of action, and equitable estoppel," and also recognizing that the Second Circuit equates both equitable estoppel and equitable tolling with fraudulent concealment).

**[21]**   **[22]**   When a "defendant fraudulently conceals the wrong, the [statute of limitations] does not begin running until the plaintiff discovers, or by the exercise of reasonable diligence should have discovered, the cause of action." *Pinaud v. Cnty. of Suffolk*, 52 F.3d 1139, 1157 (2d Cir. 1995) (quoting *Keating v. Carey*, 706 F.2d 377, 382 (2d Cir. 1983)); *Pearl*, 296 F.3d at 81; *see also Halstead v. City of New York*, No. 13-cv-4874, 2015 WL 1506133, at \*4 (E.D.N.Y. Mar. 31, 2015). To benefit from this doctrine of equitable tolling based on fraudulent concealment, the "plaintiff must submit non-conclusory evidence of conspiracy or other fraudulent wrong *which precludes his possible discovery of harms that he suffered*." *Pinaud*, 52 F.3d at 1157 (emphasis in original); *see also Gov't Employees Ins. Co. v. U.S.*, No. 13-cv-4063,

2014 WL 582164 (E.D.N.Y. Feb. 14, 2014) ("the 'burden of demonstrating the appropriateness of equitable tolling ... lies with the plaintiff.' " (quoting *Boos v. Runyon*, 201 F.3d 178, 184–85 (2d Cir. 2000))). The Second Circuit has made clear that, "as a matter of fairness", the doctrine should only be applied "where a plaintiff has been 'prevented in some extraordinary way from exercising [her] rights' ". *Pearl*, 296 F.3d at 85 (citation and quotation marks omitted). *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (noting that courts apply equitable tolling only in "rare and exceptional circumstances" (citation and internal quotation marks omitted)).

 [23]  Here, Plaintiff presents only an unsupported, conclusory statement to justify equitable tolling: "[D]efendants' fraud, misrepresentation, and deception, induced plaintiff from filing a timely action. Defendants' misconduct caused the plaintiff to delay in bringing suit and/or wrongfully deceived or misled plaintiff in order to conceal the existence of a cause of action." (Am. Compl. ¶ 209.) The Amended Complaint does not allege (a) which of the numerous Defendants committed fraud, misrepresentation, or deception, (b) what information was kept from Plaintiff, or (c) how the alleged withholding of information made it impossible for Plaintiff to discover the harms she had suffered. *See, e.g., Harrison v. Harlem Hosp.*, 364 Fed.Appx. 686, 688 (2d Cir. 2010) (summary order) ("The appellants have failed to identify any specific fact they have learned *since* the limitations period expired which, if known by them sooner, would have led them to file suit sooner." (emphasis in original)).

In her opposition brief, Plaintiff claims that she became aware of her false arrest only "when Plaintiff's attorneys were told ... that there was no 'medical proof' that she could have saved her daughter," and that Plaintiff's reliance on Dr. Kupferman's assessment that earlier medical intervention could have saved Annie caused Plaintiff to delay filing her false arrest claim. (Dkt. 66 at 7.) However, as the Medical Center Defendants correctly point out, none of these factual allegations are in Plaintiff's Amended Complaint. [16]

 ***603**  Furthermore, even assuming *arguendo* that Dr. Kupferman had concealed information that might have supported Plaintiff's false arrest claim, equitable tolling is still not warranted if this alleged concealment did not sufficiently justify Plaintiff's failure to pursue her cause of action. *Paige v. Police Dept. of City of Schenectady*, 264 F.3d 197 (2d Cir. 2001). In *Paige*, the plaintiff, a minor at the time, was sexually assaulted by a police officer. *Id.* at 198. She reported the

assault to the police department soon after it occurred, but the department told her that there was insufficient evidence to pursue the case. *Id.* Fifteen years later, the plaintiff found out through a newspaper article that the police department might have had an investigatory file with information identifying the assaulting officer as the suspect, but chose not to pursue the case. *Id.* at 199. In bringing a Section 1983 claim against the City, the police department, and the suspected assaulting officer, the plaintiff argued that none of her claims was time-barred because (a) they did not accrue until the publishing of the newspaper article, and, in the alternative (b) the statute of limitations should be tolled until the date the article was published under the doctrine of equitable tolling. *Id.* The Second Circuit rejected both arguments finding, *inter alia*, that the plaintiff had sufficient knowledge to timely commence her causes of action without the investigatory file. *Id.* at 200 ("Although some of the facts putatively concealed by the defendants might have strengthened [plaintiff's] case ... the absence of those facts did not sufficiently justify [plaintiff] in not pursuing her cause of action as to merit equitable tolling.")*; see also Pearl*, 296 F.3d at 78–85 (finding Section 1983 plaintiff, who alleged a brutal beating by four officers, was not entitled to equitable tolling, despite one of the officer's subsequent confession that the officers had fabricated evidence against plaintiff; explaining that plaintiff had full knowledge of his encounter with the officers and that the officer's recantation was "not newly developed awareness of a previously concealed cause of action", but simply "more persuasive evidence").

Even accepting Plaintiff's new, and improperly asserted, theory of fraudulent concealment, her case is indistinguishable from *Paige* and *Pearl*: Plaintiff "had full knowledge" of her actions relating to her child's death, including whether she knowingly delayed getting her child medical attention, and thus the purportedly withheld information that earlier medical intervention might not have saved Annie's life does not lead to a "newly developed awareness of a previously concealed cause of action", but simply provides potentially persuasive evidence for that claim. Indeed, Plaintiff fails to explain how Dr. Kupferman's purported diagnosis with regard to Annie made it "impossible" for Plaintiff to learn that she had a claim for false arrest. *See Pearl*, 296 F.3d at 85 (reiterating that, with respect to application of the equitable tolling doctrine, "we made it clear that we had in mind a situation where a plaintiff 'could show that it would have been *impossible* for a reasonably prudent person to learn' about [her] cause of action." (emphasis in original)). In fact, some allegations in

the Amended Complaint suggest that Plaintiff always knew or believed that she had a false arrest claim. For example, she alleges that she had "steadfastly denied wrongdoing throughout the numerous interrogations **\*604** conducted by Defendants," even in the early stages of the investigation of Annie's death. (*See* Am. Compl. ¶ 127; *see also* Am. Compl. ¶ 118 ("Ying Li, however was positive that she did not harm her daughter, that she never saw Hang Bin do anything but love and treasure Annie. She maintained her innocence throughout.").) Plaintiff also pleaded not guilty to all counts in the criminal complaint and indictment. (Am. Compl. ¶ 179.) Furthermore, Plaintiff also alleges in the Amended Complaint that she made diligent attempts to disprove the shaken baby syndrome diagnosis of Annie, thereby demonstrating her belief from the time of her arrest that the diagnosis was wrong and that Plaintiff had been falsely arrested and accused of causing her daughter's death, whether by SBS or failing to get her daughter prompt medical attention. (*See, e.g.,* AC ¶ 197 ("In May of 2012[,] Judge Gregory Lasak ordered further DNA testing done on [the Lis], after the OI [Osteogenesis Imperfecta] [17] gene had been detected in Hang Bin Li.").) While Plaintiff may have "diligently attempted to disprove Kupferman's ... diagnosis (Dkt. 66 at 7), in this case, it only reinforces the conclusion that Plaintiff was aware of her false arrest claim before 2013.

In sum, Plaintiff's Amended Complaint provides only an unsupported, conclusory assertion regarding "fraud, misrepresentation, and deception" that is patently insufficient to support equitable tolling with respect to her false arrest claim, which is barred by the three-year statute of limitations. Furthermore, even Plaintiff's belated and improper assertion of facts regarding the withholding of information by the Medical Center Defendants fails to show that Plaintiff could not have timely brought her false arrest claim, and thus even these facts, if accepted as true, would not support the application of the equitable tolling doctrine.

Accordingly, Defendants' motions to dismiss Plaintiff false arrest claim are granted. [18]

## V. MALICIOUS PROSECUTION

**[24]    [25]    [26]**  Plaintiff asserts a federal malicious prosecution claim against all Defendants. (Am. Compl. ¶ 211–213.) To allege a Section 1983 claim for malicious prosecution, a plaintiff must allege the four elements of a malicious prosecution claim under New York law—"(1) the initiation or continuation of a criminal proceeding against

plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions"—as well as a violation of the plaintiff's rights under the Fourth Amendment. [19] **\*605** *Manganiello v. City of New York,* 612 F.3d 149, 160–61 (2d Cir. 2010) (citations and quotation marks omitted); *Cornejo,* 592 F.3d at 129 ("And § 1983, in recognizing a malicious prosecution claim when the prosecution depends on a violation of federal rights, adopts the law of the forum state so far as the elements of the claim for malicious prosecution are concerned." (citation omitted)); *see also Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 116–117 (2d Cir. 1995) (relying in part on common law and New York State malicious prosecution law in analyzing § 1983 malicious prosecution claim). In establishing a violation of a Fourth Amendment right in relation to a Section 1983 malicious prosecution claim, a plaintiff must demonstrate "a sufficient post-arraignment deprivation[ ] of liberty." [20] *Singer,* 63 F.3d at 117; *see also Rohman v. New York City Transit Auth.,* 215 F.3d 208, 215 (2d Cir. 2000) (noting that it is insufficient for a plaintiff to assert only the four elements of New York State malicious prosecution claim alone).

The Medical Center Defendants contend that Plaintiff cannot satisfy three out of the five requisite elements—specifically, favorable termination, lack of probable cause, and malice. (Dkt. 55 at 5–9.) The City Defendants argue that Plaintiff's claim must be dismissed because there was probable cause and because none of the Officer Defendants initiated the prosecution against Plaintiff. (*See* Dkt. 59 at 7–11.) For the reasons stated below, the Court finds that Plaintiff has adequately alleged a malicious prosecution claim against Det. Degnan, Dr. Landi, and also Dr. Kupferman, but not as to all of the other Defendants. The malicious prosecution claim is dismissed as to Dets. Moser, Phelan, and Heffernan, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan.

### A. Initiation of a Criminal Proceeding

**[27]    [28]    [29]**  To initiate or continue a criminal proceeding, "a defendant must do more than report the crime or give testimony. He must play an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act." *Manganiello,* 612 F.3d at 163 (quoting *Rohman,* 215 F.3d at 217) (alteration and internal quotation marks omitted). An active role in prosecution is inferred when a defendant had the plaintiff arraigned, filled out a complaining and corroborating

affidavit, or signed a felony complaint. *See Cameron v. City of New York*, 598 F.3d 50, 63 (2d Cir. 2010) (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments); *see also Costello v. Milano*, 20 F.Supp.3d 406, 415 (S.D.N.Y. 2014). Additionally, a defendant could have initiated a prosecution "by creating material, false information and forwarding that information to a prosecutor or by withholding material information from a prosecutor." *Costello*, 20 F.Supp.3d at 415; *see also Llerando Phipps v. City of New York*, 390 F.Supp.2d 372, 383 (S.D.N.Y. 2005) ("[A]n arresting **\*606** officer may be held liable for malicious prosecution [if he] creates false information likely to influence a jury's decision and forwards that information to prosecutors." (citation and quotation marks omitted)); *Webster v. City of New York*, 333 F.Supp.2d 184, 198–99 (S.D.N.Y. 2004) (noting that police officers could be held liable for malicious prosecution if they provided false information to prosecutors).

The Medical Center Defendants do not dispute that they took part in the initiation of the criminal proceeding (*see* Dkt. 55), whereas the City Defendants contend that Plaintiff's Amended Complaint only alleges active participation in the prosecution by Det. Degnan (*see* Dkt. 59 at 9 n.10). The Court finds that the Amended Complaint contains sufficient factual allegations to support a plausible inference that not only Det. Degnan, but also Dr. Landi, initiated Li's prosecution. [21] (*See* Am. Compl. ¶ 149.)

 **[30]**    **[31]**  Plaintiff has adequately alleged that Det. Degnan initiated the prosecution, because the Amended Complaint alleges that Det. Degnan swore to the criminal complaint. (*See* Am. Compl. ¶ 145.) Plaintiff has also alleged that Dr. Landi "swore under oath in the criminal complaint against plaintiff" and made assertions that were "false, misleading, and perjurious, and entirely unsupported and unsupportable by any medical science or clinical or forensic evidence." (Am. Compl. ¶¶ 149–150.) *See Cameron*, 598 F.3d at 63 (noting that a police officer can initiate prosecution by filing charges or other accusatory instruments). The Amended Complaint also alleges that Dr. Landi "played an active role in the prosecution of Ying Li. She provided advice and encouragement, that went well beyond her role, and into ancillary and forensic aspects of motive, culpability, and the veracity of Ying Li." (Am. Compl. ¶ 155.)

These City Defendants "cannot hide behind the decision of the DA to prosecute" when they, according to Plaintiff's allegations, provided the prosecutor with false information.

*Blake v. Race*, 487 F.Supp.2d 187, 211 (E.D.N.Y. 2007) (rejecting the defendants' argument that the District Attorney, not the officers, initiated the prosecution); *Zahrey v. Coffey* ("*Coffey*"), 221 F.3d 342, 352 (2d Cir. 2000) ("[I]t is not readily apparent why the chain of causation should be considered broken where the initial wrongdoer can reasonably foresee that his misconduct will contribute to an 'independent' decision that results in a deprivation of liberty.") Therefore, the Court finds that Plaintiff has adequately alleged that Det. Degnan and Dr. Landi participated in the initiation of Plaintiff's criminal proceeding.

By contrast, the Amended Complaint contains no factual allegations to support the inference that Dets. Moser, Phelan, **\*607** and Heffernan, Lt. Conforti, Lt. Perdoch, Sgt. Rodriguez, Lt. Hall, Det. Lee, Sgt. Manfredi, P.O. Yam, Sgt. Cai, and Det. Chan played an active role in initiating Plaintiff's prosecution. Therefore, as to these Defendants, the malicious prosecution claim is dismissed. *See, e.g., Jean–Laurent v. Bowman*, No. 12-cv-2954, 2014 WL 4662221, at \*6 (E.D.N.Y. Jul. 7, 2014) (finding that plaintiff failed to demonstrate that some of the defendants played an active role in commencing the criminal prosecution against plaintiff, even though plaintiff alleged that they "authorized, approved and/or participated" in plaintiff's criminal prosecution, because the defendants neither swore out a criminal complaint or corroborating affidavit, nor presented any information to the prosecutor).

### B. Favorable Termination

The second element of a malicious prosecution claim is termination of the criminal proceeding in the plaintiff's favor. The Medical Center Defendants argue that Plaintiff's criminal proceeding did not terminate in her favor because (i) the prosecution was not terminated on its merits, (ii) Plaintiff does not set forth factual allegations to support an inference that the charges were dropped because she was innocent, and (iii) a dismissal "in the interest of justice" does not constitute a favorable termination. (*See* Dkt. 56 at 5–8.) The Court disagrees, and finds that Plaintiff has sufficiently alleged a favorable termination for purposes of her malicious prosecution claim. [22]

 **[32]**    **[33]**  The Court looks to New York law to determine whether Plaintiff has sufficiently alleged a favorable termination of her Queens County criminal proceeding. *Neal v. Fitzpatrick*, 250 F.Supp.2d 153, 154 (E.D.N.Y. 2003) (citing *Hygh v. Jacobs*, 961 F.2d 359, 367 (2d Cir. 1992)).

"Under New York law, there are two ways to establish [a] favorable termination: '(1) an adjudication of the merits by the tribunal in the prior action,' or (2) 'an act of withdrawal or abandonment on the part of the party prosecuting the prior action.' " *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F.Supp.3d 267 (E.D.N.Y. 2014) (quoting *Morgan v. Nassau County*, No. 03-cv-5109, 2009 WL 2882823, at *8 (E.D.N.Y. Sept. 2, 2009) and citing *Castro v. East End Plastic, Reconstructive & Hand Surgery, P.C.*, 47 A.D.3d 608, 850 N.Y.S.2d 483, 485 (2008)); *Castro*, 850 N.Y.S.2d at 485 ("The favorable termination element must be established by evidence that 'the court passed on the merits of the charge or claim ... under circumstances as to show ... nonliability,' or evidence that the action was abandoned under circumstances 'which fairly imply the plaintiff's innocence.' ") (citation and internal quotation marks omitted). Thus, the fact that a criminal prosecution never reached the merits does not preclude a plaintiff from alleging a favorable termination. *See Castro*, 850 N.Y.S.2d at 485; *see also Norton v. Town of Brookhaven*, 47 F.Supp.3d 152, 158 (E.D.N.Y. 2014) (noting, on reconsideration, "the fact that the underlying prosecutions against the Plaintiff [were dismissed pursuant to statutes that] did not reach the merits does not, without more, render the termination of the prosecution inconsistent with innocence"); *Verboys v. Town of Ramapo*, 12 A.D.3d 665, 785 N.Y.S.2d 496, 497 (2004) (holding that favorable termination can be shown by "the formal abandonment of the proceedings").

[34]  [35]  Furthermore, "New York law does not require a malicious prosecution **\*608** plaintiff to prove her innocence, or even that the termination of the criminal proceeding was indicative of innocence." *Rothstein v. Carriere*, 373 F.3d 275, 286 (2d Cir. 2004) (citing *Smith–Hunter v. Harvey*, 95 N.Y.2d 191, 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000)). "[A]ny final termination of a criminal proceeding in favor of the accused, such that the proceeding cannot be brought again, qualifies as a favorable termination for purposes of a malicious prosecution action," *Smith–Hunter*, 95 N.Y.2d at 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750, unless the disposition was "inconsistent with the innocence of the accused," *Cantalino v. Danner*, 96 N.Y.2d 391, 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (2001). *See Rothstein*, 373 F.3d at 275 (discussing New York Law regarding the favorable termination element and citing to both *Smith–Hunter*, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750, and *Cantalino*, 96 N.Y.2d 391, 729 N.Y.S.2d 405, 754 N.E.2d 164); *see also Stampf v. Long Island R. Co.*, 761 F.3d 192, 201 (2d Cir. 2014) (applying *Smith–Hunter*, 95 N.Y.2d 191, 712 N.Y.S.2d 438, 734 N.E.2d 750 (2000)).

While New York and federal courts in this circuit have consistently applied the *Cantalino* "not inconsistent with innocence" standard in deciding whether a termination is favorable, there is open disagreement and divergence in this circuit on the constituent issue of whether the termination of a criminal case "in the interest of justice" is a favorable termination, *i.e.*, a termination that is not inconsistent with innocence.[23] *See Gem Financial Serv., Inc. v. City of New York*, No. 13-cv-1686, 2014 WL 1010408, at *10 n.10 (E.D.N.Y. Mar. 17, 2014) (recognizing "an apparent fissure amongst Second Circuit opinions with respect to the proper standard for assessing a favorable termination" where an "interest of justice" dismissal is involved). On the one hand, the New York Court of Appeals in 2001 held in *Cantalino* that there is no "per se rule that a dismissal in the interest of justice can never constitute a favorable termination." 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164.[24] Nonetheless, in 2009, the Second Circuit in a summary order in *Lynch v. Suffolk County Police Dep't, Inc.* found, "as a matter of law," that a dismissal in the interest of justice could not "provide the favorable termination required as the basis for a claim of malicious prosecution", because such a dismissal was "neither an acquittal of the charges nor any determination of the merits[, and left] the question of guilt or innocence unanswered." 348 Fed.Appx. 672, 675 (2d Cir. 2009) (citing *Hygh*, 961 F.2d 359). Even after the *Lynch* decision, district courts in this circuit have continued to apply *Cantalino* to find that an "interest of justice" termination can be deemed favorable in a malicious prosecution action. *See Norton*, 47 F.Supp.3d at 160 (collecting district court cases that adopted *Cantalino* even after *Lynch* ); **\*609** *Guzman v. United States*, No. 11-CV-5834, 2013 WL 543343, at *8 (S.D.N.Y. Feb. 14, 2013) (collecting cases decided by the Southern District of New York that applied *Cantalino* even after the Second Circuit decided *Lynch* ); *see, e.g.*, *Genovese v. Cnty. of Suffolk*, 128 F.Supp.3d 661, 672 n.3 (E.D.N.Y. 2015) (declining to apply the standard set forth in *Lynch*, noting that it is a non-binding summary order failing to cite to *Cantalino*, which had already been decided at the time *Lynch* was decided). Other courts, however, have followed *Lynch* in dismissing malicious prosecution claims involving "interest of justice" dismissals. *See Norton*, 47 F.Supp.3d at 160–161 (citing *Tribie v. Parwanta*, No. 10 Civ. 6016, 2012 WL 246619, at *8 (S.D.N.Y. Jan. 26, 2012) and *Paulin v. Figlia*, 916 F.Supp.2d 524, 533 (S.D.N.Y. 2013)). However, as discussed below, notwithstanding the Medical Center Defendants' argument, the Court need not resolve this

issue in order to determine whether Plaintiff has sufficiently *alleged* a favorable termination.

 **[36]**  The Court now turns to the Medical Center Defendants' three arguments. First, the argument that Plaintiff cannot show a favorable termination because her criminal case was not terminated on the merits is plainly unavailing. As discussed, there are "two ways to establish a favorable termination", one of which is the "act of withdrawal or abandonment" of the case by the prosecution, which is what Plaintiff alleges happened here. (Am. Comp. ¶ 201 ("Contemporaneously with the commencement of Hang Bin's trial, all charges against plaintiff were dismissed.").)

Second, the argument that Plaintiff has not sufficiently alleged malicious prosecution because she has not alleged facts from which it can be inferred that the criminal charges against her were dropped because she was innocent similarly lacks merit. As the New York Court of Appeals made clear in *Smith–Hunter*, a claim of malicious prosecution does not require that the plaintiff prove her innocence of the charges that were dropped, or even that the termination of her prosecution was indicative of innocence. 96 N.Y.2d at 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750.[25]  **\*610**  Rather, all that is required after *Smith–Hunter* and *Cantalino* is that the termination of Plaintiff's case was "final," *e.g.*, that the charges were dismissed with prejudice, and that the termination did not fall into one of the exceptions recognized by *Cantalino*, *e.g.*, that the disposition of Plaintiff's criminal case was "inconsistent with innocence". *Cantalino*, 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164. Thus, the absence of any allegations demonstrating that the termination of Plaintiff's prosecution is indicative of her innocence of the charges that were dropped does not preclude her malicious prosecution claim.

Third, the Medical Center Defendants argue that the termination of Plaintiff's prosecution was an "interest of justice" dismissal and therefore does not constitute a favorable termination. However, the Court cannot make that determination at this stage, because it cannot determine the reason or reasons for the District Attorney's dismissal of the charges against Plaintiff. The Amended Complaint simply alleges that, "Defendants ... caused plaintiff to be prosecuted with malice and without probable cause—*a prosecution that terminated in plaintiff's favor....*"[26] (Am. Comp. ¶ 212 (emphasis added).)) Although Plaintiff does not allege the specific disposition of the case, the Court finds she has sufficiently alleged favorable termination to survive a motion to dismiss. *See Rivers v. Towers, Perrin, Foster & Crosby*

*Inc.*, No. 07-cv-5441, 2009 WL 817852, at *4 (E.D.N.Y. Mar. 27, 2009) ("There is nothing implausible about a bare allegation that the prosecution terminated in plaintiff's favor and hence there is no need to amplify that allegation by pleading specific facts."); *see also Norton*, 47 F.Supp.3d at 161 (reinstating plaintiff's malicious prosecution claim on reconsideration after concluding that the court cannot conclude that the dismissal of the charges was inconsistent with plaintiff's innocence); *McLennon v. New York City*, No. 13-cv-128, 2015 WL 1475819, at *6 n.16 (E.D.N.Y. Mar. 31, 2015); *Peros v. Castano*, No. CV-01-4457, 2002 WL 603042, at *4 (E.D.N.Y. Mar. 22, 2002) (stating, "Although there apparently is some uncertainty as to the precise basis of the state court's dismissal of the criminal charges, I cannot say at this point that there is no set of facts on which plaintiff could satisfy the favorable termination element of his claim," when plaintiff's Complaint alleged "[t]hat after the Plaintiff was arraigned on [ ] charges [and] appeared in Court ... the case was finally disposed of by the Court granting the Motion to Dismiss." (citation omitted)); *accord Tommy Hilfiger Lic., Inc. v. Bradlees, Inc.*, No. 99-CIV-4677, 2002 WL 737477, at *6 (S.D.N.Y. Apr. 25, 2002) (finding that the defendant sufficiently alleged favorable termination to withstand a motion to dismiss because the basis for the dismissal of the criminal action was unclear at that particular stage of litigation) (citation omitted); *Bacquie v. City of New York*, No. 99-CIV-10951, 2000 WL 1051904, at *3 (denying defendant's motion to dismiss plaintiffs' malicious prosecution claim where the plaintiffs alleged that the charges against them were dismissed by the district attorney's **\*611**  motion and where, at the early stage in the litigation, the Court could not tell why the charges had been dropped); *but see Campbell v. Giuliani*, No. 99-cv-2603, 2000 WL 194815, at *4 (E.D.N.Y. Feb. 16, 2000) ("I find that the bare allegation of dismissal, absent any explanation of the basis on which the case was dismissed, is insufficient to meet the favorable termination requirement."); *Weaver v. Warrington*, No. 14-cv-7097, 2015 WL 4645298, at *5 (E.D.N.Y. Aug. 4, 2015) (directing plaintiff to amend the complaint alleging additional facts that make clear whether the dismissal was under circumstances not inconsistent with plaintiff's innocence). It is important to note that while the Court has taken judicial notice of the criminal court records submitted by Plaintiff and the City Defendants, including the transcript of the conference at which Plaintiff's case was dismissed, the Court has only considered those documents to establish the date and fact of the dismissal, but not for the truth of statements made by ADA Bishop at the conference as to why Plaintiff's case was being dismissed. *See Global Network Commc'ns, Inc.*, 458 F.3d at

157 ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings.").

Accordingly, the Court finds that Plaintiff has adequately alleged a favorable termination of her criminal proceedings.

### C. Probable Cause

The Medical Center Defendants also contend that Plaintiff's malicious prosecution claim must be dismissed because there was probable cause. (Dkt. 55 at 8.) Specifically, they assert that the Amended Complaint's factual allegations regarding Annie's condition when she arrived at FHMC and her subsequent medical test results are sufficient to establish the existence of probable cause at the time criminal proceedings were initiated against Plaintiff. (Dkt. 55 at 8) They also argue that there is a presumption of probable cause unless the indictment was procured through improper means. (Dkt. 55 at 9.) For the reasons explained below, the Court finds that Plaintiff has rebutted the presumption of probable cause, and that the facts alleged in the Amended Complaint support a plausible inference that there was no probable cause for Plaintiff's prosecution.

**[37]** **[38]** **[39]** As an initial matter, the Court notes that probable cause for malicious prosecution is different from probable cause for false arrest. *See Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999) ("The defendants seem to conflate probable cause to arrest with probable cause to believe that [the plaintiff] could be successfully prosecuted. Only the latter kind of probable cause is at issue with respect to the malicious prosecution claim...."). For a malicious prosecution claim, probable cause to prosecute consists of "facts and circumstances [that] would lead a reasonably prudent person to believe the plaintiff guilty." *Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003) (citing *Colon v. City of New York*, 60 N.Y.2d 78, 82, 455 N.E.2d 1248, 468 N.Y.S.2d 453 (N.Y. 1983)). Probable cause to prosecute is evaluated "in light of the facts known or reasonably believed at the time the prosecution was initiated, as opposed to at the time of arrest." *Drummond v. Castro*, 522 F.Supp.2d 667, 677–78 (S.D.N.Y. 2007) (citations and quotation marks omitted).

**[40]** **[41]** A grand jury indictment "gives rise to a presumption that probable cause exists" and thereby defeats a claim for malicious prosecution. *Rentas v. Ruffin*, 816 F.3d 214, 220 (2d Cir. 2016) (quoting *McClellan v. Smith*, 439

F.3d 137, 145 (2d Cir. 2006)). "If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the **\*612** indictment was produced by fraud, perjury, the suppression of evidence or other police conduct undertaken in bad faith." *McClellan*, 439 F.3d at 145 (quoting *Colon*, 60 N.Y.2d at 83, 468 N.Y.S.2d 453, 455 N.E.2d 1248). A plaintiff may demonstrate fraud or perjury through "evidence establishing that the [ ] witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Rothstein*, 373 F.3d at 283 (quoting *Colon*, 60 N.Y.2d at 82–93, 468 N.Y.S.2d 453, 455 N.E.2d 1248).

### 1. Rebutting the Presumption of Probable Cause as to the City Defendants

**[42]** Plaintiff alleges that the indictment against her was procured by bad faith on the part of the City Defendants. Plaintiff alleges that "the Officer Defendants failed to obtain or disclose evidence inconsistent with plaintiff's guilt, did not document or inform the district attorney's office of exculpatory evidence, falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses. Officers sought to strengthen their case against plaintiff in order to avoid acquittal, leading them to falsify and omit information in their reports and representations to the district attorney's office." (Am. Compl. ¶ 178; *see also id.* ¶ 181.) More specifically, Plaintiff alleges that "it was apparent from medical evidence that [she] was innocent." (Am. Compl. ¶ 201.) Plaintiff also alleges that Dr. Landi "enthusiastically and with commitment" sought the Lis' prosecution and conviction "despite the lack of any evidence connecting them with any crime whatsoever." (Am. Compl. ¶ 171.) The Amended Complaint further alleges that Dr. Landi misrepresented that the medical evidence conclusively showed Plaintiff's guilt. (Am. Compl. ¶ 208.)

Taking these allegations as true and given the circumstantial nature of the case against Plaintiff, which, in turn, rested almost entirely on Dr. Landi's and Dr. Kupferman's medical conclusions, the Court finds that these allegations are sufficient to rebut the presumption of probable cause created by the grand jury indictment. *See Anilao v. Spota*, 774 F.Supp.2d 457, 494 (E.D.N.Y. 2011) (denying defendant's motion to dismiss finding that plaintiff sufficiently overcame the presumption of probable cause by alleging that the grand

jury indictment was based on falsified evidence and testimony in spite of defendant's knowledge of significant exculpatory evidence, and that the defendants agreed to present false evidence to the grand jury); McLennon, 2015 WL 1475819, at *8 (finding sufficient allegations similar to Plaintiff's allegations about Defendants procuring indictment in bad faith); see also Brandon v. City of New York, 705 F.Supp.2d 261, 273–74 (S.D.N.Y. 2010) (denying summary judgment to defendant with respect to malicious prosecution claim where jury could reasonably find that the indictment was secured through bad faith or perjury).

Accordingly, the Court finds that Plaintiff has sufficiently rebutted the presumption of probable cause.

### 2. Rebutting the Presumption of Probable Cause Against the Medical Center Defendants

Plaintiff also sufficiently alleges that the indictments were procured in bad faith by the Medical Center Defendants. For example, Plaintiff alleges that "Defendant FHMC and Kupferman made no efforts to seek a diagnosis other than SBS." [27] (Am. **\*613** Compl. ¶ 122.) This claim is analogous to an allegation that a police officer failed to obtain evidence inconsistent with a plaintiff's guilt, which has been considered sufficient to allege that an indictment was procured in bad faith. See McLennon, 2015 WL 1475819, at *8 (finding bad faith sufficiently alleged where officer defendants accused of, inter alia, failing to obtain or disclose evidence inconsistent with plaintiff's guilt and not informing the district attorney's office of exculpatory evidence).

[43] While the Court acknowledges that a grand jury witness is entitled to absolute immunity in Section 1983 actions, Rehberg v. Paulk, 566 U.S. 356, 132 S.Ct. 1497, 182 L.Ed.2d 593 (2012), the Second Circuit's decision in Coggins v. Buonora, 776 F.3d 108 (2d Cir. 2015), provides a clarification of this principle that is applicable to Plaintiff's malicious prosecution claim against Dr. Kupferman. In Coggins, the plaintiff was arrested and charged with various felonies based on allegations made by two officers in police paperwork and also verbally to the grand jury. 776 F.3d 108. The Second Circuit affirmed the district court's denial of absolute immunity to one of the police officers because the plaintiff's Section 1983 claims against that officer were based on alleged misconduct "prior to and independent of [the police officer's] perjurious grand jury appearance." Id. at 113 ("The fact that [the police officer's] grand jury testimony paralleled

information he gave in other contexts does not mean that [plaintiff's] malicious prosecution claim was 'based on' [the officer's] grand jury testimony[;] ... [thus,] the district court properly found that absolute immunity is inappropriate.") Similarly, here, Plaintiff alleges that, separate and apart from Dr. Kupferman's grand jury testimony, the Medical Center Defendants, including Dr. Kupferman, diagnosed Annie with SBS in bad faith and provided false information about the cause of Annie's death to the prosecutor. (See Am. Compl. ¶¶ 122, 150–52.) [28] Therefore, even assuming that Plaintiff cannot rebut the presumption of probable cause based on Dr. Kupferman's grand jury testimony alone, Plaintiff has done so based on other allegedly wrongful acts by Dr. Kupferman. Accordingly, the Court finds that Plaintiff has rebutted the presumption of probable cause.

### 3. Amended Complaint Sufficiently Alleges Lack of Probable Cause to Prosecute

For the same reasons just discussed, the Court finds that the allegations in the Amended Complaint are sufficient to create a plausible inference that there was no probable cause to prosecute Plaintiff at the time she was indicted. The case against Plaintiff was almost entirely circumstantial and depended upon the accuracy of the Medical Center Defendants' determination that SBS and the failure to obtain prompt medical attention caused Annie's death. Plaintiff's allegations that both the Medical Center Defendants and the City Defendants **\*614** failed to obtain evidence that would have contradicted these findings—i.e., that Annie suffered from osteogenesis imperfecta, and that Annie's brain damage was so extensive that prompter medical intervention would not have saved her life—and the resulting communication of false or incomplete information to the prosecutors support a plausible inference that there was no probable cause to prosecute when Plaintiff was indicted.

### D. Malice

[44]  [45]  To plead a malicious prosecution claim, Plaintiff must also allege malice for each of the Defendants. Manganiello, 612 F.3d at 160–61. "[M]alice may be shown by proving that the prosecution complained of was undertaken from improper or wrongful motives, or in reckless disregard of the rights of the plaintiff." Id. at 163; see also TADCO Const. Corp. v. Dormitory Auth. of State of New York, 700 F.Supp.2d 253, 271 (E.D.N.Y. 2010) ("Actual malice requires pleading facts that show the defendant 'commenced

the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served.' " (citation and quotation marks omitted)); *Manbeck v. Micka*, 640 F.Supp.2d 351, 377 (S.D.N.Y. 2009) ("Malice in this context does not have to be actual spite or hatred." (citation, internal quotation marks, and alteration omitted)); *Newton v. City of New York*, 566 F.Supp.2d 256, 273 (S.D.N.Y. 2008) (Malice is "a wrong or improper motive[.]" (citations and quotation marks omitted)). "[A] lack of probable cause *generally* creates an inference of malice." *Manganiello*, 612 F.3d at 163 (citation and quotation marks omitted) (emphasis added); *see also Lowth v. Town of Cheektowaga*, 82 F.3d 563, 573 (2d Cir. 1996) ("In most cases, the lack of probable cause—while not dispositive —'tends to show that the accuser did not believe in the guilt of the accused, and malice may be inferred from the lack of probable cause.' " (quoting *Conkey v. State*, 74 A.D.2d 998, 427 N.Y.S.2d 330, 332 (1980))).

### 1. The City Defendants' Malice

 **[46]**  **[47]**  Drawing all inferences in favor of Plaintiff, the Court finds that Plaintiff has adequately pled malice only for Det. Degnan and Dr. Landi. (Am. Compl. ¶ 145 (alleging that Degnan signed the criminal complaint knowing that its content was false and fabricated); *see also* Am. Compl. ¶ 150 (alleging that Dr. Landi swore under oath in the criminal complaint and made a statement that was false, perjurious, and entirely unsupported by any medical science or clinical or forensic evidence).) Plaintiff incorrectly argues that she has "plainly alleged malice" for all Defendants and directs the Court to Paragraph 215 of the Complaint. However, that paragraph is conclusory and is one of the numerous instances where Plaintiff resorts to "group pleading" against all the Defendants.[29] While Paragraph 215 properly alleges an improper motive for her prosecution, *i.e.*, to "us[e] plaintiff as a bargaining chip to pressure Hang Bin Li to plead guilty and covering up defendants' illegal actions in **\*615** knowingly arresting plaintiff without any legal basis, justification, or probable cause[,]" it fails to allege any facts upon which to plausibly infer that *each* of the City Defendants acted out of this improper motive, and instead categorically states that they *all* had the same improper motive. Such conclusory allegations are not enough to infer malice on the part of all City Defendants. The Court, therefore, finds that malice has been sufficiently alleged only as to Det. Degnan and Dr. Landi.

### 2. The Medical Center Defendants' Malice

 **[48]**  Notwithstanding Plaintiff's failure to cite to the relevant paragraphs in the Complaint, the Court finds that Plaintiff has adequately alleged malice on the part of the Medical Center Defendants. Plaintiff alleges that Defendants "arrested and imprisoned [her] despite knowing that there was no legal justification ... in order to pressure plaintiff to testify against her husband ... or to put pressure on plaintiff's husband to plead guilty." (Am. Compl. ¶ 196.) More specifically, Plaintiff alleges that "[d]espite lab results showing high alkaline phosphatase and low calcium, consistent with metabolic bone disease," FHMC and Dr. Kupferman "made no effort to seek a diagnosis other than SBS." (Am. Compl. ¶ 122.) Plaintiff also alleges, in describing "the interrogations and searches of [the Lis'] home by three separate squads ... [and] forensic interrogations by several medical personnel at Flushing Hospital," that she was treated with "suspicion and unconcealed and unrestrained racism." (Am. Compl. ¶ 114.) Drawing inferences in the light most favorable to Plaintiff, the Court finds that Plaintiff has sufficiently alleged malice on the part of the Medical Center Defendants, based on their motives in concealing exculpatory medical evidence to enable the prosecutor's use of Plaintiff as a "bargaining chip" against Plaintiff's husband [30] and conducting racially biased "forensic interrogations" of her.

\* \* \*

Accordingly, the Medical Defendants' motion to dismiss the malicious prosecution claim is denied in its entirety, and the City Defendants' motion to dismiss Plaintiff's malicious prosecution claim is denied as to Det. Degnan and Dr. Landi, but is granted as to all other City Defendants.[31]

## VI. ABUSE OF PROCESS

 **[49]**  **[50]**  **[51]**  Plaintiff also asserts a claim of abuse of process under Section 1983 against the City Defendants.[32] As with malicious prosecution, the Court looks to State law for the elements of a Section 1983 abuse of process claim. *Mangino v. Incorporated Village of Patchogue*, 808 F.3d 951, 958 n.5 (2d Cir. 2015) (citing *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994) and *Savino v. City of New York*, 331 F.3d 63, 76–77 (2d Cir. 2003)). Under New **\*616** York law, "a malicious abuse-of-process claim lies against a defendant

who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with the intent to do harm without excuse of justification and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Savino*, 331 F.3d at 76 (quoting *Cook*, 41 F.3d at 80); *Hoffman v. Town of Southampton*, 523 Fed.Appx. 770, 771 (2d Cir. 2013) (summary order) (citing *Savino*, 331 F.3d 63). In the context of an abuse of process claim, "legal process means that a court issued the process, and the plaintiff will be penalized if he violates it." *Cook*, 41 F.3d at 80 (quoting *Mormon v. Baran*, 35 N.Y.S.2d 906, 909 (Sup. Ct. 1942)). So, for example, an arrest executed by the officers for a " 'collateral objective outside the legitimate ends of the process', satisfies the first element of an abuse of process claim." *Crockett v. City of New York*, No. 11-CV-4378, 2015 WL 5719737, at *10 (E.D.N.Y. Sept. 29, 2015) (citation and quotation marks omitted); *see also Cook*, 41 F.3d at 80 (finding, with respect to abuse of process claim, that New York State Troopers who stopped and arrested plaintiff "clearly employed criminal process against [plaintiff] by having him arraigned on charges" that caused him to be held in custody). Notably, in *TADCO Const. Corp.*, the court found that allegations that defendants "improperly contributed to [plaintiff's] arrest, but not that they took any further actions in his prosecution" were sufficient to withstand a motion to dismiss an abuse of process claim. 700 F.Supp.2d at 272 (recognizing "split of opinion" on whether mere act of issuing process is sufficient for first element of malicious abuse of process claim).

**[52]** **[53]** "The crux of a malicious abuse of process claim is the collateral objective element." *Kraft v. City of New York*, 696 F.Supp.2d 403, 416 (S.D.N.Y. 2010), *aff'd*, 441 Fed.Appx. 24 (2d Cir. 2011). To plead a collateral objective, a plaintiff must plausibly plead not that defendant acted with an "improper motive," but rather an "improper purpose": "[A plaintiff] must claim that [the defendant] aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Savino*, 331 F.3d at 77.

**[54]** The City Defendants argue that Plaintiff's abuse of process claim should be dismissed because the claim accrued at the time of Plaintiff's arrest, and therefore the three-year statute of limitations expired sometime around March 2011. (Dkt. 59 at 21.) The Court, however, finds that because Plaintiff could not have discovered one of the two collateral objectives she alleges until her prosecution was dismissed on January 12, 2013, her complaint in this action was timely filed.

**[55]** A claim for abuse of process accrues "at such a time as the criminal process is set in motion—typically at arrest—against the plaintiff. However, accrual cannot be appropriate before such time as plaintiff is aware, or ought to be aware, of those facts providing a basis for his claim." *Duamutef v. Morris*, 956 F.Supp. 1112, 1118 (S.D.N.Y. 1997) (Sotomayor, J.) (citing *Rose v. Bartle*, 871 F.2d 331, 350 (3d Cir. 1989) and *Singleton*, 632 F.2d at 192); *see also Hadid v. City of New York*, No. 15-cv-19, 2015 WL 7734098, at *5 (E.D.N.Y. Nov. 30, 2015) (citing *Duamutef*, 956 F.Supp. at 1118). Unlike the plaintiffs in other cases, Plaintiff in this case does not even allege in the Complaint when she learned of her abuse of process claim. *See, e.g., Duamutef*, 956 F.Supp. at 1118–19 (finding that plaintiff's abuse of process claim was not time-barred because "[a]ccording to the allegations in [plaintiff's] Complaint, plaintiff was unaware that he was being retaliated against until September 28, 1995, when he received an affidavit detailing defendants' intention to stifle his **\*617** political activities through a criminal prosecution"); *Lukowski v. Cnty. of Seneca*, No. 08-cv-6098, 2009 WL 467075, *8 (W.D.N.Y. Feb. 24, 2009) ("The Complaint alleges that plaintiffs learned of the allegedly illegal conduct of the defendants in 'late March 2007, ... after being contacted by Ontario County District Attorney Michael Tantillo[.]' ")

Here, Plaintiff alleges that Defendants had two collateral objectives for prosecuting her: (1) using her as a "bargaining chip" to get her husband to plead guilty; and (2) covering up their illegal arrest of her. (*See* Am. Compl. ¶ 215). While these two objectives are sufficient to state an abuse of process claim[33], the "cover-up" objective does not provide a basis for finding this claim timely. As the Court has already found in connection with Plaintiff's false arrest claim, Plaintiff believed from the time of her arrest that her arrest was illegal, and thus Plaintiff was aware of or should have been aware of the facts providing a basis for her claim, *Duamutef*, 956 F.Supp. at 1118, that at least one purpose of her prosecution was to cover up this illegal arrest. Were Plaintiff's abuse of process claim based solely on this objective, that claim would have accrued, as the City Defendants maintain, on the date of her arrest, and therefore would be time-barred.

However, Plaintiff also alleges that another purpose of her prosecution was to use her as leverage to get her husband to plead guilty. As to that collateral objective, the Court finds that Plaintiff was not reasonably aware of that possible objective until the dismissal of her case, without any effort to pursue her prosecution during the four years of her pretrial

incarceration and only after her husband was convicted. It was only when Plaintiff's case was dismissed, without prosecution and following her husband's conviction, did the objective of using Plaintiff as a "bargaining chip" become clear. [34] Accordingly, the Court finds that Plaintiff's abuse of process claim did not accrue until the date on which her case was dismissed, January 2, 2013, and thus her abuse of process is not time-barred. [35]

**[56]** The Court briefly addresses the City Defendants' two other grounds for **\*618** dismissing Plaintiff's abuse of process claim. First, they contend that neither police officers nor medical examiners, such as Dr. Landi, have the authority to offer and/or to induce defendants to accept plea deals and that, therefore, Plaintiff's abuse of process claim against them fails "as a matter of practicality." (Dkt. 59 at 20.) However, the City Defendants do not cite any legal authority for this contention, and it is unclear to the Court why the police officers and medical examiners would not be liable if they worked with the prosecutors to pursue Plaintiff's prosecution for the purposes of getting Plaintiff's husband to plead guilty or covering up an unlawful arrest. Second, the City Defendants argue that, although "there is a split in the Second Circuit as to whether probable cause is a defense against abuse of process claims", the Court should follow the line of cases finding probable cause to be a complete defense to this claim. (Dkt. 59 at 21 n.17.) The Court declines that invitation, and instead adheres to the view that "[t]he Second Circuit has long recognized that probable cause is not a complete defense to malicious abuse of process." *Goldring v. Zumo*, No. 14–Civ–4861, 2015 WL 148451, at \*5 (E.D.N.Y. Jan. 12, 2015). In any event, as the Court has already found, in connection with Plaintiff's malicious prosecution claim, the Amended Complaint contains sufficient allegations from which the absence of probable cause to prosecute Plaintiff can be reasonably inferred.

**[57]** **[58]** While the Court finds that Plaintiff has sufficiently and timely pled an abuse of process claim, she has not adequately alleged that claim as to all City Defendants. Plaintiff, again, indiscriminately group pleads her abuse of process claim against *all* Defendants. (*See* Am. Compl. ¶¶ 215–217.) As with Plaintiff's malicious prosecution claim, however, her abuse of process claim is only properly pled as to Det. Degnan and Dr. Landi. These are the only City Defendants as to whom Plaintiff has adequately pled involvement in the use of legal process, *i.e.*, arresting and detaining Plaintiff on the basis of allegedly false or incomplete evidence, and thus these are the only Defendants

as to whom the pursuit of one or both of the alleged collateral objectives could be plausibly inferred. Although the court in *TADCO Const. Corp.* suggested that individuals who "improperly contributed" to the plaintiff's arrest could be held liable for malicious abuse of process, there, the defendants were alleged to have directly contributed to the plaintiff's arrest. Here, while Dets. Moser, Phelan, and Heffernan are alleged to have participated in the investigation of Plaintiff's case, there is nothing in the Amended Complaint from which to infer that they participated in the actual legal process that was used against Plaintiff, *i.e.*, her arrest and detention. [36]

Accordingly, Defendants' motion to dismiss Plaintiff's abuse of process claim is denied as to Det. Degnan and Dr. Landi, and granted as to all other City Defendants.

## VII. FAILURE TO INTERVENE

**[59]** The Amended Complaint asserts, as part of Plaintiff's Section 1983 claim, that *all* Defendants failed to intervene to prevent other Defendants from violating her constitutional rights not to be subjected to false arrest, malicious prosecution, and abuse of process. Both groups of Defendants argue for dismissal of this claim on the grounds that Plaintiff's claim is based on conclusory allegations. The Court agrees. Moreover, the Court independently **\*619** finds these allegations irreconcilable with Plaintiff's theory of direct participation by each Defendant.

**[60]** **[61]** "It is widely recognized that law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Terebesi v. Torreso*, 764 F.3d 217, 243 (2d Cir. 2014) (quoting *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994)). "An officer who fails to intercede is liable for the preventable harm caused by the actions of the other officers where that officer observes or has reason to know: (1) that excessive force is being used; (2) that a citizen has been unjustifiably arrested; or (3) that any constitutional violation has been committed by a law enforcement official." *Anderson*, 17 F.3d at 557 (citations omitted). To establish a claim for failure to intervene, a plaintiff must show (1) the officer's failure "permitted fellow officers to violate [plaintiff's] clearly established statutory or constitutional rights," and (2) it was "objectively unreasonable for him to believe that his fellow officers' conduct did not violate those rights." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 129 (2d Cir. 1997) (citation and quotation marks omitted). Additionally, Plaintiff

must show that the officer had "a realistic opportunity to intervene to prevent the harm from occurring" but failed to do so. *See Cerbelli v. City of New York*, No. 99-CV-6846, 2008 WL 4449634, at \*11 (E.D.N.Y. Oct. 1, 2008) (citation and quotation marks omitted).

Plaintiff's failure to intervene claim is dismissed as to all Defendants for two reasons. [37] First, Plaintiff's allegations are merely conclusory. [38] Second, Plaintiff resorts to conclusory generalized allegations asserting her failure to intervene claim against every single Defendant and refers to the numerous defendants collectively. Such conclusory and generalized allegations do not give any of the Defendants "fair notice of what [Plaintiff's] claim is and the grounds upon which it rests." *Jackson v. Onondaga Cnty.*, 549 F.Supp.2d 204, 212 (N.D.N.Y. 2008) (quotation marks omitted); *see* **\*620** *Bouche v. City of Mount Vernon*, No. 11–Civ–5246, 2012 WL 987592, at \*7 (S.D.N.Y. Mar. 23, 2012) (dismissing the plaintiff's failure to intervene claim because the plaintiff "only refer[red] to the defendants in the collective, never identifying which defendants were responsible for specific actions"); *see also Clay v. Cnty. of Clinton*, No. 8:10-cv-00239, 2012 WL 4485952, at \*14 (N.D.N.Y. Sep. 27, 2012) (granting motion for judgment on the pleadings as to plaintiff's failure to intervene claim because the plaintiff "fail[ed] to distinguish which ... Defendant was responsible for actually violating Plaintiff's constitutional rights and which, if any, Defendant failed to intervene to prevent such violations from occurring"). As the district court explained in *Hardy v. City of New York*, No. 12–Civ–17, 2013 WL 5231459, at \*4 (S.D.N.Y. Jul. 9, 2013), "restatement of the legal standard ... does not sufficiently allege constitutional violations in which the [defendants] might have intervened. Where were the [defendants] in relation to Plaintiff and in relation to each other? What impermissible actions did they take? Which officers observed those actions? Plaintiff does not say. Accordingly, he fails to nudge his failure to intervene claim from possible to plausible."

Such a generalized pleading, which fails to differentiate between the Defendants, is especially problematic where, as here, Plaintiff is also alleging that Defendants are all liable under a theory of direct participation. [39] *See Chepilko v. City of New York*, No. 06-CV-5491, 2012 WL 398700, at \*8 n.5 (E.D.N.Y. Feb. 6, 2012) (finding that if a defendant "may be liable under a theory of direct participation, there is no claim against [that defendant] for failure to intervene"); *see also Buchy v. City of White Plains*, No. 14-CV-1806, 2015 WL 8207492, \*3 (S.D.N.Y. Dec. 7, 2015) (same) (citation

omitted). Plaintiff's failure to specify which Defendants participated directly in the unlawful conduct, as opposed to failed to intervene in it, is fatal to her claim, even at this stage.

Accordingly, Defendants' motion to dismiss with regard to Plaintiff's failure to intervene claim is granted as to all Defendants. [40]

## VIII. CONSPIRACY

**[62]    [63]    [64]** Plaintiff asserts a Section 1983 conspiracy claim against all Defendants. (Am. Compl. ¶¶ 221–223.) "[T]o survive a motion to dismiss on [a plaintiff's] § 1983 conspiracy claim, [the plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002). "[C]omplaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct." *Id.* (quoting **\*621** *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)). To state a Section 1983 conspiracy claim against a private entity, "the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act." [41] *Id.* at 324 (quoting *Spear v. Town of West Hartford*, 954 F.2d 63, 68 (2d Cir. 1992)). For the reasons stated below, the Court finds that Plaintiff has sufficiently pled a claim of conspiracy against specific City Defendants and the Medical Center Defendants.

**[65]** While Plaintiff's pleading of her conspiracy claim is hardly robust, drawing all reasonable inferences in her favor, the Court finds that Plaintiff has adequately pled this claim as to Dets. Degnan, Moser, Heffernan, and Phelan, Dr. Landi, and Dr. Kupferman. The Complaint provides factual allegations that these Defendants acted jointly. For example, Plaintiff alleges that Det. Degnan was present at the autopsy of Annie that Dr. Landi performed (Am. Compl. ¶ 129) and that "Defendant Degnan and Heffernan engaged in lengthy communications with FHMC staff, including Defendant Kupferman" (Am. Compl. ¶ 108). Plaintiff also alleged that Dr. Kupferman joined Dets. Heffernan and Moser in screaming at her during an investigation (Am. Compl. ¶ 115) and that Dr. Landi "made her determination largely based on the evidence presented to her by" Dr. Kupferman and other City Defendants (Am. Compl. ¶ 152). Moreover,

Plaintiff alleges that Det. Phelan and Det. Degnan together interrogated the Lis, and participated in the early stages of investigating Plaintiff's criminal case. (*See, e.g.,* Am. Compl. ¶¶ 102–104, 106, 110.)

Pointing to Plaintiff's allegations in paragraphs 157 and 158 that Dr. Kupferman acted "as a deputy of the NYPD and the Queens County D.A.'s office," the Medical Center Defendants argue that they are "legally incapable of conspiring" with the City Defendants under the intra-corporate conspiracy doctrine. (*See* Dkt. 55 at 11–12.) Plaintiff responds that she has adequately pled facts to support this claim [42] and that "[j]ust because one is alleged to be [sic] State Actor, does not make them members of the NYPD, or break intro-corporate [sic] conspiracy." (*See* Dkt. 66 at 16–17.) In their reply, the Medical Center Defendants clarify that Plaintiff's counsel misconstrues the argument: "[T]he doctrine applies [not simply because Plaintiff alleged that Dr. Kupferman was a state actor but] because plaintiff alleged that Kupferman 'acted as a deputy of the NYPD and the Queen County D.A.'s office[.]' " (Dkt. 56 at ECF 15.)

 [66]  Under the intra-corporate conspiracy doctrine, "there is no conspiracy if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own directors, officers, and employees, each acting within the scope of his employment." *Herrmann v. Moore,* 576 F.2d 453, 459 (2d Cir. 1978) (citation omitted). While the Court must accept the factual allegations **\*622** set forth in the complaint as true, it must also draw all reasonable inferences *in favor* of the plaintiff. *See Nielsen,* 746 F.3d at 62. Here, the Court infers from paragraphs 157 and 158 that Plaintiff is alleging—albeit in exaggerated language—that Dr. Kupferman acted in concert with or "acted as a part of the team" that is the NYPD and the Queens County D.A.'s Office, not that Dr. Kupferman was an actual "employee" of the NYPD or District Attorney's Office. Indeed, any inference that Dr. Kupferman actually worked for those offices is belied by the Amended Complaint's allegations that Dr. Kupferman worked for FMHC. (Am. Compl. ¶ 108.) In *Herrmann,* the case on which the Medical Center Defendants rely, there was no question that all defendants accused of conspiracy belonged to a single corporation. *See* 576 F.2d 453, 459 ("Every one of the defendants ... was either a trustee or faculty member of the Brooklyn Law School[.]") Therefore, at this stage of the proceedings, the Court does not find it appropriate to dismiss Plaintiff's conspiracy claim against Dr. Kupferman based on the intra-corporate conspiracy doctrine.

* * *

Accordingly, the City Defendants' motion to dismiss Plaintiff's conspiracy claim is denied as to Dets. Degnan, Moser, Heffernan, and Phelan, but granted as to all other City Defendants; the Medical Center Defendants' motion to dismiss Plaintiff's Section 1983 conspiracy claim is denied. [43]

## IX. UNREASONABLY PROLONGED DETENTION

Plaintiff also asserts a Section 1983 claim for unreasonably prolonged detention in violation of her Fourth Amendment rights. (Am. Compl. ¶¶ 225–229.) Specifically, Plaintiff alleges that Defendants' mishandling, concealing, and suppressing of exculpatory evidence, and their intimidation and coercion of witnesses, caused her unreasonably prolonged detention. (*Id.* citing *Russo v. City of Bridgeport,* 479 F.3d 196 (2d Cir. 2007).).)

 [67]  [68]  Unreasonably prolonged pretrial detention where exculpatory evidence is readily available can form the basis of a Section 1983 claim against police officers as a violation of the Fourth Amendment's protection against unreasonable seizures. *Russo,* 479 F.3d at 208–09. To state such a claim, Plaintiff must allege that (1) she has a right to be free from continued detention stemming from law enforcement officials' mishandling or suppression of exculpatory evidence, (2) the actions of the officers violated that right, and (3) the officers' conduct "shocks the conscience." *Russo,* 479 F.3d at 205 (citing *Cnty. of Sacramento v. Lewis,* 523 U.S. 833, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). In *Russo,* the Second Circuit considered the following three factors in determining whether the plaintiff's detention was excessive in violation of the Fourth Amendment: (1) the length of time the plaintiff was incarcerated; (2) the ease with which the exculpatory evidence in the officers' possession could have been checked; and (3) the alleged intentionality of the defendants' behavior. *Id.* at 209.

Applying these standards, the Court finds that Plaintiff has adequately alleged an unreasonably prolonged detention claim against some of the City Defendants, but **\*623** not against the Medical Center Defendants.

### A. The City Defendants

**[69]**  The City Defendants argue that this claim should be dismissed because (1) Plaintiff only recites the elements of the cause of action, and (2) Plaintiff cannot allege the third element, *i.e.*, that the alleged conduct "shocks the conscience", because the exculpatory evidence at issue is not equivalent to the exculpatory evidence in *Russo.*

First, the Court disagrees with the City Defendants' contention that Plaintiff only recites the elements of unreasonably prolonged detention and nothing more. In the Amended Complaint, Plaintiff alleges that she was held at Riker's Island Jail for about four years (Am. Compl. ¶¶ 180, 234), and that Defendants "disregarded plainly exculpatory evidence" (Am. Compl. ¶ 173), "failed to ... disclose evidence inconsistent with plaintiff's guilt" (Am. Compl. ¶ 182), and mishandled and suppressed "exculpatory ... evidence" (Am. Compl. ¶ 225). Had Plaintiff only alleged this, her claim would have been conclusory. However, Plaintiff provides specifics regarding these broad allegations. For example, she alleges that Defendants mishandled evidence that "Annie's injuries could have been caused by osteogenesis imperfecta or other natural causes" (Am. Compl. ¶ 137), and that Dr. Landi's statement was "entirely ... unsupportable by any medical science" (*see* Am. Compl. ¶ 150). She also alleges that Dr. Landi withheld exculpatory evidence (Am. Compl. ¶ 154), falsely "swore under oath in the criminal complaint" that the Lis could have prevented Annie's death by getting her prompt medical attention the night she died (Am. Compl. ¶ 150), and "ignored signs of rib anterior flaring, and [the need for] any kind of thorough eye [sic] exam for eyes, or bones." (Am. Compl. ¶ 152.) To the extent that Dets. Degnan, Moser, Phelan, and Heffernan took an active role in investigating the Lis, the Court can infer that any exculpatory evidence concealed by Dr. Landi was also known by these Officer Defendants. From these allegations, the Court can plausibly infer that these City Defendants failed to disclose medical evidence that would have contradicted Dr. Landi's diagnosis and thus suppressed evidence that would have exculpated Plaintiff sooner.

**[70]**  Second, the Court disagrees with the City Defendants' contention that the exculpatory evidence in this case—*i.e.*, that Annie could not have been saved even if medical care was sought out sooner or that she died due to a condition other than SBS—is not equivalent to the definitive and conclusive exculpatory evidence contemplated by the Second Circuit in *Russo*. (Dkt. 59 at 25.) The failure to obtain or disclose evidence that is only arguably exculpatory does not shock the conscience. *See, e.g., Wilson v. City of New York,*

480 Fed.Appx. 592, 595 (2d Cir. 2012) (summary order) (distinguishing *Russo* because the evidence in *Wilson* was conflicting and some of the testimonial evidence at issue identified the defendant as an accomplice to the charged crime). In *Russo*, the exculpatory evidence at issue was a video surveillance tape that showed the perpetrator of the robbery in question without tattoos on his arms; Russo, who was arrested for the robbery, had distinctive tattoos covering his arms and repeatedly alerted the defendant-officers that the surveillance video would establish his innocence. *Id.* at 200. Here, the exculpatory evidence that Plaintiff alleges was concealed is the *absence* of any medical support for the charge that she caused Annie's death by SBS. (*Id.* ¶¶ 150, 135 (asserting that charge of SBS was "*entirely* ... unsupportable by *any* medical science," that the "there was *no* evidence, and *no reasonable basis* to believe, that plaintiff had any time **\*624** engaged in any conduct which could have caused or contributed to Annie's injuries and death," and that "there was *no* clinical or diagnostic medical evidence to support a finding of SBS [based on Annie's condition]." (emphasis added)).) Although the Amended Complaint is not a model of clarity, the Court infers that Plaintiff's unreasonably prolonged detention claim is based on the allegation that the City Defendants knew from conversations with, or information provided by, the Medical Center Defendants that there was no medical support for the conclusion that Annie died from SBS or that earlier medical intervention could have prevented her death—conclusions that were central to the case against Plaintiff—and that the City Defendants concealed this information for over four years while Plaintiff remained in prison. At this stage of the litigation, the Court takes these allegations as true—*i.e.*, that there was definitive and conclusive exculpatory evidence—and finds that Plaintiff has adequately pled the third element of her unreasonably prolonged detention claim. [44]

Accordingly, the City Defendants' motion to dismiss Plaintiff's unreasonably prolonged detention claim is denied as to Dets. Degnan, Moser, Phelan, and Heffernan, and Dr. Landi, but granted as to all other City Defendants.

**B. The Medical Center Defendants**

The Medical Center Defendants contend that Plaintiff cannot state a claim for unreasonably prolonged detention against Dr. Kupferman because that claim can only be brought against law enforcement officers. (Dkt. 55 at 12.) Plaintiff, citing no legal authority, argues that the Second Circuit's holding in *Russo* should be extended to non-law-enforcement officials.

(Dkt. 66 at 19.) Plaintiff also argues that as long as the defendant acted under color of state law, that defendant is subject to an unreasonably prolonged detention claim recognized by the court in *Russo.* The Court disagrees with Plaintiff's overly expansive and unsupported reading of *Russo*.

In *Russo*, the Second Circuit specifically stated that a plaintiff has a right to be free from prolonged detention "stemming from *law enforcement officials'* mishandling or suppression of exculpatory evidence...." *See Russo,* 479 F.3d at 205 (emphasis added). Indeed, all three prongs of the test for determining whether an unreasonably prolonged detention has occurred expressly references conduct by a law enforcement officer. *See id.* There is nothing in *Russo* or any case applying *Russo* that suggests that non-State individuals or entities can be held liable for unreasonably prolonged detention. *See, e.g., Jackson v. City of New York,* 29 F.Supp.3d 161, 178 (E.D.N.Y. 2014) ("*Russo* has been narrowly construed to involve situations where a law enforcement official has mishandled or suppressed readily available exculpatory evidence...."); *Harewood v. Braithwaite,* 64 F.Supp.3d 384, 401–03 (E.D.N.Y. 2014); *Thompson v. City of New York,* 603 F.Supp.2d 650, 656 (S.D.N.Y. 2009); *Wilson v. City of New York,* 480 Fed.Appx. 592, 594–95 (2d Cir. 2012) (summary order); *Nelson v. Hernandez,* 524 F.Supp.2d 212, 224–25 (E.D.N.Y. 2007). Nor does Plaintiff cite any such case law.

**\*625** Accordingly, the Medical Center Defendants' motion to dismiss Plaintiff's unreasonably prolonged detention claim as to them is granted in its entirety.

## X. DUE PROCESS

**[71]** Under the Due Process Clause of the Fourteenth Amendment, no State shall "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. This prohibition applies to municipalities. *See Horvath v. Westport Library Ass'n,* 362 F.3d 147, 151 (2d Cir. 2004) (stating only that the Fourteenth Amendment due process right applies only to government entities whose action may be fairly attributed to the State).

**[72]** **[73]** **[74]** **[75]** The Due Process Clause was "intended to secure the individual from the arbitrary exercise of the powers of government." *Daniels v. Williams,* 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (quoting *Hurtado v. California,* 110 U.S. 516, 527, 4 S.Ct. 292, 28 L.Ed. 232 (1884)). Procedural due process requires that

government action depriving an individual of substantial interest in life, liberty, or property "be implemented in a fair manner." *United States v. Salerno,* 481 U.S. 739, 746, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987). Substantive due process, as recognized by the Supreme Court, bars "certain government actions regardless of the fairness of the procedures used to implement them," in order to "prevent governmental power from being used for purposes of oppression." *Daniels,* 474 U.S. at 331, 106 S.Ct. 662 (citation and quotations marks omitted); *McClary v. O'Hare,* 786 F.2d 83, 88 (2d Cir. 1986). "In other words, while a procedural due process claim challenges the procedure by which [deprivation of liberty] is effected, a substantive due process claim challenges the 'fact of the [deprivation]' itself." *See Southerland v. City of New York,* 680 F.3d 127, 142 (2d Cir. 2012) (alteration in original omitted) (differentiating a procedural due process claim from a substantive due process claim); *see also Kerry v. Din,* ––– U.S. ––––, 135 S.Ct. 2128, 192 L.Ed.2d 183 (2015) ("[T]here are two categories of implied rights protected by the Due Process Clause: really fundamental rights, which cannot be taken away at all absent a compelling state interest; and not-so-fundamental rights, which can be taken away so long as procedural due process is observed.").

The Court interprets Plaintiff's due process claim, set forth in her seventh cause of action, to be based on the alleged (1) concealment of exculpatory evidence, *i.e.,* a *Brady* violation (Am. Compl. ¶¶ 232–233), (2) fabrication of evidence (*id.*), (3) failure to investigate (Am. Compl. ¶ 235), (4) violation of the right to a speedy trial (Am. Compl. ¶ 234), and (5) violation of the right to be treated with dignity during her pretrial detention (¶ 236). While Plaintiff does not clearly articulate which due process claims are procedural and which are substantive, the Court interprets the first two claims, regarding the mishandling of evidence, to be procedural [45], and the others to be substantive.

### \*626 A. Procedural Due Process

**[76]** **[77]** A procedural due process violation occurs when the government deprives a person of a protected life, liberty, or property interest without first providing notice and an opportunity to be heard. *See B.D. v. DeBuono,* 130 F.Supp.2d 401, 432–33 (S.D.N.Y. 2000). "To determine whether a Section 1983 due process claim is plausibly alleged, the Court evaluates the sufficiency of the allegations with respect to the liberty or property interest alleged and the process due before deprivation of that interest." *Norton v. Town of Islip,* 97

F.Supp.3d 241, 266 (E.D.N.Y. 2015); *see also Ciambriello, 292 F.3d at 313.*

 **[78]**  **[79]**  **[80]** Here, Plaintiff has asserted Section 1983 due process claims that are often referred to as fair trial claims. "A fair trial claim is a civil claim for violations of a criminal defendant's Fourteenth Amendment due process rights." *Fappiano v. City of New York,* 640 Fed.Appx. 115, 118 (2d Cir. 2016) (citing *Ramchair v. Conway,* 601 F.3d 66, 73 (2d Cir. 2010)). A defendant's right to a fair trial is violated when exculpatory evidence is withheld, *i.e.,* when a *Brady* violation occurs (*see Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)), and also when an officer forwards fabricated evidence to prosecutors, *Ricciuti,* 124 F.3d at 130. "A plaintiff need not have gone to a full trial on the merits in order to have an actionable Section 1983 claim based on the denial of a fair trial." *Marom v. City of New York,* No. 15-CV-2017, 2016 WL 916424, at *9 (S.D.N.Y. Mar. 7, 2016); *see Ricciuti,* 124 F.3d at 127 (plaintiffs who brought a Section 1983 claim for right to a fair trial had their criminal charges dismissed pretrial).

The Court finds that Plaintiff has adequately alleged fair trial claims against Dets. Degnan, Moser, Phelan, and Heffernan, Dr. Landi, and the Medical Center Defendants.

### 1. *Brady* violation claim

 **[81]**  **[82]** The Supreme Court held that a prosecutor violates a criminal defendant's due process right when the prosecutor fails to disclose favorable material to the defendant, "irrespective of the good faith or bad faith of the prosecution." *Brady,* 373 U.S. at 87, 83 S.Ct. 1194; *see also Poventud v. City of New York,* 750 F.3d 121, 155 (2d Cir. 2014) ("[T]he constitutional right defined by *Brady* ... is the criminal defendant's procedural due process right to the disclosure of 'evidence that is material to his guilt or punishment.' ") (quoting *Cone v. Bell,* 556 U.S. 449, 469, 129 S.Ct. 1769, 173 L.Ed.2d 701 (2009)). Police officers also "can be held liable for *Brady* due process violations under § 1983 if they withhold exculpatory evidence from prosecutors." *Bermudez v. City of New York,* 790 F.3d 368, 376 n.4 (2d Cir. 2015). **\*627** Once a police officer turns over exculpatory evidence to the prosecutor, that officer satisfies his obligations under *Brady. Walker v. City of New York,* 974 F.2d 293, 299 (2d Cir. 1992) ("It is appropriate that the prosecutors, who possess the requisite legal acumen, be charged with the task of determining which evidence constitutes *Brady* material that

must be disclosed to the defense."); *see also Blake v. Race,* 487 F.Supp.2d 187, 215–16 (E.D.N.Y. 2007) (noting that the Second Circuit had extended the *Brady* obligations to police officers in that they are required to turn exculpatory evidence over to the prosecutors).

 **[83]**  **[84]** "A classic *Brady* violation contains three elements: 'The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued.' " *Fappiano v. City of New York,* 640 Fed.Appx. 115, 118 (2d Cir. 2016) (summary order) (quoting *United States v. Rivas,* 377 F.3d 195, 199 (2d Cir. 2004)). "To establish prejudice, a plaintiff must show the evidence was material; i.e., whether the 'evidentiary suppression undermines confidence in the outcomes of the trial.' " *Id.* at 118 (quoting *Leka v. Portuondo,* 257 F.3d 89, 104 (2d Cir. 2001)).

 **[85]** Here, Plaintiff has sufficiently pled her *Brady* violation claim against Dets. Degnan, Moser, Phelan, and Heffernan, Dr. Landi, and Dr. Kupferman.[46] The Amended Complaint states that "the Officer Defendants failed to ... disclose evidence inconsistent with plaintiff's guilt, *did not document or inform the district attorney's office of exculpatory evidence,* [and] falsely reported facts in reports and search warrant affidavits." (Am. Compl. ¶ 178 (emphasis added).) Plaintiff also alleges that Defendants "*maliciously concealed material* exculpatory evidence" (Am. Compl. ¶ 233 (emphasis added)), and that prejudice ensued because it resulted in her arrest (Am. Compl. ¶ 238). In addition, as previously discussed, the Amended Complaint describes the nature of this exculpatory evidence as relating to the false conclusions of Dr. Landi and/or Dr. Kupferman regarding the causes of Annie's death, which implicated Plaintiff and her husband in their daughter's death. (*Id.* ¶¶ 150, 152, 164.)

### 2. Fabrication of Evidence claim

 **[86]** Separate from her malicious prosecution claim, Plaintiff alleges a procedural due process violation based on Defendants' alleged fabrication of evidence. (*See* Am. Compl. ¶ 233.)[47] The claim of denial of the right to a fair trial due to fabricated evidence stems from the Sixth Amendment and the Due Process clauses of the Fifth, Sixth, Fourteenth Amendments of the U.S. Constitution. *See Holbrook v. Flynn,* 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986); *Zahrey*

*v. City of New York*, No. 98-4546, 2009 WL 1024261, at \*16 (S.D.N.Y. Apr. 15, 2009) (characterizing plaintiff's right to a fair trial claim as an action for violation of his right to procedural **\*628** due process rooted in the Fifth, Sixth, and Fourteenth Amendments). Fabrication of evidence constitutes a violation of this right to a fair trial. *Coffey*, 221 F.3d at 344 ("[T]here is a constitutional right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigatory capacity, at least where the officer foresees that he himself will use the evidence with a resulting deprivation of liberty."); *Brandon v. City of New York*, 705 F.Supp.2d 261, 276 (S.D.N.Y. 2010) (noting that the Second Circuit has permitted "claims for both malicious prosecution and a denial of his right to trial based on the same alleged fabrication of evidence") (citing *Ricciuti*, 124 F.3d at 130–31); *see also Zahrey*, 2009 WL 1024261, at \*8 n.14 (S.D.N.Y. Apr. 15, 2009) ("Because evidence fabrication serves to both improperly charge and/ or arrest a plaintiff as well as unfairly try him, the *Coffey* violation, in its essence, involves aspects of both the Fourth Amendment and procedural due process."); *Myers v. Cnty. of Nassau*, 825 F.Supp.2d 359, 367 (E.D.N.Y. 2011) (noting that when a police officer turned over fabricated evidence to the prosecutor, such conduct can be redressed, not as a *Brady* violation, but as a deprivation of liberty on the basis of false and fabricated evidence).

 [87]   To state a claim of fabrication of evidence, a plaintiff must allege that "an (1) investigating official (2) fabricat[ed] information (3) that is likely to influence a jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff suffers a deprivation of life, liberty, or property as a result." *Garnett v. Undercover Officer C0039*, 838 F.3d 265, 280 (2d Cir. 2016).

### a) The City Defendants

 [88]   The City Defendants assert that Plaintiff's fabrication of evidence claims should be dismissed for three reasons: (1) none of the City Defendants could have possibly fabricated the SBS medical evidence, and the Complaint does not credibly allege that Dr. Landi "fabricated" evidence of SBS; (2) ADA Bishop is absolutely immune from the claim; and (3) the claims are time-barred, because Plaintiff was always aware of her theory that Annie died from a genetic disorder and not from any action taken by Plaintiff or her husband. (Dkt. 59 at 27–28.) Plaintiff provides a somewhat haphazard analysis in response and argues, "[Det.] Degnan states 'that

he was informed by Dr. Landi that earlier medical attention for the complainant could have resulted in the complainant's survival, and that the lack of immediate medical attention contributed to the complainant's death' .... Whether such a statement was fabricated is discoverable." (Dkt. 61 at 25 (citing Plaintiff's Exhibit B, Criminal Court Complaint in *People v. Ying Li* )). Notwithstanding Plaintiff's cursory response to the City Defendants' arguments, the Court finds that Plaintiff has adequately alleged a plausible claim of fabrication of evidence against Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi.

Although Plaintiff fails to identify the relevant paragraphs of the Amended Complaint, except for Paragraph 233, the Amended Complaint does contain allegations of fact that support her fabrication of evidence claim with regard to these City Defendants. (*See* Am. Compl. ¶¶ 145, 146, 150, 160, 178.) Specifically, Plaintiff alleges that Det. Degnan signed the criminal court complaint in spite of his knowing that its content was not true (Am. Compl. ¶ 145), that Plaintiff was arraigned based on the fabricated information Defendants forwarded to the District Attorney's Office (Am. Compl. ¶ 146), and that Defendants "falsely reported facts in reports and search warrant affidavits, and fabricated oral statements of witnesses." (Am. Compl. **\*629** ¶ 178.)[48] Plaintiff also alleges that Dr. Landi swore under oath in the criminal complaint that had Annie received medical care sooner, she could have survived—a fact that was, according to the Complaint, "false, misleading, and perjurious, and entirely unsupported ... by any medical science...." (Am. Compl. ¶ 150.) At this stage of the litigation, the Court takes these allegations as true—*i.e.*, that the content of the criminal complaint, reports, and search warrant affidavits contained false information that certain City Defendants knowingly provided and/or swore to—and finds that Plaintiff has adequately pled her fabrication of evidence claim against Dets. Degnan, Moser, Heffernan, and Phelan, and Dr. Landi.

### b) The Medical Center Defendants

 [89]   As previously discussed (*see supra* Sections X.A.1), Plaintiff has alleged that Dr. Kupferman ignored evidence suggesting that Annie's death was not caused by SBS and provided false information to Dr. Landi, who based her conclusions on that false information.

Although the Medical Center Defendants argue that "the [Amended] Complaint does not contain an allegation

regarding violation of plaintiff's right to a fair trial" (*see* Dkt. 56 at 10), the Court disagrees, given the numerous allegations of fabrication of evidence and Dr. Kupferman's alleged failure to consider Annie's lab results that were consistent with metabolic bone disease. (*See* Am. Compl. ¶¶ 122, 145, 146, 150, 178, 232, 233.) Even though, as the Medical Center Defendants point out, the Amended Complaint does not specifically mention the Fifth Amendment, the Court finds that the factual allegations in the complaint have given the Medical Center Defendants sufficient notice of this claim.[49]

3. Statute of Limitations With Respect to Fair Trial Claims

Having found that Plaintiff adequately pled both her *Brady* violation and fabrication of evidence claim against the City Defendants and the Medical Center Defendants, the Court turns to those Defendants' argument that these claims are time-barred (*see* Dkt. 59 at 28). The City Defendants contend that Plaintiff's fair trial claim accrued at the time of her arrest because "she was always aware of her theory that her baby died from a genetic disorder and not any action taken by plaintiff or her husband." (*Id.*) In response to this argument, Plaintiff simply states, without citing any legal authority, that her procedural due process claim is not time barred because "Federal equitable tolling standards should apply." (Dkt. 61 at 25.) Plaintiff makes no other argument. Notwithstanding Plaintiff's inadequate response, the Court finds the City Defendants' argument unpersuasive.

**[90]** **[91]** Fabrication of evidence claims accrue "when the plaintiff learns that evidence was fabricated and an injury was **\*630** caused by the fabrication." *Carr v. City of New York*, No. 11–Civ–6982, 2013 WL 1732343, at \*6 (S.D.N.Y. Apr. 19, 2013) ("[P]laintiff arguably learned of the alleged fabrication as soon as the criminal complaint was filed and certainly no later than when [the defendant] took the stand at [ ] trial...."); *see also Garnett v. Undercover Officer C0039*, No. 13-cv-7083, 2015 WL 1539044, at \*4 (S.D.N.Y. Apr. 6, 2015) ("[A fabrication of evidence] claim accrues when the officer forwards the false information to the prosecutors."). Because the statute of limitations is an affirmative defense, "[t]he burden is on the defendant to establish when a federal claim accrues." *Gonzalez v. Hasty*, 651 F.3d 318, 322 (2d Cir. 2011).

**[92]** Here, the Court finds that the City Defendants have not established that Plaintiff knew all along that she had *Brady* violation and fabrication of evidence claims simply because she believed in her innocence; the City Defendants' contrary assertion is too sweeping. At a January 2, 2013 status conference, Plaintiff learned that ADA Bishop moved to dismiss the criminal charges against Plaintiff because Dr. Kupferman informed ADA Bishop that Annie's brain injuries were so severe that immediate medical intervention would likely not have saved her. (*See* Dkt. 63 at Ex. F at ECF 6.) Therefore, it is plausible to infer that in January 2013 Plaintiff specifically learned that she might have a fabrication of evidence claim against the City Defendants based on Dr. Landi's earlier contrary assessment of how Plaintiff was responsible for Annie's death, in part, because Plaintiff failed to get medical attention for her daughter quickly enough. *See Mitchell v. Home*, 377 F.Supp.2d 361, 373 (S.D.N.Y. 2005) ("[A] fair trial claim premised on fabrication of evidence accrues when the plaintiff learns or should have learned that the evidence was fabricated and such conduct causes the claimant some injury[.]") (citing *Veal v. Geraci*, 23 F.3d 722, 724–25 (2d Cir. 1994)); *see also Bailey v. City of New York*, 79 F.Supp.3d 424, 444 (E.D.N.Y. 2015) (same).[50]

As for Plaintiff's *Brady* violation claim, the Court cannot assess when it was that the claim could have plausibly accrued because Plaintiff does not specifically allege what exculpatory evidence the City Defendants concealed. However, because the City Defendants have the burden of establishing that the statute of limitations has expired, and in light of the cursory argument put forth by the City Defendants, the Court denies the City Defendants' motion to dismiss Plaintiff's fair trials claims on statute of limitations grounds with respect to Dets. Degnan, Moser, Phelan, Heffernan, and Dr. Landi. For the reasons previously discussed, the Medical Center Defendants' motion to dismiss Plaintiff's fair trials claims against them is also denied.

**B. Substantive Due Process**

**[93]** **[94]** **[95]** **[96]** "[D]ue process protection in the substantive sense limits what the government may do in both its legislative, and its executive capacities...." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 845, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998) (citing *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) and **\*631** *Rochin v. California*, 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952)). "The protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity." *Albright v. Oliver*, 510 U.S. 266, 273, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). "[C]riteria to identify

what is fatally arbitrary differ depending on whether it is legislation or a specific act of a governmental officer that is at issue." *Cnty. of Sacramento*, 523 U.S. at 845, 118 S.Ct. 1708. "[F]or executive action to violate substantive due process, it must be so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Bolmer v. Oliveira*, 594 F.3d 134, 142 (2d Cir. 2010) (citation and quotations marks omitted). "It is not enough that the government act [was] 'incorrect or ill-advised[.]' " *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) (quoting *Kaluczky v. City of White Plains*, 57 F.3d 202, 211 (2d Cir. 1995)). "Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional." *Id.* (citation and quotation marks omitted).

### 1. Failure to Investigate

Against the Medical Center Defendants and Dr. Landi, Plaintiff asserts a claim best characterized as a claim of failure to investigate, in violation of Plaintiff's substantive due process rights. (*See* Am. Compl. ¶ 235; *see also* Dkt. 66 at 20.) [51] More specifically, this claim is based on the argument that the Medical Center Defendants and Dr. Landi failed to "exhaust all possibilities" before rendering an SBS diagnosis, and therefore violated Plaintiff's liberty. (*See* Dkt. 66 at 20–21; Am. Compl. ¶ 238 ("Defendants' conduct precipitated and caused the sequence of events that ultimately resulted in the deprivation of plaintiff's liberty....").)

Both groups of Defendants contend that all of Plaintiff's substantive due process claims are solely based on Plaintiff's Fourth Amendment claims of false arrest, malicious abuse of process, and conspiracy, and thus are duplicative of her Fourth Amendment claims and should be dismissed. (*See* Dkt. 55 at 14; Dkt. 56 at 10; Dkt. 59 at 26.) Plaintiff responds that "the Fourth Amendment does not 'cover a cause of action for government abuse of process in the investigation or pursuit of a suspect', and that she therefore has a separate, standalone substantive due process claim against certain Defendants for failing to investigate other explanations for Annie's death before concluding that she died from SBS. (Dkt. 66 at 20 (citing *Russo v. City of Hartford*, 184 F.Supp.2d 169, 184 (D. Conn. 2002)).)

**[97]** **[98]** "The right [to be free from arbitrary government action,] to the extent it exists, is the right to be free of arbitrary **\*632** government action *that infringes a protected right.*" *O'Connor v. Pierson*, 426 F.3d 187, 200 n. 6 (2d Cir.

2005). Here, Plaintiff does not provide adequate legal support for her assertion of a substantive due process right to have investigating officials "exhaust all possibilities" that could have explained the cause of Annie's death before concluding that it was SBS. (*See* Dkt. 66 at 20–21.) [52] Moreover, even though Plaintiff attempts to distinguish her substantive due process claim from her Fourth Amendment claims, Plaintiff's failure to investigate claim, at the end of the day, is based on her substantive due process right to be free of prosecution and arrest *without probable cause.* [53] *Cf. Campbell*, 2000 WL 194815, at *3 ("allegations of an officer's failure to investigate are considered under the rubric of false imprisonment, false arrest, or malicious prosecution."). This is evidenced by Plaintiff's own brief and the Amended Complaint, which both state that Defendants' failure to investigate "effectuated Plaintiff's arrest." [54] (Dkt. 66 at 22.)

**\*633** "As a general matter, [the U.S. Supreme Court] has always been reluctant to expand the concept of substantive due process because the guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Albright*, 510 U.S. at 271–72, 114 S.Ct. 807 (citing *Collins v. Harker Heights*, 503 U.S. 115, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992)). The Supreme Court has instructed that "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process,' must be the guide for analyzing these claims." *Id.* at 273, 114 S.Ct. 807 (quoting *Graham v. Connor*, 490 U.S. 386, 395, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) and holding that substantive due process cannot afford plaintiff relief when the plaintiff "ask[ed] [the Supreme Court] to recognize a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause"). In light of this guidance and given the plain overlap between Plaintiff's substantive due process claim alleging a failure to investigate and her Fourth Amendment claims, the Court finds that, to the extent Plaintiff has a viable failure to investigate claim [55], it falls under the Fourth Amendment rubric. Here, Plaintiff's claim of failure to investigate, as a practical matter, will be subsumed by all of her other Section 1983 claims.

Accordingly, both the City Defendants' and the Medical Center Defendants' motions to dismiss Plaintiff's substantive due process claim based on a failure to investigate are granted.

### 2. Speedy Trial

**[99]**  Plaintiff also alleges that she was denied a speedy trial, in violation of her right under the speedy trial clause of the Sixth Amendment. (*See* Am. Compl. ¶ 234.) The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. amend. VI. Specifically, Plaintiff alleges that she was held for more than four years in pretrial detention and that all Defendants encouraged this for the purpose of using Plaintiff's confinement as a bargaining chip to pressure her husband to plead guilty. (Am. Compl. ¶ 234.)

The Medical Center Defendants argue that Plaintiff failed to allege, other than in conclusory fashion, the causation element of this claim with respect to the Medical Center Defendants. (*See* Dkt. 55 at 14.) The Court agrees.

**\*634 [100]  [101]**  A Section 1983 action, "like its state tort analogs, employs the principle of proximate causation." *Townes v. City of New York*, 176 F.3d 138, 146 (2d Cir. 1999); *see also Higazy v. Templeton*, 505 F.3d 161, 181 (2d Cir. 2007) (Jacobs, C.J., concurring) ("Our cases affirm that traditional tort law principles apply equally to a Section 1983 plaintiff and require him to show the causal link from the original police misconduct up to the point of injury in order to proceed on his claim."). "It is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment." *Townes*, 176 F.3d at 147. Here, Plaintiff fails to allege any facts to support a causal link between the Medical Center's alleged conduct and the unreasonable delay in Plaintiff criminal case being resolved.

**[102]**  The City Defendants do not discuss Plaintiff's speedy trial claim in their briefing. In any event, the Court finds that Plaintiff's allegations that Defendants sought to use her as a "bargaining chip" to obtain a guilty plea from her husband, coupled with the four-year delay in her case being resolved and her case being dismissed shortly after her husband's conviction, is sufficient to state a speedy trial claim as to the City Defendants who were involved in her prosecution.

Accordingly, the Court denies the City Defendants' motion to dismiss Plaintiff's speedy trial claim as to Dets. Degnan, Moser, Phelan, Heffernan, and Dr. Landi, but grants the Medical Center Defendants' motion to dismiss this claim as to them.

### 3. Unconstitutional Conditions of Confinement

**[103]**  Plaintiff also alleges that certain conditions of confinement violated her substantive and procedural due process rights. (Am. Compl. ¶ 236.)[56] "A pretrial detainee's claim of unconstitutional conditions of confinement are governed by the Due Process Clause of the Fourteenth Amendment, rather than the Cruel and Unusual Punishments Clause of the Eighth Amendment." *Darnell v. City of New York*, 849 F.3d 17, 29 (2d Cir. 2017) (citing, *inter alia*, *Benjamin v. Fraser*, 343 F.3d 35, 49 (2d Cir. 2003)).

Only the Medical Center Defendants discuss this claim; they assert that their conduct did not proximately cause Plaintiff's condition of detention. (*See* Dkt. 55 at 14.) Not only does Plaintiff fail to respond to this argument, she does not discuss this claim at all, and therefore abandons it. *See deVere Grp. GmbH v. Op. Corp.*, 877 F.Supp.2d 67, 70 n.3 (E.D.N.Y. 2012) ("Because plaintiff did not address defendants' motion to dismiss with regard to this claim, it is deemed abandoned and is hereby dismissed.") (quoting *Hanig v. Yorktown Cent. Sch. Dist.*, 384 F.Supp.2d 710, 723 (S.D.N.Y. 2005)); *Harley v. City of New York*, 14–CV–5452, 2016 WL 552477, at \*7 (E.D.N.Y. Feb. 10, 2016) (finding plaintiff's claims abandoned where plaintiff's response to motion to dismiss "did not dispute, and in fact wholly ignore[d], **\*635** defendants' argument" (citing *Jackson v. Federal Exps.*, 766 F.3d 189 (2d Cir. 2014))); *Moccio v. Cornell Univ.*, No. 09–Civ–3601, 2009 WL 2176626, at \*4 (S.D.N.Y. Jul. 21, 2009) ("Whatever the merit of [the defendants'] argument [for dismissal], plaintiff has abandoned the ... claim, as her motion papers fail to contest or otherwise respond to defendants' contention."), *aff'd*, 526 Fed.Appx. 124 (2d Cir. 2013); *see also Simon v. City of New York*, No. 14-CV-8391, 2015 WL 4092389, at \*2 (S.D.N.Y. Jul. 6, 2015) (collecting cases).

**[104]**  In any event, the Medical Center Defendants are correct. Plaintiff's claim of unconstitutional conditions of confinement must be dismissed as to all Defendants because the Amended Complaint does not allege any facts establishing the personal involvement of any Defendant with respect to those conditions. *See Spavone*, 719 F.3d at 135; *Johnson v. Barney*, 360 Fed.Appx. 199, 201 (2d Cir. 2010) (summary order) (finding that plaintiff's claim failed "as a matter of law" where plaintiff failed to allege sufficient personal involvement on the part of the prison

superintendent); *Scott v. Fischer*, 616 F.3d 100, 110 (2d Cir. 2010) (dismissing claim against Department of Correctional Services ("DOCS"), where plaintiff had argued that DOCS violated her constitutional rights by arresting her for non-compliance with her post-release supervision ("PRS"), since "the practice of re-incarcerating persons who violated their administratively-imposed PRS was a practice of the Division of Parole, and not of [DOCS]"). [57]

Accordingly, the Court grants the Medical Center Defendants' motion to dismiss the Medical Center Defendants' conditions of confinement claim as to them. The Court also dismisses that claim *sua sponte* as to the City Defendants since there are no factual allegations in the Amended Complaint that support such a claim as to these Defendants. *See, e.g., Barreto v. Suffolk Cnty.*, No. 10-CV-0028, 2010 WL 301949, at *2 (E.D.N.Y. Jan. 20, 2010) ("When a complaint fails to comply with the requirements of Rule 8, district courts have the authority to dismiss the complaint *sua sponte*." (citing *Salahuddin v. Cuomo*, 861 F.2d 40, 41 (2d Cir. 1988))); *LeBarron v. Warren Cnty. Sheriff's Office*, No. 1:13-CV-1572, 2015 WL 2248749 (N.D.N.Y. May 13, 2015) (*sua sponte* dismissing plaintiff's claim where the claim failed to allege facts plausibly suggesting personal involvement of individual defendants even though the defendants did not raise a lack-of-personal-involvement challenge to the claim); *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363 (2d Cir. 2000) (recognizing that district courts have power to *sua sponte* dismiss complaints "in order to preserve scarce judicial resources").

## XI. *MONELL* CLAIMS

### A. Against the City

[105] Plaintiff asserts a *Monell* claim against the City based on her Section 1983 claims for false arrest, malicious prosecution, and violation of right to a fair trial, alleging a theory of "deliberate indifference" **\*636** to provide adequate training for its officers who work on SBS cases or to properly instruct Defendants of "applicable provisions of [New York] State Penal Law ... federal and state constitutional limitations...." (*See* Am. Compl. ¶ 243, 244, 248.) The Court finds Plaintiff's allegations of municipal liability adequate to state a *Monell* claim against the City.

[106]   [107]   [108] A municipality may be liable under Section 1983 if a municipal "policy or custom" causes "deprivation of rights protected by the Constitution." *Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658, 690–91,

98 S.Ct. 2018, 56 L.Ed.2d 611 (1978); *see also Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012). For a *Monell* claim to survive a motion to dismiss, a plaintiff must allege "sufficient factual detail" and not mere "boilerplate allegations" that the violation of the plaintiff's constitutional rights resulted from the municipality's custom or official policy. *Plair v. City of New York*, 789 F.Supp.2d 459, 469 (S.D.N.Y. 2011) (collecting cases). "A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised 'deliberate indifference' to the rights of the plaintiff." *Moran v. Cnty. of Suffolk*, No. 11 Civ.3704, 2015 WL 1321685 (E.D.N.Y. Mar. 24, 2015) (citing *Parker v. City of Long Beach*, 563 Fed.Appx. 39 (2d Cir. 2014), *as amended*, (Apr. 21, 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 62 (2d Cir. 2014) (widespread and persistent practice); *Hines v. Albany Police Dep't*, 520 Fed.Appx. 5, 7 (2d Cir. 2013) (actions of policymakers); *Schnitter v. City of Rochester*, 556 Fed.Appx. 5, 8 (2d Cir. 2014) (failure to train or supervise); *Missel v. Cnty. of Monroe*, 351 Fed.Appx. 543, 545 (2d Cir. 2009) (formal policy and act of a person with policymaking authority for the municipality)).

Here, Plaintiff advances two theories of municipal liability. First, Plaintiff asserts that the City has a custom of zealously promoting "debated science," here, the diagnosis of SBS. (Dkt. 61 at 26–27.) Second, Plaintiff asserts that the City failed to train its employees, especially child abuse detectives, regarding SBS cases. (Dkt. 61 at 29, 30.) [58] The City contends that Plaintiff's *Monell* claim must be dismissed because the claims against individual City Defendants are without merit (Dkt. 59 at 29) and because Plaintiff has not identified any municipal policy that could serve as the basis of a *Monell* claim (*id.* at 31). [59] The Court disagrees.

Plaintiff has alleged that "the NYPD and their precinct(s) and/or the OCME [Office of Chief Medical Examiner of the City of New York] ... [r]outinely conclude[ed] that Shaken Baby Syndrome is responsible for many infant fatalities despite the absence of evidence necessary to make such a finding." (Am. Compl. ¶ 243a.) **\*637** Additionally, Plaintiff alleges, *inter alia*, that the NYPD and the OCME routinely ignored the existence of debate and doubt in the medical community

concerning SBS diagnoses (*id.* ¶ 243b), and routinely failed to perform tests to rule out SBS or consider evidence that contradicts an SBS diagnosis (*id.* ¶ 243c-d). [60] Plaintiff also alleges that the City "with deliberate indifference failed to provide adequate training and standards and policies and practices for its police officers in SBS related cases." (*id.* ¶ 243.) The Court finds these allegations sufficient to overcome a 12(b)(6) motion.

### B. "*Monell*-type" claim against FHMC

[109] Plaintiff brings a "*Monell*-type" claim [61] against FHMC based on multiple theories: (1) FHMC has a policy pursuant to which its employees, such as Dr. Kupferman, conduct forensic and factual investigation of SBS cases "for non-medical purposes, in order to reach non-medical conclusions, and with knowledge that law enforcement will rely on these investigative conclusions in directing the course of an arrest and prosecution" (Am. Compl. ¶ 257); (2) FHMC "perpetuated this policy [of having its staff conduct investigations for 'non-medical purposes'] in order to see those accused of SBS arrested, prosecuted, and convicted, despite the lack of any evidence connecting them with any crime whatsoever" (Am. Compl. ¶ 259); (3) FHMC failed to train its staff on advances in the field of Child Abuse Diagnosis and Investigation, including SBS (Am. Compl. ¶ 260); (4) FHMC was aware that its employees, including Dr. Kupferman, had a tendency to jump to conclusions and to diagnose SBS without supporting evidence (Am. Compl. ¶ 264); (5) FHMC failed to supervise its employees (Am. Compl. ¶¶ 265–266); and (6) FHMC failed to adequately screen and hire its employees "to respect the constitutional rights of those individuals with whom FHMC comes in contact" (Am. Compl. ¶ 266).

While Plaintiff's pleading of a *Monell*-type claim against FHMC is largely based on conclusory allegations, [62] Plaintiff does **\*638** specifically allege that Dr. Kupferman had a history of overzealously diagnosing SBS of which FHMC was aware, and that Dr. Kupferman was a "final policymaker" [63] with respect to these diagnoses, which resulted in no confirmation being sought with respect to her conclusion that "Annie's death was due to SBS." (Am. Compl. ¶ 164.) [64] Taking Plaintiff's allegations as true, the Court finds that she has nudged her *Monell* claim against FHMC across the line from merely "conceivable to plausible." *See Iqbal,* 556 U.S. at 680, 129 S.Ct. 1937.

Accordingly, FHMC's motion to dismiss Plaintiff's *Monell* claim against it is denied.

### C. Liability Based on *Respondeat Superior*

[110] [111] Plaintiff also argues that FHMC should be held liable under the doctrine of *respondeat superior* and therefore Plaintiff need not show that a violation of Plaintiff's constitutional rights by FHMC's employees was due to a policy or custom. (Dkt. 66 at 21–22.) However, the doctrine of *respondeat superior* is not available to render a supervisor liable under Section 1983 for the unconstitutional conduct of his subordinates. *Connick v. Thompson,* 563 U.S. 51, 60, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011) ("[U]nder § 1983, local governments are responsible only for 'their *own* illegal acts.' ... They are not vicariously liable under § 1983 for their employee's actions."). In *Connick,* the Supreme Court unequivocally stated that *respondeat superior* cannot be applied either to superiors or to local government entities. *See id.*; *Monell,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (holding that Section 1983's language demands a causal relationship between the conduct of the defendant and the plaintiff's constitutional deprivation, and that this relationship is absent when liability is imposed solely on the basis of *respondeat superior* ). In *Rojas,* the Second Circuit extended *Monell* to Section 1983 suits against private entities. 924 F.2d 406. And just as a municipal entity cannot be held liable under *respondeat superior*, a private corporation cannot be held liable under *respondeat superior* for the allegedly unconstitutional conduct of its employee. *Green v. City of New* York, 465 F.3d 65 (2d Cir. 2006) (citing *Rojas,* 924 F.2d at 408); *see also Feder v. Sposato,* No. 11-CV-193, 2014 WL 1801137, at *10 (E.D.N.Y. May 7, 2014) (noting that under *Rojas* a plaintiff must prove an official policy that caused a constitutional tort rather than relying on *respondeat superior* theory). [65]

**\*639** Accordingly, the Medical Center Defendants' motion to dismiss Plaintiff's claim against FHMC based on the doctrine of *respondeat superior* is granted.

### XII. STATE CONSTITUTIONAL CLAIM

Plaintiff's tenth claim against all Defendants alleges violation of Plaintiff's rights under the New York State Constitution to be free of unreasonable and unlawful searches and seizures under Article I, Section 12 and to be free of deprivation of liberty and property without due process of law under Article I, Section 6. (Am. Compl. ¶¶ 270–275.)

**[112]**  Plaintiff's State constitution claims must be dismissed because "[d]istrict courts in this circuit have consistently held that there is no private right of action under the New York State Constitution where, as here, remedies are available under § 1983." *Campbell v. City of N.Y.*, No. 09-CV-3306, 2011 WL 6329456, at *5 (E.D.N.Y. Dec. 15, 2011) (citation and quotation marks omitted); *see also Biswas v. City of New York*, 973 F.Supp.2d 504, 522 (S.D.N.Y. 2013) (dismissing plaintiff's State constitutional tort claims of unlawful seizures and arrest because the plaintiff had a remedy at common law for false arrest/false imprisonment under a § 1983 claim based on the same grounds and stating that "the state constitutional tort is usually available only in cases in which a plaintiff ... has no alternative remedy."); *see also Wahad v. F.B.I.*, 994 F.Supp. 237, 240 n.4 (S.D.N.Y. 1998) ("Section 1983 need not provide the exact same standard of relief in order to provide an adequate remedy").

Here, Plaintiff has a remedy based on Section 1983. Furthermore, Plaintiff has asserted the same due process claim under Section 1983, making Plaintiff's State constitutional claim duplicative. Accordingly, Defendants' motion to dismiss Plaintiff's State constitutional claim is granted.

## XIII. IMMUNITY

### A. Absolute Immunity of ADA Bishop

**[113]**  District courts "are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage." *Norton v. Town of Brookhaven*, 33 F.Supp.3d 215, 229 (E.D.N.Y. 2014) (citation and quotation marks omitted), *reconsidered on other grounds*, 47 F.Supp.3d 152 (E.D.N.Y. 2014). ADA Bishop claims absolute immunity from liability for her prosecutorial actions (Dkt. 59 at 15). *See Giraldo v. Kessler*, 694 F.3d 161, 165 (2d Cir. 2012) (defendant claiming absolute immunity bears burden of showing that immunity doctrine applies).

**[114]    [115]**  Prosecutors performing core prosecutorial functions are entitled to absolute immunity. *See Warney v. Monroe Cnty.*, 587 F.3d 113, 120 (2d Cir. 2009) (citing *Imbler v. Pachtman*, 424 U.S. 409, 430–31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976)). They are entitled to absolute immunity "because their prosecutorial activities are 'intimately associated with the judicial phase of the criminal process, and thus [are] functions to which the reasons for absolute immunity apply with full force.' " *Cornejo*, 592 F.3d at 127 (quoting *Imbler*, 424 U.S. at 430, 96 S.Ct. 984) (modification in

the original). Prosecutorial functions protected by absolute immunity include conduct "preliminary to the initiation of a prosecution," such as "whether to present a case to a grand jury ... whether and when to prosecute, whether to dismiss an indictment against particular defendants, which witnesses to call, and what other evidence to present." **\*640** *Giraldo*, 694 F.3d at 165. The Supreme Court has "made clear that absolute immunity may not apply when a prosecutor is not acting as 'an officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks." *Van de Kamp v. Goldstein*, 555 U.S. 335, 342, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009) (citing *Imbler*, 424 U.S. at 431 n.33, 96 S.Ct. 984). A prosecutor who engages in such activities is protected only by qualified immunity. *Sclafani v. Spitzer*, 734 F.Supp.2d 288, 296 (E.D.N.Y. 2010) (citing *Van de Kamp*, 555 U.S. 335, 129 S.Ct. 855).

**[116]**  Plaintiff argues that ADA Bishop's conduct was administrative and investigatory in nature. (*See* Dkt. 61 at 15–17.) In support of this argument, Plaintiff notes that ADA Bishop "was an initial point of contact for the hospital, and had been in communications with its staff [and] had investigators ... from the DA's Office involved...." (*Id.* at 16.) However, none of this is alleged in the Complaint, and Plaintiff does not direct the Court to any relevant portion of the Complaint in support of these assertions. Moreover, because information from FHMC staff was crucial to the prosecution of the Lis, ADA Bishop's communications with them are considered part of the prosecutorial process. *See, e.g., Schnitter v. City of Rochester*, 556 Fed.Appx. 5 (2d Cir. 2014) (summary order) (finding ADA's interview of crucial witness to be a core part of the prosecutorial process).

**[117]**  Plaintiff's other allegations regarding ADA Bishop also relate to prosecutorial functions. Plaintiff alleges that ADA Bishop "failed to examine the medical reports and ask relevant questions as to [Annie's medical] history" (Am. Compl. ¶ 169), and also "ignored evidence ... and [the] absence of witnesses" (Am. Compl. ¶ 174). However, these allegations "amount[ ] to the claim that [ADA Bishop] sought an indictment based on insufficient or unpersuasive evidence[,] ... [thus challenging] an essential prosecutorial decision." *Schnitter*, 556 Fed.Appx. at 7. Moreover, a prosecutor is entitled to absolute immunity even in the face of allegations of "deliberate withholding of exculpatory information" or "his knowing use of perjured testimony." *Shmueli v. City of New York*, 424 F.3d 231, 237 (2d Cir. 2005) (citing *Imbler*, 424 U.S. at 431 n.34, 96 S.Ct. 984); *see also Warney v. Monroe Cnty.*, 587 F.3d 113, 125 (2d

Cir. 2009) ("[I]f the prosecutors had tested all the evidence, and then sat on the exculpatory results for at least 72 days, they may well have violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); but they would be absolutely immune from personal liability"). Thus, absolute immunity applies even though Plaintiff alleges that ADA Bishop "concealed evidence" (Am. Compl. ¶ 175) and "misrepresented facts" (Am. Compl. ¶ 208). [66]

**[118]** To the extent that Plaintiff's claims are asserted against ADA Bishop in her official capacity, they are barred because Bishop acted on behalf of New York State, which is immune under the Eleventh Amendment. *See Caldwell v. James*, 14–CV–5384, 2015 WL 427980, at *3 (E.D.N.Y. Jan. 30, 2015) ("[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against **\*641** the State itself." (quoting *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989))); *see, also Caldwell*, 2015 WL 427980 at *3 (collecting cases where courts dismissed claims against State officials on Eleventh Amendment grounds); *Reid v. Schuman*, 83 Fed.Appx. 376, 377 (2d Cir. 2003) (summary order) ("We have held that when a District Attorney is prosecuting a criminal matter, she represents the State, not the municipality." (citing *Ying Jing Gan v. City of New York*, 996 F.2d 522, 529 (2d Cir. 1993)).

Accordingly, Plaintiff's claims against ADA Bishop are dismissed with prejudice.

### B. City Defendants

The City Defendants also contend that the Officer Defendants are entitled to qualified immunity as to Plaintiff's Fourth Amendment claims of false arrest and malicious prosecution. [67] However, for the reasons explained below, the Court cannot find qualified immunity at this stage of the litigation.

**[119]    [120]** "Qualified immunity shields law enforcement officers from § 1983 claims for money damages provided that their conduct does not violate clearly established constitutional rights of which a reasonable person would have been aware." *Barboza v. D'Agata*, 676 Fed.Appx. 9, 12, 2017 WL 214563, at *2 (summary order) (2d Cir. 2017) (citing *Ashcroft v. al–Kidd*, 563 U.S. 731, 735, 131 S.Ct. 2074, 179 L.Ed.2d 1149 (2011); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982); *Zalaski*

*v. City of Hartford*, 723 F.3d 382, 388 (2d Cir. 2013)). It is an affirmative defense as to which the defendant officers or officials bear the burden of proof. *Harlow*, 457 U.S. at 815, 102 S.Ct. 2727.

**[121]    [122]** In analyzing the applicability of qualified immunity, courts conduct a two-step analysis: "First, do the facts show that the officer's conduct violated plaintiff's constitutional rights? Second, if there was a constitutional violation, was the right clearly established at the time of the officer's actions?" *Barboza*, 676 Fed.Appx. at 12, 2017 WL 214563, at *2 (citation omitted); *Pearson v. Callahan*, 555 U.S. 223, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009). In short, "[e]ven if the right at issue was clearly established in certain respects, ... an officer is still entitled to qualified immunity if 'officers of reasonable competence could disagree' on the legality of the action at issue *in its particular factual context*." *Barboza*, 676 Fed.Appx. at 12, 2017 WL 214563, at *2 (emphasis in original) (quoting *Walczyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)). Moreover, courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson*, 555 U.S. at 236, 129 S.Ct. 808.

At this juncture, the Court cannot find that the Officer Defendants are entitled to qualified immunity, especially where Plaintiff's theory of liability is based on the alleged fabrication of evidence and suppression of exculpatory evidence. (*See, e.g.,* Am. Compl. ¶ 145 (with respect to malicious prosecution claim, stating that a criminal complaint containing false information was signed with knowledge that there was no legal basis to prosecute Plaintiff); Am. Compl. ¶ 222 (with respect **\*642** to Section 1983 conspiracy claim, noting that Defendants conspired to accuse Plaintiff of a crime she did not commit); Am. Compl. ¶ 225 (with respect to unreasonably prolonged detention claim, noting that Defendants mishandled exculpatory evidence); Am. Compl. ¶ 234 (noting that Plaintiff was in pretrial detention because of Defendants' collateral motive).)

Based on these allegations, Plaintiff has sufficiently demonstrated potential violations of her constitutional right to be free from prosecution based on fabricated or suppressed exculpatory evidence. Those rights were clearly established at the time of her prosecution and pretrial detention, such that no reasonable officer could believe that fabricating evidence or suppressing exculpatory evidence is constitutional. *See Coggins v. Cnty. of Nassau*, 988 F.Supp.2d 231, 245, n.8

(E.D.N.Y. 2013) ("It is beyond cavil that [ ] conspiring to and actually falsifying police records, evidence, and testimony violates clearly established rights.... and [ ] no public official would think it was objectively reasonable to violate those rights."); *see also Coggins*, 776 F.3d 108 (affirming the district court's conclusion that qualified immunity was inappropriate); *Blake v. Race*, 487 F.Supp.2d 187, 214 (E.D.N.Y. 2007) ("The [Second Circuit] found qualified immunity unavailable because conspiring to fabricate and forward to prosecutors a known false confession 'violates an accused's clearly established constitutional right, and no reasonably competent police officer could believe otherwise.' ") (quoting *Ricciuti*, 124 F.3d at 130); *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) ("The right not to be arrested or prosecuted without probable cause has, of course, long been a clearly established constitutional right.").

**[123]** The City Defendants assert that the Officer Defendants are entitled to qualified immunity because a police officer who signs a supporting deposition under penalty of perjury may be entitled to qualified immunity from a malicious prosecution claim if he reasonably relied on the statement of a witness. *See, e.g., Jean–Laurent v. Bowman*, 2014 WL 4662221, at *4 (citing *Loria v. Gorman*, 306 F.3d 1271, 1289–90 (2d Cir. 2002)). However, because Plaintiff contends that Dr. Kupferman's and Dr. Landi's diagnoses of Annie's condition and the cause of her death were "entirely unsupported and unsupportable by any medical science or clinical or forensic evidence" (*see* Am. Compl. ¶¶ 150, 160), the Court cannot determine at this point whether it was reasonable for the officers—some of whom are members of the NYPD Child Abuse Squad—to rely on the statements of witnesses, such as Dr. Kupferman or Dr. Landi. Moreover, Plaintiff alleges that the Officer Defendants (and Dr. Kupferman) ignored her claims of innocence out of "unconcealed and unrestrained racism" (Am. Compl. ¶ 114), and that this led to her arrest and prosecution. No reasonable officer would believe seeking arrest and prosecution based on such improper motives was constitutional.

Additionally, in support of their argument, the City Defendants cite to *V.S. v. Muhammad*, 595 F.3d 426 (2d Cir. 2010). Although *V.S.* may seem similar to the instant case, the two are distinguishable in that the "reasonably objective" decision made by the defendants in *V.S.* was in a very different circumstance from the challenged conduct of the Officer Defendants here. In *V.S.*, the Second Circuit held that a caseworker at the New York City Administration of Child Services was entitled to qualified immunity because

she sought a court order permitting the removal of a child from the parent. *Id.* at 431. On summary judgment, the district court found that qualified immunity could not be granted given the plaintiff's allegation that the caseworker had relied on a diagnosis **\*643** by a doctor who was known to have repeatedly misdiagnosed children's injuries as evidence of child abuse. *Id.* at 431 (district court reasoned that "reliability of [the doctor's] diagnosis ... is an issue of material fact that goes directly to the objective reasonableness of the caseworker in seizing and removing the child from his mother"). The Second Circuit reversed the district court's decision on qualified immunity, holding that "to impose on [a] caseworker the obligation in such circumstances of assessing the reliability of a qualified doctor's past and present diagnoses would impose a wholly unreasonable burden of the very kind qualified immunity is designed to remove." *Id.* However, in *V.S.*, the caseworker was making a time-sensitive decision to remove a child from a potentially dangerous and abusive environment. *See V.S. ex rel. T.S. v. Muhammad*, 581 F.Supp.2d 365, 388 (E.D.N.Y. 2008) (noting defendants' argument that "in light of [the doctor's diagnosis of injury caused by child abuse], the caseworker's belief in the imminent danger to the child was reasonable and their removal of [the child] into protective custody was justified"); *see also Cornejo*, 592 F.3d at 128–29 (recognizing that the caseworker defendants were forced to "choose between difficult alternatives" and were reasonable to believe that "immediate temporary removal" of the children from a potentially abusive environment was justified).

Here, in determining whether the officers reasonably believed that there was probable cause to prosecute Plaintiff, the Court notes that the decision to prosecute was not made under the same threat of imminent harm or time-sensitivity; there was no child to be protected from a potentially abusive parent, as the Lis' only child had already died. Nor was the decision to prosecute a temporary one. Moreover, in *V.S.*, the Second Circuit found that the caseworker's actions were reasonable because the doctor had diagnosed the child with SBS "*in the absence of any plausible alternative.*" *V.S.*, 595 F.3d at 431 (emphasis added). By contrast, Plaintiff alleges that there were several plausible alternative explanations to SBS as the cause of death, including that a genetic disorder and the child's prior medical history, that the Officer Defendants chose to ignore. (Am. Compl. ¶ 173.) Plaintiff also alleges that at some point, the Officer Defendants became aware of information that cast doubt on the medical opinions, including the SBS diagnosis, upon which the investigation was premised, but the officers failed to disclose that information to the prosecution

or consider it before deciding to prosecute Plaintiff or continue that prosecution. (*See, e.g.,* Am. Compl. ¶ 178.) At this stage, the Court must accept these allegations as true, and thus *V.S.* does not dictate that the Officers are entitled to qualified immunity.

Accordingly, the Court does not find that the Officer Defendants are entitled to qualified immunity as to Plaintiff's false arrest and malicious prosecution claims.

### C. Dr. Landi

The City Defendants contend that Dr. Landi is entitled to absolute and qualified immunity. (Dkt. 59 at 17.) Again, at this stage of the litigation, the Court finds it inappropriate to dismiss claims against Dr. Landi based on immunity.

#### 1. Absolute Immunity

In determining whether Dr. Landi's acitivity was investigative or prosecutorial, the Court applies a "functional approach" and looks to the function being performed rather than to the office or identity of the defendant. *See Cornejo, 592 F.3d at 127* (citing *Briscoe v. LaHue, 460 U.S. 325, 342, 103 S.Ct. 1108, 75 L.Ed.2d 96 (1983)*); *see also Warney v. Monroe Cnty., 587 F.3d 113, 121 (2d Cir. 2009)* (identifying prosecutorial immunity "not by the identity of **\*644** the actor but by reference to the 'function' performed"); *Ying Jing Gan v. City of New York, 996 F.2d 522, 530 (2d Cir. 1993)* (noting that immunity attaches to the "function performed, not [ ] the office itself").

In arguing that Dr. Landi is entitled to absolute immunity, the City Defendants rely heavily on *Newton v. City of New York, 738 F.Supp.2d 397 (S.D.N.Y. 2010)*. However, the Court does not find *Newton* to be applicable here. In *Newton,* the plaintiff, who had been convicted of rape, brought a civil rights action against a forensic scientist, employed by the Office of the Chief Medical Examiner of the City of New York, for allegedly failing to conduct proper DNA testing that would have exonerated the plaintiff. *Id.* at 400–03. The forensic scientist had conducted a DNA test three years after the plaintiff was convicted for a court-ordered adversarial post-conviction proceeding. The district court held that the scientist was entitled to absolute and qualified immunity. *Id.* at 411, 416. However, in granting absolute immunity, the court stated that "the protection of absolute immunity may not be appropriate in a pre-conviction context where

the jury's determination of guilt may result from a faulty scientific process, and where the laboratory scientist's role is primarily an investigative one." *Id.* at 411. That distinction is critical here, given that Dr. Landi, unlike the forensic scientist in *Newton,* was involved in Plaintiff's criminal case in a *pre*-conviction context and is alleged to have provided false statements and analyses in support of the criminal complaint and the NYPD's investigation.

**[124]** Based on the allegations in the Complaint, the Court cannot find, as a matter of law, that Dr. Landi was acting in a prosecutorial role rather than an investigatory one. *See Hill v. City of New York, 45 F.3d 653 (2d Cir. 1995)* ("[W]hen it may not be gleaned from the complaint whether the conduct objected to was performed ... in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss."); *see also Wilkins v. Herky,* No. 11-cv-6104, 2013 WL 2385065, at *7 (W.D.N.Y. May 29, 2013)* ("[I]t is appropriate to address absolute immunity in a 12(b)(6) context *if the complaint clearly indicates the nature of the function for which the defendant is being sued....*" (emphasis added)); *also compare Newton, 738 F.Supp.2d at 408, 412* (noting that the defendant-scientist was entitled to absolute immunity because the scientists' role in the plaintiff's criminal case was in an advocacy capacity and *not* for the purpose of identifying potential suspects) *with Cornejo, 592 F.3d at 128* (finding that the district court was incorrect to find that a caseworker was entitled to absolute immunity because the caseworker's initiation of the child's removal from his mother's custody was functionally equivalent to police officers making arrests in criminal cases).

#### 2. Qualified Immunity

The City Defendants also argue that Dr. Landi is entitled to qualified immunity because she did not violate Plaintiff's Fourth Amendment rights. (Dkt. 59 at 19.) The City Defendants contend that Dr. Landi could not have falsely arrested or maliciously prosecuted Plaintiff and thus there was no violation of Plaintiff's clearly established constitutional right. (*Id.*) However, the Court has ruled that Plaintiff's malicious prosecution claim will, in fact, proceed against Dr. Landi and several Officer Defendants. Furthermore, Plaintiff's claims against Dr. Landi are not limited to false arrest and malicious prosecution. For example, as previously discussed, Plaintiff also asserts fair trial claims, based on alleged fabrication of evidence and concealment of

exculpatory evidence, against Dr. **\*645** Landi. Accordingly, the Court cannot find, at this time, that Dr. Landi is entitled to qualified immunity.

### D. Dr. Kupferman Is Not Entitled to Statutory Immunity

[125] The Medical Center Defendants assert that Dr. Kupferman is entitled to statutory immunity under the New York Child Protective Services Act. (Dkt. 55 at 2–3.)

Section 413 of the Child Protective Services Act requires physicians, such as Dr. Kupferman and FHMC's staff, to report suspected child abuse if they have "reasonable cause" to believe that a child has been abused. *See* N.Y. Soc. Serv. Law § 413(1)(a) (McKinney). Failure to report a case of suspected child abuse is a class A misdemeanor. N.Y. Soc. Serv. Law § 420 (McKinney). Section 419 of the Child Protective Services Act provides good faith immunity from any liability to individuals who report suspected cases of child abuse. That section states in pertinent part:

> Any person, official or institution participating in good faith in ... the making of a report [of suspected child abuse] ... pursuant to this title shall have immunity from any liability, civil or criminal, that might otherwise result by reason of such actions. For the purpose of any proceeding, civil or criminal, the good faith of any such person, official or institution required to report cases of child abuse or maltreatment ... shall be presumed....

Contrary to the Medical Center Defendants' assertion, the Court does not find *Thomas v. Beth Israel Hospital Inc.,* 710 F.Supp. 935 (S.D.N.Y. 1989) to be particularly relevant. In *Thomas*, the court held that the defendant-physician who examined an infant and reported suspected child abuse had immunity under Section 419 of the Child Protective Services Act because the physician had "reasonable cause" to suspect abuse when the examination revealed multiple abrasions and black and blue marks. *Id.* at 941–42. In contrast to *Thomas*, however, Plaintiff alleges that Dr. Kupferman's role went beyond simply reporting suspected child abuse. Plaintiff alleges that Dr. Kupferman took on an active role

in investigating the Lis. (*See* Am. Compl. ¶ 115 (Kupferman "repeatedly screamed at [the Lis] that they killed their daughter...."); Am. Compl. ¶ 120 ("Kupferman conducted a 'forensic interview' of plaintiff.")).

Similarly, the Court is not convinced by the Medical Center Defendants' reliance on *Storck v. Suffolk County Dep't of Social Servs.,* 62 F.Supp.2d 927, 946 (E.D.N.Y. 1999) because, there, the court "clearly" found that the defendant doctors were acting "in the discharge of their duties and within the scope of their employment." Here, Plaintiff's allegations, accepted as true, suggest that Dr. Kupferman's conduct may have exceeded the scope of her employment with FHMC. (*See, e.g.,* Am. Compl. ¶ 157 (Kupferman "acted as a deputy of the *NYPD* and the *Queens County D.A.'s Office*" (emphasis in original)); Am. Compl. ¶ 161 (Kupferman "played an active role in the prosecution of Ying Li ... that went well beyond her role, and into ancillary and forensic aspects of determining motive, culpability, and the veracity of Ying Li.").) Moreover, Plaintiff alleges that Dr. Kupferman's determination that Annie died of SBS was "such a substantial departure from accepted professional judgment, practice, or standards" (Am. Compl. ¶ 235), and that Dr. Kupferman failed to consider other pertinent information that might have suggested alternative causes for Annie's death (*see, e.g.,* Am. Compl. ¶ 122). Taking these allegations as true, such alleged acts "go beyond mere error and amount to willful misconduct," and thus Dr. Kupferman would not be entitled to statutory immunity based on the lack of **\*646** "good faith". *See* Section 419 of the Child Protective Services Act; *see also Estiverne v. Esernio–Jenssen,* 581 F.Supp.2d 335, 347 (E.D.N.Y. 2008) (allowing plaintiffs to proceed with discovery to prove their allegations of bad faith on the part of the Medical Center Defendants and denying statutory immunity, given that plaintiff alleged that the defendant-doctor's "diagnosis of child abuse was not supported by *any* medical evidence ... [and] that she disregarded the medical assessment of a colleague.").

Accordingly, because the Court cannot determine at this time whether Dr. Kupferman enjoys immunity under the Child Protective Services Act, the Court denies the Medical Center Defendants' motion to dismiss the claims against Dr. Kupferman on the ground that she is statutorily immune.

### XIV. LEAVE TO AMEND

Plaintiff has requested leave to amend her complaint in the event any of her claims are dismissed. For the reasons discussed below, the Court denies that request in its entirety.

**[126]**     **[127]** Federal Rules of Civil Procedure 15(a) provides that a court "should freely give leave [to amend] when justice so requires." "Although 'it is the usual practice upon granting a motion to dismiss to allow leave to replead, such leave should be denied where the proposed amendment would be futile.' " *S.B. v. City of New York*, No. 14-CV-1021, 2016 WL 4530455, at *18 (E.D.N.Y. Aug. 29, 2016) (citation and quotation marks omitted); *see also Hill v. Curcione*, 657 F.3d 116, 123 (2d Cir. 2011). An amendment to a pleading is considered futile if the claim is time-barred due to the expiration of the applicable statute of limitations period. *See, e.g.,* Kwon v. Santander Consumer U.S.A., No. 15-CV-3352, 2016 WL 6518578, at *6 (E.D.N.Y. Oct. 6, 2016) (dismissing with prejudice claims that are time-barred while allowing the plaintiff to replead his other claims); *Johnson v. New York City Police Dept.*, 651 Fed.Appx. 58 (2d Cir. 2016) (summary order) (affirming district court's dismissal of the plaintiff's Section 1983 claims "without granting him an opportunity to amend or discussing whether leave to amend would be appropriate" because the three-year statute of limitations expired).

**[128]** First, the Court denies, as futile, leave to amend any time-barred claims and all claims against ADA Bishop, whom the Court has found is entitled to absolute immunity. *See, e.g.,* Harrison v. Cnty. of Nassau, No. 15-cv-2712, 2016 WL 4083381, at *6 (E.D.N.Y. Aug. 1, 2016) (denying leave to replead claims against ADAs "because it is clear that all of plaintiff's allegations relate to their involvement in [plaintiff's] prosecution and are therefore protected by absolute immunity"); *Johnson*, 651 Fed.Appx. at 61 (finding leave to amend would be futile where the district court found the prosecutor was entitled to absolute immunity); *Contreras v. Perimenis*, 562 Fed.Appx. 50 (Summary Order) (2d Cir. 2014) (same).

Second, the Court exercises its discretion to deny Plaintiff leave to amend as to the other claims that the Court has dismissed. *Avent v. Doe*, No. 2008 WL 877176, at *14 (N.D.N.Y. Mar. 31, 2008) ("Plaintiff has already filed one amended complaint in this action, and this court has found that the complaint does not state a claim[.]"). The Court already permitted Plaintiff the opportunity to amend the complaint, and, in fact, at the pre-motion conference held in connection with Defendants' motions to dismiss, urged Plaintiff to correct the deficiencies identified in Defendants' pre-motion conference requests and at the conference, and to pare down her claims to only viable ones. However, as noted throughout this decision, Plaintiff **\*647** did not heed the Court's advice, nor make good use of that opportunity to prune her complaint of invalid claims or to add useful or relevant factual allegations or particularity to her complaint, which is currently 275 paragraphs. To allow Plaintiff to attempt to amend her complaint again would be an act of futility and a waste of resources. The Court therefore denies Plaintiff leave to amend her complaint a second time.

In summary, the following claims are dismissed:

• Count 1 (False Arrest and Imprisonment)—as to all Defendants;

• Count 2 (Malicious Prosecution)—as to all Defendants, except Defendants Degnan and Landi, and the Medical Center Defendants;

• Count 3 (Malicious Abuse of Process)—as to all Defendants, except Defendants Degnan and Landi;

• Count 4 (Failure to Intervene)—as to all Defendants;

• Count 5 (Section 1983 Conspiracy)—as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, and Landi, and the Medical Center Defendants;

• Count 6 (Unreasonably Prolonged Detention)—as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

• Count 7 (Due Process)—as to all Defendants, except Defendants Degnan, Moser, Phelan, Heffernan, Landi, and Medical Center Defendants. However, the speedy trial aspects of Plaintiff's due process claim is dismissed as to the Medical Center Defendants. Moreover, Plaintiff's due process claim of failure to investigate and conditions of confinement are dismissed as to all Defendants.

• Count 10 (State Constitution)—as to all Defendants.

## CONCLUSION

For the reasons stated above, the City Defendants' motion to dismiss is GRANTED in part and DENIED in part. The Medical Center Defendants' motion to dismiss is GRANTED in part and DENIED in part. Plaintiff shall proceed on the following claims:

• Malicious Prosecution against Defendants Degnan, Landi, and the Medical Center Defendants;

- Malicious Abuse of Process against Defendants Degnan and Landi;

- Section 1983 Conspiracy against Defendants Degnan, Moser, Phelan, Heffernan, Landi, and the Medical Center Defendants;

- Unreasonably Prolonged Detention against Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

- Due Process (*Brady* violation and fabrication of evidence) against Defendants Degnan, Moser, Phelan, Heffernan, and Landi, and the Medical Center Defendants;

- Due Process (speedy trial) against Defendants Degnan, Moser, Phelan, Heffernan, and Landi;

- *Monell* claims against the City and FHMC.

Given that several Defendants as to whom claims are proceeding are not yet represented (*see supra* footnote 1), Plaintiff shall by April 14, 2017 advise the Court in writing how she intends to proceed with respect to these Defendants.

SO ORDERED.

**All Citations**

246 F.Supp.3d 578

---

## Footnotes

1    The twelve individual NYPD Officer Defendants are Det. Matthew Degnan ("Det. Degnan"), Lt. Thomas Conforti ("Lt. Conforti"), Det. David Moser ("Det. Moser"), Lt. John Perdoch ("Lt. Perdoch"), Det. John Phelan ("Det. Phelan"), P.O. Yatyu Yam ("P.O. Yam"), Det. Sgt. Guisella Rodriguez ("Sgt. Rodriguez"), Lt. Arthur Hall ("Lt. Hall"), Det. Michael Heffernan ("Det. Heffernan"), Sgt. Timothy Cai ("Sgt. Cai"), Det. Douglas Lee ("Det. Lee"), Det. Dennis Chan ("Det. Chan"), Sgt. "FNU" Manfredi ("First Name Unknown") ("Sgt. Manfredi").

     Of these individual Officer Defendants, Dets. Moser, Phelan, Heffernan, and Sgt. Manfredi are not represented. (Dkt. 69.)

2    The Court takes the allegations in the Amended Complaint as true, as it must on a motion to dismiss under FRCP 12. *See EEOC v. Port Auth. of New York & New Jersey,* 768 F.3d 247, 253 (2d Cir. 2014) ("[W]e accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff.").

3    A medical report from that day indicated that Annie had no external signs of trauma. (Am. Compl. ¶ 98.)

4    The Amended Complaint does not indicate where these interviews occurred. (Am. Compl. ¶¶ 112–15.)

5    SBS is "a devastating form of child abuse caused by violently shaking a baby, resulting in traumatic brain injury, which is characterized by a constellation of injuries including subdural hematomas (i.e. bleeding in the brain), retinal hemorrhages, rib fractures and long-bone fractures." *Phelan ex rel. Phelan v. Torres,* 843 F.Supp.2d 259, 261 (E.D.N.Y. 2011) (citing, *inter alia,* Shaken Baby Syndrome, Medline Plus Medical Encyclopedia, a service of the U.S. National Library of Medicine, National Institutes of Health ("Medline Plus"), http://www.nlm.nih.gov/medlineplus/ency/article/000004.htm). However, some courts have acknowledged that there is an "emergence of a legitimate and significant dispute within the medical community as to the cause of [ ] injuries" that used to be attributed to SBS. *See State v. Edmunds,* 308 Wis.2d 374, 746 N.W.2d 590, 599 (Wis. Ct. app. 2008); *see also Cavazos v. Smith,* 565 U.S. 1, 132 S.Ct. 2, 181 L.Ed.2d 311 (2011) (Ginsburg, J., dissenting) ("What is now known about shaken baby syndrome (SBS) casts grave doubt on the charge leveled against [petitioner].")

6    As an initial matter, the Court cautions Plaintiff's counsels that their scatter-shot, kitchen-sink approach to this litigation thus far has done a great disservice to her client's case. Plaintiff's 275–paragraph Amended Complaint indiscriminately asserts eight of her ten claims against every single Defendant, even though, as discussed herein, these claims clearly should not have been brought against many of these Defendants, and many of these Defendants should not have been named at all. Despite the Court's repeated suggestions at the pre-motion conference that Plaintiff's counsel focus on developing meritorious claims and arguments, and consider pruning this action of non-viable claims, Plaintiff not only persisted with all of her claims, but doubled down on her helter-skelter approach by responding to Defendants' motions to dismiss with two separate Memoranda of Law ("MOLs") with internal editing notes left for the Court to read, place-holders for citations, and multiple grammatical errors. (*See, e.g.*, Dkt. 61 at 22 n.36; *id.* at 41; Dkt. 66 at 29). "Not only does the 'kitchen sink' approach to briefing cause distraction and confusion, it also 'consumes space that should be devoted to developing the arguments with some promise.' " *Dynegy Marketing & Trade v. Multiut Corp.*, 648 F.3d 506, 512 (7th Cir. 2011) (citation omitted). Indeed, here, the Court has had to struggle to tease out of Plaintiff's MOLs legally coherent and supported positions. While the Court has done so in order to comply with its duty *at this stage* to view the complaint in the light most favorable to Plaintiff, it will not be so forgiving as this case progresses.

7    Citations to "ECF" refer to the pagination generated by the Court's electronic docketing system and not the document's internal pagination.

8    The Amended Complaint repeatedly refers to the criminal complaint in alleging Plaintiff's fabrication of evidence and malicious prosecution claims. (*See, e.g.*, Am. Compl. ¶ 145 ("Defendant DEGNAN signed the criminal court complaint ... despite his knowing that there was no truth to those allegations...."); Am. Compl. ¶ 146 (alleging that the criminal court complaint was based on fabricated information provided to the District Attorney's Office; Am. Compl. ¶ 150 (alleging that Dr. Landi made a false statement in the criminal complaint)). Plaintiff also alleges that Dr. Landi made a false statement in the criminal complaint that Annie may have been saved had Plaintiff sought medical care for Annie sooner. (Am. Compl. ¶ 150.)

9    *See also McLoughlin v. People's United Bank, Inc.*, 586 F.Supp.2d 70, 73 (D. Conn. 2008) ("The Court may take judicial notice of the press releases of government agencies" (citing *In re Zyprexa Products Liability Litigation*, 549 F.Supp.2d 496, 501 (E.D.N.Y. 2008))); *Mitchell v. Home*, 377 F.Supp.2d 361, 367 n.1 (S.D.N.Y. 2005) ("The press release [from the New York Attorney General] may be considered on this motion to dismiss because ... this Court may take judicial notice of it as a matter of public record[.]"); *Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007) ("If the court takes judicial notice, it does so in order to determine what statements they contained—but ... not for the truth of the matters asserted.").

10    Moreover, Plaintiff's counsel has also represented to the Court that she has used one of the press releases in order to identify the named Defendants (*see* 1/7/2016 Pre–Motion Conference Transcript), and the Court therefore may consider at least one of the press releases to be "integral" to the Complaint. *See Sira*, 380 F.3d at 67. The Court, however, will not consider the new factual assertions Plaintiff makes in her opposition papers. *See Green v. City of Mount Vernon*, 96 F.Supp.3d 263, 285 (S.D.N.Y. 2015) (citing, *inter alia*, *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988) ("Factual allegations contained in legal briefs or memoranda are also treated as matters outside the pleading[s] for purposes of Rule 12(b).")).

11    Though Plaintiff alleges a claim of failure to intervene in her arrest and prosecution, the allegation that Sgt. Manfredi simply was present at the precinct when the Lis were brought there by Det. Phelan is still not enough to plausibly allege that Sgt. Manfredi was aware of the circumstances relating to Plaintiff's arrest or detention, such that he had a duty to intervene.

12    Plaintiff alleges that P.O. Yam interpreted on October 23, 2007 (Am. Compl. ¶¶ 101–06), that Sgt. Cai interrogated Hang Bin Li on October 29, 2007 (Am. Compl. ¶ 126), and that Det. Chan "served as an

interpreter" from the afternoon of October 24, 2007, until the morning of October 25, 2007, when Heffernan and Moser interrogated the Lis (Am. Compl. ¶ 112).

13    Plaintiff also alleges a false imprisonment claim under Section 1983. However, the Court does not address this claim separately, because pursuant to New York law, false arrest and false imprisonment are "synonymous." *Posr v. Doherty,* 944 F.2d 91, 96 (2d Cir. 1991); *see also Singer,* 63 F.3d at 118 ("The common law tort of false arrest is a species of false imprisonment." (citing *Broughton v. State,* 37 N.Y.2d 451, 456, 373 N.Y.S.2d 87, 335 N.E.2d 310 (1975))).

14    Although Plaintiff has not alleged in her Amended Complaint when she made her initial appearance in State court or when she was arraigned on the indictment, given her March 2008 arrest and incarceration date, her arraignment clearly took place long before March 2012.

15    The Court recognizes that "the application of the doctrine of equitable tolling is not limited to [fraudulent concealment]." *Valdez ex rel. Donely v. U.S.,* 518 F.3d 173, 183 (2d Cir. 2008). However, based on Plaintiff's articulation of why equitable tolling should be granted, it is clear that she is seeking equitable tolling based on fraudulent concealment. Plaintiff's MOL also mentions "equitable estoppel," which is applicable "where the plaintiff knew of the existence of the cause of action, but the defendant's conduct caused plaintiff to delay in bringing suit." (Dkt. 66 at 7 n.7 (citing, *inter alia, Cerbone v. Int'l Ladies' Garment Workers' Union,* 768 F.2d 45, 49–50 (2d Cir. 1985)).) However, equitable estoppel is inapplicable here, because Plaintiff's theory is that she was *unaware* of her false arrest claim, not that she was aware of it, but Defendants' conduct caused her to delay bringing the claim. (*See* Am. Compl. ¶ 209; *see also* Dkt. 66 at 7 (asking the Court to toll the statute of limitations until 2013, "when Plaintiff *became aware*-that she had, in fact, been falsely arrested...." (emphasis added)).)

16    In fact, there is a discrepancy between what Plaintiff argues in her MOL and what she alleges in the Complaint regarding the suppressed or concealed information that warrants equitable tolling. In the Complaint, Plaintiff alleges that Dr. Landi stated that Plaintiff's failure to get earlier medical care contributed to Annie's death. (Am. Compl. ¶ 150.) But in her MOL, she attributes that statement to Dr. Kupferman. (Dkt. 66 at 7 ("Plaintiff relied on false statements made by Kupferman that Annie's death was caused by Ying Li not obtaining lifesaving medical attention for Annie, and that had she come to the hospital sooner, she could have saved Annie.")).

17    Osteogenesis imperfecta is "a group of genetic disorders that mainly affect the bones. The term 'osteogenesis imperfecta' means imperfect bone formation. People with this condition have bones that break easily, often from mild trauma or with no apparent cause. Multiple fractures are common, and in severe cases, can occur even before birth.... The milder forms of osteogenesis imperfecta ... are characterized by bone fractures during childhood and adolescence that often result from minor trauma.... Other types of osteogenesis imperfecta are more severe, causing frequent bone fractures that may begin before birth and result from little or no trauma.... The most severe forms of osteogenesis imperfecta ... can include an abnormally small, fragile rib cage and underdeveloped lungs. Infants with these abnormalities have life-threatening problems with breathing and often die shortly after birth." *See https://ghr.nlm.nih.gov/condition/osteogenesis-imperfecta* (Last visited 3/25/2017.)

18    Because Plaintiff's false arrest claim is time-barred, the Court does not address the Defendants' argument that there was probable cause to arrest Plaintiff.

19    The Second Circuit in *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110 (2d Cir. 1995), left open the possibility of a plaintiff bringing a malicious prosecution claim premised on some other constitutional right. *Id.* at 116 n.5 ("It is theoretically possible ... for a plaintiff to premise a malicious prosecution claim on some other constitutional

right. Where that is the case, it will be the standard governing that right that will determine whether there has been a constitutional violation.")

20   "The Fourth Amendment right implicated in a malicious prosecution action is the right to be free of unreasonable seizure of the person—*i.e.*, the right to be free of unreasonable unwarranted restraints on personal liberty. A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must therefore show some deprivation of liberty consistent with the concept of 'seizure.' ... To maintain a § 1983 claim for malicious prosecution under the Fourth Amendment, the deprivation of liberty—the seizure—must have been effected 'pursuant to legal process.' " *Singer*, 63 F.3d at 116–17.

21   The Court notes that Plaintiff's opposition did little to assist the Court in resolving this issue. In her response, Plaintiff directed the Court to thirty paragraphs in the Amended Complaint, many of which did not allege facts related to whether the City Defendants initiated Plaintiff's prosecution. (*See* Dkt. 61 at 10 (citing to paragraphs 168–198 of the Amended Complaint).) For example, paragraph 179 states, "As plaintiff did not commit or aid/abet in the any of the offenses with which she was charged, she pleaded not guilty to all counts, and bail was set at $250,000." (Am. Compl. ¶ 179.) This plainly has nothing to do with whether Plaintiff has adequately alleged, for each of the City Defendants, participation in the prosecution. Plaintiff is reminded that "[w]hile the trial court has discretion to conduct an assiduous review of the record in an effort to weigh the propriety of granting a summary judgment motion, it is not required to consider what the parties fail to point out." *Monahan v. New York City Dep't of Corrections*, 214 F.3d 275, 292 (2d Cir. 2000) (quotations and citations omitted); *see also 24/7 Records, Inc. v. Sony Music Entertainment, Inc.*, 429 F.3d 39, 46 (2d Cir. 2005).

22   At this stage, the Court need not decide whether the termination of Plaintiff's criminal case was, in fact, a favorable one; rather, the only issue before the Court is whether Plaintiff has sufficiently *alleged* a favorable termination. *See Bacquie v. City of New York*, No. 99 CIV10951, 2000 WL 1051904, at *3 (S.D.N.Y. Jul. 31, 2000).

23   The Medical Center Defendants cite *Singer*, 63 F.3d 110, in support of their argument. (Dkt. 56 at 5.) However, as discussed below, because the New York Court of Appeals decision in *Cantalino* largely negates this aspect of *Singer,* the Court does not address *Singer*. In any event, the Medical Center Defendants need not rely on *Singer*, given the numerous federal court decisions, including one by the Second Circuit, reaching the same conclusion as *Singer.*

24   Significantly, reiterating part of its holding in *Smith–Hunter*, the Court of Appeals in *Cantolino* stated, "[t]o be sure, there are circumstances where a dismissal in the interest of justice is inconsistent with innocence because it represents 'mercy requested or accepted by the accused' ". 96 N.Y.2d at 396, 729 N.Y.S.2d 405, 754 N.E.2d 164 (quoting *Smith–Hunter*, 95 N.Y.2d at 197, 712 N.Y.S.2d 438, 734 N.E.2d 750).

25   The Medical Center Defendants rely on decisions that define a favorable termination as one that "involves the merits and indicates the accused's innocence." *MacFawn v. Kresler*, 88 N.Y.2d 859, 644 N.Y.S.2d 486, 666 N.E.2d 1359, 1360 (1996); (*see* Dkt. 55 at 6–7) (citing *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995); *Singleton v. City of New York*, 632 F.2d 185, 193 (2d Cir. 1980), *Fulton v. Robinson*, 289 F.3d 188, 196 (2d Cir. 2002); *Hershey v. Goldstein*, 938 F.Supp.2d 491, 518 (S.D.N.Y. 2013)). However, the Court does not find this authority persuasive in light of *Smith–Hunter*, which implicitly rejected this position in favor of the principle that "a criminal proceeding is terminated favorably to the accused when 'there can be no further proceeding upon the complaint or indictment, and no further prosecution of the alleged offense' ", recognizing only a few exceptions to this rule. *Smith–Hunter*, 95 N.Y.2d at 195–96, 712 N.Y.S.2d 438, 734 N.E.2d 750 (noting as exceptions termination "inconsistent with innocence"; charges withdrawn pursuant to a voluntary compromise with the accused; and charges being dismissed out of mercy requested or accepted by the accused (citing *Robbins v. Robbins*, 133 N.Y. 597, 599, 30 N.E. 977 (1892))). Notably, *Smith–Hunter* also distinguished *MacFawn* on the basis that it involved a dismissal *without* prejudice, which also distinguishes

it from the instant case. *Id.* at 197, 712 N.Y.S.2d 438, 734 N.E.2d 750 (noting that *MacFawn* was "[f]ar from controlling in the case at hand" and "simply held that a plaintiff in a malicious prosecution action must show, as a threshold matter, that the criminal proceeding was *finally* terminated.") (emphasis in original).

Though the Court did not factor this into its decision, at the status conference in which the charges against Plaintiff were dismissed, Plaintiff explicitly refused any conditions, *i.e.*, any compromise (Dkt. 63–6, Ex. F at 3:22–24; *see* Smith–Hunter, 95 N.Y.2d at 196, 712 N.Y.S.2d 438, 734 N.E.2d 750 ("noting that an action terminated by settlement cannot sustain a malicious prosecution claim").)

26    Even if the Court were to consider the City Defendants' Exhibit B, the dismissal hearing transcript, and draws all inferences in favor of Plaintiff—as it must at this stage—the transcript indicates that dismissal of the criminal prosecution was with prejudice. (Ex. F, Dkt. 63–6 at 7:8–9.) While the transcript also includes the prosecution's explanation for why it is dismissing the charges (*see* Ex. F, Dkt. 63–6 at 5:29–6:18), it is inappropriate for the Court to interpret articulated reasons given by the prosecutor as the real motivation for the government's dismissal of the case. *See* Liang v. City of New York, 2013 WL 5366394, at *5; *see also* Nielsen, 746 F.3d at 62 (noting that the court must draw all reasonable inferences in favor of the plaintiff).

27    The Complaint also alleges that "Dr. Kupferman testified to the forensic interrogation she conducted with Ying Li ... [and] deliberately testif[ied] falsely under oath that 'If you read any book, it is a classical case of shaken baby syndrome.' Defendant Kupferman knew that these statements were false and misleading and contrary to all valid and reliable medical evidence." (Am. Compl. ¶ 160.)

28    In her Amended Complaint, Plaintiff alleges that despite Annie's "lab results ... consistent with metabolic bone disease[, an alternative explanation for Annie's injuries,] Dr. Kupferman made no effort to seek a diagnosis other than SBS." (Am. Compl. ¶ 122.) Plaintiff also alleges that Dr. Landi falsely "swore under oath in the criminal complaint" as to Annie's death and that her opinion was "largely based on the evidence" presented by Dr. Kupferman. (*Id.* ¶¶ 150–52.) From this, the Court can reasonably infer that Dr. Kupferman also provided false information that eventually was relayed to the prosecutor.

29    Paragraph 215 states, "Defendants, acting in concert and within the scope of their employment and authority, employed regularly issued process against plaintiff compelling the performance or forbearance of prescribed acts. The purpose of activating the process was intent to harm plaintiff without economic or social excuse or justification, and the defendants were seeking a collateral advantage or corresponding detriment to plaintiff which was outside the legitimate ends of the process. Such collateral objectives included, but were not limited to, using plaintiff as a bargaining chip to pressure Hang Bin Li to plead guilty and covering up defendants' illegal actions in knowingly arresting plaintiff without any legal basis, justification, or probable cause."

30    While Plaintiff may face a steep challenge in ultimately proving that the Medical Center Defendants colluded with the City Defendants to the extent of sharing the alleged goal of using Plaintiff as leverage against her husband, at this stage, the Court finds that she has sufficiently alleged facts to support a plausible inference of such a coordinated effort.

31    The Court discusses *infra* Defendants' claims of immunity with respect to all claims. In sum, the Courts finds that: (1) ADA Bishop is entitled to absolute immunity from all claims; (2) the Officer Defendants and Dr. Landi are not entitled to qualified immunity at this juncture; and (3) Dr. Kupferman is not entitled to statutory immunity. (*See infra* at Section XIII.)

32    Plaintiff withdrew her malicious abuse of process claim against the Medical Center Defendants. (*See* 1/7/2016 Minute Entry.)

33    *See, e.g., Pinter v. City of New York,* 976 F.Supp.2d 539, 569 (S.D.N.Y. 2013) (finding that there was a collateral objective for plaintiff's arrest where the defendant "us[ed] prostitution arrests for leverage in negotiations over nuisance abatement, without any apparent interest in conviction").

34    Although Plaintiff has not made this exact argument, the Court has the obligation at this stage to draw all reasonable inferences in Plaintiff's favor. *See Nielsen,* 746 F.3d at 62.

35    The Court also rules that, for the time being, her abuse of process claim can proceed on the basis of both collateral objectives, even though, as previously discussed, a claim based solely on the "cover-up" objective would have been time-barred. *See Bacchus v. New York City Bd. of Ed.,* 137 F.Supp.3d 214 (E.D.N.Y. 2015) (finding that "better course" was not to dismiss claim based on same evidence as surviving claims); *Thibodeaux v. Travco Ins. Co.,* 13–CV–5599, 2014 WL 354656, at *2 (E.D.N.Y. Jan. 31, 2014) ("If one of a number of integrally related causes of action have to be tried, it makes little sense to grant a motion to dismiss as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that the motion to dismiss was improperly granted.").

However, to the extent that Plaintiff argues in her MOL (Dkt. 61) that another "collateral motive ... [for Plaintiff's arrest was to obtain Hang Bin's confession because] such confessions are very valuable to promoting the City's agenda in promoting the truth of SBS science," Plaintiff will not be permitted to pursue this as part of her abuse of process claim, since there is nothing remotely related to this allegation in the Complaint, nor does Plaintiff cite to any paragraph in the Complaint to support this newly proffered objective.

36    By contrast, as discussed *infra,* the involvement of these detectives in the investigation is sufficient to state a claim against them for Section 1983 conspiracy, unreasonably prolonged detention, and violating some of Plaintiff's substantive due process rights.

37    In addition to the deficiencies the Court discusses here, the City Defendants also argue that the failure to intervene claim is time-barred. (Dkt. 59 at 23.) Specifically, they argue that "because the alleged constitutional violations were being committed 'by other police officers,' and such conduct necessarily would have taken place during or before plaintiff's arrest in March 2008, the three-year statute of limitations has run." (*Id.*) The Court finds this argument unclear and unpersuasive. Plaintiff's Complaint alleges constitutional violations that are not limited to false arrest, and it is conceivable that her constitutional rights were violated after March 2008 since she was in prison—awaiting trial—for over four years. (Am. Compl. ¶¶ 234, 236.) In any event, because Plaintiff's claim fails to include sufficient factual allegations, the Court cannot even determine whether the statute of limitations has expired as to virtually all of the Defendants. The Court also finds Plaintiff's response to the City Defendants' argument deficient at best. Plaintiff simply recites, in a footnote, the law that the statute of limitations for Section 1983 actions arising in New York is three years and that New York law determines the tolling of the limitations period while federal law determines when the claim accrues. (Dkt. 61 at 21 n.35.) This recitation of boilerplate law is in no way responsive or illuminating on the issue of whether Plaintiff's failure to intervene claim is time barred.

38    Plaintiff alleges that "[e]ach individual defendant had an affirmative duty to intervene on behalf of plaintiff, whose constitutional rights were being violated in that defendant's presence by other police officers, but failed to intervene to prevent the unlawful conduct, despite having had a realistic opportunity to do so, in violation of plaintiff's right under the First, Fourth, and Fourteenth Amendments to the United States Constitution." (Am. Compl. ¶ 219.)

39    Indeed, Plaintiff names every Defendant in all but her *Monell* and malicious abuse of process claims. (*See* Compl; *see also* Dkt. 61 at 21 ("Defendant Officers collectively caused Plaintiff's constitutional violations

and each of those officers also can be found liable for failing to intervene to prevent his fellow officers from committing those acts." (citation omitted)).)

40    Given the deficient pleading of Plaintiff's failure to intervene claim, the Court need not address the Medical Center Defendants' argument that, as a non-governmental hospital and a medical expert who provided testimony and information to the prosecuting authority, they had no affirmative duty to intervene to prevent the alleged false arrest, malicious prosecution, or abuse of process. (*See* Dkt. 55 at 10.)

41    Given that the parties have not, at this stage, delved into the issue of whether the Medical Center Defendants can be considered "joint actors" that can be held liable under Section 1983, the Court's finding that Plaintiff has adequately pled her conspiracy claim is limited to whether Plaintiff's claim overcomes a 12(b)(6) motion.

42    Though making this argument, Plaintiff does not, in fact, provide adequate citation to the Amended Complaint. For example, Plaintiff argues in her MOL that "Dr. Kupferman did not begin her extensive investigation notes imbedded in the medical records until October 25, 2007, two days after police were first notified of possible child abuse." (Dkt. 66 at 16.) However, she fails to provide relevant citation to the Amended Complaint to support this statement.

43    Furthermore, to the extent that Dr. Kupferman is alleged to have acted as an agent of FHMC, the hospital is also liable for the Section 1983 conspiracy. *See Niemann v. Whalen*, 911 F.Supp. 656, 664 (S.D.N.Y. 1996) (where bank employees who allegedly violated plaintiff's constitutional rights were acting as agents of defendant bank, plaintiff could bring § 1983 action against bank).

44    While the City Defendants cite to a string of cases in support of their argument that Plaintiff has failed to adequately plead a claim of unreasonable detention (*see* Dkt. 59 at 26), the courts in those cases dismissed the claim either at the stage of summary judgment or after a trial was conducted. *See Nzegwu v. Friedman*, No. 10-CV-02994, 2014 WL 1311428 (E.D.N.Y. Mar. 31, 2014); *Harewood v. Braithwaite*, 64 F.Supp.3d 384 (E.D.N.Y. 2014); *Thompson v. City of New York*, 603 F.Supp.2d 650 (S.D.N.Y. 2009); *Jackson v. City of New York*, 29 F.Supp.3d 161 (E.D.N.Y. 2014). Citations to such cases are not persuasive.

45    "The Supreme Court has never definitively held whether *Brady* is based on substantive or procedural due process. Nevertheless, it seems clear that it is a procedural due process aspect of the criminal defendant's right to a fair trial." Martin A. Schwartz, *The Supreme Court's Unfortunate Narrowing of the Section 1983 Remedy for Brady Violations*, Champion, May 2013 at 58, 59. As for Plaintiff's fabrication of evidence claim, it is unclear whether Plaintiff characterizes it as a procedural or substantive due process claim. (*See* Dkt. 66 at 20 ("Dr. Kupferman's actions [of fabricating evidence, *inter alia*,] deprived Plaintiff of the right to a fair trial under the doctrine of *procedural* due process." (emphasis added)); *but see* Dkt. 61 at 24–25 (first laying out the law of substantive due process and then immediately following it with a discussion of Plaintiff's claim of fabrication of evidence, among other claims).) Regardless, courts in this Circuit have characterized the right to be protected against the deprivation of liberty based on fabricated evidence as a procedural due process issue. *See Coffey*, 221 F.3d at 348–49 (the use of fabricated evidence amounts to a deprivation of liberty without due process); *see also Jean–Laurent v. Bowman*, No. 12-cv-2954, 2014 WL 4662221, at *12 (E.D.N.Y. Jul. 7, 2014); *Zachary v. City of Newburgh*, 13–cv–5737, 2014 WL 1508705, at *4–5 (S.D.N.Y. Apr. 1, 2014) (dismissing plaintiff's substantive due process claim but finding that plaintiff alleged a procedural due process claim based on fabricated evidence); *Maldonado v. City of New York*, No. 11-cv-3514, 2014 WL 787814, at *12 (S.D.N.Y. Feb. 26, 2014) (dismissing plaintiff's substantive due process claim but noting that plaintiff's fabrication of evidence claims may proceed "via the Fourth Amendment and the procedural component of the Fourteenth Amendment's Due Process Clause"); *Pinter v. City of New York*, 976 F.Supp.2d 539, 576 (S.D.N.Y. 2013) (recognizing a separate "fabrication-based due process claim").

46    Plaintiff's due process claim under *Brady* is distinct from her malicious prosecution claim. *See Fappiano*, 640 Fed.Appx. at 120–21 (differentiating plaintiff's malicious prosecution claim from his "fair trial" claim stemming from defendants alleged *Brady* violation); *Alexander v. McKinney*, 692 F.3d 553, 556–57 (7th Cir. 2012) (listing the elements of a malicious prosecution claim and the elements of a due process claim under *Brady*, and identifying lack of probable cause as a requirement only of the former).

47    Specifically, Plaintiff alleges that Defendants "created and fabricated evidence to create the appearance of probable cause to believe that plaintiff had abused her daughter[,] ... [and] developed and cultivated witnesses to testify falsely...." (Am. Compl. ¶ 233.)

48    As previously discussed, because the Amended Complaint does not allege direct involvement by all Defendants in the investigation of Plaintiff's case, these group pleadings are insufficient in themselves to state a fabrication of evidence claim as to those City Defendants as to whom there are no specific allegations of involvement.

49    The Medical Center Defendants also assert that even assuming that Dr. Kupferman diagnosed Annie with SBS and that she failed to consider alternative causes for Annie's death, Dr. Kupferman cannot be liable for violating Plaintiff's right to a fair trial because Plaintiff's indictment was based on her failure to seek timely medical attention and not based on Dr. Kupferman's opinions on the cause of Annie's death. (Dkt. 56 at 10.) The Court this argument unpersuasive as it is plausible that Dr. Kupferman's conclusion that Annie died of SBS proximately caused Plaintiff's indictment for failure to seek medical attention sooner.

50    This conclusion is not inconsistent with the Court's finding that the fact that Plaintiff might not have known until long after her arrest that there was evidence that could have supported her claim of innocence—such as Dr. Kupferman's contrary conclusion about the preventability of Annie's death—did not warrant equitable tolling. *See supra* at Section IV.B. In analyzing specifically the accrual of a fabrication of evidence claim, when Plaintiff learned of the alleged fabricated evidence *is* the triggering date, but not so for a claim of false arrest or malicious prosecution.

51    The City Defendants interpret Paragraph 235 of the Amended Complaint as stating a claim of professional malpractice, and argues that "such a claim is not cognizable under § 1983." (Dkt. 59 at 28–29; *id.* at 26 ("For good measure, [Plaintiff] appears to include a professional malpractice claim of sorts against defendants Landi, Kupferman and FHMC....").) This is a misunderstanding of Plaintiff's allegation. A more suitable reading of Plaintiff's allegation in Paragraph 235 would be that it is touching on the "professional judgment" standard that is discussed in the context of substantive due process claims. The Supreme Court has articulated this "professional judgment" standard in *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982). The Supreme Court held in *Youngberg* that State officials are liable for treatment decisions concerning involuntarily committed mental health patients only if the officials' decisions were "such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Id.* at 323, 102 S.Ct. 2452 (citation and quotation marks omitted).

52    In her MOL, Plaintiff argues that, "Plaintiff properly pleads that [the Medical Center] Defendants failed to exhaust all possibilities before rendering an SBS diagnosis and adopted an improper burden shifting presumption that presumes subdural hemorrhaging is caused by abuse. (FAC ¶¶ 122, 160, 208, 235, 257).... Kupferman's actions shocked the conscious [sic] because Plaintiff had the right to liberty protected under the Fifth Amendment and Kupferman and FHMC acted 'so outrageous [sic], that it may fairly be said to shock the contemporary conscience.' " (Dkt. 66 at 20–21 (citation omitted).) Plaintiff cites to one Middle District of Pennsylvania case, *Isbell v. Bellino*, 983 F.Supp.2d 492 (M.D.P.A. 2012), but does not discuss the case. Setting aside the fact that this case is not Second Circuit law, *Isbell* does not even support a finding that the protection of substantive due process creates an obligation for a government official to follow alternative

investigatory paths. Indeed, the court in *Isbell* concluded that where the plaintiff went "to the emergency room with an infant suffering from subdural hematomas, retinal hemorrhaging, reinoschisis, and rib fractures ... [and] the injuries were later revealed to have been caused by a Vitamin D deficiency and congenital rickets," the defendant's child abuse diagnosis *did not* shock the conscience. *Id.* at 500. The *Isbell* court also explained that "mere negligence or deliberate indifference on the part of the Defendants [under Third Circuit law was] insufficient to support a substantive due process claim." *Id.* at 499–500.

53    The Court is not persuaded by Plaintiff's reliance on *Russo v. City of Hartford*, 184 F.Supp.2d 169 (D. Conn. 2002) in attempting to distinguish her substantive due process failure-to-investigate claim from her Fourth Amendment claims. In *Russo*, the court stated, "[W]hile claims arising from a plaintiff's arrest and prosecution would fall within the scope of the Fourth Amendment, that Amendment would not cover a cause of action for government abuse of process in the investigation or pursuit of a suspect." *Id.* at 184. However, the plaintiff in *Russo* specifically argued that "allegations of a conspiracy to discredit him, jeering *after* his arrest, and continued harassment state a claim for substantive due process." *Id.* It also appears that the plaintiff in *Russo* alleged injury besides his arrest and prosecution that was caused by the defendant's violation of his substantive due process rights. *Id.* ("Supporting his substantive due process cause of action, Russo claims that the [defendants] conspired to ruin Russo's credibility...."). In contrast, the sole injury Plaintiff alleges here relating to her substantive due process violation claim is deprivation of liberty, *i.e.*, her arrest and incarceration. (*See* Am. Compl. ¶ 238.)

54    The overlap between Plaintiff's substantive due process failure to investigate and her Fourth Amendment claims is further evidenced by the Due Process section of the Amended Complaint, which begins with a paragraph stating, "By the conduct and actions described above, defendants ... violat[ed] rights secured to plaintiff by the Constitution of the United States ... including, but not limited to, Plaintiff's Fourth and Fourteenth Amendment rights." (Am. Compl. ¶¶ 231, 238) and closes with, *inter alia*, a paragraph that states, "Defendants' conduct precipitated and caused the sequence of events that *ultimately resulted in the deprivation of plaintiff's liberty*...." (Am. Compl. ¶ 238.)

55    Whether the alleged failure to investigate gives rise to a constitutional claim is far from clear. Courts have explained that failure to pursue a particular investigative path does not give rise to an independent due process claim apart from claims of false arrest, malicious prosecution, or violation of right to a fair trial. *See, e.g.*, *Blake v. Race*, 487 F.Supp.2d 187, 212 n.18 (E.D.N.Y. 2007) (rejecting an independent due process claim of failure to investigate and finding the allegations of failure to investigate should be regarded as part of plaintiff's false arrest and malicious prosecution claims); *Stokes v. City of New York*, No. 5-CV-0007, 2007 WL 1300983, at *6 (E.D.N.Y. May 3, 2007) ("[I]t is well-settled that there is no independent claim for a police officer's purported failure to investigate; rather, such allegations are considered, to the extent they are relevant, within the framework of claims for false arrest, false imprisonment, or malicious prosecution."); *Newton v. City of New York*, 566 F.Supp.2d 256, 278 (S.D.N.Y. 2008) ("[T]here is no constitutional right to an adequate investigation. Accepting [plaintiff's] allegations as true, his rights were violated as a result of the malicious prosecution, not the failure to investigate."); *McCaffrey v. City of New York*, No. 11-cv-1636, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) ("[A] 'failure to investigate' is not independently cognizable as a stand-alone claim.").

56    Specifically, Plaintiff alleges that every Defendant violated her due process right during her detention by (1) refusing to tell Plaintiff where her daughter's body was buried, (2) refusing the usual and customary medical services, including OB–GYN care, (3) forcing Plaintiff to give birth to her second daughter while handcuffed and shackled, (4) refusing Plaintiff the opportunity to breastfeed or bond with her infant daughter after childbirth, and (5) taking away Plaintiff's infant daughter two-and-a-half days after delivery. (Am. Compl. ¶ 236.) While Plaintiff argues that these deprivations constitute both a substantive and procedural due process violation (Am. Compl. ¶ 237), the Court need not decide whether these claims allege substantive or procedural

due process violations because they must be dismissed due to the lack of connection to any Defendant in this case.

57    To the extent Plaintiff has a viable claim based on the conditions of her confinement in a State correctional facility, that claim should have been brought against the State, the correctional facility, or the prison officials, not the prosecutor or police officers who handled Plaintiff's criminal case. *See, e.g., Women Prisoners of District of Columbia Dep't of Corrections v. District of Columbia,* 877 F.Supp. 634 (D.D.C. 1994), *modified in part on other grounds,* 899 F.Supp. 659 (D.D.C. 1995), *vacated in part and remanded on other grounds,* 93 F.3d 910 (D.C. Cir. 1996); *Nelson v. Correctional Medical Services,* 583 F.3d 522 (8th Cir. 2009) (en banc); *Brawley v. Washington,* 712 F.Supp.2d 1208 (W.D. Wash. 2010); *Zaborowski v. Dart,* No. 08–cv–6946, 2011 WL 6660999 (N.D. Ill. Dec. 20, 2011); *Villegas v. Metropolitan Govt. of Nashville,* 709 F.3d 563 (6th Cir. 2013).

58    It appears that Plaintiff is also arguing that the City's failure to train its employees as to SBS is consistent with the custom of zealously promoting a diagnosis of SBS. (*See* Dkt. 61 at 28 ("Instead of training its Detectives on diligently and cautiously investigating SBS cases to avoid constitutional violations[,] ... the District Attorney's Office, in conjunction with the Office for the Chief Medical Examiner puts on yearly conferences advocating for the continued finding of SBS.").)

59    The City also denies Plaintiff's allegation that the police abdicated their investigatory obligations to medical professionals when arresting Plaintiff, and her allegation that Defendants were deliberately indifferent. (*Id.* at 31.)

60    The Amended Complaint includes many more allegations in support of Plaintiff's *Monell* claim that are generally conclusory, insufficient, or irrelevant. For example, she alleges that, "[t]he foregoing customs, policies, practices ... include, but are not limited to, making arrests without probable cause, initiating and continuing prosecutions without probable cause, and committing perjury." (Am. Compl. ¶ 243). She also alleges that the City failed to properly instruct Defendants on the "proper and prudent use of force" (*id.* ¶ 248).

61    In *Rojas v. Alexander's Dept. Store, Inc.,* 924 F.2d 406 (2d Cir. 1990), the Second Circuit explicitly extended *Monell* to Section 1983 suits against private entities. *Id.* at 408–09 ("Private employers are not liable under § 1983 for the constitutional torts of their employees, unless the plaintiff proves that 'action pursuant to official ... *policy* of some nature caused a constitutional tort.' Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses." (quoting *Monell* )).

62    FHMC argues that Plaintiff's *Monell* claim is deficient because: (1) Plaintiff fails to allege the existence of a policy or custom; (2) Plaintiff puts forth an implausible allegation that "a private hospital dedicated to the well-being of its patients had a policy and procedure for its staff 'to reach non-medical conclusions' 'in order to see those accused of SBS [ ] arrested, prosecuted, and convicted, despite the lack of any evidence connecting them with any crime whatsoever' "; (3) Plaintiff fails to sufficiently allege a *Monell* claim based upon failure to train; (4) co-Defendants' actions were an intervening cause; (5) "by requesting discovery to determine whether FHMC 'even had a policy in place' for diagnosing and investigating child abuse and SBS cases," Plaintiff has acknowledged that she has no basis to support a *Monell* claim against the hospital; (6) Plaintiff has not alleged facts that Dr. Kupferman was a policymaker; and (7) Plaintiff has not alleged well-settled "custom or usage" to imply the acquiescence of policymaking officials at FHMC because she has not alleged that anyone other than Dr. Kupferman at FHMC engaged in allegedly unconstitutional actions. (*See* Dkt. 56 at 12–15.) The Court explicitly addresses some of these arguments, but has considered FHMC's other arguments and deemed them meritless or irrelevant at this stage.

63    Although Plaintiff argues that Dr. Kupferman was a policymaker with final authority because she was a Child Abuse Specialist and "was the Director of Continuity Clinics" at FHMC with "responsibility to overview patient care and training of residents" (Dkt. 66 at 26), none of this is alleged in the Complaint. It is thus improper

for the Court to consider such factual allegations in deciding the motion to dismiss. *See Green v. City of Mount Vernon*, 96 F.Supp.3d 263 (S.D.N.Y. 2015) (collecting cases in which the court declines to consider additional facts set forth in plaintiff's opposition papers that are not in the complaint).

64    FHMC asserts that because Plaintiff only alleges facts as to Dr. Kupferman's unconstitutional actions pertaining to this particular case, there could be no policy or custom inferred on the part of FHMC. (Dkt. 56 at 13.) However, at this stage, given Plaintiff's allegation that Dr. Kupferman, on multiple occasions, overzealously diagnosed SBS and ignored contradictory evidence, the Court finds that the claim survives the Medical Center Defendants' 12(b)(6) motion.

65    Notably, Plaintiff does not even acknowledge *Rojas* and instead "respectfully requests this Court to line with the 7th Circuit [ ] and find FHC liable under the theory of *respondeat superior.*" (Dkt. 66 at 22.)

66    Furthermore, the Court does not find that Plaintiff's allegation that ADA Bishop "encouraged and, in effect, deputized Drs. LANDI and KUPFERMAN to forensically and factually investigate the case against the [Lis]" (Am. Compl. ¶ 170) creates a plausible inference that ADA Bishop acted in an investigative or administrative capacity. Plaintiff provides no factual or legal support for her "deputization" theory. This allegation is simply too conclusory to pierce the grant of absolute immunity here.

67    Although the City Defendants do not specify which claims they direct their qualified immunity defense against, to the extent they assert the defense based on the existence of probable cause, the defense goes to Plaintiff's claims of false arrest and malicious prosecution. (*See* Dkt. 59 at 12–27.)

---

End of Document                                                 © 2025 Thomson Reuters. No claim to original U.S. Government Works.